UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 26-01087-FMR |
| CHS FL, LLC, *et al.*, | Chapter 11 |
| Debtors. | (*Jointly Administered*) |
| THE STATUTORY UNSECURED CLAIMHOLDERS COMMITTEE and MICHAEL GOLDBERG, as Chapter 11 Trustee and Representative of the Estates of CHS FL, LLC, et al., | Adv. Pro. No. ______________________ |
| Plaintiffs, | |
| v. | |
| M2 LOANCO, LLC and M2 HOLDCO, LLC, | |
| Defendants. | |

**PLAINTIFFS' (A) OBJECTION TO THE PROOF OF CLAIM FILED BY M2 LOANCO, LLC; AND (B) COMPLAINT FOR DISALLOWANCE, RECHARACTERIZATION, EQUITABLE SUBORDINATION, AND LIEN AVOIDANCE**

The Statutory Unsecured Claimholders Committee (the "**Committee**"), appointed in the above-captioned chapter 11 cases of CHS FL, LLC, et al. (collectively, the "**Debtors**" or "**YesCare**"), and Michael Goldberg, as Chapter 11 Trustee and Representative of the Estates of the Debtors (the "**Trustee**" and, together with the Committee, "**Plaintiffs**"), object to the proof of claim (the "**Claim**") filed by M2 LoanCo, LLC ("**M2**" or "**M2 LoanCo**"), asserting a secured claim of approximately $16,204,259 against the Debtors' estates, and bring this complaint (the

"**Complaint**") against M2 LoanCo and M2 HoldCo, LLC ("**M2 HoldCo**"; together, the "**Defendants**")[1], and allege as follows:

## NATURE OF ACTION AND PRELIMINARY STATEMENT

1. M2 is not the secured lender it purports to be. It is the instrument through which Isaac Lefkowitz ("**Lefkowitz**") — who controlled the Debtors and M2 at the same time — looted the Debtors to the tune of over one hundred million dollars. While Lefkowitz siphoned money to insiders, employees lost paychecks, vendors went unpaid, patient care collapsed, and operations unraveled. Lefkowitz now seeks to use M2's purported secured claim to soak up any remaining value in the estates, prevent usage of cash to investigate his vast campaign of insider malfeasance, and obtain priority over every legitimate creditor these cases are designed to protect. The employees, vendors, and patients are the creditors here, not M2.

2. The M2 debt was not a true debt even before Lefkowitz acquired it. In June 2020, the Flacks Group acquired both Corizon's operations and its existing debt as a distressed investment, paying no more than $1 million in cash—and possibly as little as $1—plus $10 million in notes, $5 million of which was funded with the Debtors' own money. As part of that acquisition, Flacks created the M2 HoldCo structure: M2 LoanCo acquired the secured debt while its corporate sibling M2 EquityCo, LLC ("**M2 EquityCo**") acquired 100% of the equity for $1.00, with both entities wholly owned by M2 HoldCo.

3. The enterprise was already deeply insolvent upon acquisition—by $88,858,000, according to the third-party valuation. Because the debt and equity were now held by related parties under common ownership, section 108(e)(4) of the Internal Revenue Code (the "**IRC**")

---

[1] As of the date hereof, M2 LoanCo has not filed a proof of claim. As explained below, the deadline for Plaintiffs to challenge the stipulation relating to the Claim is October 4, 2026, while the general bar date is October 9, 2026 at 5:00 pm ET. Plaintiffs reserve all rights to amend the Complaint based on the proof of claim filed by M2 LoanCo.

caused the debt to be treated as cancelled: M2 HoldCo's consolidated 2020 tax return recognized $108.1 million in cancellation-of-debt income, then invoked the insolvency of the very enterprise it now claims owed it money to avoid any tax consequences. M2 HoldCo's decision to file a consolidated tax return confirms that the parties treated the debt and equity holders as a unified economic enterprise, not as arm's-length parties with adverse interests. M2 cannot have it both ways—treating the debt as extinguished for tax purposes while now seeking to enforce it as a valid secured claim.

4. Within months, Flacks would engage bankruptcy counsel and contemplate a chapter 11 restructuring for the enterprise. As part of that analysis, bankruptcy counsel advised that there were "several factors weighing in favor of recharacterization" of the M2 secured debt, and that the outcome would be a "coin toss." Rather than commence chapter 11 proceedings, and just weeks before the planned filing, Flacks offloaded the entire enterprise—M2 HoldCo, M2 LoanCo and M2 EquityCo (i.e., the Debtors)— to Lefkowitz, through Perigrove 1018, LLC ("**Perigrove**"), in December 2021 for $2.5 million.[2] In doing so, Flacks deprived the Debtors of the opportunity to acquire and retire their own debt for the nominal sum of $2.5 million—which would have eliminated the obligation at a fraction of its face amount and achieved debt forgiveness of over $100 million—and enabled Lefkowitz to usurp that corporate opportunity by acquiring the debt for himself. From that point forward, one Lefkowitz-controlled entity purportedly owed another under an obligation best described as equity masquerading as debt, much of which had already been treated as discharged.

[2] The price Perigrove, the Lefkowitz entity, paid for the enterprise—including M2 HoldCo and therefore both the M2 debt and the equity—has never been disclosed. The Tehum debtors told the U.S. Senate that additional information regarding Perigrove's ownership was "not publicly available," that Corizon had not secured a formal valuation of its assets, and that the circumstances demonstrated that Corizon was "likely insolvent by a significant margin." (Exhibit A). Upon information and belief, Perigrove paid $2.5 million for an approximately $119 million face value debt. Plaintiffs will seek discovery concerning the purchase price.

5. The Debtors' own people knew the truth — and said so in writing. Days after Lefkowitz took operational control, the company's Senior Staff Accountant asked the chief financial officer ("**CFO**") what was "happening with our faux debt." When Lefkowitz ordered cash transfers booked as "long-term debt payments," she wrote: "Oh my gosh … what debt payments — we do not owe them anything — that means that we will not get that money back. What are they doing??" Corizon's chief executive officer ("**CEO**") further confirmed that "the $75mm debt is not real."

6. M2's purported debt was not administered as genuine debt. M2 never declared a default, accelerated the obligation, enforced covenants, or demanded a scheduled cash payment — despite years of nonperformance. Instead, Lefkowitz repeatedly waived defaults, extended maturities (ultimately to June 30, 2031), and permitted the balance to balloon to approximately $152 million through paid-in-kind ("**PIK**") interest while the Debtors never paid M2 any cash to service the M2 loan. When "repayment" was made, it mostly took the form of related-party setoffs — accounting entries directed by Lefkowitz that settled intercompany receivables owed to the Debtors by M2's related parties (also Lefkowitz's own affiliates), starving the Debtors of cash while reducing the "faux debt" of the M2 loan on paper years ahead of its scheduled maturity. The amendment dated July 30, 2025 and effective as of January 1, 2024 (the "**Eighth Amendment**") alone offset approximately $42.1 million in "Related Party Balances"— all retroactive to January 1, 2024. M2 and the Debtors were not in an arm's-length relationship — they were controlled by the same person, who used the "debt" as an accounting device to extract over one hundred million in value rather than as a genuine financial obligation to be repaid.

7. The most damning account comes from the Debtors' own CFO. In an internal memorandum begun on April 10, 2026 and updated through May 6, 2026 — two days before the

first petition — CFO James Sprouse documented ownership's actions "to the detriment of YesCare" (the "**Sprouse Memo**") (Exhibit B). He recorded that $125.6 million had been transferred out to Lefkowitz affiliates since December 2021; that requests for payments to vendors that were critical to the provision of healthcare were "rarely if ever" fully approved; and that, after the Alabama Department of Corrections had warned of vendor complaints and paid nearly $19 million ahead of schedule in February 2026, Lefkowitz's management company sent $10.4 million to M2 director Eli Alan Rubenstein ("**Rubenstein**") rather than pay the vendors — and continued sending millions more to Rubenstein even after it knew that vendor nonpayment was costing the Debtors the Alabama contract.

