# EXHIBIT B

April 10, 2026

To: Files of YesCare

From: Jimmy Sprouse, CFO

Subject: Actions Taken by Ownership to the Detriment of YesCare

This memo is to document certain actions taken by ownership which have been to the detriment of YesCare and / or demonstrate the control exercised by ownership over YesCare without the involvement of YesCare leadership ("Leadership"). It is not intended to be an all inclusive list as it is only inclusive of items which I had direct or indirect knowledge.

Management Service Agreement / Control of Cash

At the direction of ownership, YesCare entered into a Management Services Agreement (the "YesCare MSA") with ADAR MANAGEMENT LLC and prior to that with GENEVA CONSULTING LLC. (the "Manager"). It is my understanding that the Manager is under common ownership with YesCare. The YesCare MSA gave the Manager broad rights regarding the management of YesCare but also allowed the Manager to delegate those rights. Certain rights were delegated to Leadership, including billing and collections, accounting, budgeting and certain other day to day activities. However, the Manager maintained strict control over banking activities, including maintenance of accounts, transfer of funds and payment of obligations of YesCare. This level of control included requiring approval of the Manager before any disbursement could be executed. This approval was normally obtained via: 1) sending the Manager a list of vendors which Leadership believed needed to be paid for YesCare to continue providing services (rarely if ever was the full request approved); 2) sending an e-mail to the Manager regarding a specific vendor which required payment or 3) a phone conversation with the Manager regarding a specific vendor which required payment. Only on rare occasion would Leadership approve payment of an insignificant amount without Manager approval.

Similarly, while the YesCare MSA gave the Manager complete control over the execution of contracts and purchase of equipment; generally, Leadership was allowed to approve contracts with off-site providers and other vendors and purchase equipment but was required to obtain approval to enter into agreements related to financing matters. One exception to the purchase of equipment, the Manager required the use of King David

Technology Solutions (“KDTS”) for the purchase of computer equipment, computer software, copiers and management of communications contracts.

Cash Transfers

As documented above, the Manager had control over cash. Since obtaining ownership of Corizon in December 2021 and the subsequent formation of YesCare in May 2022, the Manager has either directly or through instruction to Leadership made transfers from the accounts it maintains for YesCare. A record of those transfers is maintained in the Related Party Receivable Activity file in the Finance\Reporting directory. As of February 2026, since December 2021, a total of $125.6M had been transferred from those accounts to numerous parties. Approximately $18M of these transfers were for fees to CHS Employee Group, CHS Staffing and Geneva. The remaining $108M represented transfers primarily to or for the benefit of M2, Geneva and PharmaCorr.

While the cumulative impact of the transfers is impacting YesCare, one in particular was especially impactful. YesCare was already under the close watch of many clients, including Alabama DOC and Philadelphia Department of Corrections for paying vendors late and many vendors were complaining to YesCare and our clients regarding slow payments when in early February Alabama DOC made payment of the invoice for February services earlier than normal (on February 4th) after just paying us for January on January 22nd, each for almost $19M. Rather than paying past due vendors with this second collection, the Manager transferred $10.4M to Eli Rubenstein Esq. Additionally, $4.4M was transferred to Rubenstein across three transactions in late January 2026, between the first and second payment from Alabama DOC. To my knowledge, Leadership was never given an explanation for this transfer – instead only to be told he was tried of hearing about it.

April 23rd Update – The Manager transferred another $4.3M from the Company in mid-April 2026 -- $1.25M on April 17th and another $1.25M on April 22nd, both to its account and $1.8M on April 23rd to Mr. Rubenstein. These transfers all occurred after the company was aware it was losing the Alabama DOC contract due to lack of payment to vendors.

May 1st Update – The Manager transferred another $2.0M from the Company on April 29th to Mr. Rubenstein.

Capital Infusion / Refinancing

Ownership has told Leadership for a number of months that it would be making a capital infusion into YesCare to resolve the liquidity issue resulting from the cash that had been

removed from the company. Specifically in September 2025, the Manager said a $20M infusion was ‘confirmed” for the end of October 2025. Through March 2026, an infusion has not occurred. On a call in March 2026 with the Manager, Jeff Sholey and Scott King regarding our financial situation, when I questioned the timing of the infusion as we had been promised an infusion for at least six months and one had not occurred, the Manager told me to get off the call as he only wanted to talk with Jeff and Scott.

