# EXHIBIT C

UNITED STATES BANKRUPTCY COURT MIDDLE
DISTRICT OF FLORIDA FORT MYERS DIVISION
www.flmb.uscourts.gov

In re: Chapter 11, Jointly Administered
CHS FL, LLC, Case No. 2:26-bk-01087-FMR
YESCARE CORP Case No. 2:26-bk-01089-FMR
CHS TX, INC Case No. 2:26-bk-01090-FMR
CHS AL, LLC Case No. 2:26-bk-01091-FMR
CHS Care TX Case No. 2:26-bk-01146-FMR
CHS Care NY Case No. 2:26-bk-01145-FMR
CORIZON HEALTH Case No. 2:26-bk-01144-FMR
Debtors.
___________________________/

SECTION 341 MEETING OF CREDITORS
Held July 23, 2026

A P P E A R A N C E S

FOR THE OFFICE OF THE UNITED STATES TRUSTEE:
ADISLEY CORTEZ-RODRIGUEZ, ESQ.
Assistant United States Trustee
Office of the United States Trustee
Northern District of Florida

FOR THE DEBTORS:
JEREMY JOHNSON, ESQ.
Polsinelli PC

MS. GREEN, ESQ.
(Debtors' Counsel)

ALSO PRESENT ON BEHALF OF THE DEBTORS
(WITNESSES):

DAVID GOLDWASSER
Chief Restructuring Officer of the Debtors
(FIA)

JAMES SPROUSE

Chief Financial Officer of the Debtors

FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

LOUIS SALAZAR, ESQ.
(Statutory Unsecured Claim Holders Committee)

FOR COCHISE JACKSON:
IAN CROSS, ESQ.

FOR CONSUL TECH (D/B/A AM ROSE):
DAVID BLANSKY, ESQ.

FOR THE ESTATE OF LEWISTON, JR.:
LOLO SERRANO, ESQ.

ALSO APPEARING / PARTICIPATING:
TAMIKA MISTER
MS. DION (Recording)
Teleconference Representative: ("ALAN") - AT&T Event Teleconferencing

---

Appearances compiled from the transcript record; affiliations reflect statements made on the record. Where a party's full name, title, or firm was not stated on the record, the entry reflects only what was stated.

OPERATOR: A moment, please. Thank you for standing by and welcome to the CHSFL, LLC et al conference call. At this time, your telephone lines are in a listen-only mode. Later, there will be an opportunity for questions and answers with instructions given at that time. If you should require assistance during your call, please press star, then zero, and a specialist will assist you offline. As a reminder, your conference call is being recorded. I'll now turn the conference call over to your host, Adisley Cortez-Rodriguez. Please go ahead.

THE TRUSTEE: Thank you. Good morning, folks. My name is Adisley Cortez-Rodriguez; I am the Assistant United States Trustee for the Northern District of Florida. Today is July 23rd, 2026, and the time is now 10:21 AM Eastern Time. We are here on seven related jointly administered cases. The lead case is CHSFL, LLC. It is case number 2601087. The six remaining jointly administered cases are as follows: YesCare Corp., case number 2601089; CHSCX, Inc., 2601090; CHSAL, LLC, 2601091; CHS Care CX, LLC, 2601146; CHS Care NY, LLC, 2601145; and Horizon Healthcare of New Mexico, LLC, case number 2601144. This meeting of the debtors, creditors, and the

United States Trustee is being conducted pursuant to section 341 of the Bankruptcy Code. Section 341 authorizes the United States Trustee to examine the debtors concerning their financial affairs, assets, liabilities, and the information contained in the petition schedule, statement of financial affairs, and all related filings.

This meeting is being recorded. Any party in interest wishing to obtain a copy of the recording should contact the office of the United States Trustee and no other recording should be made. I will conduct the initial examination. After I have concluded, creditors and other parties in interest will have an opportunity to examine the debtors. Before asking questions, please state your name and the party you represent for the record.

At this time, I would like to start with debtor's counsel. Please enter your appearance for the record.

MR. JOHNSON: Good morning. This is Jeremy Johnson of Polsinelli on behalf of the debtors.

THE TRUSTEE: Thank you, Mr. Johnson. And are the debtors' representatives present today?

MR. SPROUSE: Yes. I'm sorry. No, go ahead.

MR. JOHNSON: The debtors have two

representatives present today. David Goldwasser, who's the Chief Restructuring Officer of the debtors and James Sprouse, who is the chief financial officer.

THE TRUSTEE: Okay. Mr. Sprouse and Mr. Goldwasser, please raise your right hand. Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. SPROUSE: I do.

MR. GOLDWASSER: David Goldwasser, I do affirm.

THE TRUSTEE: And please state your name for the record, one at a time, starting with Mr. Goldwasser.

MR. GOLDWASSER: David Goldwasser.

THE TRUSTEE: Mr. Sprouse.

MR. SPROUSE: James Sprouse, I do.

THE TRUSTEE: Mr. Sprouse, would you please describe your position with the debtors and when you assumed that role?

MR. SPROUSE: I am the chief financial officer. I assumed the role in July 2023.

THE TRUSTEE: And Mr. Goldwasser, would you please describe your position as chief restructuring officer and when you were retained?

MR. GOLDWASSER: Chief Restructuring Officer of

the debtors, and I was retained prior to the bankruptcy. I was advising the company before that, but I was retained two days prior to the bankruptcy, about a week prior to the bankruptcy in order to prepare.

THE TRUSTEE: And what was your relationship to the debtor prior to filing?

MR. GOLDWASSER: I was advising with respect to a settlement agreement that they had, that they were negotiating with the respective trusts and to carve out their own bankruptcy.

THE TRUSTEE: Okay. Mr. Sprouse, because you reviewed and signed the bankruptcy petitions, schedules and statements and all of the other related documents, most of my questions are going to be directed to you. Mr. Goldwasser, if you have additional information or if you wish to supplement any answer, please identify yourself for the record before responding. And unless otherwise indicated, my questions are going to relate to all seven of these debtors. And Mr. Sprouse, are you personally familiar with the information contained in the petition, schedules, statement of financial affairs, and related documents filed in these cases?

MR. SPROUSE: I am.

THE TRUSTEE: And did you assist in the preparation of those documents?

MR. SPROUSE: I did.

THE TRUSTEE: Did you review them before they were filed?

MR. SPROUSE: I did.

THE TRUSTEE: Did you sign the petition and all schedules?

MR. SPROUSE: I did.

THE TRUSTEE: And did you authorize debtors' counsel to file the petition, the schedules and statements and all other related documents?

MR. SPROUSE: I did.

MR. GOLDWASSER: I'm sorry, this is David Goldwasser. I believe I signed the petitions and I authorized the attorneys to file the bankruptcies. And Mr. Sprouse, although he did help with several of the petitions, I believe I'm the one who signed the petitions. Mr. Sprouse is the one who signed all the schedules. I just wanted to --

THE TRUSTEE: I'm sorry, repeat that. There were two people speaking.

MR. SPROUSE: Yes. This is James. I signed the SOFA and the schedules. And those are the documents I executed.

THE TRUSTEE: Okay. Thank you for that clarification. To the best of your knowledge, both of your knowledge, are the petitions, schedules, statements of financial affairs, and related documents true and correct?

MR. GOLDWASSER: This is David Goldwasser. I will answer first. Yes, to the best of my knowledge, they were true and correct for everything that I've signed. I know that there are some pending amendments that Mr. Sprouse has been working on, and he can address that they'll be filed. I just know that he's not used to being in a 341. So we have some corrections that are being filed. To the point that we did filed, everything that I understand was true and correct on the petitions. I stand by that as of today.

MR. SPROUSE: Yes. This is James Sprouse. I agree the information provided was accurate to the best of our knowledge at the time it was provided.

THE TRUSTEE: Are there any errors or omissions?

MR. SPROUSE: This is James. Again, to the best of my knowledge, I'm not aware of any. I do have one question on the priority claimants, creditors as far as how information is presented regarding PTO obligations and that we are working through with FIA

and David Goldwasser and his team on how to best present that information. That's the only question I'm aware of that's outstanding.

THE TRUSTEE: Okay, thank you. And did you identify all of the assets of each debtor?

MR. SPROUSE: We identified all the assets of each debtor to the best of our knowledge, yes.

THE TRUSTEE: Did you identify all of the creditors of each debtor?

MR. SPROUSE: Again, to the best of our knowledge, yes, we provided a list of each creditor.

THE TRUSTEE: And did you receive the United States Trustee's operating guidelines?

MR. SPROUSE: I have not seen the operating guidelines. We did work with FIA in preparing the schedules and provided them with the information to prepare the schedules in accordance with the guidelines.

THE TRUSTEE: Mr. Goldwasser, did you receive the operating guidelines?

MR. GOLDWASSER: I did receive the operating guidelines and I went over them with Counsel.

THE TRUSTEE: Okay. And do you understand the guidelines?

MR. GOLDWASSER: I do understand the guidelines.

THE TRUSTEE: Do you have any questions regarding the debtors' obligations with regards to the guidelines?

MR. GOLDWASSER: I do not have any questions at this point.

THE TRUSTEE: And when did each debtor last file a federal income tax return?

MR. GOLDWASSER: The debtors file a consolidated tax return under YesCare Corp., and it was filed for the year 2024 in October 2025.

MS. DION: I'm sorry, Adi, I need to stop the recording for just one moment.

THE TRUSTEE: Okay. One moment. Give us one second. I've begun recording. Mr. Goldwasser, Mr. Sprouse, you are both still sworn in under oath.

MS. DION: I'm sorry. Adi, I'm back.

THE TRUSTEE: Okay. Dion, are you recording as well?

MS. DION: I am.

THE TRUSTEE: Okay. Okay, thank you. Okay. So let's pick up where we left off. I was inquiring of Mr. Goldwasser and Mr. Sprouse about the debtor's last filed income tax returns. Have all debtors filed tax returns for 2025 or are those on extension?

MR. SPROUSE: Those are on extension.
THE TRUSTEE: That's going to take us through October?
MR. SPROUSE: Those returns due -- yes, those returns will be due in October.
THE TRUSTEE: And this is Mr. Sprouse speaking.
MR. SPROUSE: This is Mr. Sprouse.
THE TRUSTEE: Mr. Sprouse, were true and correct copies of the filed tax returns provided to the office of the United States Trustee?
MR. SPROUSE: To my knowledge, they were. We have provided tax returns to our advisors. I think they were provided to the trustee.
THE TRUSTEE: Could you please describe the debtor's business operations immediately before the petition date?
MR. SPROUSE: I don't know how much detail you want here, but we were a provider of healthcare to correctional institutions in approximately 20 locations across the country.
THE TRUSTEE: Are the debtors currently operating?
MR. SPROUSE: We are not. All contracts have now ended. As we wind down the business, there is a small number of people continuing to work and

operate the wind down of the company, but there are no operating contracts.

THE TRUSTEE: And how many employees do the debtors have currently?

MR. SPROUSE: Approximately 23.

THE TRUSTEE: And what are their primary responsibilities?

MR. SPROUSE: Again, it's wind down. It is collecting receivables, providing information to former clients to be able to collect receivables. It's transferring data to clients that relates to EHR information and other information clients need to, or former clients need to transition services to someone else. It's winding down legal matters. It's winding down HR and payroll matters. So it's back office wind down operations.

THE TRUSTEE: And is it your understanding that a debtor at this juncture requires 23 employees to effect this wind down process?

MR. SPROUSE: We have had discussions regarding that matter. Most are necessary in some manner or another, but we are open to looking to see if other reductions can be made as we continue this wind down. This is something the management team has not been through as far as winding down a company.

THE TRUSTEE: And who would be the person responsible for determining if a further reduction in workforce is needed?

MR. GOLDWASSER: This is David Goldwasser. I'm sorry.

MR. SPROUSE: No. Yeah, David, go ahead.

MR. GOLDWASSER: Yeah. We have had -- this is David Goldwasser to address this. We have had extensive discussions about this as the way the company had been operating. Many different people were needed in order to accomplish certain tasks. And while some might say it was a little bit too bureaucratic, that's the way that they operated. I think we are reaching a point where we understand the balance of the duties to the estate and we are making a wind down plan for the next week to two weeks to bring the staff down to what would be an on-call or as needed basis after we accomplish the last few things with delivering -- to be able to deliver to, we believe, the incoming trustee all the information necessary to finish up the affairs of the estate. So we will not be continuing with the full 23 people by the end of next week.

THE TRUSTEE: Okay. Thank you, Mr. Goldwasser. And who currently serves as the officers of the

debtors?

MR. GOLDWASSER: To the best of my knowledge -- this is David Goldwasser. You have James Sprouse as the chief financial officer. You have Jeff Sholey as the chief executive officer and Scott King, I think is also an officer.

MR. SPROUSE: Scott's the chief legal officer.

MR. GOLDWASSER: Chief legal officer, right. Okay. Those are the actual officers of the corporation, and then I'm the chief restructuring officer.

THE TRUSTEE: And are they receiving compensation?

MR. GOLDWASSER: They are currently receiving compensation.

THE TRUSTEE: Has the compensation changed since the filing?

MR. GOLDWASSER: Mr. Sprouse, you have the numbers on exactly--

MR. SPROUSE: Yeah. No, it has not changed since the filing.

THE TRUSTEE: And Mr. Goldwasser, as CRO, are you receiving the same compensation?

MR. GOLDWASSER: I'm not receiving any kind. I have my contract; I'm not receiving compensation as

of yet.
THE TRUSTEE: So post-filing, there has been no compensation then to the CRO, correct?
MR. GOLDWASSER: Correct. We'll be filing the proper requisite of the application of the same even though it was approved in the budget, we felt it appropriate to have everything approved by the Court.
THE TRUSTEE: Okay. I want to talk a little bit about the assets of each debtor because it's a little bit unclear to me from the way the schedules were initially drafted. Do any of the debtors lease any real property?
MR. GOLDWASSER: The debtor, did you say do the debtors lease real property?
THE TRUSTEE: Yes. Do they lease any real property?
MR. GOLDWASSER: The only real property that was leased was an office space in our CHS Alabama contract. Otherwise, there is no real property leased by the debtors.
THE TRUSTEE: Is that lease still ongoing or has it been terminated?
MR. GOLDWASSER: It has been terminated.
THE TRUSTEE: But the schedule lists property

and equipment in general terms. It doesn't specifically identify the assets and the ownership or the location. So the debtors will need to amend the schedules to identify the specific property as to which debtor owns it, where it's located and whether or not it's insured if it's a piece of property that needs to be insured.

MR. GOLDWASSER: So the debtors have no real property. The debtors do have personal property, primarily computer equipment. As most equipment was provided by the client, most medical equipment was provided by the client. So to the extent there's personal property, it's primarily computer equipment, that is the place where services were provided.

THE TRUSTEE: Okay. Thank you for clarifying that. Did the debtors -- did any of the debtors own any vehicles?

MR. GOLDWASSER: The debtors do not -- to my knowledge, there are no vehicles owned by the debtors.

THE TRUSTEE: Okay. Let's talk a little bit about the banking and cash management system. The schedules do not identify any bank accounts owned by the debtors before the debtor-in-possession accounts

were opened. So what accounts were being used by the debtors before the petition date?

MR. GOLDWASSER: So the arrangement with our ownership contained a management agreement most recently with ADAR and prior to that Geneva in which cash is managed through that management agreement. And the bank accounts were owned by those management companies. That's the reason you do not see any bank accounts owned by any of the debtors. They were owned by the management company.

THE TRUSTEE: And so did all of the receipts and disbursements flow through these non-debtor affiliates?

MR. GOLDWASSER: They did.

THE TRUSTEE: And why is that? Why was that the structure for banking?

MR. GOLDWASSER: That is the structure that was in place when I assumed my role. That is a question I think is probably better addressed by ownership as that was the structure. My understanding that was the structure they put in place at the beginning of their ownership.

THE TRUSTEE: So we have not received statements covering the 90 days preceding the petition date. And since those accounts that the debtor was using

contain debtor funds, will the debtor be providing the requested pre-petition bank statements?

MR. GOLDWASSER: This is David Goldwasser. I believe that counsel should be either in receipt or will be in receipt of those documents that were requested from the account holder. And yes, we'll be able to provide that.

THE TRUSTEE: When will they be produced?

MR. GOLDWASSER: So I would defer to Mr. Johnson to know if he actually has them. As we speak, if not, I think he's more in control of the actual receipt and production of those.

THE TRUSTEE: Mr. Johnson, do you know when we can expect to receive the bank statements?

MR. JOHNSON: I'll check to see if we have them. If we have them, we'll have them to you tomorrow. If we don't, we'll give you an update as to where we are. I'm not aware of us having them right now, but let me check with my team. It's possible somebody has them and we'll get them over.

THE TRUSTEE: Okay. So just to go back to the banking practices, I want to make sure I really understand how it works. It's my understanding that ADAR Management collected receivables under a management services agreement and deposited those

funds into an account that was maintained by another entity, TN CorrectHealth Services, before transferring funds to the debtors. Is that correct?

MR. SPROUSE: So the accounts -- so ADAR provided management services for cash as well as other services. ADAR established the CorrectHealth account as its account. And it was to those accounts that funds were received and funds were disbursed. So those healthcare accounts or CorrectHealth accounts were established and owned by ADAR to the best of my knowledge.

THE TRUSTEE: What is the relationship among ADAR Management and TN CorrectHealth Services and the debtors?

MR. SPROUSE: Well, myself personally and to my knowledge, management as a whole of YesCare did not have a lot of knowledge of the ownership of those other entities. Our understanding is there was a relationship amongst ownership between ADAR Management, CorrectHealth, and other entities, but that was not information that was shared with me personally. And again, I don't think the other members of the management team had information around that ownership and the exact relationship.

THE TRUSTEE: Do you know who has authority over

those bank accounts?

MR. SPROUSE: Well, my understanding is Mr. Isaac Lefkowitz has control over those accounts. Are there others? I do not know. But I do know Mr. Lefkowitz was involved in setting up those accounts and managing those accounts.

THE TRUSTEE: So Mr. Lefkowitz is the person who produced those requested bank statements, correct?

MR. SPROUSE: The company, while ADAR, again, owns the accounts, we have access to the accounts. I don't know if they've been requested of us, but we can provide those to Counsel, to FIA, to produce those. We have access to the statements, or we had access. I don't know if we do today or not. But we should have to look back in our records or past accounts and provide those. Even though we do not own the account, so we'll control the accounts.

THE TRUSTEE: Okay. But you have access, or so you believe you still do?

MR. SPROUSE: We used -- Sorry. We used to have access. I think we'll have a copy of those statements from when we used to have access to those accounts.

THE TRUSTEE: Okay. We need those right away. So please put that as an urgent request. That has been

outstanding for some time now. I want to understand a little bit better what Geneva Consulting, LLC is relating to. We received information that was produced that indicates that funds were transferred recently to Geneva Consulting. What is Geneva Consulting, LLC? And what services does it provide?

MR. SPROUSE: David, you may want to add to this. Geneva Consulting was the predecessor to -- well, I say predecessor. It provided management services to the company, to the debtors prior to ADAR providing management services to the debtors. I'm not familiar with these recent transfers you referred to for Geneva. The ADAR agreement took the place of the Geneva agreement in February of 2025, as far as the company is concerned. Any questions on what Geneva is today, if it still exists, would have to be addressed to, again, others.

THE TRUSTEE: The transfer I'm referring to, just so the record is clear, it's coming from the bank statements that were provided to the US trustee. The bank accounts that were open post-petition. YesCare Corp. transferred funds to an account named Geneva Consulting, LLC. And I believe--

MR. GOLDWASSER: Yes. This is David Goldwasser.

THE TRUSTEE: Yes.

MR. GOLDWASSER: That was for payroll to be paid from the accounts that we sent the money to.

THE TRUSTEE: And this is despite the fact that it was now ADAR that was providing management services? That's what I'm not understanding. Is the debtor utilizing ADAR?

MR. GOLDWASSER: Yes, it's confusing to start from end to end. The name on the account to send was to Geneva. When we received money, it came from CHS. But the account name where -- it was the same account name. I think if there was a DBA, I do not have -- I did not open the bank account, so I can't give you direct testimony on it. But it was the same account number where the monies were being held. The same account number that was being used for payroll. The title on the account is Geneva as per the way that it was set up in the banking system and where they always had -- it's the same account that they've always been drawing payroll from, so it was not a new account. I don't know if the ownership of the Geneva account went to Adar. I'm not involved in the exterior companies, but we did verify that it was the same account when we did have the online access to see the money being there. It was the same

account, even though it said the CHS employee group where the monies were drawn from, it still had a Geneva name as to where it was being sent. I don't have an exact explanation as to why that is, but it's the same account number that there was access to watch the money from the side of the company.

