# EXHIBIT E

EXECUTION VERSION

# SECRETARY'S CERTIFICATE

June 26, 2020

I, J. Scott King, hereby certify that I am the duly elected, qualified and acting Secretary of Valitás Holdings, Inc., a corporation organized and existing under the laws of the state of Delaware (the"**Company**"), and am authorized to execute this Secretary's Certificate (this "**Certificate**") on behalf of the Company, and do so solely in my official capacity and not in my individual capacity. This Certificate is delivered in connection with that certain Stock Purchase Agreement dated as of the date hereof (the "**Agreement**"), by and between the Company, M2 EQUITYCO, LLC, a Florida limited liability company, and solely for purposes of Section 7.01 and Section 7.12 of the Agreement, Valitás Intermediate Holdings, Inc., a Delaware corporation. All capitalized terms used but not defined in this Certificate shall have the meanings set forth in the Agreement.

Solely in my official capacity as Secretary of the Company, and on behalf of the Company and not in my individual capacity, I further certify as of the date hereof that:

(a) Attached hereto as Exhibit A are true and complete copies of all resolutions of the board of directors and the stockholders of the Company authorizing the execution, delivery, and performance of the Agreement and the consummation of the transactions contemplated thereby, and such resolutions are in full force and effect.

(b) The persons whose names appear on Exhibit B attached hereto are, on and as of the date hereof, the duly elected, qualified, and acting officers of the Company occupying the offices set forth opposite their respective names on Exhibit B, the signatures set forth opposite their respective names are their true and genuine signatures, and each such officer is duly authorized to execute and deliver the Agreement and each of the related documents to which the Company is a party and any other agreement, instrument, or document to be delivered by the Company pursuant to the Agreement and to act on behalf of the Company in connection therewith.

(c) Attached hereto as Exhibit C are true and complete copies of the governing documents of the Company, including any amendments or restatements thereof, and such governing documents are in full force and effect.

* * * *

IN WITNESS WHEREOF, I have hereto set my hand on behalf of the Company as of the date first written above.

By: ______________________
Name: J. Scott King
Title: Secretary

The undersigned, being the duly elected and qualified Chief Executive Officer of the Company, hereby certifies that J. Scott King is the duly elected and qualified Secretary of the Company and that the foregoing signature appearing above his name is his genuine signature.

IN WITNESS WHEREOF, I have hereto set my hand on behalf of the Company as of the date first written above.

By: ______________________
Name: James Hyman
Title: Chief Executive Officer

**Exhibit A**

Resolutions

**EXECUTION VERSION**

# UNANIMOUS WRITTEN CONSENT OF THE BOARDS OF DIRECTORS OF VALITÁS HOLDINGS, INC. AND VALITÁS INTERMEDIATE HOLDINGS, INC.

June 26, 2020

The undersigned, constituting all of the members of the board of directors (the "**Holdings Board**") of Valitás Holdings, Inc., a Delaware corporation ("**Holdings**"), and all of the members of the board of directors (the "**VIH Board**" and, together with the Holdings Board, the "**Boards**" and each of them a "**Board**") of Valitás Intermediate Holdings, Inc., a Delaware corporation ("**VIH**" and, together with Holdings, the "**Companies**" and each of them a "**Company**"), hereby take the following actions by written consent without a meeting, pursuant to the authority of Section 3.11 of the respective By-Laws of each Company (such Company's "**By-Laws**") and Sections 141(f) and 271, as applicable, of the Delaware General Corporation Law, as amended, permitting such actions to be taken:

**WHEREAS**, Holdings is party to that certain Stockholders Agreement, dated as of April 14, 2017 (the "**Stockholders Agreement**"), by and among Holdings and each of the stockholders thereof;

**WHEREAS**, pursuant to resolutions adopted on May 13, 2020 (the "**Committee Establishment Resolutions**"), the Holdings Board established a special committee of the Holdings Board to review and evaluate Holdings' strategic alternatives (the "**Special Committee**") and authorized it to, among other actions and things, (a) manage, respond, negotiate, accept or reject on behalf of Holdings the proposed terms of any transaction that may become available to Holdings and (b) take all such action with respect to the foregoing as the Special Committee may deem necessary, appropriate or advisable in order fully to carry out the intent and to accomplish the execution of the purposes of such resolutions;

**WHEREAS**, the Committee Establishment Resolutions provided that the Holdings Board shall not approve any potential transaction, or recommend any potential transaction or any modification, variation, supplement or waiver thereof or any alternative thereto for approval by Holdings' stockholders, without a prior favorable recommendation by the Special Committee;

**WHEREAS**, each Company desires to enter into that certain Stock Purchase Agreement by and between Holdings, M2 EQUITYCO, LLC, a Florida limited liability company (the "**Buyer**"), and solely for purposes of Section 7.01 and Section 7.12 of the Agreement, VIH, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Agreement**") on or about the date hereof, to provide for the sale by Holdings of all of the issued and outstanding shares of VIH (the "**Shares**") to the Buyer pursuant to the terms and conditions of the Agreement (the "**Sale**");

**WHEREAS**, pursuant to Section 2.2.1(a) of the Stockholders Agreement, Holdings may not undertake any Major Corporate Action (as defined therein), including any Sale of the

Company (as defined therein), without the prior affirmative vote of a majority of the Holdings Board, including at least one Majority Holder Designee (as defined therein);

**WHEREAS**, the Shares constitute substantially all of the assets of Holdings;

**WHEREAS**, the Special Committee has favorably recommended to the Holdings Board the approval of the Agreement and the Sale;

**WHEREAS**, each of Jeffrey D. Goldberg and Daniel S. Slipkovich is a Majority Holder Designee (as defined in the Stockholders Agreement); and

**WHEREAS**, each Board has reviewed the Agreement and is of the opinion that it is advisable, fair to and in the best interests of the applicable Company and its stockholder or stockholders, as applicable, to enter into the Agreement and consummate the Sale.

***Approval of the Agreement***

**NOW, THEREFORE, BE IT, RESOLVED**, that the form, terms, and provisions of the Agreement, including all schedules attached thereto, and the Sale hereby are approved;

***General Authorization***

**FURTHER RESOLVED,** that each Board hereby authorizes, empowers and directs Jeffrey D. Goldberg and any duly elected and incumbent officer of the applicable Company, and each of them (such persons, together with any and all persons hereafter duly appointed as officers of such Company hereinafter being referred to as its "**Authorized Persons**"), for and on behalf and in the name of such Company and without necessity for joinder or consent of any other person, to execute and deliver (without attaching the corporate seal thereto) the Agreement, including all schedules attached thereto, together with such other amendments, instruments and documents as such Authorized Person may deem necessary or appropriate (such determination to be conclusively, but not exclusively, evidenced by the execution of such Agreement or such other amendments, instruments or documents by such Authorized Person);

**FURTHER RESOLVED,** that each Company hereby is authorized and empowered to perform all of its obligations under the Agreement, including the consummation of the Sale;

**FURTHER RESOLVED,** that each Board hereby recommends that the stockholders of the applicable Company approve the Sale and the execution of the agreements, and consummation of the transactions, contemplated by the Sale and the Agreement;

**FURTHER RESOLVED,** that in addition to the specific authorizations set forth in the foregoing resolutions, the Authorized Persons of each Company hereby are authorized, in the name and on behalf of such Company, from time to time to take any and all such further actions and to execute and deliver (without attaching the corporate seal thereto) such further agreements, instruments, requests, receipts, notes, applications, reports, certificates and other documents and to obtain such consents and to incur and pay all such costs, fees and expenses as such person or persons may determine to be necessary, appropriate, convenient or advisable in order to effectuate the foregoing resolutions and the transactions contemplated thereby (such determination to be

conclusively, but not exclusively, evidenced by the taking of such actions or the execution of such instruments, certificates or documents by any such person);

**FURTHER RESOLVED,** that any actions taken by the Board and/or representatives, officers or agents of the Board, or any Authorized Person, of either Company on or prior to the date of the foregoing resolutions that are within the authority conferred hereby are hereby ratified, authorized, adopted, confirmed and approved as the acts and deeds of such Company;

**FURTHER RESOLVED,** that the authority conferred upon each Authorized Person of each Company by these resolutions is in addition to, and shall in no way limit, such other authority as such Authorized Person may have with respect to the subject matter of the foregoing resolutions, and that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements, instruments or documents described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements, instruments or documents described in the foregoing resolutions shall in no manner derogate from the authority of such Authorized Person to take all actions necessary, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intents and purposes of the foregoing resolutions;

**FURTHER RESOLVED,** that each Authorized Person is authorized, empowered and directed, for and on behalf of the applicable Company, to certify to any person a copy of these resolutions, and the names and signatures of the respective Authorized Persons of such Company;

**FURTHER RESOLVED,** that this Written Consent may be executed (by original or by facsimile) in two or more counterparts, each of which shall be an original and all of which together shall be considered one and the same instrument; and

**FURTHER RESOLVED,** that these resolutions supersede all prior resolutions with respect to the subject matter hereof, and these resolutions, and all authority resolved and granted hereby, shall remain in full force and effect for each Company until such time, if any, as the same may be expressly superseded by resolution of the applicable Board duly adopted in accordance with the applicable By-Laws and applicable law.

[*Signature page(s) follow(s).*]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

________________________________
Jeffrey D. Goldberg

________________________________
James Hyman

________________________________
Daniel S. Slipkovich

________________________________
Larry I. Wolk, MD, MSPH

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

_____________________________________
Jeffrey D. Goldberg

_____________________________________
James Hyman

_____________________________________
Daniel S. Slipkovich

_____________________________________
Larry I. Wolk, MD, MSPH

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

______________________________
Jeffrey D. Goldberg

______________________________
James Hyman

______________________________
Daniel S. Slipkovich

______________________________
Larry I. Wolk, MD, MSPH

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

______________________________
Jeffrey D. Goldberg

______________________________
James Hyman

______________________________
Daniel S. Slipkovich

______________________________
Larry L. Wolk, MD, MSPH

**<u>Exhibit A</u>**

Stock Purchase Agreement

See attached

EXECUTION VERSION

# STOCK PURCHASE AGREEMENT

among

**VALITÁS HOLDINGS, INC.**

and

**M2 EQUITYCO, LLC**

And, solely for purposes of Section 7.01 and Section 7.12,

**VALITÁS INTERMEDIATE HOLDINGS, INC.**

dated as of

June 26, 2020

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "**Agreement**"), dated as of June 26, 2020, is entered into among VALITÁS HOLDINGS, INC., a Delaware corporation ("**Seller**"), and M2 EQUITYCO, LLC, a Florida limited liability company ("**Buyer**"), and, solely for purposes of Section 7.01 and Section 7.12, VALITÁS INTERMEDIATE HOLDINGS, INC., a Delaware corporation (the "**Company**"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

## RECITALS

**WHEREAS**, Seller owns all of the issued and outstanding shares of common stock, par value $.001 per share (the "**Shares**"), of the Company; and

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein; and

**WHEREAS**, this Agreement is being entered into in connection with the consummation of a restructuring of the debt and equity interests of the Company pursuant to this Agreement and the other Transaction Documents (as defined below), pursuant to which the Company will receive good and valuable consideration.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined in ARTICLE II), Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Shares shall be $1.00 (the "**Purchase Price**"). Buyer shall pay the Purchase Price to Seller at the Closing in cash.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts), or at such other place or in such other manner as the parties may mutually agree upon.

**Section 2.02 Seller Closing Deliverables.** At the Closing, Seller shall deliver, or cause to be delivered, to Buyer the following:

(a) A share certificate evidencing the Shares, duly endorsed in blank or accompanied by a stock power or other instrument of transfer duly executed in blank.

(b) A certificate of the Secretary (or other officer) of Seller certifying (i) that attached thereto are true and complete copies of all resolutions of the board of directors and the stockholders of Seller authorizing the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect, (ii) the names, titles, and signatures of the officers of Seller authorized to sign this Agreement, and (iii) that attached thereto are true and complete copies of the governing documents of the Company, including any amendments or restatements thereof, and that such governing documents are in full force and effect.

(c) A properly completed and duly executed Internal Revenue Service Form W-9 from Seller.

**Section 2.03 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a) The Purchase Price.

(b) A certificate of the sole member and manager of Buyer certifying (i) that attached thereto are true and complete copies of all resolutions of the sole member and manager of Buyer authorizing the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect, and (ii) the names, titles, and signatures of the officers of Buyer authorized to sign this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as set forth in the Disclosure Schedules, the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01 Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws (as defined in ARTICLE V) of the state of Delaware. Seller has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder, and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement constitutes a legal, valid, and binding obligation of Seller enforceable against Seller in

accordance with its terms. Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all requisite corporate action on the part of Seller. Seller has duly executed and delivered this Agreement and each other Transaction Document to which it is a party. Each of the Transaction Documents to which Seller is or will be a party is, or upon its execution and delivery will be (assuming that this Agreement and each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 3.02 Organization, Authority, and Qualification of the Company.** The Company is a corporation duly organized, validly existing, and in good standing under the Laws of the state of Delaware and has all necessary corporate power and authority to own, operate, or lease the material properties and assets now owned, operated, or leased by it and to carry on its business as it is currently conducted. The Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. The Company has the requisite corporate power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder, all of which have been duly authorized by all requisite corporate action on the part of the Company. The Company has duly executed and delivered each Transaction Document to which it is a party. Each of the Transaction Documents to which the Company is or will be a party is, or upon its execution and delivery will be (assuming that each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 3.03 Capitalization.**

(a) The authorized shares of the Company consist of 1,000 shares of common stock, par value $.001 per share, of which 100 shares are issued and outstanding and constitute the Shares. All of the Shares have been duly authorized, are validly issued, fully paid and nonassessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances, other than those Encumbrances set forth in Section 3.03(a) of the Disclosure Schedules. The Shares, when sold and delivered in accordance with the terms hereof and for the consideration expressed herein, will be acquired by Buyer free and clear of all Encumbrances (other than those Encumbrances set forth in

Section 3.03(a) of the Disclosure Schedules), and Buyer will acquired good and marketable title to the Shares. The term "**Disclosure Schedules**" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement and the Closing.

(b) All of the Shares were issued in compliance with applicable Laws. None of the Shares were issued in violation of any agreement or commitment to which Seller or the Company is a party or is subject to or in violation of any preemptive or similar rights of any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity (each, a "**Person**"). For purposes of this Agreement, "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction.

(c) There are no (i) outstanding or authorized options, warrants, convertible securities, stock appreciation, phantom stock, profit participation, or other rights, agreements, or commitments relating to the shares of stock of the Company or obligating Seller or the Company to issue or sell any shares of stock of, or any other interest in, the Company, (ii) voting trusts, proxies or other agreements or understandings with respect to the voting or transfer of the Company's shares of capital stock, or (iii) authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with equity holders of such Person or any matter. There are no voting trusts, shareholder agreements, proxies, or other agreements of the Company in effect with respect to the voting or transfer of any of the Shares.

**Section 3.04 Subsidiaries.** Each Company Subsidiary is duly organized, validly existing, and in good standing (or the equivalent thereof, where such concept is recognized) under the Laws of its jurisdiction of organization and has all necessary corporate or other applicable power and authority to own, operate, or lease the material properties and assets now owned, operated, or leased by it and to carry on its businesses as currently conducted. Each Company Subsidiary is duly licensed or qualified to do business and is in good standing (or the equivalent thereof, where such concept is recognized) in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. As of the date hereof, (a) there are no Company Subsidiaries other than the entities identified in Section 3.04(a) of the Disclosure Schedules, and (b) all of the outstanding shares of capital stock of (or other ownership or profit interests in) each Company Subsidiary are directly or indirectly owned by the Company. There are no (i) outstanding or authorized options, warrants, convertible securities, stock appreciation, phantom stock, profit participation, or other rights, agreements, or commitments relating to the shares of stock of any Company Subsidiary or obligating Seller, the Company or any Company Subsidiary to issue or sell any shares of stock of, or any other interest in, any Company Subsidiary, (ii) voting trusts, proxies or other agreements or understandings with respect to the voting or transfer of any Company Subsidiary's

membership interests, capital stock or other ownership interests, or (iii) authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with equity holders of such Person or any matter. For purposes of this Agreement, "**Company Subsidiary**" means any entity of which securities or other ownership interests (i) having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, or (ii) representing more than fifty percent of such securities or ownership interests, are directly or indirectly owned by the Company.

**Section 3.05 Compliance with Applicable Laws; Governmental Authorizations; Licenses.** Neither the Company nor any Company Subsidiary is in violation of, or delinquent with respect to any applicable Laws, which violation or delinquency would be material. As of the date of this Agreement, there is no action, case or proceeding pending or, to the Knowledge of Seller, threatened by any Governmental Authority with respect to (i) any alleged violation by the Company or any Company Subsidiary of any statute, law, rule, regulation, code, ordinance, order, policy, or guideline of any Governmental Authority, or (ii) any alleged failure by the Company or any Company Subsidiary to have any permit, license, approval, franchise, order, certificate, or other authorization from any Governmental Authority required in connection with the operation of the business of the Company or any Company Subsidiary. Each Company Subsidiary is duly qualified or licensed to do business as a foreign corporation or other organization, and each is in good standing (or the equivalent thereof, where such concept is recognized), under the Laws of each jurisdiction where the character of the properties owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so qualified or so licensed has not had and is not likely to have a material adverse effect on the business conducted by the Company and the Companies Subsidiaries, taken as a whole. For purposes of this Agreement, the "**Knowledge**" of Seller means the actual knowledge of Scott King or F. Jeffrey Sholey.

**Section 3.06 Brokers.** Except for Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), no broker, finder, investment banker or any other Person is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.07 No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III (including the related portions of the Disclosure Schedules), none of Seller, the Company, the Company Subsidiaries, or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, the Company, or the Company Subsidiaries.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01 Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the state of Florida. Buyer has all necessary limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms. Buyer has the requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all requisite limited liability company action on the part of Buyer. Buyer has duly executed and delivered this Agreement and each other Transaction Document to which it is a party. Each of the Transaction Documents to which Buyer is or will be a party is, or upon its execution and delivery will be (assuming that this Agreement and each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 4.02 Investment Purpose.** Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"). Buyer acknowledges that Seller has not registered the offer and sale of the Shares under the Securities Act or any state securities Laws, and that the Shares may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities Laws, as applicable. Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment) and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

**Section 4.03 Brokers.** Except for HDI Distribution Europe B.V. ("**HDI**"), no broker, finder, or investment banker or any other Person is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.04 No Other Representations or Warranties; Independent Investigation.** Buyer has conducted to its satisfaction its own independent investigation, review, and analysis of the business, results of operations, prospects, condition (financial or otherwise), or assets of the Company and the Company Subsidiaries and acknowledges that to its knowledge it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller, the Company, and the Company Subsidiaries for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties set forth in ARTICLE III of this Agreement (including the related portions of the Disclosure Schedules) and not on any other representations, warranties, statements or other information made or furnished by or on behalf of Seller, the Company, the Company Subsidiaries or any other Person; and (b) none of Seller, the Company, the Company Subsidiaries or any other Person has made any representation or warranty, either express or implied, as to the accuracy or completeness of any information regarding Seller, the Company, the Company Subsidiaries, or this Agreement, except as expressly set forth in ARTICLE III of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE V
## COVENANTS

**Section 5.01 Confidentiality.** From and after the Closing, Seller (i) shall hold, and shall cause its Affiliates and its and their respective directors, officers, employees, consultants, counsel, accountants, and other agents (collectively, "**Representatives**") to hold, in confidence any and all information, in any form, concerning (A) FlacksGroup LLC, Buyer, and their Affiliates, or (B) the Company and the Company Subsidiaries as of the date of this Agreement and (ii) shall not, and shall cause its Affiliates and its and their respective Representatives not to, use any confidential or non-public information of the Company or the Company Subsidiaries for its own or its Affiliates' own account (except as may be needed to dissolve, liquidate, or otherwise wind up following the Closing), for the account of any other Person or to the detriment of the Company or the Company Subsidiaries, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by any obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or any statute, law, ordinance, regulation, rule, code, treaty, or other requirement of any Governmental Authority (collectively, "**Law**"), Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. For purposes of this Agreement, "**Affiliate**" of a Person means any other

Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

**Section 5.02 Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), none of Buyer, the Company, the Company Subsidiaries, and any of their respective Representatives shall, without the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed), and neither Seller nor any of its Representatives shall, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media, and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.03 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents and instruments, and take such further actions, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VI
## TAX MATTERS

**Section 6.01 Tax Covenants.**

(a) For purposes of this Agreement, "**Tax**" or "**Taxes**" means any U.S. federal, state, local, or non-U.S. taxes, assessments, fees, duties or levies (including any penalties and interest) imposed on, or determined by reference to, gross or net income or profits or other similar tax or any franchise tax imposed on, or calculated by reference to, gross or net income, as well as any other sales, use, production, ad valorem, transfer, registration, license, lease, service, services use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, escheat, abandoned property, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, including any such amounts by contract or as successor, transferee, or otherwise by operation of law, together with any interest, additions, or penalties with respect thereto.

(b) All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") to which Seller is a party shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and, upon Buyer's reasonable request, Seller shall reasonably cooperate with respect thereto as necessary). For purposes of this Agreement, a "**Tax Return**" means any return, declaration, report, filing, questionnaire, estimate,

notice, election, claim, registration, information return or statement, or other document relating to Taxes (including any amended return or claim for refund).

(c) Buyer shall, at its own expense, prepare, or cause to be prepared, and timely file or cause to be timely filed, all Tax Returns required to be filed by Seller, the Company or any of the Company Subsidiaries with respect to any taxable period or portion thereof, including, for the avoidance of doubt, in respect of (i) any taxable period that begins before and ends after the Closing Date (each a "**Straddle Period**") and (ii) any Tax Returns for the 2019 tax year. Unless otherwise required by Law, each such Tax Return for a Pre-Closing Tax Period or Straddle Period shall be prepared in a manner consistent with past practice and without a change of any election or any accounting method. Buyer shall be solely responsible for the full and timely payment of all Taxes required to be paid by Seller, the Company, or any of the Company Subsidiaries, including, for the avoidance of doubt, (x) all Taxes for any Straddle Period and (y) any Taxes associated with the Tax Returns as prepared by Buyer in accordance with this Section 6.01(c) for the 2019 Tax year.

**Section 6.02 Termination of Existing Tax-Sharing Agreements.** Any and all existing Tax-sharing agreements (whether written or not) binding upon the Company shall be terminated as of the Closing Date. After such date neither the Company, Seller, nor any of Seller's Affiliates and their respective Representatives shall have any further rights or liabilities thereunder.

**Section 6.03 Cooperation and Exchange of Information.** Seller shall provide Buyer with such reasonable cooperation and information as Buyer reasonably may request in filing any Tax Return pursuant to this ARTICLE VI or in connection with any proceeding in respect of taxes of the Company. Buyer shall retain all Tax Returns and other documents in its possession relating to Tax matters of the Company and the Company Subsidiaries for any Pre-Closing Tax Period and any Straddle Period (collectively, "**Tax Records**") until the expiration of the statute of limitations of the taxable periods to which such Tax Records relate. For purposes of this Agreement, a "**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, that Seller shall cause the Company to, and the Company shall, pay at the Closing all amounts payable with respect to such costs and expenses of Houlihan Lokey, Arnold & Porter Kaye Scholer LLP, Dechert LLP, Morrison, Brown, Argiz & Farra, LLC, HDI, and Weil, Gotshal & Manges LLP for which final invoices have been delivered to Seller and Buyer at or before the Closing (and Buyer shall cause the Company to pay any such amounts payable to the extent such amounts are not paid at the Closing); *provided, further,* that Buyer shall cause the Company to, and the Company shall, within thirty (30) days after the date of receipt of

each invoice setting forth reasonable and documented out-of-pocket expenses incurred by Seller or any of its Affiliates in connection with the liquidation, dissolution, or wind-up of Seller following the Closing, reimburse Seller or Seller's designee for all such expenses (in no event exceeding $100,000 in the aggregate).

**Section 7.02 Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third business day after the date mailed from a location within the continental United States, by certified or registered mail, return receipt requested, postage prepaid, in each case if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

| | |
|---|---|
| **If to Seller:** | Valitás Holdings, Inc.<br>c/o Jeffrey D. Goldberg<br>3201 Barhite Street<br>Pasadena, CA 91107<br>Email: jdg3201@gmail.com |
| with a copy (which shall not constitute notice) to: | Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave., NW<br>Washington, DC 20001-3743<br>Facsimile: 202-942-5999<br>Email: Kevin.Lavin@arnoldporter.com and David.Valeck@arnoldporter.com<br>Attention: Kevin J. Lavin and David J. Valeck<br><br>and<br><br>Cortland Capital Market Services LLC<br>225 W. Washington St., 21st Floor<br>Chicago, IL 60606<br>Facsimile: 312-376-0751<br>Email: CPCagency@cortlandglobal.com and legal@cortlandglobal.com<br>Attention: Maria Villagomez and Legal Department<br><br>and<br><br>Weil, Gotshal & Manges LLP<br>767 5th Avenue<br>New York, NY 10153<br>Facsimile: 212-310-8007<br>Email: damian.ridealgh@weil.com<br>Attention: Damian Ridealgh |

| | |
|---|---|
| **If to Buyer:** | M2 EquityCo, LLC<br>c/o FlacksGroup LLC<br>1450 Brickell Avenue<br>Suite 1900<br>Miami, FL 33131<br>Facsimile: 305-675-2717<br>Email: mflacks@flacksgroup.com<br>Attention: Michael Flacks, Chairman & CEO |
| with a copy (which shall not constitute notice) to: | Dechert LLP<br>3 Bryant Park<br>1095 Avenue of the Americas<br>New York, New York 10036<br>Facsimile: (212) 698-3599<br>Email: markus.bolsinger@dechert.com<br>Attention: Markus Bolsinger |

**Section 7.03 Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. All dollar amounts in this Agreement refer to United States currency.

**Section 7.04 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05 Survival**. None of the representations and warranties contained in this Agreement or in any instrument delivered under this Agreement will survive the Closing Date. This Section 7.05 does not limit any covenant or agreement of the parties hereto contained in this Agreement that, by its terms, contemplates performance after the Closing Date.

**Section 7.06 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings, and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 7.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither Buyer nor the Company may assign its rights or obligations hereunder without the prior written consent of Seller, and Seller may not assign its rights or obligations hereunder without the prior written consent of Buyer; and no such consent

shall be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.08 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.09 Governing Law; Submission to Jurisdiction.**

(a) This Agreement shall be governed by and construed in accordance with the internal Laws of the state of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the state of Delaware or any other jurisdiction). Any legal suit, action, proceeding, or dispute arising out of or related to this Agreement or the transactions contemplated hereby shall be instituted in the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over any such matter, the United States District Court for the District of Delaware, or in the event such United States District Court for the District of Delaware also does not have subject matter jurisdiction over such matter, any Delaware state court sitting in New Castle County, Delaware, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute. The parties agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the above-named courts and hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such court. Each party hereto irrevocably agrees to be bound by any non-appealable judgment rendered by such courts in connection with such actions or proceedings. Service of process by certified mail to the respective party at the addresses set forth in Section 7.02 shall be effective service of process for any suit, action, proceeding, or dispute brought in any such court.

(B) EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND

ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.09(B).