8. Lefkowitz knew that his looting had left the Debtors without sufficient capital to operate. As Mr. Sprouse documented, Lefkowitz repeatedly promised—but failed—to provide equity infusions needed to replace the cash he had extracted, and a supposed $75 million revolver facility from M2 was a mirage: the Debtors were told they had "access to draw, but we were never able to draw on such a facility," and "[n]o monies were ever advanced on that component of the facility." Tr. of Meeting of Creditors at 79 (July 23, 2026) (the "**341 Tr.**") (Exhibit C). The Debtors' chief restructuring officer ("**CRO**") would later testify that Lefkowitz promised M2 would fund the chapter 11 cases, that the funding never came, and that the resulting weeks without cash were "the death knell of the entire estate," forcing them to transition all remaining contracts and pursue liquidation. And the looting did not stop at bankruptcy's door: even after the chapter 11 cases were filed, Lefkowitz continued to utilize his control over the Debtors' accounts to misappropriate approximately $2.33 million more.

9. Even taking M2's paper at face value, M2 cannot prove what is owed. The general ledger records only one side of each transaction, the interest was never properly calculated (as a

Senior Staff Accountant admitted), and the balance was manipulated through retroactive corrections, reversals, and insider-directed setoffs. Despite Lefkowitz "agreeing" with himself as lender and borrower as to the correct amounts, the administrative agent "could not agree on the $s[.]" The documentation was so unreliable that the administrative agent for the loan required language in loan amendments that they have no liability for relying on the dollar amounts.

> Jimmy,
>
> I understand that you connected with AD the other day, and that while you all could not agree on the $s, but that as Lender and Borrower have, have asked AD to accept them. AD is fine doing that as long as the following change is made:
>
> In the amendment in Section 2(j) for the revisions to Section 2.04 of the Credit Agreement at the end of subsection (e) we will need the following revisions highlighted below to be made:
>
> Notwithstanding anything to the contrary, the amounts set forth above shall be deemed accurate, binding and not subject to further adjustment or recalculation, and shall be used for all purposes under this Agreement and the parties hereto acknowledge and agree that the Administrative Agent shall have no liabilities for relying upon such amounts.
>
> **Daniel Sylvester** | **Holland & Knight**
> Partner
> Holland & Knight LLP
> 150 N. Riverside Plaza, Suite 2700 | Chicago, Illinois 60606
> Phone +1.312.715.5880 | Mobile +1.773.633.3973
> daniel.sylvester@hklaw.com | www.hklaw.com

10. The Plaintiffs therefore seek: (i) disallowance of the Claim under 11 U.S.C. § 502(b)(1); (ii) recharacterization of the purported debt as equity; (iii) equitable subordination under 11 U.S.C. § 510(c); (iv) transfer of M2's liens, if any, to the estates under 11 U.S.C. § 510(c)(2); and (v) a declaration that M2's liens, if any, do not extend to the estates' chapter 5 avoidance and recovery actions, related recoveries or preserved property, or commercial tort claims and other causes of action not validly encumbered under applicable law.

## JURISDICTION AND STANDING

11. The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (C), (F), (H), (K), and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

12. The statutory predicates for the relief sought are sections 105, 502, 510, 544, 547, 548, 550, 551, and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"); applicable state law governing attachment and perfection of security interests, including the applicable enactments of Article 9 of the Uniform Commercial Code; 28 U.S.C. §§ 2201 and 2202; and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure. Relief is properly sought by adversary proceeding under Rules 7001(a), (b), and (i).

13. The Trustee has standing as representative of the estates under 11 U.S.C. § 323.

14. The Committee has standing to object to the Claim under 11 U.S.C. §§ 502(a) and 1109(b), and to prosecute the estate causes of action asserted herein under 11 U.S.C. § 1103(c)(5) and the Final Stipulation and Order Authorizing Use of Cash Collateral and Grant of Adequate Protection [Dkt. 321] (the "**Cash Collateral Order**").

## PARTIES

15. Plaintiffs are the Statutory Unsecured Claimholders Committee appointed in these chapter 11 cases and Michael Goldberg, as Chapter 11 Trustee and Representative of the Estates of CHS FL, LLC, et al., who bring this action on behalf of the Debtors' estates.

16. Defendant M2 LoanCo was formed on June 18, 2020 as a Florida limited liability company with its principal place of business at 666 NE 125th Street, Suite 212, North Miami, Florida 33161. M2 LoanCo is wholly owned by M2 HoldCo. It has only two directors — Isaac

Lefkowitz and Alan Rubenstein — no employees, no email server of its own, and no operations independent of Lefkowitz's direction.

17. Defendant M2 HoldCo was formed on June 18, 2020 as a Florida limited liability company with the same principal place of business as M2 LoanCo. M2 HoldCo is owned by Correct Health Services, LLC. M2 HoldCo is the sole member of both M2 LoanCo and M2 EquityCo, the entity that acquired 100% of the equity of the Debtors' corporate parent.

18. Correct Health Services, LLC ("**Correct Health**") was formed on February 28, 2025 as a Tennessee limited liability company with its principal place of business at 205 Powell Pl, Brentwood, TN 37027. Correct Health is wholly owned by Lefkowitz. On August 20, 2026, Correct Health was administratively dissolved by the state of Tennessee.

19. Non-party Yitzchok Lefkowitz (a/k/a Isaac Lefkowitz and Jack Lefkowitz) was, at relevant times, a director, officer, or owner (whether directly or indirectly) of M2 LoanCo, M2 HoldCo, and substantially all of the Debtors, including YesCare Corp. and CHS TX, Inc. Isaac Lefkowitz is an investor in, and director of, Perigrove and Correct Health. He is the Debtors' sole board member and controller. Many entities in the structure have no officers or employees of their own, leaving Lefkowitz the sole decision-maker across the enterprise. He sits on both sides of transactions between the Debtors and M2. No independent director, special committee, or financial advisor has ever evaluated M2's position.

## <u>BACKGROUND</u>

### A. The Chapter 11 Cases and the Committee's Challenge.

20. On May 8 and 9, 2026 (together, the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11. The Debtors remain debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. The United States Trustee thereafter appointed the Committee.

21. The Debtors' schedules list M2 LoanCo as a secured creditor of YesCare Corp. in the amount of $16,140,579.00, with CHS TX, Inc. as codebtor, and identifying M2 as an "insider or related party" with a "Disputed" claim. M2 is not scheduled as a secured creditor of any other Debtor.

22. The Cash Collateral Order, entered July 1, 2026, grants M2 replacement liens and a superpriority claim, but provides that the Debtors' stipulations regarding M2's claims and liens do not bind the Committee or Trustee absent expiration of the "Challenge Period" without a timely "Challenge" (as those terms are defined in the Cash Collateral Order). By Stipulation [ECF No. 505] dated August 26, 2026, the deadline for Plaintiffs to bring a Challenge is October 4, 2026. This Complaint is a timely Challenge to the existence, amount, validity, perfection, priority, extent, enforceability, and avoidability of M2's claims and liens, including whether any such lien extends to the estates' chapter 5 avoidance and recovery actions, related recoveries or preserved property, commercial tort claims, or other causes of action that were not validly encumbered under applicable law.