Most recently, it is my understanding that the Manager stated on April 7th, funding of $10M would occur on April 8th to provide for payroll to be paid to employees, including employees of YesCare's most significant contract, YesCare's pharmacy vendor and other needs. The representative of the Manager would be unreachable April 8th and 9th due to Passover but a person from his office would be available to facilitate the funding. The designated person was available but the promised funding did not occur on April 8th and still has not occurred as of this time. As a result, the funding of the payroll has not occurred. [May 6, 2026 update] The funding did not occur until 4/13/26, resulting in the Alabama payroll not being paid until 4/13; funding for the pharmaceutical invoice was not provided. The delayed Alabama payroll was a contributing factor to the cancellation of our contract by the Alabama DOC.

Ownership has been promising to convert YesCare to an ESOP for over two years. It was promised to be a contributory ESOP (meaning no payment for the equity); additionally, Ownership stated it would continue to provide financing for the term debt if third party financing was not available. Ownership engaged a consulting firm, Chartwell, to assist in the ESOP process, including financing. In 2024, Chartwell identified potential working capital lenders but was not able to identify a term debt lender, later stating identifying a term debt lender for a company such as YesCare was not its specialty. With this, Leadership initially relied on the promise of financing from Ownership, even though this was not our preference. However, as time passed and with no progress being made on the ESOP while we had a client whose contract was coming up for renewal and who had stated we must replace Ownership to retain the contract, Leadership consulted with Chartwell to identify a party who did specialize in placing the term debt for a company such as YesCare. Leadership obtained proposals from two parties in September 2025 and engaged Riveron in October 2025 to assist in obtaining term financing. The Manager agreed to the engagement of Riveron. Riveron was building its model in October and November 2025; however, the Manager refused to pay Riveron its fees; therefore, work on the model and the effort to obtain term financing ended in November 2025.

Separately, the Manager asked Leadership to explore the possibility of factoring receivables. The Manager provided three firms to contact, two of which did not lead to

anything but the third led to a referral to another party, Alterna Capital Solutions. Leadership worked with Alterna to arrive at an agreement that was acceptable. The agreement included a required capital infusion to pay liabilities which were in excess of 90 days along with certain other past due liabilities (insurance and taxes) and a personal guarantee from Isaac Lefkowitz (Ownership and the Manager). The terms of the agreement were agreed to by the Manager. Alterna received approval for the facility in February 2026. The capital contribution has not been made nor has the personal guarantee been executed; therefore, the facility has not closed. The facility would provide on average $10M to $15M in liquidity with the balance varying based on timing of payment by clients; the maximum which could be borrowed under the facility, if executed, is $25M.

Pharmaceuticals (added May 6, 2026)

Availability of pharmaceuticals is critical to the provision of our services. YesCare received a notice of termination from our provider of pharmaceuticals, Clinical Solutions Pharmacy, on 4/27/26 due to non-payment of invoices. By 5/4/2026, management had negotiated an agreement with a replacement pharmacy, Diamond. The Manager was provided an initial draft of an agreement with Diamond on 5/1 and the version YesCare and Diamond management agreed upon on 5/4. As of 5/6, the Manager has not agreed to the contract or the required funding.

Employment Matters and Other Expenditures

In 2025, the Manager required YesCare to add a representative of the Manager, Isaac Lefkowitz, to its payroll at an annual salary of $650,000. In addition, in the past, the Manager required YesCare to include Alan and Mark Goldman and Baila Meisels on its payroll and to add King David Technology Solutions (KDTS) as a consultant. YesCare attempted to eliminate the expenses of the Goodmans, Meisels and KDTS as a part of a cost reduction initiative after the loss of the Maryland and Wyoming DOC contracts. The Manager allowed the elimination of Mark Goldman and Baila Meisels but would not allow the elimination of Alan Goldman or KDTS.

The Manager required YesCare to change its credit card program (a limited number of employees had pre-existing credit cards for travel and company expenses) to American Express with the relationship managed by the Goldmans. Lefkowitz and the Goldmans were provided a YesCare American Express credit card. Over the course of their involvement with YesCare, there were expenses charged to the card for which the business purpose was not obvious. A business justification was requested but was not provided.