THE TRUSTEE: And just to clarify the record, the account is named Geneva Consulting, LLC, DBA CHS Employee Group, LLC. So that's the full name on the account.

MR. GOLDWASSER: Right.

THE TRUSTEE: And do the debtors currently maintain any directors and officers liability insurance?

MR. GOLDWASSER: Yes.

THE TRUSTEE: Do the debtors maintain general liability insurance?

MR. GOLDWASSER: The answer is I believe so. I don't have the policies in front of me. But I believe there was a general liability insurance policy.

THE TRUSTEE: The United States Trustee requested proof of these policies, but we have not yet received them. Our understanding was that these policies may have been canceled for non-payment. Is

that correct?

MR. GOLDWASSER: There was a myriad of different policies that were issued from the brokerage. Some of them were canceled. Some of them were not canceled. Some of them were paid. We do have -- I don't have it in front of me, but we can get a list of each one and then send it over to you tomorrow morning.

THE TRUSTEE: Yes, that would be very helpful because the cash collateral budget does have a line item that was approved for payment of insurance. So I would like to know were those premiums paid?

MR. GOLDWASSER: Some of them, yes. And we'll get a detail for you so it's more clear. They were not more clear, sorry.

THE TRUSTEE: Also, please provide the certificates of the insurance as well as any proof of renewal if they had--

MR. GOLDWASSER: Yes.

THE TRUSTEE: -- lapsed with coverage. And do the debtors currently have outstanding accounts receivable?

MR. GOLDWASSER: Yes.

THE TRUSTEE: Which debtor owns the receivables?

MR. GOLDWASSER: I'm going to leave that to Mr.

Sprouse.

MR. SPROUSE: Yes. The receivables are owned by CHSTX, CHSFL, and CHS CareTX. I'm trying to remember exactly how that name is formed. Well, and CHSAL. Those are the entities that have outstanding receivables.

THE TRUSTEE: And approximately how much remains outstanding?

MR. SPROUSE: Approximately $10 million.

THE TRUSTEE: When do you expect those receivables to be collected?

MR. SPROUSE: That is a difficult question to answer from the standpoint of, again, some clients want additional information. Some clients are just reluctant to pay with the contracts ending. I know efforts are being made by FIA, by us to continue to collect those dollars, but to put a timeline on it would be difficult.

THE TRUSTEE: And who's responsible for collections?

MR. SPROUSE: I mean, currently, it is primarily an activity of Mr. Goldwasser and the team at FIA. They've been in the most recent contact with most clients. We have had some correspondence with clients through our counsel. But most clients,

except for us providing information to them, which would be providing either directly or through FIA. Most have these communications for the most part with the company.

THE TRUSTEE: Okay, thank you. What role does TN CorrectHealthcare Services play in collecting receivables?

MR. SPROUSE: It really does not. I mean, again, it's a holding management company, but it does not really play a role in collecting receivables.

THE TRUSTEE: The statement of financial affairs reflects approximately $281.9 million in transfers to insiders during the year preceding the petition date. And I'm wondering specifically how you all went about identifying those transfers. How were these transfers all identified?

MR. SPROUSE: If I can, I want to ask a clarifying question. How did we go about identifying the related parties or how did we go about identifying the transactions themselves?

THE TRUSTEE: Let's do both, starting with the transactions themselves.

MR. SPROUSE: So the transactions themselves are transactions obviously we would be recording in our books and records. And we identified and listed all

potential transactions that we identified with potential related parties, insiders. We tried to cast a broad net in putting that schedule together to make sure all potential parties were identified.

THE TRUSTEE: Most of -- not most, but many of the transfers appear to be round dollar amounts which is a bit unusual. Can you explain exactly how that could be? Or your idea of how that could happen?

MR. SPROUSE: I will give you obviously the best answer I can. The transfers -- many of the transfers were to CHS Employee Group, or as you mentioned earlier, that's a DBA for Geneva Consulting. But for CHS Employee Group, those transfers were for the payment of payroll. But what would happen is we would be instructed to make round dollar transfers in amounts sufficient to cover those payrolls or in line with the cash available. But we would be instructed by ADAR of the amount to transfer to fund payroll in the case of CHSEG for that period. Whether that be a specific payroll period, whether it be the end of the month. But we would be given direction on what to transfer and the amount that would be transferred.

THE TRUSTEE: Okay. Thank you. After the

petition date, there were funds that belonged to the debtor that were transferred to or used for the benefit of non-debtor affiliates. Could you please explain how those post-petition transfers occurred?

MR. SPROUSE: David, do you have that one?

MR. GOLDWASSER: I'm sorry, could you clarify the question a little bit further? I just want to make sure to answer it properly.

THE TRUSTEE: Absolutely. There were some funds belonging to the debtor, post-petition, that were transferred to or for the benefit of non-debtor affiliates to be specific, May 13, there was a wire out to American Express for over $140,000.

MR. GOLDWASSER: I understand the transactions.

THE TRUSTEE: Okay.

MR. GOLDWASSER: I just wanted to make sure that's what you were. I just wanted to make sure what you were referencing.

THE TRUSTEE: Yes

MR. GOLDWASSER: So from my understanding, your question is, how did those amounts get transferred without permission of the company?

THE TRUSTEE: Correct.

MR. GOLDWASSER: Okay. That's why. I just wanted to clarify the question. Okay. So the company did

not have access to or ownership of those accounts. So the company did not have the ability to make any transfers. All the transfers were made from those accounts by the owner of those accounts. From what I was told, those monies were not for the benefit of third parties, but for the benefit of YesCare. Again, I know there's a pending dispute as to that, and I'm not opining as to anything to that, but the direct question is that YesCare did not have -- YesCare and its affiliates, as are in the bankruptcy, did not have access to initiate any transactions from those accounts. Not now and not before the bankruptcy, not after the bankruptcy. Those accounts were set up in the way to receive monies from the different municipalities predating probably Mr. Sprouse as well as me. And that's the way that they had operated. So monies went there and then flowed to however they paid. They didn't have DIP accounts, and as you stated earlier, YesCare did not have accounts. So their standard operating procedure was to operate through those accounts up and through the bankruptcy. Once these, we'll call it disbursements were made, we brought strong attention to the fact that every dollar has to flow through this DIP account for purposes of being in

the bankruptcy. And regular transfers were made to the DIP account upon alert of monies coming into the account. Sometimes they were made before we knew, before I got my morning update, and sometimes they were made after we got my morning update.

THE TRUSTEE: Do you know who authorized those transfers?

MR. GOLDWASSER: I do not have direct knowledge. I don't have the copies of the wire from the bank.

THE TRUSTEE: Were there any internal controls in place to prevent the use of the estate property for the benefit of the non-debtors?

MR. GOLDWASSER: You're saying upon filing of the bankruptcy?

THE TRUSTEE: Yes.

MR. GOLDWASSER: Or prior to? So upon filing the bankruptcy, we didn't place official control on those accounts because there was no way to place official control on the accounts from YesCare to there. I did discuss with management about having funds redirected to the DIP account instead of being paid to that account. And due to the nature of needing to pay the payroll, as everybody knows the beginning of this case was the largest concern, management said that speaking to their contacts,

they could not get the accounts changed on how to be paid without a tremendous amount of paperwork and maybe a few weeks to a month delay, and having that done. We discussed, I believe, Counsel discussed with the US trustee and not myself. I did not discuss with the trustee, but I did discuss with Counsel and they felt that for the time being to make sure the flow of funds was not delayed by a long amount of time, that it would be standard operating procedure as has been done in other cases. That money flow through what you would call maybe a paymaster or a servicer of some sort. So it was not -- I mean, that's how it was designed from the beginning. Obviously, upon knowledge of these transfers, we started to try to figure something else out. I did, for some of the, or one of the clients in Philadelphia. They were able to wire us money. They went around the regulations in order to make sure we can make payroll, and they were to wire us money. But all the others said they could not redirect the funds. Now, those accounts have been closed and we have told all of the people who owe us money, the clients, former clients, that we can only receive money from the debtor accounts. We cannot receive money through the other account anymore. And

in fact, we did have a payment, I believe, earlier this week, for $600,000 from Coxsackie, which was bounced back to Coxsackie and was not received into the account because the accounts are, in fact, closed.

THE TRUSTEE: So the debtor's current cash management system is now designed to ensure that the estate funds are segregated and not used for the non-debtor entities going forward?

MR. GOLDWASSER: Absolutely. And we've directed Counsel. As your collection question before, I'd like to bring a little clarity to what Mr. Sprouse said. I got involved with collections from when we came in, and maybe a few days later, not the first day, but a few days later, we got involved with the collections in order to try to speed them up and to make the payroll. And I had favorable dealings with some of the clients, since I said Philadelphia and some of the other counties, where we're able to resolve and make sure that people got paid that money in order to be able to pay payroll, some of the other clients were not as excited to speak with us and wanted to speak through Counsel, so we've had a myriad of different ways of collections. Although as Mr. Sprouse said, the people were called the

back-office people who need to process the payroll or the payments and the bills that we send still have called into the CHS staff in order to get clarifications on some of the bills or some of the information. So they've been assisting in correcting invoices and/or clarifying invoices in order for us to be able to collect. So it's been sort of a joint effort, but most of the collections, if not all the collections at this point, are going through the -- to counsel because we don't have the same robust system we had before of people. And most of the remaining clients are either saying they don't owe as much money or have different types of claims. And so they have brought in counsel, and counsel for YesCare being, Ms. Green and Mr. Johnson have been handling most of those since then from the actual collection standpoint working on the front end with the attorneys, and then anybody on the back end has been clarifying information.

THE TRUSTEE: Okay. And has the debtor's estate been reimbursed for any of the post-petition transfers made to or for the benefit of these non-debtor affiliates?

MR. GOLDWASSER: That original claim has not been paid back. The demand that we put on has not

been paid as of yet.

THE TRUSTEE: Okay. And what is your understanding of what is the debtor's anticipated exit from Chapter 11? What does the debtor hope to accomplish?

MR. GOLDWASSER: Well, as we have, the current motion on, I believe the 30th, we look to transition over to a trustee in order to collect the balance of the receivables to try to collect the approximately $8 million that we have sitting by a former workman's comp and insurance policy. A former insurance policy that we have a cash deposit of $8 million as well as work through the claims that are on from priority down through all the different claims that are in the estate. They might look to recover some money from different avenues that the trustee finds above and beyond what we've already started and settle out the estate by collecting whatever they can from all the receivables. The potential claims they have the $8 million that I referenced. And then pay that out to the respective creditors and classes of creditors.

THE TRUSTEE: Thank you, Mr. Goldwasser. I would now like to proceed to the questions from creditors and other interested parties. I would like to start

with Counsel for the official committee of unsecured creditors, Mr. Louis Salazar.

MR. SALAZAR: I'm here. Can you hear me?

THE TRUSTEE: Yes.

MR. SALAZAR: Thank you so much. Louis -- hmm?

THE TRUSTEE: You may proceed.

MR. SALAZAR: Thank you very much, Madam Trustee. Louis Salazar for the Statutory Unsecured Claim Holders Committee of the Debtors. Good morning, Mr. Sprouse and Mr. Goldwasser. Mr. Goldwasser, good to be speaking with you again. I'd like to start with a little bit of follow-up from some of the questions that I heard. Mr. Goldwasser, can you confirm that you have yet to file an application to retain your firm or yourself as chief restructuring officer?

MR. GOLDWASSER: I don't know if Counsel found it. We had gone back and forth. It was lost in the fray, but it is there to be filed. It was clerical. No problem.

MR. SALAZAR: Okay. Thank you. And you did say that to date, from the petition until now, FIA, neither you nor FIA have received any compensation for your services.

MR. GOLDWASSER: We have not been changed. We

have not put in the bill. As we said, we would do that via application.

MR. SALAZAR: Thank you. Just a moment. This is a question for Mr. Sprouse. Mr. Sprouse, currently, you testified as the chief financial officer of the debtors, correct?

MR. SPROUSE: Correct.

MR. SALAZAR: You would agree with me as chief financial officer, it's your responsibility to establish and maintain internal controls, accounting systems, financial reporting processes, right?

MR. SPROUSE: Correct.

MR. SALAZAR: Thank you. And by the way, Mr. Sprouse, where are you presently?

MR. SPROUSE: I am in Nashville, Tennessee.

MR. SALAZAR: Okay. Are you at the offices of the debtor or debtors?

MR. SPROUSE: The debtors function virtually from a corporate standpoint.

MR. SALAZAR: So you're at the -- again, is it fair to say you're at a home office?

MR. SPROUSE: I am at the home office.

MR. SALAZAR: Okay. Thank you. And is there anyone else from the company there with you?

MR. SPROUSE: No.

MR. SALAZAR: Thank you. Mr. Sprouse, as CFO, then it was your responsibility to oversee, say, the finance team, chart of accounts, company policies about financial reporting. Is that fair?

MR. SPROUSE: That is fair.

MR. SALAZAR: Okay. You were also responsible. Well, as CFO, you were also responsible for or your responsibilities would've included month-end or year-end closings of financial records?

MR. SPROUSE: I was responsible for closing the year-end records, correct.

MR. SALAZAR: Thank you. Now, does the debtor continue to maintain financial records sufficient to create financial statements?

MR. SPROUSE: With the reduction in staff, that is becoming more difficult, but we are continuing to close the books, so we did through the month of May, at least.

MR. SALAZAR: Thank you, Mr. Sprouse. So you are, at least through May. I'm sorry, were you going to add something else?

MR. SPROUSE: No, at least through May. And we're working on June, but June is not complete.

MR. SALAZAR: Thank you. So through May, you would be able to produce, for example, a balance

sheet, income statement, cashflow statement, and the like?

MR. SPROUSE: We could produce a balance sheet and income statement. We have not produced those. We closed the books, but there's been no need for those statements with the current proceeding.

MR. SALAZAR: Thank you. And Mr. Sprouse, on what system is that financial information maintained?

MR. SPROUSE: We use PeopleSoft.

MR. SALAZAR: So with PeopleSoft, the financial data is maintained in the cloud with PeopleSoft?

MR. SPROUSE: It is maintained in the Cloud, correct.

MR. SALAZAR: And is the debtor current on its obligations to PeopleSoft, such that there's no risk that that's going to be cut off or lost or anything like that?

MR. SPROUSE: No, we are not current with the provider.

MR. SALAZAR: Are you not current post-petition, or is there a pre-petition liability?

MR. SPROUSE: There's both a pre-petition and a post-petition obligation outstanding.

MR. SALAZAR: Thank you, Mr. Sprouse. Is there

any reason in particular why that has not been paid, say, post-petition?

MR. SPROUSE: And I'll let David add to this, but post-petition, very few creditors have been paid outside payroll. The first priority has been to maintain payroll, and few creditors post-petition have been paid.

MR. SALAZAR: Right. Thank you. Other than through the system that you just described, are financial records maintained anyplace else?

MR. SPROUSE: Well, PeopleSoft is our financial system. I mean, we generate reports using Microsoft products such as Excel and things of that sort. But PeopleSoft is the general ledger. Records from a payable standpoint. Provider claims, for example, are in a separate system called QNext. So depending on how detailed you want to go, there are other systems. But PeopleSoft is the general ledger and payable system.

MR. SALAZAR: All right. Thank you, sir. So is there any -- are there any physical records that need to be also maintained or physical copies of financial records that are stored someplace?

MR. SPROUSE: No, everything is electronic either in the PeopleSoft servers. We maintain

invoices electronically through scanned images, so everything should be electronic.

MR. SALAZAR: Okay. Now, let me turn a second to the schedule. So you signed, you Mr. Sprouse, signed these schedules. And at the end of the schedule, it says, "I declare under penalty of perjury that the foregoing is true and correct." Do you recall that?

MR. SPROUSE: I do.

MR. SALAZAR: Right. Now, I want to ask you a little bit about the global notes that are attached to the schedules. Does the global note say, for example, on page two, it says, "The debtors and their officers, employees, agents, attorneys, and advisors do not guarantee or warrant the accuracy or completeness of the data that is provided in the schedules and statements." So Mr. Sprouse, how are those? Which is it? Are they true and correct? Or in your mind, are these not accurate and complete or cannot be guaranteed to be accurate and complete?

MR. SPROUSE: I mean, we have provided information to the best of our knowledge that is complete and accurate. Honestly, I'd have to go back and look at that global statement. I think David signed the global statement, and I'm trying to remember the exact context for that phrase. But the

information we provided to be included in the statement of affairs and the schedules is accurate to the best of our knowledge.

MR. SALAZAR: Thank you. When you say to the best of our knowledge, what do you understand that to mean?

MR. SPROUSE: Well, we have provided all the information we have to provide the values of the creditor's claims, to identify who could be an insider. The information that was required, we have provided the information for the preparation of schedules and the schedules to be accurate. Will a creditor have a different amount? Could there be an invoice that we don't have in the system? Absolutely. So I'm not going to say that there's not another liability out there, but these are the liabilities we are aware of and have recorded.

MR. SALAZAR: Thank you, Mr. Sprouse. So primarily it's the -- what if you're identifying reasons why there might be a lack of accuracy, it's maybe a lagging record or with respect to creditors. Is that it?

MR. SPROUSE: Yes. I mean, that's correct.

MR. SALAZAR: Thank you for that. But as you sit here today, other than that exception you mentioned,

it's your belief that the schedules and statements of financial affairs that you signed are pursuant to that last line, true and correct. Is that right?

MR. SPROUSE: Yes. Correct.

MR. JOHNSON: This is Jeremy Johnson. I'm going to object at this point. I mean, I appreciate Mr. Salazar that you're asking these questions, but you're mixing concepts here regarding the global notes that are talking about guaranteeing or warranting the accuracy. Those relate to issues for people relying upon and then liability for loss, et cetera. So he's testified that these are true and correct to the best of his knowledge. He signed them. He signed them under penalty of perjury, so I think we should just move on.

MR. SALAZAR: Thank you, Mr. Johnson. I'll rely on Mr. Sprouse's testimony. I appreciate your comments. Just a moment. So Mr. Sprouse, a couple of questions back to answers you gave to the US Trustee. I've understood that there's still an amendment to be made or you're working on an amendment to the schedules and statement of financial affairs. With respect to priority creditors, can you explain that again, please?

MR. SPROUSE: In the schedules related to

priority creditors, namely employees in this case, there's a question regarding PTO liability. Our prior practice was to pay employees upon their leaving the company. And I felt the schedules as prepared were somewhat inconsistent, and I'm still waiting for an answer to how those should be prepared as it relates to disclosing wages versus PTO liability. I think it's cleaning up the amounts there. It's not anything of people missing or that type of issue. It's making sure the information is presented correctly for the Court.

MR. SALAZAR: Thank you, Mr. Sprouse. Other than the amendment or potential amendment to address the priority creditor issue you just explained, do you contemplate as a debtor, do the debtors contemplate making any other amendments at this time?

MR. SPROUSE: David, I'll let you chime the answer as well. I am not aware of any other changes at this time.

MR. SALAZAR: Thank you. Mr. Goldwasser, do you know anything different or?

MR. GOLDWASSER: I know that there's been preparation. I've been traveling overseas. I know there's been preparation of some amendments. I could have Mr. Johnson explain which exact documents they

might all pertain to that. It might all tie in. But there were some documents that were being amended to be filed. Mr. Sprouse was the one who's been signing schedules on the amendments. I've not been in overview. My office has been working with them to get that done, so I could let Mr. Johnson answer exactly what documents would be uploaded. They were intended to be done before the hearing, but there was the technical issue with the filing.

MR. SPROUSE: And so let me clarify. I am entering the copies of what I've seen these amended statements that I thought had been uploaded. So yeah, there could be other additional changes if these have not been officially filed.

MR. SALAZAR: Wait, before Mr. Johnson jumps in, just to clarify. Mr. Sprouse, you're saying there are some amendments pending, but in addition, there may be a further amendment on the priority issue?

MR. SPROUSE: The priority issue is a further amendment. Yes. When we were going through them yesterday, that's a further amendment.

MR. SALAZAR: All right. Well, Mr. Johnson, I don't want to put you on the spot at all. If you don't want to jump in, that's fine. But if you want to jump in, now's a good time.

MR. JOHNSON: Thanks, Mr. Salazar. This is Jeremy Johnson. We have provided Omni with some, I would say, some small amendments to the schedules, those amendments that Mr. Goldwasser said. We had hoped to have them on file before today's hearing, for today's 341, but we're going to have to do it afterwards. We also thought we would make any changes that came up during the 341, so we would have to amend them again. So we do have some amendments. I can actually forward those to you, Mr. Salazar, after this call. Yeah, I don't think that they're material necessarily to clean up on various things.