**Section 7.10 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 7.11 Non-recourse.** This Agreement may be enforced only against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may be brought only against, the entities that are expressly named as parties hereto and then with respect to only the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim or Action based on, in respect of or by reason of the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller shall have no liability for any damages or losses resulting from a breach or inaccuracy of any of the representations or warranties contained herein, except in the case of actual, intentional and knowing fraud with respect to the making of any such representations or warranties.

**Section 7.12 Release.** As of the Closing, the Company, for itself, its subsidiaries, and their respective successors and assigns (collectively, the "**Releasors**"), hereby forever fully and irrevocably releases and discharges Seller and its predecessors, successors, direct or indirect subsidiaries, and past and present stockholders, members, other equityholders, managers, directors, officers, agents, and other representatives other than, in each case, any individual who is or was an employee of the Company or any of its direct or indirect subsidiaries (collectively, the "**Released Parties**") from any and all actions, suits, claims, demands, debts, agreements, obligations, promises, judgments, or liabilities of any kind whatsoever in law or equity and causes of action of every kind and nature (including claims for damages, costs, expense, and attorneys', brokers', and accountants fees and expenses) arising out of or related to events, facts, conditions, or circumstances existing or arising prior to the Closing Date that the Releasors can, shall, or may have against the Released Parties, whether based on ownership interest or otherwise, and whether known or unknown, absolute or contingent, suspected or unsuspected, unanticipated as well as anticipated (collectively, the "**Released Claims**"), and hereby irrevocably agrees to refrain from directly or indirectly asserting any claim or

demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against any Released Party based upon any Released Claim. Notwithstanding the preceding sentence of this Section 7.12, “Released Claims” do not include, and the provisions of this Section 7.12 shall not release or otherwise diminish, the rights and obligations of any party hereto set forth in or arising under any provisions of this Agreement or any Transaction Document.

**Section 7.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers or other authorized persons thereunto duly authorized.

VALITÁS HOLDINGS, INC.

By: ___________________________
Name: Jeffrey D. Goldberg
Title: Authorized Person

M2 EQUITYCO, LLC

By: ___________________________
Name: Michael Flacks
Title: Authorized Signatory

*Solely for purposes of Section 7.01 and Section 7.12:*

VALITÁS INTERMEDIATE HOLDINGS, INC.

By: ___________________________
Name: Jeffrey D. Goldberg
Title: Authorized Person

**Execution Version**

**ACTION BY WRITTEN CONSENT OF**
**THE STOCKHOLDERS OF**
**VALITÁS HOLDINGS, INC.**
**IN LIEU OF A SPECIAL MEETING**

June 26, 2020

The undersigned, being the holders of a majority of the outstanding shares of common stock (the "**Stockholders**") of Valitás Holdings, Inc., a Delaware corporation (the "**Company**"), hereby consent to and adopt the following resolutions by written consent (this "**Consent**") in lieu of a meeting as permitted under Sections 228(a) and 271 of the Delaware General Corporation Law, as amended (the "**DGCL**"), and Section 2.11 of the By-Laws of the Company (the "**By-Laws**"). Each Stockholder, by signing this Consent, hereby waives any and all notice otherwise required to be given pursuant to applicable law, the By-Laws or that certain Stockholders Agreement, dated as of April 14, 2017, by and among the Company and each of the stockholders thereof, in connection herewith.

**WHEREAS**, the Company will enter into that certain Stock Purchase Agreement substantially in the form attached hereto as Exhibit A (the "**Agreement**"), by and between the Company, M2 EQUITYCO LLC, a Florida limited liability company (the "**Buyer**"), and solely for purposes of Section 7.01 and Section 7.12 of the Agreement, Valitás Intermediate Holdings, Inc., a Delaware corporation ("**VIH**"), pursuant to which the Company will sell to the Buyer all of the issued and outstanding shares of VIH (the "**Sale**");

***Approval of the Stock Purchase Agreement***

**WHEREAS**, pursuant to resolutions adopted on May 13, 2020 (the "**Committee Establishment Resolutions**"), the board of directors of the Company (the "**Board**") established a special committee of the Board to review and evaluate the Company's strategic alternatives (the "**Special Committee**") and authorized it to, among other actions and things, (a) manage, respond, negotiate, accept or reject on behalf of the Company the proposed terms of any transaction that may become available to the Company and (b) take all such action with respect to the foregoing as the Special Committee may deem necessary, appropriate or advisable in order fully to carry out the intent and to accomplish the execution of the purposes of such resolutions;

**WHEREAS**, the Committee Establishment Resolutions provided that the Board shall not approve any potential transaction, or recommend any potential transaction or any modification, variation, supplement or waiver thereof or any alternative thereto for approval by the Company's stockholders, without a prior favorable recommendation by the Special Committee;

**WHEREAS**, the Special Committee has favorably recommended to the Board the approval of the Agreement and the Sale;

**WHEREAS**, the Board has deemed it advisable, fair to and in the best interests of the Company and its Stockholders to enter into the Agreement, recommended to the Company's Stockholders that they approve and adopt the Agreement and the Sale, and submitted the Agreement and the Sale to the Stockholders for their approval; and

**WHEREAS**, the Stockholders desire to approve and adopt the Agreement and approve the consummation of the Sale in accordance with the DGCL and the applicable provisions of the By-Laws.

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms, and provisions of the Agreement, including all schedules attached thereto, and all documents executed by the Company in connection therewith, be and hereby are approved and adopted in all respects, and that such approval shall constitute for approval for all purposes of the DGCL;

**FURTHER RESOLVED**, that the execution, delivery, and performance of the Agreement are hereby consented to and ratified and that the Sale is hereby consented to;

*[Signature page(s) follow(s)]*

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the date first written above.

**IVY HILL ASSET MANAGEMENT, L. P.**

By: DocuSigned by: ______________________________
53CE801F6EFA451...
Name: Kevin Braddish
Title: Authorized Signatory

**IVY HILL MIDDLE MARKET CREDIT FUND VII, LTD.**
By: Ivy Hill Asset Management, L.P., as Asset Manager

By: DocuSigned by: ______________________________
53CE801F6EFA451...
Name: Kevin Braddish
Title: Authorized Signatory

**IVY HILL MIDDLE MARKET CREDIT FUND IX, LTD.**
By: Ivy Hill Asset Management, L.P., as Asset Manager

By: DocuSigned by: ______________________________
53CE801F6EFA451...
Name: Kevin Braddish
Title: Authorized Signatory

**IVY HILL MIDDLE MARKET CREDIT FUND X, LTD.**
By: Ivy Hill Asset Management, L.P., as Asset Manager

By: DocuSigned by: ______________________________
53CE801F6EFA451...
Name: Kevin Braddish
Title: Authorized Signatory

**PRIVATE DEBT STRATEGIES FUND IV, L.P.**
By: Ivy Hill Asset Management, L.P., as Manager

By: DocuSigned by: ______________________________
53CE801F6EFA451...
Name: Kevin Braddish
Title: Authorized Signatory

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the date first written above.

**BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.**

**BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND L.P.**

**BLUEMOUNTAIN KICKING HORSE FUND L.P.**

**BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF**

**BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.**

**BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.**

**BY: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, THEIR INVESTMENT MANAGER**

By: ______________________________
Name: Richard Horne
Title: Deputy General Counsel, Tax

**MADISON PARK FUNDING XVII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XVI, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XV, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XIII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XIV, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**ATRIUM X**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING X, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**ATRIUM XI**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**CREDIT SUISSE NOVA (LUX)**
By: Credit Suisse Asset Management, LLC or Credit Suisse Asset Management Limited, each as Co-Investment Adviser to Credit Suisse Fund Management S.A., management company for Credit Suisse Nova (Lux)

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**CREDIT SUISSE FLOATING RATE HIGH INCOME FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor

By: 
Name: Thomas Flannery
Title: Managing Director

**CREDIT SUISSE STRATEGIC INCOME FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor

By:
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XI, LTD**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XL, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**ATRIUM V**
By: Credit Suisse Asset Management, LLC, as collateral manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**ATRIUM VII**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING XXVI, LTD.**
By: Credit Suisse Asset Management, LLC, as collateral manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING III, LTD.**
By: Credit Suisse Asset Management, LLC, as collateral manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING V, LTD.**
By: Credit Suisse Asset Management, LLC, as collateral manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING VI, LTD.**
By: Credit Suisse Asset Management, LLC, as collateral manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING VIII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**MADISON PARK FUNDING IX, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**STATE OF NEW MEXICO STATE INVESTMENT COUNCIL**
By authority delegated to the New Mexico State Investment Office
By: Credit Suisse Asset Management, LLC, as its manager

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**SENIOR SECURED FLOATING RATE LOAN FUND**
By: Credit Suisse Asset Management, LLC, the Portfolio Manager for
Propel Capital Corporation, the manager for
Senior Secured Floating Rate Loan Fund

By: ______________________
Name: Thomas Flannery
Title: Managing Director

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

CORTLAND CAPITAL MARKET SERVICES LLC, as Agent

By: ______________________________

Name: Matthew Trybula

Title: Associate Counsel

**CREDIT AGREEMENT ADMINISTRATIVE AGENT:**

Cortland Capital Market Services LLC

By:______________________________
Name: Matthew Trybula
Title: Associate Counsel

CORTLAND CAPITAL MARKET SERVICES
LLC, as Administrative Agent

By: ______________________________
Name: Matthew Trybula
Title: Associate Counsel

CORTLAND CAPITAL MARKET SERVICES LLC, as the Second Out Note Holder Representative

By: ______________________________
Name: Matthew Trybula
Title: Associate Counsel

CORTLAND CAPITAL MARKET SERVICES LLC

By:________________________________
Name: Matthew Trybula
Title: Associate Counsel

GUARANTEED PARTY:

CORTLAND CAPITAL MARKET SERVICES LLC

By: ______________________
Name: Matthew Trybula
Title: Associate Counsel

**<u>Exhibit A</u>**

Stock Purchase Agreement

[See attached]

EXECUTION VERSION

# STOCK PURCHASE AGREEMENT

among

**VALITÁS HOLDINGS, INC.**

and

**M2 EQUITYCO, LLC**

And, solely for purposes of Section 7.01 and Section 7.12,

**VALITÁS INTERMEDIATE HOLDINGS, INC.**

dated as of

June 26, 2020

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "**Agreement**"), dated as of June 26, 2020, is entered into among VALITÁS HOLDINGS, INC., a Delaware corporation ("**Seller**"), and M2 EQUITYCO, LLC, a Florida limited liability company ("**Buyer**"), and, solely for purposes of Section 7.01 and Section 7.12, VALITÁS INTERMEDIATE HOLDINGS, INC., a Delaware corporation (the "**Company**"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

## RECITALS

**WHEREAS**, Seller owns all of the issued and outstanding shares of common stock, par value $.001 per share (the "**Shares**"), of the Company; and

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein; and

**WHEREAS**, this Agreement is being entered into in connection with the consummation of a restructuring of the debt and equity interests of the Company pursuant to this Agreement and the other Transaction Documents (as defined below), pursuant to which the Company will receive good and valuable consideration.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined in ARTICLE II), Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Shares shall be $1.00 (the "**Purchase Price**"). Buyer shall pay the Purchase Price to Seller at the Closing in cash.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts), or at such other place or in such other manner as the parties may mutually agree upon.

**Section 2.02 Seller Closing Deliverables.** At the Closing, Seller shall deliver, or cause to be delivered, to Buyer the following:

(a) A share certificate evidencing the Shares, duly endorsed in blank or accompanied by a stock power or other instrument of transfer duly executed in blank.

(b) A certificate of the Secretary (or other officer) of Seller certifying (i) that attached thereto are true and complete copies of all resolutions of the board of directors and the stockholders of Seller authorizing the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect, (ii) the names, titles, and signatures of the officers of Seller authorized to sign this Agreement, and (iii) that attached thereto are true and complete copies of the governing documents of the Company, including any amendments or restatements thereof, and that such governing documents are in full force and effect.

(c) A properly completed and duly executed Internal Revenue Service Form W-9 from Seller.

**Section 2.03 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a) The Purchase Price.

(b) A certificate of the sole member and manager of Buyer certifying (i) that attached thereto are true and complete copies of all resolutions of the sole member and manager of Buyer authorizing the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect, and (ii) the names, titles, and signatures of the officers of Buyer authorized to sign this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as set forth in the Disclosure Schedules, the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01 Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws (as defined in ARTICLE V) of the state of Delaware. Seller has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder, and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement constitutes a legal, valid, and binding obligation of Seller enforceable against Seller in

accordance with its terms. Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all requisite corporate action on the part of Seller. Seller has duly executed and delivered this Agreement and each other Transaction Document to which it is a party. Each of the Transaction Documents to which Seller is or will be a party is, or upon its execution and delivery will be (assuming that this Agreement and each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 3.02 Organization, Authority, and Qualification of the Company.** The Company is a corporation duly organized, validly existing, and in good standing under the Laws of the state of Delaware and has all necessary corporate power and authority to own, operate, or lease the material properties and assets now owned, operated, or leased by it and to carry on its business as it is currently conducted. The Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. The Company has the requisite corporate power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder, all of which have been duly authorized by all requisite corporate action on the part of the Company. The Company has duly executed and delivered each Transaction Document to which it is a party. Each of the Transaction Documents to which the Company is or will be a party is, or upon its execution and delivery will be (assuming that each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 3.03 Capitalization.**

(a) The authorized shares of the Company consist of 1,000 shares of common stock, par value $.001 per share, of which 100 shares are issued and outstanding and constitute the Shares. All of the Shares have been duly authorized, are validly issued, fully paid and nonassessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances, other than those Encumbrances set forth in Section 3.03(a) of the Disclosure Schedules. The Shares, when sold and delivered in accordance with the terms hereof and for the consideration expressed herein, will be acquired by Buyer free and clear of all Encumbrances (other than those Encumbrances set forth in

Section 3.03(a) of the Disclosure Schedules), and Buyer will acquired good and marketable title to the Shares. The term "**Disclosure Schedules**" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement and the Closing.

(b) All of the Shares were issued in compliance with applicable Laws. None of the Shares were issued in violation of any agreement or commitment to which Seller or the Company is a party or is subject to or in violation of any preemptive or similar rights of any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity (each, a "**Person**"). For purposes of this Agreement, "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction.

(c) There are no (i) outstanding or authorized options, warrants, convertible securities, stock appreciation, phantom stock, profit participation, or other rights, agreements, or commitments relating to the shares of stock of the Company or obligating Seller or the Company to issue or sell any shares of stock of, or any other interest in, the Company, (ii) voting trusts, proxies or other agreements or understandings with respect to the voting or transfer of the Company's shares of capital stock, or (iii) authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with equity holders of such Person or any matter. There are no voting trusts, shareholder agreements, proxies, or other agreements of the Company in effect with respect to the voting or transfer of any of the Shares.

**Section 3.04 Subsidiaries.** Each Company Subsidiary is duly organized, validly existing, and in good standing (or the equivalent thereof, where such concept is recognized) under the Laws of its jurisdiction of organization and has all necessary corporate or other applicable power and authority to own, operate, or lease the material properties and assets now owned, operated, or leased by it and to carry on its businesses as currently conducted. Each Company Subsidiary is duly licensed or qualified to do business and is in good standing (or the equivalent thereof, where such concept is recognized) in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. As of the date hereof, (a) there are no Company Subsidiaries other than the entities identified in Section 3.04(a) of the Disclosure Schedules, and (b) all of the outstanding shares of capital stock of (or other ownership or profit interests in) each Company Subsidiary are directly or indirectly owned by the Company. There are no (i) outstanding or authorized options, warrants, convertible securities, stock appreciation, phantom stock, profit participation, or other rights, agreements, or commitments relating to the shares of stock of any Company Subsidiary or obligating Seller, the Company or any Company Subsidiary to issue or sell any shares of stock of, or any other interest in, any Company Subsidiary, (ii) voting trusts, proxies or other agreements or understandings with respect to the voting or transfer of any Company Subsidiary's

membership interests, capital stock or other ownership interests, or (iii) authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with equity holders of such Person or any matter. For purposes of this Agreement, "**Company Subsidiary**" means any entity of which securities or other ownership interests (i) having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, or (ii) representing more than fifty percent of such securities or ownership interests, are directly or indirectly owned by the Company.

**Section 3.05 Compliance with Applicable Laws; Governmental Authorizations; Licenses.** Neither the Company nor any Company Subsidiary is in violation of, or delinquent with respect to any applicable Laws, which violation or delinquency would be material. As of the date of this Agreement, there is no action, case or proceeding pending or, to the Knowledge of Seller, threatened by any Governmental Authority with respect to (i) any alleged violation by the Company or any Company Subsidiary of any statute, law, rule, regulation, code, ordinance, order, policy, or guideline of any Governmental Authority, or (ii) any alleged failure by the Company or any Company Subsidiary to have any permit, license, approval, franchise, order, certificate, or other authorization from any Governmental Authority required in connection with the operation of the business of the Company or any Company Subsidiary. Each Company Subsidiary is duly qualified or licensed to do business as a foreign corporation or other organization, and each is in good standing (or the equivalent thereof, where such concept is recognized), under the Laws of each jurisdiction where the character of the properties owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so qualified or so licensed has not had and is not likely to have a material adverse effect on the business conducted by the Company and the Companies Subsidiaries, taken as a whole. For purposes of this Agreement, the "**Knowledge**" of Seller means the actual knowledge of Scott King or F. Jeffrey Sholey.

**Section 3.06 Brokers.** Except for Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), no broker, finder, investment banker or any other Person is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.07 No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III (including the related portions of the Disclosure Schedules), none of Seller, the Company, the Company Subsidiaries, or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, the Company, or the Company Subsidiaries.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01 Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the state of Florida. Buyer has all necessary limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms. Buyer has the requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all requisite limited liability company action on the part of Buyer. Buyer has duly executed and delivered this Agreement and each other Transaction Document to which it is a party. Each of the Transaction Documents to which Buyer is or will be a party is, or upon its execution and delivery will be (assuming that this Agreement and each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 4.02 Investment Purpose.** Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"). Buyer acknowledges that Seller has not registered the offer and sale of the Shares under the Securities Act or any state securities Laws, and that the Shares may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities Laws, as applicable. Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment) and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

**Section 4.03 Brokers.** Except for HDI Distribution Europe B.V. ("**HDI**"), no broker, finder, or investment banker or any other Person is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.04 No Other Representations or Warranties; Independent Investigation.** Buyer has conducted to its satisfaction its own independent investigation, review, and analysis of the business, results of operations, prospects, condition (financial or otherwise), or assets of the Company and the Company Subsidiaries and acknowledges that to its knowledge it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller, the Company, and the Company Subsidiaries for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties set forth in ARTICLE III of this Agreement (including the related portions of the Disclosure Schedules) and not on any other representations, warranties, statements or other information made or furnished by or on behalf of Seller, the Company, the Company Subsidiaries or any other Person; and (b) none of Seller, the Company, the Company Subsidiaries or any other Person has made any representation or warranty, either express or implied, as to the accuracy or completeness of any information regarding Seller, the Company, the Company Subsidiaries, or this Agreement, except as expressly set forth in ARTICLE III of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE V
## COVENANTS

**Section 5.01 Confidentiality.** From and after the Closing, Seller (i) shall hold, and shall cause its Affiliates and its and their respective directors, officers, employees, consultants, counsel, accountants, and other agents (collectively, "**Representatives**") to hold, in confidence any and all information, in any form, concerning (A) FlacksGroup LLC, Buyer, and their Affiliates, or (B) the Company and the Company Subsidiaries as of the date of this Agreement and (ii) shall not, and shall cause its Affiliates and its and their respective Representatives not to, use any confidential or non-public information of the Company or the Company Subsidiaries for its own or its Affiliates' own account (except as may be needed to dissolve, liquidate, or otherwise wind up following the Closing), for the account of any other Person or to the detriment of the Company or the Company Subsidiaries, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by any obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or any statute, law, ordinance, regulation, rule, code, treaty, or other requirement of any Governmental Authority (collectively, "**Law**"), Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. For purposes of this Agreement, "**Affiliate**" of a Person means any other

Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

**Section 5.02 Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), none of Buyer, the Company, the Company Subsidiaries, and any of their respective Representatives shall, without the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed), and neither Seller nor any of its Representatives shall, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media, and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.03 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents and instruments, and take such further actions, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VI
## TAX MATTERS

**Section 6.01 Tax Covenants.**

(a) For purposes of this Agreement, "**Tax**" or "**Taxes**" means any U.S. federal, state, local, or non-U.S. taxes, assessments, fees, duties or levies (including any penalties and interest) imposed on, or determined by reference to, gross or net income or profits or other similar tax or any franchise tax imposed on, or calculated by reference to, gross or net income, as well as any other sales, use, production, ad valorem, transfer, registration, license, lease, service, services use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, escheat, abandoned property, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, including any such amounts by contract or as successor, transferee, or otherwise by operation of law, together with any interest, additions, or penalties with respect thereto.

(b) All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") to which Seller is a party shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and, upon Buyer's reasonable request, Seller shall reasonably cooperate with respect thereto as necessary). For purposes of this Agreement, a "**Tax Return**" means any return, declaration, report, filing, questionnaire, estimate,

notice, election, claim, registration, information return or statement, or other document relating to Taxes (including any amended return or claim for refund).

(c) Buyer shall, at its own expense, prepare, or cause to be prepared, and timely file or cause to be timely filed, all Tax Returns required to be filed by Seller, the Company or any of the Company Subsidiaries with respect to any taxable period or portion thereof, including, for the avoidance of doubt, in respect of (i) any taxable period that begins before and ends after the Closing Date (each a "**Straddle Period**") and (ii) any Tax Returns for the 2019 tax year. Unless otherwise required by Law, each such Tax Return for a Pre-Closing Tax Period or Straddle Period shall be prepared in a manner consistent with past practice and without a change of any election or any accounting method. Buyer shall be solely responsible for the full and timely payment of all Taxes required to be paid by Seller, the Company, or any of the Company Subsidiaries, including, for the avoidance of doubt, (x) all Taxes for any Straddle Period and (y) any Taxes associated with the Tax Returns as prepared by Buyer in accordance with this Section 6.01(c) for the 2019 Tax year.

**Section 6.02 Termination of Existing Tax-Sharing Agreements.** Any and all existing Tax-sharing agreements (whether written or not) binding upon the Company shall be terminated as of the Closing Date. After such date neither the Company, Seller, nor any of Seller's Affiliates and their respective Representatives shall have any further rights or liabilities thereunder.

**Section 6.03 Cooperation and Exchange of Information.** Seller shall provide Buyer with such reasonable cooperation and information as Buyer reasonably may request in filing any Tax Return pursuant to this ARTICLE VI or in connection with any proceeding in respect of taxes of the Company. Buyer shall retain all Tax Returns and other documents in its possession relating to Tax matters of the Company and the Company Subsidiaries for any Pre-Closing Tax Period and any Straddle Period (collectively, "**Tax Records**") until the expiration of the statute of limitations of the taxable periods to which such Tax Records relate. For purposes of this Agreement, a "**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, that Seller shall cause the Company to, and the Company shall, pay at the Closing all amounts payable with respect to such costs and expenses of Houlihan Lokey, Arnold & Porter Kaye Scholer LLP, Dechert LLP, Morrison, Brown, Argiz & Farra, LLC, HDI, and Weil, Gotshal & Manges LLP for which final invoices have been delivered to Seller and Buyer at or before the Closing (and Buyer shall cause the Company to pay any such amounts payable to the extent such amounts are not paid at the Closing); *provided, further,* that Buyer shall cause the Company to, and the Company shall, within thirty (30) days after the date of receipt of

each invoice setting forth reasonable and documented out-of-pocket expenses incurred by Seller or any of its Affiliates in connection with the liquidation, dissolution, or wind-up of Seller following the Closing, reimburse Seller or Seller's designee for all such expenses (in no event exceeding $100,000 in the aggregate).

**Section 7.02 Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third business day after the date mailed from a location within the continental United States, by certified or registered mail, return receipt requested, postage prepaid, in each case if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

| | |
|---|---|
| **If to Seller:** | Valitás Holdings, Inc.<br>c/o Jeffrey D. Goldberg<br>3201 Barhite Street<br>Pasadena, CA 91107<br>Email: jdg3201@gmail.com |
| with a copy (which shall not constitute notice) to: | Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave., NW<br>Washington, DC 20001-3743<br>Facsimile: 202-942-5999<br>Email: Kevin.Lavin@arnoldporter.com and David.Valeck@arnoldporter.com<br>Attention: Kevin J. Lavin and David J. Valeck<br><br>and<br><br>Cortland Capital Market Services LLC<br>225 W. Washington St., 21st Floor<br>Chicago, IL 60606<br>Facsimile: 312-376-0751<br>Email: CPCagency@cortlandglobal.com and legal@cortlandglobal.com<br>Attention: Maria Villagomez and Legal Department<br><br>and<br><br>Weil, Gotshal & Manges LLP<br>767 5th Avenue<br>New York, NY 10153<br>Facsimile: 212-310-8007<br>Email: damian.ridealgh@weil.com<br>Attention: Damian Ridealgh |

| | |
|---|---|
| **If to Buyer:** | M2 EquityCo, LLC<br>c/o FlacksGroup LLC<br>1450 Brickell Avenue<br>Suite 1900<br>Miami, FL 33131<br>Facsimile: 305-675-2717<br>Email: mflacks@flacksgroup.com<br>Attention: Michael Flacks, Chairman & CEO |
| with a copy (which shall not constitute notice) to: | Dechert LLP<br>3 Bryant Park<br>1095 Avenue of the Americas<br>New York, New York 10036<br>Facsimile: (212) 698-3599<br>Email: markus.bolsinger@dechert.com<br>Attention: Markus Bolsinger |

**Section 7.03 Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. All dollar amounts in this Agreement refer to United States currency.

**Section 7.04 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05 Survival**. None of the representations and warranties contained in this Agreement or in any instrument delivered under this Agreement will survive the Closing Date. This Section 7.05 does not limit any covenant or agreement of the parties hereto contained in this Agreement that, by its terms, contemplates performance after the Closing Date.

**Section 7.06 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings, and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 7.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither Buyer nor the Company may assign its rights or obligations hereunder without the prior written consent of Seller, and Seller may not assign its rights or obligations hereunder without the prior written consent of Buyer; and no such consent

shall be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.08 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.09 Governing Law; Submission to Jurisdiction.**

(a) This Agreement shall be governed by and construed in accordance with the internal Laws of the state of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the state of Delaware or any other jurisdiction). Any legal suit, action, proceeding, or dispute arising out of or related to this Agreement or the transactions contemplated hereby shall be instituted in the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over any such matter, the United States District Court for the District of Delaware, or in the event such United States District Court for the District of Delaware also does not have subject matter jurisdiction over such matter, any Delaware state court sitting in New Castle County, Delaware, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute. The parties agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the above-named courts and hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such court. Each party hereto irrevocably agrees to be bound by any non-appealable judgment rendered by such courts in connection with such actions or proceedings. Service of process by certified mail to the respective party at the addresses set forth in Section 7.02 shall be effective service of process for any suit, action, proceeding, or dispute brought in any such court.

(B) EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND

ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.09(B).