**B. The "Faux Debt": Flacks Acquires Corizon; the Debt Is Treated as Discharged.**

23. In June 2020, Corizon began marketing itself to distressed investors. The Flacks Group acquired Corizon's operations and existing debt. At that time, Corizon owed more than $100 million of secured funded debt to third-party institutional lenders dating back at least to 2017.

24. On June 26, 2020, M2 LoanCo and M2 EquityCo were then Flacks-controlled. M2 LoanCo acquired the senior debt for $1,000,000 in cash (but possibly only $1) plus newly issued senior notes with a principal amount of $10,000,000. Immediately after M2 EquityCo acquired 100% of Valitás Intermediate Holdings "pursuant to the same plan" the debt's adjusted issue price

was $119,104,391. Form 982 Statement to M2 HoldCo 2020 Tax Return (Exhibit D); Stock Purchase Agreement (Exhibit E).

25. M2 HoldCo's consolidated amended 2020 return states that a third-party valuation firm determined that the borrower was insolvent immediately before the debt acquisition, with liabilities exceeding the fair market value of assets by $88,858,000. It reports $108,104,391 of cancellation-of-debt income, of which $88,858,000 was excluded under IRC § 108(a)(1)(B) because of insolvency. The Form 1120X states that it was filed "to correctly exclude $88,858,000 of cancellation of debt income based on the fact that the Taxpayer is insolvent," reducing total tax from $5,057,173 (amount owed $5,167,417) to NONE. Thus, the filed return treated approximately 91% of the debt's $119,104,391 adjusted issue price as discharged and reported no tax because the enterprise was insolvent. Form 982 Statement and Form 1120X Amended Return to M2 HoldCo's 2020 Tax Return (Exhibit D).

26. The Debtors' own tax advisor described the transaction even more starkly: "Flacks [Group] purchased the debt for $1 for tax purposes and issued a term loan payable of $10m." The same October 7, 2021 e-mail stated that once Flacks acquired the debt, "it immediately became intercompany debt ... and was deemed forgiven under IRC." E-mail from Bill Fowler to Jeff Sholey (Oct. 7, 2021) (Exhibit F). Corizon's CEO later wrote that the only thing Flacks Group "actually paid" was a $10 million seller note, "$5mm [of which] was paid out of company funds"—meaning that half of the only consideration identified by the CEO came from Corizon itself. E-mail from James Hyman to Martin Magida (June 27, 2021) (Exhibit G).

27. In the same period, Corizon management was contemplating chapter 11. The Flacks Group planned to split off PharmaCorr and file bankruptcy cases for Corizon and related entities just a few weeks before it instead sold the entire portfolio to Lefkowitz-entity Perigrove.

In that 363/chapter 11 planning context, Corizon engaged Arnold & Porter ("**A&P**") as company counsel to analyze the recharacterization issue. On August 9, 2021, Chief Legal Officer Scott King wrote that "the primary concern is that the secured debt could be re-characterized as equity, in which case the unsecured creditors would be ahead in line"; that A&P had "looked at the issue back in May" and found "several factors weighing in favor of recharaterization [sic]"; and that recharacterization appeared to be "a coin toss." E-mail chain concerning "Logic for 363 Incentives" (Aug. 9, 2021) (Exhibit H). Sholey likewise wrote that he wanted to verify whether the debt would "revert to an unsecured claim versus just go away." E-mail chain concerning "Logic for 363 Incentives" (Aug. 9, 2021) (Exhibit H).

28. The accounting staff called the obligation what it was. On December 13, 2021—days after Lefkowitz and the other Perigrove investors acquired the portfolio—Senior Staff Accountant Anita Dorris wrote to CFO Jeff Sholey: "I was not sure what is happening with our faux debt." E-mail from Anita Dorris to Jeff Sholey (Dec. 13, 2021) (Exhibit I).

29. On January 31, 2022, when Lefkowitz directed a $5 million transfer to Signature Bank to be treated as a "long-term debt payment," Dorris responded: "Oh my gosh … what debt payments — we do not owe them anything — that means that we will not get that money back. What are they doing??" E-mails from Michelle Rice to Jeff Sholey and from Anita Dorris to Michelle Rice (Jan. 31, 2022) (Exhibit J). The record therefore reflects that the debt was treated either as cancelled or like equity and not a true arm's-length debt.

**C. Cash Extraction Through the Signature Accounts.**

30. In December 2021, just weeks before the planned chapter 11 filing, and after only a week of negotiations, Perigrove acquired the entire portfolio from Flacks Group. The corporate

structure chart showing Corizon's ownership after the Perigrove/Lefkowitz acquisition but prior to the divisional merger is as follows:




31. Immediately following the acquisition, Lefkowitz and his partners opened accounts at Signature Bank in the name of Corizon and a subsidiary (the "**Signature Accounts**"). Perigrove's members were the sole signers; Corizon's CFO and existing management had no access.

32. Lefkowitz then moved Corizon's cash from its Bank of America operating accounts, through the Signature Accounts, to M2 LoanCo, and from M2 LoanCo upstream to Perigrove. The transfers to M2 LoanCo include: $10,000,000 (December 29, 2021); $5,000,000

(December 30, 2021); $2,300,000 (January 4, 2022); $600,000 (January 5, 2022); $5,000,000 (January 31, 2022); $600,000 (February 18, 2022); $1,000,000 (May 17, 2022); $25,572.19 (November 14, 2022); and $12,583 (November 14, 2022), totaling $24,538,155.19.

33. Lefkowitz directed these transfers personally. Senior executives often learned of large wires out of accounts holding the Debtors' funds only after the money was gone. Management lacked access to the Signature Accounts.

34. These were not debt payments in any ordinary sense. The first purported "payments" on the debt came only after Lefkowitz and the other Perigrove investors acquired the lender and borrower together. The transfers were upstream distributions of the operating company's cash to Perigrove, routed through M2 LoanCo, an entity with no employees, no operations independent of Lefkowitz, and no independent governance.

**D. The Forged Bank Statement and the Divisional Merger Fraud.**

35. To ensure he could continue milking his cash cow regardless of the extreme detriment to creditors and patients, Lefkowitz had to find a solution to Corizon's insolvency where the Flacks Group had not.

36. In May 2022, Lefkowitz caused a divisional merger (the "**Divisional Merger**") that moved Corizon's productive operating assets to CHS TX, Inc. ("**CHS TX**"), a YesCare subsidiary, while Tehum remained vested with all inactive and expired customer contracts, all historical liabilities related to those contracts, and extensive tort liabilities. The purported consideration received by Tehum was a release from the "faux debt" secured obligations to M2 LoanCo, which were allocated to CHS TX, $1 million in cash, and the right to draw on a $15 million funding agreement (the "**Funding Agreement**").

37. The practical effect was to split Corizon's assets and liabilities. Tehum kept the disfavored liabilities—including tort claims of inmates and their families, certain vendor liabilities, and liabilities owed to terminated employees—while CHS TX received Corizon's productive assets and favored liabilities and became a YesCare subsidiary. Tehum ceased to be an operating entity with active contracts or medical service providers, and its liabilities exceeded its allocated cash, insurance rights, and Funding Agreement rights.

38. To support the "fairness" of the divisional merger "to the RemainCo [Corizon] Unsecured Creditors," Lefkowitz engaged FTI Capital Advisors, LLC ("**FTI**") (Exhibit K). The FTI fairness opinion was obtained after Lefkowitz provided FTI with a falsified bank statement showing $22,306,821.78 in the Signature Account held in Corizon's name (the "**Corizon Signature Account**"), even though the account held only $12,583 as of February 28, 2022. Corizon's CFO then represented that approximately $22.3 million was held at Signature Bank, and FTI later stated that it had relied on the factual accuracy of information provided and had not conducted the widescale due diligence later attributed to it.