MR. SALAZAR: All right. Thank you. Thank you for that information. Let me continue on. Mr. Sprouse, you mentioned there's a small group. I believe it was you mentioned that, or maybe Mr. Goldwasser. There's about a small group of about 23 employees remaining that are winding down or working on winding down the affairs of the debtors. Is that correct?

MR. SPROUSE: That is correct.

MR. SALAZAR: And those 23 employees, are they all remote or do they have an office they work from?

MR. SPROUSE: They are all remote.

MR. SALAZAR: Thank you. And formerly, was the office in Brentwood, Tennessee?

MR. SPROUSE: Well, again, the debtor always provides services on site, so we had employees at the client location. The corporate office has been virtual since I returned to the company. And sometime before that, I think back to 2000 even before COVID.

MR. SALAZAR: Thank you, Mr. Sprouse.

MR. SPROUSE: Oh, sorry.

MR. SALAZAR: Sorry, go ahead.

MR. JOHNSON: No, no, go ahead.

MR. SPROUSE: There was a mailing address in Brentwood, a small suite of offices for people to go in if they needed to go in to meet. But our corporate staff is scattered around the country. There is no corporate office, per se.

MR. SALAZAR: Thank you for that clarification. Mr. Sprouse, I want to ask you now about some more items on the schedules, right? So in the statement--

MR. JOHNSON: Mr. Salazar, just wanted to -- I apologize for interrupting. It's Jeremy Johnson. I just wanted to put on the record, I know we discussed this with the US trustee, but Mr. Goldwasser. He's traveling overseas. He's in Israel.

And it's a religious holiday today, so he's been on for as long as he could do today. He's going to temple to observe the holiday. So we're losing Mr. Goldwasser for the record. We still have Mr. Sprouse here for another 30 minutes if there are more questions, but--

MR. SALAZAR: Well, then this can be Mr. Goldwasser. Yeah.

THE TRUSTEE: I have some -- this is Adisley Cortez-Rodriguez. If there's any need to adjourn and continue today's meeting for further questioning, I am able to do so, but for the time being, I would like to continue with Mr. Sprouse and see how far we can get and then determine at a later point whether we need to continue the meeting.

MR. JOHNSON: That works. Thanks.

THE TRUSTEE: Thank you.

MR. GOLDWASSER: Thank you, everybody. I'm signing off. This is David Goldwasser. Thank you.

MR. SALAZAR: Goodbye, Mr. Goldwasser. Madam Trustee, may I continue? It's Louis Salazar.

THE TRUSTEE: Yes, sir. Go ahead.

MR. SALAZAR: Thank you. So Mr. Sprouse, in the Statement of Financial Affairs, question number four, which are the payments to insiders in the

one-year period, there's a gentleman listed called Eli Allen Rubinstein who received $20.7 million in payments. It's actually titled Loan Payments. Can you explain what loan that's referring to?

MR. SPROUSE: So Mr. Rubinstein were -- so those -- well, the loan he's referring to is the M2 Loan Co. loan. The payments were directed by ADAR Management to make those payments to Mr. Rubinstein. And the way the loan agreement functions is any payments such as those would be applied against the loan. So that's the reason it's referred to as a loan payment. But those wires were at the direction of ADAR Management.

MR. SALAZAR: When you say the direction of ADAR Management, it's your understanding that ADAR Management is in turn owned and controlled by Mr. Lefkowitz, correct?

MR. SPROUSE: I cannot address who owns ADAR Management. That would have to be addressed to Mr. Lefkowitz.

MR. SALAZAR: Well, other than ownership, it's your understanding that Mr. Lefkowitz controls ADAR Management?

MR. SPROUSE: He appears to, but I do not know that.

MR. SALAZAR: Thank you, Mr. Sprouse. When you received these directions to send a $20.7 million in payments to Mr. Rubinstein, were those directions coming from Mr. Lefkowitz?

MR. SPROUSE: Mr. Lefto -- sorry. Mr. Lefkowitz provided those directions to our staff to either initiate those wires, or he had the ability to initiate wires directly.

MR. SALAZAR: And when you say he had the ability to initiate wires directly, it's from the -- I confess to being a little confused. The Geneva Consulting or the TN CorrectHealth accounts? Is that fair?

MR. SPROUSE: From the operating account of CorrectHealth, which again, ADAR Management owned those accounts. They were used by YesCare, but we did not own those accounts.

MR. SALAZAR: Thank you. Do you have any understanding of Mr. Rubinstein's relationship either to, well, to either YesCare or to Mr. Lefkowitz?

MR. SPROUSE: I do not know his relationship with Mr. Lefkowitz. I'm not aware of any services he has provided or performed for YesCare.

MR. SALAZAR: Thank you. So this $20.7 million

or so that was paid to Rubinstein was for the benefit of, or it acted to pay down the M2 loan in the same amount, correct?

MR. SPROUSE: Yes. The loan agreement allowed us to account for those payments as a pay down in full of the loan.

MR. SALAZAR: Okay, thank you. Another entry on that same schedule is one we've already been talking about, ADAR Management, which received $4.4 million during that same period. Again, you talked a little bit about ADAR before. Can you explain the services that ADAR performed for that $4.4 million?

MR. SPROUSE: Well, ADAR was paid a management fee of, I think, $250,000 a month. But the services were very comprehensive per agreement where ADAR really had full control to manage the affairs of YesCare. Some of those, they acted more -- they were more involved in others that they would allow company management to play a more active role. But the agreement itself gave them very broad control to provide services and to make decisions.

MR. SALAZAR: Thank you, Mr. Sprouse. When you're saying -- just down in your answer, when you're referring to ADAR, you say they. Are there specific individuals that were acting on behalf of

ADAR or providing the services that you mentioned that you could identify?

MR. SPROUSE: When I speak of they, I'm speaking of ADAR a company. Our interaction was with Mr. Lefkowitz.

MR. SALAZAR: So the services provided for the $4.4 million, that 250 a month that you mentioned were some form of management services. Is that correct?

MR. SPROUSE: That's correct.

MR. SALAZAR: Thank you. Just one moment. Now, with respect to M2, which also, I guess, indirectly appears on that same question. Is it your understanding that M2 Loan Co. is also controlled by Mr. Lefkowitz?

MR. SPROUSE: That is my understanding, but I do not have any documentation or support for that. That is just an understanding.

MR. SALAZAR: Thank you.

MR. SPROUSE: That would have to be -- I'm sorry, that would have to be obtained from Mr. Lefkowitz.

MR. SALAZAR: Understood. Thank you. And the schedules, though, I think in Schedule D of the CHS Texas schedules M2 is listed as a creditor in the

box checked as insider, right? Is that correct?

MR. SPROUSE: It is. And again, please remember, we erred on the side of caution including entities that might be an insider for full disclosure, just so that the court would have the potential list to perform its own investigation of who really is or is not an insider, make its own determination.

MR. SALAZAR: Thank you. And do you have any understanding of whether that M2 loan, which was paid down over $20 million or so or more, is that an actual legitimate loan?

MR. SPROUSE: My understanding is when current ownership acquired the company, they acquired a loan that was existing at the time as well as the equity in the company. This loan is that same loan that goes back to that transaction in 2021.

MR. SALAZAR: All right. Do you have an understanding of an initial loan amount or whether it was fully repaid at any point, either prior to or by the time of your arrival?

MR. SPROUSE: How that balance over the history of Horizon and then YesCare, I do not have knowledge of how that loan balance evolved.

MR. SALAZAR: And the payments that -- thank you for your answer. And the payments that were made,

that $20.7 million that was paid or credited to M2, do you know if that was applied to principal or interest? How was that booked by M2?

MR. SPROUSE: I cannot address how M2 was booking the transaction. Obviously, that's an M2 question.

MR. SALAZAR: Well, did they provide a statement or a like so that you could internally, in your financial -- well, in the debtor's financial records, correctly book the amount of the loan or interest due and remain?

MR. SPROUSE: So the way the company booked it is the loan allows for interest to be paid in kind. So quarterly, the interest has been added to the loan balance, therefore becoming essentially principal. So we applied the payments against the principal.

MR. SALAZAR: So internally, you booked it against principal. Is that correct?

MR. SPROUSE: That's correct.

MR. SALAZAR: Thank you. And when you made those payments, the $20 million -- sorry, let me start again, because it's not you making those payments. When the debtors were making those payments, Mr. Sprouse, to, for example, Mr. Rubinstein for 20

million dollars, did you as chief financial officer have some concern that making those kinds of payments, the amount of those payments would leave the debtors in a situation where they did not have enough cash to operate or provide medical services?

MR. SPROUSE: We were operating under the management agreement with ADAR where they controlled cash and gave direction regarding what to do.

MR. SALAZAR: Thank you, Mr. Sprouse. Let me move a minute to something else that was mentioned earlier. There's this claim against AIG for a deposit or a workers' comp, a deposit of some kind or escrow. Can you tell us more about that?

MR. SPROUSE: Sure. AIG provided workers' compensation insurance for a period of years. And again, before my arrival, but they were the workers' comp provider at the time. It is not unusual for there to need to be collateral set aside for potential claims under those policies. These are amounts that were paid into AIG for workers' compensation claims that AIG to date has refused to refund the company.

MR. SALAZAR: And Mr. Sprouse, there's such a pending arbitration to recover those funds. Is that right?

MR. SPROUSE: There is pending arbitration that's been ongoing both, I think for the duration of the time up to a year and before that to recover those funds and those proceedings continue.

MR. SALAZAR: And who is representing the debtors or whichever debtor, YesCare Corp. or whichever debtor it applies, in that dispute?

MR. SPROUSE: I do not know the firm that is representing us. I mean, I've worked with Mr. Keeney, our CLO, and Mr. Shelley, our CEO on that. But I do not know the firm that is representing us in those proceedings.

MR. SALAZAR: And Mr. Sprouse like I said, along the same lines, to your knowledge, they have not been retained in this bankruptcy case to defend or pursue that claim, whatever they're doing in the arbitration?

MR. SPROUSE: To put a fair statement, to my knowledge, they have not been, but I could be incorrect on that.

MR. SALAZAR: All right, thank you. So--

MR. JOHNSON: This is Jeremy Johnson just interjecting here. Mr. Salazar, it's my understanding that arbitration has been stayed. Nothing has gone forward on that since the

bankruptcy. We've looked at the documents. We, Polsinelli, as special counsel, have looked at the documents and discussed potential options with the company, but no action's been taken on it since the petition date.

MR. SALAZAR: All right. Thank you, Mr. Johnson. I appreciate that information. Just a moment. Mr. Sprouse, so post-petition, you mentioned something earlier when we were discussing the pay down to M2 and ADAR, post-petition, did ADAR continue to control the cash and give direction as to who was being paid post-petition?

MR. SPROUSE: Mr. Goldwasser and FIA have been in control of cash payments since the filing of the bankruptcy.

MR. SALAZAR: But to your knowledge, is ADAR still giving direction as to, you know, what gets paid post-petition and the like?

MR. SPROUSE: To my knowledge, no.

MR. SALAZAR: Then if you could, maybe jumping a little bit ahead, the $360,000 that Mr. Goldwasser discussed briefly earlier in this meeting, do you have any idea then how that was authorized if it wasn't from ADAR or someone outside the company directing those payments?

MR. SPROUSE: That would have to be a question for Mr. Goldwasser.

MR. SALAZAR: You're not familiar with how those transfers were made? Why?

MR. SPROUSE: Why? No. And again, I think that's a question better addressed to Mr. Goldwasser as far as those accounts and how those transfers occurred.

MR. SALAZAR: Thank you. Let's switch a moment to the ARs and collections. So the last budget that was filed was July 2nd. How much cash have the debtors collected since that budget was filed?

MR. SPROUSE: That I don't know offhand. By July 2nd, I mean, the largest collection that's occurred recently has been Philadelphia, but that occurred end of June, maybe July 1st. So not since July 2nd. Maybe there's been $1 million from Coxsackie, but I would have to go look at the detail. I don't know exactly when the cash transactions occurred as far as receipts were concerned.

MR. SALAZAR: And earlier, I believe it was -- well, I believe it was you, but I understood there was about $10 million. Someone testified. There's about $10 million in accounts receivable still outstanding. Is that fair?

MR. SPROUSE: Yeah. My recollection is there's

about $10 million of gross receivables outstanding, $10 to $11 million of gross dollars outstanding.

MR. SALAZAR: Thank you. And that's in fact what I was going to ask you next. You say gross dollars, so that's the face amount of what's due, not adjusted or written down for collectability?

MR. SPROUSE: That's correct.

MR. SALAZAR: All right, thank you. And do you know of that $10 million, who owes the money, broadly speaking?

MR. SPROUSE: I mean, broadly, it is almost all of our clients still owe some amount. Most of those dollars are with Philadelphia, Alabama, Coxsackie. But again, still most owe some amount.

MR. SALAZAR: All right, thank you. Just one moment. Can you tell me who or what is Sigma Risk Management?

MR. SPROUSE: Sigma Risk Management is a company that was separated from YesCare, I think at the time of the change in ownership to separate the professional liability professionals, and those that had been within the company before that managed our professional liability claims internally into a separate company.

MR. SALAZAR: Okay. And what, if anything, did

Sigma Risk Management do? Or what does it do?

MR. SPROUSE: They manage professional liability claims. I mean, they are the frontline in assessing the claim, engaging outside counsel where Counsel's needed. But we will -- I say we, they will try to settle on our behalf claims where they can. But they manage professional liability claims.

MR. SALAZAR: And going forward with the group of 23 that are currently working, does that include any individuals from Sigma?

MR. SPROUSE: Boy, I think I'd have to look at the list. I can't remember if there's one person with Sigma in that 23 or not, but I just can't recall.

MR. SALAZAR: Thank you, Mr. Sprouse. Earlier, you testified, again, I apologize, there's some testimony in the record about how accounts of these receivables are collected. And am I correct that the receivables are now -- those outstanding $10 million in a receivable, and the receivables post-petition are being deposited into accounts under the name of TN CorrectHealth Services, LLC?

MR. SPROUSE: So post-petition, we continue to receive funds into the pre-petition accounts. And Mr. Goldwasser went into this to some degree to have

clients change where they are sending ACH or wire transfers takes some time just because of risk related to people trying to misdirect funds. Clients seem to be very careful. And plus, just bureaucratically, it takes some of our clients a long time to make a change like that. So it was discussed and the decision was made to continue receiving collections into that depository account.

MR. SALAZAR: Thank you. And pursuant to, is your understanding, am I correct that -- let me start again. Post-Bankruptcy, there is an order in place requiring that the monies in that account be swept into a debtor's DIP account, correct?

MR. SPROUSE: That is my understanding, because those funds were to be swept to the DIP account, or transferred to the DIP account. I would be careful using the term sweep because that implies automatic. And these accounts are in two different banks. But they were to be -- my understanding is they were to be transferred to the DIP account.

MR. SALAZAR: Thank you for that clarification. And how often was that, was the transfer to take place?

MR. SPROUSE: That really should be answered by Mr. Goldwasser. My understanding is those transfers

would occur as collections were received as we became aware of them.

MR. SALAZAR: Earlier, when you say we became aware of them, are you referring to individuals at the debtors?

MR. SPROUSE: Well, the debtors. I mean, between the debtors and people at FIA, because they were also working with the clients to collect money. So they need, and sometimes, or at least they expected collections. They didn't always occur. But they were expecting collections at times. But then there are times when clients would pay us and there was no communication prior to that. So as knowledge of the collections occurred, it's my understanding they were to be transferred at that time. Or as soon as possible.

MR. SALAZAR: Thank you. Again, as CFO, after the bankruptcy started, post-petition, have you been regularly seeing money being, in fact, transferred into the DIP account as required by the order?

MR. SPROUSE: We have seen money transferred to the DIP account, yes.

MR. SALAZAR: How frequently is that happening? How frequently is that happening? That's the question.

MR. SPROUSE: I'd have to go back and look. But I know FIA has to make those transfers. The company, the debtors cannot. And I think they were making the transfers as expeditious -- as expeditiously, sorry, as they could, but that would have to be a question for them.

MR. SALAZAR: Okay, thank you. Now, am I correct that TN CorrectHealth Services there's no contractual agreement between TN CorrectHealth Services and the debtor that gives TN CorrectHealth Services control over the assets of the debtors?

MR. SPROUSE: Yeah. My understanding is TN CorrectHealth Services is the name ADAR Management elected to use in changing those account names. I think that company may be affiliated in some manner with ADAR management, but that would have to be a question for ADAR.

MR. SALAZAR: To your knowledge, there's no contractual agreements between TN CorrectHealth and the debtors that would give TN CorrectHealth control over the assets of the debtors, the cash and the accounts?

MR. SPROUSE: Post-petition, no. Again, pre-petition, I think there's maybe some affiliation between TN CorrectHealth and ADAR, and therefore

throughout ADAR management agreement, there might be that control, but that would not exist post-petition.

MR. SALAZAR: Okay. Thank you. And did I understand your testimony earlier that currently the debtors do not have visibility into the TN CorrectHealth accounts?

MR. SPROUSE: That visibility ended June 30th. I do need to confirm if it was restored yesterday, but I need to confirm that. I did see a partial bank statement yesterday from those accounts, but it had ceased as of July 1st up until potentially yesterday.

MR. SALAZAR: All right. And when you say you saw a partial account, or let me go back a little bit, Mr. Sprouse, when you say visibility, what do you mean by visibility? You actually can log on and see the account?

MR. SPROUSE: Yes. We could log on, see activity in the accounts, print bank statements. And again, those accounts were not owned by us. We could initiate transactions in them. They were to be used by the debtors or by YesCare pre-bankruptcy. But again, they were not owned by us, but we could make transactions pre-bankruptcy. But yes, visibility,

including online visibility, obtained copies of bank statements, typical visibility in a normal bank account sense.

MR. SALAZAR: Thank you. The money in the account into which you had visibility, that money, or those deposits were strictly the debtor's collections on accounts receivable. Is that fair?

MR. SPROUSE: The collections into those accounts would have been collections on accounts receivables. Correct.

MR. SALAZAR: Accounts receivable -- sorry, accounts receivable of the debtors, right?

MR. SPROUSE: Yes.

MR. SALAZAR: Thank you. To your knowledge was money from other unrelated third parties being deposited into those accounts?

MR. SPROUSE: Not to my knowledge.

MR. SALAZAR: Thank you, Mr. Sprouse. Going back a moment to the statement of financial affairs, and those payments, it was a 90-day list in the one-year list of transfers, but there are a number of other transfers that are listed there that I'd like to ask you about. So one of them is Ankura Consulting Group. Ankura is A-N-K-U-R-A?

MR. SPROUSE: Yes.

MR. SALAZAR: So they were paid $200,000 in February, and the notation on the schedule says ARM2 Holdco. Can you explain again what Ankura is and why they were paid $200,000?

MR. SPROUSE: Ankura is a financial consultant. That was a payment made at the direction of ADAR. So it would have to be addressed to Mr. Lefkowitz or if there is another party associated with ADAR. And that's the reason it has the description that it has.

MR. SALAZAR: And then it says -- the description is ARM2 Holdco. Does that mean it's being applied to pay down--

MR. SPROUSE: M2 Holdco or Loan Co. It is how that was treated.

MR. SALAZAR: Thank you. The same notation appears for $500,000 in April to Bowman & Brooke, LLP. Do you know who Bowman and Brooke were? Or are?

MR. SPROUSE: Bowman & Brooke, they're a law firm that represented YesCare, both PLI cases, but also other cases that Mr. Lefkowitz used them for.

MR. SALAZAR: All right, thank you. And then also on this list, this 90-day list is Mr. Rubinstein again, Eli Allen Rubinstein for $4.7 million over two days in April, April 23 and April

29. Again, that was also the pay down or part was also credited against the loan?

MR. SPROUSE: It was credited against the loan. The payments were made at the direction of ADAR.

MR. SALAZAR: Thank you. And again, you don't have any understanding of who Mr. Rubinstein is, at least with respect to the debtors?

MR. SPROUSE: That is correct.

MR. SALAZAR: Thank you. Again, also listed and credited to M2 is Gray Reed & McGraw, LLP. Do you know what -- sorry, do you know who they are?

MR. SPROUSE: Yeah. Again, a law firm. I think they were involved in the Horizon bankruptcy. Horizon/Teuran bankruptcy. But I don't know anything more about them.