**Section 7.10 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 7.11 Non-recourse.** This Agreement may be enforced only against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may be brought only against, the entities that are expressly named as parties hereto and then with respect to only the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim or Action based on, in respect of or by reason of the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller shall have no liability for any damages or losses resulting from a breach or inaccuracy of any of the representations or warranties contained herein, except in the case of actual, intentional and knowing fraud with respect to the making of any such representations or warranties.

**Section 7.12 Release.** As of the Closing, the Company, for itself, its subsidiaries, and their respective successors and assigns (collectively, the "**Releasors**"), hereby forever fully and irrevocably releases and discharges Seller and its predecessors, successors, direct or indirect subsidiaries, and past and present stockholders, members, other equityholders, managers, directors, officers, agents, and other representatives other than, in each case, any individual who is or was an employee of the Company or any of its direct or indirect subsidiaries (collectively, the "**Released Parties**") from any and all actions, suits, claims, demands, debts, agreements, obligations, promises, judgments, or liabilities of any kind whatsoever in law or equity and causes of action of every kind and nature (including claims for damages, costs, expense, and attorneys', brokers', and accountants fees and expenses) arising out of or related to events, facts, conditions, or circumstances existing or arising prior to the Closing Date that the Releasors can, shall, or may have against the Released Parties, whether based on ownership interest or otherwise, and whether known or unknown, absolute or contingent, suspected or unsuspected, unanticipated as well as anticipated (collectively, the "**Released Claims**"), and hereby irrevocably agrees to refrain from directly or indirectly asserting any claim or

demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against any Released Party based upon any Released Claim. Notwithstanding the preceding sentence of this Section 7.12, “Released Claims” do not include, and the provisions of this Section 7.12 shall not release or otherwise diminish, the rights and obligations of any party hereto set forth in or arising under any provisions of this Agreement or any Transaction Document.

**Section 7.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers or other authorized persons thereunto duly authorized.

VALITÁS HOLDINGS, INC.

By: ___________________________
Name: Jeffrey D. Goldberg
Title: Authorized Person

M2 EQUITYCO, LLC

By: ___________________________
Name: Michael Flacks
Title: Authorized Signatory

*Solely for purposes of Section 7.01 and Section 7.12:*

VALITÁS INTERMEDIATE HOLDINGS, INC.

By: ___________________________
Name: Jeffrey D. Goldberg
Title: Authorized Person

**EXECUTION VERSION**

**UNANIMOUS WRITTEN CONSENT OF
THE SPECIAL COMMITTEE OF
THE BOARD OF DIRECTORS OF
VALITÁS HOLDINGS, INC.**

June 26, 2020

The undersigned, constituting all of the members of a special committee of the board of directors (the "**Board**") of Valitás Holdings, Inc., a Delaware corporation (the "**Company**"), formed to review and evaluate the Company's strategic alternatives (the "**Special Committee**"), of hereby consent to the taking of the following actions by written consent without a meeting, pursuant to authority delegated by the Board pursuant to Section 5 of the By-Laws of the Company and pursuant to Section 141(f) of the Delaware General Corporation Law, as amended, permitting such actions to be taken:

***Approving and Recommending the Agreement and Sale***

**WHEREAS**, pursuant to resolutions adopted on May 13, 2020 (the "**Committee Establishment Resolutions**"), the Board established the Special Committee and authorized it to, among other actions and things, (a) manage, respond, negotiate, accept or reject on behalf of the Company the proposed terms of any transaction that may become available to the Company and (b) take all such action with respect to the foregoing as the Special Committee may deem necessary, appropriate or advisable in order fully to carry out the intent and to accomplish the execution of the purposes of such resolutions;

**WHEREAS**, pursuant to the Committee Establishment Resolutions, the Board delegated to the Special Committee the full power and authority of the Board, to the fullest extent permitted by law but subject to certain limitations stated therein, to take any and all actions and make any and all determinations or recommendations with respect to any of the Company's strategic alternatives, in the name of and on behalf of the Company;

**WHEREAS**, the Committee Establishment Resolutions provided that the Board shall not approve any potential transaction, or recommend any potential transaction or any modification, variation, supplement or waiver thereof or any alternative thereto for approval by the Company's stockholders, without a prior favorable recommendation by the Special Committee;

**WHEREAS**, the Special Committee and certain persons of the Company have engaged in diligent negotiations and discussions with various parties relating to the Sale (as defined below) and other strategic alternatives of the Company;

**WHEREAS**, the Special Committee has reviewed that certain Stock Purchase Agreement by and between the Company, M2 EQUITYCO, LLC, a Florida limited liability company (the "**Buyer**"), and solely for purposes of Section 7.01 and Section 7.12 of the Agreement, Valitás Intermediate Holdings, Inc., a Delaware corporation, substantially in the form attached hereto as Exhibit A (the "**Agreement**") and to be dated on or about the date hereof, to provide for the sale by the Company of all of the issued and outstanding shares of Valitás Intermediate Holdings, Inc.

(the “**Shares**”) to the Buyer pursuant to the terms and conditions of the Agreement (the “**Sale**”); and

**WHEREAS**, the Special Committee has deemed it to be fair to, advisable and in the best interests of the Company and its stockholders for the Company to enter into the Agreement, perform all of its obligations pursuant to and as set forth in the Agreement and consummate the Sale.

**NOW, THEREFORE, BE IT RESOLVED**, that, subject to the approval of the Board, the Agreement and the Sale are hereby approved in all respects, and the Agreement and the Sale are deemed to be fair to, advisable and in the best interests of the Company and its stockholders;

**RESOLVED FURTHER**, that the Special Committee resolves to recommend the Agreement and the Sale to the Board for approval and directs that the Agreement be submitted to the Board for consideration; and

**RESOLVED FURTHER**, that any and all acts heretofore done, and any and all documents, instruments and certificates heretofore executed and delivered, in the name and on behalf of the Company, in connection with the Sale are hereby ratified and approved with the same force and effect as if approved by the Special Committee in advance.

[*Signature Page to Follow*]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

________________________________
Jeffrey D. Goldberg

________________________________
Daniel S. Slipkovich

________________________________
Larry I. Wolk, MD, MSPH

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

Jeffrey D. Goldberg

Daniel S. Slipkovich

Larry I. Wolk, MD, MSPH

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date first written above.

______________________________
Jeffrey D. Goldberg

______________________________
Daniel S. Slipkovich

______________________________
Larry J. Wolk, MD, MSPH

**Exhibit A**

Stock Purchase Agreement

See attached

EXECUTION VERSION

# STOCK PURCHASE AGREEMENT

among

**VALITÁS HOLDINGS, INC.**

and

**M2 EQUITYCO, LLC**

And, solely for purposes of Section 7.01 and Section 7.12,

**VALITÁS INTERMEDIATE HOLDINGS, INC.**

dated as of

June 26, 2020

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "**Agreement**"), dated as of June 26, 2020, is entered into among VALITÁS HOLDINGS, INC., a Delaware corporation ("**Seller**"), and M2 EQUITYCO, LLC, a Florida limited liability company ("**Buyer**"), and, solely for purposes of Section 7.01 and Section 7.12, VALITÁS INTERMEDIATE HOLDINGS, INC., a Delaware corporation (the "**Company**"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

## RECITALS

**WHEREAS**, Seller owns all of the issued and outstanding shares of common stock, par value $.001 per share (the "**Shares**"), of the Company; and

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein; and

**WHEREAS**, this Agreement is being entered into in connection with the consummation of a restructuring of the debt and equity interests of the Company pursuant to this Agreement and the other Transaction Documents (as defined below), pursuant to which the Company will receive good and valuable consideration.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined in ARTICLE II), Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Shares shall be $1.00 (the "**Purchase Price**"). Buyer shall pay the Purchase Price to Seller at the Closing in cash.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts), or at such other place or in such other manner as the parties may mutually agree upon.

**Section 2.02 Seller Closing Deliverables.** At the Closing, Seller shall deliver, or cause to be delivered, to Buyer the following:

(a) A share certificate evidencing the Shares, duly endorsed in blank or accompanied by a stock power or other instrument of transfer duly executed in blank.

(b) A certificate of the Secretary (or other officer) of Seller certifying (i) that attached thereto are true and complete copies of all resolutions of the board of directors and the stockholders of Seller authorizing the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect, (ii) the names, titles, and signatures of the officers of Seller authorized to sign this Agreement, and (iii) that attached thereto are true and complete copies of the governing documents of the Company, including any amendments or restatements thereof, and that such governing documents are in full force and effect.

(c) A properly completed and duly executed Internal Revenue Service Form W-9 from Seller.

**Section 2.03 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a) The Purchase Price.

(b) A certificate of the sole member and manager of Buyer certifying (i) that attached thereto are true and complete copies of all resolutions of the sole member and manager of Buyer authorizing the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect, and (ii) the names, titles, and signatures of the officers of Buyer authorized to sign this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as set forth in the Disclosure Schedules, the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01 Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws (as defined in ARTICLE V) of the state of Delaware. Seller has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder, and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement constitutes a legal, valid, and binding obligation of Seller enforceable against Seller in

accordance with its terms. Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all requisite corporate action on the part of Seller. Seller has duly executed and delivered this Agreement and each other Transaction Document to which it is a party. Each of the Transaction Documents to which Seller is or will be a party is, or upon its execution and delivery will be (assuming that this Agreement and each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 3.02 Organization, Authority, and Qualification of the Company.** The Company is a corporation duly organized, validly existing, and in good standing under the Laws of the state of Delaware and has all necessary corporate power and authority to own, operate, or lease the material properties and assets now owned, operated, or leased by it and to carry on its business as it is currently conducted. The Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. The Company has the requisite corporate power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder, all of which have been duly authorized by all requisite corporate action on the part of the Company. The Company has duly executed and delivered each Transaction Document to which it is a party. Each of the Transaction Documents to which the Company is or will be a party is, or upon its execution and delivery will be (assuming that each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 3.03 Capitalization.**

(a) The authorized shares of the Company consist of 1,000 shares of common stock, par value $.001 per share, of which 100 shares are issued and outstanding and constitute the Shares. All of the Shares have been duly authorized, are validly issued, fully paid and nonassessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances, other than those Encumbrances set forth in Section 3.03(a) of the Disclosure Schedules. The Shares, when sold and delivered in accordance with the terms hereof and for the consideration expressed herein, will be acquired by Buyer free and clear of all Encumbrances (other than those Encumbrances set forth in

Section 3.03(a) of the Disclosure Schedules), and Buyer will acquired good and marketable title to the Shares. The term "**Disclosure Schedules**" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement and the Closing.

(b) All of the Shares were issued in compliance with applicable Laws. None of the Shares were issued in violation of any agreement or commitment to which Seller or the Company is a party or is subject to or in violation of any preemptive or similar rights of any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity (each, a "**Person**"). For purposes of this Agreement, "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction.

(c) There are no (i) outstanding or authorized options, warrants, convertible securities, stock appreciation, phantom stock, profit participation, or other rights, agreements, or commitments relating to the shares of stock of the Company or obligating Seller or the Company to issue or sell any shares of stock of, or any other interest in, the Company, (ii) voting trusts, proxies or other agreements or understandings with respect to the voting or transfer of the Company's shares of capital stock, or (iii) authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with equity holders of such Person or any matter. There are no voting trusts, shareholder agreements, proxies, or other agreements of the Company in effect with respect to the voting or transfer of any of the Shares.

**Section 3.04 Subsidiaries.** Each Company Subsidiary is duly organized, validly existing, and in good standing (or the equivalent thereof, where such concept is recognized) under the Laws of its jurisdiction of organization and has all necessary corporate or other applicable power and authority to own, operate, or lease the material properties and assets now owned, operated, or leased by it and to carry on its businesses as currently conducted. Each Company Subsidiary is duly licensed or qualified to do business and is in good standing (or the equivalent thereof, where such concept is recognized) in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. As of the date hereof, (a) there are no Company Subsidiaries other than the entities identified in Section 3.04(a) of the Disclosure Schedules, and (b) all of the outstanding shares of capital stock of (or other ownership or profit interests in) each Company Subsidiary are directly or indirectly owned by the Company. There are no (i) outstanding or authorized options, warrants, convertible securities, stock appreciation, phantom stock, profit participation, or other rights, agreements, or commitments relating to the shares of stock of any Company Subsidiary or obligating Seller, the Company or any Company Subsidiary to issue or sell any shares of stock of, or any other interest in, any Company Subsidiary, (ii) voting trusts, proxies or other agreements or understandings with respect to the voting or transfer of any Company Subsidiary's

membership interests, capital stock or other ownership interests, or (iii) authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with equity holders of such Person or any matter. For purposes of this Agreement, "**Company Subsidiary**" means any entity of which securities or other ownership interests (i) having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, or (ii) representing more than fifty percent of such securities or ownership interests, are directly or indirectly owned by the Company.

**Section 3.05 Compliance with Applicable Laws; Governmental Authorizations; Licenses.** Neither the Company nor any Company Subsidiary is in violation of, or delinquent with respect to any applicable Laws, which violation or delinquency would be material. As of the date of this Agreement, there is no action, case or proceeding pending or, to the Knowledge of Seller, threatened by any Governmental Authority with respect to (i) any alleged violation by the Company or any Company Subsidiary of any statute, law, rule, regulation, code, ordinance, order, policy, or guideline of any Governmental Authority, or (ii) any alleged failure by the Company or any Company Subsidiary to have any permit, license, approval, franchise, order, certificate, or other authorization from any Governmental Authority required in connection with the operation of the business of the Company or any Company Subsidiary. Each Company Subsidiary is duly qualified or licensed to do business as a foreign corporation or other organization, and each is in good standing (or the equivalent thereof, where such concept is recognized), under the Laws of each jurisdiction where the character of the properties owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so qualified or so licensed has not had and is not likely to have a material adverse effect on the business conducted by the Company and the Companies Subsidiaries, taken as a whole. For purposes of this Agreement, the "**Knowledge**" of Seller means the actual knowledge of Scott King or F. Jeffrey Sholey.

**Section 3.06 Brokers.** Except for Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), no broker, finder, investment banker or any other Person is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.07 No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III (including the related portions of the Disclosure Schedules), none of Seller, the Company, the Company Subsidiaries, or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, the Company, or the Company Subsidiaries.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01 Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the state of Florida. Buyer has all necessary limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms. Buyer has the requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all requisite limited liability company action on the part of Buyer. Buyer has duly executed and delivered this Agreement and each other Transaction Document to which it is a party. Each of the Transaction Documents to which Buyer is or will be a party is, or upon its execution and delivery will be (assuming that this Agreement and each such Transaction Document has been duly and validly authorized, executed and delivered by the other party or parties thereto), a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability hereof or thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at Law or in equity).

**Section 4.02 Investment Purpose.** Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"). Buyer acknowledges that Seller has not registered the offer and sale of the Shares under the Securities Act or any state securities Laws, and that the Shares may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities Laws, as applicable. Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment) and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

**Section 4.03 Brokers.** Except for HDI Distribution Europe B.V. ("**HDI**"), no broker, finder, or investment banker or any other Person is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.04 No Other Representations or Warranties; Independent Investigation.** Buyer has conducted to its satisfaction its own independent investigation, review, and analysis of the business, results of operations, prospects, condition (financial or otherwise), or assets of the Company and the Company Subsidiaries and acknowledges that to its knowledge it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller, the Company, and the Company Subsidiaries for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties set forth in ARTICLE III of this Agreement (including the related portions of the Disclosure Schedules) and not on any other representations, warranties, statements or other information made or furnished by or on behalf of Seller, the Company, the Company Subsidiaries or any other Person; and (b) none of Seller, the Company, the Company Subsidiaries or any other Person has made any representation or warranty, either express or implied, as to the accuracy or completeness of any information regarding Seller, the Company, the Company Subsidiaries, or this Agreement, except as expressly set forth in ARTICLE III of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE V
## COVENANTS

**Section 5.01 Confidentiality.** From and after the Closing, Seller (i) shall hold, and shall cause its Affiliates and its and their respective directors, officers, employees, consultants, counsel, accountants, and other agents (collectively, "**Representatives**") to hold, in confidence any and all information, in any form, concerning (A) FlacksGroup LLC, Buyer, and their Affiliates, or (B) the Company and the Company Subsidiaries as of the date of this Agreement and (ii) shall not, and shall cause its Affiliates and its and their respective Representatives not to, use any confidential or non-public information of the Company or the Company Subsidiaries for its own or its Affiliates' own account (except as may be needed to dissolve, liquidate, or otherwise wind up following the Closing), for the account of any other Person or to the detriment of the Company or the Company Subsidiaries, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by any obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or any statute, law, ordinance, regulation, rule, code, treaty, or other requirement of any Governmental Authority (collectively, "**Law**"), Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. For purposes of this Agreement, "**Affiliate**" of a Person means any other

Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

**Section 5.02 Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), none of Buyer, the Company, the Company Subsidiaries, and any of their respective Representatives shall, without the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed), and neither Seller nor any of its Representatives shall, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media, and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.03 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents and instruments, and take such further actions, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VI
## TAX MATTERS

**Section 6.01 Tax Covenants.**

(a) For purposes of this Agreement, "**Tax**" or "**Taxes**" means any U.S. federal, state, local, or non-U.S. taxes, assessments, fees, duties or levies (including any penalties and interest) imposed on, or determined by reference to, gross or net income or profits or other similar tax or any franchise tax imposed on, or calculated by reference to, gross or net income, as well as any other sales, use, production, ad valorem, transfer, registration, license, lease, service, services use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, escheat, abandoned property, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, including any such amounts by contract or as successor, transferee, or otherwise by operation of law, together with any interest, additions, or penalties with respect thereto.

(b) All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") to which Seller is a party shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and, upon Buyer's reasonable request, Seller shall reasonably cooperate with respect thereto as necessary). For purposes of this Agreement, a "**Tax Return**" means any return, declaration, report, filing, questionnaire, estimate,

notice, election, claim, registration, information return or statement, or other document relating to Taxes (including any amended return or claim for refund).

(c) Buyer shall, at its own expense, prepare, or cause to be prepared, and timely file or cause to be timely filed, all Tax Returns required to be filed by Seller, the Company or any of the Company Subsidiaries with respect to any taxable period or portion thereof, including, for the avoidance of doubt, in respect of (i) any taxable period that begins before and ends after the Closing Date (each a "**Straddle Period**") and (ii) any Tax Returns for the 2019 tax year. Unless otherwise required by Law, each such Tax Return for a Pre-Closing Tax Period or Straddle Period shall be prepared in a manner consistent with past practice and without a change of any election or any accounting method. Buyer shall be solely responsible for the full and timely payment of all Taxes required to be paid by Seller, the Company, or any of the Company Subsidiaries, including, for the avoidance of doubt, (x) all Taxes for any Straddle Period and (y) any Taxes associated with the Tax Returns as prepared by Buyer in accordance with this Section 6.01(c) for the 2019 Tax year.

**Section 6.02 Termination of Existing Tax-Sharing Agreements.** Any and all existing Tax-sharing agreements (whether written or not) binding upon the Company shall be terminated as of the Closing Date. After such date neither the Company, Seller, nor any of Seller's Affiliates and their respective Representatives shall have any further rights or liabilities thereunder.

**Section 6.03 Cooperation and Exchange of Information.** Seller shall provide Buyer with such reasonable cooperation and information as Buyer reasonably may request in filing any Tax Return pursuant to this ARTICLE VI or in connection with any proceeding in respect of taxes of the Company. Buyer shall retain all Tax Returns and other documents in its possession relating to Tax matters of the Company and the Company Subsidiaries for any Pre-Closing Tax Period and any Straddle Period (collectively, "**Tax Records**") until the expiration of the statute of limitations of the taxable periods to which such Tax Records relate. For purposes of this Agreement, a "**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, that Seller shall cause the Company to, and the Company shall, pay at the Closing all amounts payable with respect to such costs and expenses of Houlihan Lokey, Arnold & Porter Kaye Scholer LLP, Dechert LLP, Morrison, Brown, Argiz & Farra, LLC, HDI, and Weil, Gotshal & Manges LLP for which final invoices have been delivered to Seller and Buyer at or before the Closing (and Buyer shall cause the Company to pay any such amounts payable to the extent such amounts are not paid at the Closing); *provided, further,* that Buyer shall cause the Company to, and the Company shall, within thirty (30) days after the date of receipt of

each invoice setting forth reasonable and documented out-of-pocket expenses incurred by Seller or any of its Affiliates in connection with the liquidation, dissolution, or wind-up of Seller following the Closing, reimburse Seller or Seller's designee for all such expenses (in no event exceeding $100,000 in the aggregate).

**Section 7.02 Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third business day after the date mailed from a location within the continental United States, by certified or registered mail, return receipt requested, postage prepaid, in each case if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

| | |
|---|---|
| **If to Seller:** | Valitás Holdings, Inc.<br>c/o Jeffrey D. Goldberg<br>3201 Barhite Street<br>Pasadena, CA 91107<br>Email: jdg3201@gmail.com |
| with a copy (which shall not constitute notice) to: | Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave., NW<br>Washington, DC 20001-3743<br>Facsimile: 202-942-5999<br>Email: Kevin.Lavin@arnoldporter.com and David.Valeck@arnoldporter.com<br>Attention: Kevin J. Lavin and David J. Valeck<br><br>and<br><br>Cortland Capital Market Services LLC<br>225 W. Washington St., 21st Floor<br>Chicago, IL 60606<br>Facsimile: 312-376-0751<br>Email: CPCagency@cortlandglobal.com and legal@cortlandglobal.com<br>Attention: Maria Villagomez and Legal Department<br><br>and<br><br>Weil, Gotshal & Manges LLP<br>767 5th Avenue<br>New York, NY 10153<br>Facsimile: 212-310-8007<br>Email: damian.ridealgh@weil.com<br>Attention: Damian Ridealgh |

**If to Buyer:** M2 EquityCo, LLC
c/o FlacksGroup LLC
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Facsimile: 305-675-2717
Email: mflacks@flacksgroup.com
Attention: Michael Flacks, Chairman & CEO

with a copy (which shall not constitute notice) to: Dechert LLP
3 Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 698-3599
Email: markus.bolsinger@dechert.com
Attention: Markus Bolsinger

**Section 7.03 Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. All dollar amounts in this Agreement refer to United States currency.

**Section 7.04 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05 Survival**. None of the representations and warranties contained in this Agreement or in any instrument delivered under this Agreement will survive the Closing Date. This Section 7.05 does not limit any covenant or agreement of the parties hereto contained in this Agreement that, by its terms, contemplates performance after the Closing Date.

**Section 7.06 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings, and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 7.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither Buyer nor the Company may assign its rights or obligations hereunder without the prior written consent of Seller, and Seller may not assign its rights or obligations hereunder without the prior written consent of Buyer; and no such consent

shall be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.08 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.09 Governing Law; Submission to Jurisdiction.**

(a) This Agreement shall be governed by and construed in accordance with the internal Laws of the state of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the state of Delaware or any other jurisdiction). Any legal suit, action, proceeding, or dispute arising out of or related to this Agreement or the transactions contemplated hereby shall be instituted in the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over any such matter, the United States District Court for the District of Delaware, or in the event such United States District Court for the District of Delaware also does not have subject matter jurisdiction over such matter, any Delaware state court sitting in New Castle County, Delaware, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute. The parties agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the above-named courts and hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such court. Each party hereto irrevocably agrees to be bound by any non-appealable judgment rendered by such courts in connection with such actions or proceedings. Service of process by certified mail to the respective party at the addresses set forth in Section 7.02 shall be effective service of process for any suit, action, proceeding, or dispute brought in any such court.

(B) EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND

ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.09(B).

**Section 7.10 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 7.11 Non-recourse.** This Agreement may be enforced only against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may be brought only against, the entities that are expressly named as parties hereto and then with respect to only the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim or Action based on, in respect of or by reason of the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller shall have no liability for any damages or losses resulting from a breach or inaccuracy of any of the representations or warranties contained herein, except in the case of actual, intentional and knowing fraud with respect to the making of any such representations or warranties.

**Section 7.12 Release.** As of the Closing, the Company, for itself, its subsidiaries, and their respective successors and assigns (collectively, the "**Releasors**"), hereby forever fully and irrevocably releases and discharges Seller and its predecessors, successors, direct or indirect subsidiaries, and past and present stockholders, members, other equityholders, managers, directors, officers, agents, and other representatives other than, in each case, any individual who is or was an employee of the Company or any of its direct or indirect subsidiaries (collectively, the "**Released Parties**") from any and all actions, suits, claims, demands, debts, agreements, obligations, promises, judgments, or liabilities of any kind whatsoever in law or equity and causes of action of every kind and nature (including claims for damages, costs, expense, and attorneys', brokers', and accountants fees and expenses) arising out of or related to events, facts, conditions, or circumstances existing or arising prior to the Closing Date that the Releasors can, shall, or may have against the Released Parties, whether based on ownership interest or otherwise, and whether known or unknown, absolute or contingent, suspected or unsuspected, unanticipated as well as anticipated (collectively, the "**Released Claims**"), and hereby irrevocably agrees to refrain from directly or indirectly asserting any claim or

demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against any Released Party based upon any Released Claim. Notwithstanding the preceding sentence of this Section 7.12, "Released Claims" do not include, and the provisions of this Section 7.12 shall not release or otherwise diminish, the rights and obligations of any party hereto set forth in or arising under any provisions of this Agreement or any Transaction Document.

**Section 7.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers or other authorized persons thereunto duly authorized.

VALITÁS HOLDINGS, INC.

By: ___________________________
Name: Jeffrey D. Goldberg
Title: Authorized Person

M2 EQUITYCO, LLC

By: ___________________________
Name: Michael Flacks
Title: Authorized Signatory

*Solely for purposes of Section 7.01 and Section 7.12:*

VALITÁS INTERMEDIATE HOLDINGS, INC.

By: ___________________________
Name: Jeffrey D. Goldberg
Title: Authorized Person

# Exhibit B

Incumbency Certificate

| Name | Title | Signature |
|---|---|---|
| James Hyman | Chief Executive Officer | |
| J. Scott King | Executive Vice President, Chief Legal Officer and Secretary | |
| Shalin Shah | Executive Vice President, Chief Financial Officer and Treasurer | |
| Jeffrey D. Goldberg | Authorized Person | |

**Exhibit B**

Incumbency Certificate

| **Name** | **Title** | **Signature** |
| --- | --- | --- |
| James Hyman | Chief Executive Officer | ______________________ |
| J. Scott King | Executive Vice President, Chief Legal Officer and Secretary | ______________________ |
| Shalin Shah | Executive Vice President, Chief Financial Officer and Treasurer | ______________________ |
| Jeffrey D. Goldberg | Authorized Person | ______________________ |

# **Exhibit C**

Governing Documents

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "VALITAS HOLDINGS, INC." AS RECEIVED AND FILED IN THIS OFFICE.*

*THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:*

*CERTIFICATE OF INCORPORATION, FILED THE ELEVENTH DAY OF APRIL, A.D. 2017, AT 12:42 O`CLOCK P.M.*

*RESTATED CERTIFICATE, FILED THE THIRTEENTH DAY OF APRIL, A.D. 2017, AT 4:46 O`CLOCK P.M.*

*CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF NOVEMBER, A.D. 2018, AT 2:48 O`CLOCK P.M.*

*CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF NOVEMBER, A.D. 2018, AT 5:14 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "VALITAS HOLDINGS, INC.".*

Jeffrey W. Bullock, Secretary of State

SECRETARY'S OFFICE · 1793 · DELAWARE · 1855

6376333 8100H
SR# 20205749642

Authentication: 203125779
Date: 06-17-20

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:42 PM 04/11/2017
FILED 12:42 PM 04/11/2017
SR 20172421034 - File Number 6376333

# CERTIFICATE OF INCORPORATION

# OF

# VALITÁS HOLDINGS, INC.

**FIRST:** The name of the corporation is Valitás Holdings, Inc. (the "Corporation").

**SECOND:** The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, in the county of New Castle. The name of the Corporation's registered agent is The Corporation Trust Company.