39. The same purported M2 debt that had been acquired from third-party lenders for nominal consideration was thus used in the Divisional Merger as the stated consideration for leaving the tort and trade liabilities behind. The merger documents, the falsified bank statement, and the FTI opinion must be read together with the contemporaneous tax and accounting records describing the obligation as discharged, intercompany, "faux," and "not real."

**E. Lefkowitz Came to Loot, Not Rescue; Insider Payments.**

40. Corizon and its affiliates were structured as a group of affiliated entities tied together through related-party loans and contracts. Perigrove and Lefkowitz operated Corizon as a mere instrumentality, extracting substantial value while providing inadequate care to inmates

and failing to pay third parties. From virtually the second they took control of Corizon, they began siphoning funds.

41. Perigrove and Lefkowitz disregarded corporate separateness, caused non-arm's-length related-party agreements, failed to observe corporate formalities, commingled assets including bank accounts, failed to maintain business records, and used corporate funds for personal purposes. The resulting undercapitalization caused substandard healthcare and left Corizon unable to cover its tort exposure.

42. Against that backdrop, the Debtors' Statements of Financial Affairs identify eleven payments totaling $20,766,000 to [Eli] Alan Rubenstein, one of M2 LoanCo's directors, each described as a "Loan Payment": $503,500 on May 12, 2025; $200,000 on November 17, 2025; $500,000 on November 24, 2025; $2,000,000 on January 28, 2026; $400,000 and $2,000,000 on January 30, 2026; $10,400,000 on February 4, 2026; $310,000 on April 23, 2026; and $2,052,500, $1,800,000, and $600,000 on April 29, 2026. Many of these transactions, including the $10.4 million wire, were initiated by Lefkowitz himself. Others were completed by YesCare's accounting staff at Lefkowitz's instruction; on April 21, 2026, Lefkowitz's instruction for the $310,000 wire was: "Please wire to Alan Rubinstein $310K book as M2 compliance fee." Lefkowitz Text Message Communications (Exhibit L). Lefkowitz also caused Corizon to pay $5,500,000 to Geneva Consulting, which shares directors and authorized representatives with Perigrove, including Lefkowitz, although Lefkowitz admitted that Geneva could not identify any services it provided to Corizon.

### F. The Loan Documents and the Eve-of-Bankruptcy Paper Paydown.

43. M2's Claim rests on the following documents (the "**Loan Documents**"):

(a) Third Amended and Restated Credit Agreement, dated as of August 17, 2020 (the "**Credit Agreement**") (Exhibit M);

(b) First Amendment to Third Amended and Restated Credit Agreement, dated as of July 12, 2021 (Exhibit N);

(c) Second Amendment to Third Amended and Restated Credit Agreement, dated as of May 5, 2021 (Exhibit O);

(d) Third Amendment to Third Amended and Restated Credit Agreement, dated as of September 30, 2021 (Exhibit P);

(e) Fourth Amendment and Waiver to Third Amended and Restated Credit Agreement, dated as of April 29, 2022 (Exhibit Q);

(f) Fifth Amendment, Assignment, Assumption, Waiver and Release to Third Amended and Restated Credit Agreement, dated as of May 5, 2022 (Exhibit R);

(g) Sixth Amendment to Third Amended and Restated Credit Agreement, dated as of December 20, 2023 (Exhibit S);

(h) Seventh Amendment to Third Amended and Restated Credit Agreement, dated as of March 5, 2024 (effective February 26, 2024) (Exhibit T);

(i) Eighth Amendment to Third Amended and Restated Credit Agreement, dated as of July 30, 2025 (effective January 1, 2024) (Exhibit U);

(j) Reaffirmation Agreement, dated as of August 17, 2020 (Exhibit V);

(k) Perfection Certificate, dated as of August 17, 2020 (Exhibit W); and

(l) Omnibus Officer's Closing Certificate, dated as of August 17, 2020 (Exhibit X).

44. The Loan Documents chronicle continuous forbearance, default waivers, covenant resets, maturity extensions, and debt forgiveness. They do not change the contemporaneous facts: the obligation was acquired by a Flacks-controlled lender together with the equity, later purportedly transferred with the borrower to Perigrove in one portfolio, treated as discharged for tax purposes by M2 HoldCo and its subsidiaries, and then used as the stated consideration for the Divisional Merger. Following the 2021 Perigrove acquisition, amendments to the M2 Loan were executed by Lefkowitz or his designees on both sides.

45. YesCare's general ledger (specifically, account 287170) (Exhibit Y) shows that from May 1, 2022 through December 30, 2024, the M2 balance grew from approximately $92.6

million to over $150 million through PIK interest calculated on the balance. According to the same ledger, YesCare never paid any cash to M2 to service the M2 Loan. CFO Sprouse testified at the second meeting of creditors that reductions were made on an ad hoc basis and with credits.

46. Then, as bankruptcy approached, Lefkowitz wrote the balance down on paper, from a peak of approximately $152 million to the $16.2 million now claimed. The Eighth Amendment, which was made retroactive to January 1, 2024, drove this reduction by, among other things, (i) applying $42,110,398.42 in related-party balances (other than claims with M2 itself), (ii) forgiving $17,000,000, (iii) extending maturity to June 30, 2031, and (iv) allowing future balances between the Borrowers and M2's related parties to be applied against the M2 Loan balance quarterly. The ledger reflects zero reductions through credits or otherwise—only PIK interest accruals and adjustments—in 2022 and 2023, approximately $104 million settled in 2024, approximately $33 million settled in 2025, and approximately $17 million settled on April 30, 2026—eight days before the Petition Date. In the aggregate, it appears that nearly $99 million in receivables (net of any payables) due from M2's related parties were applied against the M2 Loan balance through April 30, 2026. The largest component appears attributable to receivables previously owed by M2 HoldCo: $59 million in the aggregate through April 30, 2026, most of which—over $44 million—comprises payments seemingly directed to Alan Rubenstein. YesCare's ledger records these M2 HoldCo receivables under account 128055 (as "A/**R - M2 Hold Co**") (Exhibit Z), separate from the M2 Loan account (account 287170).

47. The mechanism was triangular. Lefkowitz affiliates owed cash to YesCare (because he kept funneling YesCare's cash to them); YesCare supposedly owed M2 LoanCo; and rather than cause his affiliates to pay back YesCare the cash they owed, Lefkowitz set off both obligations, leaving the cash at non-debtor entities controlled by Lefkowitz (e.g., TN Correct and

Adar) while shrinking the M2 balance on paper into a claim small enough to look plausible and senior enough to purportedly control these cases (the "**Triangular Setoffs**").

48. The bookkeeping was as careless as it was self-serving. In July 2026, Dorris wrote to Sprouse about the accrued interest: "I don't know how the interest could be right — since it was not transferred to the debt quarterly — but I doubt we care at this point." E-mail from Anita Dorris to James Sprouse (July 28, 2026) (Exhibit AA). M2 LoanCo bore the contractual obligation to maintain accurate records of the loans and interest thereon. Its failure to do so means the Claim's stated balance cannot be taken at face value.

49. Alter Domus, the administrative agent under the Loan Documents (the "**Administrative Agent**"), confirmed the unreliability of those figures through its counsel. In an e-mail to CFO Sprouse sent in connection with finalizing the Eighth Amendment, Daniel Sylvester of Holland & Knight LLP, counsel to the Administrative Agent, wrote that the Administrative Agent and YesCare "could not agree on the $s" but accepted the figures only after the lender and borrower agreed to language shielding the Administrative Agent from liability for relying on them. E-mail from Daniel Sylvester, Holland & Knight LLP, to James Sprouse (Exhibit BB). This removes the only independent source of recordkeeping for the M2 Loan balance and demonstrates a failure to comply with the requirement under the Credit Agreement that "The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business." Credit Agreement § 2.09 (Exhibit M).