MR. SALAZAR: Thank you. Last one that I want to ask you about, it has the same notation is Kane, K-A-N-E, Russell. Do you know who that is? It was $13,500?

MR. SPROUSE: I do not. Yeah. That I do not know.

MR. SALAZAR: Okay. Just one moment, please. Now, in the section of the schedules that discloses payments to insiders in the one-year period, and we called it the debtors checked the box on M2 being an

insider, there are no direct payments to M2. Was M2 not paid directly during that time period? The whole year prior to--

MR. SPROUSE: I do not recall. Yeah, I do not recall any payments directly to M2 during that period.

MR. SALAZAR: Thank you. Just a moment. Now, did the debtor have -- did any of the debtors have an American Express card or credit cards that they used?

MR. SPROUSE: We had a credit card program that was used by employees of the company as well as Mr. Lefkowitz and other people. Yes.

MR. SALAZAR: Okay. Are those credit cards that were -- on the credit explicitly of the debtors or tied to individuals as well?

MR. SPROUSE: No, they were the credit of the debtors.

MR. SALAZAR: Okay. Did that include an American Express card?

MR. SPROUSE: Yes.

MR. SALAZAR: Did you happen to have handy the card number?

MR. SPROUSE: Did you ask if I had an American Express card? I did not have one.

MR. SALAZAR: No, no, I was not asking that. I'm asking, do you happen to know or have handy information about the credit card number that was tied to that card?

MR. SPROUSE: No, I mean, it was a credit card program, so there were multiple cards. Some issued to individuals who generally traveled. But the card program was managed by an employee, Mark Goldman. We were instructed to set up that program, I think, in the summer of 2023. But Mr. Goldman was the one to manage that program with American Express.

MR. SALAZAR: And you say that was primarily used for travel?

MR. SPROUSE: The company expenses on it were primarily used for travel. And other company expenses as far as the use of the card by company employees.

MR. SALAZAR: And speaking of travel, there's an entry or on the schedules for a company called Jet 41 as an insider payment in the amount of $244,000. Am I right that was for private jet travel?

MR. SPROUSE: Mr. Lefkowitz would use his card for travel. And that's the charge you're referring to. Other employees would not use Jet or did not use Jet41.

MR. SALAZAR: When you say he used his card, you're referring to his company card or his personal card?

MR. SPROUSE: The card provided to him as part of the company program.

MR. SALAZAR: Okay, thank you. There's an entry for King David Technology Services in the year prior to the petition was paid about $268,000. Can you tell me who or what King David Technology Services is and what services they provided? Hello, Mr. Sprouse, can you hear me?

MR. SPROUSE: Yes.

MR. SALAZAR: Okay.

MR. SPROUSE: Yeah, it's been silent for a minute though, so if you try to add something, I did not do it.

MR. SALAZAR: Okay, great. I was saying something very brilliant, so I'm going to have to try again. I don't think I'll be able to recreate it, but my question was, King David Technology Services was paid $268,000 in the year prior to the bankruptcy. Did you hear that?

MR. SPROUSE: I just heard it this time. I did not hear it before.

MR. SALAZAR: No problem. Just checking. What's

your understanding of what King David Technology Services is and what services did it provide to the debtors?

MR. SPROUSE: So we were instructed beginning in early 2024 to use King David Technology Services to assist in purchase of computer equipment and in managing communication services.

MR. SALAZAR: All right. And did in fact -- King David, did you pay King -- sorry, did the debtors pay King David for equipment? And was that equipment in fact provided?

MR. SPROUSE: We paid King David for services and procuring the equipment. I think there may have been an occasion or a few occasions where King David may have purchased the equipment and we paid them for it. I think more recently, King David would charge the equipment to the American Express card, to the American Express account and we were billed through American Express. But I think there may have been occasion early in the relationship where King David may have purchased the equipment and resold it to us.

MR. SALAZAR: Thank you. So the service that King David was providing was managing those purchases, not necessarily reselling them or the

like?

MR. SPROUSE: Correct. Correct.

MR. SALAZAR: Thank you.

MR. SPROUSE: Generally correct. Yes.

MR. SALAZAR: So public records of that company show that David Lefkowitz is involved or could be an owner. Do you have an understanding of what, if any, relationship David Lefkowitz has to Mr. Isaac Lefkowitz?

MR. SPROUSE: I have no official knowledge of what their relationship is.

MR. SALAZAR: Okay, thank you. Just a moment, sir. All right. Who or what is GMA Hospitality?

MR. SPROUSE: GMA Hospitality, it is a company that managed -- I was asked earlier if we owned any vehicles. We did not. We did use some vehicles as part of a fleet for provision of care. GMA owns those vehicles. GMA would provide other services, but generally it was around that mobile fleet that GMA was most involved.

MR. SALAZAR: So Mr. Sprouse, GMA had the fleet and in turn would lease it back to the debtors or as a pay per use basis? How did that work?

MR. SPROUSE: Yes. I mean, essentially, yes, they managed the fleet for the company. I think the

-- and I'm trying to re -- honestly, I'd have to look back into that exactly how those vehicles were acquired and managed. That was some time ago.

MR. SALAZAR: Yeah. I understand. But to your knowledge, do you recall -- well, your testimony that the debtors did not own vehicles, that does not change. Is that fair?

MR. SPROUSE: That's fair. Correct.

MR. SALAZAR: Thank you. So there are a couple of other individuals on the payroll that I'd like to ask you about. One of them is Abraham Goldman. Do you have any understanding of who that person is?

MR. SPROUSE: We refer to him as Alex. I think he is Mark Goldman's brother. Part of GMA. That's really all I know about him.

MR. SALAZAR: So he's listed on schedules as a relative of director. Is Mr. Goldman the director that's being referenced there or is it Mr. Lefkowitz?

MR. SPROUSE: Well, and again, this is being as inclusive as possible. He may be a relative of ownership in some way, but I have no proof of that. So we listed him out of an abundance of caution so that we were disclosing all information available to us, but we do not know that he was a relative.

MR. SALAZAR: Okay. I appreciate that, Mr. Sprouse. For the $150,000 or so in salary and benefits that he's listed during that one-year period, what services did he provide?

MR. SPROUSE: He would help manage onboarding and offboarding clients as far as getting equipment to the site. I'm not aware of a lot of other services, honestly. But he would assist with onboarding clients when we were onboarding a client.

MR. SALAZAR: Okay, thank you. And you also listed as a relative of director someone called Rivky Hersko, H-E-R-S-K-O.

MR. SPROUSE: Yeah.

MR. SALAZAR: What services did Rivky provide?

MR. SPROUSE: Rivky was a manager in our claims processing department. So she managed a group of individuals who would process claims that were received from providers that provided offset site care to us.

MR. SALAZAR: Okay, thank you. Let me pause for a second here. Madam Trustee, I still have some more questions. Shall I continue?

THE TRUSTEE: We have until 3:00 PM today reserved on this line, so there is plenty of time. I believe that Mr. Sprouse is available for the entire

day. Is that correct, Mr. Sprouse?

MR. SPROUSE: Well, I made a commitment for noon because I was only asked to reserve two hours, but I can look at changing that to a -- or that. I'm sorry, one o'clock Eastern, but that one o'clock commitment.

THE TRUSTEE: Okay. So in that case, Mr. Salazar, if you're agreeable, I'd like to give the other parties that are on the line an opportunity to ask questions and then go back to your questions. And if necessary, then adjourn at another day.

MR. SALAZAR: Madam Trustee, just a moment. Yes. I think that works for me. I can reserve all the questions I have. Thank you.

THE TRUSTEE: Thank you. I appreciate that. Alan, would you please go back to the call log and plug in the next person who's on the line?

OPERATOR: I'm sorry, who would you like?

THE TRUSTEE: It's no particular order. Whoever is next on the line for the Q&A portion.

OPERATOR: Okay. Ladies and gentlemen, if you'd like to ask a question, please press one then zero. Once again, if you have a question, please press one then zero. And you have a question from the line of Tamika Mister. Please go ahead.

MS. MISTER: Good morning, everyone. Good afternoon. I was wanting to inquire about, and I may have missed this earlier, the full interpretation of it. But as far as healthcare premiums for the employees/creditors that were not paid for the month of May, nor the month of June, are those in queue to be paid? That would be a question for Mr. Sprouse.

MR. SPROUSE: Yeah. Hi, Tamika. I think this has to -- I think we need Mr. Goldwasser. And that's my concern in going down this path about Mr. Goldwasser being on the line, is some of these are going to have to be addressed by him.

MS. MISTER: Okay. Yeah, because I wanted to inquire about those premiums and if they're not going to be paid, who is responsible for the actual cost or expenses incurred by medical coverage? I just wanted to add that notice for the court.

THE TRUSTEE: No, I appreciate that and that's certainly a concern and we need to have that address. Does debtor's counsel have anything to add on that?

MR. JOHNSON: This is Jeremy Johnson. We are going to have to address that with Mr. Goldwasser when we can get him back. I know he's been working on that.

MS. MISTER: Thank you, Madam Trustee.

THE TRUSTEE: Certainly. I will be filing a formal continuation on the docket with the date and time and call-in information. I don't have that date and time right at this moment, but I will be doing that and everyone will be on notice. So do be on the lookout for that, ma'am. And you can call back at that time.

MS. GREEN: This is Ms. Green with the debtor's counsel. We will also make sure that the case website provides notice of the continued 341 with the date and time.

THE TRUSTEE: Okay. All right. Alan, next person.

OPERATOR: Your next question comes from the line of Ian Cross. Please go ahead.

MR. CROSS: Hi, Mr. Sprouse. This is Ian Cross. I represent Cochise Jackson. I want to go back to the SOFA four for YesCare Corp. There were $2.5 million about in one-year payments you reported to Career Staff Unlimited, LLC. Can you explain the relationship between Career Staff Unlimited and the debtor?

MR. SPROUSE: Career Staff was another one listed out of the abundance of caution as a

potential related party. I'm not absolute, absolutely certain of what that relationship was at one point. But we listed them as there was potentially a relationship at some point in the past. They are just a provider of temporary staffing is what the company does.

MR. CROSS: So what made you believe that there was a relationship?

MR. SPROUSE: Again, it was just unofficial information that we discussed should they be listed and we listed all parties that we thought might be a potential related party. But it was through some kind of ownership, common ownership at some point in the past, potentially.

MR. CROSS: Common ownership. So do you know who the natural person, beneficial owners of YesCare Corp. are?

MR. SPROUSE: We have discussed that before and the management team was not providing information of who the individuals are that own the debtors.

MR. CROSS: Okay. Now the debtors opened a bank account post-petition at TD Bank. Is that correct?

MR. SPROUSE: The debtors did. Yes, the consultants opened that account on behalf of the debtors, correct.

MR. CROSS: And in order to open a bank account in the United States, there's some beneficial ownership reporting requirements. Are you familiar with those?

MR. SPROUSE: I am familiar with those.

MR. CROSS: So someone who opened the bank account must have known who the beneficial owners of the debtor are, correct?

MR. SPROUSE: Like I stated, those accounts were opened by the consultants, FIA. I do not know what they had to produce and how those accounts were opened, but those were opened by Mr. Goldwasser and his team.

MR. CROSS: So presumably Mr. Goldwasser is aware of the beneficial owners of the company, of the debtors.

MR. SPROUSE: I cannot answer that question.

MR. CROSS: Okay. During your tenure as CFO, did the debtors, did any of the debtors ever enter into a revolving credit agreement?

MR. SPROUSE: A revolving credit agreement outside of the M2 Loan Co? No. We had discussions with M2 about adding a revolving facility to the term loan, but there was not a revolver outside of M2.

MR. CROSS: So did M2 extend a revolver to any of the debtors?

MR. SPROUSE: No monies were ever advanced on that component of the facility.

MR. CROSS: But did the debtors have access or an ability to draw on a revolver from M2 at any time during your tenure?

MR. SPROUSE: We were told we had access to draw, but we were never able to draw on such a facility.

MR. CROSS: What was the credit limit that you were able to draw? Or you were told you had access to be able to draw?

MR. SPROUSE: The facility would have had a maximum value of $75 million, but obviously subject to typical revolver limitations on the assets supporting it. But the facility size was $75 million.

MR. CROSS: And I understand that the debtor defaulted on some payments to a trust in the PM Care Services bankruptcy. Are you familiar with that?

MR. SPROUSE: The debtor was a settling party in the case. I do not know if we were a defaulting party in settling payments being made or not. But we were a settling party to that bankruptcy.

MR. CROSS: Can you explain why the debtor was not able to make its payments under that settlement agreement?

MR. SPROUSE: Our--

MR. CROSS: Starting in September 2025?

MR. SPROUSE: Our cash management was under the direction of ADAR Management and they were making decisions on what was paid and when it was paid.

MR. CROSS: Okay. And why were you not able to draw on the $75 million revolver to make those payments?

MR. SPROUSE: That would have to be addressed to M2 as far as why monies were not made available.

MR. CROSS: Okay. I'm going to switch gears a little. I want to direct your attention to something the debtor filed, Docket 99, specifically page 40. And I think this is a listing of wages to employees that you were intending to pay. Are you able to pull that up?

MR. SPROUSE: I do not have the document you're referencing.

MR. CROSS: All right. Well, it's a spreadsheet of wages owed to employees and there is a column in the spreadsheet that says org level one. And there are notations in that column for things like Polk

County contract or Lexington Fayette contract. And there are 11 lines. The employee names are blacked out that say Sigma. Is it your understanding that employees of Sigma Risk Management or Sigma RM, LLC were paid in the same way as all of the other debtors' employees through these payments to CHS Employee Group?

MR. SPROUSE: The employees of Sigma were paid through CHS Employee Group. That is correct.

MR. CROSS: All right. And in SOFA four, I see that there are also a number of payments to Sigma RM, LLC. Most recently, I think a $700,000 payment in April of 2026. Can you tell us what those payments were for?

MR. SPROUSE: The debtors paid Sigma a management fee for the services that Sigma provided to the debtors.

MR. CROSS: And who at Sigma provided those services?

MR. SPROUSE: The employees of Sigma.

MR. CROSS: And the debtor also, in addition to this management fee paid the employees of Sigma directly or through its ordinary payroll process. Is that right?

MR. SPROUSE: The amounts that were processed

through CHSEG for Sigma were charged to the M2 Loan Co loan since we were paying a management fee to Sigma. We did not recognize the expense for those employees as well as the management fee.

MR. CROSS: Can you walk me through from a cash flow standpoint exactly how employee wages were paid pre-petition? So I understand there is a set of bank accounts at PPAC, one of which is labeled Employee Group. Is that correct?

MR. SPROUSE: There is an account at PPAC for CHS Employee Group, correct.

MR. CROSS: All right. For these payments to CHS Employee Group listed in the SOFA, are these transfers from one PPAC account to the employee group account at PPAC? That's all under TN CorrectHealth Services, LLC or are these transfers to a bank account not at PPAC?

MR. SPROUSE: Well, CHS Employee Group is not a debtor. It's not a subsidiary owned by YesCare. So while there may be an account at PPAC, it is not a YesCare account. So the payments you see are payments being made to that PPAC bank account.

MR. CROSS: So the payments from the SOFA are payments to the PPAC bank account?

MR. SPROUSE: Correct.

MR. CROSS: From the TN CorrectHealth depository account?

MR. SPROUSE: From the depository account or from the operating account, but from a YesCare account. From a YesCare -- from an account YesCare utilized that was owned by ADAR.

MR. CROSS: And titled TN CorrectHealth Services, LLC, right?

MR. SPROUSE: Right.

MR. CROSS: Okay. After the payments are made into the CHS Employee Group account at PPAC, do they go directly to the payroll processor? Or are they transferred to another account in the name of Geneva Consulting and then to the payroll processor?

MR. SPROUSE: No, my understanding is the payroll processor processes payroll files that draw off of that CHS employee group account. From earlier testimony, my understanding is that CHS Employee Group account is a Geneva management account doing business as CHS Employee Group.

MR. CROSS: Wait, is it a Geneva Consulting or Geneva Consultant or an ADAR Management account doing business as Geneva with CHS employees?

MR. SPROUSE: I didn't -- I do not--

MR. CROSS: Do you know which employment--

MR. SPROUSE: I'm sorry. Could you repeat that?
MR. CROSS: I'm sorry. So I think you said it's a CHS employee group. It's a Geneva Consulting account doing business as CHS Employee Group. Is that what I understand your testimony to be?
MR. SPROUSE: That was testimony that Mr. Goldwasser gave earlier.
MR. CROSS: Okay. And I believe you also testified that the PPAC accounts, the five accounts at PPAC Bank under the name TN CorrectHealth Services, LLC were doing business -- they were owned by ADAR Management. Is that right?
MR. SPROUSE: I am not looking at a list of the bank accounts to know what five bank accounts you were referring to, but the debtors did not own any bank accounts at PPAC. They--
MR. CROSS: During your tenure, had any of the -- oh, go ahead. I'm sorry.
MR. SPROUSE: No, the debtors utilized accounts owned by ADAR Management, but they were not owned by the debtors.
MR. CROSS: During your tenure, have any of the debtors ever owned a bank account?
MR. SPROUSE: Not to my knowledge. I'm not going to say that there's not a small bank account. I

mean, the limited, limited, limited activity, but no. The transactions flow through the accounts owned by ADAR Management, the depository, the operating -- the depository and the operating accounts.

MR. CROSS: All right. I'll pass the witness.

THE TRUSTEE: Okay. Thank you, sir. Is there anyone else?

OPERATOR: Yes. We do have David Blansky in Q. Go ahead.

MR. BLANSKY: Good afternoon, everyone. Mr. Sprouse, my name is David Blansky. We've spoken before. I represent Consul Tech, which most people know as AM Rose. During Mr. Salazar's questioning, you mentioned the PeopleSoft system. Is that the name of the system where some of the receivable records were maintained?

MR. SPROUSE: The receivable records would be in PeopleSoft, correct.

MR. BLANSKY: Okay. Where does PeopleSoft reside?

MR. SPROUSE: It resides in the cloud with the provider, Tenentech.

MR. BLANSKY: Okay. And does that particular vendor have a direct contract with one of the YesCare entities?

MR. SPROUSE: Yes.

MR. BLANSKY: Okay. And with respect to all the other data and financial information for the company all that information is maintained in servers with your services provided by my client. Is that right?

MR. SPROUSE: That is correct.

MR. BLANSKY: Okay. I don't have any further questions for you today, sir. Thank you.

MR. SPROUSE: Thank you.

THE TRUSTEE: Thank you.

OPERATOR: If there are any additional questions, please take this opportunity now to press one then zero on your telephone keypad. We'll go to the line of Lolo Serrano. Your line is open. Pardon me. It looks like Ms. Serrano, you've taken yourself out of queue. Okay, thank you. Just one second. All right. Ms. Serrano, your line is open. Go ahead.

MS. SERRANO: All right. Thank you. Sorry for that. I'm Lolo Serrano. I represent the Estate of Lewiston, Jr. I'll be pretty quick. Was a publication notice of the bankruptcy published in Prison Legal News?

MR. SPROUSE: I cannot answer that question. I don't know if there's anyone who can, but I cannot answer that question.

MS. SERRANO: Okay. So do you know who, who would be able to answer that question? Is that for Mr. Goldwasser or someone else?

MR. SPROUSE: Mr. Johnson, Ms. Green, any idea?

MS. GREEN: Wait a minute. Jeremy?

MR. JOHNSON: Yeah, this--

MS. GREEN: This is Ms. Green. Okay.

MR. JOHNSON: Go ahead, Jenny.

MS. GREEN: We are working with Omni on publication notice, and there's an order that establishes how publication notice will be provided. And so, if it has not been provided, it will be provided. That's in process.

MS. SERRANO: Okay. Thank you for that. I think a question in a similar vein, are any of you aware if a notice has been posted on bulletin boards in facilities where the debtors were operating prior to the bankruptcy?

MS. GREEN: So the bulletins, we actually have no control of the facilities because the debtors are no longer operating at the facilities. And so we're having to -- we're in the process of working with Omni on outreach protocol where we first start with phone calls and then follow up letters, basically asking the facilities to post notice on their

bulletins, but we can't control whether they do or they don't. But we're doing everything we can to make sure that to the extent we can cause those notices to be published on the bulletins, then they will be.

MS. SERRANO: Okay. I appreciate that. Actually, that's all that I have for now. Thank you.

MS. GREEN: Thank you.

OPERATOR: And once again, if there are questions, press one, then zero at this time. We have no one queuing up at this time.

THE TRUSTEE: Okay. Thank you. Since we still do have 30 more minutes, would Mr. Salazar like to continue his questioning?