**THIRD:** The nature of business of purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware (the "GCL").

**FOURTH:** The total number of shares of capital stock which the Corporation shall have authority to issue is 10,000 shares of common stock, par value $.001 per share.

**FIFTH:** The name and mailing address of the Corporation's incorporator is:

| Name: | Mailing Address: |
|---|---|
| Sharon Moy | c/o Paul Hastings LLP<br>71 S. Wacker Drive, 45th Floor<br>Chicago, IL 60606 |

**SIXTH:** The Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal the by-laws of the Corporation (the "By-Laws").

**SEVENTH:** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. Elections of directors need not be by written ballot, unless otherwise provided in the By-Laws.

**EIGHTH:** The personal liability of the directors of the Corporation is hereby eliminated to the fullest extent permitted by the GCL. Any repeal or modification of this Article Eighth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

**NINTH:** The Corporation may indemnify each director, officer, trustee, employee or agent of the Corporation and each person who is or was serving at the request of the Corporation as a director, officer, trustee, employer or agent of another corporation, partnership, joint venture, trust or other enterprise in the manner and to the fullest extent provided in section 145 of the GCL as the same now exists or may hereafter be amended.

**TENTH:** The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

The undersigned incorporator hereby acknowledges that the foregoing certificate of incorporation is such incorporator's act and deed and that the facts stated therein are true.

Dated: April 11, 2017

By: ______________________
Sharon Moy, Sole Incorporator

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:46 PM 04/13/2017
FILED 04:46 PM 04/13/2017
SR 20172502419 - File Number 6376333

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

# OF

# VALITÁS HOLDINGS, INC.

(Pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware)

Valitás Holdings, Inc., a Delaware corporation (the "Corporation"), hereby certifies that:

1. The name of the Corporation is Valitás Holdings, Inc. The Corporation filed its original Certificate of Incorporation with the Secretary of State of the State of Delaware on April 11, 2017, under the name of Valitás Holdings, Inc.

2. This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 103, 242 and 245 of the General Corporation Law of the State of Delaware (the "GCL"). The Corporation has received payment for its stock.

3. The Board of Directors of the Corporation, pursuant to a unanimous written consent in lieu of a meeting pursuant to Section 141(f) of the GCL, adopted resolutions proposing and declaring advisable that the Corporation restate its Certificate of Incorporation to read in its entirety as follows:

**FIRST:** The name of the corporation is "Valitás Holdings, Inc."

**SECOND:** The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, in the county of New Castle. The name of the Corporation's registered agent is The Corporation Trust Company.

**THIRD:** The nature of business of purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "GCL").

**FOURTH:** The total number of shares of capital stock which the Corporation shall have authority to issue is 40,000,000 shares of common stock, par value $.001 per share.

**FIFTH:** The Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal the by-laws of the Corporation (the "By-Laws").

**SIXTH:** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. Elections of directors need not be by written ballot, unless otherwise provided in the By-Laws.

**SEVENTH:** The personal liability of the directors of the Corporation is hereby eliminated to the fullest extent permitted by the GCL. Any repeal or modification of this Article Seventh shall not adversely affect any right or protection of any director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

**EIGHTH:** The Corporation shall indemnify each director, officer, trustee, employee or agent of the Corporation and each person who is or was serving at the request of the Corporation as a director, officer, trustee, employee or agent of another corporation, partnership, joint venture, trust or other enterprise in the manner and to the fullest extent provided in Section 145 of the GCL as the same now exists or may hereafter be amended. Any repeal or modification of this Article Eighth shall not adversely affect any right or protection of a director, officer, trustee, employee or agent of another corporation, partnership, joint venture, trust or other enterprise of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

**NINTH:** The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

**TENTH:** The Corporation hereby exercises its powers pursuant to Section 122(17) of the GCL and renounces any interest or expectancy of the Corporation in, or being offered an opportunity to participate in, any business opportunities that are presented to the Corporation or one or more of its officers, directors or stockholders.

* * * * * * * * * * * * *

**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this Corporation on this 13th day of April, 2017.

**VALITÁS HOLDINGS, INC.**

By: [signature]
Name: Karey L. Witty
Title: President and Chief Executive Officer

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT
# OF THE AMENDED AND RESTATATED CERTIFICATE OF INCORPORATION

Valitás Holdings, Inc. ("Corporation") a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware does hereby certify:

**FIRST:** That the name of the corporation is Valitás Holdings, Inc.

**SECOND**: That the Amended and Restated Certificate of Incorporation was filed on April 13, 2017.

**THIRD**: That at a meeting of the Board of Directors of the Corporation, resolutions were duly adopted setting forth the proposed amendment of the Amended and Restated Certificate of Incorporation of the Corporation, declaring that said amendment to be advisable and in the best interest of the Corporation, and recommending that the stockholders of the Corporation approve and adopt this Certificate of Amendment. The resolutions setting forth the proposed amendments is as follows:

RESOLVED, that, subject to approval by the requisite vote or consent of the stockholders of the Corporation, the "FOURTH" paragraph of the Amended and Restated Certificate of Incorporation be amended, so that, as amended, it shall read in its entirety as follows:

> **"FOURTH: The total number of shares of capital stock which the Corporation shall have authority to issues is 4,000,000,000 shares of common stock, par value $.001 per share."**

**FOURTH**: That, by written consent executed in accordance with Section 228 of the General Corporation Law of the State of Delaware, the holders of a majority of the outstanding stock of the Corporation entitled to vote thereon, and the holders of a majority of the outstanding stock of each class entitled to vote thereon as a class, was given written notice of the proposed amendment to the Amended and Restated Certificate of Incorporation and voted in favor of the adoption of the amendment to the Amended and Restated Certificate of Incorporation. The necessary numbers of shares, as required by statute, were voted in favor of the amendment.

**FIFTH**: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

[*Signature Page Follows*]

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:48 PM 11/15/2018
FILED 02:48 PM 11/15/2018
SR 20187666421 - File Number 6376333

**IN WITNESS WHEREOF**, said corporation has caused this certificate to be signed this 15th day of November, 2018.

By: J. Scott King
Title: Executive VP & Chief Legal Officer
Name: J. Scott King

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:14 PM 11/15/2018
FILED 05:14 PM 11/15/2018
SR 20187671935 - File Number 6376333

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT
# OF THE AMENDED AND RESTATATED
# CERTIFICATE OF INCORPORATION

Valitás Holdings, Inc. ("Corporation") a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware does hereby certify:

**FIRST**: That the name of the corporation is Valitás Holdings, Inc.

**SECOND**: That the Amended and Restated Certificate of Incorporation was filed on April 13, 2017 as amended by the Certificate of Amendment filed on November 15, 2018.

**THIRD**: That at a meeting of the Board of Directors of the Corporation, resolutions were duly adopted setting forth the proposed amendment of the Amended and Restated Certificate of Incorporation of the Corporation, declaring that said amendment to be advisable and in the best interest of the Corporation, and recommending that the stockholders of the Corporation approve and adopt this Certificate of Amendment. The resolutions setting forth the proposed amendments is as follows:

RESOLVED, that, subject to approval by the requisite vote or consent of the stockholders of the Corporation, the "FOURTH" paragraph of the Amended and Restated Certificate of Incorporation be amended, so that, as amended it shall read in entirety with the following two paragraphs as follows:

"FOURTH: **The total number of shares of capital stock which the Corporation shall have authority to issues is 20,000,000 shares of common stock, par value $.001 per share.**

**Upon the filing and effectiveness (the "Effective Time") pursuant to the Delaware General Corporation Law of this Certificate of Amendment to the Amended and Restated Certificate of Incorporation of the Corporation, each 200 shares of Common Stock either issued and outstanding or held by the Corporation in treasury stock immediately prior to the Effective Time shall, automatically and without any action on the part of the respective holders thereof, be combined and converted into 1 share of Common Stock ("Reverse Stock Split"). The Reverse Stock Split shall also apply to any rights convertible into, or exchangeable or exercisable for, Common Stock of the Corporation. No fractional shares shall be issued in connection with the Reverse Stock Split. Stockholders who otherwise would be entitled to receive fractional shares of Common Stock shall be entitled to receive cash (without interest or deduction) from the Corporation in lieu of such fractional share interests in an amount equal to the product obtained by multiplying (a) the then fair value of a share of Common Stock as determined in good faith by the Special Committee of the Board of Directors of the Corporation, by (b) the fraction of one share owned by the stockholder."**

**FOURTH**: That, by written consent executed in accordance with Section 228 of the General Corporation Law of the State of Delaware, the holders of a majority of the outstanding stock of the Corporation entitled to vote thereon, and the holders of a majority of the outstanding stock of each class entitled to vote thereon as a class, was given written notice of the proposed amendment to the Amended and Restated Certificate of Incorporation and voted in favor of the adoption of the amendment to the Amended and Restated Certificate of Incorporation. The necessary numbers of shares, as required by statute, were voted in favor of the amendment.

**FIFTH**: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, said corporation has caused this certificate to be signed this ______15th______ day of ______November______, 2018.

By: J. Scott King
Title: Executive VP & Chief Legal Officer
Name: J. Scott King

# BY-LAWS

# OF

# VALITÁS HOLDINGS, INC.

## ARTICLE I

## Offices

**Registered Offices; Other Offices.** The registered office of the Corporation in the State of Delaware shall be in the City of Wilmington and County of New Castle. The Corporation may have such other offices, either within or outside of the State of Delaware, as the business of the Corporation may require from time to time.

## ARTICLE II

## Stockholders

**SECTION 2.1. Annual Meeting.** An annual meeting of the stockholders shall be held on such date as may be determined by resolution of the Board of Directors; provided, however, that if in any year such date is a legal holiday, such meeting shall be held on the next succeeding business day. At each annual meeting, the stockholders shall elect directors to hold office for the term provided in Section 3.1 of these By-Laws.

**SECTION 2.2. Special Meeting.** Majority Holders and Minority Holders (as such terms are defined in the Stockholders Agreement of the Corporation) shall each have the right to call a special meeting of holders of Common Stock at any time by a vote of the Majority Holders or Minority Holders, in either case, holding a majority of the issued and outstanding Common Stock held by all such Majority Holders or Minority Holders, as the case may be.

**SECTION 2.3. Place of Stockholder Meetings.** The Board of Directors may designate any place, either within or without the State of Delaware, as the place of meeting for any annual meeting or for any special meeting. If no such place is designated by the Board of Directors, the place of meeting will be the principal business office of the Corporation.

**SECTION 2.4. Notice of Meetings.** Unless waived as herein provided, whenever stockholders are required or permitted to take any action at a meeting, written notice of the meeting shall be given stating the place, date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Such written notice shall be given not less than ten (10) days nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at the meeting or in the event of a merger, consolidation, share exchange, dissolution or sale, lease or exchange of all or substantially all of the Corporation's property, business or assets not less than twenty (20) days before the date of the meeting. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at the stockholder's address as it appears on the records of the Corporation.

When a meeting is adjourned to another time or place in accordance with Section 2.5 of these By-Laws, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting in which the adjournment is taken. At the adjourned meeting the Corporation may conduct any business which might have been transacted at the original meeting. If the adjournment is for more than thirty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

**SECTION 2.5. Quorum and Adjourned Meetings.** Unless otherwise provided by law or the Corporation's Certificate of Incorporation, a majority of the shares entitled to vote, present in person or represented by proxy, shall constitute a quorum at a meeting of stockholders. If less than a majority of the shares entitled to vote at a meeting of stockholders is present in person or represented by proxy at such meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the original meeting. The stockholders present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal of such number of stockholders as may leave less than a quorum.

**SECTION 2.6. Fixing of Record Date.**

(a) For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b) For the purpose of determining stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is established by the Board of Directors, and which date shall not be more than ten (10) days after the date on which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal office, or an officer or agent of the Corporation having custody of the book in which the proceedings of meetings of stockholders are recorded. Delivery to the Corporation's registered office shall be by hand or by certified or

registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders' consent to corporate action in writing without a meeting shall be the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c) For the purpose of determining the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect to any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix the record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining the stockholders for any such purpose shall be the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**SECTION 2.7. Voting List.** The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

**SECTION 2.8. Voting.** Unless otherwise provided by the Corporation's Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by each stockholder. In all matters other than the election of directors, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders. Directors shall be elected by plurality of the votes of the shares present in person or represented by a proxy at the meeting entitled to vote on the election of directors.

**SECTION 2.9. Proxies.** Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may remain irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

**SECTION 2.10. Ratification of Acts of Directors and Officers.** Except as otherwise provided by law or by the Certificate of Incorporation of the Corporation, any transaction or contract or act of the Corporation or of the directors or the officers of the

Corporation may be ratified by the affirmative vote of the holders of the number of shares which would have been necessary to approve such transaction, contract or act at a meeting of stockholders, or by the written consent of stockholders in lieu of a meeting.

**SECTION 2.11. Informal Action of Stockholders.** Any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. In the event that the action which is consented to is such as would have required the filing of a certificate with any governmental body if such action had been voted on by stockholders at a meeting thereof, the certificate filed shall state, in lieu of any statement required by law concerning any vote of stockholders, that written consent had been given in accordance with the provisions of Section 228 of the Delaware General Corporation Law, and that written notice has been given as provided in such section.

**SECTION 2.12. Organization.** Such person as the Board of Directors may designate or, in the absence of such a designation, the President of the Corporation, if there shall be one, or, in his or her absence, such person as may be chosen by the holders of a majority of the shares entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairman of such meeting. In the absence of the secretary of the Corporation, the chairman of the meeting shall appoint a person to serve as secretary at the meeting.

## ARTICLE III

## DIRECTORS

**SECTION 3.1. Number and Tenure of Directors.** The number of directors which shall constitute the first board shall be five (5). Thereafter, the number of directors shall be established from time to time in accordance with the provisions of Section 2.1 of the that certain Stockholders Agreement, dated as of April 14, 2017, among the Corporation and its stockholders (the "Stockholders Agreement") or after termination of the Stockholders Agreement, by resolution of the Board. The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors in compliance with the provisions of the Stockholders Agreement. The directors shall be elected at the annual meeting of the stockholders, except as provided in Section 3.9 of these By-Laws. Each director shall hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal. Any director may resign at any time upon written notice to the Corporation.

**SECTION 3.2. Election of Directors.** Directors shall be elected at the annual meeting of stockholders. In all elections for directors, every stockholder entitled to vote shall have the right to vote the number of shares owned by such stockholder for each director to be

elected, unless otherwise provided in the Certificate of Incorporation, as the same may be from time to time amended.

**SECTION 3.3. Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such time and in such place as shall from time to time be determined by the Board of Directors.

**SECTION 3.4. Annual Meetings.** The first meeting of each newly elected Board of Directors shall be held immediately following each annual meeting of the stockholders, and no notice of such meeting shall be necessary to the newly elected directors in order to legally constitute the meeting, provided that a quorum shall be present. In the event that such meeting is not held immediately following an annual meeting of the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver of notice signed by all of the directors.

**SECTION 3.5. Special Meetings.** Special meetings of the Board of Directors may be called by or at the request of the Chairman of the Board or at least one-half of the number of directors constituting the whole Board of Directors. The person or persons authorized to call special meetings of the Board of Directors may fix any place, either within or without the State of Delaware, as the place for holding any special meeting of the Board of Directors called by them.

**SECTION 3.6. Notice of Special Meetings of the Board of Directors.** Notice of any special meeting of the Board of Directors shall be given at least two (2) days previous thereto by written notice to each director. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with first-class postage thereon prepaid. If sent by any other means (including electronic mail, facsimile, courier, or express mail, etc.), such notice shall be deemed to be delivered when actually delivered to the home or business address of the director.

**SECTION 3.7. Quorum.** A majority of the total number of directors then in office shall constitute a quorum for the transaction of business. If less than a majority of the directors are present at a meeting of the Board of Directors, a majority of the directors present may adjourn the meeting from time to time without further notice.

**SECTION 3.8. Voting.** The vote of the majority of the total number of directors then in office shall be the act of the Board of Directors, unless the Delaware General Corporation Law or the Corporation's Certificate of Incorporation or the Stockholders Agreement (including pursuant to Section 2.2 of the Stockholders Agreement) requires a vote of a greater number.

**SECTION 3.9. Vacancies.** Board vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled as provided in the Stockholders Agreement; provided that at any time the Stockholders Agreement is no longer in effect, such vacancies and newly created directorships shall may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director. Each

director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

**SECTION 3.10. Removal of Directors.** Subject to the provisions of Article 2 of the Stockholders Agreement, a director, or the entire Board of Directors, may be removed at any time, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

**SECTION 3.11. Informal Action of Directors.** Unless otherwise restricted by the Certificate of Incorporation of the Corporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

**SECTION 3.12. Participation by Conference Telephone.** Members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or committee thereof, by means of conference telephone or similar communications equipment as long as all persons participating in the meeting can speak with and hear each other, and participation by a director pursuant to this Section 3.12 shall constitute presence in person at such meeting.

## ARTICLE IV

## WAIVER OF NOTICE

**SECTION 4.1. Written Waiver of Notice.** A written waiver of any required notice, signed by the person entitled to notice, whether before or after the date stated therein, shall be deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of stockholders, directors or members of a committee of directors need be specified in any written waiver of notice.

**SECTION 4.2. Attendance as Waiver of Notice.** Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, and objects at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE V

## COMMITTEES

**SECTION 5. General Provisions.** The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member at any meeting of a committee, the member or members thereof

present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint any alternate member of such committee to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease, or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending the By-Laws of the Corporation; and, unless the resolution so provides, no such committee shall have the power or authority to declare a dividend, to authorize the issuance of stock or to adopt a certificate of ownership and merger, pursuant to Section 253 of the Delaware General Corporation Law.

## ARTICLE VI

## OFFICERS

**SECTION 6.1. General Provisions.** The Board of Directors may elect a President and a Treasurer of the Corporation, and shall elect a Vice President and Secretary of the Corporation. The Board of Directors may also elect such additional officers as the Board of Directors may deem necessary or appropriate from time to time. Any two or more offices may be held by the same person. The officers elected by the Board of Directors shall have such duties as are hereafter described and such additional duties as the Board of Directors may from time to time prescribe.

**SECTION 6.2. Election and Term of Office.** The officers of the Corporation shall be elected annually by the Board of Directors at the regular meeting of the Board of Directors held after each annual meeting of the stockholders (or action by written consent of stockholders in lieu of an annual meeting of stockholders). If the election of officers is not held at such meeting, such election shall be held as soon thereafter as may be convenient. New offices of the Corporation may be created and filled and vacancies in offices may be filled at any time, at a meeting or by the written consent of the Board of Directors. Unless removed pursuant to Section 6.3 of these By-Laws, each officer shall hold office until his successor has been duly elected and qualified, or until his earlier death or resignation. Election or appointment of an officer or agent shall not of itself create contract rights.

**SECTION 6.3. Removal of Officers.** Any officer or agent elected or appointed by the Board of Directors may be removed by the Board of Directors whenever, in its judgment, the best interests of the Corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person(s) so removed.

**SECTION 6.4. The President.** The President, if there shall be one, shall have the active management of the business of the Corporation. In general, the President shall perform all duties incident to the office of president and such other duties as the Board of Directors may from time to time prescribe.

**SECTION 6.5. <u>The Chairman of the Board</u>.** The Chairman of the Board, if one is chosen, shall be chosen from among the members of the Board of Directors. The Chairman of the Board shall perform such duties as may be assigned to the Chairman of the Board by the Board of Directors.

**SECTION 6.6. <u>The Vice President</u>.** In the absence of the President, or in the event of his inability or refusal to act, the Vice President (or in the event there be more than one Vice President, the Executive Vice President and then the other Vice President or Vice Presidents in the order designated by the Board of Directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

**SECTION 6.7. <u>The Secretary</u>.** The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings thereof in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, under whose supervision he shall be. The Secretary shall have custody of the corporate seal of the Corporation, if any, and the Secretary shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his signature.

**SECTION 6.8. <u>The Treasurer</u>.** The Treasurer, if there shall be one, shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President, if there shall be one, and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond (which shall be renewed every six (6) years) in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his office and for the restoration to the Corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Corporation.

**SECTION 6.9. <u>Duties of Officers May be Delegated</u>.** In the absence of any officer of the Corporation, or for any other reason the Board of Directors may deem sufficient, the Board of Directors may delegate the powers or duties, or any of such powers or duties, of any officers or officer to any other officer or to any director.

**SECTION 6.10. Compensation.** The Board of Directors shall have the authority to establish reasonable compensation of all officers for services to the Corporation.

## ARTICLE VII

## CERTIFICATES FOR SHARES

**SECTION 7.1. Certificates of Shares.** The shares of the Corporation shall not be certificated.

**SECTION 7.2. Stock Register.** The Corporation shall, or shall engage a third party to, create and maintain a ledger (the "Stock Register"), setting forth the name of each stockholder and the number of shares held by each such stockholder. Upon any change in the number or ownership of shares (whether upon an issuance, a transfer, a cancellation or otherwise), the Corporation, or such third party, shall amend and update the Stock Register.

## ARTICLE VIII

## DIVIDENDS

**SECTION 8. Dividends.** The Board of Directors of the Corporation may declare and pay dividends upon the shares of the Corporation's capital stock in any form determined by the Board of Directors, in the manner and upon the terms and conditions provided by law.

## ARTICLE IX

## CONTRACTS, LOANS, CHECKS AND DEPOSITS

**SECTION 9.1. Contracts.** The Board of Directors may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

**SECTION 9.2. Loans.** No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors. Such authority may be general or confined to specific instances.

**SECTION 9.3. Checks, Drafts, Etc.** All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by one or more officers or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board of Directors.

**SECTION 9.4. Deposits.** The funds of the Corporation may be deposited or invested in such bank account, in such investments or with such other depositaries as determined by the Board of Directors.

## ARTICLE X

## AMENDMENTS

**SECTION 10. Amendments.** These By-Laws may be adopted, amended or repealed by the Corporation's Board of Directors and or stockholders; provided that no amendment made by the stockholders may be amended or repealed by the Corporation's Board of Directors without stockholder approval.

## ARTICLE XI

## INDEMNIFICATION

**SECTION 11.1. Indemnification**. The Corporation shall indemnify, in accordance with and to the full extent now or hereafter permitted by law, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including, without limitation, any action by or in the right of the Corporation), by reason of the fact that such person is or was a director or an officer of the Corporation (and the Corporation, in the sole discretion of the Board of Directors, may so indemnify a person by reason of the fact that such person is or was an employee of the Corporation or is or was serving at the request of the Corporation in any other capacity for or on behalf of the Corporation) against any liability or expense actually and reasonably incurred by such person in respect thereof; provided, however, that the Corporation shall not be obligated to indemnify any such person (i) with respect to proceedings, claims or actions initiated or brought voluntarily by such person and not by way of defense or brought against such person in response to a proceeding, claim or action by such person against the Corporation, or (ii) for any amounts paid in settlement of an action effected without the prior written consent of the Corporation to such settlement or, (iii) if liability was incurred because such person breached or failed to perform a duty he owes to the Corporation and the breach or failure to perform constitutes (a) a willful failure to deal fairly with the Corporation or its stockholders in connection with a matter in which such person has a material conflict of interest, (b) a violation of criminal law, unless such person had reasonable cause to believe his conduct was lawful or no reasonable cause to believe his conduct was unlawful, (c) a transaction from which such person derived an improper personal profit, or (d) willful misconduct. The termination of a proceeding by judgment, order, settlement or conviction, or upon a plea of no contest or an equivalent plea, shall not, by itself, create a presumption that indemnification of such person is not required. Requests for indemnification pursuant to this section shall be made in writing to the Corporation. Such indemnification is not exclusive of any other right to indemnification provided by law, agreement or otherwise. The right to indemnification arising under this section shall not be eliminated or impaired by an amendment to this section after the occurrence of the act or omission that is the subject of civil, criminal, administrative or investigative action, suit or proceeding for which indemnification is sought. Expenses (including attorneys' fees) incurred by a person who is or was a director or an officer of the Corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding for which such person may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking

by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized under this section.

**SECTION 11.2. Determination of Right to Indemnification**. Unless otherwise provided by the Corporation's Certificate of Incorporation, these By-Laws, or a written agreement between the Corporation and the director or officer, the determination as to the right to indemnification shall be made by a majority vote of the directors not at the time parties to the same or related proceedings, even though less than a quorum, or by the stockholders.

**FIRST AMENDMENT TO**

**THE BY-LAWS OF**

**VALITÁS HOLDINGS, INC.**

This is the first amendment (this "Amendment") to the By-Laws (the "By-Laws") of Valitás Holdings, Inc. as adopted by the Board of Directors on May 30, 2017.

**WHEREAS**, capitalized terms used but not defined herein shall have the meanings ascribed to them in the By-Laws;

**NOW, THEREFORE**, the By-Laws are amended as follows:

1. The By-Laws are hereby amended by adding new Section 2.9.1 as follows:

Notwithstanding anything to the contrary in these By-Laws, for so long as Blue Mountain Credit Alternatives Master Fund L.P. ("BMCA") is a shareholder of the Company, the Board of Directors is appointed with full power of substitution as BMCA's proxy to vote all the shares of BMCA's stock (including any shares of BMCA's stock that are transferred to a person, 50 percent or more of the interest in whose assets or net profits is owned, directly or indirectly, by one or more persons owning 50 percent or more of the interests in BMCA's assets or net profits), together with all other shares of capital stock of the Company standing in BMCA's name or which BMCA may have the right to vote, now owned or hereafter acquired, and to exercise all powers which BMCA would be entitled to exercise if personally present, on all matters upon which BMCA may be entitled to vote or act at any annual or special meeting or shareholders of the Company to be held on or after the date hereof, and at any adjournment or postponement thereof, and to sign any written consent of shareholders on BMCA's behalf to vote or otherwise act on BMCA's behalf with respect to all of BMCA's shares in lieu of any annual or special meeting of shareholders; *provided however*, that the Board shall only vote the Shares in proportion with all votes cast in favor of or opposed to such proposal or proposals in which BMCA is entitled to vote.

2. All provisions of the By-Laws not hereby amended shall remain in full force and effect.

3. This Amendment and the By-Laws shall be read and construed together as a single instrument. To the extent of any inconsistency between the terms contained in the By-Laws and this Amendment, the terms contained in this Amendment shall control.