**G. The Sprouse Memo: Insiders Paid While Vendors, Contracts, and Patients Went Unpaid.**

50. The Debtors' own CFO documented the looting in real time. In the Sprouse Memo, dated April 10, 2026 and updated through May 6, 2026, CFO Sprouse recorded ownership's

actions "to the detriment of YesCare." According to the Sprouse Memo, ADAR Management LLC (the "**Manager**"), Lefkowitz's management company, exercised "strict control" over the Debtors' banking, and vendor payment requests were "rarely if ever" fully approved. Since December 2021, $125.6 million had been transferred out: $18 million to CHS EG and Geneva and $108 million to M2, Geneva, and PharmaCorr.

51. The Sprouse Memo records that in early February 2026 the Alabama Department of Corrections paid the Debtors nearly $19 million. Rather than pay past-due vendors, the Manager transferred $10.4 million to Rubenstein, on top of $4.4 million sent to Rubenstein in late January. When the vendor crisis was raised, Lefkowitz said he was "tired of hearing about it."

52. The Sprouse Memo further records that, knowing the Alabama contract was being lost because vendors were not being paid, Lefkowitz caused the Debtors to send Rubenstein approximately $4.3 million more in April 2026, plus $2 million on April 29, 2026. On April 27, 2026, Clinical Solutions Pharmacy served a termination notice for non-payment. Lefkowitz chose paying himself and his co-director over the Debtors' pharmacy, vendors, and patients, days before the petition.

53. The Sprouse Memo thus establishes, in the words of the Debtors' own CFO, that the payments M2 now calls debt service were deliberate choices to pay insiders ahead of the vendors, payroll, and pharmacy on which the Debtors' government contracts and the care of incarcerated patients depended.

### H. Broken Equity Promises, Deliberate Undercapitalization, and the Debtor-in-Possession Financing Betrayal.

54. According to the Sprouse Memo, ownership promised a $20 million capital infusion for October 2025. It never arrived, and still had not by March 2026. When Sprouse questioned the timing on a call with Lefkowitz, Jeff Sholey, and Scott King regarding YesCare's

financial situation, he was told to "get off the call" because Lefkowitz "only wanted to talk with Jeff and Scott." A separate $10 million infusion promised for April 8, 2026 did not arrive until April 13, even though Lefkowitz knew the funds were needed to pay employees — including employees of YesCare's most significant contract — and YesCare's pharmacy vendor. The resulting delay in the Alabama payroll contributed to the cancellation of the Alabama Department of Corrections contract.

55. The Sprouse Memo also records that ownership blocked every outside lifeline. In October 2025, YesCare leadership engaged Riveron to help secure term financing. Riveron worked through November to build its model, but Lefkowitz refused to pay Riveron's fees, bringing the financing effort to an end.

56. Separately, leadership worked with Alterna Capital Solutions on a factoring facility expected to provide average liquidity of $10 million to $15 million, with maximum availability of $25 million. Alterna received approval for the facility in February 2026. Closing, however, required a capital infusion to pay liabilities that were more than 90 days past due and a personal guarantee from Lefkowitz. Lefkowitz agreed to the terms but then failed to make the capital contribution or execute the personal guarantee, so the facility never closed. And M2's own $75 million revolving facility was a mirage: as Mr. Sprouse testified, the Debtors were told they had "access to draw, but we were never able to draw on such a facility," and "[n]o monies were ever advanced on that component of the facility." 341 Tr. at 78-79 (Exhibit C).

57. The Debtors entered chapter 11 with zero dollars in the bank. Testifying under oath on June 17, 2026, Mr. Goldwasser, who led the Debtors' debtor-in-possession ("**DIP**") financing efforts, stated that he negotiated DIP financing "only with Mr. Lefkowitz," who represented that M2 would fund. That representation caused the Debtors to defer broader financing efforts. As

Mr. Goldwasser testified under oath, "I really thought that we were getting the funding." Goldwasser Dep. (June 17, 2026) (Exhibit CC).

58. No DIP agreement was ever signed before or after filing. By the time other lenders were contacted, the Debtors' contracts were already cascading toward termination. Mr. Goldwasser testified under oath: "There was no ability to have the continuity of care. And the two or three weeks that we missed in between collecting money and paying was the death knell of the entire estate."

**I. Postpetition Misappropriation and the Lefkowitz Adversary Proceeding.**

59. The looting did not stop at the petition. As alleged in Adversary Proceeding No. 2:26-ap-00028-FMR (the "**Lefkowitz Adversary Proceeding**"), Lefkowitz made $630,440.10 in unauthorized transfers from non-debtor accounts between May and July 2026 and orchestrated a $1.7 million cashier's check scheme, claiming a payroll tax payment to UKG Kronos when the envelope contained paper and no check. Postpetition misappropriation totals approximately $2.33 million.

60. After receiving a demand letter, Lefkowitz revoked the Debtors' access to their bank accounts, and has continued to intercept the Debtors' receivables. That is the conduct of M2's controlling principal — even as M2 asks this Court to recognize a first-priority secured claim ahead of the very creditors his conduct has harmed.

## CAUSES OF ACTION

### COUNT I
### Disallowance of Claim — 11 U.S.C. § 502(b)(1)
### (Against M2 LoanCo, LLC)

61. Plaintiffs repeat and reallege each of the preceding allegations as if fully set forth herein.

62. A claim must be disallowed to the extent it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…" 11 U.S.C. § 502(b)(1); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007). A bankruptcy court may look behind an insider's claim and disallow it where it lacks lawful existence or is fictitious or a sham. Once an objector rebuts a proof of claim's prima facie validity, the claimant bears the burden of proving its claim. *In re Aegis Asset Mgmt., LLC*, No. 25-10331, slip op. at 8–9 (11th Cir. July 24, 2026).

63. The Claim is a sham. Lefkowitz controlled both lender and borrower and dictated the character and amount of the obligation through false classifications and retroactive entries. The Debtors' own records call it "faux debt" (Exhibit I); say "we do not owe them anything" (Exhibit J); record Lefkowitz's instruction to book cash transfers as "long-term debt payments" (Exhibit J); and describe the debt as "not real" (Exhibit G). M2 HoldCo's own tax return recognized $108.1 million of cancellation-of-debt income (Exhibit D).

64. Independently, M2 cannot prove the validity or amount of any enforceable obligation. The amendments on which it relies were executed by Lefkowitz on both sides without independent review and are subject to rigorous scrutiny. The asserted balances were so unreliable that the Administrative Agent required specific language in the loan amendments absolving it from liability for relying on them, even though the governing documents required it to keep an accurate record of the loan balance. The amendments prove only that Lefkowitz could manipulate the balance at will — from roughly $152 million to $16.2 million — through retroactive, non-cash entries, related party setoffs, and transfers to other insiders. Even the Debtors' own accountant doubted the interest calculation.

65. At a minimum, every portion of the Claim attributable to false classifications, retroactive entries, unsupported PIK accruals, or insider setoffs lacks lawful existence and must be disallowed.