MR. SALAZAR: Hello, is my line active now?

THE TRUSTEE: Yes.

OPERATOR: Your line is on.

MR. SALAZAR: Can you hear me? Okay. Thank you. Thank you. I have, I think, somewhat more than the time allotted, but some of it would've been directed, I think, to Mr. Goldwasser. If we're going to continue the 341, I'd ask that we do that. Adjourn it now, and we take it up next time.

THE TRUSTEE: That makes sense to me as well. I will go ahead and adjourn this meeting of creditors,

and I will be filing an official notice of adjournment on the docket with the date, time, and call-in information. So please be on notice for that. Debtor's counsel will coordinate to have that also published on the website for this case and effect service in that manner. Thank you all for participating. Thank you, Mr. Sprouse. I greatly appreciate you being here today and taking the time to answer all of these questions to the best of your ability.

MR. SPROUSE: You're welcome.

THE TRUSTEE: Thank you.

MR. SPROUSE: Thank you, ma'am. Thank you, Madam Trustee.

MR. JOHNSON: Thank you.

OPERATOR: Ladies and gentlemen, that will conclude your conference call for today. Thank you for your participation and for using AT&T event teleconferencing. You may now disconnect.

(Thereupon, the proceeding concluded at 1:00 p.m.)

CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
):SS
COUNTY OF FORT MYERS )

I, Chancelor Merritt, do hereby certify that I was authorized to and did stenographically report the proceeding and that the foregoing transcript, is a true record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney or counsel of any of the parties', nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I hereunto set my hand and affix my official seal of office this 23rd day of July, 2026.

Chancelor Merritt

Chancelor Merritt, Stenographer

**&**

**&** 65:17,19 66:10

**0**

**01087** 1:4
**01089** 1:4
**01090** 1:5
**01091** 1:5
**01144** 1:7
**01145** 1:6
**01146** 1:6

**1**

**1** 57:16
**10** 25:9 57:22 57:23 58:1,2,9 59:19
**10:21** 3:17
**11** 1:3 34:4 58:2 81:2
**13** 28:12
**13,500** 66:19
**140,000** 28:13
**150,000** 73:2
**1st** 57:15 63:12

**2**

**2.5** 76:19
**20** 11:19 52:10 53:22,25
**20.7** 48:2 49:2 49:25 53:1
**200,000** 65:1,4
**2000** 46:7
**2021** 52:16
**2023** 5:21 68:10
**2024** 10:10 70:5
**2025** 10:10,24 21:14 80:5
**2026** 1:10 3:16 81:13 90:12
**23** 1:10 12:5,18 13:23 45:18,23 59:9,13 65:25
**23rd** 3:16 90:12
**244,000** 68:20
**250** 51:7
**250,000** 50:14
**2601087** 3:19
**2601089** 3:21
**2601090** 3:22
**2601091** 3:22
**2601144** 3:24
**2601145** 3:23
**2601146** 3:23
**268,000** 69:8,21
**281.9** 26:12
**29** 66:1
**29599** 90:17
**2:26** 1:4,4,5,5,6 1:6,7
**2nd** 57:10,13 57:15

**3**

**30** 47:5 88:13
**30th** 34:7 63:8
**341** 1:10 4:2,2 8:12 45:6,8 76:11 88:22
**360,000** 56:21
**3:00** 73:23

**4**

**4.4** 50:9,12 51:7
**4.7** 65:24
**40** 80:16
**41** 68:20

**5**

**500,000** 65:17

**6**

**600,000** 32:2

**7**

**700,000** 81:12
**75** 79:15,17 80:10

**8**

**8** 34:10,12,20

**9**

**90** 17:24 64:20 65:23
**99** 80:16

**a**

**ability** 29:2 49:7,10 79:6 89:10
**able** 12:10 13:19 18:7 31:17 32:19,21 33:7 37:25 47:12 69:19 79:9,12,13 80:2,9,18 87:2
**above** 34:17
**abraham** 72:11
**absolute** 77:1
**absolutely** 28:9 32:10 41:15 77:2
**abundance** 72:23 76:25
**access** 20:10,13 20:14,18,21,22 22:25 23:5 29:1,11 79:5,8 79:12
**accomplish** 13:11,18 34:5
**accordance** 9:17
**account** 18:6 19:1,7,7 20:17 21:23 22:9,11 22:12,13,15,16 22:17,19,21,22

22:24 23:1,5,8 23:10 29:25 30:2,3,21,22 31:25 32:4 49:14 50:5 60:8,12,13,15 60:16,20 61:20 61:22 62:14 63:15,18 64:3 64:5 70:18 77:22,24 78:1 78:7 82:10,14 82:15,17,20,21 82:22,24 83:2 83:3,4,5,5,11 83:13,17,19,19 83:22 84:4,23 84:25
**accounting** 36:10
**accounts** 16:24 16:25 17:1,7,9 17:25 19:4,7,9 19:10 20:1,3,5 20:6,10,10,16 20:17,23 21:21 22:3 24:21 29:1,4,4,12,14 29:19,20,21 30:18,19 31:1 31:21,24 32:4 37:3 49:12,16 49:17 57:7,23 59:17,21,24 60:18 62:22 63:7,11,20,21 64:7,9,9,11,12 64:16 78:9,11 82:8 84:9,9,14 84:14,16,19 85:2,4
**accuracy** 40:14 41:20 42:10
**accurate** 8:18 40:18,19,22 41:2,12
**ach** 60:1
**acquired** 52:13 52:13 72:3
**acted** 50:2,17
**acting** 50:25
**action** 90:10,10
**action's** 56:4
**active** 50:19 88:15
**activity** 25:22 63:19 85:1
**actual** 14:9 18:11 33:16 52:11 75:15
**actually** 18:10 45:10 48:3 63:17 87:19 88:6
**adar** 17:5 18:24 19:4,6 19:10,13,19 20:9 21:11,13 22:5,7,22 27:19 48:7,13 48:14,15,18,22 49:15 50:9,11 50:12,13,15,24 51:1,4 54:7 56:10,10,16,24 62:13,16,17,25 63:1 65:6,8 66:4 80:7 83:6 83:22 84:12,20 85:3
**add** 21:7 37:21 39:3 69:15 75:17,20
**added** 53:14
**adding** 78:23
**addition** 44:17 81:21
**additional** 6:17 25:14 44:13 86:11
**address** 8:11 13:8 43:13 46:13 48:18 53:4 75:20,23
**addressed** 17:19 21:17 48:19 57:6 65:7 75:12 80:12
**adi** 10:11,16
**adisley** 1:14 3:11,14 47:9
**adjourn** 47:10 74:11 88:23,25
**adjournment** 89:2
**adjusted** 58:6
**administered** 1:3 3:18,20
**advanced** 79:3
**advising** 6:2,8
**advisors** 11:12 40:14
**affairs** 4:4,6 6:23 8:4 13:21 26:11 41:2 42:2,23 45:20 47:24 50:16 64:19
**affiliated** 62:15
**affiliates** 17:13 28:3,12 29:10 33:23
**affiliation** 62:24
**affiliations** 2:19
**affirm** 5:7,11
**affix** 90:12
**afternoon** 75:2 85:10
**agents** 40:13
**ago** 72:3
**agree** 8:18 36:8
**agreeable** 74:8

**agreement** 6:9 17:4,6 18:25 21:13,14 48:9 50:4,15,20 54:7 62:9 63:1 78:20,21 80:3
**agreements** 62:19
**ahead** 3:12 4:24 13:6 46:11,12 47:22 56:21 74:25 76:16 84:18 85:9 86:17 87:8 88:25
**aig** 54:11,14,20 54:21
**al** 1:5 3:2
**alabama** 15:19 58:13
**alan** 2:15 74:16 76:13
**alert** 30:2
**alex** 72:13
**allen** 48:2 65:24
**allotted** 88:20
**allow** 50:18
**allowed** 50:4
**allows** 53:13
**amend** 16:3 45:9
**amended** 44:2 44:11
**amendment** 42:21,22 43:13 43:13 44:18,20 44:21
**amendments** 8:10 43:16,24 44:4,17 45:3,4 45:10
**american** 28:13 67:9,19,24 68:11 70:17,18 70:19
**amount** 27:19 27:23 31:2,9 41:13 50:3 52:18 53:10 54:3 58:5,12 58:14 68:20
**amounts** 27:6 27:17 28:21 43:8 54:20 81:25
**ankura** 64:23 64:24 65:3,5
**answer** 6:18 8:7 23:18 25:13 27:11 28:8 43:6,18 44:6 50:23 52:25 78:17 86:23,25 87:2 89:9
**answered** 60:24
**answers** 3:5 42:19
**anticipated** 34:3
**anybody** 33:18
**anymore** 31:25
**anyplace** 39:10
**apologize** 46:22 59:16
**appear** 27:6
**appearance** 4:18
**appearances** 2:18
**appearing** 2:13
**appears** 48:24 51:13 65:17
**application** 15:5 35:15 36:2
**applied** 48:10 53:2,16 65:13
**applies** 55:7
**appreciate** 42:6 42:17 56:7 73:1 74:15 75:18 88:6 89:8
**appropriate** 15:7
**approved** 15:6 15:7 24:11
**approximately** 11:19 12:5 25:7,9 26:12 34:9
**april** 65:17,25 65:25,25 81:13
**arbitration** 54:24 55:1,17 55:24
**arm2** 65:2,12
**arrangement** 17:3
**arrival** 52:20 54:16
**ars** 57:9
**aside** 54:18
**asked** 71:15 74:3
**asking** 4:15 42:7 68:1,2 87:25
**assessing** 59:3
**assets** 4:4 9:5,6 15:10 16:2 62:11,21 79:16
**assist** 3:8 7:1 70:6 73:8
**assistance** 3:7
**assistant** 1:14 3:14
**assisting** 33:5
**associated** 65:8
**assumed** 5:19 5:21 17:18
**at&t** 2:15 89:18

**attached** 40:10
**attention** 29:24 80:15
**attorney** 90:8,9
**attorneys** 7:16 33:18 40:13
**authority** 19:25
**authorize** 7:10
**authorized** 7:16 30:6 56:23 90:5
**authorizes** 4:3
**automatic** 60:17
**available** 27:18 72:24 73:25 80:13
**avenues** 34:16
**aware** 8:22 9:3 18:18 41:17 43:18 49:23 61:2,4 73:7 78:15 87:15

**b**

**b** 2:9
**back** 10:16 12:15 18:21 20:15 32:3 33:1,18,25 35:18 40:22 42:19 46:7 52:16 62:1 63:15 64:18 71:22 72:2 74:10,16 75:24 76:7,18
**balance** 13:15 34:8 37:25 38:3 52:21,23 53:15
**bank** 16:24 17:7,8 18:2,14 20:1,8 21:20 21:21 22:13 30:9 63:10,20 64:1,2 77:21 77:22 78:1,6 82:7,17,22,24 84:10,14,14,16 84:23,25
**banking** 16:23 17:16 18:22 22:18
**bankruptcies** 7:16
**bankruptcy** 1:1 4:2 6:2,3,4,11 6:13 29:11,13 29:13,22 30:1 30:14,17 55:15 56:1,15 60:11 61:18 63:23,25 66:13,14 69:22 79:21,25 86:21 87:18
**banks** 60:18
**basically** 87:24
**basis** 13:18 71:23
**becoming** 37:16 53:15
**beginning** 17:21 30:24 31:14 70:4
**begun** 10:14
**behalf** 1:22 4:21 50:25 59:6 77:24
**belief** 42:1
**believe** 7:15,18 13:20 18:4 20:19 21:24 23:18,20 31:4 32:1 34:7 45:17 57:20,21 73:25 77:7 84:8
**belonged** 28:1
**belonging** 28:10
**beneficial** 77:16 78:2,7 78:15
**benefit** 28:3,11 29:5,6 30:12 33:22 50:2
**benefits** 73:3
**best** 8:2,7,19,21 9:1,7,10 14:2 19:11 27:10 40:21 41:3,5 42:13 89:9
**better** 17:19 21:2 57:6
**beyond** 34:17
**bill** 36:1
**billed** 70:18
**bills** 33:2,4
**bit** 13:12 15:9 15:11 16:22 21:2 27:7 28:7 35:12 40:10 50:11 56:21 63:16
**bk** 1:4,4,5,5,6,6 1:7
**blacked** 81:2
**blansky** 2:9 85:8,10,11,19 85:23 86:2,7
**boards** 87:16
**book** 53:10
**booked** 53:3,12 53:18
**booking** 53:5
**books** 26:25 37:17 38:5
**bounced** 32:3
**bowman** 65:17 65:18,19
**box** 52:1 66:25
**boy** 59:11
**brentwood** 46:2,14

**briefly** 56:22
**brilliant** 69:18
**bring** 13:17 32:12
**broad** 27:3 50:20
**broadly** 58:10 58:11
**brokerage** 24:3
**brooke** 65:17 65:18,19
**brother** 72:14
**brought** 29:23 33:14
**budget** 15:6 24:10 57:9,11
**bulletin** 87:16
**bulletins** 87:19 88:1,4
**bureaucratic** 13:13
**bureaucratica...** 60:5
**business** 11:15 11:24 83:20,23 84:4,11

**c**

**c** 1:12
**call** 3:3,7,9,10 13:18 29:22 31:11 45:11 74:16 76:4,7 89:3,17
**called** 32:25 33:3 39:16 48:1 66:25 68:19 73:11
**calls** 87:24
**canceled** 23:25 24:4,5
**card** 67:9,11,20 67:23,25 68:3 68:4,5,7,16,22 69:1,2,3,4 70:17
**cards** 67:9,14 68:6
**care** 1:6,6 3:22 3:23 71:17 73:19 79:20
**career** 76:21,22 76:24
**careful** 60:4,16
**caretx** 25:3
**carve** 6:10
**case** 1:4,4,5,5,6 1:6,7 3:18,19 3:21,24 27:20 30:24 43:1 55:15 74:7 76:10 79:23 89:5
**cases** 3:18,20 6:24 31:10 65:20,21
**cash** 16:23 17:6 19:5 24:10 27:18 32:6 34:12 54:5,8 56:11,14 57:10 57:18 62:21 80:6 82:5
**cashflow** 38:1
**cast** 27:3
**cause** 88:3
**caution** 52:3 72:23 76:25
**ceased** 63:12
**ceo** 55:10
**certain** 13:11 77:2
**certainly** 75:19 76:2
**certificate** 90:1
**certificates** 24:17
**certify** 90:5,8
**cetera** 42:12
**cfo** 37:1,7 61:17 78:18
**chancelor** 90:5 90:18
**change** 58:20 60:1,6 72:7
**changed** 14:16 14:20 31:1 35:25
**changes** 43:18 44:13 45:8
**changing** 62:14 74:4
**chapter** 1:3 34:4
**charge** 68:23 70:17
**charged** 82:1
**chart** 37:3
**check** 18:15,19
**checked** 52:1 66:25
**checking** 69:25
**chief** 1:24 2:1 5:2,3,20,23,25 14:4,5,7,8,10 35:15 36:5,8 54:1
**chime** 43:17
**chs** 1:4,5,5,6,6 3:22,23 15:19 22:10 23:1,8 25:3 27:12,14 33:3 51:24 81:6,9 82:11 82:12,18 83:11 83:17,18,20,23 84:3,4
**chsal** 3:22 25:4
**chscx** 3:21
**chseg** 27:20 82:1
**chsfl** 3:2,19 25:3
**chstx** 25:3
**claim** 2:5 33:24 35:9 54:11

55:16 59:4
**claimants** 8:23
**claims** 33:13 34:13,15,20 39:15 41:9 54:19,21 58:23 59:3,6,7 73:15 73:17
**clarification** 8:2 46:18 60:21
**clarifications** 33:4
**clarify** 23:7 28:6,25 44:10 44:16
**clarifying** 16:16 26:18 33:6,19
**clarity** 32:12
**classes** 34:22
**clean** 45:12
**cleaning** 43:8
**clear** 21:19 24:14,15
**clerical** 35:19
**client** 16:11,12 46:5 73:9 86:5
**clients** 12:10,11 12:12,13 25:13 25:14,24,25,25 31:17,23,23 32:18,22 33:12 58:12 60:1,3,5 61:8,12 73:6,9
**clo** 55:10
**close** 37:17
**closed** 31:22 32:5 38:5
**closing** 37:10
**closings** 37:9
**cloud** 38:12,13 85:21
**cochise** 2:6 76:18
**code** 4:2
**collateral** 24:10 54:18
**collect** 12:10 25:17 33:7 34:8,9 61:8
**collectability** 58:6
**collected** 18:24 25:11 57:11 59:18
**collecting** 12:9 26:6,10 34:18
**collection** 32:11 33:17 57:13
**collections** 25:20 32:13,16 32:24 33:8,9 57:9 60:8 61:1 61:10,11,14 64:7,8,9
**column** 80:23 80:25
**comes** 76:15
**coming** 21:19 30:2 49:4
**comments** 42:18
**commitment** 74:2,6
**committee** 2:3 2:5 35:1,9
**common** 77:13 77:15
**communication** 61:13 70:7
**communicati...** 26:3
**comp** 34:11 54:12,17
**companies** 17:8 22:23
**company** 6:2 12:1,25 13:10 17:10 20:9 21:10,15 23:6 26:4,9 28:22 28:25 29:2 36:24 37:3 43:4 46:6 50:19 51:4 52:13,15 53:12 54:22 56:4,24 58:18,22,24 62:2,15 67:12 68:14,15,16,19 69:2,5 71:5,14 71:25 77:6 78:15 86:3
**compensation** 14:13,15,16,23 14:25 15:3 35:23 54:15,21
**compiled** 2:18
**complete** 37:23 40:18,19,22
**completeness** 40:15
**component** 79:4
**comprehensive** 50:15
**computer** 16:10,13 70:6
**concepts** 42:8
**concern** 30:24 54:2 75:10,19
**concerned** 21:15 57:19
**concerning** 4:4
**conclude** 89:17
**concluded** 4:13 89:20
**conduct** 4:12
**conducted** 4:1
**conference** 3:3 3:9,10 89:17
**confess** 49:11

**confirm** 35:14 63:9,10
**confused** 49:11
**confusing** 22:8
**connected** 90:9
**consolidated** 10:8
**consul** 2:9 85:12
**consultant** 65:5 83:22
**consultants** 77:24 78:10
**consulting** 21:2 21:5,6,8,23 23:8 27:13 49:12 64:23 83:14,21 84:3
**contact** 4:10 25:23
**contacts** 30:25
**contain** 18:1
**contained** 4:5 6:22 17:4
**contemplate** 43:15,15
**context** 40:25
**continuation** 76:3
**continue** 12:23 25:16 37:13 45:15 47:11,13 47:15,21 55:4 56:10 59:23 60:7 73:22 88:14,22
**continued** 76:11
**continuing** 11:25 13:22 37:16
**contract** 14:25 15:20 81:1,1 85:24
**contracts** 11:23 12:2 25:15
**contractual** 62:9,19
**control** 18:11 20:3,17 30:17 30:19 50:16,20 56:11,14 62:11 62:20 63:2 87:20 88:1
**controlled** 48:16 51:14 54:7
**controls** 30:10 36:10 48:22
**coordinate** 89:4
**copies** 11:9 30:9 39:22 44:11 64:1
**copy** 4:9 20:21
**corizon** 1:7
**corp** 1:4 3:21 10:9 21:22 55:6 76:19 77:17
**corporate** 36:19 46:5,16 46:17
**corporation** 14:10
**correct** 8:5,8,15 11:8 15:3,4 19:3 20:8 24:1 28:23 36:6,7 36:12 37:11 38:14 40:7,17 41:23 42:3,4 42:13 45:21,22 48:17 50:3 51:9,10 52:1 53:19,20 58:7 59:18 60:10,13 62:7 64:10 66:8 71:2,2,4 72:8 74:1 77:22,25 78:8 81:9 82:9,11 82:25 85:18 86:6
**correcthealth** 19:2,6,9,13,20 49:12,15 59:22 62:8,9,10,13,19 62:20,25 63:7 82:16 83:1,7 84:10
**correcthealth...** 26:6
**correcting** 33:5
**correctional** 11:19
**corrections** 8:13
**correctly** 43:11 53:10
**corresponden...** 25:24
**cortez** 1:14 3:11,14 47:10
**cost** 75:16
**counsel** 1:20 4:18 7:11 9:22 18:4 20:12 25:25 31:4,7 32:11,23 33:10 33:14,14 35:1 35:17 56:2 59:4 75:20 76:10 89:4 90:8,9
**counsel's** 59:4
**counties** 32:19
**country** 11:20 46:16
**county** 81:1 90:4
**couple** 42:18 72:9
**court** 1:1 15:8 43:11 52:5