**EXECUTION COPY**

STOCKHOLDERS AGREEMENT

by and among

VALITÁS HOLDINGS, INC.

and

EACH OF THE STOCKHOLDERS THEREOF

Dated as of April 14, 2017

ARTICLE 1 DEFINITIONS....1

Section 1.1 Definitions....1
Section 1.2 Other Definitional and Interpretive Matters ....10

ARTICLE 2 MANAGEMENT OF THE COMPANY AND CERTAIN ACTIVITIES....11

Section 2.1 Board....11
Section 2.2 Actions Requiring Consent....14

ARTICLE 3 PREEMPTIVE RIGHTS ....16

Section 3.1 Preemptive Rights....16

ARTICLE 4 TRANSFERS....18

Section 4.1 Restrictions on Transfers ....18
Section 4.2 Right of First Offer on Equity Securities (other than Warrants) ....20
Section 4.3 Right of First Offer on Warrants....22
Section 4.4 Tag-Along Right ....24
Section 4.5 Drag-Along Right ....25
Section 4.6 Conditions to Transfers....28

ARTICLE 5 INSPECTION AND INFORMATION RIGHTS ....29

Section 5.1 Periodic Reports....29

ARTICLE 6 TERMINATION....30
ARTICLE 7 MISCELLANEOUS ....31

Section 7.1 Notices ....31
Section 7.2 Governing Law; Venue; Jurisdiction....31
Section 7.3 Waiver of Jury Trial....32
Section 7.4 Successors and Assigns....32
Section 7.5 Counterparts....32
Section 7.6 Severability ....33
Section 7.7 Specific Performance....33
Section 7.8 No Waivers; Amendments....33
Section 7.9 Waiver of Corporate Opportunities ....34
Section 7.10 Non-Recourse; Non-Petition....35
Section 7.11 Recapitalization; Exchanges; Affecting Securities....36
Section 7.12 Aggregation of Equity Securities....36
Section 7.13 Further Assurances....36
Section 7.14 Entire Agreement....36

Schedule I(a) – Majority Holders
Schedule I(b) – Minority Holders
Schedule I(c) – Valitás Equity Holder
Schedule I(d) – Significant Holders

Exhibit A – Form of Joinder

# STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "Agreement"), dated as of April 14, 2017, is entered into by and among Valitás Holdings, Inc., a Delaware corporation (the "Company"), the Persons (as hereinafter defined) who are signatories to this Agreement on the signature pages hereto and all Persons that, from time to time, hereafter become holders of Equity Securities (as hereinafter defined) and parties hereto in accordance with the terms hereof (collectively, "Holders").

Pursuant to, and in consideration of the obligations of the Company and the Holders under the Exchange Agreement, the premises, mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1 Definitions. In addition to the definitions set forth above, the following terms, as used herein, shall have the following meanings:

"Additional Holder" shall have the meaning set forth in Section 3.1.1.

"Affiliate" means, with respect to any Person, any Person who, directly or indirectly, controls, is controlled by or is under common control with that Person. The term "control" (including the terms "controlled", "controlled by" and "under common control with") as used herein means the possession, directly or indirectly, of the power or authority to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract (including proxy or, with respect to a Person that is a single account, an investment management contract or similar agreement) or otherwise. The term "Affiliated" shall have a correlative meaning. Notwithstanding the foregoing, no Holder shall be deemed an "Affiliate" of any other Holder solely on account of ownership of Equity Securities or being party to this Agreement, and no Holder shall be deemed an "Affiliate" of the Company solely on account of being party to this Agreement.

"Affirmative Percentage Vote" means, with respect to the election of any Majority Holders Nominee or Minority Holder Nominee to serve as a Majority Holder Designee or Minority Holder Designee, as applicable, in accordance with the terms hereof, each such vote equal to a fraction (expressed as a percentage), the numerator of which is the number of issued and outstanding Common Stock held by the Majority Holders or Minority Holders, as applicable, who have affirmatively voted for the selection of such Majority Holders Nominee or Minority Holder Nominee at the time of determination and the denominator of which is the total number of issued and outstanding Common Stock held by all Majority Holders or Minority Holders, as applicable, at the time of determination.

"Agreement" shall have the meaning set forth in the introductory paragraph hereof.

"Base Participating Holder" shall have the meaning set forth in Section 4.2.2.

"Board Call Participant" shall have the meaning set forth in Section 2.1.5(a).

"Board Observer" shall have the meaning set forth in Section 2.1.5(a).

"Board" means the board of directors of the Company.

"Business Day" means any day other than a Saturday, Sunday or a day on which state or federally chartered banking institutions in New York City, New York are not required to be opened.

"Buyout Notice" shall have the meaning set forth in Section 4.5.1.

"Bylaws" means the By-laws of the Company, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"CEO Designee" shall have the meaning set forth in Section 2.1.1(c).

"Certificate of Incorporation" means the Certificate of Incorporation of the Company, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"Change of Control" means (i) the sale, transfer, conveyance or other disposition, in one transaction or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its Subsidiaries, taken as a whole, to any Third Party Purchaser (or group of Affiliated Third Party Purchasers), or (ii) the consummation of any transaction (including any Transfer of Equity Securities or merger or consolidation whether by operation of law or otherwise), the result of which is that any Third Party Purchaser (or group of Affiliated Third Party Purchasers) becomes the beneficial owner, directly or indirectly, of Equity Securities (or of the equity interests of any surviving entity of any such merger or consolidation) representing more than fifty percent (50%) of the voting power of the Company.

"Chief Executive Officer" means the natural person from time to time serving as chief executive officer of the Company and its Subsidiaries in accordance with this Agreement.

"CLO Notes" shall have the meaning set forth in Section 7.10.2.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock, par value $0.001 per share, of the Company, and any shares of capital stock for or into which such common stock hereafter is exchanged, converted, reclassified or recapitalized by the Company or pursuant to an agreement to which the Company is a party, excluding, for the avoidance of doubt, any Unconverted Securities.

"Company" shall have the meaning set forth in the introductory paragraph hereof.

"Competitor" means a Person, together with its respective Subsidiaries, that is reasonably determined by a majority of the disinterested members of the Board to be a competitor of the Company or any of its Subsidiaries in any material respect; provided, however, that for purposes of this Agreement no Person (including private equity sponsors and their affiliated investment funds and hedge fund or other alternative asset managers) shall be deemed a Competitor solely due to its direct or indirect investment (through a portfolio company, investment fund or otherwise) in a Competitor unless such Person owns more than five percent (5%) of the equity interests of a Competitor.

"Confidential Information" means all confidential or proprietary written, recorded or oral information or data (including research, developmental, engineering, manufacturing, technical, marketing, sales, financial, operating, performance, cost, business and process information or data, know-how and computer programming and other software techniques) provided or developed by the Company or any of its Subsidiaries, or another Holder or their respective Confidentiality Affiliates in connection with this Agreement or the business of the Company or any of its Subsidiaries, whether such confidentiality or proprietary status is indicated orally or in writing or in a context in which the Company or the disclosing Holder or its Confidentiality Affiliates reasonably communicated, or the receiving Holder or its Confidentiality Affiliates should reasonably have understood, that the information should be treated as confidential, whether or not the specific words "confidential" or "proprietary" are used; provided, however, that, for the avoidance of doubt, with respect to any Holder, "Confidential Information" shall not include (i) any information that was developed or obtained solely by such Holder and its Confidentiality Affiliates, without reference to the words "confidential" or "proprietary", (ii) information that was or becomes generally available to the public other than as a result of a disclosure by such Holder or its Confidentiality Affiliates not contemplated by this Agreement or (iii) any information that becomes available to a Holder or one of its Confidentiality Affiliates from a Person other than the Company or any of its Subsidiaries on a non-confidential basis, provided that such Person was not known by such Holder or Confidentiality Affiliate to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any of its Subsidiaries with respect to such information.

"Confidentiality Affiliates" shall have the meaning set forth in Section 5.1.5.

"Contracting Parties" shall have the meaning set forth in Section 7.10.

"Credit Agreements" means the First Lien Credit Agreement and the Second Lien Credit Agreement.

"Drag Percentage" means the portion of a Holder's Equity Securities that represents the same percentage as the number, expressed as a percentage, of Equity Securities held by the Dragging Parties being sold by the Dragging Parties in a Drag-Along Sale. For example, if the Dragging Parties are selling shares of Common Stock that represent seventy percent (70%) of the issued and outstanding shares of Common Stock and other Equity Securities held by the Dragging Parties, then each other Holder shall be required to sell shares of Common Stock and other Equity Securities that represent seventy percent (70%) of the shares of Common Stock and other Equity Securities held by such Holder.

"Drag-Along Outside Date" shall have the meaning set forth in Section 4.5.3.

"Drag-Along Sale" shall have the meaning set forth in Section 4.5.1.

"Dragged Stockholders" shall have the meaning set forth in Section 4.5.1.

"Dragging Parties" shall have the meaning set forth in Section 4.5.1.

"Effective Date" means April 14, 2017.

"Entitled Holder" shall have the meaning set forth in Section 3.1.2.

"Equity Securities" means common stock or other equity securities of the Company and any Unconverted Securities.

"Excess Portion" shall have the meaning set forth in Section 4.2.2.

"Excess Shares" shall have the meaning set forth in Section 3.1.4.

"Excess Warrants Portion" shall have the meaning set forth in Section 4.3.2.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Exchange Agreement" means that certain Exchange Agreement, dated as of the date hereof, by and among the Company, the Holders as of the date hereof, and the other parties thereto.

"Exempt Issuances" shall have the meaning set forth in Section 3.1.7.

"Extra Participating Rightholder" shall have the meaning set forth in Section 4.2.2.

"Extra Participating Warrants ROFO Rightholder" shall have the meaning set forth in Section 4.3.2.

"Family Member" means a natural person's spouse, domestic partner, sibling, child, or other lineal descendant of such person (including adoptive relationships and stepchildren) and the spouses of each such natural person.

"Final Offer Notice" shall have the meaning set forth in Section 4.2.3.

"Final Warrants Offer Notice" shall have the meaning set forth in Section 4.3.3.

"First Lien Credit Agreement" means that certain First Lien Credit Agreement, by and among Valitás Health Services, Inc. and the other parties thereto, dated as of the Effective Date, as it may be amended or amended and restated from time to time in accordance with its terms and any credit agreement entered into connection with the refinancing thereof.

"First Sentence" shall have the meaning set forth in 4.6.5.

"GAAP" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, applied on a consistent basis for the periods involved.

"Holdco" shall mean Valitas Intermediate Holdings, Inc., a Delaware corporation and a wholly-owned subsidiary of the Company.

"Holder Ownership Percentage" means, with respect to any Holder, a fraction (expressed as a percentage), the numerator of which is the number of shares of Common Stock held by a specified Holder at the time of determination, and the denominator of which is the total number of issued and outstanding shares of Common Stock at the time of determination.

"Holders" shall have the meaning set forth in the introductory paragraph hereof, and "Holder" means each of the Holders, individually.

"Identified Persons" shall have the meaning set forth in Section 7.9.1.

"Indebtedness" means with respect to any Person, without duplication, any liability of such Person for borrowed money or evidenced by notes, bonds, debentures or other similar instruments. The amount of Indebtedness of any Person at any date shall be the outstanding principal amount of all obligations described above, as such amount would be reflected on a balance sheet prepared in accordance with GAAP.

"Independent Director" shall mean a person who is not at the time of the initial appointment and has not been at any time during the preceding five (5) years: (A) a holder of Equity Securities of the Company or equity securities of any of its Subsidiaries or a director, officer, employee or partner of the Company or any of its Subsidiaries or any Majority Holder or any of its Affiliates; (B) a customer, supplier or other person, in each case who derives more than ten percent (10%) of its purchases or revenues from its activities with the Company or any of its Subsidiaries; (C) a person or other entity controlling or under common control with any such holder of Equity Securities, customer, supplier or other person; or (D) a member of the immediate family of any such holder of Equity Securities, director, officer, employee, partner, customer, supplier or other person. (As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies, or activities of a Person or entity, whether through ownership of voting securities, by contract or otherwise.)

"Initial Public Offering" means the initial underwritten public offering of Common Stock or other Equity Securities or equity securities of any corporate successor to the Company by way of conversion, or parent of the Company, or any of their respective Subsidiaries, pursuant to a registration statement effective under the Securities Act after the Effective Date.

"Interest Swap Obligations" means the obligations of any Person under any interest rate protection agreement, interest rate future, interest rate option, interest rate swap, interest rate cap or other interest rate hedge or arrangement.

"Issuance Notice" shall have the meaning set forth in Section 3.1.2.

"Liens" means liens, pledges, claims, security interests, restrictions, mortgages, tenancies and other possessing interests, conditional sale or other title retention agreements, assessments, easements, rights of way, covenants, restrictions, rights of first refusal, defects in title, encroachments and other burdens, options or encumbrances of any kind.

"Major Corporate Action" shall have the meaning set forth in Section 2.2.1.

"Majority Holder" means a Holder with a Holder Ownership Percentage of at least six point seven five percent (6.75%); provided, that none of the Minority Holders shall be considered a Majority Holder under this Agreement. Schedule I(a) sets forth a list of the Majority Holders as of the Effective Date.

"Majority Holder Designee" or "Majority Holder Designees" shall have the meaning set forth in Section 2.1.1(a).

"Majority Holders Nominee" shall have the meaning set forth in Section 2.1.1(a)(i).

"Management Incentive Plan" shall have the meaning set forth in Section 2.2.1(b).

"Minority Holders" means the Holders set forth on Schedule I(b) (together with such Person's Permitted Transferees), including the Holders who are managed, advised or sub-advised by any such Persons or any such Persons' Permitted Transferees.

"Minority Holder Designee" shall have the meaning set forth in Section 2.1.1(b).

"Minority Holders Nominee" shall have the meaning set forth in Section 2.1.1(b)(i).

"NASDAQ" means the National Association of Securities Dealers, Inc. Automated Quotation (and any successor thereto).

"Non-Party Affiliates" shall have the meaning set forth in Section 7.10.

"Offer Notice" shall have the meaning set forth in Section 4.2.1.

"Offer Purchase Notice" shall have the meaning set forth in Section 4.2.2.

"Offer Sale Price" shall have the meaning set forth in Section 4.2.1.

"Offered Securities" shall have the meaning set forth in Section 4.2.1.

"Offered Warrants" shall have the meaning set forth in Section 4.3.1.

"Offered Warrants Sale Price" shall have the meaning set forth in Section 4.3.1.

"Opportunity" shall have the meaning set forth in Section 7.9.1.

"Participating Rightholders" shall have the meaning set forth in Section 4.2.2.

"Participating Warrants ROFO Rightholders" shall have the meaning set forth in Section 4.3.2.

"Permitted Transferee" means, (i) with respect to any Holder who is an individual, any Family Member of such Holder (or a Family Member of such Holder's spouse, parent or sibling), a company, partnership or a trust established for the benefit of any of the foregoing or any personal representative, estate or executor under any will of such Holder or pursuant to the laws of intestate succession, or (ii) with respect to a Holder who is not an individual, (A) any Affiliate of such Holder, (B) any Person or an Affiliate of a Person that is advised, sub-advised or managed by a Person who advises, sub-advises or manages such Holder, (C) with respect to any trust, to any successor trustee to that trust (provided there is no Transfer of a beneficial interest in such trust as a result of such succession) or the beneficiaries of such trust, or (D) with respect to any limited partnership, a pooled investment vehicle or similar institutional investor, as part of a pro rata distribution to such person's direct or indirect equityholder(s).

"Person" or "person" means any individual, firm, partnership, company or other entity, and shall include any successor (by merger or otherwise) of such entity.

"Preemptive Ratio" shall have the meaning set forth in Section 3.1.2.

"Preemptive Shares" shall have the meaning set forth in Section 3.1.2.

"Pro Rata Tag Portion" means a fraction equal to the product of (i) the number of shares of Common Stock proposed to be or actually Transferred, as applicable, by a Selling Tag Holder to a Third Party Purchaser multiplied by (ii) a fraction, the numerator of which is the number of shares of Common Stock held by the applicable Tag-Along Rightholder or Selling Tag Holder, and the denominator of which is the aggregate number of shares of Common Stock held by the Selling Tag Holder and each Tag-Along Rightholder; provided, that, in the event that a Tag-Along Rightholder or Selling Tag Holder is a holder of Warrants, who timely notifies the Company that it will exercise any of such Warrants in connection with such Tag-Along Transaction, then the definition of "Pro Rata Portion" shall be adjusted to include in both the numerator and the denominator the number of shares of Common Stock issuable upon exercise of such Warrants in such transaction in accordance with the terms hereof and the Warrant Agreement.

"Proposed Transfer" shall have the meaning set forth in Section 4.4.2.

"Qualified Pledge" means a *bona fide* pledge of Common Stock or other Equity Securities in connection with a secured borrowing transaction, the pledgee with respect to which is a financial institution in the business of engaging in secured lending and similar transactions which has entered into such transaction in the ordinary course of such business.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and among the Company and the Holders party thereto, as the same may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time in accordance with its terms.

"Related Companies" shall have the meaning set forth in Section 7.9.3.

"Rightholder Ownership Percentage" means, with respect to any Majority Holder, a fraction (expressed as a percentage), the numerator of which is the number of Equity Securities (excluding any Unconverted Securities) held by such Majority Holder and its Affiliates at the time of determination, and the denominator of which is the total number of Equity Securities (excluding any Unconverted Securities) held by all Majority Holders and their Affiliates, at the time of determination.

"Rightholders" shall have the meaning set forth in Section 4.2.1.

"ROFO Evaluation Period" shall have the meaning set forth in Section 4.2.2.

"ROFO Sale" shall have the meaning set forth in Section 4.2.4.

"Sale of the Company" means a transaction or series of related transactions resulting in a Change of Control.

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, by and among Valitás Health Services, Inc. and the other parties thereto, dated as of the Effective Date, as it may be amended or amended and restated from time to time in accordance with its terms and any credit agreement entered into connection with the refinancing thereof.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"Selling Holder" shall have the meaning set forth in Section 4.2.1.

"Selling Tag Holder" shall have the meaning set forth in Section 4.4.1.

"Selling Warrants Holder" shall have the meaning set forth in Section 4.3.1.

"Significant Holder" means any Holder with a Holder Ownership Percentage as of the Effective Date of at least fifteen percent (15%); provided, that if at any time following the Effective Date any Significant Holder does not have a Holder Ownership Percentage of at least five percent (5%), such Holder shall no longer be considered a Significant Holder under this Agreement. Schedule I(d) sets forth a list of the Significant Holders as of the Effective Date.

"Subsidiary" of any Person means (i) a corporation a majority of whose outstanding shares of capital stock or other equity interests with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person, and (ii) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (x) at least a majority ownership interest or (y) the power to elect or direct the election of the directors or other governing body of such Person.

"Tag-Along Notice" shall have the meaning set forth in Section 4.4.2.

"Tag-Along Notice Period" shall have the meaning set forth in Section 4.4.2.

"Tag-Along Rightholder" shall have the meaning set forth in Section 4.4.1.

"Tag-Along Transaction" shall have the meaning set forth in Section 4.4.1.

"Third Party Purchaser" means (i) if for purposes of Section 4.3, any Person who is not a Permitted Transferee of a Selling Warrants Holder, and (ii) otherwise with respect to a Holder, any Person who is not a Permitted Transferee of such Holder.

"Transfer" means, when used as a verb, to sell, transfer, assign, convey or otherwise dispose, and when used as a noun, any direct or indirect sale, transfer, assignment, conveyance or other disposition, including by merger, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily; provided, that (i) no Transfer of Equity Securities (excluding any Unconverted Securities) or other securities shall be deemed to have occurred as a result of the entry into, modification of or existence of any Qualified Pledge until such time as the pledgee commences any action to foreclose upon such Equity Securities (excluding any Unconverted Securities) or other securities, or any Equity Securities (excluding any Unconverted Securities) or other securities are delivered upon settlement or termination of such Qualified Pledge (whichever occurs first), (ii) with respect to any Holder that is a widely held "investment company" as defined in the Investment Company Act of 1940, as amended, or any publicly traded company whose securities are registered under the Exchange Act, a sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed a Transfer; and (iii) with respect to any Holder that is a private equity fund, hedge fund or similar vehicle, any Transfer of limited partnership or other similar non-controlling interests in any entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Holder, or the change in control of any general partner, manager or similar person of such entity, will not be deemed to be a Transfer for purposes hereof.

"Unconverted Securities" means any rights, warrants, options, convertible securities or Indebtedness, exchangeable securities or Indebtedness, or other rights exercisable for or convertible or exchangeable into, directly or indirectly, Common Stock or securities convertible or exchangeable (but not yet converted or exchanged) into Common Stock, including the Warrants.

"Valitás Equity Holder" means the Holders set forth on Schedule I(c) (together with such Person's Permitted Transferees), including the Holders who are managed, advised or sub-advised by any such Persons or any such Persons' Permitted Transferees.

"Warrant Agreements" means those certain Warrant Agreements, dated as of the date hereof.

"Warrant Purchase Notice" shall have the meaning set forth in Section 4.3.2.

"Warrants" means the warrants issued pursuant to the Warrant Agreements, dated as of the date hereof.

"Warrants Offer Notice" shall have the meaning set forth in Section 4.3.1.

"Warrants ROFO Base Participating Holder" shall have the meaning set forth in Section 4.3.2.

"Warrants ROFO Evaluation Period" shall have the meaning set forth in Section 4.3.2.

"Warrants ROFO Rightholders" shall have the meaning set forth in Section 4.3.1.

"Warrants ROFO Sale" shall have the meaning set forth in Section 4.3.4.

Section 1.2 Other Definitional and Interpretive Matters. For purposes of this Agreement, the following rules shall apply:

1.2.1 Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

1.2.2 Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars.

1.2.3 Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

1.2.4 Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

1.2.5 Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section of this Agreement unless otherwise specified.

1.2.6 Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

1.2.7 Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

1.2.8 Successor Laws. Any reference to any law or code section thereof will be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified.

1.2.9 Heirs, Executors, etc. References herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this Section 1.2.9 is intended to authorize any assignment or other Transfer not otherwise permitted by this Agreement.

1.2.10 Joint Drafting. It is the intention of the parties that every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party). Further, prior drafts of this Agreement or any ancillary agreements hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

## ARTICLE 2

## MANAGEMENT OF THE COMPANY AND CERTAIN ACTIVITIES

Section 2.1 Board.

2.1.1 Board Representation. Subject to Section 2.1.2, the Board shall consist of five (5) Persons constituted as follows:

(a) three (3) persons, designated by the Majority Holders in accordance with this Section 2.1.1(a), who, as of the date hereof, shall be Dan Slipkovich, Ken Paulus and Jeff Goldberg (each, a "Majority Holder Designee", and, collectively, the "Majority Holder Designees"); provided, that each Majority Holder Designee designated pursuant to this Section 2.1.1(a) must qualify as an Independent Director. The Majority Holder Designees shall be designated as follows:

(i) *Nomination and Election of Majority Holder Designees*. Each Majority Holder shall be entitled to submit the names of one or more persons to stand for election as a Majority Holder Designee (each, a "Majority Holders Nominee"). Upon a vote at a meeting or by written consent of the Majority Holders, the three (3) (or two (2) in the circumstances set forth in Section 2.1.2) Majority Holders Nominees who receive (i) the highest Affirmative Percentage Vote of the Majority Holders and (ii) at least a majority vote of the issued and outstanding Common Stock held by all Majority Holders, shall be designated as the Majority Holder Designees.

(b) one (1) person, designated by the Minority Holders holding a majority of the issued and outstanding Common Stock held by all Minority Holders, who, as of the date hereof, shall be Vincent Lu (the "Minority Holder Designee").

(i) *Nomination and Election of Minority Holder Designee*. Each Minority Holder shall be entitled to submit the names of one or more persons to stand for election as a Minority Holder Designee (each, a "Minority Holders Nominee"). Upon a vote at a meeting or by written consent of the Minority Holders, the Minority Holders Nominee (or the

two (2) Majority Holders Nominees in the circumstances set forth in Section 2.1.2) who receive (i) the highest Affirmative Percentage Vote of the Minority Holders and (ii) at least a majority vote of the issued and outstanding Common Stock held by all Minority Holders, shall be designated as the Minority Holder Designee (or the Minority Holder Designees in the circumstances set forth in Section 2.1.2).

(c) the Chief Executive Officer of the Company (the "CEO Designee"), who, as of the date hereof shall be Karey L. Witty.

2.1.2 Board Representation upon Certain Events.

(a) Following the date hereof, the Board shall be constituted and designated for election in the same manner as set forth in Section 2.1.1 hereof; provided, however, that (i) in the event that the Minority Holders (together with their Permitted Transferees) cease to hold at least five percent (5%) of the issued and outstanding shares of Common Stock, the Board shall consist of four (4) Persons, the number of Persons entitled to be elected to the Board by the Minority Holders pursuant to Section 2.1.1(b) shall be zero (0) and such Minority Holder Designee shall automatically be removed from the Board and (ii) in the event that the Minority Holders (together with their Permitted Transferees) hold more than forty percent (40%) of the issued and outstanding shares of Common Stock, the number of Persons entitled to be designated to the Board by the Majority Holders pursuant to Section 2.1.1(a) shall be two (2) and the number of Persons entitled to be designated to the Board by the Minority Holders pursuant to Section 2.1.1(b) shall be two (2).

(b) Notwithstanding anything to the contrary in this Agreement, in the event that a vacancy has occurred and no Holder is entitled to designate a replacement to the Board pursuant to Section 2.1.1 of this Agreement, such position(s) on the Board, other than that of the CEO Designee, shall be elected by a plurality of the holders of Common Stock at the next annual meeting of holders of Common Stock. Any vacancies created as a result of the resignation or removal of a director appointed pursuant to this Section 2.1.2(b) prior to the expiration of his/her term shall be filled by the Board until the next annual meeting of holders of Common Stock, with such position thereafter filled by a plurality vote of holders of Common Stock at the next annual meeting of holders of Common Stock.

2.1.3 Board Elections; Board Vacancies. Subject to compliance with Section 2.1.2, the Company agrees to cause each Person designated pursuant to Section 2.1.1 who has consented to stand for election and is willing to serve on the Board to be nominated to serve as a director on the Board, and to take all other necessary actions to ensure that the composition of the Board is as set forth in Section 2.1.1, and each Holder agrees that, if at any time it is then entitled to vote for the election of directors to the Board, whether at any annual or special meeting, by written consent or otherwise, it shall vote all of its shares of Common Stock over which such Holder has voting power or control and which are entitled to vote on any matter presented to Holders pursuant to this Section 2.1.3 (or to execute written consents with respect to such shares) to ensure that the composition of the Board is as set forth in Section 2.1.1 and Section 2.2.2. Except as otherwise provided in Section 2.1.4(d) with respect to the filling of any vacancy created upon the removal of the CEO Designee, in the event that there is any vacancy on the Board (whether as a result of death, disability, retirement, resignation, removal, refusal to

stand for re-election or otherwise, or due to a newly created directorship), such vacancy shall be filled by the Person or Persons entitled to designate a person for that vacancy as set forth in Section 2.1.1 or Section 2.1.2 hereof. The Majority Holders and the Minority Holders (so long as the Minority Holders (together with their Permitted Transferees) hold more than five percent (5%) of the issued and outstanding shares of Common Stock) shall have the right to call a special meeting of holders of Common Stock at any time by a vote of the Majority Holders or the Minority Holders holding a majority of the issued and outstanding Common Stock held by all Majority Holders or the Minority Holders, respectively.

2.1.4 Removal.

(a) Subject to clauses (b), (c) and (d) of this Section 2.1.4, any director may be removed from the Board at any time in accordance with the provisions of the Certificate of Incorporation and Bylaws.