66. The Claim should be disallowed in its entirety under 11 U.S.C. § 502(b)(1).

**COUNT II**
**Recharacterization of Debt as Equity — 11 U.S.C. § 105(a)**
**(Against M2 LoanCo, LLC)**

67. Plaintiffs repeat and reallege each of the preceding allegations as if fully set forth herein.

68. A purported shareholder loan may be treated as a capital contribution where the evidence establishes initial undercapitalization or that the loan was made when no disinterested lender would have extended credit. *In re N & D Props., Inc*., 799 F.2d 726, 733 (11th Cir. 1986). In evaluating the substance of a purported debt obligation, courts also consider the manner in which the parties actually structured and administered their relationship. *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 248–50 (M.D. Fla. 1994). *Hillsborough* applied the thirteen nonexclusive debt-equity factors identified in *In re Lane*, 742 F.2d 1311, 1314–15 (11th Cir. 1984), a case concerning the tax treatment of shareholder advances: (a) the names given to the instruments; (b) the presence or absence of a fixed maturity date; (c) the source of payments; (d) the right to enforce payment of principal and interest; (e) participation in management resulting from the advance; (f) the contribution's status relative to ordinary corporate creditors; (g) the parties' intent; (h) capitalization; (i) identity of interest between creditor and stockholder; (j) the source of interest payments; (k) the ability to obtain outside financing; (l) the extent to which the advance financed capital assets; and (m) failure to repay when due or to seek postponement. These factors must be evaluated in context rather than mechanically counted. *Lane*, 742 F.2d at 1315. Here, they point

overwhelmingly toward equity, both while the obligation was held by the Flacks Group and after its acquisition by Lefkowitz entities.

69. **Names and form; maturity; enforcement; status relative to outside creditors**. The Credit Agreement, amendments, stated interest provisions, and formal repayment terms facially favor debt, but those labels are not conclusive. The parties repeatedly waived defaults, extended maturity, permitted PIK accrual, and adjusted or forgave the balance without the ordinary exercise of creditor remedies. The same obligation was later used as purported consideration in the Divisional Merger. See ¶¶ 36, 39, 43–46, supra. Thus, the stated maturity and enforcement rights were functionally illusory, and M2's treatment of the obligation was consistent with owner risk capital rather than a claim held by an economically adverse outside creditor. These circumstances favor recharacterization under factors (a), (b), (d), and (f), and inform the failure-to-repay factor as well.

70. **Source of repayment; interest; failure to repay.** The obligation was not serviced as an ordinary loan. The Debtors made no cash payment from May 2022 through July 2024 while the balance grew through PIK interest on the faux balance, and later reductions were accomplished through insider-controlled setoffs, related-party entries, and forgiveness rather than scheduled cash payments. M2 did not accelerate, declare defaults, or enforce its remedies; it instead continued to extend the maturity, ultimately to June 30, 2031. See ¶¶ 44–47, supra. The absence of cash repayment and the dependence on discretionary allocations among affiliated entities support equity under factors (c), (j), and (m). The first purported payments likewise do not establish a bona fide lending relationship: they followed the change in control and were accompanied by internal statements that the parties did not owe M2 anything and that the obligation was "faux debt." See ¶¶ 27–32, supra.

71. **Participation in management; intent; capitalization; identity of interest; source of funds**. The obligation was already equity in substance while the Flacks Group held it. The filed tax statement describes M2 LoanCo and M2 EquityCo as commonly owned siblings under M2 HoldCo that acquired the debt and 100% of the borrower's equity "pursuant to the same plan." M2 LoanCo acquired debt with an adjusted issue price of approximately $119.1 million for $1 million in cash plus $10 million of senior notes—approximately nine cents on the dollar. The filed return reports that the borrower was insolvent by $88,858,000, and that $108,104,391 of cancellation-of-debt income was recognized; the contemporaneous tax explanation stated that the debt "immediately became intercompany debt" and "was deemed forgiven under IRC." See ¶¶ 24–26, supra. The contemporaneous record also includes CEO Hyman's statement that "the $75mm debt is not real" and the assessment of Corizon's own counsel, A&P, that "several factors" favored recharacterization and that the issue was "a coin toss." See ¶¶ 5, 27, supra. Those facts bear directly on intent, capitalization, and identity of interest and show that the obligation functioned as an insider contribution before its later acquisition by Lefkowitz entities. The source of the acquisition funds independently reinforces that conclusion. As Hyman reported, the $10 million seller note—the only real consideration he identified—was paid "$5mm ... out of company funds and $5mm ... by Flacks." See ¶ 26, supra. Flacks Group therefore used the borrower's own money to fund at least part of its acquisition of the claim—an amount which was more than double the $2.5 million for which Flacks Group would later sell the enterprise to Perigrove/Lefkowitz. No new value was advanced to the enterprise; instead, company capital was recycled into an insider claim.

72. **Outside financing, use of advances, secondary transfer, and arm's-length dealing.** The Debtors' inability to obtain or maintain outside financing supports treating the

obligation as equity. See ¶¶ 55–57, supra. The later Perigrove acquisition did not rehabilitate the obligation or break the identity of interest; no outside party extended new credit to the enterprise. The first purported "payments" came only after that combined acquisition, when company personnel responded that "we do not owe them anything" and referred to the obligation as "faux debt." See ¶¶ 27–32, supra. Further, the Divisional Merger used release from Tehum's purported secured debt to M2 LoanCo, $1 million in cash, and the right to draw on the $15 million Funding Agreement as purported consideration. Tehum Trust Compl. ¶ 137; see ¶¶ 34–37, supra. That sequence is consistent with an insider moving its own claim among commonly controlled entities to facilitate the stripping of operating assets, not with a lender enforcing rights against a borrower. These circumstances support factors (e), (g), (i), (k), (l), and (m), and confirm the absence of arm's-length dealing.

73. Considered together, the factors support recharacterization. M2's asserted obligation functioned as equity rather than bona fide debt. The alleged insolvency of the enterprise, inability to obtain outside financing, common ownership of lender and borrower, discretionary treatment of repayment, and insider-directed adjustments to principal and interest support that contention. The circumstances of the obligation's creation and continuation, together with its subsequent administration, establish that the asserted Claim represents capital placed at the risk of the enterprise rather than an enforceable lending relationship. Plaintiffs therefore seek recharacterization of the Claim as equity, with no distribution on account of the Claim as debt.

## COUNT III
## Breach of Fiduciary Duty, Usurpation of Corporate Opportunity, and Aiding and Abetting
## (Against M2 LoanCo, LLC and M2 HoldCo, LLC)

74. Plaintiffs repeat and reallege each of the preceding allegations as if fully set forth herein.

75. **Fiduciary Status.** This Count asserts claims belonging to the Debtors and their estates. Under Delaware law, directors and controlling stockholders owe the corporation a duty of loyalty that forbids self-dealing and the appropriation of corporate opportunities. *Guth v. Loft, Inc.*, 5 A.2d 503, 510–11 (Del. 1939); *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996); *Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110, 1114–15 (Del. 1994); 8 *Del. C.* § 144. In the insolvency context, a controller that causes the company to transfer value to itself or its affiliates through self-interested transactions—including payments on insider-held debt, excessive affiliate fees, or transfers of operating assets—may be subject to a derivative claim for breach of fiduciary duty. *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183–85 (Del. Ch. 2014) (holding that allegations concerning insider-debt payments and excessive affiliate fees stated derivative fiduciary-duty claims governed by an entire fairness analysis); *In re TransCare Corp.*, 81 F.4th 37, 49–53 (2d Cir. 2023) (affirming liability where a controller transferred profitable corporate assets to entities she controlled through a self-interested transaction that failed entire-fairness review). M2 HoldCo, through M2 EquityCo, was the controlling stockholder of the Debtors' corporate parent when M2 LoanCo acquired the senior debt in June 2020 and again from December 2021, when Perigrove acquired M2 HoldCo and the portfolio. Isaac Lefkowitz was the sole director of M2 HoldCo and Corizon (later Tehum) and oversaw Corizon's operations and finances. M2 HoldCo and those acting for it exercised control over the borrower group and owed fiduciary duties to the enterprise.