75:17
**cover** 27:17
**coverage** 24:20 75:16
**covering** 17:24
**covid** 46:8
**coxsackie** 32:2 32:3 57:16 58:13
**create** 37:14
**credit** 67:9,11 67:14,15,17 68:3,5 78:20 78:21 79:11
**credited** 53:1 66:2,3,10
**creditor** 9:11 41:13 43:14 51:25
**creditor's** 41:9
**creditors** 1:10 2:3 3:25 4:13 8:23 9:9 34:22 34:22,24 35:2 39:4,6 41:21 42:24 43:1 75:5 88:25
**cro** 14:22 15:3
**cross** 2:7 76:16 76:17,17 77:7 77:15,21 78:1 78:6,14,18 79:1,5,11,19 80:1,5,9,14,22 81:10,18,21 82:5,12,23 83:1,7,10,21,25 84:2,8,17,22 85:5
**current** 32:6 34:6 38:6,15 38:19,21 52:12
**currently** 11:21 12:4 13:25 14:14 23:12 24:21 25:21 36:4 59:9 63:5
**cut** 38:17
**cx** 3:22

**d**

**d** 2:9 51:24
**data** 12:11 38:12 40:15 86:3
**date** 11:16 17:2 17:24 26:14 28:1 35:22 54:21 56:5 76:3,4,12 89:2
**david** 1:23 2:9 5:1,11,14 7:14 8:6 9:1 13:4,6 13:8 14:3 18:3 21:7,25 28:5 39:3 40:23 43:17 47:19 69:7,9,20 70:1 70:5,9,10,12,14 70:16,21,24 71:6,8 85:8,11
**day** 32:15 64:20 65:23 74:1,11 90:12
**days** 6:3 17:24 32:14,15 65:25
**dba** 22:12 23:8 27:13
**dealings** 32:17
**debtor** 6:7 9:5 9:7,9 10:6 12:18 15:10,14 16:5,25 17:12 17:25 18:1,1 22:7 24:24 28:2,3,10,11 31:24 32:9 33:23 34:4 36:17 37:12 38:15 43:15 46:3 55:6,7 62:10 67:8 76:23 78:8 79:19,22 80:1 80:16 81:21 82:19
**debtor's** 4:18 10:22 11:15 32:6 33:20 34:3 53:9 60:13 64:6 75:20 76:9 89:4
**debtors** 1:8,17 1:20,22,24 2:1 3:25 4:4,14,21 4:23,25 5:2,18 6:1,21 7:10 10:2,8,23 11:21 12:4 14:1 15:12,15 15:21 16:3,8,9 16:17,17,19,21 16:25 17:2,9 19:3,14 21:10 21:11 23:12,16 24:21 30:12 35:9 36:6,17 36:18 40:12 43:15 45:20 53:24 54:4 55:6 57:11 61:5,6,7 62:3 62:11,20,21 63:6,23 64:12 66:7,25 67:8 67:15,18 70:3 70:9 71:22 72:6 77:20,21 77:23,25 78:16 78:19,19 79:2 79:5 81:6,15 81:17 84:15,19 84:21,23 87:17 87:20

**decision** 60:7
**decisions** 50:21 80:8
**declare** 40:6
**defaulted** 79:20
**defaulting** 79:23
**defend** 55:15
**defer** 18:9
**degree** 59:25
**delay** 31:3
**delayed** 31:8
**deliver** 13:20
**delivering** 13:19
**demand** 33:25
**department** 73:16
**depending** 39:16
**deposit** 34:12 54:12,12
**deposited** 18:25 59:21 64:16
**depository** 60:8 83:1,3 85:3,4
**deposits** 64:6
**describe** 5:18 5:23 11:14
**described** 39:9
**description** 65:9,12
**designed** 31:13 32:7
**despite** 22:4
**detail** 11:17 24:14 57:17
**detailed** 39:17
**determination** 52:7
**determine** 47:14
**determining** 13:2
**different** 13:10 24:2 29:15 32:24 33:13 34:14,16 41:13 43:21 60:18
**difficult** 25:12 25:18 37:16
**dion** 2:14 10:11 10:16,17,19
**dip** 29:19,25 30:2,21 60:13 60:15,16,20 61:20,22
**direct** 22:14 29:9 30:8 67:1 80:15 85:24
**directed** 6:16 32:10 48:7 88:21
**directing** 56:25
**direction** 27:23 48:12,14 54:8 56:11,17 65:6 66:4 80:7
**directions** 49:2 49:3,6
**directly** 26:2 49:8,10 67:2,5 81:23 83:12
**director** 72:17 72:17 73:11
**directors** 23:13
**disbursed** 19:8
**disbursements** 17:12 29:23
**discloses** 66:23
**disclosing** 43:7 72:24
**disclosure** 52:4
**disconnect** 89:19
**discuss** 30:20 31:6,6
**discussed** 31:4 31:4 46:24 56:3,22 60:7 77:10,18
**discussing** 56:9
**discussions** 12:20 13:9 78:22
**dispute** 29:7 55:7
**district** 1:1,15 3:15
**division** 1:1
**docket** 76:3 80:16 89:2
**document** 80:20
**documentation** 51:17
**documents** 6:15,24 7:2,12 7:24 8:5 18:5 43:25 44:2,7 56:1,3
**doing** 55:16 76:5 83:19,23 84:4,11 88:2
**dollar** 27:6,16 29:24
**dollars** 25:17 54:1 58:2,4,13
**drafted** 15:12
**draw** 79:6,9,9 79:12,13 80:10 83:16
**drawing** 22:20
**drawn** 23:2
**due** 11:4,5 30:22 53:11 58:5
**duration** 55:2
**duties** 13:15

**e**

**e** 1:12,12 66:18 73:12

**earlier** 27:13 29:19 32:1 54:11 56:9,22 57:20 59:15 61:3 63:5 71:15 75:3 83:17 84:7
**early** 70:5,20
**eastern** 3:17 74:5
**effect** 12:19 89:6
**effort** 33:8
**efforts** 25:16
**ehr** 12:12
**either** 18:4 26:2 33:12 39:25 49:6,20,20 52:19
**elected** 62:14
**electronic** 39:24 40:2
**electronically** 40:1
**eli** 48:2 65:24
**employee** 23:1 23:9 27:12,14 68:8 81:2,7,9 82:6,8,11,13,14 82:18 83:11,17 83:18,20 84:3 84:4 90:8,9
**employees** 12:3 12:18 40:13 43:1,3 45:19 45:23 46:4 67:12 68:17,24 75:5 80:17,23 81:4,6,8,20,22 82:4 83:23
**employment** 83:25
**ended** 11:24 63:8
**engaging** 59:4
**ensure** 32:7
**enter** 4:18 78:19
**entering** 44:11
**entire** 73:25
**entities** 19:18 19:20 25:5 32:9 52:3 85:25
**entity** 19:2
**entry** 2:21 50:7 68:19 69:6
**equipment** 16:1,10,10,11 16:14 70:6,10 70:10,13,15,17 70:21 73:6
**equity** 52:14
**erred** 52:3
**errors** 8:20
**escrow** 54:13
**esq** 1:14,18,20 2:5,7,9,11
**essentially** 53:15 71:24
**establish** 36:10
**established** 19:6,10
**establishes** 87:11
**estate** 2:11 13:15,22 30:11 32:8 33:20 34:15,18 86:19
**et** 3:2 42:11
**event** 2:15 89:18
**everybody** 30:23 47:18
**evolved** 52:23
**exact** 19:24 23:4 40:25 43:25
**exactly** 14:19 25:4 27:7 44:7 57:18 72:2 82:6
**examination** 4:12
**examine** 4:3,14
**example** 37:25 39:15 40:12 53:25
**excel** 39:13
**except** 26:1
**exception** 41:25
**excited** 32:22
**executed** 7:25
**executive** 14:5
**exist** 63:2
**existing** 52:14
**exists** 21:16
**exit** 34:4
**expect** 18:14 25:10
**expected** 61:9
**expecting** 61:11
**expeditious** 62:4
**expeditiously** 62:4
**expense** 82:3
**expenses** 68:14 68:16 75:16
**explain** 27:7 28:4 42:24 43:25 48:4 50:11 65:3 76:21 80:1
**explained** 43:14
**explanation** 23:4
**explicitly** 67:15
**express** 28:13 67:9,20,25 68:11 70:17,18 70:19

**extend** 79:1
**extension** 10:25 11:1
**extensive** 13:9
**extent** 16:12 88:3
**exterior** 22:23

**f**

**face** 58:5
**facilities** 87:17 87:20,21,25
**facility** 78:23 79:4,10,14,17
**fact** 22:4 29:24 32:1,4 58:3 61:19 70:8,11
**fair** 36:21 37:4 37:5 49:13 55:18 57:24 64:7 72:7,8
**familiar** 6:22 21:12 57:3 78:3,5 79:21
**far** 8:23 12:25 21:15 47:13 57:6,18 68:16 73:6 75:4 80:13
**favorable** 32:17
**fayette** 81:1
**february** 21:14 65:2
**federal** 10:7
**fee** 50:14 81:16 81:22 82:2,4
**felt** 15:6 31:7 43:4
**fia** 1:24 8:25 9:15 20:12 25:16,22 26:2 35:22,23 56:13 61:7 62:2 78:10
**figure** 31:15
**file** 7:11,16 10:6,8 35:14 45:5
**filed** 6:24 7:5 8:11,13,14 10:9,23,24 11:9 35:19 44:3,14 57:10 57:11 80:16
**files** 83:16
**filing** 6:7 14:17 14:21 15:2,4 30:13,16 44:9 56:14 76:2 89:1
**filings** 4:7
**finance** 37:3
**financial** 2:1 4:4,6 5:3,20 6:23 8:4 14:4 26:11 36:5,9 36:11 37:4,9 37:13,14 38:8 38:11 39:10,11 39:23 42:2,23 47:24 53:9,9 54:1 64:19 65:5 86:3
**financially** 90:10
**finds** 34:17
**fine** 44:24
**finish** 13:21
**firm** 2:20 35:15 55:8,11 65:20 66:12
**first** 8:7 32:14 39:5 87:23
**five** 84:9,14
**fl** 1:4
**fleet** 71:17,19 71:21,25
**florida** 1:1,15 3:16 90:3
**flow** 17:12 29:24 31:8,11 82:6 85:2
**flowed** 29:18
**fmr** 1:4,4,5,5,6 1:6,7
**folks** 3:13
**follow** 35:12 87:24
**follows** 3:20
**foregoing** 40:7 90:6
**form** 51:8
**formal** 76:3
**formed** 25:4
**former** 12:10 12:13 31:23 34:10,11
**formerly** 46:1
**fort** 1:1 90:4
**forth** 35:18
**forward** 32:9 45:10 55:25 59:8
**found** 35:17
**four** 47:25 76:19 81:10
**fray** 35:19
**frequently** 61:23,24
**front** 23:19 24:6 33:17
**frontline** 59:3
**full** 2:20 13:23 23:9 50:5,16 52:4 75:3
**fully** 52:19
**function** 36:18
**functions** 48:9
**fund** 27:19
**funds** 18:1 19:1 19:3,8,8 21:4 21:22 28:1,9 30:21 31:8,21 32:8 54:24 55:4 59:24

60:3,15
**further** 13:2 28:7 44:18,19 44:21 47:11 86:7 90:8

**g**

**gears** 80:14
**general** 16:1 23:16,20 39:14 39:18
**generally** 68:7 71:4,19
**generate** 39:12
**geneva** 17:5 21:2,5,5,8,13 21:14,16,23 22:10,17,22 23:3,8 27:13 49:11 83:13,19 83:21,22,23 84:3
**gentleman** 48:1
**gentlemen** 74:21 89:16
**getting** 73:6
**give** 5:8 10:13 18:17 22:14 27:10 56:11 62:20 74:8
**given** 3:6 27:22
**gives** 62:10
**giving** 56:17
**global** 40:10,11 40:23,24 42:8
**gma** 71:13,14 71:17,18,20,21 72:14
**go** 3:12 4:24 13:6 18:21 26:18,19 39:17 40:22 46:11,12 46:14,15 47:22 57:17 62:1 63:15 74:10,16 74:25 76:16,18 83:12 84:18 85:9 86:13,17 87:8 88:25
**goes** 52:16
**going** 6:15,20 11:2 24:25 32:9 33:9 37:20 38:17 41:15 42:5 44:20 45:6 47:2 58:4 59:8 64:18 69:18 75:10,11,15,23 80:14 84:24 88:21
**goldman** 68:8 68:10 72:11,17
**goldman's** 72:14
**goldwasser** 1:23 5:1,6,11 5:11,13,14,14 5:22,25 6:8,16 7:14,15 8:6,6 9:1,19,21,25 10:4,8,14,22 13:4,4,7,8,24 14:2,3,8,14,18 14:22,24 15:4 15:14,18,24 16:8,19 17:3 17:14,17 18:3 18:3,9 21:25 21:25 22:2,8 23:11,15,18 24:2,13,19,23 24:25 25:22 28:6,14,16,20 28:24 30:8,13 30:16 32:10 33:24 34:6,23 35:10,11,13,17 35:25 43:20,22 45:4,18 46:25 47:4,8,18,19,20 56:13,21 57:2 57:6 59:25 60:25 75:9,10 75:23 78:12,14 84:7 87:3 88:21
**good** 3:13 4:20 35:9,11 44:25 75:1,1 85:10
**goodbye** 47:20
**gray** 66:10
**great** 69:17
**greatly** 89:7
**green** 1:20 33:15 76:9,9 87:4,5,7,7,9,19 88:8
**gross** 58:1,2,4
**group** 23:1,9 27:12,14 45:16 45:18 59:8 64:24 73:16 81:7,9 82:9,11 82:13,15,18 83:11,17,19,20 84:3,4
**guarantee** 40:14
**guaranteed** 40:19
**guaranteeing** 42:9
**guess** 51:12
**guidelines** 9:13 9:15,18,20,22 9:24,25 10:3

**h**

**h** 73:12
**hand** 5:6 90:11
**handling** 33:16
**handy** 67:22 68:2

**happen** 27:9,15 67:22 68:2
**happening** 61:23,24
**health** 1:7
**healthcare** 3:24 11:18 19:9 75:4
**hear** 35:3 69:11 69:22,24 88:18
**heard** 35:13 69:23
**hearing** 44:8 45:5
**held** 1:10 22:15
**hello** 69:10 88:15
**help** 7:17 73:5
**helpful** 24:9
**hereunto** 90:11
**hersko** 73:12
**hi** 75:8 76:17
**history** 52:21
**hmm** 35:5
**holdco** 65:3,12 65:14
**holder** 18:6
**holders** 2:5 35:9
**holding** 26:9
**holiday** 47:1,3
**home** 36:21,22
**honestly** 40:22 72:1 73:8
**hope** 34:4
**hoped** 45:5
**horizon** 3:23 52:22 66:13,14
**hospitality** 71:13,14
**host** 3:11
**hours** 74:3
**hr** 12:15

**i**

**ian** 2:7 76:16 76:17
**idea** 27:8 56:23 87:4
**identified** 9:6 26:16,25 27:1 27:4
**identify** 6:18 9:5,8 16:2,4,24 41:9 51:2
**identifying** 26:15,18,20 41:19
**images** 40:1
**immediately** 11:15
**implies** 60:17
**include** 59:9 67:19
**included** 37:8 41:1
**including** 52:3 64:1
**inclusive** 72:21
**income** 10:7,23 38:1,4
**incoming** 13:20
**inconsistent** 43:5
**incorrect** 55:20
**incurred** 75:16
**indicated** 6:19
**indicates** 21:4
**indirectly** 51:12
**individuals** 50:25 59:10 61:4 67:16 68:7 72:10 73:17 77:20
**information** 4:5 6:17,22 8:18,24 9:2,16 12:9,12,12 13:21 19:21,23 21:3 25:14 26:1 33:5,19 38:8 40:21 41:1,8,10,11 43:10 45:15 56:7 68:3 72:24 76:4 77:10,19 86:3 86:4 89:3
**initial** 4:12 52:18
**initially** 15:12
**initiate** 29:11 49:7,8,10 63:22
**inquire** 75:2,14
**inquiring** 10:21
**insider** 41:10 52:1,4,7 67:1 68:20
**insiders** 26:13 27:2 47:25 66:24
**institutions** 11:19
**instructed** 27:16,19 68:9 70:4
**instructions** 3:6
**insurance** 23:14,17,20 24:11,17 34:11 34:12 54:15
**insured** 16:6,7
**intended** 44:8
**intending** 80:18
**interaction** 51:4
**interest** 4:9,13 53:3,11,13,14
**interested** 34:25 90:10

**interjecting** 55:23
**internal** 30:10 36:10
**internally** 53:8 53:18 58:23
**interpretation** 75:3
**interrupting** 46:22
**investigation** 52:6
**invoice** 41:14
**invoices** 33:6,6 40:1
**involved** 20:5 22:22 32:13,15 50:18 66:13 71:6,20
**isaac** 20:3 71:8
**israel** 46:25
**issue** 43:10,14 44:9,18,19
**issued** 24:3 68:6
**issues** 42:10
**item** 24:11
**items** 46:20

**j**

**jackson** 2:6 76:18
**james** 1:25 5:3 5:16 7:23 8:17 8:21 14:3
**jeff** 14:4
**jenny** 87:8
**jeremy** 1:18 4:20 42:5 45:2 46:22 55:22 75:22 87:5
**jet** 68:19,21,24
**jet41** 68:25
**johnson** 1:18 4:20,21,22,25 18:9,13,15 33:15 42:5,5 42:16 43:25 44:6,15,22 45:1,2 46:12 46:21,22 47:16 55:22,22 56:6 75:22,22 87:4 87:6,8 89:15
**joint** 33:7
**jointly** 1:3 3:18 3:20
**jr** 2:11 86:20
**july** 1:10 3:16 5:21 57:10,12 57:15,15 63:12 90:12
**jump** 44:24,25
**jumping** 56:20
**jumps** 44:15
**juncture** 12:18
**june** 37:23,23 57:15 63:8 75:6

**k**

**k** 64:24 66:18 73:12
**kane** 66:17
**keeney** 55:10
**keypad** 86:13
**kind** 14:24 53:13 54:12 77:13
**kinds** 54:2
**king** 14:5 69:7 69:9,20 70:1,5 70:8,9,10,12,14 70:16,20,24
**knew** 30:3
**know** 8:9,11 11:17 18:10,13 19:25 20:4,4 20:11,14 22:21 24:12 25:15 29:7 30:6 35:17 43:21,22 43:23 46:23 48:24 49:22 53:2 55:8,11 56:17 57:12,17 58:9 62:2 65:18 66:11,11 66:14,18,21 68:2 72:15,25 75:24 77:15 78:10 79:23 83:25 84:14 85:13 86:24 87:1
**knowledge** 8:2 8:3,7,19,22 9:7 9:11 11:11 14:2 16:20 19:11,16,17 30:8 31:14 40:21 41:3,5 42:13 52:22 55:14,19 56:16 56:19 61:13 62:18 64:14,17 71:10 72:5 84:24
**known** 78:7
**knows** 30:23

**l**

**labeled** 82:8
**lack** 41:20
**ladies** 74:21 89:16
**lagging** 41:21
**lapsed** 24:20
**largest** 30:24 57:13
**law** 65:19 66:12
**lead** 3:18
**lease** 15:12,15 15:16,22 71:22