(b) The Majority Holder Designees may be removed from the Board at any time by a vote of the Majority Holders holding a majority of the issued and outstanding Common Stock held by all Majority Holders.

(c) The Minority Holder Designee may be removed from the Board at any time by a vote of the Minority Holders holding a majority of the issued and outstanding Common Stock held by all Minority Holders.

(d) The CEO Designee may be removed from the Board only in accordance with this Section 2.1.4(d). If at any time the then current CEO Designee ceases to be the Chief Executive Officer of the Company, the Company and each Holder agree promptly to act in accordance with this Agreement, the Certificate of Incorporation and Bylaws to cause both the removal of such director and, at such time as a succeeding Chief Executive Officer of the Company is appointed in conformity with the Certificate of Incorporation and Bylaws, the election of such person as the CEO Designee pursuant to Section 2.1.1(c).

2.1.5 Board Observer; Board Call Participant.

(a) Each Significant Holder shall have the right to designate one non-voting observer to the Board (a "Board Observer"). Until the date that is twelve (12) months following the Effective Date, Healthcare Financial Solutions, LLC and each Majority Holder on the date hereof who (i) is not a Significant Holder and (ii) maintains a Holder Ownership Percentage of at least five percent (5%) shall each have the right to designate one person to participate in any conference calls and meetings of the Board on a muted line (the "Board Call Participant", and, collectively, the "Board Call Participants"). For the avoidance of doubt, the rights to designate a Board Observer and Board Call Participant pursuant to this Section 2.1.5 are personal to such Significant Holders, Healthcare Financial Solutions, LLC and applicable Majority Holders, as the case may be, and shall not be exercised by any Transferee of such Persons.

(b) Subject to the provisions of this Section 2.1.5, the Board Observer shall have the right to attend all meetings of the Board, and the Company shall give the Board

Observer copies of all notices, minutes, consents and other materials that it provides to the directors of the Board.

(c) Notwithstanding the foregoing, the Company reserves the right to withhold information and to exclude any Board Observer and Board Call Participant from any meeting or conference call, as applicable, or portion thereof, if access to such information, attendance at such meeting or participation at such conference call could adversely affect the attorney-client privilege between the Company and its counsel, serve to waive the work product doctrine or any other similarly protective privilege or doctrine.

(d) For the avoidance of doubt, all Board Observer and Board Call Participants shall not be permitted to vote at any meeting of the Board. The Board Observers and the Board Call Participants shall not be counted for purposes of determining whether there is a sufficient quorum for the Board to conduct its business. The Board Observers shall be reimbursed by the Company for any reasonable out-of-pocket travel and other reasonable out-of-pocket expenses incurred in order to attend Board meetings.

(e) Each Board Call Participant shall cease to have any rights hereunder automatically on the date that Healthcare Financial Solutions, LLC or the Majority Holder (that, for the avoidance of doubt, is not a Significant Holder) designating such Board Call Participant no longer has the right to designate a Board Call Participant pursuant to this Agreement. Each Board Observer shall cease to have any rights hereunder automatically on the date that the applicable Significant Holder ceases to constitute a Significant Holder. The Board Observer may be removed at any time by the Significant Holder who had designated such Board Observer, and, upon any such removal, such Significant Holder shall have the right to designate a replacement Board Observer.

(f) Each Board Observer shall be entitled to enter into an agreement providing indemnification rights on substantially the same terms as entered into by the members of the Board.

2.1.6 Chairman of the Board. The Board may appoint a non-executive chairman of the Board who shall preside at all meetings of the Board.

2.1.7 Committees. The Board may designate one or more committees in accordance with the provisions of the Bylaws.

2.1.8 Expenses. Each member of the Board shall be reimbursed by the Company upon written request (including submission of reasonable documentation) for any of its reasonable out-of-pocket travel and other reasonable out-of-pocket expenses incurred in order to attend Board meetings, in accordance with policies to be developed by the Board.

2.1.9 No Conflicts. The Company shall take all actions necessary to ensure that the Certificate of Incorporation and Bylaws, in each case as in effect immediately following the date hereof, do not, at any time thereafter, conflict in any respect with the provisions of this Article 2.

Section 2.2 Actions Requiring Consent.

2.2.1 From and after the date hereof, the Company shall not, and, as applicable, shall not permit any of its Subsidiaries to, take any of the following actions (each, a "Major Corporate Action") without the prior affirmative vote of a majority of the Board (which majority shall, subject to Section 2.2.3, include (i) at least one Majority Holder Designee and (ii) the Minority Holder Designee):

(a) (i) consummate a Sale of the Company; provided, that nothing in this Section 2.2.1(a) shall restrict the Company or any of its Subsidiaries from initiating discussions or negotiations regarding the activities listed in this Section 2.2.1(a);

(b) other than issuances of Equity Securities pursuant to any management incentive plan approved by the Board on substantially the same terms as the management incentive plan term sheet attached hereto as Exhibit B (the "Management Incentive Plan") or in connection with the issuance of Equity Securities pursuant to the exercise of the Warrants, issue any Equity Securities or any other securities convertible into or exchangeable for, or any options, warrants or other rights to purchase, any Equity Securities;

(c) incur, issue or otherwise become liable with respect to, any Indebtedness in the aggregate in excess of $1,000,000, other than (i) Indebtedness existing on the Effective Date pursuant to the Credit Agreements, (ii) Indebtedness whereby (A) the principal amount of such Indebtedness does not exceed the principal amount outstanding under the New First Lien Credit Agreement as of the Effective Date (the "New First Lien Principal Amount") plus any unused incremental first lien debt permitted to be incurred thereunder, (B) the proceeds of such Indebtedness are applied to repay in full the outstanding New First Lien Principal Amount, and (C) such Indebtedness is provided on terms and conditions which are substantially similar to, or more favorable to the Company or its Subsidiaries than, the terms and conditions of the New First Lien Credit Agreement or (iii) Indebtedness whereby substantially all of the proceeds of such Indebtedness are applied to repay in full the principal amount outstanding under the Second Lien Credit Agreement;

(d) consummate any acquisition (whether by stock or asset purchase, merger, consolidation or otherwise in a transaction or series of related transactions) valued, or involving assets or stock, worth in excess of the greater of (i) five percent (5)% of total assets of the Company and its Subsidiaries or (ii) $30,000,000;

(e) other than with respect to this Agreement or any amendment, waiver, forbearance or other document or agreement related to the Credit Agreements, enter into any transaction with or involving any Holders who holds more than ten percent (10%) of the outstanding and issued Common Stock or any of such Holder's respective Affiliates (excluding the Company and any of its wholly-owned Subsidiaries); and

(f) enter into any agreement or other binding obligation to do any of the foregoing.

2.2.2 For the avoidance of doubt, nothing in this Section 2.2 shall affect any requirement for Board approval with respect to actions of the Company or its Subsidiaries that may be required by the Company's Certificate of Incorporation or Bylaws or under applicable

law, including the requirement for the approval of the Board with respect to the incurrence of Indebtedness of the Company or its Subsidiaries outside of the ordinary course of business.

2.2.3 The prior affirmative vote of the Minority Holder Designee in connection with a Major Corporate Action as set forth in Section 2.2.1 shall no longer be required (i) after the date that is thirty (30) months after the Effective Date or (ii) during an ongoing financial covenant default as set forth in Section 7.11 of the First Lien Credit Agreement (provided, that if the First Lien Credit Agreement is amended, restated or replaced such financial covenants for purposes of determining whether this Section 2.2.3 is triggered shall be the financial covenants set forth in the First Lien Credit Agreement as of the date hereof to the extent such financial covenants are more favorable to the Company) that is not yet cured.

## ARTICLE 3

## PREEMPTIVE RIGHTS

Section 3.1 Preemptive Rights.

3.1.1 The Board, subject to the Certificate of Incorporation, the Bylaws, the preemptive rights provided for in Section 3.1.2 through Section 3.1.6, and the approval rights provided for in Section 2.2, shall have the authority to issue shares of Common Stock or other Equity Securities to the Holders or any new stockholder (any such new stockholder, an "Additional Holder") in such amounts and at a purchase price per share of Common Stock or other Equity Security as the Board shall determine.

3.1.2 In the event the Board determines to issue shares of Common Stock or other Equity Securities or equity securities of any of its Subsidiaries (other than issuances of Equity Securities to the Company or any of its Subsidiary) after compliance with Section 2.2, to the extent applicable (the foregoing, collectively, the "Preemptive Shares"), except as provided in Section 3.1.7, the Board shall give each of the Holders that hold at least three and one-half percent (3.5%) of the issued and outstanding shares of Common Stock or other previously-issued Equity Securities (excluding any Unconverted Securities) (each such Holder, an "Entitled Holder"), written notice of such proposed issuance at least twenty (20) Business Days prior to the proposed issuance date (an "Issuance Notice"). The Issuance Notice shall specify the number and class of Preemptive Shares and the price at which such Preemptive Shares are proposed to be issued and the other material terms and conditions of such Preemptive Shares and of the issuance, including the proposed closing date. Subject to Section 3.1.7, each such Entitled Holder shall be entitled to purchase, at the price and on the other terms and conditions specified in the Issuance Notice, a number of Preemptive Shares equal to (x) the number of Preemptive Shares proposed to be issued by the Company, multiplied by (y) their Holder Ownership Percentage immediately prior to the proposed issuance (the "Preemptive Ratio"). Each Entitled Holder may assign its rights under this Section 3.1 to any of its Affiliates.

3.1.3 An Entitled Holder may exercise its rights (if any) under Section 3.1.2 by delivering written notice of its election to purchase such Preemptive Shares to the Board within fifteen (15) Business Days after receipt of the Issuance Notice. A delivery of such notice (which notice shall specify the number of Preemptive Shares requested to be purchased by the

Entitled Holder submitting such notice up to the maximum amount determined pursuant to the final sentence of Section 3.1.2 above) by such Entitled Holder shall constitute a binding agreement of such Entitled Holder to purchase, at the price and on the terms and conditions specified in the Issuance Notice, the number of Preemptive Shares specified in such Entitled Holder's notice. If, at the end of such fifteen (15) Business Day period, any Entitled Holder has not exercised its right to purchase any of its Preemptive Ratio of such Preemptive Shares, such Entitled Holder shall be deemed to have waived all of its rights under Section 3.1.2 through Section 3.1.6 with respect to, and only with respect to, the purchase of such Equity Securities specified in the applicable Issuance Notice.

3.1.4 If any of the Entitled Holders fails to exercise its preemptive rights (if any) under Section 3.1.2 through Section 3.1.6, or elects to exercise such rights with respect to less than such Entitled Holder's Preemptive Ratio (the difference between such Entitled Holder's Preemptive Ratio and the number of Preemptive Shares for which such Entitled Holder exercised its preemptive rights under Section 3.1.2 through Section 3.1.6, the "Excess Shares"), then the Company (or the applicable Subsidiary) shall offer to sell to the Entitled Holders that have elected to purchase all of their Preemptive Ratio of the Preemptive Shares any Excess Shares that have not otherwise been acquired by the Entitled Holders, at the same price and on the same terms as those specified in the Issuance Notice, and such Entitled Holders shall have the right to acquire all or any portion of such Excess Shares within five (5) days following the expiration of the period specified in Section 3.1.3 by delivering written notice thereof to the Company.

3.1.5 Subject to compliance with this Article 3, the Company shall have ninety (90) days after the date of the Issuance Notice to consummate the proposed issuance of any or all of such Preemptive Shares that the applicable Entitled Holders have elected not to purchase at the same (or higher) price and upon such other terms and conditions that are not materially less favorable to the Company than those specified in the Issuance Notice; provided, that, if such issuance is subject to regulatory approval, such 90-day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event to later than one hundred twenty (120) days after the date of the Issuance Notice. If the Board proposes to issue any Preemptive Shares after such 90-day period (or 120-day period, if applicable) or during such 90-day period (or 120-day period, if applicable) at a lower price or on such other terms materially less favorable to the Company, it shall again comply with the procedures set forth in under Section 3.1.2 through Section 3.1.6.

3.1.6 The closing of any issuance of Preemptive Shares to the Entitled Holders under Section 3.1.2 through Section 3.1.6, shall take place at the time and in the manner provided in the Issuance Notice. The Company shall be under no obligation to consummate any proposed issuance of Preemptive Shares, nor shall there be any liability on the part of the Company or the Board to any Entitled Holder if the Company has not consummated any proposed issuance of Preemptive Shares under Section 3.1.2 through Section 3.1.6 for whatever reason, except for willful misconduct, regardless of whether the Board shall have delivered an Issuance Notice in respect of such proposed issuance.

3.1.7 The preemptive rights under Section 3.1.2 through Section 3.1.6 shall not apply to (i) issuances or sales of Equity Securities to employees, officers, directors, managers or consultants of the Company or any of its Subsidiaries pursuant to the Management Incentive

Plan or other employees benefit or similar employee or management equity incentive plans or arrangements of the Company or any of its Subsidiaries approved by the Board (and issuances in connection with the exercise thereof), (ii) issuances or sales of Equity Securities in, or in connection with, a merger of the Company or any of its Subsidiaries with or into another Person or an acquisition by the Company or any of its Subsidiaries of another Person or substantially all the assets of another Person, in each case, approved by the Board in accordance with the terms of this Agreement (provided such issuance or sale represents no more than ten percent (10%) of the issued and outstanding Common Stock of the Company), (iii) issuances upon the conversion or exercise of any Unconverted Securities of the Company which Unconverted Securities were (A) outstanding on the date hereof or (B) issued in compliance with the terms and conditions of this Section 3.1, (iv) issuances of Equity Securities pursuant to the exercise of the Warrants, or (v) issuances as a dividend or upon any stock split, reclassification, recapitalization, exchange or readjustment of Common Stock, or other similar transaction (in each case, on a pro rata basis) (such issuances, "Exempt Issuances").

3.1.8 Each Additional Holder shall execute and deliver a written instrument satisfactory to the Board, whereby such Additional Holder shall become a party to this Agreement, as well as any other documents required by the Board. Upon execution and delivery of a counterpart of this Agreement and acceptance thereof by the Board, such Person shall be admitted as a Holder. Each such Additional Holder shall thereafter be entitled to all the rights and subject to all the obligations of a Holder as set forth herein.

3.1.9 Notwithstanding anything to the contrary herein, if the Board, acting in good faith, determines that it would be in the best interests of the Company to issue Preemptive Shares which would otherwise be required to be offered to the Entitled Holders under this Section 3.1 prior to making such offer, the Company may issue such Preemptive Shares without first complying with the procedures set forth in Section 3.1.2 through Section 3.1.6; provided, however, that within forty five (45) days after such issuance of such Preemptive Shares, the Company offers each Person that would have been an Entitled Holder as of the date of such issuance the opportunity to purchase the number of such Preemptive Shares that such Person would have been entitled to purchase pursuant to procedures set forth in Section 3.1.2 through Section 3.1.6 had this Section 3.1.9 not been invoked. The procedure for exercising such option on the part of the Eligible Holders shall be, *mutatis mutandis*, as set forth in Section 3.1.2 through Section 3.1.6. In no event will the Company make any dividends, distributions or other payments with respect to any Preemptive Shares issued pursuant to this Section 3.1.9 until such time that the Company has offered the Entitled Holders the opportunity to purchase the number of such Preemptive Shares that such Person would have been entitled to purchase pursuant to procedures set forth in Section 3.1.2 through Section 3.1.6 had this Section 3.1.9 not been invoked.

## ARTICLE 4

## TRANSFERS

Section 4.1 Restrictions on Transfers.

4.1.1 Subject to compliance with this Agreement (including Section 4.2, Section 4.3, Section 4.4 and Section 4.5, as applicable), a Holder may Transfer all or any portion of such Holder's Equity Securities to any Person; provided, that except for any Transfer of Equity Securities on the effective date of a public offering of the Company's securities pursuant to the Registration Rights Agreement, no such Transfer shall be permitted (i) if as a result of such Transfer, the Company would be reasonably likely to be subject to reporting obligations under the Exchange Act or otherwise required to make any filing with the Commission, (ii) if such Transfer would be in violation of Federal or State securities laws, (iii) if such Transfer is to a Competitor or a Person who owns five percent (5%) or more of the equity interests of a Competitor (except in connection with a Sale of the Company) or (iv) if such Transfer would result in a Change of Control prior to the date that is thirty (30) months following the Effective Date unless approved by the Board in accordance with Section 2.2.1(a). A Transfer to a private equity sponsor or hedge fund or other alternative asset manager who (through a portfolio company, investment fund or otherwise) (i) owns more three percent (3%) or more of the equity interests of a Competitor and (ii) has information rights or rights to designate members to the board of directors or equivalent governing body of such Competitor, shall require the prior approval of the Board. The Company may institute legal proceedings to force rescission of a Transfer prohibited by this Section 4.1 and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer. Any attempt to Transfer any Equity Securities in violation of the provisions of this Article 4 shall be null and void *ab initio* and the Company shall not register or effect any such Transfer.

4.1.2 The Board shall have the power to determine all matters related to this Section 4.1, including matters necessary or desirable to administer or to determine compliance with this Section 4.1 and, absent actual fraud, bad faith, manifest error, or self-dealing, the determinations of the Board shall be final and binding on the Company and the Holders and any proposed Transferee.

4.1.3 The Transfer restrictions in this Agreement may not be avoided by the holding of Equity Securities directly or indirectly through a Person that can itself be sold to dispose of an interest in Equity Securities free of such restrictions. For the avoidance of doubt, no Holder shall, directly or indirectly, intentionally seek to avoid the provisions of this Agreement by Transferring, issuing, or permitting the issuance of, any direct or indirect equity or beneficial interest in such Holder, in any such case, in a manner that does not comply with the Transfer restrictions in this Agreement.

4.1.4 Each Permitted Transferee to whom Equity Securities are Transferred shall, and the Holder who Transferred such Equity Securities shall cause such Permitted Transferee to, Transfer back to such Holder any Equity Securities it owns if such Permitted Transferee ceases to be a Permitted Transferee of such Holder.

4.1.5 Notwithstanding anything in this Article 4 to the contrary, in lieu of exercising Warrants and then selling the shares of Common Stock issuable thereunder, in connection with a Tag-Along Transaction or a Drag-Along Sale, as applicable, a Holder of Warrants shall be entitled to Transfer such Holder's Warrants to such purchaser conditioned upon the consummation of such Tag-Along Transaction or Drag-Along Sale, as applicable.

Section 4.2 Right of First Offer on Equity Securities (other than Warrants).

4.2.1 Except pursuant to a Transfer made in accordance with Section 4.3 or Section 4.5 or (ii) to a Permitted Transferee, if at any time a Holder (the "Selling Holder") wishes to Transfer all or any portion of such Holder's Equity Securities (other than Warrants) to a Minority Holder, such Selling Holder shall first offer to each Majority Holder the Offered Securities (as defined below, consisting of a portion of such Equity Securities that are proposed to be Transferred) by sending a written notice (the "Offer Notice") to the Majority Holders (the "Rightholders") and the Company, which Offer Notice shall be an offer to sell and shall state the proposed terms of such Transfer, including (i) the number of Equity Securities such Selling Holder proposes to Transfer *less* the number of Equity Securities equal to the product of (a) the number of Equity Securities such Selling Holder proposes to Transfer and (b) a fraction, the numerator of which is the number of Equity Securities held by the Minority Holder and the denominator of which is the aggregate number of Equity Securities held by all Majority Holders and the Minority Holder (the "Offered Securities"), (ii) the proposed amount and consideration (which consideration shall be exclusively cash) and terms and conditions of payment (the "Offer Sale Price") and (iii) the other material terms and conditions of the proposed Transfer. For the avoidance of doubt, the Minority Holder shall have the right to purchase the number of Equity Securities equal to the total number of Equity Securities the Selling Holder wishes to Transfer less the Offered Securities.

4.2.2 Each Rightholder shall have a period of ten (10) Business Days following the receipt of the Offer Notice (the "ROFO Evaluation Period") to accept the Selling Holder's offer by delivering a written notice (the "Offer Purchase Notice") to the Company agreeing to purchase the Offered Securities on the terms set forth in the Offer Notice (including the same price and with the same amount of consideration per Equity Security), which Offer Purchase Notice shall include (i) such Rightholder's election and agreement to purchase the number of Offered Securities up to such Rightholder's entire Rightholder Ownership Percentage of Offered Securities (each, a "Base Participating Holder"), (ii) if such Rightholder has elected to purchase its entire Rightholder Ownership Percentage of Offered Securities, then, in such Rightholder's sole discretion, such Rightholder's election and agreement to purchase up to its entire Rightholder Ownership Percentage of the Offered Securities not subscribed for by other Rightholders and (iii) if such Rightholder has elected to purchase, in its sole discrection, its entire Rightholder Ownership Percentage of Offered Securities and its entire Rightholder Ownership Percentage of the Offered Securities not subscribed for by other Rightholders (each, an "Extra Participating Rightholder", and together with the Base Participating Holders, the "Participating Rightholders"), the number of remaining Offered Securities not purchased by other Rightholders that such Extra Participating Rightholder elects to purchase (the "Excess Portion"). If more than one Extra Participating Rightholder wishes to exercise its right to purchase all of the Excess Portion, each such Extra Participating Rightholder shall only have the right to purchase Offered Securities with respect to such Excess Portion equal to the ratio of (i) the number of Equity Securities then held by such Extra Participating Rightholder to (ii) the total number of Equity Securities held by all Extra Participating Rightholders wishing to so exercise. Each Rightholder may assign its rights under this Section 4.2.2 to any of its Affiliates.

4.2.3 During the ROFO Evaluation Period, the Company shall not provide or discuss any Offer Purchase Notice with any Holder; provided; however, that the Company may

discuss an Offer Purchase Notice with the Participating Rightholder who delivered such Offer Purchase Notice. The Company shall notify in writing (such notice, the "Final Offer Notice") the Selling Holder, and each Participating Rightholder within three (3) Business Days following the expiration of the ROFO Evaluation Period of the number of Offered Securities which such Participating Rightholder has agreed to purchase pursuant to this Section 4.2. Following the time that the Selling Holder and the Minority Holder agree to a mutually acceptable definitive transfer agreement in accordance with Section 4.2.4, the Participating Rightholders and the Selling Holder shall consummate the transaction contemplated by the Offer Notice within ten (10) Business Days after receipt of the Final Offer Notice. At such closing, the Selling Holder shall deliver to the Participating Rightholders the Offered Securities, including certificates (if any) representing the Offered Securities. The Participating Rightholders shall, at the closing, deliver to the Selling Holder payment in full in immediately available funds for the Offered Securities purchased by it; it being further agreed that no portion of the purchase price shall be subject to any escrow or holdback. At such closing, all the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate to effect the contemplated transactions.

4.2.4 If no Offer Purchase Notice has been timely delivered under Section 4.2.2, if the Rightholders have not agreed to purchase all of the Offered Securities pursuant to the terms and conditions in the Offer Notice, or if the Rightholders have failed to purchase all of the Offered Securities pursuant to the terms and conditions in this Section 4.2, the Selling Holder shall be permitted to Transfer the remaining Offered Securities on the terms and conditions not materially less favorable to the Participating Rightholder as those set forth in the Offer Notice for a purchase price in cash, net of commissions or similar expenses, that is no lower than the Offer Sale Price (a "ROFO Sale") to the Minority Holder; provided, however, that such ROFO Sale is consummated within ninety (90) days after the earlier to occur of (i) the waiver by all of the Rightholders of their option to purchase the Offered Securities and (ii) the expiration of the ROFO Evaluation Period. If such ROFO Sale is not consummated within such ninety (90) day period for any reason, then the restrictions provided for in this Section 4.2 shall again become effective, and no Transfer of Equity Securities may be made thereafter by the Selling Holder without again offering the same to the Rightholders in accordance with this Section 4.2.

4.2.5 At the closing contemplated by Sections 4.2.3 or 4.2.4, as applicable, the Selling Holder shall provide representations, warranties, covenants and indemnities in its individual capacity in connection with such transaction. Such representations and warranties shall be limited to customary fundamental representations and warranties regarding (i) its brokers and finders, (ii) title to its Offered Securities, free and clear of all liens, claims and encumbrances (other than those arising under applicable securities laws and this Agreement), (iii) its authority, power and right to enter into and consummate the transaction without violating any other material agreement or applicable law, (iv) its power and right to enter into and consummate the transaction without the consent of any governmental authority or Person and (v) the absence of any required consents for it to enter into and consummate the transaction and the absence of any registration requirements in connection therewith. The Selling Holder will only be subject to indemnification obligations with respect to breach of the foregoing representations and warranties and the Selling Holder's liability under the definitive transfer agreement with respect to such transaction will not exceed the total purchase price received by the Selling Holder in such

transaction except for liability resulting from fraud or knowing and willful breach. In no event shall any Affiliate (other than any Affiliate of such Selling Holder which Affiliate itself is Transferring Equity Securities (excluding any Unconverted Securities) in such transaction) of such Selling Holder be liable under such transaction, in any respect.

Section 4.3 Right of First Offer on Warrants.

4.3.1 Except pursuant to a Transfer made to a Permitted Transferee, if at any time a Holder (except for the Valitás Equity Holder) that holds Warrants (the "Selling Warrants Holder") wishes to Transfer all or any portion of such Holder's Warrants to a Third Party Purchaser, such Selling Warrants Holder shall first offer to each Majority Holder the Offered Warrants (as defined below) by sending a written notice (the "Warrants Offer Notice") to the Company, and the Company will thereafter send such Warrants Offer Notice to the Majority Holders (the "Warrants ROFO Rightholders"). The Warrants Offer Notice shall be an offer to sell and shall state the proposed terms of such Transfer, including (i) the number of Warrants such Selling Warrants Holder proposes to Transfer (the "Offered Warrants"), (ii) the proposed amount and consideration (which consideration shall be exclusively cash) and terms and conditions of payment (the "Offered Warrants Sale Price") and (iii) the other material terms and conditions of the proposed Transfer.

4.3.2 Each Warrants ROFO Rightholder shall have a period of ten (10) Business Days following the receipt of the Warrants Offer Notice (the "Warrants ROFO Evaluation Period") to accept the Selling Warrants Holder's offer by delivering a written notice (the "Warrant Purchase Notice") to the Company agreeing to purchase the Offered Warrants on the terms set forth in the Warrants Offer Notice (including the same price and with the same amount of consideration per Warrant), which Warrant Purchase Notice shall include (i) such Warrants ROFO Rightholder's election and agreement to purchase the number of Offered Warrants up to such Warrants ROFO Rightholder's entire Rightholder Ownership Percentage of Offered Warrants (each, a "Warrants ROFO Base Participating Holder"), (ii) if such Warrants ROFO Rightholder has elected to purchase its entire Rightholder Ownership Percentage of Offered Warrants, then, in such Warrants ROFO Rightholder's sole discretion, such Warrants ROFO Rightholder's election and agreement to purchase up to its entire Rightholder Ownership Percentage of the Offered Warrants not subscribed for by other Warrants ROFO Rightholders and (iii) if such Warrants ROFO Rightholder has elected to purchase, in its sole discretion, its entire Rightholder Ownership Percentage of Offered Warrants and its entire Rightholder Ownership Percentage of the Offered Warrants not subscribed for by other Warrants ROFO Rightholders (each, an "Extra Participating Warrants ROFO Rightholder", and together with the Warrants ROFO Base Participating Holders, the "Participating Warrants ROFO Rightholders"), the number of remaining Offered Warrants not purchased by other Warrants ROFO Rightholders that such Extra Participating Warrants ROFO Rightholder elects to purchase (the "Excess Warrants Portion"). If more than one Extra Participating Warrants ROFO Rightholder wishes to exercise its right to purchase all of the Excess Warrants Portion, each such Extra Participating Warrants ROFO Rightholder shall only have the right to purchase Offered Warrants with respect to such Excess Warrants Portion equal to the ratio of (i) the number of Equity Securities then held by such Extra Participating Warrants ROFO Rightholder to (ii) the total number of Equity Securities held by all Extra Participating Warrants ROFO Rightholders wishing to so exercise. Each Warrants ROFO Rightholder may assign its rights under this Section 4.3.2 to any of its Affiliates.