76. **The Opportunity.** The corporate opportunity arose in December 2021, when the Flacks Group sold the portfolio—including M2 HoldCo and therefore both the M2 debt and the equity—to Lefkowitz and Perigrove. At that moment, the enterprise was insolvent. M2 HoldCo, as the controller of the Debtors through M2 EquityCo, was obligated to present the Debtors with

the opportunity to purchase and retire their own senior debt at the acquisition price rather than deploy its powers for the benefit of the equity owner at the expense of the residual value of the enterprise. Upon information and belief, the sale price was nominal—possibly as little as $2.5 million for approximately $119 million of stated debt. The fiduciaries knew that the M2 LoanCo claim was available as part of a transaction requiring only $2.5 million of consideration. Rather than cause M2 EquityCo to pursue the extraordinary opportunity to acquire, compromise, or extinguish the indebtedness, the opportunity was diverted to Lefkowitz and Perigrove, who then wielded the debt as an instrument to immediately extract tens of millions of dollars from the Debtors, hinder creditors, and harm patients. Had the Debtors acquired and retired the debt, the enterprise would have been freed of this insider claim entirely.

77. ***Broz* Factors Applied.** *Broz* identifies four relevant considerations: (1) whether the corporation was financially able to undertake the opportunity; (2) whether the opportunity was within the corporation's line of business; (3) whether the corporation had an interest or expectancy in it; and (4) whether the fiduciary was placed in a position inimical to the fiduciary's duties to the corporation. 673 A.2d at 155. Each factor supports the estate's claim. (1) *Financial ability.* The Debtors' financial ability to purchase the debt is proven by what happened next. Beginning just days after the December 2021 acquisition, Lefkowitz directed the Debtors to transfer $24,538,155.19 to M2 LoanCo: $10,000,000 on December 29, 2021; $5,000,000 on December 30, 2021; and millions more in January and February 2022. See ¶ 32, supra. If the Debtors could pay over $24 million to M2 LoanCo *after* Lefkowitz acquired the debt, they plainly could have paid the nominal acquisition price *before*—and retired the debt entirely. The timing and magnitude of these transfers support that the Debtors had the financial ability to acquire the debt at the nominal portfolio acquisition price. (2) *Line of business.* Retiring one's own debt is not an unrelated

investment opportunity; it directly concerns the company's own capital structure, solvency, and ability to pay creditors. (3) *Interest or expectancy.* The filed return treated the acquisition as a discharge of $108,104,391 of the borrower's debt, with $88,858,000 excluded because the borrower was insolvent. That treatment confirms the economic substance of the transaction: the benefit of the discount was available to reduce the borrower's debt, not to create a continuing insider claim. (4) *Inimical position.* By keeping the debt alive at an affiliate rather than presenting the Debtors with the opportunity to retire it, the controllers positioned themselves as senior secured creditors ahead of tort and trade creditors of an insolvent enterprise, later used the debt as consideration in the Divisional Merger, and now rely on it as the basis of the $16.2 million secured Claim.

78. **No Disinterested Approval; No Entire-Fairness Protection.** No special committee, independent director, or financial advisor evaluated the opportunity for the Debtors, whether in June 2020 or in connection with the December 2021 portfolio acquisition. The Debtors were never asked whether they wished to purchase and retire their own debt at the acquisition price. The transaction was controlled by interested persons on both sides and was not approved by disinterested directors or stockholders. Moreover, the diversion of the opportunity was substantively unfair to the Debtors: it deprived them of the alleged opportunity to retire substantial indebtedness for nominal consideration, preserved that indebtedness for the benefit of their controller and his affiliates, and enabled the subsequent extraction of corporate funds described above. Plaintiffs therefore allege both the absence of qualifying disinterested approval and the absence of substantive fairness. It therefore was not cleansed or otherwise protected under 8 *Del. C.* § 144 and must be tested under the applicable entire-fairness principles.

79. **Insolvency Context.** The filed tax return states that the borrower was insolvent by $88,858,000 immediately before the debt acquisition. The enterprise was planning to file for chapter 11 bankruptcy in December 2021. The fiduciary-duty claim is pleaded as the corporation's claim, asserted for the benefit of the Debtors' estates; the estates, and derivatively their creditors, are the parties injured by the diversion of the opportunity and the continued assertion of the insider debt.

80. **Aiding and Abetting; Knowing Participation.** M2 LoanCo and M2 HoldCo knowingly participated in the breaches described above. The elements are a fiduciary relationship, a breach, knowing participation, and resulting damages. *Malpiede v. Townson*, 780 A.2d 1075, 1096–97 (Del. 2001). M2 HoldCo participated as the common parent and controlling affiliate through which M2 EquityCo and M2 LoanCo held the equity and debt, respectively. M2 LoanCo acquired and retained the diverted opportunity, received the transfers, and now asserts the leverage of a secured claim. M2 has no employees and no governance independent of Lefkowitz; its only other director is Rubenstein, the insider to whom Lefkowitz directed millions in payments.

81. These facts are indicia that M2 LoanCo and M2 HoldCo knew that the challenged conduct constituted a fiduciary breach because Lefkowitz simultaneously controlled the Debtors and both Defendants, orchestrated the transactions on both sides, directed the transfers and accounting treatment, and caused Defendants to receive and retain the resulting benefits.

**COUNT IV**
**Equitable Subordination and Transfer of Lien — 11 U.S.C. § 510(c)**
**(Against M2 LoanCo, LLC)**

82. Plaintiffs repeat and reallege each of the preceding allegations as if fully set forth herein.

83. Equitable subordination is warranted where (1) the claimant engaged in inequitable conduct; (2) the conduct injured creditors or conferred an unfair advantage on the claimant; and (3) subordination is consistent with the Bankruptcy Code. *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977); *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986). Once the objector produces evidence sufficient to overcome the claim's prima facie validity—including material evidence of unfair conduct—the insider bears the burden of proving the validity and good faith of the claim and the fairness of the transaction. *N & D Props.*, 799 F.2d at 731; *Mobile Steel*, 563 F.2d at 701–02.

84. **Inequitable conduct.** M2 maintained and manipulated a "faux debt" that even the Debtors' own CEO confirmed was "not real"; diverted the Debtors' corporate opportunity to acquire and retire over $100 million in stated debt for a nominal $2.5 million; extracted $24,538,155.19 through accounts only Lefkowitz and his partners could access while management had no visibility; concealed the depletion of the Debtors' cash with a forged bank statement; routed $20,766,000 in eleven "loan payments" to M2 director Rubenstein while the Debtors' vendors went unpaid, contracts collapsed, and patient care deteriorated; paid Geneva $5.5 million for no services; conducted approximately $99 million in retroactive Triangular Setoffs that extinguished valuable receivables on paper without returning cash to the Debtors; induced the Debtors to forgo other DIP financing on a false promise that M2 would fund — leading to what the CRO called "the death knell of the entire estate"; and M2's principal, Lefkowitz, continued misappropriating approximately $2.33 million in estate funds postpetition, including through a $1.7 million cashier's check scheme. ¶¶ 16–19, 22–59.

85. **Injury and unfair advantage**. M2's conduct caused concrete, quantifiable harm to the Debtors and their creditors. M2's extraction of tens of millions of dollars deprived the

Debtors of the cash they needed to pay trade creditors, employees, and tort claimants. M2's prioritization of payments to Rubenstein and itself over vendors caused the Debtors to breach contractual obligations to the Alabama Department of Corrections, Clinical Solutions Pharmacy, and other critical counterparties — resulting in the loss of the Alabama contract and the collapse of continuity and quality of care. Lefkowitz and M2 repeatedly promised to provide capitalization to the Debtors to offset their looting but never followed through. M2's broken promise to fund the chapter 11 cases left the estates with no cash at filing and no DIP financing thereafter, causing what the Debtors' CRO called "the death knell of the entire estate" and forcing the transition of all remaining contracts and liquidation. M2's conduct extinguished valuable related-party receivables that could have been collected for creditors. Allowing M2 to recover first would reward the insider that caused the harm. The injury far exceeds the $16.2 million Claim.