**leased** 15:19,21
**leave** 24:25 54:3
**leaving** 43:4
**ledger** 39:14,18
**lefkowitz** 20:3 20:5,7 48:17 48:20,22 49:4 49:5,21,23 51:5,15,22 65:7,21 67:13 68:22 71:6,8,9 72:19
**left** 10:21
**lefto** 49:5
**legal** 12:14 14:7,8 86:22
**legitimate** 52:11
**letters** 87:24
**level** 80:24
**lewiston** 2:11 86:20
**lexington** 81:1
**liabilities** 4:5 41:17
**liability** 23:13 23:17,20 38:22 41:16 42:11 43:2,8 58:21 58:23 59:2,7
**limit** 79:11
**limitations** 79:16
**limited** 85:1,1,1
**line** 24:10 27:18 42:3 73:24 74:9,17 74:20,24 75:11 76:16 86:14,14 86:17 88:15,17
**lines** 3:3 55:14 81:2
**list** 9:11 24:6 52:5 59:12 64:20,21 65:23 65:23 84:13
**listed** 26:25 48:1 51:25 64:22 66:9 72:16,23 73:3 73:11 76:25 77:3,10,11 82:13
**listen** 3:4
**listing** 80:17
**lists** 15:25
**little** 13:12 15:9 15:11 16:22 21:2 28:7 32:12 35:12 40:10 49:11 50:10 56:21 63:15 80:15
**llc** 1:4,5 3:2,19 3:22,22,23,24 21:2,6,23 23:8 23:9 59:22 76:21 81:4,12 82:16 83:8 84:11
**llp** 65:18 66:10
**loan** 48:3,4,6,6 48:7,9,11,12 50:2,4,6 51:14 52:9,11,13,15 52:15,18,23 53:10,13,15 65:14 66:2,3 78:22,24 82:1 82:2
**located** 16:5
**location** 16:3 46:5
**locations** 11:20
**log** 63:17,19 74:16
**lolo** 2:11 86:14 86:19
**long** 31:9 47:2 60:6
**longer** 87:21
**look** 20:15 34:7 34:15 40:23 57:17 59:11 62:1 72:2 74:4
**looked** 56:1,2
**looking** 12:22 84:13
**lookout** 76:7
**looks** 86:15
**losing** 47:3
**loss** 42:11
**lost** 35:18 38:17
**lot** 19:17 73:7
**louis** 2:5 35:2,5 35:8 47:21

**m**

**m2** 48:6 50:2 51:12,14,25 52:9 53:1,3,4,5 56:9 65:14 66:10,25 67:1 67:1,5 78:22 78:23,25 79:1 79:6 80:13 82:1
**ma'am** 76:7 89:13
**madam** 35:7 47:20 73:21 74:12 76:1 89:13
**made** 2:19 4:11 12:23 25:16 29:3,23 30:1,3 30:5 33:22 42:21 52:25 53:21 57:4 60:7 65:6 66:4 74:2 77:7 79:24 80:13 82:22 83:10

**mailing** 46:13
**maintain** 23:13 23:16 36:10 37:13 39:6,25
**maintained** 19:1 38:9,12 38:13 39:10,22 85:16 86:4
**make** 18:22 27:4,16 28:8 28:16,17 29:2 31:8,19,19 32:17,20 45:7 48:8 50:21 52:7 60:6 62:2 63:24 76:10 80:2,10 88:3
**makes** 88:24
**making** 13:16 43:10,16 53:23 53:24 54:2 62:3 80:7
**manage** 50:16 59:2,7 68:11 73:5
**managed** 17:6 58:22 68:8 71:15,25 72:3 73:16
**management** 12:24 16:23 17:4,6,7,10 18:24,25 19:5 19:13,16,20,23 21:9,11 22:5 26:9 30:20,25 32:7 48:8,13 48:15,16,19,23 49:15 50:9,13 50:19 51:8 54:7 58:17,18 59:1 62:13,16 63:1 77:19 80:6,7 81:4,16 81:22 82:2,4 83:19,22 84:12 84:20 85:3
**manager** 73:15
**managing** 20:6 70:7,24
**manner** 12:21 62:15 89:6
**mark** 68:8 72:14
**material** 45:12
**matter** 12:21
**matters** 12:14 12:15
**maximum** 79:15
**mcgraw** 66:10
**mean** 25:21 26:8 31:13 39:12 40:20 41:6,23 42:6 55:9 57:13 58:11 59:3 61:6 63:17 65:12 68:5 71:24 85:1
**medical** 16:11 54:5 75:16
**meet** 46:15
**meeting** 1:10 3:25 4:8 47:11 47:15 56:22 88:25
**members** 19:23
**mentioned** 27:12 41:25 45:16,17 51:1 51:7 54:10 56:8 85:14
**merritt** 90:5,18
**mexico** 3:24
**microsoft** 39:12
**middle** 1:1
**million** 25:9 26:12 34:10,13 34:20 48:2 49:2,25 50:9 50:12 51:7 52:10 53:1,22 54:1 57:16,22 57:23 58:1,2,9 59:19 65:25 76:20 79:15,18 80:10
**mind** 40:18
**minute** 54:10 69:15 87:5
**minutes** 47:5 88:13
**misdirect** 60:3
**missed** 75:3
**missing** 43:9
**mister** 2:14 74:25 75:1,13 76:1
**mixing** 42:8
**mobile** 71:19
**mode** 3:4
**moment** 3:1 10:12,13 36:3 42:18 51:11 56:7 57:8 58:16 64:19 66:22 67:7 71:12 74:12 76:5
**money** 22:3,10 22:25 23:6 31:11,18,20,23 31:24,25 32:21 33:13 34:16 58:9 61:8,19 61:21 64:4,5 64:15
**monies** 22:15 23:2 29:5,15 29:17 30:2 60:12 79:3 80:13
**month** 27:22 31:3 37:8,17

50:14 51:7 75:5,6
**morning** 3:13 4:20 24:8 30:4 30:5 35:10 75:1
**motion** 34:7
**move** 42:15 54:10
**multiple** 68:6
**municipalities** 29:15
**myers** 1:1 90:4
**myriad** 24:2 32:24

**n**

**n** 1:12 64:24 66:18
**name** 2:20 3:14 4:15 5:12 22:9 22:11,12 23:3 23:9 25:4 59:21 62:13 83:13 84:10 85:11,15
**named** 21:23 23:8
**names** 62:14 81:2
**nashville** 36:15
**natural** 77:16
**nature** 30:22
**necessarily** 45:12 70:25
**necessary** 12:21 13:21 74:11
**need** 10:11 12:12,13 16:3 20:24 33:1 38:5 39:22 47:10,15 54:18 61:9 63:9,10 75:9,19
**needed** 13:3,11 13:18 46:15 59:5
**needing** 30:23
**needs** 16:7
**negotiating** 6:10
**neither** 35:23
**net** 27:3
**never** 79:9
**new** 3:24 22:21
**news** 86:22
**non** 17:12 23:25 28:3,11 30:12 32:9 33:23
**noon** 74:2
**normal** 64:2
**northern** 1:15 3:15
**notation** 65:2 65:16 66:17
**notations** 80:25
**note** 40:11
**notes** 40:10 42:9 90:7
**notice** 75:17 76:6,11 86:21 87:10,11,16,25 89:1,3
**notices** 88:4
**now's** 44:25
**number** 3:19 3:21,24 11:25 22:15,16 23:5 47:24 64:21 67:23 68:3 81:11
**numbers** 14:19
**ny** 1:6 3:23

**o**

**o** 73:12
**o'clock** 74:5,5
**oath** 10:15
**object** 42:6
**obligation** 38:24
**obligations** 8:25 10:2 38:16
**observe** 47:3
**obtain** 4:9
**obtained** 51:21 64:1
**obviously** 26:24 27:10 31:14 53:5 79:15
**occasion** 70:14 70:20
**occasions** 70:14
**occur** 61:1,10
**occurred** 28:4 57:7,13,14,18 61:14
**october** 10:10 11:3,5
**offboarding** 73:6
**offhand** 57:12
**office** 1:13,15 4:10 11:10 12:16 15:19 33:1 36:21,22 44:5 45:24 46:2,5,17 90:12
**officer** 1:24 2:1 5:2,4,20,24,25 14:4,5,6,7,8,11 35:16 36:5,9 54:1
**officers** 13:25 14:9 23:13 40:13
**offices** 36:16 46:14

**official** 2:3 30:17,19 35:1 71:10 89:1 90:12
**officially** 44:14
**offline** 3:9
**offset** 73:18
**oh** 46:10 84:18
**okay** 5:5 6:12 8:1 9:4,23 10:13,17,20,20 10:20 13:24 14:9 15:9 16:16,22 18:21 20:18,24 26:5 27:25 28:15,24 28:25 33:20 34:2 35:21 36:16,23 37:6 40:3 50:7 58:25 62:7 63:4 66:22 67:14,19 69:6 69:13,17 71:12 73:1,10,20 74:7,21 75:13 76:13 77:21 78:18 80:9,14 83:10 84:8 85:6,19,23 86:2,7,16 87:1 87:7,14 88:6 88:12,18
**omissions** 8:20
**omni** 45:2 87:9 87:23
**onboarding** 73:5,9,9
**once** 29:22 74:23 88:9
**ongoing** 15:22 55:2
**online** 22:24 64:1
**open** 12:22 21:21 22:13 78:1 86:14,17
**opened** 17:1 77:21,24 78:6 78:10,12,12
**operate** 12:1 29:21 54:5
**operated** 13:13 29:17
**operating** 9:13 9:14,20,21 11:22 12:2 13:10 29:20 31:10 49:14 54:6 83:4 85:3 85:4 87:17,21
**operations** 11:15 12:16
**operator** 3:1 74:18,21 76:15 85:8 86:11 88:9,17 89:16
**opining** 29:8
**opportunity** 3:5 4:14 74:9 86:12
**options** 56:3
**order** 6:4 13:11 31:18 32:16,21 33:3,6 34:8 60:11 61:20 74:19 78:1 87:10
**ordinary** 81:23
**org** 80:24
**original** 33:24
**outreach** 87:23
**outside** 39:5 56:24 59:4 78:22,24
**outstanding** 9:3 21:1 24:21 25:5,8 38:24 57:24 58:1,2 59:19
**overseas** 43:23 46:25
**oversee** 37:2
**overview** 44:5
**owe** 31:22 33:12 58:12,14
**owed** 80:23
**owes** 58:9
**own** 6:11 16:17 20:17 49:17 52:6,7 72:6 77:20 84:15
**owned** 16:20 16:24 17:7,9 17:10 19:10 25:2 48:16 49:15 63:21,24 71:15 82:19 83:6 84:11,20 84:20,23 85:2
**owner** 29:4 71:7
**owners** 77:16 78:7,15
**ownership** 16:2 17:4,19,22 19:17,19,24 22:21 29:1 48:21 52:13 58:20 72:22 77:13,13,15 78:3
**owns** 16:5 20:10 24:24 48:18 71:17

**p**

**p** 1:12,12
**p.m.** 89:21
**page** 40:12 80:16
**paid** 22:2 24:5 24:12 29:18 30:22 31:2 32:20 33:25

34:1 39:1,4,7 50:1,13 52:10 53:1,13 54:20 56:12,18 65:1 65:4 67:2 69:8 69:21 70:12,15 75:5,7,15 80:8 80:8 81:5,8,15 81:22 82:6
**paperwork** 31:2
**pardon** 86:14
**part** 26:3 66:1 69:4 71:17 72:14
**partial** 63:10 63:15
**participating** 2:13 89:7
**participation** 89:18
**particular** 39:1 74:19 85:23
**parties** 4:13 26:19 27:2,4 29:6 34:25 64:15 74:9 77:11 90:9,9
**party** 4:8,16 65:8 77:1,12 79:22,24,25
**party's** 2:20
**pass** 85:5
**past** 20:15 77:5 77:14
**path** 75:10
**pause** 73:20
**pay** 25:15 30:23 32:21 34:21 43:3 50:2,5 56:9 61:12 65:13 66:1 70:9,10 71:23 80:18
**payable** 39:15 39:19
**paying** 82:2
**paymaster** 31:12
**payment** 23:25 24:11 27:15 32:1 48:12 65:6 68:20 81:12
**payments** 33:2 47:25 48:3,3,7 48:8,10 49:3 50:5 52:24,25 53:16,22,23,24 54:3,3 56:14 56:25 64:20 66:4,24 67:1,5 76:20 79:20,24 80:2,11 81:6 81:11,14 82:12 82:21,22,23,24 83:10
**payroll** 12:15 22:2,16,20 27:15,20,21 30:23 31:19 32:17,21 33:1 39:5,6 72:10 81:23 83:12,14 83:16,16
**payrolls** 27:17
**pc** 1:18
**penalty** 5:9 40:6 42:14
**pending** 8:9 29:7 44:17 54:24 55:1
**people** 7:22 11:25 13:10,23 31:22 32:20,25 33:1,11 42:11 43:9 46:14 60:3 61:7 67:13 85:12
**peoplesoft** 38:10,11,12,16 39:11,14,18,25 85:14,18,19
**perform** 52:6
**performed** 49:24 50:12
**period** 27:20,21 48:1 50:10 54:15 66:24 67:2,6 73:4
**perjury** 5:9 40:6 42:14
**permission** 28:22
**person** 13:1 20:7 59:12 72:12 74:17 76:14 77:16
**personal** 16:9 16:13 69:2
**personally** 6:21 19:15,22
**pertain** 44:1
**petition** 4:6 6:23 7:7,11 11:16 17:2,24 18:2 21:22 26:13 28:1,4 28:10 33:21 35:22 38:21,22 38:23,24 39:2 39:4,6 56:5,8 56:10,12,18 59:20,23,24 61:18 62:23,24 63:3 69:8 77:22 82:7
**petitions** 6:13 7:15,18,19 8:3 8:15
**philadelphia** 31:17 32:18 57:14 58:13

**phone** 87:24
**phrase** 40:25
**physical** 39:21 39:22
**pick** 10:21
**piece** 16:6
**place** 16:14 17:18,21 21:14 30:11,17,18 60:12,23
**plan** 13:16
**play** 26:6,10 50:19
**please** 3:1,7,11 4:15,18 5:6,12 5:17,23 6:18 11:14 20:25 24:16 28:3 42:24 52:2 66:22 74:16,22 74:23,25 76:16 86:12 89:3
**plenty** 73:24
**pli** 65:20
**plug** 74:17
**plus** 60:4
**pm** 73:23 79:20
**point** 8:13 10:5 13:14 33:9 42:6 47:14 52:19 77:3,4 77:13
**policies** 23:19 23:23,25 24:3 37:3 54:19
**policy** 23:21 34:11,12
**polk** 80:25
**polsinelli** 1:18 4:21 56:2
**portion** 74:20
**position** 5:18 5:23
**possession** 16:25
**possible** 18:19 61:16 72:21
**post** 15:2 21:22 28:4,10 33:21 38:21,24 39:2 39:4,6 56:8,10 56:12,18 59:20 59:23 60:11 61:18 62:23 63:3 77:22 87:25
**posted** 87:16
**potential** 27:1 27:2,4 34:20 43:13 52:5 54:19 56:3 77:1,12
**potentially** 63:12 77:4,14
**ppac** 82:8,10 82:14,15,17,20 82:22,24 83:11 84:9,10,16
**practice** 43:3
**practices** 18:22
**pre** 18:2 38:22 38:23 59:24 62:24 63:23,25 82:7
**preceding** 17:24 26:13
**predating** 29:15
**predecessor** 21:8,9
**premiums** 24:12 75:4,14
**preparation** 7:2 41:11 43:23,24
**prepare** 6:5 9:17
**prepared** 43:5 43:7
**preparing** 9:15
**present** 1:22 4:23 5:1 9:2
**presented** 8:24 43:11
**presently** 36:14
**press** 3:7 74:22 74:23 86:12 88:10
**presumably** 78:14
**pretty** 86:20
**prevent** 30:11
**primarily** 16:10,13 25:21 41:19 68:12,15
**primary** 12:6
**principal** 53:2 53:16,17,19
**print** 63:20
**prior** 6:1,3,4,7 17:5 21:10 30:16 43:3 52:19 61:13 67:3 69:7,21 87:17
**priority** 8:23 34:14 39:5 42:23 43:1,14 44:18,19
**prison** 86:22
**private** 68:21
**probably** 17:19 29:16
**problem** 35:20 69:25
**procedure** 29:21 31:10
**proceed** 34:24 35:6
**proceeding** 38:6 89:20 90:6
**proceedings** 55:4,12

**process** 12:19 33:1 73:17 81:23 87:13,22
**processed** 81:25
**processes** 36:11 83:16
**processing** 73:16
**processor** 83:12,14,16
**procuring** 70:13
**produce** 20:12 37:25 38:3 78:11
**produced** 18:8 20:8 21:4 38:4
**production** 18:12
**products** 39:13
**professional** 58:21,23 59:2 59:7
**professionals** 58:21
**program** 67:11 68:6,8,9,11 69:5
**proof** 23:23 24:17 72:22
**proper** 15:5
**properly** 28:8
**property** 15:13 15:15,17,18,20 15:25 16:4,7,9 16:9,13 30:11
**protocol** 87:23
**provide** 18:7 20:12,16 21:6 24:16 41:8 50:21 53:7 54:5 70:2 71:18 73:4,14
**provided** 8:18 8:19 9:11,16 11:9,12,13 16:11,12,15 19:5 21:9,20 40:15,20 41:1 41:7,11 45:2 49:6,24 51:6 54:14 69:4,10 70:11 73:18 81:16,18 86:5 87:11,12,13
**provider** 11:18 38:20 39:15 54:17 77:5 85:22
**providers** 73:18
**provides** 46:4 76:11
**providing** 12:9 18:1 21:11 22:5 26:1,2 51:1 70:24 77:19
**provision** 71:17
**pto** 8:24 43:2,8
**public** 71:5
**publication** 86:21 87:10,11
**published** 86:21 88:4 89:5
**pull** 80:18
**purchase** 70:6
**purchased** 70:15,21
**purchases** 70:25
**purposes** 29:25
**pursuant** 4:1 42:2 60:9
**pursue** 55:16
**put** 17:21 20:25 25:17 33:25 36:1 44:23 46:23 55:18
**putting** 27:3

**q**

**q&a** 74:20
**qnext** 39:16
**quarterly** 53:14
**question** 8:23 9:2 17:18 25:12 26:18 28:7,21,25 29:9 32:11 36:4 43:2 47:24 51:13 53:6 57:1,6 61:25 62:5,17 69:20 74:22,23 74:24 75:7 76:15 78:17 86:23,25 87:2 87:15
**questioning** 47:11 85:13 88:14
**questions** 3:5 4:15 6:15,20 10:1,4 21:15 34:24 35:13 42:7,19 47:6 73:22 74:10,10 74:14 86:8,12 88:10 89:9
**queue** 75:6 86:16
**queuing** 88:11
**quick** 86:20

**r**

**r** 1:12 64:24 73:12
**raise** 5:6
**reaching** 13:14
**real** 15:13,15 15:16,18,20

16:8
**really** 18:22 26:8,10 50:16 52:6 60:24 72:15
**reason** 17:8 39:1 48:11 65:9
**reasons** 41:20
**recall** 40:7 59:14 67:4,5 72:5
**receipt** 18:4,5 18:12
**receipts** 17:11 57:19
**receivable** 24:22 57:23 59:20 64:7,11 64:12 85:15,17
**receivables** 12:9,10 18:24 24:24 25:2,6 25:11 26:7,10 34:9,19 58:1 59:18,19,20 64:10
**receive** 9:12,19 9:21 18:14 29:14 31:24,25 59:24
**received** 17:23 19:8 21:3 22:10 23:24 32:3 35:23 48:2 49:2 50:9 61:1 73:18
**receiving** 14:12 14:14,23,24,25 60:8
**recent** 21:12 25:23
**recently** 17:5 21:5 57:14 70:16 81:12
**recognize** 82:3
**recollection** 57:25
**record** 2:19,20 2:21 4:16,19 5:13 6:18 21:19 23:7 41:21 46:23 47:4 59:17 90:6
**recorded** 3:10 4:8 41:17
**recording** 2:14 4:9,11 10:12 10:14,17 26:24
**records** 20:15 26:25 37:9,11 37:13 39:10,14 39:21,23 53:10 71:5 85:16,17
**recover** 34:16 54:24 55:3
**recreate** 69:19
**redirect** 31:21
**redirected** 30:21
**reduction** 13:2 37:15
**reductions** 12:23
**reed** 66:10
**refer** 72:13
**referenced** 34:21 72:18
**referencing** 28:18 80:21
**referred** 21:13 48:11
**referring** 21:18 48:4,6 50:24 61:4 68:23 69:2 84:15
**reflect** 2:19
**reflects** 2:21 26:12
**refund** 54:22
**refused** 54:21
**regarding** 8:24 10:2 12:20 42:8 43:2 54:8
**regards** 10:2
**regular** 30:1
**regularly** 61:19
**regulations** 31:18
**reimbursed** 33:21
**relate** 6:20 42:10
**related** 3:18 4:7 6:15,24 7:12 8:4 26:19 27:2 42:25 60:3 77:1,12
**relates** 12:11 43:7
**relating** 21:3
**relationship** 6:6 19:12,19 19:24 49:19,22 70:20 71:8,11 76:22 77:2,4,8
**relative** 72:17 72:21,25 73:11 90:8,9
**religious** 47:1
**reluctant** 25:15
**rely** 42:16
**relying** 42:11
**remain** 53:11
**remaining** 3:20 33:12 45:19
**remains** 25:7
**remember** 25:3 40:25 52:2 59:12
**reminder** 3:9
**remote** 45:24 45:25