4.3.3 During the Warrants ROFO Evaluation Period, the Company shall not provide or discuss any Warrant Purchase Notice with any Holder; provided; however, that the Company may discuss a Warrant Purchase Notice with the Participating Warrants ROFO Rightholder who delivered such Warrant Purchase Notice. The Company shall notify in writing (such notice, the "Final Warrants Offer Notice") the Selling Warrants Holder and each Participating Warrants ROFO Rightholder within three (3) Business Days following the expiration of the Warrants ROFO Evaluation Period of the number of Offered Warrants which such Participating Warrants ROFO Rightholder has agreed to purchase pursuant to this Section 4.3. Following the time that the Selling Warrants Holder and the Third Party Purchaser agree to a mutually acceptable definitive transfer agreement in accordance with Section 4.3.5, the Participating Warrants ROFO Rightholders and the Selling Warrants Holder shall consummate the transaction contemplated by the Warrants Offer Notice within ten (10) Business Days after receipt of the Final Warrants Offer Notice. At such closing, the Selling Warrants Holder shall deliver to the Company, which shall deliver to the Participating Warrants ROFO Rightholders, the Offered Warrants. The Participating Warrants ROFO Rightholders shall, at the closing, deliver to the Selling Warrants Holder payment in full in immediately available funds for the Offered Warrants purchased by it; it being further agreed that no portion of the purchase price shall be subject to any escrow or holdback. At such closing, all the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate to effect the contemplated transactions.

4.3.4 If no Warrant Purchase Notice has been timely delivered under Section 4.3.2, if the Warrants ROFO Rightholders have not agreed to purchase all of the Offered Warrants pursuant to the terms and conditions in the Warrants Offer Notice, or if the Warrants ROFO Rightholders have failed to purchase all of the Offered Warrants pursuant to the terms and conditions in this Section 4.2, the Selling Warrants Holder shall be permitted to Transfer the remaining Offered Warrants on the terms and conditions not materially more favorable to the Selling Warrants Holder as those set forth in the Warrants Offer Notice for a purchase price in cash, net of commissions or similar expenses, that is no lower than the Offered Warrants Sale Price (a "Warrants ROFO Sale") to the Third Party Purchaser; provided, however, that such Warrants ROFO Sale is consummated within ninety (90) days after the earlier to occur of (i) the waiver by all of the Warrants ROFO Rightholders of their option to purchase the Offered Warrants and (ii) the expiration of the Warrants ROFO Evaluation Period. If such Warrants ROFO Sale is not consummated within such ninety (90) day period for any reason, then the restrictions provided for in this Section 4.3 shall again become effective, and no Transfer of Warrants may be made thereafter by the Selling Warrants Holder without again offering the same to the Warrants ROFO Rightholders in accordance with this Section 4.3.

4.3.5 At the closing contemplated by Sections 4.3.3 or 4.3.4, as applicable, the Selling Warrants Holder shall provide representations, warranties, covenants and indemnities in its individual capacity in connection with such transaction. Such representations and warranties shall be limited to customary fundamental representations and warranties regarding (i) its brokers and finders, (ii) title to its Offered Warrants, free and clear of all liens, claims and encumbrances (other than those arising under applicable securities laws and this Agreement), (iii) its authority, power and right to enter into and consummate the transaction without violating any other material agreement or applicable law, (iv) its power and right to enter into and consummate the transaction without the consent of any governmental authority or Person and (v) the absence of any required

consents for it to enter into and consummate the transaction and the absence of any registration requirements in connection therewith. The Selling Warrants Holder will only be subject to indemnification obligations with respect to breach of the foregoing representations and warranties and the Selling Warrants Holder's liability under the definitive transfer agreement with respect to such transaction will not exceed the total purchase price received by the Selling Warrants Holder in such transaction except for liability resulting from fraud or knowing and willful breach. In no event shall any Affiliate (other than any Affiliate of such Selling Warrants Holder which Affiliate itself is Transferring Warrants in such transaction) of such Selling Warrants Holder be liable under such transaction, in any respect.

Section 4.4 Tag-Along Right.

4.4.1 If a Holder or group of Holders (each, a "Selling Tag Holder") elects to Transfer shares of Common Stock representing at least thirty-five percent (35%) of the issued and outstanding shares of Common Stock to one or more Third Party Purchasers in one or a series of related transactions (excluding Transfers pursuant to a Drag-Along Sale, or pursuant to exercise of registration rights pursuant to the Registration Rights Agreement) (any such transaction, a "Tag-Along Transaction"), then following the application of Section 4.2 (if applicable), such Selling Tag Holder shall offer the other Holders (each a "Tag-Along Rightholder") the right to include in such Selling Tag Holder's Transfer to the Third Party Purchaser the Tag-Along Rightholder's Pro Rata Tag Portion of the shares of Common Stock proposed to be Transferred by the Selling Tag Holder at the same price and on the same terms and conditions described in the Tag-Along Notice (as defined below). For the avoidance of doubt, Selling Tag Holders and Tag-Along Rightholders include Holders of Warrants.

4.4.2 At least fifteen (15) days prior to the consummation of any proposed Tag-Along Transaction (a "Proposed Transfer" and such 15-day period, the "Tag-Along Notice Period"), the Selling Tag Holder proposing to make the Proposed Transfer shall offer to the other Tag-Along Rightholders the right to be included in the Proposed Transfer by sending written notice (the "Tag-Along Notice") to the Company and each of the other Holders, which notice shall (i) state the name of such Selling Tag Holder, (ii) state the name and address of the proposed Third Party Purchaser, (iii) state the portion of such Selling Tag Holders' shares of Common Stock to be sold (assuming (A) no exercise of any Warrants, (B) assuming full exercise of Warrants on a cashless basis, and (C) assuming full exercise of Warrants and payment in cash of the applicable exercise price, in each case, in connection with the Tag-Along Transaction), (iv) state the proposed purchase price and form of consideration of payment and all other material terms and conditions of such sale (including the identity of the Third Party Purchaser), (v) include a calculation of the consideration per share of Common Stock to be received by each Tag-Along Rightholder who elects to participate, (vi) include a representation that the Third Party Purchaser has been informed of the "tag-along" rights provided in this Section 4.4.2 and has agreed to purchase the shares of Common Stock in accordance with the terms hereof, and (vii) be accompanied by a written offer from the Third Party Purchaser. Such right shall be exercisable by written notice to the Selling Tag Holder proposing to make the Proposed Transfer (with a copy to the Company) during the Tag-Along Notice Period specifying the number of shares of Common Stock with respect to which such Tag-Along Rightholder shall exercise its rights under this Section 4.4.2. If the Third Party Purchaser elects to purchase less than all of the shares of Common Stock offered for sale as a result of the Tag-Along Rightholders' exercise of

their "tag-along" rights provided in this Section 4.4.2, (i) the Selling Tag Holder shall have the right to include in such sale such number of shares of Common Stock equal to such Selling Tag Holder's Pro Rata Tag Portion of the shares of Common Stock to be Transferred to the Third Party Purchaser and (ii) each Tag-Along Rightholder exercising its rights hereunder shall have the right to include in such sale its Pro Rata Tag Portion of the shares of Common Stock to be Transferred to the Third Party Purchaser on the same terms and conditions as the Selling Tag Holder, including in exchange for its respective Pro Rata Tag Portion of consideration to be received in the Transfer to the Third Party Purchaser based on its applicable portion of the shares of Common Stock being so Transferred. Failure by a Tag-Along Rightholder to respond within the Tag-Along Notice Period shall be regarded as a rejection of the offer made pursuant to the Tag-Along Notice and a decline by such Tag-Along Rightholder of its rights under this Section 4.3.

4.4.3 Each Tag-Along Rightholder shall agree (i) to make such representations, warranties, covenants, indemnities and agreements to the Third Party Purchaser as made by the Selling Tag Holder in connection with the Tag-Along Transaction (other than any noncompetition, nonsolicitation or similar agreements or covenants that would bind the Tag-Along Rightholder or its Affiliates), and (ii) to substantially the same terms and conditions to the Transfer as the Selling Tag Holder agrees (including the same consideration the Selling Tag Holder receives); provided, however, that (A) the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Tag-Along Transaction shall in no event be broader or more burdensome than those given by the Selling Tag Holder, (B) all such representations, warranties, covenants, indemnities and agreements shall be made by each Tag-Along Rightholder severally and neither jointly nor jointly and severally, (C) a Tag-Along Rightholder's liability under the definitive purchase agreement with respect to such transaction will not exceed the total purchase price received by such Tag-Along Rightholder in such transaction except for liability resulting from fraud or knowing and willful breach, and (D) any consideration, including escrow or holdbacks, applicable to such Tag-Along Transaction shall be applied pro rata among the Holders participating in the Tag-Along Transaction based on the number of shares of Common Stock participating in the Tag-Along Transaction held by such Holders. It being further agreed that in no event shall any Affiliate (other than any Affiliate of such Tag-Along Rightholder which Affiliate itself is selling its shares of Common Stock in such transaction) of such Tag-Along Rightholder be liable under such transaction, in any respect.

Section 4.5 Drag-Along Right.

4.5.1 If, prior to an Initial Public Offering, Holders of more than fifty percent (50%) of the issued and outstanding Common Stock (the "Dragging Parties") agree and determine to cause a Sale of the Company (any such transaction, a "Drag-Along Sale"), the Dragging Parties shall have the right to require all Holders (the "Dragged Stockholders") to Transfer their Drag Percentages of their respective Equity Securities to one or more Third Party Purchasers in connection with such Drag-Along Sale on terms determined by the Dragging Parties. Such right shall be exercisable by written notice (a "Buyout Notice") given to each Holder at least ten (10) Business Days prior to the consummation of such Drag-Along Sale, which shall state (i) the Drag Percentage and the number and type of Equity Securities of each Holder proposed to be Transferred to such Third Party Purchasers, (ii) the name of the Third

Party Purchasers, and (iii) the purchase price the Third Party Purchasers are paying for the Equity Securities and which attaches a copy of any definitive agreements between the Company and the other parties to the Drag-Along Sale. Each such Dragged Stockholder agrees that, upon receipt of a Buyout Notice, each such Dragged Stockholder shall be obligated to Transfer its Drag Percentage of Equity Securities for the purchase price and form and mix of consideration set forth in the Buyout Notice and upon the other terms and conditions of such Drag-Along Sale. Each share of a class of Equity Securities shall receive the same purchase price as each other share of such class of Equity Securities; provided that for this purpose the Common Stock issuable upon exercise of the Warrants shall be considered the same class as shares of Common Stock.

4.5.2 Without limiting the foregoing, in a Drag-Along Sale, each Dragged Stockholder shall vote in favor of such Drag-Along Sale and shall cooperate in the Drag-Along Sale and will take all necessary and desirable actions in connection with the consummation of the Drag-Along Sale as are reasonably requested, including by (i) waiving any appraisal or similar rights with respect to the Drag-Along Sale, (ii) executing any action by written consent of the Holders, (iii) delivering to the Company the certificate or certificates representing the Equity Securities of such Holder to be included in the Drag-Along Sale, duly endorsed, in proper form for Transfer; provided, however, that if the Drag-Along Sale is terminated, the Company shall promptly return to the Dragged Stockholder all certificates and other applicable instruments representing the Equity Securities that such Dragged Stockholder delivered for Transfer.

4.5.3 The closing with respect to any Drag-Along Sale pursuant to this Section 4.5.3 shall be held as soon as practicable and at the time and place specified in the Buyout Notice but in any event within six (6) months of the date the Buyout Notice is delivered to the Holders; provided, that such six (6) month period may be extended for a period of ninety (90) days to the extent necessary to obtain any regulatory approvals required in connection with such closing (the "Drag-Along Outside Date"). Consummation of the Transfer of Equity Securities by any Dragged Stockholder to the Third Party Purchasers in a Drag-Along Sale may be effected by a Transfer of the Equity Securities or the merger, consolidation or other combination of the Company with or into the Third Party Purchasers or their Affiliate, in one or a series of related transactions. If the proposed Transfer with respect to the applicable Equity Securities subject to the Buyout Notice does not meet the requirements of Section 4.5.1 prior to the Drag-Along Outside Date, the Dragging Parties shall be deemed to have forfeited its right to require the Dragged Stockholder to Transfer their Drag Percentages of their Equity Securities to such Third Party Purchasers in connection with such Drag-Along Sale.

4.5.4 The Company shall arrange for payment or distribution of the consideration payable or distributable by the Third Party Purchasers in the Drag-Along Sale to each Dragged Stockholder, upon delivery of an appropriate assignment in form and substance reasonably satisfactory to the Third Party Purchasers, which assignment shall be made free and clear of all liens, claims and encumbrances, except as provided by this Agreement or as otherwise agreed to by such Third Party Purchasers. In connection with any Transfer pursuant to a Buyout Notice, each Dragged Stockholder shall execute the applicable purchase agreement, if applicable, and make or provide such representations, warranties, covenants, indemnities and agreements to the Third Party Purchasers as made by the Dragging Parties (other than any noncompetition, nonsolicitation or similar agreements or covenants that would bind such

Dragging Stockholder or its Affiliates); provided, however, that each Dragged Stockholder shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Equity Securities, authorization, execution and delivery of relevant documents, enforceability of such documents against such Holder, and other matters relating to such Holder, but not with respect to any of the foregoing with respect to any other Holders or their Equity Securities; provided, further, however, that (i) all representations, warranties, covenants and indemnities in the applicable purchase agreement shall be made by the Dragged Stockholder severally and neither jointly nor jointly and severally, (ii) any indemnification obligation shall be (A) for breaches of such Dragged Stockholder's individual representations and warranties or (B) *pro rata* based for breaches of representations and warranties or covenants of the Company or any of its Subsidiaries, and (iii) any indemnification obligation shall be pro rata based on the consideration received by the Dragged Stockholder, in each case, in an amount not to exceed the aggregate proceeds received by the Dragged Stockholder in the Drag-Along Sale; provided, further, however, that Affiliated Dragged Stockholders and their Permitted Transferees may be required to provide several and not joint and several indemnities as to such Affiliated Dragged Stockholders and their Permitted Transferees and such indemnification obligations may be *pro rata* based on the aggregate consideration received by such Affiliated Dragged Stockholders and their Permitted Transferees. The Dragging Parties shall have the right to select the financial advisors, legal counsel and other advisors on behalf of all Holders in connection with the Drag-Along Sale. All reasonable and documented transaction costs, including transfer taxes and legal, accounting and investment banking fees incurred by the Company and any other Holder participating in a Transfer pursuant to a Buyout Notice shall be borne by the Company.

4.5.5 Notwithstanding anything to the contrary in this Section 4.5, there shall be no liability on the part of the Company or the Dragging Parties to the other Holders (other than the obligation to return any certificates and instruments evidencing Equity Securities) if the Transfer of Equity Securities pursuant to this Section 4.5 is not consummated for whatever reason, regardless of whether the Company or the Dragging Parties have delivered a Buyout Notice. The decision to effect a Transfer of Equity Securities pursuant to this Section 4.5 by the Board or the Dragging Parties is in the sole and absolute discretion of the Board or the Dragging Parties, as applicable. Each Dragged Stockholder, except for the Minority Holders, hereby grants to the Company or the Dragging Parties, as applicable, (i) an irrevocable proxy coupled with an interest to vote, including in any action taken by written consent, such Dragged Stockholder's Common Stock to approve any Drag-Along Sale pursuant to this Section 4.5 and (ii) an irrevocable power of attorney coupled with an interest to execute and deliver in the name and on behalf of such Dragged Stockholder all such agreements, instruments and other documentation as is required to transfer such Dragged Stockholder's Common Stock, in each case, subject to the limitations in Section 4.5.4.

Section 4.6 Conditions to Transfers. In addition to all other terms and conditions contained in this Agreement, no Transfers permitted under this Article 4 (excluding Transfers pursuant to a Drag-Along Sale in accordance with Section 4.5) shall be completed or effective unless each of the conditions set forth in this Section 4.6 has been satisfied or otherwise approved or waived by the Board on the date of such Transfer.

4.6.1 Neither the proposed Transferee nor any of its Affiliates shall be prohibited by Section 4.1.1.

4.6.2 The Holder making such Transfer shall have provided to the Company (i) at least five (5) Business Days' prior notice of such Transfer, (ii) a certificate of the Holder making such Transfer, delivered with such notice, containing a statement that such Transfer is permitted under this Article 4, together with such information as is reasonably necessary for the Company to make such determination, and (iii) such other information or documents as may be reasonably requested by the Company in order for it to make such determination.

4.6.3 The Transferee of such Equity Securities shall have executed and delivered to the Company a joinder to this Agreement substantially in the form attached hereto as Exhibit A, or in such other form and substance satisfactory to the Company, by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement.

4.6.4 If requested by the Board in its reasonable judgment within the five (5) Business Day period referenced in Section 4.6.2, the Company shall have received an opinion of counsel to the Company, at the expense of the Holder making such Transfer, reasonably satisfactory in form and substance to the Board, to the effect that: (i) such Transfer would not violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or the Equity Securities to be Transferred; (ii) such Transfer shall not impose liability or reporting obligations on the Company or any Holder thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Holder thereof becoming subject to the jurisdiction of any court or governmental entity anywhere, other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligation or jurisdiction; (iii) such Transfer would not, individually or together with other concurrently proposed Transfers, cause the Company to be regarded as an "investment company" under the Investment Company Act of 1940, as amended; and (iv) such Transfer shall not cause a dissolution of the Company or, unless the Board determines it to be immaterial, a termination of the Company pursuant to Section 708 of the Code.

4.6.5 Legends. In addition to any other legend that may be required to the extent that Equity Securities are certificated, each certificate for Equity Securities shall bear a legend in substantially the following form (the "First Sentence"):

"THIS SECURITY IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH IN A STOCKHOLDERS AGREEMENT, A COPY OF WHICH MAY BE OBTAINED UPON REQUEST FROM THE COMPANY OR ANY SUCCESSOR THERETO. IN ADDITION, THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY FOREIGN OR STATE SECURITIES LAWS AND

MAY NOT BE TRANSFERRED, OFFERED OR SOLD EXCEPT IN COMPLIANCE THEREWITH."

If any Equity Securities cease to be subject to any and all restrictions on Transfer and all other obligations set forth in this Agreement, the Company, upon the written request of the Holder thereof, shall issue to such Holder a new certificate evidencing such Equity Securities without the First Sentence endorsed thereon. The Company may request that the Holder provide a written opinion of legal counsel reasonably acceptable to it stating that such Equity Securities are freely transferable under the Securities Act.

## ARTICLE 5

## INSPECTION AND INFORMATION RIGHTS

Section 5.1 Periodic Reports.

5.1.1 The Company will furnish to each Holder as soon as available, and in any event within ninety (90) days after the end of each fiscal year of the Holdco (or such longer period as determined by the Board and approved by the Holders holding a majority of the issued and outstanding Common Stock), the consolidated balance sheet of the Holdco and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income, of stockholders' equity and of cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal year and a report on such consolidated balance sheets and financial statements by independent certified public accountants of recognized national standing which report shall state that such consolidated financial statements present fairly the consolidated financial position of the Holdco and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and that the examination by such accountants was conducted in accordance with generally accepted auditing standards; provided, that if the terms of the Credit Agreements require Holdco to prepare financial statements on a different level (other than Holdco), then the Company will furnish to each Holder the financial statements so prepared; provided, further, that if the agent or the lenders under the Credit Agreements are provided with any additional or more frequent financial reporting, then the Company will furnish to each Holder such additional or more frequent financial reporting.

5.1.2 The Company will furnish to the Holders as soon as available, and in any event within forty-five (45) days (or such longer period as determined by the Board approved by the Holders holding a majority of the issued and outstanding Common Stock) after the end of each of the first three quarterly periods in each fiscal year of the Holdco, the consolidated balance sheet of the Holdco and its Subsidiaries as at the end of such quarterly period and the related consolidated statements of income, of stockholders' equity and of cash flows for such quarterly period and of the elapsed portion of the fiscal year ended with the last day of such quarterly period, and in each case prepared in accordance with GAAP and setting forth comparative consolidated figures for the related periods in the prior fiscal year, subject to normal year-end audit adjustments, all in reasonable detail and certified by the principal financial or accounting officer of the Company; provided, that if the terms of the Credit Agreements require Holdco to prepare financial statements on a different level (other than Holdco), then the

Company will furnish to each Holder the financial statements so prepared; provided, further, that if the agent or the lenders under the Credit Agreements are provided with any additional or more frequent financial reporting, then the Company will furnish to each Holder such additional or more frequent financial reporting.

5.1.3 The Company may make available the information described in Sections 5.1.1 and 5.1.2 on a password-protected website that is available to Holders and their actual or potential Transferee(s) of all or a portion of the Common Stock (or other Equity Security) owned, held or controlled by such Holder (other than to Competitors). As a condition to gaining access to the information that may be posted on any such website, such Persons shall be required to "click through" or take other affirmative action pursuant to which such Persons shall either (i) confirm and ratify that it is a party to, any bound by all of the terms and provisions of, this Agreement, or (ii) acknowledge its confidentiality obligations in respect of such information and agree to bid by the terms of this Agreement related to Confidential Information.

5.1.4 The Company, upon reasonable prior notice, will allow any Holder that (together with its Permitted Transferees) holds more than five percent (5%) of the outstanding and issued Common Stock and is not a Competitor general access to information relating to all assets, properties and business records of the Company for inspection and copying during normal business hours.

5.1.5 Confidential Information regarding the Company and its Subsidiaries provided to any Holder or any representative or designee of a Holder (other than a Competitor) pursuant to this Article 5 shall be held in confidence and not disclosed to any other Person (other than such Holder's affiliates and its and their respective officers, directors, employees, representatives and advisors to or on behalf of whose request such disclosure is made (collectively, "Confidentiality Affiliates")) for so long as such Confidential Information remains confidential (provided, that Holders may share such Confidential Information with a prospective Transferee of Equity Securities, subject to such prospective Transferee entering into a customary confidentiality agreement with the prospective Transferor). Each Holder shall be responsible for any breach of this Section 5.1.5 by any of its Confidentiality Affiliates or prospective Transferees unless any such Person enters into a confidentiality agreement directly with the Company.

## ARTICLE 6

## TERMINATION

This Agreement shall terminate upon the earliest of (i) a Sale of the Company, (ii) the effectiveness of an Initial Public Offering, or (iii) the affirmative vote of the Holders (together with their Permitted Transferees) of at least ninety percent (90)% of the issued and outstanding Common Stock over which such Holders (together with their Permitted Transferees) have voting power or control and which are entitled to vote at any meeting of Holders for the election of the Board at the time of such termination; provided, that Article 1, this Article 6 and Article 7 shall survive any termination of this Agreement; provided, further, that in the event that this Agreement is terminated, Section 5.1.5 shall also survive any termination of this Agreement in

accordance with its terms and shall be automatically extended until such date that is two (2) years following the date of termination of this Agreement.

## ARTICLE 7

## MISCELLANEOUS

Section 7.1 Notices. Any notices or other communications required or permitted hereunder shall be in writing, and shall be sufficiently given if made by hand delivery, by facsimile or registered or certified mail, postage prepaid, return receipt requested, addressed as follows (or at such other address as may be substituted by notice given as herein provided):

If to the Company:

Valitás Holdings, Inc.
103 Powell Court
Brentwood, Tennessee 37027
Attention: Karey L. Witty, President and Chief Executive Officer
Email: karey.witty@corizonhealth.com
Facsimile No.: +1 629 333 7284

with a copy (which shall not constitute notice) to:

Paul Hastings LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Attention: Brian Richards
Matt Murphy
Email: brianrichards@paulhastings.com
mattmurphy@paulhastings.com
Facsimile No.: +1 312 499 6170
+1 312 499 6136

If to any Holder, at its address and the address of its representative, if any, listed on the signature pages hereof.

Any notice or communication hereunder shall be deemed to have been given or made as of the date so delivered if personally delivered; when receipt is acknowledged, if telecopied; and on receipt if sent by courier or registered or certified mail.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

Section 7.2 Governing Law; Venue; Jurisdiction. THIS AGREEMENT AND ALL CLAIMS OR CAUSES OF ACTION (INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS

AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. Each party hereby agrees that any action based upon, arising out of or relating to this Agreement (including any action concerning the violation or threatened violation of this Agreement) shall be heard and determined in any state or federal court sitting in the Court of Chancery of the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, in the United States District Court for the District of Delaware), and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. In addition, each party consents to process being served in any such lawsuit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address in effect for notices hereunder, and agrees that such services shall constitute good and sufficient service of process and notice thereof. The consents to jurisdiction set forth in this paragraph shall not constitute general consents to service of process in the State of Delaware and shall have no effect for any purpose except as provided in this Section 7.2 and shall not be deemed to confer rights on any Person other than the parties hereto. Nothing in this Section 7.2 shall affect or limit any right to serve process in any other manner permitted by law.

Section 7.3 **Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT WHETHER BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS AGREEMENT. EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

Section 7.4 Successors and Assigns. This Agreement shall be binding upon the Company, each Holder, and their respective successors and permitted assigns.

Section 7.5 Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be

considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 7.6 Severability. Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction is, as to such jurisdiction, ineffective to the extent of any such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof, or affecting the validity, enforceability or legality of such provision in any other jurisdiction. Upon a determination that any provision of this Agreement is prohibited, unenforceable or not authorized, the parties hereto agree to negotiate in good faith to modify this Agreement in accordance with Section 7.8 so as to effect the original intent of the parties hereto as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

Section 7.7 Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, including if the parties hereto fail to take any action required of them hereunder. It is accordingly agreed that, in addition to any other applicable remedies at law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (i) the other party has an adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or in equity. Each of the parties hereto hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (ii) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 7.8 No Waivers; Amendments.

7.8.1 No failure or delay on the part of the Company or any Holder in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the Company or any Holder at law or in equity or otherwise.

7.8.2 Any provision of this Agreement may be amended, modified or waived if, but only if, such amendment, modification or waiver makes specific reference to this Agreement, and, is with the written consent of Holders of at least sixty-six point seven percent (66.7)% of the issued and outstanding shares of Common Stock; provided, however, that (x) any amendment, modification or waiver that has the effect of adversely affecting any Holder or group of Holders differently than any other Holder or group of Holders shall only be effective against such Holder(s) with the prior written consent of such Holder(s), (y) any amendment, modification or waiver to the threshold required to terminate this Agreement pursuant to clause (iii) of Article 6 shall require the prior written consent of the Holders that would be sufficient to exercise such termination right and (z) any amendment, modification or waiver, that would adversely affect the

rights or obligations of any Holder in respect of the provisions set forth in Article 2, Article 3, Article 4, Article 5, Section 7.8, Section 7.9, or Section 7.10 (and any of the definitions used therein) shall require the prior written consent of the majority vote of the issued and outstanding Common Stock held by all Majority Holders and the majority vote of the issued and outstanding Common Stock held by all Minority Holders, and with respect to Article 5, shall also require the prior written consent of the Valitás Equity Holder. Any amendment, modification or waiver effected in accordance with this Section 7.8.2 shall be binding upon each party to the Agreement, regardless of whether such party has signed such amendment or waiver, each then current and future holder of all such Equity Securities and the Company.