86. **Consistency with the Bankruptcy Code.** Section 510(c) expressly authorizes this fact-specific, remedial relief and, under § 510(c)(2), transfer to the estates of any lien securing a subordinated claim.

87. The Claim should be subordinated below all allowed general unsecured claims (or, alternatively, below the claims of injured creditors to the extent of the injury), and any lien securing it transferred to the estates under 11 U.S.C. § 510(c)(2).

**COUNT V**
**Transfer of M2's Liens to the Estates —11 U.S.C. § 510(c)(2)**
**(Against M2 LoanCo, LLC)**

88. Plaintiffs repeat and reallege each of the preceding allegations as if fully set forth herein.

89. **Equitable subordination and lien transfer**. For the reasons set forth in Count IV, M2's Claim should be equitably subordinated. Upon subordination, any lien securing the

subordinated Claim should be transferred to the estates under § 510(c)(2). Such transfer is appropriate because any M2 lien would secure an obligation manufactured through the inequitable conduct described herein; permitting M2 to retain that lien would confer an unfair advantage on the insider that caused the harm.

90. Plaintiffs seek transfer of any lien securing a subordinated claim to the estates under § 510(c)(2).

**COUNT VI**
**Declaratory Judgment—Extent of M2's Liens**
**(Against M2 LoanCo, LLC)**

91. Plaintiffs repeat and reallege each of the preceding allegations as if fully set forth herein.

92. Under 11 U.S.C. § 552(a), except as provided in subsection (b), property acquired by the estate or by a debtor after commencement of a bankruptcy case is not subject to a lien resulting from a prepetition security agreement. The statutory rights and powers to pursue avoidance and recovery actions under chapter 5 of the Bankruptcy Code—including actions under sections 544, 545, 547, 548, 549, and 553(b)—became available only upon commencement of these cases for the benefit of the estates. The Debtors could not encumber those statutory rights and powers before the Petition Date. Neither the avoidance and recovery actions, any recoveries under section 550, nor any transfers or liens preserved for the benefit of the estates under section 551 constitute proceeds of M2's alleged prepetition collateral. The replacement liens granted under the Cash Collateral Order are limited to the same extent, validity, and priority as M2's liens, if any, on the Petition Date and therefore do not expand M2's collateral to include such claims, recoveries, or preserved property.

93. Applicable Article 9 law separately provides that, absent an independent basis for attachment as proceeds of other collateral, a security interest cannot attach to a commercial tort

claim pursuant to a blanket collateral description or an after-acquired-property clause. The commercial tort claim must have existed when the security agreement was authenticated and must be described in the security agreement with greater specificity than merely identifying it by collateral type. Any security interest must also have attached and been properly perfected under applicable law. Neither the Loan Documents nor any related collateral schedule reasonably identifies the specific commercial tort claims at issue. Accordingly, M2 cannot establish a lien on the estates' commercial tort claims or on any other causes of action that were not validly encumbered under applicable law.

94. Plaintiffs therefore seek a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and Bankruptcy Rules 7001(b) and (i) that M2's liens, if any—including any replacement liens granted under the Cash Collateral Order—do not extend to the estates' chapter 5 avoidance and recovery actions, recoveries under section 550, transfers or liens preserved under section 551 or commercial tort claims or the proceeds of any of the foregoing.

## RESERVATION OF RIGHTS

95. Plaintiffs reserve all rights to amend or supplement this Complaint, including to assert additional grounds for disallowance, recharacterization, subordination, or avoidance; to revise transfer amounts as their forensic analysis continues; to supplement their lien-avoidance claims as they investigate attachment and perfection; and to assert claims against Isaac Lefkowitz, Perigrove, Alan Rubenstein, Geneva Consulting, LLC, the Manager, the Flacks Group, Michael Flacks, and any other person who participated in or benefited from the conduct described herein, in this or any other proceeding. The Flacks Group and Michael Flacks are not defendants in this action, and nothing herein releases or waives any claims against them.

96. The Committee's and Trustee's investigation and discovery are ongoing. The Debtors' First Day Declaration expressly reserved the right to investigate the nature of the M2 indebtedness. Nothing herein limits Plaintiffs' rights to supplement their factual allegations or legal theories.

**PRAYER FOR RELIEF**

WHEREFORE, the Committee and the Trustee respectfully request that the Court enter judgment:

(a) Disallowing M2 LoanCo's Claim in its entirety pursuant to 11 U.S.C. § 502(b)(1);

(b) In the alternative, recharacterizing M2 LoanCo's purported debt as an equity contribution pursuant to 11 U.S.C. § 105(a) and subordinating such interest to the claims of all general unsecured creditors;

(c) In the further alternative, equitably subordinating M2 LoanCo's Claim below all unsecured claims pursuant to 11 U.S.C. § 510(c)(1), and ordering that any lien securing such subordinated claim be transferred to the estates pursuant to 11 U.S.C. § 510(c)(2);

(d) Entering judgment against M2 LoanCo and M2 HoldCo for damages arising from the breaches of fiduciary duty, usurpation of corporate opportunity, and aiding and abetting described herein; awarding compensatory damages and disgorgement of all benefits obtained through the diverted opportunity; imposing a constructive trust over M2's Claim and all traceable proceeds for the benefit of the estates; or, in the alternative, declaring that the Claim is held in trust for and deemed extinguished in favor of the Debtors to the extent it exceeds the amount actually paid for it; in each case without duplication;

(e) Upon equitable subordination, transferring any lien securing such subordinated claim to the estates under 11 U.S.C. § 510(c)(2), and preserving such avoided liens for the benefit of the estates pursuant to 11 U.S.C. § 551;

(f) Declaring that M2's liens, if any, including any replacement liens granted under the Cash Collateral Order, do not extend to (i) avoidance and recovery actions under chapter 5 of the Bankruptcy Code, recoveries under section 550, or transfers or liens preserved under section 551; (ii) commercial tort claims; or (iii) the proceeds of any of the foregoing;

(g) Awarding Plaintiffs costs, disbursements, and reasonable attorneys' fees incurred in this action to the extent permitted by applicable law; and

(h) Granting such other and further relief as the Court deems just and proper.

Dated: October 4, 2026

Respectfully submitted,

**AKERMAN LLP**

By: */s/ Amanda Klopp*

Amanda Klopp
Florida Bar No.: 124156
Email: amanda.klopp@akerman.com
777 South Flagler Drive, Suite 1100
West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

*Counsel for Chapter 11 Trustee, Michael I. Goldberg*

**PROSKAUER ROSE LLP**

By: /s/ *Daniel Desatnik*

Brian S. Rosen (admitted *pro hac vice*)
Daniel Desatnik (admitted *pro hac vice*)
Ehud Barak (admitted *pro hac vice*)
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: brosen@proskauer.com
Email: DDesatnik@proskauer.com
Email: EBarak@proskauer.com

-and-

**COLE SCHOTZ P.C.**

By: */s/ Luis Salazar*

Luis Salazar
Florida Bar No. 147788
Justin Alberto (admitted *pro hac vice*)
Brickell City Tower
80 SW 8th Street, Suite 1900
Miami, Florida 33130
Telephone: (305) 374-4848
Email: lsalazar@coleschotz.com
Email: cs-eservice-miami@coleschotz.com

*Counsel to the Official Committee of Unsecured Creditors*