**renewal** 24:18
**repaid** 52:19
**repeat** 7:21 84:1
**report** 90:6
**reported** 76:20
**reporter** 90:1
**reporting** 36:11 37:4 78:3
**reports** 39:12
**represent** 4:16 76:18 85:12 86:19
**representative** 2:15
**representatives** 4:23 5:1
**represented** 65:20
**representing** 55:5,9,11
**request** 20:25
**requested** 18:2 18:6 20:8,11 23:23
**require** 3:7
**required** 41:10 61:20
**requirements** 78:3
**requires** 12:18
**requiring** 60:12
**requisite** 15:5
**reselling** 70:25
**reserve** 74:3,13
**reserved** 73:24
**reside** 85:20
**resides** 85:21
**resold** 70:21
**resolve** 32:20
**respect** 6:8 41:21 42:23 51:12 66:7 86:2
**respective** 6:10 34:21
**responding** 6:19
**responsibilities** 12:7 37:8
**responsibility** 36:9 37:2
**responsible** 13:2 25:19 37:6,7,10 75:15
**restored** 63:9
**restructuring** 1:24 5:2,23,25 14:10 35:16
**retain** 35:15
**retained** 5:24 6:1,3 55:15
**return** 10:7,9
**returned** 46:6
**returns** 10:23 10:24 11:4,5,9 11:12
**review** 7:4
**reviewed** 6:13
**revolver** 78:24 79:1,6,16 80:10
**revolving** 78:20 78:21,23
**right** 5:6 14:8 18:18 20:24 23:11 36:11 39:8,20 40:9 42:3 44:22 45:14 46:20 52:1,17 54:25 55:21 56:6 58:8,15 63:14 64:12 65:22 68:21 70:8 71:13 76:5,13 80:22 81:10,24 82:12 83:8,9 84:12 85:5 86:5,17,18
**risk** 38:16 58:16,18 59:1 60:2 81:4
**rivky** 73:12,14 73:15
**rm** 81:4,12
**robust** 33:10
**rodriguez** 1:14 3:11,14 47:10
**role** 5:19,21 17:18 26:5,10 50:19
**rose** 2:9 85:13
**round** 27:6,16
**rubinstein** 48:2 48:5,8 49:3 50:1 53:25 65:24,24 66:6
**rubinstein's** 49:19
**russell** 66:18

**s**

**s** 1:12 73:12
**salary** 73:2
**salazar** 2:5 35:2,3,5,7,8,21 36:3,8,13,16,20 36:23 37:1,6 37:12,19,24 38:7,11,15,21 38:25 39:8,20 40:3,9 41:4,18 41:24 42:7,16 43:12,20 44:15 44:22 45:1,11 45:14,23 46:1 46:9,11,18,21 47:7,20,21,23 48:14,21 49:1 49:9,18,25

50:7,22 51:6 51:11,19,23 52:8,17,24 53:7,18,21 54:9,23 55:5 55:13,21,23 56:6,16,20 57:3,8,20 58:3 58:8,15,25 59:8,15 60:9 60:21 61:3,17 61:23 62:7,18 63:4,14 64:4 64:11,14,18 65:1,11,16,22 66:5,9,16,22 67:7,14,19,22 68:1,12,18 69:1,6,13,17,25 70:8,23 71:3,5 71:12,21 72:4 72:9,16 73:1 73:10,14,20 74:8,12 88:13 88:15,18
**salazar's** 85:13
**saw** 63:15
**saying** 30:13 33:12 44:16 50:23 69:17
**says** 40:6,12 65:2,11 80:24
**scanned** 40:1
**scattered** 46:16
**schedule** 4:6 15:25 27:3 40:4,5 50:8 51:24 65:2
**schedules** 6:14 6:23 7:8,11,20 7:24 8:3 9:16 9:17 15:11 16:4,24 40:5 40:11,16 41:2 41:12,12 42:1 42:22,25 43:4 44:4 45:3 46:20 51:24,25 66:23 68:19 72:16
**scott** 14:5
**scott's** 14:7
**se** 46:17
**seal** 90:12
**second** 10:14 40:3 73:21 86:16
**section** 1:10 4:2 4:2 66:23
**see** 12:22 17:8 18:15 22:25 47:13 63:10,18 63:19 81:10 82:21
**seeing** 61:19
**seem** 60:4
**seen** 9:14 44:11 61:21
**segregated** 32:8
**send** 22:9 24:7 33:2 49:2
**sending** 60:1
**sense** 64:3 88:24
**sent** 22:3 23:3
**separate** 39:16 58:20,24
**separated** 58:19
**september** 80:5
**serrano** 2:11 86:14,15,17,18 86:19 87:1,14 88:6
**servers** 39:25 86:4
**serves** 13:25
**service** 70:23 89:6
**servicer** 31:12
**services** 12:13 16:14 18:25 19:2,5,6,13 21:6,10,11 22:6 26:6 35:24 46:4 49:23 50:11,14 50:21 51:1,6,8 54:5 59:22 62:8,10,11,13 69:7,9,10,21 70:2,2,5,7,12 71:18 73:4,8 73:14 79:21 81:16,19 82:16 83:8 84:11 86:5
**set** 22:18 29:14 54:18 68:9 82:7 90:11
**setting** 20:5
**settle** 34:18 59:6
**settlement** 6:9 80:2
**settling** 79:22 79:24,25
**seven** 3:17 6:20
**several** 7:17
**shared** 19:21
**sheet** 38:1,3
**shelley** 55:10
**sholey** 14:4
**shorthand** 90:1
**show** 71:6
**side** 23:6 52:3
**sigma** 58:16,18 59:1,10,13 81:3,4,4,8,11 81:15,16,18,20 81:22 82:1,3
**sign** 7:7

**signature** 90:17
**signed** 6:13 7:15,18,19,23 8:9 40:4,4,24 42:2,13,14
**signing** 44:3 47:19
**silent** 69:14
**similar** 87:15
**sir** 39:20 47:22 71:13 85:6 86:8
**sit** 41:24
**site** 46:4 73:7 73:18
**sitting** 34:10
**situation** 54:4
**six** 3:19
**size** 79:17
**small** 11:25 45:3,16,18 46:14 84:25
**sofa** 7:24 76:19 81:10 82:13,23
**solemnly** 5:7
**somebody** 18:19
**someplace** 39:23
**somewhat** 43:5 88:19
**soon** 61:15
**sorry** 4:24 7:14 7:21 10:11,16 13:5 20:20 24:15 28:6 37:20 46:10,11 49:5 51:21 53:22 62:4 64:11 66:11 70:9 74:5,18 84:1,2,18 86:18
**sort** 31:12 33:7 39:13
**space** 15:19
**speak** 18:10 32:22,23 51:3
**speaking** 7:22 11:6 30:25 35:11 51:3 58:10 68:18
**special** 56:2
**specialist** 3:8
**specific** 16:4 27:21 28:12 50:25
**specifically** 16:2 26:14 80:16
**speed** 32:16
**spoken** 85:11
**spot** 44:23
**spreadsheet** 80:22,24
**sprouse** 1:25 4:24 5:3,5,10 5:15,16,16,17 5:20 6:12,21 6:25 7:3,6,9,13 7:17,19,23 8:10,17,17,21 9:6,10,14 10:15,22 11:1 11:4,6,7,7,8,11 11:17,23 12:5 12:8,20 13:6 14:3,7,18,20 19:4,15 20:2,9 20:20 21:7 25:1,2,9,12,21 26:8,17,23 27:10 28:5 29:16 32:12,25 35:10 36:4,4,7 36:12,14,15,18 36:22,25 37:1 37:5,10,15,19 37:22 38:3,7 38:10,13,19,23 38:25 39:3,11 39:24 40:4,8 40:16,20 41:7 41:18,23 42:4 42:18,25 43:12 43:17 44:3,10 44:16,19 45:16 45:22,25 46:3 46:9,10,13,19 47:4,13,23 48:5,18,24 49:1,5,14,22 50:4,13,22 51:3,10,16,20 52:2,12,21 53:4,12,20,25 54:6,9,14,23 55:1,8,13,18 56:8,13,19 57:1,5,12,25 58:7,11,18 59:2,11,15,23 60:14,24 61:6 61:21 62:1,12 62:23 63:8,16 63:19 64:8,13 64:17,18,25 65:5,14,19 66:3,8,12,20 67:4,11,17,21 67:24 68:5,14 68:22 69:4,11 69:12,14,23 70:4,12 71:2,4 71:10,14,21,24 72:8,13,20 73:2,5,13,15,25 74:1,2 75:7,8 76:17,24 77:9 77:18,23 78:5 78:9,17,21 79:3,8,14,22 80:4,6,12,20 81:8,15,20,25 82:10,18,25 83:3,9,15,24

84:1,6,13,19,24 85:11,17,21 86:1,6,9,23 87:4 89:7,11 89:13
**sprouse's** 42:17
**ss** 90:3
**staff** 13:17 33:3 37:15 46:16 49:6 76:21,22 76:24
**staffing** 77:5
**stand** 8:15
**standard** 29:20 31:9
**standing** 3:2
**standpoint** 25:13 33:17 36:19 39:15 82:6
**star** 3:8
**start** 4:17 22:8 34:25 35:12 53:22 60:11 87:23
**started** 31:15 34:18 61:18
**starting** 5:13 26:21 80:5
**state** 4:15 5:12 90:3
**stated** 2:21,22 29:19 78:9
**statement** 4:6 6:23 26:11 38:1,1,4 40:23 40:24 41:2 42:22 46:20 47:24 53:7 55:18 63:11 64:19
**statements** 2:19 6:14 7:12 8:4 17:23 18:2 18:14 20:8,13 20:22 21:20 37:14 38:6 40:16 42:1 44:12 63:20 64:2
**states** 1:1,13,14 1:15 3:15 4:1,3 4:10 9:13 11:10 23:22 78:2
**statutory** 2:5 35:8
**stayed** 55:24
**stenographer** 90:18
**stenographic** 90:6
**stenographic...** 90:5
**stop** 10:11
**stored** 39:23
**strictly** 64:6
**strong** 29:23
**structure** 17:16 17:17,20,21
**subject** 79:15
**subsidiary** 82:19
**sufficient** 27:17 37:13
**suite** 46:14
**summer** 68:10
**supplement** 6:17
**support** 51:17
**supporting** 79:17
**sure** 18:22 27:4 28:8,16,17 31:8,19 32:20 43:10 54:14 76:10 88:3
**swear** 5:7
**sweep** 60:17
**swept** 60:13,15
**switch** 57:8 80:14
**sworn** 10:15
**system** 16:23 22:18 32:7 33:11 38:8 39:9,12,16,19 41:14 85:14,15
**systems** 36:11 39:18

**t**

**take** 11:2 60:22 86:12 88:23
**taken** 56:4 86:15
**takes** 60:2,5
**talk** 15:9 16:22
**talked** 50:10
**talking** 42:9 50:8
**tamika** 2:14 74:25 75:8
**tasks** 13:11
**tax** 10:7,9,23 10:24 11:9,12
**td** 77:22
**team** 9:1 12:24 18:19 19:23 25:22 37:3 77:19 78:13
**tech** 2:9 85:12
**technical** 44:9
**technology** 69:7,9,20 70:1 70:5
**teleconference** 2:15
**teleconferenc...** 2:15 89:19
**telephone** 3:3 86:13
**tell** 54:13 58:16 69:9 81:13

**temple** 47:3
**temporary** 77:5
**tenentech** 85:22
**tennessee** 36:15 46:2
**tenure** 78:18 79:7 84:17,22
**term** 60:17 78:24
**terminated** 15:23,24
**terms** 16:1
**testified** 36:5 42:12 57:22 59:16 84:9
**testimony** 5:7 22:14 42:17 59:17 63:5 72:5 83:18 84:5,6
**teuran** 66:14
**texas** 51:25
**thank** 3:1,13 4:22 8:1 9:4 10:20 13:24 16:16 26:5 27:25 34:23 35:5,7,21 36:3 36:13,23 37:1 37:12,19,24 38:7,25 39:8 39:20 41:4,18 41:24 42:16 43:12,20 45:14 45:14 46:1,9 46:18 47:17,18 47:19,23 49:1 49:18,25 50:7 50:22 51:11,19 51:23 52:8,24 53:21 54:9 55:21 56:6 57:8 58:3,8,15 59:15 60:9,21 61:17 62:7 63:4 64:4,14 64:18 65:16,22 66:5,9,16 67:7 69:6 70:23 71:3,12 72:9 73:10,20 74:14 74:15 76:1 85:6 86:8,9,10 86:16,18 87:14 88:7,8,12,18,19 89:6,7,12,13,13 89:15,17
**thanks** 45:1 47:16
**things** 13:19 39:13 45:13 80:25
**think** 11:12 13:14 14:5 17:19 18:11 19:22 20:21 22:12 40:23 42:15 43:8 45:11 46:7 50:14 51:24 55:2 57:5 58:19 59:11 62:3,15,24 66:12 68:9 69:19 70:13,16 70:19 71:25 72:13 74:13 75:8,9 80:17 81:12 84:2 87:14 88:19,21
**third** 29:6 64:15
**thought** 44:12 45:7 77:11
**tie** 44:1
**tied** 67:16 68:4
**time** 3:3,6,16 3:17 4:17 5:13 8:19 21:1 31:7 31:9 43:16,19 44:25 47:12 52:14,20 54:17 55:3 58:19 60:2,6 61:15 67:2 69:23 72:3 73:24 76:4,5,8,12 79:6 88:10,11 88:20,23 89:2 89:8
**timeline** 25:17
**times** 61:11,12
**title** 2:20 22:17
**titled** 48:3 83:7
**tn** 19:2,13 26:5 49:12 59:22 62:8,9,10,12,19 62:20,25 63:6 82:15 83:1,7 84:10
**today** 3:16 4:23 5:1 8:16 20:14 21:16 41:25 47:1,2 73:23 86:8 89:8,17
**today's** 45:5,6 47:11
**together** 27:3
**told** 29:5 31:22 79:8,12
**tomorrow** 18:16 24:7
**took** 21:13
**transaction** 52:16 53:5
**transactions** 26:20,22,23,24 27:1 28:14 29:12 57:18 63:22,25 85:2
**transcript** 2:18 90:6
**transfer** 21:18 27:19,23 60:22

**transferred** 21:4,22 27:24 28:2,11,21 60:16,20 61:15 61:19,21 83:13
**transferring** 12:11 19:3
**transfers** 21:12 26:12,15,16 27:6,11,11,14 27:16 28:4 29:3,3 30:1,7 31:15 33:22 57:4,7 60:2,25 62:2,4 64:21 64:22 82:14,16
**transition** 12:13 34:7
**travel** 68:13,15 68:18,21,23
**traveled** 68:7
**traveling** 43:23 46:25
**treated** 65:15
**tremendous** 31:2
**tried** 27:2
**true** 8:5,8,15 11:8 40:7,17 42:3,12 90:6
**trust** 79:20
**trustee** 1:13,14 1:15 3:13,15 4:1,3,11,22 5:5 5:12,15,17,22 6:6,12 7:1,4,7 7:10,21 8:1,20 9:4,8,12,19,23 10:1,6,13,17,20 11:2,6,8,10,13 11:14,21 12:3 12:6,17 13:1 13:20,24 14:12 14:16,22 15:2 15:9,16,22,25 16:16,22 17:11 17:15,23 18:8 18:13,21 19:12 19:25 20:7,18 20:24 21:18,21 22:1,4 23:7,12 23:16,22,22 24:9,16,20,24 25:7,10,19 26:5,11,21 27:5,25 28:9 28:15,19,23 30:6,10,15 31:5,6 32:6 33:20 34:2,8 34:17,23 35:4 35:6,8 42:20 46:24 47:9,17 47:21,22 73:21 73:23 74:7,12 74:15,19 75:18 76:1,2,13 85:6 86:10 88:12,16 88:24 89:12,14
**trustee's** 9:13
**trusts** 6:10
**truth** 5:8,8,9
**try** 31:15 32:16 34:9 59:5 69:15,19
**trying** 25:3 40:24 60:3 72:1
**turn** 3:10 40:3 48:16 71:22
**two** 4:25 6:3 7:22 13:16 40:12 60:18 65:25 74:3
**tx** 1:5,6
**type** 43:10
**types** 33:13
**typical** 64:2 79:16

**u**

**u** 64:24
**unclear** 15:11
**under** 5:9 10:9 10:15 18:24 40:6 42:14 54:6,19 59:21 80:2,6 82:15 84:10
**understand** 8:14 9:23,25 13:14 18:23 21:1 28:14 41:5 63:5 72:4 79:19 82:7 84:5
**understanding** 12:17 17:20 18:23 19:18 20:2 22:6 23:24 28:20 34:3 48:15,22 49:19 51:14,16 51:18 52:9,12 52:18 55:24 60:10,14,19,25 61:14 62:12 66:6 70:1 71:7 72:12 81:3 83:15,18
**understood** 42:20 51:23 57:21
**united** 1:1,13 1:14,15 3:15 4:1,3,10 9:12 11:10 23:22 78:2
**unlimited** 76:21,22
**unofficial** 77:9
**unrelated** 64:15
**unsecured** 2:3 2:5 35:1,8

**unusual** 27:7 54:17
**update** 18:17 30:4,5
**uploaded** 44:7 44:12
**urgent** 20:25
**use** 30:11 38:10 62:14 68:16,22 68:24,24 70:5 71:16,23
**used** 8:12 17:1 20:20,20,22 22:16 28:2 32:8 49:16 63:22 65:21 67:10,12 68:13 68:15 69:1
**using** 17:25 39:12 60:17 89:18
**utilized** 83:6 84:19
**utilizing** 22:7

**v**

**value** 79:15
**values** 41:8
**various** 45:12
**vehicles** 16:18 16:20 71:16,16 71:18 72:2,6
**vein** 87:15
**vendor** 85:24
**verify** 22:23
**versus** 43:7
**virtual** 46:6
**virtually** 36:18
**visibility** 63:6,8 63:16,17,25 64:1,2,5

**w**

**wages** 43:7 80:17,23 82:6
**wait** 44:15 83:21 87:5
**waiting** 43:6
**walk** 82:5
**want** 11:18 15:9 18:22 21:1,7 25:14 26:17 28:7 39:17 40:9 44:23,24,24 46:19 66:16 76:18 80:15
**wanted** 7:20 28:16,17,24 32:23 46:21,23 75:13,17
**wanting** 75:2
**warrant** 40:14
**warranting** 42:10
**watch** 23:6
**way** 13:9,13 15:11 22:17 29:14,17 30:18 36:13 48:9 53:12 72:22 81:5
**ways** 32:24
**we've** 32:10,23 34:17 50:8 56:1 85:11
**website** 76:11 89:5
**week** 6:4 13:16 13:23 32:2
**weeks** 13:17 31:3
**welcome** 3:2 89:11
**went** 9:22 22:22 26:15 29:17 31:18 59:25
**whereof** 90:11
**whichever** 55:6 55:7
**wind** 11:24 12:1,8,16,19,23 13:16
**winding** 12:14 12:15,25 45:19 45:20
**wire** 28:12 30:9 31:17,19 60:1
**wires** 48:12 49:7,8,10
**wish** 6:17
**wishing** 4:9
**witness** 85:5 90:11
**witnesses** 1:22
**wondering** 26:14
**work** 9:15 11:25 34:13 45:24 71:23
**worked** 55:9
**workers** 54:12 54:14,16,20
**workforce** 13:3
**working** 8:10 8:25 33:17 37:23 42:21 44:5 45:19 59:9 61:8 75:24 87:9,22
**workman's** 34:11
**works** 18:23 47:16 74:13
**would've** 37:8 88:20
**written** 58:6
**www.flmb.us...** 1:2

| y | z |
|---|---|
| **yeah** 13:6,7 14:20 44:13 45:11 47:8 57:25 62:12 66:12,20 67:4 69:14 72:4 73:13 75:8,13 87:6 | **zero** 3:8 74:22 74:24 86:13 88:10 |
| **year** 10:10 26:13 37:9,11 48:1 55:3 64:20 66:24 67:3 69:7,21 73:3 76:20 | |
| **years** 54:15 | |
| **yescare** 1:4 3:21 10:9 19:16 21:22 29:6,9,10,19 30:19 33:15 49:16,20,24 50:17 52:22 55:6 58:19 63:23 65:20 76:19 77:16 82:19,21 83:4 83:5,5 85:25 | |
| **yesterday** 44:21 63:9,11 63:13 | |