Section 7.9 Waiver of Corporate Opportunities.

7.9.1 Each Holder (who is not also an employee of the Company or any of its Subsidiaries), each member of the Board (other than an employee of the Company or any of its Subsidiaries), each member of any board of directors, board of managers or similar governing body of any Subsidiary of the Company (other than an employee of the Company or any of its Subsidiaries), and any one or more of the respective Affiliates, managers, directors, principals, officers, employees and other representatives of each such Holder, member of the Board (or committee thereof) or member of any board of directors, board of managers or similar governing body of any Subsidiary of the Company who is not (in any such case) also an employee of the Company or any of its Subsidiaries (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Company or any of its Subsidiaries or any of their respective Affiliates, directly or indirectly, now engage or may engage or other business activities that overlap with, are complementary to, or compete with those in which the Company or any of its Subsidiaries or any of their respective Affiliates, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity"). No Identified Person shall have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity or (ii) otherwise competing with the Company or any of its Subsidiaries or any of their respective Affiliates. No Identified Person shall have any duty or obligation to refer or offer to the Company or any of its Subsidiaries or any of their respective Affiliates any Opportunity, and the Company and the Holders hereby renounce any interest or expectancy of the Company in, or in being offered, an opportunity to participate in any Opportunity which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries or any of their respective Affiliates.

7.9.2 In the event that any Identified Person acquires knowledge of a potential transaction or other corporate (or analogous) or business opportunity which may be an Opportunity for the Company or any of its Subsidiaries or any of their respective Affiliates, such Identified Person shall have no duty to communicate or offer such Opportunity to the Company or any of its Subsidiaries or any of their respective Affiliates and shall not be liable to the Company or the Holders for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

7.9.3 The Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (such entities, collectively, "Related Companies") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Company, any of the Holders or any of their respective Affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Company, any of the Holders or any of their respective Affiliates, (c) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Company, any of the Holders or any of their respective Affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Company, any of the Holders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Company, any of the Holders or any of their respective Affiliates in any such business or as to any such opportunities.

Section 7.10 Non-Recourse; Non-Petition.

7.10.1 All claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties in the preamble to this Agreement ("Contracting Parties"). No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach; and, to the maximum extent permitted by law, each Contracting Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Non-Party Affiliates.

7.10.2 Notwithstanding anything to the contrary in this Agreement, the parties hereto may not institute against any Holder, or join, cooperate with or encourage any other Person in instituting against any of the Holders, any bankruptcy, winding-up, reorganization,

arrangement, insolvency, moratorium, receivership or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law so long as any notes (the "CLO Notes") issued under a Holder's indenture or credit agreement shall be outstanding with respect to such Holder, if applicable, that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement) and there shall not have elapsed one year (or, if longer, the applicable preference period the in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands) plus one day, since the last day on which the applicable CLO Notes shall have been outstanding.

Section 7.11 Recapitalization; Exchanges; Affecting Securities. The provisions of this Agreement shall apply, to the full extent set forth herein with respect to any and all Equity Securities or equity securities of any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise, including shares issued by a parent company in connection with a triangular merger) which may be issued in respect of, in exchange for, or in substitution of shares of Common Stock, appropriately adjusted for any stock dividends, splits, reverse splits, combinations, reclassifications and the like occurring after the date hereof.

Section 7.12 Aggregation of Equity Securities. Except as otherwise explicitly stated in this Agreement (including with respect to instances when Unconverted Securities are not taken into account), all Equity Securities held by a Holder, its Affiliates and its other Permitted Transferees shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

Section 7.13 Further Assurances. Each party shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 7.14 Entire Agreement. This Agreement (including all schedules and exhibits hereto) contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters.

[Remainder of Page Intentionally Left Blank]

SIGNATURES TO STOCKHOLDERS AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the date first written above.

**COMPANY**

VALITÁS HOLDINGS, INC.

By: ______________________________
Name: Karey L. Witty
Title: President and Chief Executive Officer

**VTS WARRANT HOLDINGS LLC**

By: GSO COF Facility LLC
Its: Manager

By: ______________________________
Name: Marisa Beeney
Title: Authorized Signatory

Notice Information
Address: GSO Capital Partners
345 Park Avenue, 31st Floor
New York, New York 10154
Attention: Vince Lu
Eric Nadan
Facsimile:
Email: vincent.lu@gsocap.com
eric.nadan@gsocap.com

VALITÁS EQUITY LLC

By: [signature]
Name: Karey L. Witty
Title: President and Chief Executive Officer

Notice Information

| | |
|---|---|
| Address: | c/o Beecken Petty O'Keefe & Company<br>131 South Dearborn Street<br>Suite 2800<br>Chicago, Illinois 60603 |
| Attention: | Kenneth O'Keefe<br>M. Troy Phillips |
| Facsimile: | (312) 435-0371 |
| Email: | kokeefe@bpoc.com<br>tphillips@bpoc.com |

Cedar Funding II CLO Ltd

By: Krystle Walker

Name: Krystle Walker
Title: Associate Director - Settlements

ADDRESS: 1301 Fannin, Ste 1700, Houston
Texas 77002

Cedar Funding IV CLO, Ltd.

By: Krystle Walker
Name: Krystle Walker
Title: Associate Director - Settlements

ADDRESS: 1301 Fannin, Ste 1700, Houston
Texas 77002

Transamerica Floating Rate ______, as a Lender

By: AEGON USA Investment Management, LLC, as Investment Manager

By: ________________________________
Name: Jason Felderman
Title: Vice President ____________________

ADDRESS: 4333 Edgewood Road, NE

Cedar Rapids, IA 52499________________

**ANCHOR BANK, N.A.**

By: ______________________________
Name: Scott Sousek
Title: Senior Vice President

Notice Information
Address: Special Assets Group
Anchor Bank, N.A.
1360 Duckwood Drive,
Eagan, MN 55123

Attention: Scott Sousek
Facsimile: 651-675-4666
Email: Scott_Sousek@anchorlink.com

IVY HILL ASSET MANAGEMENT, L.P.

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
245 Park Avenue, 44th Floor
New York, NY 10167

With a copy to:

IVY HILL MIDDLE MARKET CREDIT FUND VII, LTD.
By: Ivy Hill Asset Management, L.P., as Asset Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

IVY HILL MIDDLE MARKET CREDIT FUND IX, LTD.
By: Ivy Hill Asset Management, L.P., as Asset Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

IVY HILL MIDDLE MARKET CREDIT FUND IV, LTD.
By: Ivy Hill Asset Management, L.P., as Portfolio Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

IVY HILL MIDDLE MARKET CREDIT FUND V, L.P.
By: Ivy Hill Asset Management, L.P., as Portfolio Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

IVY HILL MIDDLE MARKET CREDIT FUND X, LTD.
By: Ivy Hill Asset Management, L.P., as Asset Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

PRIVATE DEBT STRATEGIES FUND IV, L.P.
By: Ivy Hill Asset Management, L.P., as Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

EMPORIA PREFERRED FUNDING I, LTD.
By: Ivy Hill Asset Management, L.P., as Collateral Manager

By: ______________________
Name: Kevin R. Braddish
Title: Duly Authorized Signatory

ADDRESS:
c/o Ivy Hill Asset Management, L.P.
245 Park Avenue, 44th Floor
New York, NY 10167

**BANK OF AMERICA, N.A.**

By: ______________________________
Name: Heather Strickland
Title: Senior Vice President

ADDRESS:
100 N. Tryon St.
NC1-007-27-02
Charlotte, NC 28255

______________________________

**BARCLAYS BANK PLC**

By: Nicole Webb [signature]
Name: Nicole Webb
Title: Authorized Signatory

ADDRESS:
700 Prides Crossing, 2nd Floor, Newark, DE 19713

BARCLAYS BANK PLC

By: ______________________
Name: Vanessa A. Kurbatskiy
Title: Vice President

ADDRESS:

Address for notices:
Barclays Bank PLC
745 Seventh Avenue
New York, NY 10019
Attn: Jake Lam/Annie Rogosky
Email: Jake.Lam@barclays.com/ ltmny@barclays.com
Facsimile: 212-526-5115

with a copy to

Weil, Gotshal & Manges LLP
767 5th Avenue
New York, NY10153
Attn: Damian Ridealgh
Email: Damian.Ridealgh@weil.com
Facsimile: 212-310-8007

**BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.**
By: BlueMountain Capital Management, LLC, its investment manager

By: ______________________
Name: David M. O'Mara
Title: Deputy General Counsel

ADDRESS:
C/O BlueMountain Capital Management, LLC, 280 Park Ave, 12th Floor, New York, NY 10017

With a copy to:

**BLUEMOUNTAIN KICKING HORSE FUND L.P.**
By: BlueMountain Capital Management, LLC, its investment manager

By: ______________________
Name: David M. O'Mara
Title: Deputy General Counsel

ADDRESS:
C/O BlueMountain Capital Management, LLC, 280 Park Ave, 12th Floor, New York, NY 10017

With a copy to:

**BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF**
By: BlueMountain Capital Management, LLC, its investment manager

By: ______________________
Name: David M. O'Mara
Title: Deputy General Counsel

ADDRESS:
C/O BlueMountain Capital Management, LLC, 280 Park Ave, 12th Floor, New York, NY 10017

With a copy to:

**BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND L.P.**
By: BlueMountain Capital Management, LLC, its investment manager

By: ______________________
Name: David M. O'Mara
Title: Deputy General Counsel

ADDRESS:
C/O BlueMountain Capital Management, LLC, 280 Park Ave, 12th Floor, New York, NY 10017

With a copy to:

**BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.**
By: BlueMountain Capital Management, LLC, its investment manager

By: ______________________________
Name: David M. O'Mara
Title: Deputy General Counsel

ADDRESS:
C/O BlueMountain Capital Management, LLC, 280 Park Ave, 12th Floor, New York, NY 10017

With a copy to:

**BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.**
By: BlueMountain Capital Management, LLC, its investment manager

By: ______________________________
Name: David M. O'Mara
Title: Deputy General Counsel

ADDRESS:
C/O BlueMountain Capital Management, LLC, 280 Park Ave, 12th Floor, New York, NY 10017

With a copy to:

Healthcare Financial Solutions, LLC

By: ______________________________
Name: Ryan Guenin
Title: Duly Authorized Signatory
Address:
Capital One
Healthcare Finance – 6th Floor
Two Bethesda Metro Center
Bethesda, MD 20814

With a copy to:

WILLIAM A. HOLLEY III, Esq.
Director, Assistant General Counsel
Capital One Financial Corporation
299 Park Avenue
New York, New York 10171

William.Holley@capitalone.com
(646) 836-5274

PACIFIC WESTERN BANK

By: ______________________
Name: Audrey Yen
Title: Authorized Signatory

ADDRESS:
CapitalSource A division of Pacific Western Bank
Attn: CreditAdmin Portfolio Manager
5404 Wisconsin Ave, 2nd Floor
Chevy Chase, MD 20815

Courage Credit Opportunities Onshore Fund III, LP

By:____________________________
Name: Richard Patton
Title: Chief Manager

Address: 4400 Harding Rd, Suite 503
Nashville, TN 37205

Courage Credit Opportunities Offshore Master Fund III, LP

By:________________________________
Name: Richard Patton
Title: Chief Manager

Address: 4400 Harding Rd, Suite 503
Nashville, TN 37205

**ATRIUM V**
By: Credit Suisse Asset Management, LLC, as collateral manager
**ATRIUM VII**
**ATRIUM IX**
**ATRIUM X**
**ATRIUM XI**
By: Credit Suisse Asset Management, LLC, as portfolio manager
**CREDIT SUISSE FLOATING RATE HIGH INCOME FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor
**CREDIT SUISSE NOVA (LUX)**
By: Credit Suisse Asset Management, LLC or Credit Suisse Asset Management Limited, each as Co-Investment Adviser to Credit Suisse Fund Management S.A., management company for Credit Suisse Nova (Lux)
**CREDIT SUISSE STATEGIC INCOME FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor
**MADISON PARK FUNDING III, LTD.**
**MADISON PARK FUNDING IV, LTD.**
**MADISON PARK FUNDING V, LTD.**
**MADISON PARK FUNDING VI, LTD.**
By: Credit Suisse Asset Management, LLC, as collateral manager
**MADISON PARK FUNDING VIII, LTD.**
**MADISON PARK FUNDING IX, LTD.**
**MADISON PARK FUNDING X, LTD.**
**MADISON PARK FUNDING XI, LTD.**
**MADISON PARK FUNDING XII, LTD.**
**MADISON PARK FUNDING XIII, LTD.**
**MADISON PARK FUNDING XIV, LTD.**
**MADISON PARK FUNDING XV, LTD.**
**MADISON PARK FUNDING XVI, LTD.**
**MADISON PARK FUNDING XVII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
**STATE OF NEW MEXICO STATE INVESTMENT COUNCIL**
By authority delegated to the New Mexico State Investment Office
By: Credit Suisse Asset Management, LLC, as its manager
**SENIOR SECURED FLOATING RATE LOAN FUND**
By: Credit Suisse Asset Management, LLC, the Portfolio Manager for Propel Capital Corporation, the manager for Senior Secured Floating Rate Loan Fund

By: ______________________
Name: Louis Farano
Title: Authorized Signatory

ADDRESS: One Madison Avenue, New York, NY 10010

Emerson Park CLO LTD.
By: GSO / Blackstone Debt Funds Management LLC
as Collateral Manger

By: ______________________________
Name: Thomas Iannarone
Title: Authorized Signatory

ADDRESS:
345 Park Avenue, 31st Floor
New York, NY 10154

**MIDCAP FINANCIAL TRUST**

By: Apollo Capital Management, L.P.,
its investment manager

By: Apollo Capital Management GP, LLC,
its general partner

By: ______________________________
Name: Maurice Amsellem
Title: Authorized Signatory

ADDRESS:
7255 Woodmont Ave., Suite 200
Bethesda, MD 20814
Attention: Valitas Account Manager
Facsimile: 301-760-7600
Email: legalnotices@midcapfinancial.com

**MIDCAP FUNDING H TRUST**

By: Apollo Capital Management, L.P.,
its investment manager

By: Apollo Capital Management GP, LLC,
its general partner

By: ______________________________
Name: Maurice Amsellem
Title: Authorized Signatory

ADDRESS:
7255 Woodmont Ave., Suite 200
Bethesda, MD 20814
Attention: Valitas Account Manager
Facsimile: 301-760-7600
Email: legalnotices@midcapfinancial.com

**MIDCAP FUNDING K TRUST**

By: Apollo Capital Management, L.P.,
its investment manager

By: Apollo Capital Management GP, LLC,
its general partner

By: ______________________________
Name: Maurice Amsellem
Title: Authorized Signatory

ADDRESS:
7255 Woodmont Ave., Suite 200
Bethesda, MD 20814
Attention: Valitas Account Manager
Facsimile: 301-760-7600
Email: legalnotices@midcapfinancial.com

Venture VI CDO Limited
BY: its investment advisor, MJX Asset Management, LLC

By: ______________________
Name: Kenneth Ostmann
Title: Managing Director

ADDRESS: 12 E 49th Street, 29th Floor, NY, NY 10017

Venture VII CDO Limited
BY: its investment advisor, MJX Asset Management, LLC

By: ______________________
Name: Kenneth Ostmann
Title: Managing Director

ADDRESS: 12 E 49th Street, 29th Floor, NY, NY 10017

Venture VIII CDO, Limited
BY: its investment advisor, MJX Asset Management, LLC

By: ______________________
Name: Kenneth Ostmann
Title: Managing Director

ADDRESS: 12 E 49th Street, 29th Floor, NY, NY 10017

Venture IX CDO, Limited
BY: its investment advisor, MJX Asset Management LLC

By: ______________________
Name: Kenneth Ostmann
Title: Managing Director

ADDRESS: 12 E 49th Street, 29th Floor, NY, NY 10017

ROSEDALE CLO LTD.
By: Princeton Advisory Group, Inc.
the Collateral Manager

**[•]**

By: ______________________
Name: Sumit K. Sinha
Title: Sr. Analyst______________________

**ADDRESS:**
700 Alexander Park, Suite 103
Princeton, NJ 08540

With a copy to:

[Joy Sheehan]

By: [**Rosedale CLO LTD**]

ROSEDALE CLO LTD.
By: Princeton Advisory Group, Inc
the Collateral Manager

By: ______________________
Name: Sumit K. Sinha
Title: Sr. Analyst

ADDRESS:

700 Alexander Park, Suite 103
Princeton, NJ 08540

**REGIONS BANK**

By: ______________________
Name: J. Richard Baker
Title: Senior Vice President

ADDRESS:
4790 Poplar Avenue
Memphis, Tennessee 38117

With a copy to:

Baker, Donelson, Bearman,Caldwell & Berkowitz, PC
420 North 20th Street
1400 Wells Fargo Tower
Birmingham, Alabama 35203
Attention: Timothy M. Lupinacci

Stearns Bank National Association

By: ______________________________
Name: Eric Cook
Title: Vice President

ADDRESS:
4191 2nd St S
St. Cloud MN 56301

With a copy to:

Stearns Bank National Association
Attn: Greg Misterman, CCO
4191 2nd St S
St. Cloud MN 56301

Telos CLO 2007-2, Ltd.

Telos CLO 2013-3, LTD

Telos CLO 2013-4, LTD

Telos CLO 2014-5, LTD ,

Management by: Telos Asset Management LLC, as collateral servicer

By: ______________________________
Name: Jonathan Tepper
Title: Managing Director

Notice Information
Address: 780 Third Ave, Flr 22 New York, NY 10017

Attention: Jonathan Tepper
Facsimile:
Email: tam@Telosasset.com

GSO COF FACILITY LLC, as sole purchaser under the Note Purchase Agreement

By: ______________________________
Name: MARISA BEENEY
Title: AUTHORIZED SIGNATORY

Notice Information

| | |
|---|---|
| Address: | GSO Capital Partners<br>345 Park Avenue, 31st Floor<br>New York, New York 10154 |
| Attention: | Vince Lu<br>Eric Nadan |
| Facsimile: | |
| Email: | vincent.lu@gsocap.com<br>eric.nadan@gsocap.com |

# Schedule I(a)

## Bluemountain Capital Management

- BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND LP
- BLUEMOUNTAIN KICKING HORSE FUND LP
- BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF
- BLUEMOUNTAIN FOINAVEN MASTER FUND LP
- BLUEMOUNTAIN GUADALUPE PEAK FUND LP
- BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND LP

## Credit Suisse Alternative Capital

- CHIAX-CS FLOATING RATE HIGH INCOME FUND
- CREDIT SUISSE NOVA (LUX) US
- CSOIX - CREDIT SUISSE STRATEGIC INCOME FUND
- MADISON PARK FUNDING VI LIMITED
- ATRIUM V
- MADISON PARK FUNDING V LIMITED
- MADISON PARK FUNDING III LIMITED
- MADISON PARK FUNDING IX LIMITED
- MADISON PARK FUNDING X LIMITED
- MADISON PARK FUNDING XI LIMITED
- MADISON PARK FUNDING XII LIMITED
- CREDIT SUISSE FLOATING RATE HIGH INCOME FUND
- ATRIUM VII
- MADISON PARK FUNDING VIII LIMITED

- CREDIT SUISSE STRATEGIC INCOME FUND
- ATRIUM IX
- MADISON PARK FUNDING IV LIMITED
- ATRIUM X
- STATE OF NEW MEXICO STATE INVESTMENT COUNCIL
- SENIOR SECURED FLOATING RATE LOAN FUND
- MADISON PARK FUNDING XIII LIMITED
- MADISON PARK FUNDING XIV LIMITED
- ATRIUM XI
- CREDIT SUISSE NOVA (LUX)
- MADISON PARK FUNDING XVII LIMITED
- MADISON PARK FUNDING XVI LIMITED
- MADISON PARK FUNDING XV LIMITED

**Ivy Hill Asset Management**

- IVY HILL MIDDLE MARKET CREDIT FUND X, LTD.
- EMPORIA PREFERRED FUNDING I LIMITED
- IVY HILL MIDDLE MARKET CREDIT FUND IV LIMITED
- IVY HILL MIDDLE MARKET CREDIT FUND V LIMITED
- PRIVATE DEBT STRATEGIES FUND IV LP
- IVY HILL MIDDLE MARKET CREDIT FUND VII LIMITED
- IVY HILL MIDDLE MARKET CREDIT FUND IX LIMITED

**Schedule I(b)**

GSO COF FACILITY LLC

**Schedule I(c)**

VALITÁS EQUITY LLC

## Schedule I(d)

**Bluemountain Capital Management**

- BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND LP
- BLUEMOUNTAIN KICKING HORSE FUND LP
- BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF
- BLUEMOUNTAIN FOINAVEN MASTER FUND LP
- BLUEMOUNTAIN GUADALUPE PEAK FUND LP
- BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND LP

**Credit Suisse Alternative Capital**

- CHIAX-CS FLOATING RATE HIGH INCOME FUND
- CREDIT SUISSE NOVA (LUX) US
- CSOIX - CREDIT SUISSE STRATEGIC INCOME FUND
- MADISON PARK FUNDING VI LIMITED
- ATRIUM V
- MADISON PARK FUNDING V LIMITED
- MADISON PARK FUNDING III LIMITED
- MADISON PARK FUNDING IX LIMITED
- MADISON PARK FUNDING X LIMITED
- MADISON PARK FUNDING XI LIMITED
- MADISON PARK FUNDING XII LIMITED
- CREDIT SUISSE FLOATING RATE HIGH INCOME FUND
- ATRIUM VII
- MADISON PARK FUNDING VIII LIMITED
- CREDIT SUISSE STRATEGIC INCOME FUND

- ATRIUM IX
- MADISON PARK FUNDING IV LIMITED
- ATRIUM X
- STATE OF NEW MEXICO STATE INVESTMENT COUNCIL
- SENIOR SECURED FLOATING RATE LOAN FUND
- MADISON PARK FUNDING XIII LIMITED
- MADISON PARK FUNDING XIV LIMITED
- ATRIUM XI
- CREDIT SUISSE NOVA (LUX)
- MADISON PARK FUNDING XVII LIMITED
- MADISON PARK FUNDING XVI LIMITED
- MADISON PARK FUNDING XV LIMITED

**Exhibit A**

ACKNOWLEDGMENT AND AGREEMENT

The undersigned wishes to receive from [__________] ("Transferor") [_________] shares, par value $0.001 per share, of Common Stock (the "Common Shares") of Valitás Holdings, Inc., a Delaware corporation (the "Company");

The Common Shares are subject to that certain Stockholders Agreement, dated as of April [14] 2017, and as further amended from time to time (the "Agreement"), by and among the Company and the stockholders of the Company party thereto;

The undersigned has been given a copy of the Agreement and afforded ample opportunity to read it, and the undersigned is thoroughly familiar with its terms;

Pursuant to terms of the Agreement, the Transferor is prohibited from transferring the Common Shares and the Company is prohibited from registering the transfer of the Common Shares unless and until the recipient of the Common Shares acknowledges the terms and conditions of the Agreement and agrees to be bound thereby; and

The undersigned wishes to receive the Common Shares, have the Company register the transfer of the Common Shares and become a Holder (as defined in the Agreement).

NOW, THEREFORE, in consideration of the mutual premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce the Transferor to transfer the Common Shares to the undersigned and the Company to register such transfer, the undersigned does hereby acknowledge and agree that (i) the undersigned has been given a copy of the Agreement and ample opportunity to read it, and the undersigned is thoroughly familiar with its terms and (ii) the undersigned, as a Holder, is, and the Common Shares are, subject to the terms and conditions set forth in the Agreement.

This ________ day of ________, 20__.

[NAME OF TRANSFEREE]

By: ______________________________________
Name:
Title:

# <u>Exhibit B</u>

## Management Incentive Plan Term Sheet

**CONFIDENTIAL**

**CORIZON HEALTH INC.**
***Management Incentive Plan Term Sheet***

The following describes the principal terms of the Management Incentive Plan (the Plan") to be adopted by Corizon Health Inc. and certain of its affiliated entities (collectively, the "Company") in connection with the Company's emergence from a potential chapter 11 restructuring. This term sheet does not contain all of the terms and conditions of the Plan.

| | |
|---|---|
| Overview | Incentive Equity Pool. The Company will reserve exclusively for management and other employees (the "Employees") a pool of equity interests representing 10% of the Company's equity interests (the "MIP Pool") determined on a fully diluted basis taking into account any future equity interests issued).<br><br>Omnibus Stock Plan. An omnibus stock plan will be adopted providing for grants of various types of awards (e.g. stock options, restricted stock, restricted stock units, stock appreciation rights, etc.)<br><br>Initial Grants. On emergence, initial grants equal to 9% of the MIP Pool will be made in the form of restricted stock units. Of such initial grants, 3.5% of the MIP Pool will be granted to the Company's chief executive officer. The remaining MIP Pool will be allocated by the compensation committee of the Company's board of directors following emergence in consultation with a compensation consultant and the chief executive officer.<br><br>Future Grants. Future grants are expected to be made from remaining MIP Pool and forfeited unvested awards to address executive departures. |
| Vesting | • Time Vesting: 50% of the restricted stock units will vest 25% on the first through fourth anniversaries of the grant date, subject to continued employment on such date.<br><br>• Performance Vesting: 50% of the restricted stock units will vest based on achievement of performance targets to be established by the board of directors following emergence in consultation with a compensation consultant and the chief executive officer.<br><br>• Unvested equity awards would be forfeited on termination of employment for any reason.<br><br>• Termination of both vested and unvested equity awards on termination for "cause."<br><br>• All unvested equity awards vest on Change in Control.<br><br>  ○ "Change in Control" shall be defined generally as, (i) any |

| | |
|---|---|
| | person or group, other than a Lender Entity, acquires ownership, directly or indirectly, of more than 50% of the total voting power of the voting equity of the Company, including by way of merger, consolidation, reorganization or otherwise or (ii) the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its subsidiaries other than to a "Lender Entity". "Lender Entities" shall mean the [insert Lenders]. |
| Repurchase/Call Rights | Following termination of employment for any reason other than cause, Company has discretionary repurchase/call right for equity at fair market value on the date of repurchase. For termination for cause, repurchase price is lower of fair market value on the date of repurchase or purchase price paid by employee. Repurchase price paid at option of Company in either lump sum or annual installments over 3 years, subject to such longer period as may be required by the Company's credit facilities. |
| Restrictive Covenants | Non-competition, non-solicitation of employees, customers, suppliers, etc. for one year post-termination of employment. |
| Transfers | Subject to approval by the compensation committee of the Company's board of directors, equity awards may be transferred to permitted transferees for estate planning purposes, subject to joinder agreement and other customary restrictions. |