# EXHIBIT CC

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
CHAPTER 11

CASE NO.: 2:26-bk-01087-FMR
Jointly Administered

In re:
CHS FL, LLC, ET AL,,
Debtors.
--------------------------------------------

VIDEOTAPED DEPOSITION OF
DAVID GOLDWASSER
Taken on Behalf of the Statutory Unsecured Claimholders' Committee

DATE TAKEN: Wednesday, June 17, 2026
TIME: Commencing at 10:04 a.m.
PLACE: All parties appeared via video teleconference

Examination of the witness taken before:
Melissa England, CSR

APPEARANCES FOR THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE

LUIS SALAZAR, ESQ.
MICHAEL SOLIMANI, ESQ.
Cole Schotz, P.C.
2121 Southwest 3rd Avenue, Suite 200
Miami, Florida 33129
(305) 374-4848
lsalazar@coleschotz.com
msolimani@coleschotz.com
and
DANIEL DESATNIK, ESQ.
EHUD BARAK, ESQ.
JORDAN SAZANT, ESQ.
Proskauer Rose, LLP
11 Times Square
New York, New York 10036
(212) 969-3000
ddesatnik@proskauer.com
ebarak@proskauer.com
jsazant@proskauer.com

APPEARANCES FOR THE DEBTORS
JAMES MARTIN, ESQ.
JEREMY JOHNSON, ESQ.
TRINITEE GREEN, ESQ.
Polsinelli, P.C.
7676 Forsyth Boulevard, Suite 800
St. Louis, Missouri 63105
(314) 889-8000
jmartin@polsinelli.com
jeremy.johnson@polsinelli.com
tggreen@polsinelli.com

APPEARANCES FOR MATTHEW DUNDON, WIND-DOWN OFFICER

NICHOLAS ZLUTICKY, ESQ.
MORGAN LAWRENCE, ESQ.
Stinson, LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
(816) 842-8600
nicholas.zluticky@stinson.com
morgan.lawrence@stinson.com

APPEARANCES FOR M2 LOANCO

KEVIN NASH, ESQ.
Goldberg, Weprin, Finkel, Goldstein, LLP
125 Park Avenue
New York, New York 10017
(212) 221-5700
knash@gwfglaw.com

APPEARANCES FOR THE TORT CLAIMANT

NICHOLAS LAFALCE, ESQ.
Anthony & Partners
100 South Ashley Drive, Suite 1600
Tampa, Florida 33602
(813) 868-7889
nlafalce@anthonyandpartners.com

ALSO PRESENT

Darin Weaver, Videographer
Jeb Bland, Province, LLC
Ali-Marcelle Lee-Sin, Paralegal

* * *

INDEX


| | Page No. |
|---|---|
| Direct Examination by Mr. Salazar | 8 |
| Direct Examination by Mr. Zluticky | 218 |
| Certificate of Oath | 284 |
| Certificate of Reporter | 285 |
| Errata Sheet | 286 |
| Read and Sign Letter | 287 |


* * *

EXHIBITS


| No. | Description | Page No. |
|---|---|---|
| 1 | Notice of Taking Deposition | 13 |
| 2 | Document Requests to Debtors | 21 |
| 3 | Debtors' Expedited Motion for Entry of Interim, Final Orders Authority to Use Cash Collateral | 79 |
| 4 | Declaration of David Goldwasser in Support of the Debtors' Chapter 11 Petitions and First Day Relief | 83 |
| 5 | Preliminary Review of General Ledger Data | 94 |
| 6 | Notice of Filing Amended Consolidated Chapter 11 Case Management Summary | 105 |
| 7 | June 4, 2026, e-mail | 119 |
| 8 | Criminal Docket for Case No. 7:03-cr-00785-CLB-1 | 136 |
| 9 | Debtors' Emergency Motion | 162 |
| 10 | Related Entity Services Agreement | 164 |

EXHIBITS (cont.)


| No. | Description | Page No. |
|---|---|---|
| 11 | December 13, 2021, E-mail Chain | 188 |
| 12 | January 31, 2022, E-mail | 189 |
| 13 | June 26, 2021, E-mail Chain | 189 |
| 14 | August 9, 2021, E-mail Chain | 192 |
| 15 | Amended U.S. Corporation Income Tax Return | 199 |
| 16 | 2026 Florida Limited Liability Company annual Report | 207 |
| 17 | Voluntary Petition for Non-Individuals Filing for Bankruptcy | 209 |
| 18 | Declaration of David Goldwasser | 267 |

THE VIDEOGRAPHER: We're going on the record. The time is 10:04 a.m. Today is Wednesday, June 17, 2026. Please note this deposition is being conducted virtually.

Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded. Audio video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of David Goldwasser taken by the counsel for the credit committee in the matter of the bankruptcy of CHS FL, LLC, et al, filed in the United States Bankruptcy Court, Middle District of Florida, Fort Myers division, case number 2:26-bk-01087-M -- pardon me, -FMR.

This deposition is taking place via Zoom. My name is Darin Weaver. I represent Veritext Legal Solutions. I'm the videographer. Court reporter is Melissa England also from Veritext Legal Solutions.

I'm not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at

the time of your appearance.

Counsel and all present, including those remotely, will now state their appearance and affiliation for the record beginning with the noticing attorney.

MR. SALAZAR: Thank you very much. Luis Salazar of Cole Schotz, P.C. I represent the Statutory Unsecured Claimholders' Committee. And with me from my firm are Ali-Marcelle Lee-Sin, L-E-E S-I-N, I'll be calling her name throughout the deposition, and Michael Solimani. I think that's everyone. Thank you.

MR. MARTIN: Yes. This is James Martin from Polsinelli, P.C. I'm counsel for the debtors. Along with me is my partners Jeremy Johnson and Trinitee Green.

MR. ZLUTICKY: Good morning. This is Nicholas Zluticky from the law firm of Stinson, LLP. I'm here with my colleague Morgan Lawrence. I represent Matthew Dundon in his capacity as wind-down officer for Tehum Care Services, Inc. That's T-E-H-U-M. And also as the GUC trustee for the Tehum GUC Trust. GUC is G-U-C.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

WHEREUPON,

DAVID GOLDWASSER

was adduced as the deponent herein, and being first duly sworn upon oath, was questioned and testified as follows:

THE WITNESS: I do affirm.

THE VIDEOGRAPHER: Thank you.

Counsel, you may proceed.

MR. SALAZAR: Thank you.

DIRECT EXAMINATION

BY MR. SALAZAR

Q. Good morning, Mr. Goldwasser. Luis Salazar on behalf of the committee, as I mentioned. I'm going to dive right in. You've been deposed before?

A. I have, sir.

Q. Few times? Okay. So I'm going to skip right to some of the things -- usually check the box with. I don't often like to start this way, but it make sense, I think, here.

I'm going to start with your background, right? So you are currently principal of FIA Capital Partners, correct?

A. That's correct, sir.

Q. Are you the sole owner of that company?

A. I am, sir.

Q. Okay. So FIA, as I understand it from looking

at your website, from what I've read about you, handles restructuring and bankruptcy matters, correct?
A. That's correct, sir.
Q. And also you provide real estate services, correct?
A. We work within -- within the real estate -- we work within the real estate field. Not specifically real estate services, but we coordinate a lot of real estate restructuring -- yeah -- yes, we work with real estate, but we're -- I'm saying we're not a management company, per se. That's -- that's what I was trying to clarity.
Q. So more advisory services; is that fair?
A. Yes.
Q. Okay.
A. Yes, yes.
Q. And that, as I -- as I've read, again, a lot online, it suits your background 'cause you have a very -- tremendous amount of experience in real estate, correct?
A. I have a lot of experience in real estate and crisis management, that's correct.
Q. Okay. And some of that -- again, I read some of your interviews about your background. You were formerly a director of acquisition for real estate companies and family offices, correct?

A. Yes.
Q. And you were regional project manager for NICON Construction down here in the sunny state of Florida, right?
A. That is also true, correct.
Q. So -- and you mention also, again, you do offer services to the real estate area. You were -- and you've been recognized for that, right? 'Cause you were -- I think it was Ones to Watch, I think I saw in the New York Real Estate Journal. You were interviewed. You were highlighted, correct?
A. Could be.
Q. Yes. You've also been -- certainly there's a lot of articles on the Real Deal about the kind of real estate restructuring services that you provide, right?
A. That is what I am infamous for.
Q. Exactly. Right. And that's really your -- that's -- that's your sweet spot is the --
A. That's the --
Q. -- real estate --
A. That -- that is currently the largest part of the practice. That's correct.
Q. Okay. All right. And is it fair to say that you don't have any specific healthcare experience?
A. As far as running a healthcare company, no. We

have been involved in healthcare restructurings for different nursing home operators, different types of assisted living operators in the past and have been in -- in the end around the industry.

Q. Understood. And that -- that -- typically those ALS restructurings also involve a real estate component, correct?

A. A combination of both. A combination of both. That's correct.

Q. Is it fair to say that this is your first correctional healthcare restructuring assignment?

A. I would -- it's fair to say correctional health -- healthcare, this would be the first assignment, yes.

Q. So let me ask a little bit about where you went to school. Did you go to Post University; is that right?

A. Yes.

Q. Okay. So that's your most recent higher education; is that fair?

A. That -- that would be a fair statement, yes.

Q. What degree, if any, did you graduate from Post University?

A. A prelaw degree.

Q. Okay. Did you complete your studies? Did you actually get a degree?

A. I did.
Q. Okay. And now, I guess earlier you went to Touro University, correct?
A. That's correct, yes.
Q. What -- what did you study there?
A. Business.
Q. Okay. Likewise, you graduated with a degree?
A. I did not finish that. I did not finish that degree. I had children and I went to work. And I did not get to finish at that point.
Q. All right. All right. Thank you for that.
MR. SALAZAR: All right. So I'm going to turn now to -- I'm going to ask Ms. Lee-Sin -- again, she's my paralegal. You'll hear me call out to her. She's going to help me with the exhibits.
Ms. Lee-Sin, can you pull up the original notice of this deposition, please. Thank you.
BY MR. SALAZAR
Q. Mr. Goldwasser, you said you're been deposed before. You've also done these virtual depositions as well?
A. I have.
Q. Yeah. All right. So you know I have to -- I'm going to show you some of these -- these documents. I'm going to ask you to identify them if possible or tell you

what they are. And I can only show you this little sliver here. So if you want to see more, let me know. But I'm going to show you what I'll represent --

MR. SALAZAR: And we're going to mark as Exhibit 1 for this deposition is the original notice of your -- of your deposition as -- as the 30(b)(6) witness for the debtors.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 1 was marked for identification.)

BY MR. SALAZAR

Q. Did you see that notice?

A. I did, sir.

MR. SALAZAR: Okay. Now, let me ask, Ms. Lee-Sin, could you turn to the topics. It should be about page -- you have it. Thank you.

BY MR. SALAZAR

Q. Now, tell me the steps you took once you received this notice to prepare for today's deposition.

A. I reviewed the document. Discussed -- well, reviewed the document. Understood what I do know, what I believe I do know, what I do and I don't know. Discussed things that I needed to know and/or looked through files.

Then discussed with counsel as to what I would be able to testify to, what I would not be able to testify to specifically at this point, and what would

possibly need some more time to be able to get together as this was done in short order.

Q. Let me -- I'm going to tackle that issue that you -- you --

A. Sure.

Q. -- that you mentioned, what you are here for and what you're not here for.

A. Uh-huh.

Q. Yesterday we were advised that you would not be prepared -- not be presented on topics -- and then Mr. Martin maybe can chime here -- topics 1 through 9, correct?

A. So far just -- yeah, he has the -- he has the numbers and those. You know, I didn't have notes on that.

Q. Yeah. Okay. So let you off the hook here, Mr. Goldwasser. I'm just going to confirm with Mr. Martin here a moment.

A. Sure.

MR. SALAZAR: You're not presenting him for 1 through 9, correct?

MR. MARTIN: Correct.

MR. SALAZAR: And then this morning, again, a minute before we started, Mr. Martin, you receiv- -- I received another list from you on -- where he's

not designated to testify today. So I -- I'm going to read those into the record. I'm going off your e-mail. Topic 1 through 9 we talked about.

MR. MARTIN: Yes.

MR. SALAZAR: Topics 12 through 13?

MR. MARTIN: Correct.

MR. SALAZAR: Topic -- topic 18 through 21 and then 32?

MR. MARTIN: Yes, those are all -- so just to clarify what those are. Those are all topics that would just require additional time to gather information.

MR. SALAZAR: Understood. Topic 34 and then topic 39?

MR. MARTIN: Yeah. Topic 34 just says he'll be able to -- prepared to generally describe the engagement terms, but we are not waiving our objection to producing the engagement, which is a similar objection that we raised to the request for production number 10.

MR. SALAZAR: Understood. Okay. So then topic 39?

MR. MARTIN: Correct.

MR. SALAZAR: Uh-huh. 41 through --

MR. MARTIN: We objected to the -- that's --

that's an objection we also raised to document request number 27. So we looked at those as the same.

MR. SALAZAR: All right. Topics 41 to 43?

MR. MARTIN: Correct. And then for 42 there was a similar document request that was request 26. For 43 we objected to a similar document request, which was number 27.

MR. SALAZAR: All right. Then 45 and 48.

MR. MARTIN: Yes. So for those, subject to and without waiving the -- our objections to the similar document request, which were 31 and 37 respectively, Mr. Goldwasser will be prepared to provide testimony for those two topics.

MR. SALAZAR: Understood. All right. So just to -- for the sake of the record, we don't agree that this is timely. We may oppose these limitations or make -- make something of it later. But let me turn back to Mr. Goldwasser.

BY MR. SALAZAR

Q. So Mr. Goldwasser, other than what we just talked about on the record, you're prepared to testify on the remaining topics, correct?

A. Yes.

Q. All right. Now, you said you -- when you

received the document, you said that you -- you discussed some of the topics. With whom did you discuss the topics?

A. Who -- whoever it might be pertinent, whether it be somebody in my staff or somebody at the company. Again, it would be dependent upon each one of the questions, right, and/or documents.

But, you know, I have a lot of the stuff in my own files and e-mails that I have had being gathered. So it would just be pertinent to each -- call it question or group, but no one in specificity for the entirety.

Q. Okay. So give me some names. Who -- who -- who did you speak to? You said you spoke to a number of people, but who specifically did you speak to, to educate yourself about these topics?

A. So I'll give a generality because obviously each one will have its own name. But I have Mr. Yitz Taub, Isaac Taub, who works for FIA. I have Mark Taub who works for FIA. I have Karen Menendez who works for FIA.

I did speak with Jeff Sholey. I think he has a different legal name, but I call him Jeff Sholey. I think it's (video teleconference interference) Jeff Sholey. With Jimmy Sprouse and sometimes with Scott King.

There might have been somebody else at the company that might have asked for a specific question, but those -- those are the general people that I have been speaking with in relation to most of -- most of this.

Q. All right. You -- you mentioned you reviewed some documents or files. Tell me, how exactly did you go about that? What documents did you review?

A. Again, it will be specific to -- to the questions, you know. I'm -- I'm not trying to be obstructive. I'm just saying, you know, there's -- I have many e-mails obviously, you know, throughout getting stuff together. So I reviewed that, whatever we might have in our files.

And if I needed something, I would ask for it. But I don't think that in specifically preparing for this I needed to ask anybody to produce any additional documents. I might have just needed to refresh myself from documents I'd previously seen.

Q. Is -- was there any document or information that you needed that the debtors failed to provide you to prepare for this deposition?

A. Not for timing. There's nothing -- there's nothing that I've ever asked for that I've not actually gotten. If it was not for timing purpose -- I mean,

again, just because of the schedules and the plethora of information for that and dealing with the payroll and complications, technical complications of that, you know, we've had a lot of activities. But there's nothing I've ever asked for that I've not gotten.

Q. But document-wise, I should be clear --

A. Yes, yes. I'm sorry. Yes.

Q. Yeah. So building on that, let me ask you: My understanding is that our financial advisor, Michael Atkinson, and his team at Province --

A. Uh-huh.

Q. -- attempted to meet with you and speak with you, get some information about -- about what's going on at the company. And you did not make those calls. Is there a reason why you didn't make yourself available?

A. In the first instance I was in another hearing. It was not intentional. And then upon trying to make sure we got everything together for -- for whatever we were producing here and the schedules, we didn't have that much time. And since we're producing here, being duplicative of the production, under advisement from counsel, was not a smart idea.

Q. Okay. So you did not -- and just to be clear, you did not, in fact, meet with our financial advisor, correct?

A. People from my team did meet with your financial advisor.
Q. Understood. You did not though, right?
A. I was -- I was in another court proceeding at the time that we had scheduled. I had moved it twice. And I did not want to move it further. I had them give him a call. And that's what happened.
Q. But you did not attend, correct?
A. No. I was in another court proceeding at the time.
Q. Thank you.
MR. SALAZAR: Ms. Lee-Sin, you can take this down. And I'd ask you to bring up the -- the document request, please.
BY MR. SALAZAR
Q. Mr. Goldwasser, while she pulls that up, I see you're turned sideways and looking down. Is there -- are you looking at something?
A. I just have the -- I'm sorry. I just -- I just have the notice in front of me. Yeah. Sorry.
Q. All right.
MR. SALAZAR: Ms. Lee-Sin, can you scroll down to the notice itself, please. All right. Ask you to pause there.
So Mr. Goldwasser, I want to show you what's

been marked Exhibit 2 for identification.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 2 was marked for identification.)
BY MR. SALAZAR
Q. It's the -- I'll shorten the name to the document request that we served on the debtors. Have you seen this document before?
A. I believe so, yes.
Q. All right. Tell me what steps the debtors took to find responsive documents to this request.
A. We went through the request. Put together a spreadsheet. Sent that to the appropriate parties who would be getting the information together. And requested it to be sent back in. And then created a file folder for it. And started populating the file folder.
Q. When you said we went through it, who -- who was involved in going through the -- the request?
A. My staff, Mr. -- two Mr. Towsends, Menendez.
Q. Are they related, by the way? Are they -- are they -- just happen to be --
A. Just happen -- I tell everybody they're cousins, the story, but they have no relation.
Q. They're not? That's -- that's funny.
A. It is funny. And -- and they both have very -- whatever. Yes, it's funny.

Q. Okay. All right. All right. Now, you said you created a spreadsheet that you circulated to -- to try to obtain these documents; is that right?

A. Yeah. Just, you know, as a checklist just to make sure that, you know, we separated who does what. So this way it wouldn't be duplicative. And then, you know, check off the stuff when we would get it.

Q. Right. And now, I believe this was --

MR. SALAZAR: Ali, can we scroll --

Ms. Lee-Sin, can you scroll up, please. Sorry, the other direction.

BY MR. SALAZAR

Q. So this was served ten days ago on June 7th. When did you begin gathering the documents?

A. I don't know exactly. Either -- either the 7th or the 8th. But, you know, upon -- upon receipt we started to put everything in process.

Q. Is that still an ongoing process? Are -- is your -- are you -- is the debtor still gathering documents?

A. I think there's a combination of gathering the documents while we were doing the schedules at the same time. But yes, it's not something that was put on the side.

Q. All right.

A. Again, just a matter of the schedules being a little bit overcomplicated and getting the production together at the same time. It was just a little taxing on the staff. But we -- we do -- definitely have been working on it. We have meetings on this, you know, daily to -- to manage the time for both processes.

Q. Having said that, you realize that you produced about 60 documents total in response in that ten-day period. Do you understand that? I mean, not a lot --

A. If that's -- if that's what we've produced so far then -- then -- then I believe you. I'm not -- I don't have it in front of me, obviously. And I'm not sure what was sent over to counsel and what was sent over to you. But if you're saying you only got 60 documents, then I will believe you, obviously.

MR. SALAZAR: Ms. Lee-Sin, can you turn to, on page 9, the first two requests, please.

BY MR. SALAZAR

Q. Mr. Goldwasser, so on Exhibit 2 for identification, the deposition notice, I'm going to -- I'm going to draw your attention to these two first requests, right?

So one -- and bear with me while I read into the record -- is copies of the credit agreement and all related documents including, without limitation, any

exhibits, schedules, amendments, modifications, closing binders, fairness opinions, valuation analysis, solvency analysis, board minutes, schedule of guarantors, management presentations, draft agreements, exhibits, and annexes concerning or reflecting negotiations or supplement thereto or restatements thereof.

Will you admit that I read that accurately?

A. Pretty good. Pretty good.

Q. Yeah. Some experience.

A. Yeah.

Q. So can you confirm for me that the debtors have produced their entire, what we call, loan file, all the loan documents related to the -- the M2 LoanCo loan?

A. I was going to ask you -- so I have provided all the documents to counsel in relation to the M2 loan and whatever predecessor documents, which was from many years ago, in the different iteration of the company.

I did research to get that. Went through all of the -- with the company, their e-mails, and got the -- I believe the closing packages and sent them over to counsel for them to be able to send over to you.

Q. Thank you. So the credit agreement and related documents, you sent that complete package to counsel for production, correct?

A. That is correct.

Q. Okay. And you said it was -- it was many years ago, but the loan documents are -- they're roughly from about 2021? Isn't that when -- when it was from?

A. I believe so, yes. I don't have it in front of me. Yeah. Many years ago versus, you know, something in the last year. And definitely not since I've been around the company.

Q. So let me turn your attention to number two. I'm going to -- request number two on Exhibit 2. And I'll read -- again, I'm going to read through this. All documents evidencing or concerning the purported secured status of any and all claims held by M2 including, without limitations, any UCC filings, deposit account control agreements, and any other documents related to the attachment, perfection, priority, and scope of M2's purported interest in debtors' assets.

Again, can you confirm that I read that accurately?

A. I believe you did.

Q. All right. Now, same question with respect to number two. Did you turn over all the documents responsive to number two relating to the secured claim of M2?

A. All the documents that I was able to get were turned over.

Q. Right. Do you feel there's something that was -- you say you were able to get. Are there documents that you were unable to get of --
A. No. I -- as I said earlier, I believe, what I provided for one and two are one in the same, meaning the collection of documents I got and -- and information. Or, you know, I don't mean -- not one in the same, but two different paragraphs are the same, but different things that are being requested. But in what I sent over covers one and two.
Q. Understood. All right. All right. Let's --
MR. SALAZAR: Ms. Lee-Sin, you can take this down for the moment.
BY MR. SALAZAR
Q. So you started working for the debtors in summer -- in the summer of 2025, correct?
A. The summer or September, but towards the end of 2025. I don't have exact dates in front of me, but it was somewhere between August and September.
Q. All right. Well, your declaration says summer of --
A. Yeah, right. I just -- we live in Florida, right? Summer's a little bit subjective, but yes.
Q. All right. So explain to me how -- how did you come to be involved? Who reached out to you? How did

you -- how did you get involved? Again, given -- I know you -- restructuring work, but with a strength in real estate. How did you get involved in this case?

A. Mr. Lefkowitz, Isaac Lefkowitz reached out to me as I had been acquainted with him in the past some -- from some social times. And he, I believe, got a reference to call out to me from a different either attorney or somebody else in the construction world in order to discuss the fact that he was, I believe, at the time either backed up or going to be backed up on his payments for the settlement with the trusts from the Corizon case, the Corizon Tehum case.

And that he wanted to know if I had ability to help him either negotiate or find some alternative financing to some degree and assist in that process or in -- with that situation, I guess is the right way to say it.

Q. Well, you must have answered in the -- in the positive 'cause you actually started assisting him or offering your services, right?

A. Yes, I did.

Q. Okay. So tell me specifically what the scope of your engagement was at that time.

A. In generality, to try to see if there was a way to work with the trust to get either an extension or a

modification of that settlement agreement. I got introduced to the company itself, Mr. Sholey, Mr. King at the company, in discussing what the company looked like at their -- I guess their general financial situation.

The fact that they were having problems making the payments. And, you know, to see if there was a situation either that would make sense to borrow money in order to make the payments or, as I said, try to renegotiate the agreement. Which eventually we did get to negotiate some settlement and restructuring of some of the past due payments.

Q. Let me -- let me stop you there 'cause we're going to -- I'm going to ask you about that a little bit.

A. Sure, yes.

Q. You're going to have an -- you had an engagement letter at that time you started, right?

A. I don't believe I had an engagement letter at the time. I might have had a -- I might have had an informal agreement in relation to that.

Q. So explain to me what does that mean, informal agreement?

A. Informal in the fact that it was not a narrowly based agreement at the time. And to be determined later upon a restructuring, I didn't get a formal engagement

agreement.
Q. Let me be clear -- let me make sure I understand your answer.
A. Sure.
Q. So you did not -- you did not have a written engagement agreement when you started in you say the summer of 2025, correct?
A. That's correct.
Q. All right. And -- and in terms of compensation, the informal --
A. Yes.
Q. -- agreement you had made that compensation somehow connected to a successful restructuring?
A. Modification or restructure, yes.
Q. Okay. But also we talked about earlier you have extensive experience in restructuring in Chapter 11, right? So having you --
A. Yes.
Q. -- on board was also potentially preparation for Chapter 11?
A. Potentially. Was -- was not something they were looking for, but, you know, that always has -- in restructurings, you know, that does happen.
Q. Understood. All right. So when -- so you mentioned it was -- so you -- you were on board before

the -- before the debtors defaulted on their payment to the Tehum Trust, correct? So --
A. I think -- I think they had already defaulted or were in partial -- or were in some partial default. The official default wasn't called at that point, but there was -- there was a payment or some series of forward payments or inconsistency at the time.
And they wouldn't -- again, at the time purportedly in default, but not in strict compliance with the agreement. But there was no actual default called for purposes of technicality.
Q. All right. Can you explain to me what was your understanding of why the debtors at that time were unable to make those required payments?
A. The cash flow of the company was not sufficient to make the size of payments that were required under the settlement.
Q. This was well before the -- David, I lost your camera, Mr. Goldwasser.
A. Yeah. I'm sorry. I apologize. My -- I didn't realize my -- one of my other systems. Okay. Fixed that.
Q. No problem. Your -- these defaults were well before the judgment that was obtained by Kohchise Jackson. That was like in 2026, correct?

A. That's correct.
Q. All right. Just a moment. Now, you mentioned a moment ago that -- that maybe you had been an acquaintance of Mr. Lefkowitz. But had you worked with him prior to your engagement in 2025 on -- we'll get there.
A. I think we worked on some potential transactions a few years -- a few years prior to that.
Q. What kind of transactions?
A. Real estate in nature.
Q. Okay. So he knew you from -- from that -- from those transactions as well?
A. Yes, yes.
Q. Had you been retained by any of his entities directly in connection with those transactions?
A. An entity of his? No.
Q. Yeah. In other words, were you working with him or for him on those -- on those transactions or you were just involved in those deals?
A. With him, not for him.
Q. Okay. So are you saying you co-invested with him on some real estate --
A. No, no. I never -- I never invest- -- I never invested with him, no.
Q. Okay. Just a moment. So when did you

transition -- let me -- let me back up a second. You mentioned there was a -- a default. And eventually there was some arrangement reached with the trust to ensure those defaults, correct?

A. Yes.

Q. Okay. What -- what changed that made the debtors believe they can actually meet those payments?

A. The -- there were two burdens. There were two burdens. One was the accrued amount that was not paid and two was the payments to be made. The real goal was to reduce the amount on a monthly payment.

But that was not attainable through the negotiations. We were not able to get that agreed upon for reasons that the trust, you know, felt that they needed to keep to certain timelines. Not bringing any -- obviously those discussions in here.

And then finally got to a point where there was at least a slotted payback of the past due with the current payments that were previously agreed upon. And, you know, those were agreed to be made, which were more than the previous payments.

And your question is: Why would somebody agree to pay more if they couldn't pay that amount? So there was -- there -- there were two large contracts. Well, one was Alabama was going out, again, for RFP to stay in.

Philadelphia was also going out.

Again, for RFP it was believed to continue to retain those two. And there was another contract, which would put the company into a different level, the size of Alabama type of a contract, maybe even a little bit larger.

Which, if that was attained, would then be able to make the payments under the settlement agreement and properly, you know, solidify the company to close to a billion dollars in revenue and -- and, you know, move it to where the original vision was.

And it would easily make the payments at that point in time. So it was a doubling down of efforts to build the company further, which was, you know, the original goal, and be able to make those payments and, you know, be a stable company.

Q. All right. So as I understand, your answer is the -- the debtor believed that it could make those cure payments because it -- it hoped that these three contracts would -- they would attain these three contracts, which would provide the necessary support to make the payments?

A. Yes, sir.

Q. Okay. Did those three contracts not come through?

A. Those three contracts did not come through, no. Well, two -- two were renewal -- call them renewals, but two were, you know -- would be incumbent contracts, but they still have to go out to bid and entertain other providers.

And then the third one was one that was being sought anew and not one of the previously held contracts. So it was -- they were for the same contracts already held. And one was a new contract.

But if all three were gotten, then it would be, you know, to the point where the payments would be afforded even with the increased amounts due to paying back the prior missed payments.

Q. At what point in time did you -- what point in time did you formalize -- let me start again.

At some point in time you became the CRO. But prior to that, did you enter into a formal engagement agreement with the company unrelated to being a CRO?

A. No.

Q. Okay.

A. Only -- only -- only at the time of becoming a CRO.

Q. Okay. But up to that time when you became the CRO -- or say it another way. Prior to that time for the services you rendered, were you paid by the company, by

the debtors?
A. Yes, I was.
Q. Okay. Approximately how much were you paid?
A. I believe it was $125,000 in total.
Q. Okay. Now, what -- when did you form- -- formally become -- or become engaged as chief restructuring officer?
A. The word "formally," I would say loosely formally -- I'll -- I'll be clear. When the Kohchise Jackson judgment came in, I was contacted on an emergent basis to come and assess filing bankruptcy in order to stop the seizure of the assets and try to keep the company going.
I don't have the date in front of me, but that was the date I was, you know, brought back in, per se, in order to address the current crisis of the company. And at some point between then and the filing was officially appointed CRO. But that's when I was called back in, we'll call it, upon the entry of that judgment. And immediately they went to seize all the assets.
(Mr. Nash entered the virtual conference room.)
Q. At that point in time did you enter into a formal agreement for CRO services?
A. We did enter into an agreement of what my services are, which is $50,000 a month, and then the

hourlies for my staff whenever it would be needed specifically.

Q. So to be clear, there is a -- a written agreement providing a standard engagement letter?

A. Yeah. Was not formalized at that time, but that was the -- that was the discussion as to what the terms would be.

Q. Okay. Since that time have you entered into a formal written engagement agreement or -- to provide CRO and you support services?

A. Yes.

Q. Okay. Now, I don't see any kind of application to be retained as a CRO on the court's docket. Do you intend to seek authority to -- to act as CRO?

A. I believe that counsel has that or -- I believe it should have been filed or it was supposed -- but I'll leave to counsel as to where -- where that would be. I'm not -- I'm not trying to evade the question, but yes, that -- that is a standard operating procedure.

Q. All right. Okay. So to be clear, you're not intention- -- you're not intentionally refusing or -- or deciding not to seek that approval, it just has not been filed yet?

A. Correct. I mean, it was a pre-petition appointment of CRO. But yes, looking for official

recognition is not something we're looking to withhold whatsoever.

I think we only filed one of the other retentions yesterday. It was not an intentional -- for one of the attorneys. It was nothing on the intentional basis.

Q. Just a moment. Were you provided any kind of pre-petition retainer or was FIA provided a pre-petition retainer or both?

A. I myself as a person was not. I operate through FIA in a professional capacity, even though my name might be the restructuring officer. But we -- we get retained through FIA and I get designated as the restructuring officer. I'm just -- our -- our standard practice.

Q. Yeah. Understood.

A. Yes, we did get -- we did get a retainer.

Q. Do you recall the amount of that retainer?

A. I believe it was -- I believe it was $75,000 or 100,000. I know it sounds right, but I believe it was 75,000, but it might have been 100, just the way that we got the money and it calculated.

Q. One of the professionals in this -- one of the debtors' professional, Mr. Delado (phonetic) --

A. Yes.

Q. -- received his retainer, approximate amount $50,000 from FIA. Why -- why was that?

A. FIA was given the money to pay the professionals upfront in the capacity of running the restructuring (crosstalk) done before.

Q. So your testimony is that FIA received all the retainer funds and then distributed them?

A. Yes, sir.

Q. Okay.

A. That's why I said my calculation might be -- it's between 75 and $100,000 due to me paying -- me -- FIA paying for filing fees and whatnot. So there are some -- there was supposed to be $100,000, which is less because I had to pay additional fees in respect to the filing.

Q. So FIA advanced --

A. Yes.

Q. -- the fees for the filing?

A. No, no, no. We received fees to pay for the professionals. And part of that went to pay for filing fees. So it's just less than 100,000. I just don't have the gap calculation.

Q. Okay. Now, a group of debtors filed on -- gosh. It was May -- May 8. Am I right?

A. Yes. May 8th was the first date, yes.

Q. All right. So why did -- why does -- why was there -- other debtors filed later, correct, about the 13th?
A. I believe that's -- sounds about the right date.
Q. Okay. All right. So why the first batch and then why the second batch? What -- what -- what was the decision to file that limited group first?
A. Well, potentially the first -- specific -- specificity to counsel if I'm not satisfactory in my answer. But there were -- we were determining how many of the entities actually needed to go into bankruptcy as there were -- there are many official subsidiaries that had either no operations or no contracts.
And the determination was, I believe, four or five that we filed the first day were the ones that had the immediate issues that were pertinent to those specific days.
And then through the analysis determined the other subsequent entities needed to be filed as well. So we filed them soon thereafter to make sure that we got all the appropriate entities filed.
Q. So when you say that that first group had immediate issues, what -- what were those immediate issues?

A. Well, the immediate issue for filing was not being able to make the payroll. But the first entity we filed was in -- is -- was in -- what's -- the contractors being threatened to be terminated, I think.
I'm trying to think. I had a word in my mind. I don't remember what it was. But we were potentially going to lose a contract and wanted to be able to use whatever payrolls we could not to lose the contract. The other entities had to do with some of the other potential contracts that -- which were being lost and/or needed to deal with the payroll issue.
Q. Let me stop you and ask you. So part of the reason of filing those entities was to be able to preserve the contracts?
A. Yes.
Q. Okay. And then the second thing you said -- you mentioned is the debtors were -- were unable to make payroll. What -- what caused the debtors to, you know, be -- suddenly be unable to make payroll?
A. The income as in going through the company -- there was no cash. You know, full stop, there was no cash to make payroll is number one. So it's not that the money was sitting there and wasn't being made. There was no cash to make the payroll.
That's why the payroll wasn't made. There were

some receivables to be had. I do not believe that there were enough receivables to be able to get in the cash as we're seeing now through post-filing to be able to make the payroll and sustain a company.

So it was not as profitable at that point. Some of the -- you know, those in Alabama obviously brought down a tremendous loss of revenue. There were cracks in the system. As I'm going through the financials, there were cracks in the system prior to the filing.

But the company did not have additional credit or funds available to float until the rest of the receivables would be coming in. And they were just not able to make the payroll at that point, period. I mean, just -- that's -- the company had financial strain.

Q. Yeah. And you said cracks in the system. What became apparent after you reviewed? What cracks are you referring to?

MR. MARTIN: I'm going to -- hold on a second. I'm going to object. And I think (interference) this is all basically topic one. It's all pre-petition and conduct and reasons for that.

I think the -- given you enough for background. I'd like to keep moving towards cash collateral motion topics and wage topics. That might be a

little more efficient.

MR. SALAZAR: James, I understand. Again, I disagree with you. I think this is related to cash collateral. But I'd like to just finish this line of questioning before -- I'm actually pretty close to wrapping up this section anyway.

MR. MARTIN: That's fine.

BY MR. SALAZAR

Q. Mr. Goldwasser, you had said there were -- your review had revealed some cracks in the system that were --

A. It's a generality of a statement. I don't mean like a specific item that stuck out. Just a matter of the amount of -- a lot had to do with paying out the settlement payments for the trusts and, you know, not having the extra income through those periods.

I know that some payments were missed. And I'm not -- but, you know, the drain of funds from that had a strain over the prior year. And I think there were certain accounts payable that accrued over time where some of those payments were made versus other items.

And it was apparent to me that the payments from -- that went to the trusts definitely -- definitely had an impact. Partial impact maybe -- you know, fatal maybe. But, you know, having to make those extra

payments in order to stay alive.

Along with all the litigation that goes with correctional health, as you mentioned before. You know, I did a lot of research to understand the industry. And, you know, there are some cracks in that system, which is more of what I was referring to.

Not specifically the YesCare umbrella. But, you know, it's a very tough business, we'll say. So that's what I was referring to when I meant cracks in the system. I did not mean to allude to any specific issue.

Q. Right. All right. Let me -- so let me switch gears a little bit. I want to cover some other topics.

A. Sure.

Q. I'm going to go kind of through a list of players here so I make sure I understand who folks are. So first of all, we left off a moment ago that you are -- you're CRO for the -- for all the debtors, correct?

A. Correct.

Q. All right. (Crosstalk). I'm sorry. Let me say it another way. Are you also CRO for any non-debtors?

A. I believe. I believe the way that the -- that the resolution read was YesCare and affiliates. So it was meant to cover any of the entities which might have been created -- which might have had some operation --

I'll be a little clearer. YesCare and its affiliates has a list of many different entities that were created in specific states thinking that they would take contracts into specific states.

That did not occur. Some did, some didn't. So when I say YesCare and affiliates, there are some -- I'm going to use the word non-debtor entities. But there were nonoperative debtor entities or nonoperative non-debtors entities that were just listed and created under the YesCare umbrella. So by theory, yes, but not by actuality because they're nonoperative and they're just documents.

Q. Are you -- understood. Do you hold any other position with any other company that Mr. Lef- -- Lefkowitz or any of his companies owns?

A. No. I have nothing to do with anything else.

Q. Okay. I'm going to read a bunch of names to you. So do you know who --

A. Sure.

Q. Do you know who Misty Welch is?

A. No.

Q. Okay. Certainly you know who CHS Employee Group is, right?

A. I believe so.

Q. All right. When you say you believe so, what

(crosstalk) they are. Do you know? I mean, I'm sure -- what's your understanding?

A. It is a company called CHS Employee Group of which runs the payroll. And there's a leasing agreement between -- I'm using the term "leasing" in a loose term. It's an employee leasing arrangement.

And again, the agreement will speak for, you know, whatever it says. But I'm using a generality. That runs all the payroll and benefit plans for -- we're going to use the word "employees" as a loose word.

But the people of YesCare or the people who have been employed by YesCare for both services and administration and services in the field, working with the inmates in any of the local facilities.

Q. Okay. So let me ask you something connected to that 'cause the address that we were able to locate for --

A. Uh-huh.

Q. -- Employee Group --

A. Uh-huh.

Q. -- is 205 Powell Place, Suite 200, Brentwood, Tennessee. So is that also YesCare's address?

A. I believe so. Yes, I believe so.

Q. Is it a physical location? Is it an actual address like an office --

A. There -- there is an office there. I do not believe anybody actually works out of there at this point in time, but there is a physical office there.
Q. So prior to the bankruptcy were there -- were there representatives, employees of the debtor and/or Employee Group working out of that office?
A. I can only speak to the debtor. I can't speak to the Employee Group. But meaning outside of -- again, I'm using words very distinctly. Outside of employees, the debtor employed through Employee Group.
But just for sake of -- yeah, I'm just -- I don't know who works for Employee Group other than the employees at YesCare who's contracted through them. But to my knowledge, the YesCare contract and employees did at some point -- not specifically prior to the filing, but did at some point have more people in the office.
And I think they de-officed for ease of work, as many people have done in this post-COVID era. So I believe most of (interference) of the office, you know, except for meetings or, you know, gatherings that they would have to have.
Q. Well, have you traveled up to that office? Have you been in that office?
A. I -- I actually have not been at that office. Everything I've -- I've met with people on Zoom. Again,

it's -- we're in a different -- we're in a different world. We're in a different world.

Q. Yes. Fair enough. All right. So could you tell me who is Alan Rubenstein?

A. I don't know Alan Rubenstein. I believe that he is an attorney from my understanding of, you know, going through the records with the company. And payments were made to his account for M2. But that's -- that's -- that's the extent that I know who Alan Rubenstein -- I don't know him. I've never spoken to him.

Q. You said payments were made to his account for M2? Does he receive those funds in trust or something?

A. I believe so.

Q. Okay. Do you know when that happened?

A. No.

Q. Okay.

A. Just going -- just going through schedules and -- and understanding, you know, names.

Q. All right.

A. A lot of my -- a lot of my knowledge is -- is, you know, from documents and reading and asking questions.

Q. All right. And who is Michael Hagny (phonetic)?

A. I do not know.

Q. All right. Levi Gurevitch?
A. I do not know.
Q. Ring a bell? No? Okay. How about David Gefner (phonetic)?
A. I've heard the name, but I don't know him.
Q. Okay. You don't know what his involvement may be with debtor affiliates or YesCare affiliates?
A. No.
Q. All right. So you mentioned Mr. Lefkowitz. Do you know what Adar Management is?
A. To my understanding, Adar Management is -- use the word management practice that had a contract or has a contract with YesCare in order to manage the practice and claims and whatnot for the different services.
Q. For the debtors, for the debtor --
A. For the -- I'm sorry. For -- yes, for the -- for the debtor companies. I apologize.
Q. Do you know if -- do you know if Adar is providing those services to others now?
A. I don't. I don't.
Q. Okay. What's -- what is TN Correct Health Services, LLC?
A. From my understanding, TN Correct Services is, I believe, the parent of Yes -- I don't have the org chart in front of me, but I believe that's the parent of

YesCare.
Q. Is that all -- is that your understanding of TN? Do you understand anything else? Do you know anything else?
A. I don't. I do not know anything else about it.
Q. All right. Do you understand it's an affiliate? Therefore, it's certainly an affiliate?
A. I would believe that -- you know, again, I -- I believe that's what I've seen on the org chart.
Q. And, you know, we talked already about CHS Employee Group, LLC. That's also an affil- -- an affiliate of YesCare, correct, or the debtors, right?
A. I believe so. I don't have, you know, physical proof of that, but I believe so.
Q. Well, your -- the various papers, I think your declaration all say that it's an affiliate. So it's fair to say --
A. Yeah, yeah. No, no. Yes, I'm -- yes. I just don't have the --
Q. Yeah. I mean, it's owned -- it's owned by Mr. Lefkowitz as well, correct?
A. I don't know that to be a fact. I know that that's been put in the papers. And I'm not going to refute it. I just don't know. I've not seen their organizational documents, which is what --

When -- when I answer, I try to be as clear as possible. So, you know, we're -- we're all answering exact. So I'm just being exacting. I'm not trying to be difficult.

Q. Understand. All right. Now, you did -- I think you mentioned previously Scott King?

A. Yes.

Q. Does -- so what -- what's your understanding of what his role was, what his current role is?

A. I know him to be, I believe, general counsel of the company.

Q. Okay. So is he general counsel currently of the debtors?

A. Yes.

Q. Okay. Do you know if he serves as general counsel for any other company or counsel to any other company?

A. I -- I don't.

Q. Okay. Who is, if you know, James Hyman? Do you know James Hyman?

A. I do not know the name.

Q. Okay. Bill Fowler?

A. I -- I don't know the name. It just sounds like a familiar name in general.

Q. Okay. What about Anita Dorris?

A. I do not know that person.
Q. Okay. Just a moment. Oh, so what about -- I'll ask you some more about this a little bit later. What about CFG Health Systems, is that an affiliate of the debtors?
A. Not to my knowledge.
Q. Okay. Is it -- is it fair to say though that CFG Health Systems is owned by Mr. Lefkowitz directly or indirectly?
A. I have no clue.
Q. Okay. Is it fair to say that CFG Health Systems has a number of executives that used to be involved with the debtor now working with CFG Health Systems?
A. That I have heard.
Q. Okay. Do you know who?
A. I do not know offhand the names. I did ask about that to Mr. Sholey. And he said -- and he said that some of the executives were poached at one point by CFG in order to try to get some of the, you know, contracts that YesCare had.
Q. So CFG may have poached some of the -- some of the debtors' professionals and executives prior to the bankruptcy; is that your testimony?
A. That's what I -- I was not part of it, but that

was -- that's my understanding in -- when I did get some of the filings as to assertions that CFG was a reincarnation of YesCare. I immediately spoke to Mr. Sholey and Mr. King to find out why that would even be a thought process.

And they told me that, you know, there could be an understanding of a theory because some of the executives run over. But, in fact, that's not the case that it's an affiliate and/or controlled and/or owned.

But that they were very upset because CFG did poach some of the executives and -- you know, in order to try to use their influence at the contracts that CFG was going after.

Q. Okay. Just a moment. You testified earlier that when you first became involved in the summer of 2025, even then you -- there were thoughts of a possibility of a Chapter 11, right?

A. Not then. At some point during the -- you know, the potential breakdown of discussions and the default, there was an aversion of going through a bankruptcy.

It was just obviously -- I didn't testify to that. You actually asked me. And you tried to say that earlier in the question. Again, the record will reflect what it reflects.

So I didn't say that, but you asked me. I said there's always a potential for bankruptcy. Yes, people do use me for restructuring when they might be afraid that they would have to go bankrupt.

Q. Yeah, in this case -- I mean, I thought you testified that in this case, at least part of the reason you were hired is your expertise in restructuring, then maybe negotiations, but also for the -- to prepare for potential bankruptcy if necessary.

A. No. So -- so you had made that assertion.

Q. Okay.

A. Again, I'm not -- it's not like I'm being combative. I'm just (crosstalk). Yeah, yeah. So -- yeah, no. The point of potential contemplation of bankruptcy was only maybe a point when there was maybe no deal on the reinstatement and/or modification of the prior settlement.

But then, you know, the only real, real discussion of actually filing was focused when, you know, the Kohchise Jackson judgment came. That's -- that's when, you know, it was time to hit the road.

Q. All right. So maybe -- so -- so if the cure -- if the cure agreement was entered in February, maybe before then there had been some contemplation about a Chapter 11, but a hard tax was when the Kohchise Jackson

judgment --
A. Yeah. I mean, for clarity, I would say somewhere in the December, January tense time there was definitely a potential contemplation if we're not able to -- if we're not able to get an agreement on the settlement, you know, on the --
If we're not able to resolve the -- the break of the settlement agreement, there was a definite potential of filing. There was not lead up. There was no like, you know -- it wasn't where we were petitioning for that or, you know, as -- as is many times, you know, waiting for. It was -- it was discussions and -- and not more than that.
Q. Okay. So prior to the filing, the debtor -- a number of the contracts the debtor had were terminated; is that correct?
A. Prior to the filing, Alabama was terminated. And Philadelphia, the second largest contract, was already decided to be changed over. Or, you know, the next provider was selected. I'm sorry. The next provider was selected. And they had a turnover date of July 1. So those are the two largest contracts in the -- in the company.
Q. So at the time of the -- again, we're getting to like the actual timeline when you -- the debtors file.

A. Yeah.
Q. Was there -- was there -- by that point was there even an expectation that this could be a reorganization given --
A. Absolutely.
Q. -- what was happening?
A. Absolutely. I mean --
Q. Why is that?
A. So say the working theory, right? You know, these situations, things happen, you know, differently. But the working theory was we knew we would not have Alabama. We knew there was a certain period of time that Philadelphia would transition.
But that still left between 150 and $200 million in contracts that were not out for RFP, that were able to be retained or part of them, right? And maybe shrink the company to $100 million revenue company on the exit of the restructuring to rebuild, you know, with proper capitalization, financing, and whatnot to be able to restructure, right?
And then, you know, potentially restructure the payments to the trust and -- you know, and deal with the judgment, you know, and other items through an appeal, you know, and try to reduce the exposure and work through.

That was the full, full 1 billion percent intention for entering, which is why I said we had, you know, the one contract, which was teetering, which I think was a million -- or it was a few million dollars a year -- no, a month maybe, give or a take, that we wanted to stop.

As Florida was -- at that point Florida was the strongest state out of all the different contracts. And wanted to save the state of Florida so we could, you know, really focus in -- in Florida to maintain those contracts and then build up, you know, the different -- the different places across the country.

There was a -- I believe a sheriff's convention that was, you know, contemplated on being gone to, to -- you know, even during the bankruptcy to be able to, you know, garner business and say, you know, we're coming out of this. We're dealing with the problems that we had.

And, you know, I will say in all of my discussions with the different contract holders through this process, not one of them ever said anything other than great things about the YesCare company as a care provider.

And, you know, many were sad to have to change. But due to the financials and what ensued with the -- I'll use the word wrongful terminations or transitions

that happened immediately upon filing, which was not anticipated, it then put a downward spiral.

Within a week it was apparent that it was going to be almost impossible to maintain because we lost the two large Kentucky -- or we were informed we were going to lose the two large Kentucky contracts as well as some other ones.

Which I don't have the timeline, but I'm -- you know, within two weeks it was very clear that people either transitioned, were transitioning, gave notice. And there was seemingly no way to stop the falling knife, I guess, you know, would be the right terminology, but (crosstalk).

Q. Couldn't -- couldn't you have used -- isn't that one of the reasons you filed -- the debtors filed was to use the bankruptcy code provisions to stop those kind of terminations?

A. Yes, that -- exactly correct. And that's what I had stated earlier. The issue was we still had no funding. And without having people being able to be paid, it wasn't possible to stop a transition.

Meaning it doesn't mean that we're not owed monies or it doesn't mean that we might not have -- you know, we're preparing motions to -- to be able to, you know, claim as much of the monies as we believe we're

owed for the contract vendors.

But the ability to continue the service was not physically possible. And when you're talking about healthcare and lives, it's -- it's not something that you can just say, wait, wait, wait, you know.

And arguably within their agreements -- arguably, I use the word -- you know, they have rights to transition and/or cancel due to certain issues, which they claimed in their letters.

I've never acknowledged any one of them as a termination, you know. I, in fact, refused to acknowledge. You know, until today, get repeated e-mails, please acknowledge our termination. And -- and I've refused to acknowledge any of the terminations.

I just could not refuse transition of care if we were not able to pay people. So it was a very, very strange position to be in. You know, when you're selling widgets it's different.

Q. So -- so the terminations --

MR. MARTIN: Let me -- let me interrupt.

MR. SALAZAR: Let me finish my question a moment, please.

BY MR. SALAZAR

Q. When the terminations started to cascade at that time because there was no -- there was no DIP

funding to actually continue to -- to operate or sustain the operations of -- the healthcare operations (crosstalk) I'm sorry, Mr. Goldwasser, what did you say?

MR. MARTIN: No. Luis, are you done?

MR. SALAZAR: Oh, yes, I am. Sorry. There's a pending question.

MR. MARTIN: So -- so we're over an hour in. We're still on the first two sentences of topic one. I've given you a lot of background on this. I think it -- it would be more efficient if we started with the topics for which he's designated. I think over an hour of background on topic one is more than enough.

MR. SALAZAR: I appreciate it, but yes, as it happens, this is my last -- this is the last question on this area, so --

MR. ZLUTICKY: Hold on.

MR. SALAZAR: There was a pending question.

MR. ZLUTICKY: Luis. Luis. Real quick.

So James, this is -- this is Nick Zluticky. You can object to a topic. That doesn't mean your witness doesn't get to answer on that topic. If you need specific authority on that, you can look --

MR. MARTIN: Nicholas, Nicholas, I didn't -- I didn't instruct him not to answer.

MR. ZLUTICKY: Okay. So we just need to -- he just asked the question. If he knows, he knows; if he doesn't know, he doesn't know. We don't know --

MR. MARTIN: Right. I'm not -- I'm not arguing about that. I didn't --

MR. ZLUTICKY: Okay.

MR. MARTIN: -- say anything about that, Nicholas (crosstalk). I didn't say anything about that. I just objected.

MR. SALAZAR: All right. Let me -- let me continue.

MR. MARTIN: Got it?

MR. SALAZAR: I understand your position. I don't have to agree with it, but let me get -- let me dive into the question 'cause I'm on the tail end of this part.

BY MR. SALAZAR

Q. But my question was: Based on what you said before, Mr. Goldwasser, it's the terminations without DIP financing, you said one week in it became clear, I suppose, it wasn't that financing. So you could not -- the debtors could not sustain the healthcare operations; is that fair?

A. A pretty -- a pretty -- a pretty fair description.

Q. Okay. All right. So I'm going -- I'm going to go to a break. And Mr. Goldwasser, I have to go back to an unhappy circumstance in your past. I think --
A. Sure.
Q. -- maybe other depositions you might have had this line -- line of questioning.
A. Sure.
Q. So you pled guilty to bank fraud in 2003, correct?
A. That's correct.
Q. Okay. And the -- the fraud scheme involved two banks, KeyBank and First Union bank, correct?
A. I'm -- I'm refusing to answer. This is inadmissible. It's over 20 years. The transcripts speak for themselves. And I'm not going to go down the line.
Q. So listen, I understand your position, but it's -- admissibility is not an issue here. So I'm going to ask you again to -- to answer these questions. The scheme, am I correct, involved defrauding KeyBank and First Union bank, correct?
A. I -- I've said my position, sir.
Q. Right. But this is what you pled guilty to on the record, right?
A. Okay. So the record speaks -- the record speaks for itself.

Q. Right. So you got -- you pled guilty to a scheme to defraud KeyBank and First Union bank, correct?
A. Mr. Salazar, I've already spoken.
Q. Okay. Mr. Goldwasser, as part of your plea, you admitted that you submitted false financial documents to these banks, correct?
A. Whatever it says in the documents, it says.
Q. Okay. And you admitted that those false documents included false tax returns, false bank statements, and false brokerage statements, correct?
A. Mr. Salazar, you can read anything you want to read from, wherever you want to read. I've confirmed 170 bankruptcy cases. I have Judge Drain, Judge Stein, Judge -- I'll give you a list of judges if you want, produce transcripts of all of the things that I've accomplished in this case.
Mr. -- Judge Drain himself said I am the reason the system proves to be worked. I was arraigned in the same courthouse that Judge Drain sat in. And I confirmed, I believe, 35 cases in front of him. So if you want to go down the road, please lay your foundation. I'll bring judges to testify.
Q. All right.
A. Enough.
Q. I'm going to move to strike that as

unresponsive.
The last thing I'm going to ask you is that the -- so you were incarcerated for 27 months, correct?
A. No.
Q. Okay. Well, you were sentenced to be incarcerated for 27 months, correct?
A. That's what the papers say.
Q. Okay. And as part of the -- your sentencing, you were barred from being employed in any position requiring fiduciary responsibilities, correct?
A. Mr. Salazar, I -- you know, I respect you as a large member of the Bar, senior member in Florida. If you want to actually look up what the case law is, probably behoove you rather than wasting everybody on this thing's time.
I can send you legal opinion that that was during the time of the supervised release. No time after that. And it has been tried and punched in the face 50 times before. So if you want to waste everybody's time --
Q. I'm not asking -- I'm not asking the timing. I'm just asking: During that time, whatever the time it was, you were barred from holding those positions, correct?
A. Whatever you want to bring your legal

conclusions. I'm not a lawyer.
Q. I'm just telling you -- isn't that what the sentencing was, that you were barred during that supervisory period from serving as a fiduciary, correct?
A. Mr. Salazar, I'm not a lawyer. You're a lawyer. You can read all the documents you want. You can come to your conclusions.
MR. SALAZAR: Ms. Lee-Sin, can you pull up the docket from the criminal case, please. Ms. Lee-Sin, can you scroll down to the sentencing? I think it's docket 14. Go up a little bit higher.
Just stop right there. Thank you. So right smack in the middle, Ms. Lee-Sin, it says the DFT is not to be employed in any position requiring fiduciary responsibilities.
BY MR. SALAZAR
Q. Did I read that accurately, Mr. Goldwasser?
A. Yep, like you read everything accurately.
Q. You're exactly right. Thank you. Right. So this is --
MR. MARTIN: Luis, let me just raise an objection just for the record. Then you can continue. This is not one of the listed topics. So obviously these are not areas on which he's designated as the 30(b)(6) deponent. But feel free

to question.

MR. SALAZAR: Thank you.

BY MR. SALAZAR

Q. This is the pub- -- this is the public docket, correct? So I ask my question again. During this supervisory period, the time of your sentencing, you were barred from serving in a fiduciary capacity, correct?

A. That's what it says.

Q. Okay. All right. So I understand that was an unhappy thing you want to cover. It gives me no joy to cover it. But I will say this, building on what you said before: As a result of your experiences, you take your fiduciary duties very seriously now, correct?

A. Yes.

Q. Okay.

A. As you can imagine.

Q. Right. Exactly. So -- and as -- and you understand your fiduciary duties here in -- in this case as CRO goes to the bankruptcy estate and its creditors, correct?

A. Only to.

Q. One more time.

A. I said, only to them.

Q. Correct. Thank you very much.

MR. SALAZAR: All right. So it's almost been,

as Mr. Martin noted, been a little bit over an hour.

Thanks, Ms. Lee-Sin.

So I'm going to take maybe about a ten -- a ten-minute break. We'll start again at -- promptly at 11:30. All right, everybody?

THE WITNESS: Thank you.

MR. SALAZAR: All right. Thank you.

THE VIDEOGRAPHER: We're going off the record. The time is 11:20 a.m.

(A short recess was taken.)

THE VIDEOGRAPHER: We are going back on the record. The time is 11:34 a.m.

BY MR. SALAZAR

Q. All right. So I'm going to move more solidly into the cash collateral section of the questions. And I want to start with: In the lead up to the bankruptcy, as you're going into the bankruptcy, you were negotiating for a potential debtor in possession financing with M2 LoanCo, correct?

A. Yes.

Q. Okay. And I'm going to refer to it as M2. And I'll be referring to M2 LoanCo. Now -- so I'm correct that M2 is owned by Mr. Lefkowitz?

A. I believe so. Again, I don't have organizational documents. But he is a person, the only

person I spoke to that has reference to M2 LoanCo. So I can't verify what the tax returns say, but I can tell you what -- the person I've spoken to.

Q. Okay. But -- so as far as your interactions with M2, your understanding was that he was the owner and in control?

A. My understanding is he -- that he is in control of M2 LoanCo. That's --

Q. Okay.

A. -- my understanding.

Q. Okay. And also that he's an owner?

A. I don't know. I'm not trying -- again, as I've -- as I've told you, I try not to be difficult. I just don't know. Don't have a --

Q. Okay. All right. I mean, did you -- so when you were negotiating the -- the DIP financing, was it with Mr. Lefkowitz or --

A. Yes, only with Mr. Lefkowitz. I said that before. I do say Mr. Lefkowitz and M2 -- in relation to M2, Mr. Lefkowitz is M2. That's -- that's what I see.

Q. Okay. All right. But did you inquire while you were negotiating, like is this your -- are you the owner of this company, Mr. Lefkowitz, the --

A. He -- he has told me he -- he is M2, again.

Q. Okay.

A. But people's versions of what is and what they are, I don't -- you know, I don't know if he has investors or partners or -- I just don't know.
Q. So when you were negotiating the -- the DIP, potential DIP financing, it was you negotiating with him potential terms; is that fair?
A. Yes, that's fair.
Q. Okay. So wasn't Mr. Lefkowitz on both sides of that -- of that transaction? He also is the owner of the debtors, correct?
A. As far as I understand.
Q. Yeah. And he was also the DIP lender, correct?
A. M2 would be one in the same. The former DIP, I mean, again, I think is just a regular loan.
Q. A potential DIP lender?
A. He was a potential DIP lender, correct.
Q. All right. During those -- the lead up to the -- to the filing, tell me about your discussions. Was he -- did he represent that -- that he was intending to make that DIP loan?
A. The intent -- from my discussions --
Q. Yes.
A. -- the intentions were very much make the DIP loan. The questions were how much money, where it would be coming back and/or secure, you know, additionally, how

much more money would be needed, you know, potentially.

Which three days before, without having real full knowledge of every detail, but, you know, it was needed. And, again, the termination of the contracts and the running forward was not fully visible.

So the discussion was on the immediate need of the approximately $6 million to cover payroll for that immediate problem and then to be discussed further how much more would be needed.

Q. Okay. And so this is all into lead up to the filing. So post-filing what was your -- what were your discussions with Mr. Lefkowitz at M2 about the potential to make a loan?

A. Same discussion now further moving into budgets moving forward. But, you know, I think on that Saturday, I believe -- again, please -- this is -- I'm testifying to what I remember. Okay?

Just -- we've already gotten notice from one or two of the contracts that they were seeking to terminate. So then I felt very quickly much -- you know, or some of the impending potential doom started to show its face immediately.

But we were discussing further, after the filing on Sunday, still the need to be able to make the payroll and cover move-forward expenses immediately

thereafter, right? And seek -- and seek an emergency appointment -- motion, I'm sorry, for -- for financing.

Q. Dr. Goldwasser, at the time you filed -- at the time of filing you had not finalized the DIP financing?

A. We did not finalize. It was -- it was -- I will say I believed that it was going to be funded. And it wasn't. And I'm not saying like it was -- I really thought that we were getting the funding.

I believe Mr. Nash was already involved as attorney for M2, you know, to put that together, put him in contact with Mr. Johnson and -- and Ms. Green in order to get a term sheet.

You know, this was -- in my mind, I thought it was happening without a question. To me. Again, I can't -- I can tell you it didn't happen, but I just -- I really had no thought other than it was happening. If for nothing -- if for no other reason, the longevity of the company, you know, to be extended at whatever form would come out at the other side.

Q. All right.

A. That was my thought, yes.

Q. So how --

A. Without a question.

Q. When -- when did you start negotiating with Mr. Lefkowitz and M2 for the DIP? When did that first --

when did you first begin discussions?
A. I think on -- the filing was done Thursday. Tuesday or Wednesday of that week we -- we discussed the need for the money. Then there was the technicality of doing it pre-filing or post-filing.
Again, I -- I'm not going to say beyond me. Just, you know, everybody has their position on what a DIP loan would look like. And in this instance, I think some of things discussed were insider DIP, whether it would be recognized, whether it would be characterized, whether it would be objected to, how it would be viewed. And that, therefore, feeling that a post-filing DIP would be better suited for recognition or objection, you know, depending upon the case.
Q. Did the -- did the -- were there -- did the term sheets include, you know, like releases and things like that that would make it objectionable?
A. I -- we sent over a form term sheet that we wanted them to fill out. You know, as we were in short order, it did not come back. I'm just -- I'm just being very clear that we said we needed a term sheet in order to be able to file a motion and -- and be able to put this, you know, before the court.
And understanding, again, with -- I'm going to use the history of -- of the parties and the breakdown of

the settlement and whatnot to understand that there would be objection, whatever the case is.

And everybody has the right to object, but it was contemplated that there would be objection. So, therefore, the post-filing providing of the DIP was what was discussed to be done. Or, you know, asking of -- the providing the DIP was asked to be done. So it would be fully thought out without having preconceived notions, so --

Q. Okay.

A. That's why it wasn't done prior -- that was the reason given to me not to be done at the same time as the filing. I'm sorry. You know, but -- but to be done --

Q. Yeah.

A. -- after the filing.

Q. So the -- the -- as I understand it, the Kohchise Jackson judgment was --

A. Uh-huh.

Q. -- beginning of April. And I think I just heard you say that the DIP negotiations really commenced a couple days before the filing. So what was happening between that that was not picked up and developed before the filing?

A. I'm sorry. The -- the -- the Kohchise -- sorry. I don't have dates in front of me, but for --

Q. I believe it was May -- I think it was April 6 was the judgment.

A. All right. The motion to freeze assets was much closer to the time of the filing than the actual -- the entry of the judgment was shock and awe. And we have to start thinking what are we going to do.

Appeal, et cetera. Do we file bankruptcy? You know, and discussions. Not physical contemplation of the actual getting ready to file bankruptcy because there is still -- as -- as you know, we all know, getting the judgment and forcing a judgment are two different things.

So it was the advent of the filing to freeze all assets that was what precipitated actually getting to the table and filing a bankruptcy. It's -- you're not incorrect in what your questioning was, but it wasn't -- you know, judgments do happen, you know.

And until they're enforced and/or, you know, worked upon, there's usually a different level of time. But, you know, here, even going for the -- first off, the amount of the judgment seemingly is inconceivable based upon the facts.

It's, you know, unprecedented in the type of numbers that they were awarded. So going for an appeal was standard operating procedure in any judgment, but here for sure.

Q. Wouldn't you have -- so that's a good point. You would need a bond --
A. That -- that was -- that -- that becomes -- that becomes, you know, in effect, you know, a system of questions. Which again, this is all not something we don't all -- on this -- on this call that we don't all understand.
Q. Right.
A. But --
Q. Chapter 11 would have served -- Chapter 11 would have served that -- the bond function --
A. At some point, yes. It was just a matter of properly planning, you know, and walking in with, you know, the -- it was just a motion to freeze all the assets, which is the action -- you know, action that -- that caused the emergency.
And I believe it was the Thursday or Friday before the filing that that was -- again, I don't have the dates in front of me, but it was immediately within I think a ten-day -- a week to ten-day period before the filing. So that was the actual physical action that made this all the more --
Q. Yeah.
A. -- urgent.
Q. So did you -- so did you as CRO or your team

before the filing start seeking DIP financing, aside from M2?

A. So at -- before the filing, I did speak to a couple of people who I do know were healthcare related and do financing for this. One of them's named Jeremy Markowitz, who's been involved with many large healthcare cases, to work on potential DIP financing.

And sent -- I don't know that I sent him over all the documentation until after the filing just because M2 had made the overture that they were going to provide the financing.

But then, you know, after the case, sent over whatever we did have and prepared, as well as two other parties, Mark Berenblut. Again, I don't remember exact, who I sent it, but, you know, another large financial advisor who's been involved in these types of transactions, you know, who is -- who understands that we're -- the parties would be providing these types of financing.

We did get contacted by a couple of other folks immediately upon the filing who we were in contact with about, you know, the financing to discuss it. You know, the generality of the issues was the potential cancellation of the contracts due to the nature of the correctional healthcare issues and, you know, what would

-- and not -- what -- what would or not happen, you know, posthaste with all of these things.

Q. Let me think about that for a second. So --

A. Sure. (Crosstalk) I didn't mean to ramble.

Q. No, it's okay. The decision to file -- to file the debtors was ultimately Mr. Lefkowitz's, correct?

A. He gave me authority prior to that, I -- I believe on Wednesday of that week --

Q. So if I look at the resolution, it's signed by Mr. Lefkowitz --

A. Yes, yes. He gave -- he gave -- he gave -- he gave -- I'm sorry. The resolution -- I don't have it in front of me, again, but --

Q. Yeah.

A. -- the resolution, I believe, was the ability to file, but at my discretion as to if we would or we would not, depending upon all of the circumstances. But yes, I mean, he did give me -- he's the one who vested me with the authority. Put it that way.

Q. Okay. All right.

A. Just to be clear.

Q. And then -- and so -- and then just to be clear too, then he just -- on the debtors' behalf, you tried to negotiate DIP financing prior to filing, but M2 did not engage or did not want to finalize until after the

filing; is that fair?
A. To some degree. I'll just clarify. The answer is yes, but let me clarify for -- for purposes of -- of the discussion. And, you know, we had been discussing in generality M2 funding some sort of DIP when I became -- when I was designated, you know, resolutions and whatnot to be CRO or, you know, he gave me verbal CRO, I think, with Mr. Johnson.
We met, you know -- we had a meet -- a meeting. And he gave me the CRO-ship until (interference) you know, and then start talking to Mr. Lefkowitz M2 as opposed to Mr. Lefkowitz as -- as the chairman or whatever his exact position at YesCare was.
And, you know, going through the fact that we -- I really wanted to be able to make the payroll, even though the company had no money. And as the secured lender, to my knowledge, M2, I would like them to fund as a DIP lender.
And he said he believes he would fund. We were talking about what it would be. He said he would take less interest than what a typical DIP lender would take, obviously to be advantageous to the company and further secure his position.
And that was, you know, beginning and end, the intention. As I mentioned earlier in the deposition, the

concern that came up with funding it concurrent with the filing was that in the event it would be scrutinized and/or questioned as an insider DIP and designation objection.

Be thrown into a pool of, you know, you're never getting the money back. I'm using no legal term here. You know, and not proper protection based upon the anticipated objections of some of the -- of some of the factions. The thought was to do it post-filing so that it could be properly --

Q. It could -- it could have been negotiated pre-petition and approved post-petition, but you had no formal agreement of any kind once it went into bankruptcy for -- from M2 for DIP, correct?

A. No formal agreement. That is correct. I'm just giving you -- you asked the question so I just tried to explain.

Q. I understand.

MR. SALAZAR: All right. Let me -- let me ask, Ms. Lee-Sin, can you pull up the cash collateral motion, please, docket -- docket entry 81, and go to paragraph 11. Ms. Lee-Sin, can you go to -- make sure -- just a moment, please -- page 5, paragraph 10. Thank you.

Mr. Goldwasser, I'm going to show you now what

we're going to mark for identification as Exhibit 3.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 3 was marked for identification.)
BY MR. SALAZAR
Q. It's docket entry 81, which is the motion for authority to use cash collateral, et cetera. You are -- you are certainly aware of this motion, correct?
A. I am.
Q. Yeah. And as CRO you authorized it to be filed?
A. I did.
Q. Okay. All right. So I want to focus in on -- first on 10. Or 10 -- the last sentence of paragraph 10 --
A. Uh-huh.
Q. -- states, the debtors believe that the lenders' claims are secured and properly perfected in all of the assets of debtors YesCare Corp. and CHS Texas, Inc.
I read that accurately?
A. What it says.
Q. Okay. So at this point in time of the filing of the -- let me just go back in time here to 5/19 when this was filed. At that point the debtor was still -- was still determining -- it says it believes as opposed

to admits or something. Was it still determining whether the lien was valid?

A. No. Not sure why that exact lang- -- I didn't write the motion, you know. I'm not exactly sure what that --

Q. Okay, but --

A. -- that way.

Q. -- it's your understanding that by the time this motion was filed, the debtors were certain that the M2, the lender, had a valid and perfected lien?

A. Yes, to my -- I don't -- I don't ever -- sorry. At the time of the filing there was no reason for me to believe any different. And I had seen documentation to that point showing that there was a loan.

Q. So you knew there was a loan and you had no reason to believe that it was not properly secured at that point, correct?

A. Nor at this point. But yes, that's correct.

Q. Okay. The next paragraph says, upon information and belief, as of the petition date, the debtors owed the lender $16,204,259.00, correct?

A. Yes, that's correct.

Q. Okay. So upon information and belief is -- is -- is not exactly like saying we are sure. So at that point in time, and I'll say even now, are you certain of

the amount that is actually owed to M2? You or, sorry, the debtors.
A. Yes. And for clarity, when we say "upon information and belief" in this paragraph, it's because this is our accounting as to what we owe M2 in -- in our books as the company.
But I don't have an official statement from M2 stating that that's the amount. So that's why it's upon information and belief, not a matter of -- not something on our side.
Q. Yeah. (Crosstalk)
A. Yes. Yeah, these are our accounting records. These -- to the -- you know, to the dollar, which is why it's written the way that it's written. But that's -- it's not a matter of we're not certain because we don't keep records. These are our records as to exactly what we owe.
Q. All right. Have you -- you or the debtor asked M2 to give you a statement or some kind of calculation of what exactly is actually outstanding?
A. I believe we have communicated -- I'm sorry. Let me retract what I just said. I believe that we have communicated to Mr. Nash, counsel, to him to confirm that this is the amount outstanding. That's how I believe we -- we went about it. Counsel --

Q. Have you received -- have you received that statement? Have you received any kind of analysis from -- from the lender of what the amount actually due is?

A. I want to tell you I'm not sure. I'm not trying to be -- I'm not trying to be difficult. I just -- I know that we requested it.

Q. Okay.

A. I believe we requested it. And I'm not sure if we have it back yet again.

Q. Okay. So --

A. But it was requested without a question.

Q. All right. So a lender could easily say, you know, it will be half as much. They may have a totally different number?

A. Correct. But these are our records. These are our records (crosstalk).

Q. Right.

MR. SALAZAR: Ms. Lee-Sin, you can take this down. Thank you.

BY MR. SALAZAR

Q. All right. So the motion that we just saw was dated May 19. Backing up a little bit, on May 10 -- I'm going to maybe not pull it up at the moment -- well, let me go ahead and put it up.

MR. SALAZAR: Ms. Lee-Sin, can you pull up DE25, please. Give me a second.

Okay. So Mr. Goldwasser, I'm going to show you what we're going to mark as Exhibit 4 for identification. It's docket entry 25.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 4 was marked for identification.)

BY MR. SALAZAR

Q. It's the declaration of David Goldwasser in support of the debtors' Chapter 11 petitions and first day relief.

You recall executing this -- this declaration?

A. I believe so.

Q. Okay. It wasn't that long ago. It was May 10. So I know a lot has happened, but --

MR. SALAZAR: Ms. Lee-Sin, can you move to paragraph 16, I believe. Yes. If you can make it a little larger, that would be great. Mostly for my benefit. Yes. So I want to see the footnote as well, please.

BY MR. SALAZAR

Q. So Mr. Goldwasser, I'm going to show you Exhibit 4 for identification.

A. Uh-huh.

Q. Again, this is -- you recall this is your

declaration under oath, correct?
A. Yes, sir.
Q. All right. So at the time, the beginning of the case, you said as of the petition date. Here you say the debtors are owed approximately $21 million to M2 on account of the pre-petition debt. So --
A. Yes.
Q. You admit I read that correctly?
A. You read it correctly.
Q. Okay. So what happened in those ten days that you started -- think 21 million, turned out to 16 million?
A. All right. So the footnote, you know --
Q. Yes.
A. -- is clear as to that's what I had seen. That's what we had -- but when we went through the account records and I asked for reconciliation, the number came out to the number that we put in the cash collateral motion.
Q. All right. So -- so let me clarify. I was going to read that next. So when this declaration was filed, you have a footnote that you're referring to right at the end of that sentence. It says, the debtors are continuing to investigate the nature of the indebtedness to M2 and reserve all rights in that regard.

Did I read that --

A. That's right. Yeah. I'm sorry. I though it said the -- the amount and indebtedness. But the answer is that we had this number provided to us. That's why it says approximately.

When I asked for reconciliation from Mr. Sprouse as CFO, he gave me the reconciliation, which came down to the number of 16 million some-odd that is on the actual cash -- cash collateral motion.

Q. Okay. So that's the information you had at the time. And you're saying (crosstalk) went into the accounting function at the debtors' that were able to determine if the debtors' on-the-record number or in-their-books number was the 16 million number I read earlier?

A. Yes, that's correct.

Q. And at this time, the time you filed this declaration, I guess, and thereafter, you were continuing to investigate the nature of the indebtedness to M2 on behalf of the debtors, yes?

A. Yes.

Q. Okay. Just a moment. All right. So let's talk a little bit about that. You know, what steps did -- did you as CRO, your team, whomever, take to determine the validity, priority, or extent of M2's lien?

A. Yes. So I did communicate via Zoom and e-mail with the executive management of the company in order to get all of the documents respective as well as the -- I believe the confirmation of the closing documents from the original loan, which we referenced earlier.

I said many years. You said '21. We agree that in the age of COVID many year- -- you know, it's like dog years. But I got copies of e-mails, confirmation from the law firm that closed the transaction in the 2021 -- I be- -- and again, using the date that you referenced earlier. I believe it's correct.

And copies of all of the different agreements for the original credit facility. And then subsequent M2 -- there are different names as a correctional facility. Was I believe originally by a different entity and then -- and then to M2.

Q. Well (crosstalk) keep you on track, right? 'Cause you say you got loan documents, but what else did you do -- rather than tell me what you found, tell me what you do to investigate whether or not it's a valid lien. You got loan documents. What else?

A. I will be -- I will go in detail as -- to make it clearer. I didn't just get loan documents. I got loan documents that were annexed and part of the prior

bankruptcy with the Corizon to whom -- which is where the loan originally originated from.

Where YesCare and CHS were born out of. So they were embedded in the process there and acknowledged as originally -- we'll call it a DIP loan. And the signed documents that corroborated that as part of that case shown that the loan was given in connection with the case and born out of that case.

Which would lead me to believe it was on a bankruptcy docket and acknowledged that it was legitimate and secure at that point. Number -- that -- that would be the first point.

A second, requested from the law firm who closed the transaction in that bankruptcy case to confirm and send me the corroborating documents. And they, in fact, sent me the e-mails from the closing, exchanging signatures, and confirming that the wires were sent and the transaction was closed. (Crosstalk) I read on an e-mail the wires were sent.

Q. How much (crosstalk) wires?

A. As I was about to say --

Q. Okay.

A. -- did not have the amount of the wires. I did not have the actual closing statements. But it said the transaction is now closed. The wires were sent. This is

all part of the bankruptcy record.

Q. Uh-huh.

A. And I corroborated that. I just reconfirmed that we had copies of the documents and where everything flowed from one to the next as there were different amendments and restatements. And then there was some signatures embedded from one to the other amendment.

Went through in detail each and every one of those documents to see the exact chain that connected all of them to my satisfaction and I believe to counsel's satisfaction, which I forwarded them after I did my investigation and was satisfied, to confirm that they were satisfied with the same. And received confirmation that they were satisfied. That is what I did.

Q. What steps -- take any other steps beyond that, any other steps in your investigation?

A. Those were the steps.

Q. Okay. Just a moment. The -- the --

MR. SALAZAR: Ms. Lee-Sin, you can take this down.

BY MR. SALAZAR

Q. The interim cash collateral and I think your proposed cash collateral or stipulation has -- just a moment -- TN Correct Health Services still collecting the accounts receivable of the debtors, fair?

A. Yes.
Q. Okay. So -- so first of all, do you have an understanding of why, you know, TN Correct was designated as the -- you know, the collector of -- of accounts receivable by the debtor?
A. That is the way that they set it up originally. And due to the fact that they had set that up originally with all of the different contract holders, which are municipalities and/or governmental agencies. I'm just using generalization municipalities.
That they had one -- I'll use the word paymaster or collection master as the case may be and register that -- exactly why they started that way, it never got an exact answer, but that is the way that it was set up.
I'm sorry, my camera -- I thought I turned this off. I'm sorry. I thought I turned off this one thing that buzzes. Sorry. And -- start again. They -- they set it up this way originally.
Exactly why, I've not been able to fully ascertain. It was just the system that they had set up originally. And all the monies flowed through an account. And then they -- that's how they ran the business.
Q. So do you have an under- -- do you know whether

or not the lender M2 has any kind of control over the TN Correct Health Services' bank account?

A. I do not know that.

Q. What steps are you taking -- my understanding of the stipulation and the current stipulation and order, TN's got to sweep whatever it collects for or on behalf of the debtors and send it to the debtors' -- debtor possession bank account, correct?

A. Correct.

Q. All right. And you have opened a debtor -- or the debtors have opened a debtor possession bank account?

A. Yes, I believe we have two. But yes, we have debt possession bank accounts.

Q. Okay. Do you know -- happen to know -- I mean, what's -- what's your most recent understanding of how much is in that account?

A. The answer is I'm not exactly sure. As -- as we sit here, we did have, I believe, 2 or 3 million -- I know it sounds funny, but we -- we were in the middle of making partial payroll last week.

But we had a few million dollars in -- in the account from what we had collected, you know, post -- post-petition and that we would have -- were making in payroll payments. I can check in the next break to get you an amount. I apologize for not --

Q. All right. So my follow-up question then is, you know, what steps are you taking, what kind of reporting do you get to determine that, in fact, TN is sweeping all those funds that belong to the debtor and sending it to the DIP account?
A. We get a daily report of any transmittals from any of the -- for any -- the contract holders. We'll just use -- I'm using a general word. But that we get that report. And I get a copy of that every morning.
And anything that is transmitted, we then send a request. And the monies are sent over to the DIP account with one exception. When we did make the -- after we had the first cash collateral hearing, the Philadelphia contract, just for purpose of our discussion, did make a wire transaction, a wire -- a wire to the DIP account directly.
And that went directly to the DIP account. I think we've had a total of six other incoming transactions from the -- when we started for payments. And then those monies were transmitted over into the DIP account.
Q. You say you get a report every morning. What's the source --
A. Yes.
Q. -- of that report? Who sent it?

A. The YesCare -- the internal YesCare collections person. I don't know her exact title as I sit here, but there's one person who's -- who's in charge of all the incoming -- of all the incoming monies.

Q. So she -- she receives notification from the counterparties to the contract? Is that it or --

A. From the counterparties and from -- and from the bank.

Q. Oh, okay. So --

A. It's a direct -- it's a direct -- it's a direct notification so that it's a con- -- it's a confirmation on both ends.

Q. Oh, I see. So does TN collect funds for any other company, to your knowledge?

A. I don't know.

Q. All right. And then once those funds -- once you're notified or get -- obtain the report, you then request that the amount be sent over from TN?

A. Yes.

Q. All right. And you mentioned though that there was a direct wire from Philadelphia. How much was that -- that wire, do you remember?

A. It was -- the exact amount I don't know. It was approximately 4.9 -- or no, no. $5.1 million.

Q. All right. Just a moment. Just a second here.

MR. SALAZAR: Ms. Lee-Sin, can you pull up that schedule with the M2 debt, please. Just a moment.
BY MR. SALAZAR
Q. So while she's doing that, so the -- the different -- the -- whatever AR is coming from the -- or that belong -- being sent to different debtors all gets -- goes to TN and just gets commingled, correct?
A. I wouldn't use the world "commingled." I would just say goes to TN.
Q. All right. But -- so it goes -- they all go to one bank account; is that fair?
A. Yeah, yeah. I'm just saying, it's the system that they had. It's not something that is developed for, you know, pushing things together.
Q. Yeah. But it has the effect of it's all going to one bank account. So it's --
A. Yes.
Q. -- it's commingled, it's all in the same place, yes?
A. Yeah. Just commingled has an -- has an assertion. That's all. I'm just -- I'm just trying to say I'm not using a negative connotation. That's all.
MR. SALAZAR: All right. So I'm going to show you what we're marking as Exhibit 5 for identification, if I'm correct.

THE WITNESS: Okay.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 5 was marked for identification.)
BY MR. SALAZAR
Q. And so this is a document that was produced by the debtors as part of the recent production. And I'm -- first of all, do you recognize this document?
A. Not specifically, but --
Q. But do you have any reason to believe that this is -- this -- what's titled preliminary review of general ledger data and then there's a quote -- quoted section next to it. It says M2 debt GL activity.
A. No, I have no -- I have no reason to think it's not. I'm just saying --
Q. Yeah.
A. -- my team has gone through a lot of documents. I've not gone through every single one of them. So I don't have any reason to believe or not believe. Just I don't remember seeing this specifically.
Q. Got it. So you -- so you agree this is -- this is a -- a document that was produced by -- by (crosstalk) --
A. If you say it was, I believe you, yes.
Q. Well, as I got -- I got a new discovery in one of the file folders that was sent over, so --

A. Yeah, yeah. (Crosstalk). I'm not trying to be difficult.
Q. No, I just (crosstalk) I get you. So next to it, it says -- it also says it's draft subject to ongoing review for discussion purposes only. Do you have an understanding of why that -- why that has this notation?
A. I would assume just because it's not ordered and/or wouldn't be subject to potential clar- -- correction or clarification.
Q. So speaking of audits, were there audited year-end statements for the debtor or do those exist for prior years? 2025, for example.
A. There was a discussion about this yesterday. I don't remember the last -- there -- there was discussion about something being -- having an audited financial. I don't remember the year.
Q. Okay. So --
A. There -- there -- there is one -- I believe that there is -- there is at some point an audited financial.
Q. All right. So the very first line in 2022, May 1, 2022, the amount of the debt for what appears to be the M2 debt is 92 million -- $92.5 million, right, approximately?
A. That's what I see it to say.

Q. Okay. What analysis or investigation did you or your team conduct to determine whether that starting point is accurate?
A. We -- we have -- we have not done an analysis to verify that this is 100 percent accurate.
Q. Okay. So you would agree with me that if that starting number is incorrect, the ending number $60 million could also be affected, right?
A. Absolutely.
Q. Okay. And do you have some understanding that the $92 million, the actual amount that was wired against that debt, was $11 million? Have you heard that at all?
A. No.
Q. All right. Do you have an understanding that, in fact, M2 wrote off all the debt but $11 million in 2022 or prior?
A. I -- I don't have that understanding.
Q. Okay. Did you ask M2 at any time why does this start at $92 million or any -- or ask them for any backup for that starting point?
A. I did not ask them for a backup of that starting point, no.
MR. SALAZAR: All right. So Ms. Lee-Sin, if you can make this a little bit bigger and then go to month 12 of 2024. Right down there. Second red

batch. Thank you.
BY MR. SALAZAR
Q. So I'll point that to you because -- you see this okay, Mr. Goldwasser?
A. I see --
Q. (Crosstalk) glasses. Okay. So --
A. I need glasses too. Just -- I have it enlarged so we're good.
Q. So in 12 -- so my first question is in -- on 12/31/24, right? It's the first -- the first red line there.
A. Yes, sir.
Q. It says there's a $39 million related party balance. Seems like -- going up or down, but do you have any understanding why that 34 -- what that $39 million is about or what the related balance is about?
A. The answer is really do not know.
Q. All right. And then so let's go a little further down where it says --
MR. SALAZAR: Ms. Lee-Sin, scroll up a little bit.
BY MR. SALAZAR
Q. The next batch -- batch of red, it just says Sigma after it.
A. Uh-huh.

Q. And that's really my question. June 30 it says related party Sigma. Do you have any idea what that refers to?

A. I don't.

Q. Okay. And then -- just a moment. And then on -- just -- I'm sorry. I apologize. One moment. So then -- then it appears that on -- on the very last line --

A. Uh-huh.

Q. -- April 30th, which is on the eve of the filing --

A. Uh-huh.

Q. -- there is a -- an additional -- it says March 26 related party applied to. And there seems to be a reduction of almost 16, $17 million to get to that final figure here, which says $16,865,634.00. Do you see that?

A. I do see that.

Q. Okay. Do you have an understanding of what that application is?

A. Answer is as I sit here, I -- I do not have an understanding as to what that application is. I do know that they said that they applied certain monies towards this balance to bring it to where it is.

Again, this is a general ledger. It's not a

specific -- doesn't have every -- every single transaction and their applying balances. So I can't speak to exactly what -- what it is. Just they said that they brought down the balance. There was a number there.

Q. Well, let me --

MR. SALAZAR: Ms. Lee-sin, can you scroll up to the top a moment? I want to see the very top of the document.

BY MR. SALAZAR

Q. So what this actually says is that it's a preliminary review of general ledger data, not -- this is not the general ledger itself, correct?

A. Yeah. No, no. Correct. I'm just saying this is -- it's a compilation and a review in order to go through, you know, transactions they have on record. Absolutely.

Q. So, you know, again, depending on whether these applications were -- or additions were properly made, whether the starting point is -- is accurate or not, the ending balance of $16.8 million roughly or the amount -- or the 16 million or so, 16.2 million from the -- from the cash collateral motion could be off?

A. It has potential that it could be off. We've -- you know, we obviously -- if we get to the point that we have anything left beyond paying payroll, then it

might be applicable.

But you know, part of the challenge is that we don't know (interference) being able to make, you know, the outstanding payroll and any, you know, needs for anything.

So I'm not saying that this is not important in the overall scope. It was just our focus has been on making sure we get information for schedules and taking care of payroll as best we can as well as collections.

So you're correct, it could be off. And we're -- we're not admitting to a number at the moment. We put a number that we had in the actual accounting records, just what I asked from Mr. Sprouse. And that is obviously subject to change. It's not a guarantee on any which way, shape, or form.

Q. Okay.

A. So it could be less (crosstalk).

Q. Sorry, go ahead.

A. Just say, it's not that we're stating that, you know, this is the final number, that that's what we have in accounting records as, you know, what I've asked for in the reconciliation I was given.

This number shows $18 million at the end. I'm not sure how those two correlate. Obviously, you bring something good to my attention. But we still have what

to do as far as nailing this number down.
I'm just -- my statement was that whether it's $5 or 16 million, right now I don't know that any recovery is coming to M2 ever.
Q. Okay.
A. So the focus was more making sure the people get paid. That's all. Not a matter of --
Q. I understand.
A. Not a matter of discounting your questions or -- or this necessity. It was just the priority was focused on -- on people.
Q. So you raise a good point though, that given the change in the contract situation post-filing and there's -- it sounds like you're saying that at this point in time, you know, unless things change, the estate's going to be administratively insolvent; is that fair?
A. Not sure yet. We still have, you know, a decent amount of receivables. It's just a matter of whether and how fast we can collect them. So we could have a surplus above and beyond the payroll in expenses.
And we have, you know, one asset, which is not easily attainable. That's money saving insurance company. That would definitely put us, you know, well above and beyond. It's just not as easy to collect as it

would be from some municipalities.

So not -- I'm not admitting to be administratively insolvent. It just -- focus wasn't how much M2 would get. Focus was on the people. And then obviously, we'll get the accounting before anybody gets anything above and beyond.

Q. So let's digress a minute 'cause I want to understand it. So the --

A. Sure.

Q. -- the money -- the insurance company, I thought I heard something about AIG's holding maybe like some workers' comp reserve or something? Is that --

A. Yes. Approximately -- approximately $8 million. There's a cash -- there was a -- cash deposits for that insurance policy. There have been no claims made on the policy for I think two or three years.

And we have been requesting -- we, the company, has been requesting it back. There currently is a [sic] arbitration, I believe, about getting the money back. They're claiming that, you know, actuarily they could still have a claim come in, but it's two or three years since a claim has been made.

So in actuality, it will come back at some point, just a matter of whether it is, you know, next week or -- but I'm just saying it's -- it's a real asset

and it's cash. It's not --

Q. Yeah.

A. -- a theoretical derivative, was my point. Cash.

Q. I get it. All right. So in addition to that ins- -- that 8 million insurance, you said there were some other receivables. What -- what -- can you explain to me what the breakdown is? What do you see as potentially still coming in, in the weeks or months ahead from the accounts receivables side?

A. So the last number -- again, I'm not looking at my records. I don't have anything in front of me except for what we're looking at --

Q. Yeah.

A. -- and -- and my subpoena or whatever, the deposition notice, sorry. I believe it's another 12 -- 12 million-plus that -- that we deem to be collectible as far as, you know, bills that we have out and/or sent out since the filing for stuff that was not billed.

Q. Has that now been billed out? Is there any other invoices remaining to be sent?

A. So -- so as of today I will have a final invoice -- sorry. There is one contract called Dona Ana who is still owed money for services being rendered. But all other contracts, I had them put final bills actually

for today to be sent out so that I could directly speak with each of the contract holders on all the amounts that they have outstanding, the ones that we don't have already an understanding of getting paid.

Q. Do you have --

A. To make sure -- I'm sorry?

Q. Is there an AR (interference) that actually would show like here is what it should be even if --

A. Yes, yes, yes. I'm -- I'm just saying I want -- as -- I'm trying to make sure that I have every bill that should have been billed put together so that we can have discussions on collecting everything, including stuff that might have been billed during the month of May.

So yes, there's an agent. There's proper accounting. It's approximately $12 million from my last recollection. I'm just saying that I'm -- as part of what I'm doing to collect as much as I can, we just -- I just had them update all the records to make sure I send out and have conferences with each of the -- with each of the clients to find out exactly where they're holding, what it's going to take to make sure that we get the payments made.

Q. Thank you.

MR. SALAZAR: Ms. Lee-Sin, would you please

take this down and then pull up dock- -- docket entry 166, the amended case management statement or summary.

So just for everyone's benefit, while she's doing that, my intention is I'm going to finish this section, you know, some of the bulk of the questions I have on -- on the cash collateral, which I think is going to take me another 30 minutes or so. And then break for lunch for about 30 minutes around 1, assuming I'm on track. Okay. So just you know it's coming.

All right. So I'm going to show you now what is going to be marked as Exhibit 6 for identification.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 6 was marked for identification.)

BY MR. SALAZAR

Q. And this is the docket 166 entry in our bankruptcy case, notice of filing amended consolidated Chapter 11 case management summary, right? You have an understanding -- or let me ask: Are you familiar with this document from -- prior to it being filed, did you authorize it to be filed?

A. It definitely (interference) to be filed.

Q. Let me --

MR. SALAZAR: So Ms. Lee-Sin, could you turn to -- just a moment. Hold on. Let me show you the right one. Page 6 of 6. It's page 5 of the document itself, but 6 of 6 of the filing. Yes. Should be a signature page. Right there.

BY MR. SALAZAR

Q. So just to clarify, this amended Chapter 11 case management summary was submitted under your signature, correct?

A. Yes.

Q. And I know we talked about it before. So you were certain that it's accurate if you're filing something in court, correct?

A. To the best of my knowledge and ability, yes.

Q. Understood.

MR. SALAZAR: Ms. Lee-Sin, if you go back to page 3, please.

BY MR. SALAZAR

Q. And then I'm looking for -- I'm looking at -- sorry, answer to number 8, 8B. I want to draw your attention, Mr. Goldwasser, to -- in the amended case -- Chapter 11 case summary, 8B asks, with respect to creditors holding secured claims, the name of and amounts owed to such creditors and a description and estimated value of all collateral of the debtor securing their

claims, right?
Again, I did that accurately, read it accurate -- accurately?
A. In B? I'm sorry.
Q. Yes, B. Smack in the middle of the page, right? So that's what it requests. And your answer is, you have a secured creditor, the lender we've been talking about, M2 LoanCo, LLC, correct?
A. Uh-huh, uh-huh.
Q. And then an estimated claim of approximately $16 million, correct?
A. Uh-huh.
Q. Or that's consistent with the numbers we've been talking about from the general ledger, et cetera, correct?
A. Yes.
Q. So -- and then it says, the value of the collateral is approximately 34 million, correct?
A. That's what it says, yes.
Q. So the coverage of collateral to debt is almost two to one, correct?
A. That's what it says here. That's correct.
Q. Yeah.
A. Yeah, I'm --
Q. You mentioned it is. I mean, at least --

A. I'm saying yes. That's what it says.
Q. Yeah. So my next question though --
A. It's a -- it's a stylistic answer. It's not -- it's not -- it's not -- it's not -- it's not meant in any other way.
Q. No, I understand, but just to be clear --
A. Yeah.
Q. -- you signed this and you submitted --
A. It says 34 and 16. Two times 16 is 32. So it would be over two times.
Q. All right.
A. So we're talking about the same language.
Q. We're agreed. All right. So you'll agree with me, right? You've done a lot of bankruptcy work, are familiar with the term equity cushion?
A. Sure, I am.
Q. And you would agree with me that two times the collateral coverage is an adequate equity cushion for -- for adequate protection?
A. I believe so.
Q. Okay. Just a moment.
A. It's your dime. I'm here.
Q. But the --
MR. SALAZAR: Ms. -- Ms. Lee-Sin, you can take this down. Thank you.

BY MR. SALAZAR
Q. The equity cushion, as you said, is -- is -- is more than adequate protection, correct? It's two times the amount of the debt, right?
A. That -- that would -- that would seem to be correct, yes.
Q. Correct. But the debtor has, in addition to this equity cushion, also as an initial stipulation offered, a 506(c) waiver, you know, a -- walked away from a lien challenge.
You know, limited the challenge period of 30 days. A number of other things that were in addition to the two to one equity cushion, right? So wouldn't that be over -- more than adequate protection at this point, equity cushion plus all these other things?
A. Again, there's -- there's legal definitions. There's -- there's differences of, you know, what -- subjectively what is adequate protection. I'm not going to make a determination as to exactly what is adequate protection on a number basis. You're correct. You know, you're asking about specific legal terms. So I can only give you my layman opinion. I can't give you, you know, a legal analysis.
Q. Do you feel -- look, you feel -- do you feel you are in a tough spot considering that you -- you know,

the debtors are owned by Mr. Lefkowitz. Mr. Lefkowitz also owns the lender and is, I guess -- is negotiating cash collateral, again, with you or --

Do you feel that that's put you in a -- in a situation where you -- you cannot make a -- you cannot tell the lender that I'm -- I'm going to disagree with you on all these different stipulations?

MR. MARTIN: I'll object to assumes facts -- assumes facts not in evidence and lack of foundation.

Subject to that, you can answer.

BY MR. SALAZAR

Q. Go ahead, Mr. Goldwasser.

A. Sure. So the answer is, no, I don't feel hamstrung, if you're asking -- a direct answer to your question. The legal request for attorney to attorney, I would say some of them are somewhat customary. Some, as was asked at the original hearing, seemed to be overkill, as you're restating right now.

I believe we made it very clear at the hearing and Mr. Nash represented on the record there that everything was subject to challenge, subject to negotiation depending upon what the committee, the U.S. trustee, or any other proper parties, you know, would be able to challenge.

The, I'll call it, legal rights or any of the things you just listed from -- I'm going in generality for -- you know, to see if they were overkill or not. So it was not a specific -- this is, you know, going for a final order, we're getting whatever we're requesting.

It was this is what we have for an interim basis. And obviously, it's subject to challenge. The goal was only to be able to use the cash with whatever legal constraints I do have from what I've seen and not to make any payments and/or give anything to M2 in any official capacity outside of allow the process to take its place while we try to collect, pay the people, and run the case.

But not -- not specifically -- and this is just going back to the whole beginning about DIP lender and, you know, questions on -- on how to object or not object. So it's not -- we're not -- I'm not hamstrung attorney to attorney.

And if it gets overturned, it's not -- I'm not looking to get something approved that would not be appropriate given the situation. It was -- it was to make sure that we're able to function.

I think it was abundantly clear at the hearing that nobody is holding on anything at the moment that were requested. Everything is up for comment and/or

objection.

And to me, if they don't get it, they don't get it. It's not -- I'm not looking to hold anybody up or looking to pay -- you know, to pay the people and make sure they run the case as properly as possible.

Q. Mr. Goldwasser, as CRO -- and I know we talked about earlier how your fiduciary duty extends to the estate and creditors.

A. Yes.

Q. That's it, right? So you could just as easily have said I'm not agreeing to any of this stuff, you will get us use of cash collateral or I'll fight for it, no? You could have said, I'm going to fight for use of cash collateral. 100 percent equity cushion.

MR. MARTIN: Objection as to form.

THE WITNESS: I -- I will say I relied on counsel to negotiate the actual document specifically. I did not negotiate these specific terms as far as, you know, one by one on a business level with Mr. Lefkowitz.

Just -- you know, I'm just saying for clarity. And counsel said that was the best that they could do with Mr. Nash. But again, it was all subject to argument and -- and objection, which is why -- which is what was stated, you know, in the hearing.

I think we -- they backed off of having any finality. And there were some other things. I don't remember specifically, but Mr. Nash made some concessions.

Because I did call and say if you don't step back and -- some of the things or allow them to be challenged, then -- then I don't have a company. You need to step back or I can't move forward.

BY MR. SALAZAR

Q. You say you called. Who did you call to say that?

A. Well, I had counsel call Mr. Nash as -- these terms were very specifically dictated between the two counsels. So I made sure that it was abundantly clear. I did not call Mr. Lef- -- just for clarity, I did not call Mr. Lefkowitz. And -- and it was made abundantly clear through counsel how I needed it to go because there was no way I was walking out of there without being able --

Obviously, God has to grant the permission, but in my -- my view, there was no way I was walking out of there without being able to pay people, you know. And if they had to back down on something that was mandatory because this is not about their lien.

This is obviously -- again, they feel and the

documents I see feel there is a lien. I know some people feel there isn't a lien. Again, I'm not -- I'm not here to tell you what you feel.

I'm here to tell you what I've seen and what I have, you know, in the record. But it wasn't about their lien. It was about, you know, making sure the case would run and not let them stand in the way.

Q. So again, with 100 percent equity cushion, more than a 100 percent equity cushion, you could have -- 'cause you're the decision-maker as the CRO --

A. Uh-huh.

Q. -- you could have rejected all these different requests for adequate protection beyond equity cushion, no?

MR. MARTIN: Objection as to form.

THE WITNESS: In -- in any theory you want to put, I couldn't object to anything, you know. The people could reject to pay me as well. (Interference) might never come back.

Somebody -- again, I understand your position, I'm the related party. My concern is not for M2. My concern is only for YesCare and then what I'm supposed to do by YesCare.

I think it's ice and winter if you ask me as far as I'm to ever getting anything on a [sic]

experience level from where I sit today and where I was sitting, you know, then. I think this is all scholastic.

I'm not -- I'm not -- I'm not trying to be dismissive of -- of you or what your job is. I respect you and everybody on this -- you know, who's watching here.

I'm just saying (crosstalk) in a -- in a real world view, you know, with what we have now, you know, cleaning up the -- cleaning up the estate the best I can, assuming that M2 is not getting a penny unless there's some change of circumstance, which could always happen.

You know, I have been approached by a few family offers to try to buy the goodwill and management team, you know, out of the bankruptcy, if that's even a possibility at this stage. You know, there could be something, you know, more.

But, you know, I just don't see M2 getting anything. So it's not been my -- my big focus. And, you know, if I do need to take a different stance, you know, great.

But I don't -- you know, arguing about something that is in (interference) and has -- and is up to objection by others, I will side with the

estate and the -- and the rights of the estate to go against the secured lender every day of the week.

BY MR. SALAZAR

Q. So why do you think that -- you said a moment ago you think that maybe M2 would not -- is not going to get anything. What's your -- flesh that out, if you don't mind. I don't understand what the -- why you say that.

A. I meant in a financial basis. I'm just saying with where we are now, with covering what we have to for employees. And then I don't know that the equity cushion will fully develop just because not everybody is going to pay.

This is not the first bankruptcy where people don't -- you know, we -- you know, we might have to file suit on some of the municipalities to get some of the monies.

And I just don't know how much they will get versus the administrative expenses, your expenses, you know, et cetera, to see that they'll actually get anything out of -- at this point.

Again, if that $8 million comes in tomorrow, maybe there's something more -- you know, that might come in two years, right? And that just goes to, you know, whatever we leave over from the plan or -- or whatnot.

I'm just saying as we are right now, I just don't see them physically getting a dollar for the --

Q. Because of the -- because they won't get past -- because you're fighting to getting money for admin at this point?

A. Yes. Just, you know, and I want to take care of the people, you know, first. And then, you know, the admin, whatever is necessary. And, you know, that's the focus, but I'm not siding for -- I'm not trying to side for M2.

It's not like a -- I'm just not, you know. Something needs to be challenged. I'm not going to say, oh, you can't challenge them. I'm very clear in that YesCare is -- is first and foremost.

Q. Got you. But the debtor has not -- has not raised those challenges, left it to the committee or others?

A. Yeah. I'm not challenging the validity of their lien as the debtor. I really have seen documents that evidence all of that. So I'm -- I'm not questioning it from -- from my chair.

Whether -- when we get down to the actuality of the payments and the payment streams, I'm not admitting that we owe $16 million as we sit here. I haven't put on the record that I'm agreeing to their proof of claim.

It's still -- you know, it's still an amount to be yet determined. You know, so I'm not looking to give them any more position than -- than -- than would be rightfully due them.

Same way I'm not giving anybody at this point anything other than trying to deal with the nurses and people who e-mail me and call my cell phone and text me incessantly to try to get their pay. So that's like the -- the focus, not M2.

Q. Just one moment, please. So just building on what you said or following up on what you said. Just looking now back at the -- at -- just a moment. Let me see if I can get this a little cleaner. One moment. So earlier when we were looking at I believe it's Exhibit 4, whichever it is, the copy of the motion --

A. Uh-huh.

Q. -- that we read that statement into the record where -- where the motion says, upon information and belief as of the petition date, the debtors owe the lender, and it says $16,204,259.00.

A. Uh-huh.

Q. But to clarify, based on, you know, the use of that "upon information and belief" and what you're explaining to me now, the exact amount is still subject to debtors' continuing analysis or investigation to

determine the exact correct amount; is that fair?
A. Yes, that's correct.
Q. Okay. Thank you.
MR. SALAZAR: Ms. Lee-Sin, can you pull up Ms. Green's e-mail, the chart and the contracts, please. Thanks.
I'm going to show you now --
Ms. Lee-Sin, is that 7? I think Exhibit 7 for identification. She'll correct me if I'm wrong.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 7 was marked for identification.)
BY MR. SALAZAR
Q. This is a June 4, 2026, e-mail from debtors' counsel Trinitee Green to a number of folks including myself and counsel. This is --
MR. MARTIN: Can you scroll up so we can see the whole chart?
MR. SALAZAR: Did you get a chance -- have you seen this or you've seen this chart elsewhere?
MR. MARTIN: I've -- I've seen many iterations of this chart, yes.
BY MR. SALAZAR
Q. Okay. All right. So at this point in time what, if any -- which, if any, of these contracts is still, can we say, active? Is that the -- or still --

you know, still in existence or being worked on by the debtors, however you want to say it.

A. Dona Ana is the -- is the current contract that is still being serviced. That's the top one.

Q. Oh, sorry.

A. Just for -- just easy -- easy -- easy to -- easy -- easy to --

Q. Got it. Right. It's on the list. All right. So -- so that's the New Mexico.

A. Yes.

Q. And have they -- said transition status targeting 6/20. So they've indicated that it's going to be terminated by --

A. I -- I got notice yesterday that it's 6/22.

Q. And is that a termination or it just expires by its own terms?

A. It's -- they -- they are classifying as a termination. Again, I did not acknowledge that as a termination. That's a transition date.

Q. Okay. And all the other contracts have now been -- listed here have been terminated, yes?

A. Transitioned. I'm not going to -- I'm -- I'm using a very distinct term.

Q. So you -- I'm sorry. You're saying these have been transitioning. Can you explain what that means

(crosstalk) that term?
A. Alabama and Philadelphia both either are expired or expire -- Alabama was prior to filing. Philadelphia was already in transition for the 6/30 termination date prior to filing.
Q. But with the 6/30 termination date, I was going to ask you about that date. Does that mean it's still ongoing? Are you (crosstalk) --
A. They transitioned services on 5/25. We are providing some technical services through 6/30/26.
Q. So what does "technical services" mean?
A. Some specific record-keeping. We're basically letting them use -- I'm sorry. We have three systems, which transmits between healthcare providers and some other record facilities that they needed to use through 6/30/26.
So we have made an agreement with them to let them use those services from the past with a passthrough cost dollar for dollar. So we're technically providing them those services through 6/30.
Q. Okay. Do you have a sense of that what dollar -- that, I guess --
A. It's 60 -- $60,000, 60.
Q. All right. And so does the debtor -- do the debtors keep any kind of patient records?

A. No.
Q. Okay. Those are all maintained, what, by the institutions?
A. By the institutions and -- yeah. There's some -- the repository, but we -- we don't actually maintain the records.
MR. SALAZAR: All right. Thanks, Ms. Lee-Sin.
You can take this down.
BY MR. SALAZAR
Q. So you mentioned a few times paying employees. Are there any other administrative expense claims or type claims, professionals aside, that are being -- that the debtors' paying or has paid since the petition date?
A. Outside of payroll -- again, payroll taxes would be the only -- sorry. For clarity, the only payments that we have made at all were for payroll. So besides the money going to the specific individuals through the CH Employee Group -- I'm just being --
Q. Yes.
A. -- step by step. The only additional expenditure was to payroll taxes in addition to the direct payroll.
Q. All right.
A. So just, again, I'm trying to use every word properly, but -- but yes, we have not paid anything else

as of yet as we do not have proper clarification for that.

Q. The contract you just told me about, Philly -- service you're providing Philly, does that require any employees to stay on payroll to provide that service through the end of June?

A. To the best of my knowledge, no.

Q. All right. So a couple times during this -- during this deposition -- I was going to say morning, but we're out there. But during your testimony thus far, you've mentioned that some have sought -- some of the contract parties have sought to terminate or transition.

A. Uh-huh.

Q. And you have not -- you on behalf of the debtors have not acknowledged that termination; is that fair?

A. Yes.

Q. All right. So explain why the debtor has not tried to either, you know, assume or assign these contracts or assume these contracts to continue working them. Go ahead.

A. So we still don't -- well, there's -- there's a combination of a couple of -- I'm going to speak pragmatically. And then we can go into the technicality of the legality.

Just in order to service these contracts, there are different providers. There are different services needed. So you have employees. We'll use the word as a generality, employees.

Then you have pharmacies. And then you have what's called locums, which are doctors, which we use to provide services, which are subcontractors. They're not direct employees.

There are other auxiliary things, but I'm just -- those are the three main components of -- you know, besides computer software, you know, those services. Now, those are also needed, but I'm just saying the main -- the main pieces that physically operate are the locums, the employees, and the pharmacies.

There is a -- an accounts payable for the pharmacies, for many of the pharmacies that restricted them providing more medication. So that was one inhibitor.

Not having people being paid for the first two or -- two or three weeks of the case at all was the second inhibitor. And then the locums not showing up would be the third inhibitor to be able to provide any services.

Q. And that was driven by lack of a DIP financing,

the ability to actually pay for those services, you're saying?

A. Correct. So by the time we did get even money -- let's just use the word directly, right, wasn't DIP finance, but it was money -- in any sizable form was at about the time of the cash collateral hearing.

At which point many of the providers had already transitioned to other providers who either took over payroll, then paid payroll themselves, and/or agreed to pay payroll moving forward.

Q. Yeah.

A. And there's a mix of each of them. It's a very big mess, which is why some of the municipalities are not paying at the moment because they're going to deduct monies they paid to people directly.

You know, I had spoken to many of them personally, the contract holders, you know. And some of them were paying people out of pockets from the county and/or sheriff's office and making different accommodations, you know, for people's lives not to be completely shattered.

Some of the transition providers took over. Some passed through payroll. Each one is different. I'm just giving different situations that happened throughout. So as far as being able to continue the care

while somebody else took over was not possible, period.
So had -- yes. Theory, you know, it wasn't DIP financing. There was no ability to have the continuity of care. And the two or three weeks that we missed in between collecting money and paying was the death knell of -- of the entire, you know, estate.
Q. Yeah. You're saying, Mr. Goldwasser, that some of the municipalities, some -- some of the government agencies, whoever they might be, have advanced directly for employees for the expenses --
A. Yes.
Q. -- of employees?
A. Yes.
Q. Are you able -- have you been able to track that, see who's received payment?
A. Yes. This has been -- this has been a very big undertaking, period. So yes. We -- we have -- for the most part, outside of a few people who just will not talk to us at all, for the most part this has been working together.
Again, there's -- there -- many of the contract holders became friends with people at the company over the years that they service them. You know, they're good relationships.
So we've been trying to do what we can. We

have been doing what we can. So, you know, Dona Ana as one paid their people what they believe the net amount was from -- people came up with their paychecks.

This is literally what happened. People came in with their paychecks, showed them a stub, said I got paid last week $382. Can you -- you know, and they wrote them a check for $382. Obviously, I'm using fictitious numbers.

Q. Yes.

A. So on top of which we had to then go true up -- figure out what the withholdings would be. You know, deduct from the amount. In that case it was relatively simple because Dona Ana showed us the check -- the checks that they wrote out.

Said, we're going to deduct that amount from our next check. And then -- you know, like dollar for dollar. You know, not for anything else. And then we had the hideous task of figuring out how to, you know, put all that back into the system. It's a very complicated situation. Not everybody has been so forthcoming.

Q. Yeah.

A. Each one is different. Some had taken over full payroll responsibility by a new vendor. Some -- one county wrote out a -- we'll call it a bonus check of, you

know, X dollars to have people tide over.

But they immediately worked out a deal with me to pay the payroll upon the cash collateral and paid -- you know, paid their bills so that we could pay their payroll and did not ask for any deductions, you know.

Just wanted to make sure that people were taken care of. So each one is -- each one is very unique. There's no, you know, two that are the same. Some just didn't pay.

But, you know, we've had that pragmatic complication of figuring out who got what because we also don't want to pay somebody twice. We don't have enough money to waste.

Q. So -- and so the debtors are tracking them and --

A. Every --

Q. -- how it impacts -- just a moment -- and how it impacts the -- you're requesting to pay and make additional payments, make payments and payroll, that's all been factored in or --

A. Yes. We're -- we -- yes. We have not paid anybody that has not provided us documentation as to what they did or did not pay their people, period. So if -- you know, if we don't have documentation, their people are not getting paid.

Q. Payments are still being made -- payroll payments are still being made through CHS Employment Group, right?

A. Yes.

Q. Okay. So they're -- they're making calculations and accounting for that? That's being -- that's being netted or deducted before payroll is being made?

A. Yes. So -- so the internal staff -- you're asking who handles the billing and calculations for hours and -- and whatnot -- puts together their records for -- for -- you know, transmits it over. And normally they just -- okay. Sarah worked three hours. John worked ten hours. Here's their pay rate. This goes in the calculation.

If we don't have confirmation as to somebody who was paid or wasn't paid, we're not processing their payroll. Only people who we have confirmation were not paid are getting processed their payroll. And --

Q. So through that, the authorization got recently received. That's the process you went through. So it's not so -- some of that -- some of that -- some of those payments have not yet been made because you're still undertaking that analysis; is that fair?

A. Any -- yes. And for the most part the only

ones that are -- using an example, Baker County, you know, we know was not paid. They had paid their bill prior. They don't have the largest payroll. It's, you know, relatively smaller.

You know, we verified everything. We processed their specific payroll in order to take care of the post-petition obligation and make sure that they were paid. You know, in that we had to split the pay period, which was, again, a painstaking -- not complaining, but a painstaking process just from an administrative --

Physical people doing literally, you know, hand counting on their fingers trying to undo what goes into a system that's been working for five years in one way. But that's what we got permission to do and that's what we did, so --

Q. When you say payroll are you also -- does that include coverage for insurance premiums or the benefits, I guess, that CHS Employee Group also provides?

A. So we have not gotten to the insurance. The insurance is a much more complicated issue than specifically the payroll. We've not paid any dollars towards any insurance as we've not been allowed to. And it's not been something that we have paid.

We have -- you know, we are in the process of putting together a motion to compel CHS Employee Group to

pay all those benefits, as I think has been discussed counsel to counsel with you and, you know, the committee.
So that's physically in process today to be able to file that motion. But we're only paying physical dollar for dollar payroll and payroll taxes as part of the process we're doing. And only to the ones we can verify have not been paid. If they have been paid, deducting those amounts so this way it's very clear.
Q. I'm going to switch to one more topic and then we'll break in just a few minutes. Related.
You had mentioned two individuals that you had reached out to as for potential DIP financing.
A. Yeah.
Q. Could you tell me again their names slight -- a little more slowly so we can get, you know, an accurate spelling?
A. Sure. Jeremy and the last name is Markowitz.
Q. Okay. That I got. And then who was the other individual?
A. There was another person I spoke to. His name is Mark Berenblaut, B-E-R-E-N-B-L-A-U-T.
Q. Okay.
A. Then there's another company. I'm just trying to remember the name.
Q. The one I was going to ask you about is Ren- --

Renco.

A. Yeah, yeah. Renco, that -- right.

Q. Okay.

A. So the -- they were very interested in getting involved. They're still interested in getting involved in some way, shape, or form, but did not want to put money -- we'll call it at risk.

But would definitely be interested in a restructuring or funding some type of a reconstituted company. Again, I don't know that it's possible. I'm just explaining, you know, they have stayed on the boards to do so.

Then there was another individual -- I will get his name if you want during the break -- who I had extensive discussions at the same time I was having with them to Sunday, Monday, Tuesday after the filing about providing a $10 million DIP in a, you know, facility.

His concerns were how much money could he make, of course. You know, how -- how the repayment would happen. And that's where the -- because of the -- we'll call it cascading transitions and/or, you know, termination notices.

The question was not whether he -- you know, if -- what would happen if the dollars come in, can he get repaid first, and then have to recycle or would he be

left naked.

And that's where it got into a little bit more complicated territory with the fact that we might not have the recurring revenue. And, you know, he wasn't -- he got skittish on the fact that he wasn't -- didn't want to be in for the company itself.

You know, as where Renco would have -- if there was a little bit more runway, might have gone in to be able to make a run for the company specifically and, you know, provide the DIP for that reason versus -- I'm not saying they're pirates, but, you know --

Q. Yeah.

A. -- some DIP lenders, you know, have -- would rather be either recredited for the company. So, you know, they're more experienced in that realm of it. So they were having continuous conversations and meetings with the management -- management staff even during this period.

Q. Yeah. So -- so you mentioned the two individuals, Renco Group and then there was an additional person. You're going to share that --

A. Yes.

Q. -- and (crosstalk) the balance and the DIP account when -- when we return in about 30 minutes or so?

A. Yeah, let me just write that down. If I don't

write it down, I forget, you know. I do wear glasses and I do have to write things because I forgot.

MR. SALAZAR: Thank you for admitting that.

All right. So unless anybody strongly disagrees, I'm going to take a break now. Let's roughly come back about 1:30. You know, sooner started, soonest finish, I guess. Okay with anybody?

THE WITNESS: Mr. Salazar.

MR. SALAZAR: Sure.

THE WITNESS: Just -- not -- not to be rude. Do you have an idea how long do you think we'll be after that? I just want to manage some expectations of other people who will need my time.

MR. SALAZAR: Yeah. With the caveat that I've always gotten it wrong, I'm going to tell you that you should block out to the end of the day, right? So that's -- after I conclude -- I'm going to do a few other topics next. Mr. Zluticky also has some -- some questions. So we may -- it's going to take a while.

THE WITNESS: Okay. Then could I ask for 45 minutes? Is that possible? I'd like to just attend to some other things so I make sure I just address --

MR. SALAZAR: 45 minutes is -- 45 minutes is great. I'll just say the -- that may -- that may tack on 15 minutes at the end, as it were.

THE WITNESS: Oh, I understand.

MR. SALAZAR: 45 minutes is good.

THE WITNESS: I'd rather deal with it now than not deal with it, so --

MR. SALAZAR: No problem. 45 minutes. All right, everybody? Yeah. So we'll be back about 1:45.

THE WITNESS: Thank you, everybody.

MR. SALAZAR: Okay.

THE VIDEOGRAPHER: We're going off the record. The time is 1:04 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: We're going back on the record. The time is 1:57 p.m.

MR. SALAZAR: So -- so far for -- and just to recap exhibits, we have No. 1, the notice of deposition. No. 2, the RFP, the request for production to the debtor. 3 is the cash collateral motion.

4 is the declaration, Mr. Goldwasser's declaration, first declaration. 5 is the M2 debt schedule. 6 is the amended case management summary.

7 is an e-mail from Ms. Green about the remaining contracts.

I skipped over one, the docket of the case in New York in 2003. I'm going to have that as Exhibit 8. Take that out of order.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 8 was marked for identification.)

BY MR. SALAZAR

Q. And let me jump -- jump back in. Okay. Mr. Goldwasser, so some questions following up things in the first half of our depo. You said you work for some ALS nursing home operators. Can you tell me who they were?

A. ALF, not ALS. ALF --

Q. Yes, yes, correct.

A. Don't remember the name of the operator. It was right in the beginning of COVID. I don't remember -- I -- I don't remember the name. The limited partners had brought me in to oust the -- the manager, managing partner, then -- and, you know, liquidate the property. You know, transition to a new owner.

On one property, on the other -- two different deals, two different sets of people. I don't specifically remember the name of the operator. Remember limited partners.

But they were not -- they were not in the nursing home business themselves. They were just limited partners who wanted to recover their investments. So that was not -- period. That's --

Q. Okay. I wanted to ask something else that you --

A. Sure.

Q. Could you turn your head the other -- yeah. Earlier you had an AirPod on. You don't have an AirPod on now.

A. Right now I don't, no.

Q. Oh, okay.

A. I had to charge it.

Q. Okay. You're not using that as -- as a microphone though? You're -- you're not using the AirPods as the microphone, you just happen to have it on?

A. No, I was using it as the microphone.

Q. Oh, okay. You sound great. Okay.

A. I -- my desk is situated -- I use an iPad for all my Zooms because it's a better camera and better sound, so --

Q. Understand. All right. Let me -- and just to be clear on the nursing home -- those assisted living facilities that you were involved in --

A. Uh-huh.

Q. -- did they have -- did Mr. Lefkowitz have any involvement in those?
A. No.
Q. Okay.
A. No, nothing to do with Mr. Lefkowitz.
Q. Now, I want to talk a little bit about the scope of your authority as CRO.
A. Okay.
Q. Do -- do you have -- to what extent did you need to consult with Mr. Lefkowitz on decisions for the debtors?
A. I have no need to discuss with them.
Q. Does he have any sign-off decision?
A. No.
Q. You consult with him on a regular basis or on any basis whether you have authority to act without him or not?
A. I do ask sometimes contextual questions, you know, or historical questions about things that have gone on in the past or different people, but I don't ask him permission to do anything.
Q. Did you speak with him about the contract terminations?
A. He told me to fight them and keep them -- keep them if I can.

Q. When was that?
A. From day one.
Q. Okay. And so despite telling you to fight them and keep them, you did not provide the DIP financing necessary --
A. I said if I -- I said if I don't have the money, I don't have --
Q. And how did he respond to that?
A. He didn't give me the money.
Q. Okay.
A. I just -- like I said, I -- as you were asking, you know, I'm serving one boss. You know, if he can't -- it's to his detriment overall, from my perspective, if he doesn't provide it. So I can't, you know -- I only have -- I only have one -- one place to focus and that's moving forward.
And if he doesn't give -- if he didn't give me the money as the -- I'm going to use the word incumbent lender. I don't know who else -- you know, I mean, it went to other people, but he's the only one who had what -- he's the one -- double-edged sword, like you said before. He's the one who had the most to protect.
Q. So -- but have you -- we talked earlier about CF -- CFG is one of the entities that ended up with a lot of the contracts, right?

A. To my knowledge, yes.
Q. Yes. And we talked about how some of those CFG has a number of executives and high-level employees that ended up -- ended up with CFG that used to work with the debtors, right?
A. I don't know what number of. I don't know a specific number. I know of two people that Mr. Sholey mentioned to me. I don't remember exactly their names, but there were two people who he had mentioned to me.
I think one, his name was David, I believe, and another -- Michelle or some other name. But there were two people that went over to CFG prior to the bankruptcy. Like I said, I think they were either specifically to get the Philly -- I think, you know, they were in contacts with Philly specifically. And I think that's why they were hired by CFG.
Q. Did you evaluate or investigate to what extent Mr. Lefkowitz directly or indirectly has an interest in CFG?
A. I asked him --
Q. Okay.
A. -- directly and he -- and he said vehemently no. They destroyed the company outside of -- it was in Alabama. I did also ask Mr. Sholey. And he said he believes absolutely not.

But again, he's not -- you know, I'm just saying independently I asked -- I asked each of them separately to see if there was any gauge of a difference of response. And then Mr. Sholey went into vivid detail about how CFG poached the other executives. And he believes that's when he lost Philly.

Q. You're saying Sholey. Who are we talking about?

A. Jeff Sholey. He's the CEO.

Q. He's the CFO of --

A. CE -- CEO of YesCare.

Q. Oh, I'm sorry.

A. Yeah, yeah. No, no. I use names conversely. I wasn't -- I wasn't -- I wasn't in deposition brain, conversation.

Q. Sure. How does he -- how would he know if CFG does or does not have a connection to Mr. Lefkowitz?

A. So he's -- he's run -- he's run YesCare. He is the, you know -- he's been with YesCare, I think in the previous company. This is his baby, which is being slaughtered in front of him.

And if anybody were to go to CFG like for, you know -- for purposes of transitioning, he -- he would -- he would probably be the right one. He -- whether or not he knows anything, he vehemently thinks that it's not

true.

But, you know, again, couldn't tell you to -- he's not here to testify. Just I don't know how he would or not know. But in his view, him and Mr. Lefkowitz had a lot of discussions about how CFG was destroying them.

So I don't believe it's -- you know, from his view, it's not one in the same. And from my view, I asked him straight out because I -- I don't know, but he said absolutely not.

Q. So he -- you asked him whether he had --
A. Both, both. I would say both. Yeah.
Q. You asked Mr. Lefkowitz --
A. Uh-huh.
Q. -- whether he had an ownership interest in CFG and he denied that he did?
A. Correct.
Q. Okay. Did he -- any other comment about ownership or relationship to CFG?
A. I'm not a lawyer. I'm no lawyer. But I did ask him. I need the honest answer if this is a plant, not a plant. There's a lot of assertions in the papers that are being, you know, circulated that, you know, you're moving from one place to another and this is just a play, et cetera, et cetera. He said he absolutely has zero involvement in CFG, the ownership or otherwise.

Q. And so this sounds like it's an after -- some of the -- after filing when the papers were being filed? Is that -- when did you have this particular discussion?
A. No, after -- whether it was the committee or whoever filed the objections. There's all types of aspersions of, you know, CFG taking over. So I just asked straight out. I'm not -- nothing to be afraid of.
Q. Yeah, yeah. I just want to know the timing.
A. Sure. It was -- it was, I don't know, a week ago or two weeks ago. After some filing came in saying that CFG is taking over contracts. It seemed suspicious or something. I don't remember exactly the document that was filed, but there's definitely been a lot of -- a lot of that.
Q. CHS Employee Group --
A. Uh-huh.
Q. -- are they -- are they now leasing the employees to CFG?
A. I don't know for a fact that they are not, but I do know that CFG has asked us for a lot of different employment records, you know, which we were -- or, you know, which we asked permission to share. As they said, they have their own payroll and to transition people over to their specific payroll.
Q. So CFG has directly asked the debtor to -- to

provide --
A. (Crosstalk) I'm not exactly sure what, as I'm sitting, looking. There were e-mails where Philly, just for argument's sakes, asked for certain transitionary needs for CFG to either get tail off hours or some -- some information, which they needed in order for CFG to register the people properly on their payroll. So I'm assuming that they have their own payroll.
Q. So this -- you're saying Philly. You meant the city, the agency, whoever does the corrections agency --
A. The -- there's a contract holder from Philadelphia.
Q. Oh, I see. Okay.
A. Their -- their offices said that they needed certain things in order for CFG to transition the payroll specifically. That's why I'm saying I believe they have their own payroll.
Q. All right. But CFG had not -- has not provided that? I mean, sorry, CFG did not directly ask?
A. I have not been in contact with CFG.
Q. Okay. And again, so the question originally was CHS employs --
A. Yeah. I'm sorry. I'm just -- I'm speaking pragmatically, not specifically.
Q. To your knowledge -- to your knowledge, CHS --

or you're unaware whether CHS Employee Group is now providing payroll services or leasing employees to CFG Group?

A. Correct. My assumption is not based upon the matters I just discussed, that CF -- CFG was asking for specific information to be able to put out their own payroll service.

Q. Right.

A. That's where -- that's where I'm coming from.

Q. Got it. But you did not inquire? You did not inquire about that?

A. No.

Q. Okay. So switching a minute to the contract. I understood your answer in part to be that some contracts -- well, let me start again.

There are some contracts under which the debtors continued to perform after the filing of the bankruptcy; is that fair?

A. Yes.

Q. Okay. So under the circumstances you described where some were being terminated because you did not have a DIP loan financing to be able to service them, how was the debtor able to service those contracts that you just -- that we just mentioned?

A. I'm going to ask you to clarify the question.

Not -- I understand the context of the question. I just want to answer it properly. I'm not --

Q. Yeah. So you just testified that some of the contracts -- the debtor continued to perform under some of the contracts. So --

A. Yeah.

Q. -- let me shorten it. How was the debtor able to do so under the financial constraints that you described earlier?

A. Oh, okay. That's a better way -- understand. Okay. So we did not -- the debtor did not cease operations when payroll was missed. The people, employees, leased employees as we have, you know, putting the duality on that, continued to show up for -- for the most part at the facilities in order to provide care.

We communicated that we believed we would be able to solve the payroll issue in short order and to please hang in there with us in order to be able to continue to provide proper service to the contracts and to the persons who needed the medical care.

So these are very dedicated people. And they stayed on without getting paid. There -- many of them are nurses and other caregivers who care about the people and, you know, want to do the right thing. So we continued on with providing the services.

We had some also prepaid credit cards for some medications that were being used. Some of the counties provided local pharmacies to be able to provide the medicine. And as a village model, things kept on flowing.

So that's how we were able to maintain whatever we could maintain. And there's still some staff that, you know, has been pitching in above and beyond in order to try to make sure that people are cared for.

Q. So it sounds like there was that window of time when that was happening when, again, you mentioned four potential DIP financing leads --

A. Yeah.

Q. -- the fact that, you know, M2 --

A. Yeah.

Q. -- but what -- what efforts beyond that did the debtor make to obtain DIP financing or to fund that payroll in order to save those contracts?

A. We continuously communicated with the potential DIP lenders. We called upon people who owed us money to pay the invoices, which is the extent of what we could do.

At the same time, you know, looked for -- but that's what we did. That's -- that's all that we could do at that time. In fact, you know, Cook County made

efforts to pay us ahead of the hearing so that we could pay their payroll, you know, upon the hearing. Philadelphia made provisions to pay us that day as well.

As I mentioned, Dona Ana worked with us in order to get that accomplished. Not everybody else did, but we -- you know, we worked in tandem with the contract providers -- under contract -- contract -- our counterparties' clients, easier way, to work through the cash constraints in order to make sure that we have continuity of care.

And through that process some of them told us they were transitioning as they did not want to have the level of uncertainty and they would not be able to continue on.

Q. But it sounds like there's still -- the -- the lack of the DIP financing is what drilled the nail into -- nail into the proverbial coffin, yeah?

A. Seemingly so.

MR. MARTIN: Object to form.

BY MR. SALAZAR

Q. So you were -- we talk -- beginning of the day you testified about how you were involved with the debtors since 2025. You had talked about you were considering bankruptcy prior to February of 2006. Did you -- did you feel the debtor would have benefited from

filing sooner than it actually ended up filing?
MR. MARTIN: Objection as to form. Are we back on topic one?
MR. SALAZAR: I have a follow-up question.
BY MR. SALAZAR
Q. Go ahead. There's a question pending, Mr. Goldwasser.
MR. MARTIN: Well, I'll object to this. I think we're back on topic one. And we said that he's not being provided and produced regarding topic one.
MR. SALAZAR: Understood.
MR. MARTIN: He can go -- he can go ahead and answer on his individual capacity.
THE WITNESS: Mr. Salazar, could you repeat the question? I apologize.
BY MR. SALAZAR
Q. Yeah. So in your individual capacity, do you agree that the debtor would have benefited from filing bankruptcy much sooner given its financial constraints, given the financial difficulties, and ultimately what happened?
MR. MARTIN: Objection as to form.
MR. SALAZAR: So as -- as I discussed earlier, at the time, the impetus of potentially filing was

due to the default issued by the settlement, not specifically based upon the company performing some totality, even though it was still struggling, we'll say, a little bit.

But it was not, I would say, in a bankrupt position at that moment. And with the -- I apologize. I forget the contract that was pending, the RFP that the company was bidding on.

But between Alabama being up for bid, Philadelphia being up for bid, and the other contract, had there been a bankruptcy filing, there would have been no chance whatsoever to get those three contracts.

So in my personal capacity, I don't know that filing bankruptcy at that point would have been better on a business perspective for where we are today in general, but it definitely would not have allowed for the ability at all to survive the two RFPs and the third potential RFP.

BY MR. SALAZAR

Q. Related question.

A. Sure.

Q. The DIP -- I guess from your earlier testimony, the DIP -- the search for DIP financing seemed to have started or did start, I think. You had discussions with

Mr. -- with M2 just before the filing. But why didn't you seek -- why didn't the debtors seek to use cash collateral from day one instead of waiting till, you know, day 19, 20 days late?

A. We didn't have cash.

Q. No. You still have to ask permission for use of cash collateral, right? So when it comes in you have the ability to use the money, right?

A. No, no. I -- I didn't mean it in the -- I understand your question in -- in full form. It's a good question. Again, the combination of teeing up what we thought would have been a DIP motion, which was where, you know, we were headed, whether it was M2 or otherwise.

Understanding that everybody else was freezing their payments kept us on that focus until we realized we weren't getting there. And then we did have a cash collateral motion pending, which we kicked out.

This was prior to the committee being formed. I believe it was for a Monday the week and a half before we actually had the hearing for a cash collateral motion, but we did not have any cash to pay -- or wages motion in combination.

Again, I'm sitting here. We had -- we had our motions to be able to make payments for the wages had we gotten the money pending and we had a -- we had a date

pending with the court. But we had to kick it out.
I'm not talking -- I have counsel on the phone. They can give you whatever dates and motions we did physically have on, but I know that we had teed up a hearing date for an immediate motion other than the one that we had in order to be able to do that.
So it's not that we didn't get ready. We just didn't have the money. Going to ask -- it was decided by counsel not to have a hearing when we didn't have -- not to have a hearing over.
Q. You filed the case. You don't have DIP financing. You tell me that you had no cash and -- and did not line up immediately to use cash collateral. The contracts are, you know, either being terminated or transitioned, as we said.
You only have a couple of contracts where payroll is -- or nurses are basically waiting to get their payroll. You know, it would seem that immediate action was required. So what was holding off -- what was causing the hold up in filing for cash collateral, in seeking DIP financing on a broader scale?
MR. MARTIN: Objection as to form.
THE WITNESS: I don't understand. You used -- you combined a few different things with that question. So if you can just unpack it. I'm not

trying to -- just you asked a bunch of things at the same time.

BY MR. SALAZAR

Q. My question is: You know, what -- why all the delays in the beginning of the case? You didn't move immediately for cash collateral, right? You -- your DIP financing efforts were talking to about four people and M2 when M2 almost immediately threw you over.

You had contracts that are -- that are being transitioned out. Others where you're not paying payroll. You know, what was the hold up? Why didn't you move immediately, if you're using cash collateral? Why didn't the debtors do a broad-based search for DIP financing?

MR. MARTIN: Objection as to form.

THE WITNESS: So we did speak to debtor in possession lenders. We did speak to other lenders. We have Jeremy Markowitz as a broad -- he's not -- he's partially a lender and partially a banker who I had introduced to the company prior and had very broad knowledge of the company, the finances, the industry.

And spoke to other debtor in possession lenders on behalf of which the prison healthcare business is not a favored (interference) for DIP lenders,

especially given all of the different circumstances around YesCare and specific that was not something that was not undertaken.

We did not hire a banker specific. Had to pay somebody money that we didn't have to go out for an industry that we circled with people who are in the business in order to get -- that are in possession of financing.

With the cascading flow of the contracts, transitions, and terminations, and the fact that it was healthcare, I felt it was not a lift that was surmountable.

In regards to the cash collateral, I did interact with counsel to make any and all motions needed to be able to use cash as soon as we have it. Why the exact dates were filed, weren't filed, I don't have something in front of me now.

But give me an exact reason to tell you anything was delayed other than the fact is we filed on -- even the payroll without the money to make the payroll.

And we did not have the normal wind up time that we would in filing a case and then try to chase the money and stop the contracts from going out the door was the chase we were on.

And we didn't have money to spend. I did say that we need to pay the people as soon as possible. Teed up paperwork for that. And it looks like we had a date pending, which we couldn't make because we didn't have the financing and/or the cash, so --

BY MR. SALAZAR

Q. What about reaching out to others in the industry who might -- you know, might be interested in remaining assets or remaining contracts, remaining structure? Did anybody reach out to -- was there any outreach to -- to a strategic partner?

A. I had Mr. Markowitz reach out to anybody he thought would be a strategic partner. I did speak to some other people who are in this space such as Joseph Sarachek and some other people.

It was a very, very tough ask of anybody with the entirety of the staff not being paid and having to pay payroll that might or might not come back, moving forward with contracts that were failing on a daily basis with governments.

So it's not a matter -- I did reach out. I did speak. I did work. It's not something that was just ladida, too bad on everybody, and I felt faster than anybody anticipated. And there was nothing to officially catch.

Q. You had Mr. Markowitz you said? He was also -- I thought you approached him as a lender. You're saying he went out --

A. As a lender and/or as -- as -- call it a participant, broker, what have you. As I said, he had a lot more information on the company from the past. I had looked at him when we were going through the negotiations with the settlement agreement to look at the company to see if he could find a strategic partner and/or, you know, somebody possibly to come in and assist with additional financing for the company.

Definitely could have benefited from additional financing. Whether it would have benefited from a bankruptcy as you asked me before, that, as I said -- which is why I personally think it would -- it would have potentially damaged it more at that point. But additional financing would definitely be something that would have helped the company, that there's no question.

Q. Let me ask you -- want to follow up where we left off immediately before our break.

A. Sure.

Q. At the -- about the payroll payments made by -- directly by municipalities or agencies and the like.

A. Sure.

Q. So -- so first of all, to -- in what -- what's

the amount of those payments as you understand it?
A. I don't know. Not -- I'm sorry. I don't -- like I just don't have the list because we would still have been getting information.
Q. Okay. But before I forget, did you -- what's in the DIP bank account? Were you able to see that?
A. Approximately $2.162 million as we speak right now.
Q. Okay. So back to the --
A. I did -- I wrote it down and I --
Q. You remembered it. That's exactly right. And I remembered to ask, too.
A. All right. And here are --
Q. The -- that's good. If the -- if the -- to what extent then does the payment --
A. Sure.
Q. -- directly by others of this payroll, putting aside CHS Employee Group and their obligation, but --
A. Uh-huh.
Q. -- municipalities, government agencies, correctional government agencies that made those payments, to what extent does that mitigate, eliminate, or significantly, you know, reduce the amount of payroll that the debtor has to pay that you're seeking approval of?

A. Again, I want to answer you because I want the answer. It's been a little bit harder pulling teeth from the municipalities than I would like to tell you. I endeavor to have that answer by Friday.

Just nothing to do with this deposition. I'm just -- you know, under my own direction of everybody, you know, which is one of the reasons that we're sending out the bills again today, you know, the collections.

Because, you know, one of the messages is we want to pay your people. You know, here are open bills. Tell us -- you know, people are not communicating, right? So I'm going to find that out, again, with God's help, by Friday so that I can reduce the liability, right, that is currently out there, regardless of you want to call it, as you say, CHS or YesCare.

I want to reduce the liability to people and payroll, which is, you know, my first and foremost thought right now. To make sure, number one, the people are paid and reduce whatever potential liability we have as the numbers we forecasted so far.

Q. So (crosstalk) if you have the 2.162 million on hand --

A. Uh-huh.

Q. -- what -- what will you have if you, you know, pay what you're expected to pay in payroll? I think it's

this Friday, right?
A. I don't have -- I can get that in the next break. I'm not trying to be -- it's just been an evolving number. But I have no problem getting that number on the break.
Q. We're talking mill- -- several million dollars or that 2 million -- 2.1 million will be depleted?
A. That -- if I pay -- I'm thinking in forecast. I'm not -- I'm not taking an exact right now. It could be that it will be depleted, but I have another payment from Philadelphia, there's another word, Philadelphia, from the contract with Philadelphia pending of $4.3 million that they're approved and are trying to get to us. So whether that will come in -- again, speaking openly, pragmatically. Not a matter of --
Q. Uh-huh.
A. No -- no legal jargon here. Their normal process will get us paid either next Friday or the Friday after, even though they've gotten everything approved. It's just a government agency. They have processes.
As things happen, the union boss went into the mayor's office yesterday and pounded on his desk. I don't know literally, but just sounds better when you say union boss and mayor of --
So we are potentially going to get a wire so

that we can pay the final post-petition payroll to Philly, which is only a few hundred thousand dollars, but would give us, you know, another few million dollars in income that we would have.

Now, that doesn't settle their whole open account, open bill. And, you know, there are things to be settled with them over the last month in which by contract they still owe us. And, you know, they're one of the municipalities that filed a motion to try not to pay that.

But, you know, we have not agreed to that. And on the last hearing we agreed only to transition the services, but not to terminate their contract as, you know, we feel that it's still there.

But again, what -- we get beyond that, I don't know, but I'm just saying it still leaves an open potential payable of 6 million for the month of June. Whether we get -- I'm just talking openly. I don't know that we get it, but it still leaves an open payroll of 6 million.

This is representative of what, you know, we're getting now. That's what I'm saying. I'm not thinking this is a settlement. It's just 4.3 is what they were approved to pay. And Commissioner Res (phonetic) was trying to get a wire to us so that we could make payroll

tomorrow night for his people for I think it's $500,000 is the open payroll that we have.

Q. Have they -- have the -- has the -- have the employees in Philadelphia been transitioned to the new --

A. Yes, they were transitioned. They were transitioned. So we have a one-week open payroll, not a two-week open payroll. Because they were transitioned on the 25th of May and we had payroll from the Monday before through the 25th.

So payroll records were reconciled. You know, exact hours, no estimations. It's approximately $500,000 payroll. You know, approximately 5, 5 something, in that range. But, you know, to get 4.3 million and only have to pay 500,000 right now is -- is a good -- is a good business for YesCare.

Q. All right. Let's -- I'm going to move for a moment to -- so by Friday -- by Friday you'll have completed the analysis to determine -- you believe by Friday you'll be able to determine what empl- -- which employees have been paid by -- directly by these entities, the contract, other contract parties --

A. It might be that when --

Q. (Crosstalk) uh-huh.

A. It might be that when we take a break and I call in, we already have it.

Q. So maybe --
A. I -- I put in -- I'll say demand. You know, I directed everybody to make sure it's no later -- we're trying to get it for tomorrow so that we can adjust and make whatever payroll we can, but no later than Friday so we can at least have somewhere that we're standing and we can report back, you know, with updated budgets.
Q. All right. Let me -- I'm going to come back to some other cash collateral stuff, but let me move a minute, continue on with wages.
A. Sure.
MR. SALAZAR: So Ms. Lee-Sin, can you pull up as No. 9 docket entry 10, please.
MS. LEE-SIN: Sorry, one moment.
MR. SALAZAR: Okay. Thank you, Ms. Lee-Sin.
Mr. Goldwasser, I'm going to show you what we're marking as Exhibit 9 for identification.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 9 was marked for identification.)
BY MR. SALAZAR
Q. This is the emergency motion to pay wages. I want --
MR. SALAZAR: Ms. Lee-Sin, will you please turn to paragraph 8, please.
BY MR. SALAZAR

Q. Let me be clear. The debtor did not -- as you state here in paragraph 8 -- very beginning of paragraph 8 states, the debtors do not directly employ any employees, rather the debtors lease their employees from a non-debtor affiliate, CHS Employee Group, LLC.

I read that accurately?

A. Yes, sir.

Q. And again, so the debtor does not have any employees, correct? They're employees of CHS Employee Group, correct?

MR. MARTIN: Objection as to form.

MR. SALAZAR: What's the problem with the form?

MR. MARTIN: Calls for a legal conclusion.

BY MR. SALAZAR

Q. Okay. You can answer, Mr. Goldwasser.

A. So Yes- -- YesCare does not have any direct employees. They're leased employees through CHS Employee Group.

Q. Just a moment.

MR. SALAZAR: Ms. Lee-Sin, can you take this down and pull up the related entity services agreement? Just a moment. Just for the record, I have put things in one order and then I challenge Ms. Lee-Sin by calling them completely out of order. So if there's any delay, the fault is entirely me.

So I'm going to show you what we're going to mark as Exhibit 10 for identification.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 10 was marked for identification.)

BY MR. SALAZAR

Q. This is the titled related entity services agreement. You're familiar with this document, correct?

A. Yes. I -- I have seen it a few times, but anything you would ask me, I would love to read over it, whatever you want to discuss.

Q. I will -- I will -- I will walk you through it. So -- so the first thing, I'm going to start with that first paragraph of the -- of the agreement.

A. Uh-huh.

Q. The -- so it says made -- it's made effective as of the 11th day of March 2025 by and between CHS Employee Group, and it says here shorten it as CHS. Lists its principal office as 205 Powell Place in Brentwood?

A. Uh-huh.

Q. And then it's also between -- it's between CHS and YesCare Corp. who are the debtors. And notes the principal office is also at 205 Powell Place, Suite 104, Brentwood, Tennessee, correct?

A. That's what it says.

Q. Yes. (Interference) admittedly this is their -- CHS as a -- as a [sic] insider affiliate of YesCare, correct?

MR. MARTIN: Objection.

THE WITNESS: Looks like to me.

BY MR. SALAZAR

Q. Okay. And it's your understanding common ownership in that Mr. Lefkowitz has a direct or indirect ownership of CHS Employee Group and YesCare as well, correct?

A. I don't know if it's down to his name, but it says common control CHS and YesCare, so --

Q. Well, let's go to the next -- referring to the next paragraph. The first whereas paragraph states --

A. Yes.

Q. -- whereas CHS and YesCare are related entities under common control, correct?

A. That's what it says.

Q. All right. Thank you.

MR. SALAZAR: Let's -- so let's go now down, Ms. Lee-Sin, to the bottom of this page. Thank you.

BY MR. SALAZAR

Q. Under article 3 of this agreement, which is titled services provided by and obligations of CHS. Let me pause there. You admit I read -- I read that

accurately?

A. I'm sorry?

Q. The title --

A. Yes. You did -- you did a great job.

Q. Thank you. B under that section -- or sorry. Let me start again. Just a moment. Yes. B under this section says, the services to be provided by CHS for employees include, but are not limited to -- and number one say, pay wages to employees.

And then it continues to say, and prepare, administer, compile, and file all payroll information and distribute payroll checks to employees from its own accounts.

Did I read that accurately?

A. What it says.

Q. Yeah. It's the obligation of CHS Employee Group to pay these employees. Its services are paying those wages, correct?

A. That's what I read too.

MR. SALAZAR: So let's jump ahead, Ms. Lee-Sin.

Can you go to section 3.

BY MR. SALAZAR

Q. Section 3 at the very beginning it says, among the services they are required to provide, it says, administration of applicable benefit plans of CHS offered

to similarly situated employees and existing on the effective date -- and it's defined as the CHS benefit plans -- subject to and on a basis consistent with the terms of such CHS benefit plans.

Do you agree I read that accurately?

A. Did a great job once again.

Q. Thank you. So again, pursuant to the plain language of this contract, it's CHS Employee Group that has the obligation to provide these benefit plans, insurance, correct?

A. That's the way it reads.

Q. Thank you.

MR. SALAZAR: And then, Ms. Lee-Sin, if you just go to the next -- lower on the page.

BY MR. SALAZAR

Q. So Mr. Goldwasser, then article 4 says, YesCare service fees, which I guess the part -- now is the part that YesCare is obligated under, correct?

A. That's what it says.

Q. And then under A it says, fees. YesCare shall pay to CHS amounts equal to the total compensation and other costs incurred or paid by CHS to or on behalf of the employees for providing services under this agreement.

Did I read that accurately?

A. Yes.
Q. I'm on a roll. All right. So the obligation of YesCare, the debtor here, under this contract is to pay the fee to CHS Employee Group, correct?
A. That is -- that is a service fee obligations.
Q. Correct. That's the obligation of the debtor under this contract, right?
A. For services.
Q. Yes.
MR. SALAZAR: Now, Ms. Lee-Sin, if you turn to the next page, middle of the page.
BY MR. SALAZAR
Q. This section B provides for administrative fee, which is 4 percent of all gross wages, you know, per the earlier section.
A. Yeah.
Q. Administrative fee.
A. Yes.
Q. To your knowledge, has the debtor made -- paid that administrative fee since the filing of the petition?
A. We have not.
Q. Is the intention to pay it now as part of the next round of payroll?
A. The intention is not.
Q. Does CHS Employee Group agree with that

intention, to your knowledge?
A. I have told them that's not being paid and they -- and they agree to continue on.
Q. All right. When you tell -- you told them. Who -- who did you tell?
A. I -- I told Mr. Lefkowitz that I cannot pay administrative fees, any related entity, and I cannot -- I took him off of payroll the day that I took over. I directed him to be removed from the payroll. And everybody has direct -- direction -- first off, nothing's been paid, but there are no insider payments allowed to be paid during the bankruptcy.
Q. So this 4 percent as a potential insider payment is not going to be paid?
A. It will not be paid. That's correct.
Q. Just a moment.
MR. SALAZAR: Ms. Lee-Sin, can you go to the next to last page, subsection I. It's towards the bottom of the page. There you go.
BY MR. SALAZAR
Q. You agree with me I here states, no third-party beneficiary, the parties acknowledged and agreed that this agreement creates no rights for or in favor of any person or third party not a party to this agreement and that no such person may place any reliance thereon.

Again, I read that accurately?
A. You did.
Q. That's what it states, correct? So there's no third parties pursuant to this agreement, right? No third-party beneficiaries?
A. That's what it says.
Q. Correct.
MR. SALAZAR: And Ms. Lee-Sin, can you just get to the -- just turn one more page. I want to see the signatures, please.
BY MR. SALAZAR
Q. And you agree with me that CHS Employee Group, LLC, the signing party there, the signing individual is Isaac Lefkowitz as director, right?
A. Yep.
Q. And then remind me again, who's Scott -- Scott King, is -- is he still GC or CLO?
A. Yeah, he's still the general counsel.
Q. Of YesCare?
A. Yes.
Q. Now, we understand that there's this -- an insurance payment or payment for insurance, personal insurance for the employees, that still is due or going to be payable in the amount of about $2 million; is that -- is that accurate?

A. Pre and post-petition.
Q. So -- thank you. So for post-petition period. So explain to me --
A. No, no. No, no. For pre -- pre-petition and post-petition.
Q. Oh, for both. Oh, I see. So $2 million pre and post solely for the -- for the insurance component; is that right?
A. Yes.
Q. Do you have -- all right. So my question is: If it's pre and post, what exactly is -- is the debtor paying for with that $2 million? Is there a policy that's still active?
A. What -- you're saying what's being requested to be paid?
Q. Answer that question and see if it -- see if it --
A. You just said what is the debtor paying. The debtor is paying nothing.
Q. Yeah.
A. So just -- that's why I'm asking.
Q. Well, fair enough. The $2 million that we understood was -- was going to be part of the ask for payroll -- maybe I'm mistaken, but for the $2 million, the debtor is not seeking that money authorization to pay

that?

A. Okay. So I'll -- I'll be -- okay. So I'll -- I'll unpack the question.

Q. Thank you.

A. There are -- there are some post-petition insurance, 401(k), paid time off. There's a combination of things that are requested that are -- paid time off. There are a bunch of things that are benefits. We'll just use the word benefits for -- for this pragmatic discussion. There was a request to pay for an insurance.

There was a -- what I have come to understand was a self-funded insurance plan that was administered by a company called Leading Edge and was insured by a company called Anthem who paid out claims and then got paid for those claims from -- from the company.

There were a few months that were missed prior to filing. Nonpayment. And since the filing, what I understand, claims went up. People went and filed, you know, for additional medical care maybe because there was a bankruptcy and they wanted to get things done before (interference) terminate. I'm not sure.

So there was in the budget -- there is in the budget a request to pay for insurance in order to keep it alive. That might not be viable anymore. We're still finding out whether it's viable.

And as I may have mentioned earlier, the demand to be made upon CHS to make that payment, absent getting paid from YesCare, due to what you're reading in the contract and my agreement to go after that -- to be paid on behalf of the employees and then whether they have a claim for that later or not is yet to be seen.

But that's the current path that we are pursuing to try to force CHS to make that payment on its own without getting the money from YesCare upfront. Is that clear or did I --

Q. It is. I just had some -- some follow-up questions as --

A. Sure. You know, when -- when you're talking and thinking, it sometimes doesn't come out clear for everybody else.

Q. No, I think I understand. Let me ask some follow-up. So --

A. Sure.

Q. -- there was these -- this -- the payments due for this fund, which I'll get to in a minute. Some of those payments were skipped for several months before the bankruptcy filing?

A. I don't know about several. I believe two or three.

Q. Okay. So --

A. But -- but I don't have that exact in front of me, but there was -- it wasn't that they were -- I wasn't shown payments being skipped. I was shown a pre-petition balance. According to the way we budgeted it out, it would seem to me it was two to maybe three months.

Q. Understood. Are the -- and then you said it's a -- so it's a self-insured fund that -- with CH -- is it CHS Employee Group maintains? How did that work, you know?

A. Yeah. The contract has CHS Employee Group doing business as YesCare. It's -- that's the way the contract reads for the duality of, you know, we'll call it the YesCare umbrella and the leasing that was contracted with CHS Employee Group doing business as YesCare for the purposes of the insurance.

Q. So there's a -- you're saying a contract with, I guess, the providers you mentioned, Leading --

A. Yes.

Q. -- Edge and Anthem?

A. Yes. Leading Edge is called the administrator.

Q. Yeah.

A. And Anthem was the insurer, I guess, what the -- you know, yes, the insurer.

Q. Okay. And do you have an understanding whether or not the fund currently has -- has, you know, money in

it, has resources in it?
A. It definitely -- definitely did not. It was similar to this where they pay and they get paid.
Q. So they pay what, insurance claims?
A. Yes (crosstalk) they pay insurance claims, they reconcile everything, and then they come for reimbursement, correct.
Q. So there's no lag -- there's no like deposit or some money that --
A. Different -- different than what we mentioned about the AIG, workman's comp.
Q. Uh-huh, uh-huh. So -- and then maybe the last component of what you were talking about is you're not sure whether or not, you know, even making those payments is going to -- well, let me back up a second.
At this point in time, all the employees have been transitioned elsewhere, right?
A. Except for corporate and Dona Ana.
Q. Okay. And that's -- okay. How many employees at, you say, Dona Ana?
A. 42 or 52.
Q. Okay. And then other than -- and then you say corporate. How many are we speaking about there?
A. The numbers fluctuate. It was 150 at a time. Some people quit. Some people left. Laying off. So I

don't know exactly, but totality was 150. We believe, you know, we'll have 24 to 25 people to wind down and/or transition if somebody wants to buy those, you know, key people.

Q. So --

A. Yeah.

Q. -- that's happening immediately, right? So --

A. Yeah, yeah, yeah.

Q. -- 150 people there, right?

A. I'm just -- this -- as -- as there are different governmental issues, more this, that -- I'm not minimizing, I'm just saying.

Q. Uh-huh.

A. Doing things in the best concerted effort with legal advice that we have, as we walk through it and we have to determine who needed to stay and who didn't need to stay -- who we wanted to stay, right, in order to be able to deal with the affairs. So we boiled that down to I believe 25 people. And that would be the core group that, you know, would potentially need the insurance going forward. So --

Q. That's maybe -- sounds like if you include the New Mexico facility, maybe you're talking 200 people, right?

A. Max, yes.

Q. Yeah. And so -- but the rest -- really the rest are no longer employees, I would assume not eligible either for --

A. That is correct.

Q. Right. So a claim, if any, would be from I guess either Leading Edge or -- or would you say Anthem perhaps making that claim? So it's not a -- it's not an employee claim per se, is it?

A. Correct.

Q. Okay.

A. It's -- and I'm just talking out loud. It's just a convoluted -- not convoluted in secrecy. Just convoluted in the way that the system worked, so --

Q. Certainly, you know, besides the -- maybe providing insurance for the 200 or so that we talked about and New Mexico as needed, there's no other benefit to the -- to the estate. You're not maintaining thousands of employees to produce value, correct?

A. Correct. Which is why the decision was made, the demand upon CHS, not the estate.

Q. Okay. Is there a current plan on the part of the debtor to fund or -- to fund any part of that, to pay any part of that $2 million out of -- out of its own funds?

A. At the moment, no. We're looking at some

alternatives for the remaining employees to potentially just carry them forward or offer them compensation for their own insurance if they needed, you know, to minimize impact on the state in totality.

MR. SALAZAR: Okay. If it's all right with everybody, I'd like to take maybe ten minutes now. We'll come back at the top of the hour, 3:00. All right with everybody?

THE WITNESS: Yeah, good to me.

THE VIDEOGRAPHER: Going off the record. The time is 2:52 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: We're going back on the record. The time is 3:06 p.m.

MR. SALAZAR: Thank you, Mr. Weaver.

BY MR. SALAZAR

Q. Mr. Goldwasser, I want to ask you about the -- make sure I got it right -- Ala- -- Alabama --

A. Yes.

Q. -- right? 'Cause you may have seen there's an article out there. I'll show it to you if we need to. Alabama Appleseed had a -- an article. And in that article they quoted from -- from certain -- certain folks in the government. Let me start. So let me start with the basics. The Ala- -- Alaba- -- the debtor had a

contract with the Alabama Department of Corrections, right?

A. Yes, sir.

Q. Okay. So just prior to the bankruptcy filing, did the debtor receive 11 -- an $11 million payment from the Alabama Department of Corrections?

A. The answer is the exact amount I don't know. There was a large payment. The contract was generally $16 million a month, give or take.

Q. How many?

A. I think there was -- the payments were normally either 16 or $18 million.

Q. Uh-huh.

A. The contract was large, but they had some off -- that's where the contract -- you know, each of these contracts there's a different way that -- that it is. And there was a payment made prior -- not immediately prior, like the day before.

There was a payment made a few weeks before the filing -- I don't have the date in front of me -- of a sizable amount of money. To my -- again, as I'm sitting here, I don't know the exact amounts or dates, but yes, the generality of that makes sense.

Q. So the Alabama Department of Corrections contends, am I right, that it had an informal agreement

with the debtors that all of those -- all of that $11 million would be used to pay payroll, correct?

A. That I don't know.

Q. Okay.

A. I didn't make that deal. I mean, just -- I did not -- I did not speak to them about that at that time. I was not involved when that payment was made, but I do know about the payment.

Q. So you're quoted as saying that the money was used for emergency operations. So do you have a recollection of what that million was actually used for?

A. I'm quoted?

Q. Apparently, yes. Well, let me -- whether you were or not, what was --

MR. MARTIN: Objection as to form.

BY MR. SALAZAR

Q. -- used for?

A. It wasn't there when I got there.

Q. So this was paid in April.

A. Yeah. I mean, I was around the company, but I -- I only came in to -- I'm going to use the word op- -- you know, operational, use the word control, in the first week of May. The payment was made some point in April. I do know about it.

I was, you know, in discussions at the company

as far as potentially needing to do something because of the Kohchise matters we discussed earlier. But I was not part of the incoming expense at that time, you know, watching the cash flow.

Q. All right. So as you sit here today, you don't have any specific knowledge about this, you know, agreement for the 11 million to be used for -- to pay payroll?

A. No. The Department of Corrections did ask me that same question when I spoke to them.

Q. The Alabama Department of Corrections?

A. Yes. But we -- we had a -- when this all went down -- and by the way, I do have to correct myself, something I said a little bit ear- -- not -- clarify maybe. When we were talking about earlier cash collateral and making emergency motions and whatnot, where you asked me why did I not make a cash collateral. So --

Q. Let's -- let me ask to stay on target.

A. Okay.

Q. Tell me about the Alabama Department of Corrections. If you have something to add, your counsel --

A. It all tied -- it all tied in together. That's why it just came to my mind, but I'm sorry. I'll talk

about that afterwards.

But in the first week I did get on the phone with almost all the client -- client contacts to discuss, you know, where we were, what they might be able to help, not help, you know, where we were going, dealing with the payroll, you know, specifically because that was the biggest concern of anybody and everybody for the first ten days, about the first week.

And I did get on a call with the Department of Corrections from Alabama to discuss, you know, what was going on and if, you know, the -- and if they could help make the payroll or if CF -- not CF. NaphCare. I'm sorry. NaphCare has Alabama.

They were going to make -- they said they at one point were going to make the payroll. So we got on a joint call with NaphCare and Department of Corrections. NaphCare then said they were not going to make the payroll 'cause there was contention they would make it and then seek it from us later. That's --

Q. Okay.

A. -- not me, you know.

Q. Right.

A. It's a big contract for them, so, you know --

Q. Did the -- so did the payment of the $11 million come up?

A. So with him, not. Then we had a specific call with more people in the Department of Corrections. And there was not a specific number that was discussed, but they did say that we understood that if we made that payment, that the payroll would be paid.

And I said I wasn't here, you know, at that time. And maybe they took out of context or I -- you know, they said, what was the money used for? Other things in the company. So, you know, it could be taken out of context as to where that came from. But I did have -- I did have a call with a few folks at the Department of Corrections.

And then separately I called up one of the contacts there and said that, you know, I still have an open bill of $1.8 million. If you would pay that bill or, you know, I would ask the court permission just to pay your pre-petition payroll with your money. You know, obviously it would have to be court approval, but --

You know, or pay the whole 3 million. And we would just pay your people if that was acceptable to the court and all the objectors. You know, I could not make an offer to do anything.

And then they did call back and say, well, we believe you took a payment before and we're not going to give anything. We're not going to make any deals. I

said, okay. You know, I'd offered to try to bridge the gap some way, shape, or form on behalf of the employers with the Department of Corrections.

Obviously being in the position I am, I don't have anything but permission to ask. But, you know, that might be out of those conversations where, you know, these words came from. I was just trying to get the people paid with, you know, whatever I could.

And if I'm not going to get into the estate anyway and they can pay their people and get goodwill from that, that was my idea, you know. Obviously I floated it with them.

You know, it would not be done without anybody's -- it would not be done, you know, under the shade of darkness. But I would like to correct something I said before about the cash collateral, you know --

Q. Against my better judgment, go ahead. What -- what did you want to add about the --

A. Oh. We didn't make a motion, but we did ask permission from counsel and Mr. Nash providing a letter that he allowed the use of cash collateral to the extent any money came in, I think the Sunday after we filed or the Monday after we filed, so that if we needed to make a payment of any sort, he gave express permission on behalf of him to -- to use that.

So it wasn't a motion. And again, it would be up to everybody else's objection later. But because of the nature of payroll and if money came in, that was given that way than -- but you know, in the abundance of caution, I was -- made a proper motion.

I'm just saying for the purposes you asked if we had any money would we use it. We did obtain M2's permission in writing to be able to use the cash collateral if it was needed. And -- I'm sorry.

Q. Yeah. Was that produced in the -- in the recent production, loan -- loan --

A. I'm -- I'm not sure. It came to my -- came to my, you know, thought when we were just talking, so --

Q. Yeah.

A. I'm sure counsel provided. I'm just saying -- counselor wasn't excited about using it, specifically as a backstop, but I'm just addressing, you know -- you asked what the efforts were.

Q. Uh-huh.

A. And I just, you know --

Q. Yeah. Other than granting permission, what else did the letter say?

A. I don't know that it said anything else. I don't remem- -- I don't -- I'm not -- I don't have my computer open, but I do remember there was an e-mail or

letter that just said that, you know, we were allowed to use the money I think for payroll. Not, you know, for anything. Not just -- not -- not to buy Twizzlers, but, you know, it was specific. We had money for payroll so that we wouldn't have a stop.

Q. We talked earlier about the -- about the -- the total amount that's actually due to the -- to the lender, which you had to ask permission to use their cash collateral.

But I believe you're agreeing with me that if that number is still under analysis because we're not clear about the starting point of the payments, it's not clear from the debtors' perspective or certain from the debtor's perspective how much is actually owed, correct?

A. That's correct.

Q. All right. I want to talk a little bit more about that starting point. We -- we discussed earlier. We talked about earlier the -- that I recall asking you whether or not you were aware that the original $100 million amount was written down to $11 million, was forgiven down to $11 million. And I think -- believe you were not aware of that, correct?

A. That's correct.

Q. All right. But that -- that would certainly, again, impact the debtors' -- the debtors' understanding,

the debtor's position with respect to the amount that's actually due, correct?
A. If there was something produced that showed something different than what we have, obviously it would impact.
Q. Well, and if I showed you something that were, you know, documents from the company itself or from, you know, key employees of the company, would that impact your thinking?
MR. MARTIN: Objection as to form.
BY MR. SALAZAR
Q. It would, right?
A. As I just stated, if you show me documents that we can verify that would be contrary to what I have so far, I would, of course, investigate it and see which ones prevail or if they're somewhere in the middle or, you know, anything that might -- that -- that might be needed to figure that out.
Q. I'm going to run through a few documents that discuss the debt that M2 is asserting.
MR. SALAZAR: Ms. Lee-Sin, can we start with the first -- the first Dorris e-mail, please. And can you just shout out, is this No. -- Exhibit 9 or 10? Ms. Lee-Sin --
MS. LEE-SIN: This will be 11.

MR. SALAZAR: 11. Okay. So I was completely wrong again. Okay.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 11 was marked for identification.)
BY MR. SALAZAR
Q. So I'm going to show you what's -- what we're going to mark as Exhibit 11.
A. Okay.
Q. I asked you earlier in the day if you understood who Anita Dorris is. But this is an e-mail from Anita Dorris, senior staff accountant at Corizon.
A. Yes.
Q. You -- you understand that Corizon was the predecessor to YesCare, correct?
A. Yes.
Q. Yes. And then Corizon ultimately became YesCare, correct?
A. Or whatever machinations, yes.
Q. Okay.
A. I'm just -- I'm using that as -- you know, as a legal term, machinations.
Q. Right. Thank you. So, you know, in -- in response to the message below about, you know, paying cash interest, Ms. Anita Dorris describes the loan as -- it says, I -- I was not sure what is happening with our

faux debt. Do you see that?

A. I do.

MR. SALAZAR: Okay. Ms. Lee-Sin, can you pull up the next Ms. Dorris e-mail, please, 12.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 12 was marked for identification.)

BY MR. SALAZAR

Q. So this is an issue of great concern to -- to Ms. Dorris. So on -- I'm going to show you what we're going to mark as Exhibit 12 for identification. And this is a letter from Anita Dorris dated the 31st of January, 2022.

And again, in response to the -- to the payments on the loan -- I'm sorry, my camera's getting blurry -- she writes, oh, my gosh. What debt payments? We do not owe them anything. That means that we will not get that money back. What are they doing?

So this is her comment, again, about payments made to this faux debt.

A. Okay.

MR. SALAZAR: Ms. Lee-Sin, can you pull up the -- I think Mr. Hyman's e-mail.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 13 was marked for identification.)

BY MR. SALAZAR

Q. Do you have an understanding who James Hyman is?

A. No.

Q. Just a moment. Mr. Hyman also --

MR. SALAZAR: Ms. Lee-Sin, can you scroll down a little bit? I'm sorry, go back up.

BY MR. SALAZAR

Q. So Mr. Hyman, also an employee of -- of Corizon Health. And discussing the exact same loan. And it's highlighted, just one section of this -- of this letter.

A. I'd like -- I'd like to read the letter.

Q. Sure, go ahead. Highlighted just one pertinent portion of this describing the loan from M2, that M2 ended -- acquired and is asserting now saying, so the $75 million debt is not real.

A. So I'm not exactly sure how you put M2 into this or the other two letters. These are just statements with no names, no references to loans, no anything. So I think you're trying to ask me to answer you something related to M2 that I see nothing to do with M2.

Q. These are documents that ultimately -- that -- that the debtor also has access to. They're debtor documents. They're Cor- -- Corizon documents. These are essentially your documents. One of many or several of many that describe the debt and discuss the

debt, right? Again, it's part of your --
MR. MARTIN: Objection as to form.
THE WITNESS: Sir, you're asking me to agree to something that has nothing to do with M2 or any specific loan. It says faux loan, which I agree I read.
It says the loan is not real, we're never getting the money back. And it says the $75 million debt is not real. There's no reference to any loan documents, any closing packet, any -- any --
BY MR. SALAZAR
Q. Yeah. Do you have an understanding of Flacks and its role in this -- in this company?
A. I have an understanding of Flacks and its role with the company.
Q. Okay. Would you agree -- so what is your understanding of Flacks' role with respect to the debt that M2 is now seeking to enforce?
A. From my understanding, Flacks was a [sic] owner of debts and equity at some point in time and the transactions.
Q. Correct. So do you -- is your understanding that the Flacks debt is exactly the same debt that M2 is trying to enforce now?
A. So the answer is to some degree that the Flacks

owned an equity that Flacks owned, I believe is -- but again, you're asking me to agree to documents that have no reference to any name or any lender, any name of M2, any name of anything. So to ask me to -- to give you an admission of something that I have no actual reference, no loan documents, no anything, I'm not going to.

Q. I'm not asking for an admission. Did you look through the -- the company's own records to determine the validity of the debt to M2, which the debtor is ready to stipulate is valid and enforceable?

A. I did and then provided the documentation to my attorneys. I think they provided to you and -- yes.

Q. Have you seen -- you've not seen any of these e-mails before, correct?

A. I have not seen these e-mails.

MR. SALAZAR: Okay. Ms. Lee-Sin, can we pull up the next one? I guess it would be, what, 14?

(Statutory Unsecured Claimholders' Committee's Exhibit No. 14 was marked for identification.)

(Reporter clarification.)

BY MR. SALAZAR

Q. You know who Scott King is, right?

A. I do.

Q. And you understand he was general counsel, chief legal officer of Corizon, right?

A. I do.
Q. And he -- he's currently serving in that role with YesCare, right?
A. Uh-huh.
Q. Did you speak to him about the validity and enforceability of the M2 loan?
A. Absolutely.
Q. Okay. Did he advise you about his view of that loan from this e-mail on August 9, 2021, discussing how -- and highlighted a portion, read it for yourself, discussing how --
A. This e-mail --
Q. -- subject to recharacterization?
A. If -- if you give me a minute to read -- first I've ever seen it.
Q. You have not seen this e-mail?
A. No. But if I could read it, then I could discuss the e-mail.
Q. Just for the record -- I'm sorry. Let you read it. I'll let you finish.
A. Okay. I read the e-mail.
Q. It looks like you mentioned a few times, discussed a few times. You're certainly familiar with this bankruptcy concept of recharacterization, right?
A. Yeah.

Q. Recharacterizing a debt as equity or even subordinating a debt, you're familiar with that, correct?
A. Yes.
Q. Okay. So again, Mr. King, which by the way is Exhibit 14, on 9/20/21 is saying that the debt, which is now the M2 debt, is subject to recharacterization, right?
A. You're telling me that it's the debt that's -- it could be subject to character- -- again, you're -- you're making me reference things without loan documents attached to very specific --
I'm -- I'm giving -- I'm giving you comments based on what I'm reading. Okay? And this completely contradicts anything to do with what you've showed me before in the other e-mails.
Q. Say that again.
A. This -- okay. First off, I'd like to see the other e-mails again to see the dates of those e-mails, please. I'm not going to comment on this until I see the dates of the other e-mails.
Q. Well, I'm not going to show them to you 'cause they're from '21 and 2022, right? So is there any (crosstalk) other debt out there --
A. I'm not going to answer you -- you want me to give you a story on stuff you're showing me for the first time, try and leap me into saying something. I'm not

going to. You don't want to show me the dates. I'm going to tell you -- I'm going to give you really combative nonanswer answers. Or you can show me the dates and I can tell you what I see.

Q. Are you aware of any other debt that might qualify here as the Flacks debt or the M2 debt in that -- in that amount of $75-plus million? Any other debt the company has that you're aware of?

A. No.

Q. Any secured debt of that nature?

A. No.

MR. SALAZAR: Okay. Ms. Lee-Sin, let's go back and let's show -- let's show 11, 12, and 13. Show the dates. So that would be 11 is from 14 December, 2021. Thank you, Ms. -- next one, Ms. Lee-Sin. The next one is from January 2022. Next, Ms. Lee-Sin. And this e-mail from Mr. Hyman is on June 2021.

THE WITNESS: Okay.

BY MR. SALAZAR

Q. So these are documents available to the debtor.

A. I'm not -- I'm not questioning --

Q. (Crosstalk) you have not seen. You have not seen.

A. I'm not questioning you whether -- the validity. I asked for the dates. That's all.

Q. I hear you. But again, my point -- my point and my question is: You have not -- you have not seen these documents before, right?

A. No.

Q. Assuming for a moment just to say these are -- these are actual e-mails from your company.

A. I got it.

Q. Internally at the company questioning the validity of the debt, saying it should be valid of recharacterization. Would that affect -- isn't that going to affect the debtors' decision of whether or not to stipulate to the validity of this loan, of M2's loan?

MR. MARTIN: Objection as to form.

THE WITNESS: So number one, of course, everything that you're saying sounds really good to you and is done in order to try to confuse me. Okay. So you just showed me different dates without showing me the dates the loan documents were signed, giving me different dates and different years. Okay?

And at the end of the day, yes, I will look into this further and I will question further. That's my responsibility. I'm not standing on ceremony as to telling you I'm not going to look into this. I will look into this.

BY MR. SALAZAR
Q. Yeah. I'm not trying to trick you, Mr. Goldwasser.
A. No, no.
Q. It's your responsibility to look into this. These (crosstalk) looking into.
A. I'm not -- I'm not -- no, no. I'm just saying I'm not trying to -- I'm not trying to be obstructive in nature. I'm just saying when you show me four different e-mails without proper context and attachment and references to exact things and different context, dates that go back and forth in the way you -- chronological order and say this, this, this, this.
You gave me different dates. That was done on purpose. Okay? So I'm not stupid. I've done this for a long time. I'll look into this. I'm not going to admit to anything.
I have spoken to Mr. King at length about the fact that they signed these documents and monies were wired and there -- and there is -- and there is a valid loan. Okay? Number one.
And they gave me proof. And I -- and I even got proof from the law firm that closed it during this time. So to tell me that it's all faux and fake is not true. (Crosstalk) one second. You asked me a question.

I'll tell you the answers.

Q. I thought you were done.

A. Okay. So here, this is talking about a secured debt being reclassified based upon factors which are not fully flushed out in specificity and taken out of context for what you're trying to ask me.

So again, I will look into the fact that something said faux and all these things without a question. I'm not going to give you any conclusion here because you've shown me different things without proper context, with different dates, in different order.

I will look into it. You have my word. It's my responsibility to do so. I don't believe it's a faux debt, but I could be proven wrong. And if I am, great. But the fact is that I don't appreciate being ambushed with documents, flip, flop, flip, and with no context and telling me wouldn't I agree. And I won't agree.

Q. Earlier when we talked about the wires, you said that you had -- you had seen that wires were sent, but you did not see how much of it sent, right? Like you didn't indicate the amount of those wires, correct?

A. That is correct.

Q. Okay. Just a moment.

A. Take your time.

MR. SALAZAR: Ms. Lee-Sin, I just e-mailed you

a document. Could you take this one down and open that document when you have a moment? Just a moment.

So I'm going to show you now what's marked Exhibit -- just a moment. Hold on. Hold on. Don't -- don't say anything, Ms. Lee-Sin. I can figure this out. 15. Thank you.

(Statutory Unsecured Claimholders' Committee's Exhibit No. 15 was marked for identification.)

BY MR. SALAZAR

Q. This is, as it says in -- in the title, the amended U.S. corporation income tax return. And it's from M2 Holdco, LLC, and its subsidiaries, right? Do you see -- do you see that?

A. I see it.

Q. You see it's 2020, right?

A. I see it.

MR. SALAZAR: Okay. Ms. Lee-Sin, can you go to the next to last page, please. Page 91, I think. Scroll up a little bit. Just a moment. Scroll up a bit more, Ms. Lee-Sin, please.

BY MR. SALAZAR

Q. Why don't you take a moment and read through this --

A. Yep.

Q. -- Mr. Goldwasser.
A. Okay.
Q. Want to draw your attention to the second paragraph especially.
A. Okay.
Q. As a result -- I'm going to read it to the record. As a result of the acquisition of the debt by a related party, section 108E4 caused there to be realization of income from the discharge of indebtedness equal to the difference between the adjusted issue price of the outstanding indebtedness and the amount paid by M2 LoanCo, LLC.
The adjusted issue price of the debt as of June 26, 2020, was $119,104,391 and the amount paid was $11 million, i.e. cash of $1 million plus new debt with an issue price of 11 million. Accordingly, the borrower recognized cancellation of debt income, CODI, of $180,104,391.
Did I manage to read that accurately?
A. You read it really well.
Q. Yeah, thank you. And borrower, as you see up top, is Corizon Health, right?
A. Okay.
Q. So do you -- this loan that's being referred to, this is the M2 loan. Do you understand that?

A. I do.

Q. And do you see that according to M2's tax return the balance of the loan but for $11 million was written off or it had cancellation of debt income to the borrower?

MR. MARTIN: Objection as to form.

THE WITNESS: I do see everything that you're reading. Okay.

BY MR. SALAZAR

Q. So again, combination with the e-mails from Corizon, from your -- from the debtor -- from the debtor itself, does this raise some -- some suspicion in your mind that there might be some question as to the amount and the validity of the debt that the debtors stipulated to?

MR. MARTIN: Objection as to form.

THE WITNESS: So -- so the answer is, again, you're giving me a document based off of a tax return with a 2020 tax return, the loan closing amendment that happened much later, an acquisition by the current ownership of M2 later than that, and trying to have me conflate all of them into one, which I'm not going to do.

There was this done through -- before the bankruptcy. The bankruptcy, the new loan, and the

new amendment. More monies were wired. So to your point, it's not as seemingly simple as you might say. And it's not as easy as you might say to try to mischaracterize everything.

BY MR. SALAZAR

Q. So again, what was wired? How much was wired?

A. So -- so just -- just for -- for very simplicity, this is Corizon. YesCare -- YesCare came out of Newco. And there's definitely a lot to be asked, questioned, and whatnot. Not without question. I said to you I will continuously reinvestigate.

What I'm saying is what you're trying to show is documents, tax return from 2020, when the amendments and new loan documents with -- I'm going to use the word additional wires. Going to use the word additional wires. And loan closing package show differently.

So while you're reading a paragraph from 2020, giving me e-mails from 2021, 2022, different amendments along (interference) through the bankruptcy process. So again, you're using what you want to use out of context in order to prove a theory that is brought by the settlement party trusts and given to you in order to try to prove to this.

And it's a really good try. But like I said, I'm not admitting to anything, what something was

purchased for versus what the book value. All of these things are all great.

Not all of them have the legal validity that you're trying to assert that they do. But I assure that I will do my own investigation while you guys do what you do to try to undo this. And we'll see what we each come to. And we'll meet and compare notes.

Q. I'm going to move to strike that answer as entirely unresponsive to what I asked.

But I think somewhere in there you might have said that this might cause you to actually investigate this issue and determine whether or not the loan is actually valid and the amount of the loan is correct, right?

MR. MARTIN: Objection as to form.

THE WITNESS: I will say again, the amendments and what was recorded in the Corizon bankruptcy, which postdates what you're showing me here, are different than this. So --

BY MR. SALAZAR

Q. Different how? How is it different?

A. Numbers are different. And I will go to what is recorded within the bankruptcy context, not what you have here prior to that, and go through those agreements again. And what's on the books of YesCare, not what was

on the books of Corizon at that point in time.

Q. Well, this is M2's -- this is M2's --

A. I'm not -- I'm not --

Q. Not Corizon.

A. I -- I am not M2, right? I'm YesCare, right?

Q. Okay. Correct. That's why I'm showing you that.

A. Correct.

Q. M2's document telling you that they voted down.

A. No.

MR. MARTIN: Objection as to form. Is there a question?

THE WITNESS: This is a tax return. This is not -- this is not a court document. Which as I just stated, the loan documents that are recorded through the bankruptcy proceeding with Corizon that bore YesCare had different documents than this which postdate this. And if you're trying to tell me that something was done as bankruptcy fraud later on, that's a really bad thing.

BY MR. SALAZAR

Q. But were you aware -- or it sounds like you were aware that it's the allegation this is a faux debt or a fake debt or not real debt, which among others the trustee had -- the trust has a certain -- you were aware

of those claims?
A. The trust --
MR. MARTIN: Object to form.
THE WITNESS: The trust has asserted all different types of things. Whether they're right or wrong is yet to be seen. I'm not --
BY MR. SALAZAR
Q. That's not my -- that's not my question. What I asked is: You were aware that the trust had asserted that the M2 debt is not a valid debt, correct?
A. They have asserted that from the beginning, yes.
Q. Right. So as part of your investigation here, before you stipulate to cash collateral, did you undertake an investigation to determine if that was accurate or not? For example, asking M2 for records of the -- of the -- paid from the debt or tax returns?
A. So -- so let -- let me -- let me be clear. What somebody paid for debt has zero basis as to what the debt is. Their -- and you're -- you're in this business longer than I am. Okay? So -- so let's not play the game. What somebody pays for the debt is not -- was not what the amount of debt is. So that's -- that's irrelevant.
Q. Mr. Goldwasser, it was discharged as CODI

income.
A. You just said (crosstalk) you just said --
Q. Did you look at the CODI --
MR. MARTIN: Objection as to form.
THE WITNESS: You're --
MR. ZLUTICKY: Objection to the form.
THE WITNESS: You're saying what they paid to their debt is what the -- is what the debt should be. You know as well as I do that that's not --
BY MR. SALAZAR
Q. Mr. Goldwasser, I'm not saying that. I'm reading to you what --
A. You did say that. You did say that.
Q. I'm reading what M2 has said. They forgave all but $11 million of the debt. That's what they say. Not me. That's what they're saying. I'm not telling you anything. (Crosstalk). You're reading what M2 --
A. In 2020.
MR. MARTIN: Objection as to form.
THE WITNESS: In 2020. In June of 2020.
BY MR. SALAZAR
Q. Starting -- what's the starting date for the calculation of the debtors' books and records, do you know? What's the starting amount?
A. You brought it up. I don't have --

Q. It's about $100 million, right?
A. On what date?
Q. 2022.
A. Oh, okay. And in 2022 --
MR. MARTIN: Object to the form.
THE WITNESS: -- there were no loan documents signed in the bankruptcy, registered in the bankruptcy, as amendments in the bankruptcy.
BY MR. SALAZAR
Q. All right. Mr. Goldwasser, let me move on.
A. Okay.
Q. I have alerted you to the issue. I hope the debtor takes action.
MR. SALAZAR: Ms. Lee-Sin, can you take this down? Ms. Lee-Sin, can you pull up -- let's do 16, the 2026 Florida limited liability company annual report.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 16 was marked for identification.)
BY MR. SALAZAR
Q. Sorry, Mr. Goldwasser. Are you reading something there?
A. No. I was writing down on my notepad, on my -- whatever you call -- this information --
Q. It's okay.

A. Whatever you call the --
Q. Yeah (crosstalk). It's fine. I get it.
A. Fair question.
Q. Just wait for her to pull it up.
Sir, let me show you what I'm going to mark -- virtually mark as Exhibit 15 [sic] for identification. This is the -- sorry, the annual report for 2026. You'll see it's filed April 9, 2026, with the Secretary of State, State of Florida.
A. Okay.
Q. And I just want to draw your attention to where it says current principal place of business. And this is for CHS Florida, LLC.
A. Uh-huh.
Q. Where it says current principal place of business, can you read what it states as the address?
A. You're the better reader than me.
Q. I've been doing that all day. I think you deserve a turn. What is the address there, if you don't mind?
A. It's 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.
Q. Thank you.
MR. SALAZAR: So Ms. Lee-Sin, let's take this down. And would you pull up the petition, please.

MS. LEE-SIN: For the record, that's No. 16.
MR. SALAZAR: Thank you. 16. Thank you, Ms. Lee-Sin. I appreciate that.
So I'm going to show you 17, which is docket number 1 in the CHS Florida, LLC case, now Exhibit 17.
(Statutory Unsecured Claimholders' Committee's Exhibit No. 17 was marked for identification.)
MR. SALAZAR: Ms. Lee-Sin, can you scroll down to number 2.
BY MR. SALAZAR
Q. I think you ended up signing -- I think you signed this -- yeah, the petition, Mr. Goldwasser, correct? You signed the petition --
A. Uh-huh.
Q. -- for debtors --
A. Uh-huh. Uh-huh.
Q. -- electronically. You know, the principal place of --
MR. SALAZAR: Sorry, Ms. Lee-Sin. 4. I meant 4.
BY MR. SALAZAR
Q. The principal place of business here now less than a month later is identified as 3347 Tamiami Trail East in Naples. Did I read that accurately?

A. Uh-huh.
MR. MARTIN: Objection as to form.
BY MR. SALAZAR
Q. Right. Did the debtor --
MR. SALAZAR: If I misread it -- let me start again. Maybe -- I heard objection to form. I don't know. Mr. Martin, did I read it incorrectly?
MR. MARTIN: You read the prior document incorrectly.
MR. SALAZAR: Which prior document? The annual report or this one?
MR. MARTIN: The immediately prior document.
BY MR. SALAZAR
Q. Okay. Mr. -- Mr. Goldwasser, so here the principal place of business is identified as 3347 Tamiami Trail in Naples, correct?
A. That is correct.
MR. MARTIN: Objection as to form, states facts -- misstates facts and assumes facts not in evidence.
MR. SALAZAR: I'm sorry, I -- thank you for the objection.
BY MR. SALAZAR
Q. So Mr. Goldwasser, in the -- in the month in between the two -- those two filings did the debtor

change its principal place of business?

MR. MARTIN: Objection as to form, misstates facts and --

MR. SALAZAR: Just objection to form is all that's required. Thank you, Counsel.

MR. MARTIN: Objection as to form.

THE WITNESS: I'm sorry, Mr. Salazar. Could you repeat the question?

BY MR. SALAZAR

Q. Yeah. I showed you earlier the annual report dated April 9, 2026, which indicated the current principal place of business as being in Brentwood, Tennessee. You read the address, right?

A. I did.

Q. Okay. And --

MR. MARTIN: Objection as to form.

BY MR. SALAZAR

Q. -- less than a month later the address that's listed as principal place of business is now Naples, Florida. What changed?

MR. MARTIN: Objection as to form.

THE WITNESS: The principal place of business listed in the petition is where the actual business was operating in its capacity as service. And actual operations for the principal place of

business listed on the annual report form was where all accounting records and corporate notices were being sent.

BY MR. SALAZAR

Q. So am I right to say that nothing changed between those two dates, correct?

MR. MARTIN: Objection as to form.

MR. SALAZAR: I don't know what "nothing" means.

BY MR. SALAZAR

Q. Was there any change between the date of the annual report and this filing of this petition that triggered a change in the principal place of business?

MR. MARTIN: Objection as to form.

THE WITNESS: Stated already that the actual operations for CHS Florida where people work was at 3347 Tamiami Trail in Naples, Florida. And that is why it's on the petition.

MR. SALAZAR: Okay. I'm going to take -- I'm going to take a ten-minute break. Let's go to 4:00. And then I'll see if I got anything more to add, yeah?

THE WITNESS: Thank you.

MR. SALAZAR: Thank you.

THE VIDEOGRAPHER: We're going off the record.

The time is 3:49 p.m.
(A short recess was taken.)
THE VIDEOGRAPHER: We're going back on the record. The time is 4:02 p.m.
BY MR. SALAZAR
Q. Mr. Goldwasser, continuing on the issue of the validity of the debt. So a couple follow-up questions.
A. Sure.
Q. When you reviewed the total amount due, that $16 million figure, were you able to determine whether any cash payments had been made by the debtors against this loan at any time since 2022? (Interference).
A. Did -- you're saying did YesCare make loan payments? Is that what the question is?
Q. Yeah.
A. Oh.
Q. Did anybody -- were you able to determine whether they made any loan payments since 2022?
A. To my belief, yes, they made loan payments, yes.
Q. Okay. Is it your understanding they made periodic cash payments against the loan?
A. Versus what type of payments?
Q. Well, wouldn't a typical loan require payments, say, on a monthly basis with --

A. You say cash payments. I mean, versus --
Q. Yeah. (Crosstalk). Not cash -- not cash like here's a bundle of cash. Like in money. Money. Money --
A. Okay. Yeah, yeah. I just -- I don't, you know -- yes. I'm sorry. Just when you say cash payments, I was like, you know, diamonds, but no.
Q. Yeah.
A. Yeah. Yeah, I do believe that there were payments made. I do not believe it was on a schedule.
Q. Okay. Would you agree with me that the fact that there were no scheduled payments or perhaps even a schedule of payments would be one factor that would indicate that perhaps it's not a real debt?
A. No.
MR. MARTIN: Objection as to form.
BY MR. SALAZAR
Q. That's not a factor? You don't think that's a factor?
MR. MARTIN: Objection as to form.
BY MR. SALAZAR
Q. You can answer, Mr. Goldwasser.
A. Just ask the question again. I will answer directly.
Q. Yeah. The fact that there's no -- no periodic

payments, no cash payments, discussed a moment ago, since 2022 on this loan that was acquired by a related entity, does it indicate to you that perhaps this loan was not a real loan?

MR. MARTIN: Objection as to form.

THE WITNESS: So again, I believe there were some payments made. Whether or not payments are made on a loan to me doesn't make it valid or not valid.

There are many loans that don't get paid or have periodic payments or as cash is available types of payments that are still real loans. I -- I have more -- I have more concern from the fact that you showed me an e-mail saying faux debt, whether or not there were regular payment streams.

BY MR. SALAZAR

Q. Okay. When you review of the amounts due --

A. Uh-huh.

Q. -- were -- you know, the history of the -- of payments or whatever it was --

A. Uh-huh.

Q. -- were you able to determine wires or additional lending that would explain a difference between the tail end of a million dollars that we saw on the write-down to the $100 million, nearing $100 million

that we saw as the starting point in 2022?
A. There were -- okay. In specificity here, I'm not going to go through details that I don't remember exactly, meaning (crosstalk) --
Q. If you can't remember them --
A. I'm giving -- I'm just giving context. Yes, there was money that I believe I saw advanced periodically as well as money returned. So exactly from which entities and not -- I'm not -- again, I'm not going to sit here and speak to.
But there is, you know, an administrator called Cortland who is a loan administrator. And I think it was inherited when the current ownership bought the M2 loan who has the responsibility of maintaining records.
To me, a company like that, you know, would give me more confidence that there is a loan. Obviously it's whatever they're giving, you know, it's what they use. But it's not that it's a -- it's a real administrator of loans. It's not John and Jerry's, you know, sidebar loan company.
So, you know, I do believe from what I've seen that there's a loan. Again, you're giving me stuff to investigate further. I'm not -- like I say, I'm going to investigate. But there are more (interference) to me currently from a documentary standpoint to show there's a

loan.

Exactly to the amount specifically, as you're -- as you're bringing cause to question and some of the e-mails you showed me, you know, will bring me to get down deep into questions. I did not do so in the breaks because that's not the proper use of my time and I'm not allowed to. But --

MR. SALAZAR: Okay. Well, let me ask -- let me ask, Ms. Lee-Sin, can you bring up just Exhibit 11, the first Anita e-mail.

BY MR. SALAZAR

Q. I just want to show you something --

A. Please.

Q. -- for you to further investigate or to fuel your investigation. Just want to point out -- look at the subject here. This is Exhibit 11, which I showed you earlier back in 2021. Again, I just want to say the subject is Cortland PIK, correct?

A. That is, yes.

Q. And Cortland, you -- you mentioned was -- was and continued to be the -- the agent under the loan, correct?

A. Yes.

MR. SALAZAR: Okay. Ms. Lee-Sin, you can take this down.

BY MR. SALAZAR

Q. Now, you said that there's -- you did your investigation, et cetera. And I think earlier in the day we looked at the -- at the document request, you know, among the things that was requested.

I think I showed you number two, which asks for documents to determine whether the validity, priority, and extent of the lien and what you may have looked at. Did you provide everything that you looked at in response to that question?

A. I believe so.

Q. That document request?

A. I believe so.

MR. SALAZAR: Okay. All right, I'm going to pause here, reserve on a couple issues. One is the -- the limited number of documents we actually received in response to our request and issues related to preparation for today or topics that were excluded from today. And I'll reserve on that. Perhaps we'll come back some other day. And I'm going to stop for the moment and turn it over to Mr. Zluticky.

MR. ZLUTICKY: Thank you.

MR. SALAZAR: Thank you.

DIRECT EXAMINATION

BY MR. ZLUTICKY
Q. Hi, Mr. Goldwasser. This -- my name is Nick Zluticky. It's good to speak with you again.
A. Yes.
Q. I represent Matt Dundon as the wind-down officer for Tehum Care Services, Inc. and as trustee for the Tehum GUC Trust. And this is the first time that you and I have been in a deposition together, but it's not the first time we've spoken about this case, is it?
A. No. We spoke last year in regards to the settlement agreement, you know, in -- in those fun times. Yes, we -- we have -- we have -- we have had prior discussions.
Q. Yeah. End of January, early February when that settlement agreement was filed in the Southern District of Texas, right?
A. Yeah. I don't remember -- it was a period of time. I can't remember exact dates. I don't remember. But you and I have had the pleasure of speaking.
Q. Yeah. Well, I can represent to you that that agreement was filed on February 1st of this year. Do you have any reason to disagree with that?
A. No, no. I'm saying when we physically spoke.
Q. Oh, sure.
A. You know, I think it was earlier. It was just

a reference to when you and I had had --
Q. Absolutely. Yeah. So I want to go back a little bit. You said to prepare for your deposition today you spoke with Jeff Sholey?
A. I did.
Q. Okay. And you spoke with James Sprouse?
A. I have.
Q. And Scott King?
A. I have.
Q. Okay. Did you speak to Isaac Lefkowitz?
A. I did. I -- I did. I did speak to Isaac Lefkowitz, yes.
Q. What did you talk about?
A. I don't know -- I had one or two questions. I've spoken to him more recently about some questions with -- with the preparation of these schedules and some questions that I have, not specifically in preparation for the deposition.
I did speak to him in preparation for the deposition. There were some specific questions. But not specific to prepare me for the deposition. Meaning if I had a question about something, I -- I asked. I don't remember specifically. It wasn't like a long conversation.
Q. Okay. You said you had one or two questions

for him. What were they?
A. I don't have my notes in front of me. Nothing -- nothing earth-shattering. Maybe a clarification on something.
Q. Any particular topic you can recall?
A. I'm trying to recall. No, nothing -- nothing very specific.
Q. Okay. Did you speak to David Gefner?
A. No. I don't think I've ever spoken to a man named David Gefner.
Q. Did you speak to Joel Landau?
A. I have not spoken to Joel Landau in a long time.
Q. Did you speak to Zalman Shapiro?
A. I do not know who that is.
Q. And you had said that you were engaged first in the summer of 2025 to help negotiate a potential settlement with the trusts in the Tehum Care Services bankruptcy case; is that right?
A. Yeah. I -- I made reference to summer. Might have been in September in my mind. But in that -- in that time frame to deal with -- to deal with that situation.
Q. And you said that FIA, your firm, was paid $125,000 for that work?

A. Yes.
Q. What other money has FIA received from the debtors or their affiliates since the fall 2025?
A. I represented before we got $400,000 towards the filing -- not -- on behalf of getting the professionals paid, which was all disclosed on the retention applications.
Q. So let me make sure I understand this. FIA received $400,000?
A. Uh-huh.
Q. And some of that money was used to provide retainers for other professionals --
A. Most of that --
Q. -- is that right?
A. Most of that money, yes.
Q. Okay. From whom did FIA receive the money?
A. I believe it was Sigma Risk Management.
Q. Sigma Risk Management is not a debtor?
A. Sigma Risk Management is not a debtor.
Q. All right. Does Sigma Risk Management own any of the debtors?
A. To my knowledge, no. I did ask that question.
Q. Have you ever spoken with anyone at Sigma Risk Management?
A. I did not.

Q. Do you know who Sigma Risk Management is?
A. I asked that question. And it's my understanding it is a company that is owned by 12 different attorneys. I do not have their names. This was described to me by Mr. Lefkowitz, for clarity. And they provide the risk management services for the litigation in relation to YesCare.
Q. Sigma Risk Management provides services to YesCare?
A. That is what I was told. I have not contracted with them. I don't -- I have not spoken with anybody about it. But I asked where the money came from. And that's what I was explained.
Q. You -- so I just want to make sure I understand this.
A. Sure.
Q. You received $400,000 and then you asked where the money came from; is that right?
A. I requested the money to be able to pay the professionals with each of their retainers. And normally -- sometimes, sometimes we do get money for all the professionals in some cases. And then we distribute the money as the chosen CRO for the cases.
Sometimes the money goes to the professionals directly. In the instance -- usually it's either a

lender or some other party that will fund. If there's no money in the company, they will give us the money to give to the professionals.

It's not -- it's not something that is uncommon. When we put the totality of what we needed for the retainers, I asked Mr. Lefkowitz to have the money sent. He said there was no money in the company. He had -- he said he had the money sent.

And when I looked on my wire receipt, it said Sigma Risk Management. And I wanted to know who that was. And that was the answer that I got. That's where the money came from in order to fund the filing of the bankruptcy.

Q. And it was represented to you by Isaac Lefkowitz that Sigma Risk Management is a company owned by 12 different attorneys?

A. Yes.

Q. Is Scott King one of those attorneys?

A. I do not know, but it would make sense to me, but I do not know.

Q. Okay.

A. I did -- I did not ask Scott, but it's not something that would not make sense.

Q. And then FIA used that money to, among other things, fund the retainer to Polsinelli and to local

counsel and to Omni; is that right?
A. Yeah, yes. And to pay filing fees.
Q. And there's about $100,000 that was left over -- or not left over, but was allocated to the FIA's retainer?
A. About 88 or 87 after the filing fees.
Q. Okay. You said earlier that you've confirmed 170 bankruptcy cases, right?
A. Approximately.
Q. Okay. And including -- and, you know, again, I don't want to put words in your mouth here, but you emphasized that you had cases confirmed in the Southern District of New York in front of Judge Drain, right?
A. I have.
Q. And in the very courthouse where, you know --
A. Yes.
Q. -- things happened that we weren't excited talking about, right?
A. Absolutely.
Q. Okay. So I want to talk about just for a moment another case in the Southern District of New York in front of Judge Lane.
A. Uh-huh.
Q. This is a little bit of a reunion, but you're familiar with the case Indie Plaza Apartments?

MR. MARTIN: I'm going to object. This is beyond the scope of topics.
BY MR. ZLUTICKY
Q. You can still answer. Are you familiar with Indie Plaza Apartments?
A. I am.
Q. Okay. And you were -- filed an application to become the CRO in that case; isn't that right?
A. I did, yeah.
Q. And submitted declarations in support of --
MR. MARTIN: Nick, do you want me to object individually each time or can I get a continuing --
MR. ZLUTICKY: Oh, sure. You can have a standing objection to this whole line of questioning. That's totally fine.
MR. MARTIN: Yeah, thanks.
MR. ZLUTICKY: Yep.
BY MR. ZLUTICKY
Q. So Indie Plaza Apartments, you were -- you filed an application to become the CRO; is that right?
A. That's correct.
Q. And FIA to become the financial advisor?
A. I believe so.
Q. In fact, it's Mr. Nash who was their counsel in that case, right?

A. Mr. Nash could -- yeah. Okay.
Q. Okay. And did you ever get appointed as CRO in that case?
A. No. I think that case con- -- dismissed or converted.
Q. Yeah. So it was dismissed, wasn't it?
A. I believe so.
Q. For bad faith?
A. I think that might have been the finding.
Q. And that company's actually barred from filing again for 12 months, right?
A. For actions that prec- -- preceded me coming in. A prior filing that they had done improperly, yes.
Q. So prior filing where you weren't aware of all the facts?
A. Nor was I involved, correct.
Q. Yeah. Okay. So that was not one of the 170 cases that was confirmed?
A. No.
Q. Okay. All right. So you said earlier you didn't know Alan Rubenstein, right?
A. Correct.
Q. You didn't know who that was. So you and I negotiated back in January and February about trying to work out a settlement in this -- in Tehum Care Services,

right, for YesCare?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Okay. And ultimately we did reach an agreement and settlement payments were made to the two trusts, were they not?
A. That's correct.
Q. Okay. So even -- I can represent to you that those wires were received from Alan Rubenstein's trust account. And you're not familiar with who that is?
A. Well, if you want to review the record, which I'm sure you will, I said that I believe Mr. Rubenstein was an attorney who received money for M2 and into his trust account, which Mr. Salazar subsequently asked me. And I do remember the payments coming from -- I don't know him personally, is what I said.
Q. Okay. And that was an agreement that was reached like end of January, like February 1, 2026, right?
A. Yes.
Q. And there was default on or about February 16, 2026?
A. I think that's exactly the date.
Q. And I believe you said that the reason for the

default was the Kohchise Jackson verdict?
A. That's not what I said.
Q. Okay. Then can you please tell me how I got that incorrectly?
A. You didn't listen properly.
Q. Okay. Well, can you please educate me on what I missed?
MR. MARTIN: Objection as to form.
THE WITNESS: I don't know what you missed. How am I supposed to educate you?
BY MR. ZLUTICKY
Q. Okay. So why did you miss -- why didn't you make the payment?
MR. MARTIN: Objection as to form.
THE WITNESS: There was not enough money.
BY MR. ZLUTICKY
Q. So it wasn't because of the Kohchise Jackson verdict, is that what you're saying?
A. The -- the Kohchise Jackson verdict came much later. And if you were paying attention, you would have heard what I said.
Q. Got it. When you've spoken with M2 LoanCo about cash collateral and DIP financing, who have you spoken with -- to other than Isaac Lefkowitz?
A. Isaac Lefkowitz and sometimes I was on the

phone with Mr. Johnson and Mr. Nash.
Q. And Mr. Johnson being the -- the attorney for the debtors and Mr. Nash being the attorney for M2 LoanCo?
A. That's correct.
Q. But in terms of any other nonlawyer, non-outside counsel, the only person you'd spoken to for M2 LoanCo was Isaac Lefkowitz?
A. That's correct.
Q. Okay. So if you had any questions about M2 LoanCo's debt, you asked Isaac?
A. On behalf of M2, yes.
Q. Okay. And you relied on Isaac's answers?
A. For whatever I asked him.
Q. Okay. You also testified earlier that you believed the DIP loan would be funded when you filed the case. Not that it would be funded that day, but when you filed the bankruptcy case it was your belief that the DIP loan would be funded?
A. Absolutely.
Q. And what's the basis for that belief?
A. Mr. Lefkowitz said he was going to fund the DIP loan.
Q. And what happened? Why didn't he fund it?
A. I really --

MR. MARTIN: Objection as to form.
THE WITNESS: I'm not him so I can't answer.
BY MR. ZLUTICKY
Q. Okay. And you don't know anyone else who would know because you haven't talked to anybody other than Isaac Lefkowitz from M2?
A. That's correct.
Q. You said earlier Isaac Lefkowitz is the person who gave you as CRO the authority to file the bankruptcy cases; is that right?
A. Yes, sir.
Q. And gave you the decision-making authority on whether that was the right decision?
A. Yes, sir.
Q. Okay. To whom do you report in -- within the company?
A. Everybody reports to me.
Q. Do you report to the directors?
A. The director was Mr. Lefkowitz and he gave me over the proverbial baton.
Q. Do you discuss decisions with Mr. Lefkowitz before you make them?
A. I don't discuss decisions I have to make if I want context for something that I might not understand from history. As I testified earlier, I might discuss

with him, but I don't ask him permission.
Q. Well, you said earlier instructions were to keep the contracts. That sounds like an instruction.
A. I didn't say instructions.
Q. Okay. So what was the communication about keeping the contracts Mr. Lefkowitz gave you? I don't want to mischaracterize. So what was the communication?
MR. MARTIN: Objection as to form.
THE WITNESS: It was asked of me what Mr. Lefkowitz thought. I said he discussed -- makes sense -- or what was thought about the contracts being canceled. And he said you shouldn't let them cancel. That's all I said.
Didn't say that he directed me. Didn't say that he demanded. Didn't say. His feeling and his -- his thoughts were not to let them cancel in order to keep the company going. That's all.
BY MR. ZLUTICKY
Q. Okay. You also said that by May 19th you were certain M2 had a valid and perfected lien; is that right?
A. Are you referencing a document that I filed or are you referencing something that I stated on the record here today?
Q. Your testimony from earlier today.
MR. MARTIN: Objection as to form.

THE WITNESS: I believe I was shown a document with a May 19th date. And a statement made on there was to the validity of the M2 loan. And I believe I testified that I was satisfied with the documents I received from the law firm that closed the transaction with the documents and signatures therein.

That the lien was properly -- the loan was properly closed with the amendments, some amendments, further amendments, and other amendments evidencing that the loan was properly done at the time it was entered into, yes.

BY MR. ZLUTICKY

Q. And you also said you had no reason to believe it wasn't a valid and properly secured loan, right?

A. That's correct.

Q. Okay. Is that still the case now?

A. The case now is that the question as to the amounts of the loan, whether those amounts were correct. There was a document provided with an e-mail using the word faux loan. I don't know what that really means.

But yes, it's going to cause me to further look at the information provided to make sure my assessment is correct and investigate what was written in those e-mails and the amounts therein.

Q. So just to make sure I understand, you are now going to investigate based on what you've been shown today?
A. Absolutely. I have a responsibility to do so.
Q. Okay. And I just want to be clear on something. I know there was a lot of back and forth when you saw Exhibits 11 through 15.
A. I don't know --
Q. Which were the e-mails -- those were the e-mails --
A. Uh-huh.
Q. -- and the tax return.
A. Yes, sir.
Q. Had you seen those documents before today?
A. No.
MR. ZLUTICKY: Okay. So I have to ask a favor, Lou. Would your handy, trusty assistant be able to pull up some exhibits for me?
MR. SALAZAR: Yes.
Ms. Lee-Sin, can you just confirm you're online? She should be --
MS. LEE-SIN: I'm here.
MR. SALAZAR: All right.
MR. ZLUTICKY: Thank you so much. Would you please pull up Exhibit 5.

MS. LEE-SIN: Just one moment.
MR. ZLUTICKY: Thank you.
BY MR. ZLUTICKY
Q. So this is a preliminary review of general ledger data for M2; is that right?
A. That's what it says.
Q. This is a document that you -- that the debtors produced to the committee, right?
A. Understood. Yes.
Q. Okay. So can we -- well, as I'm looking here, first, do you see any amounts that M2 LoanCo advances to the debtors from May 1, 2022, on?
A. I don't see anything there, no.
Q. So earlier when you were asked about the M2 debt and there was discussion about faux debt and being written down, all sorts of things, you had said that you had seen some additional wires from M2. Where are they?
A. So what I did say is that I saw an e-mail from the closing that said the wire should be initiated. And Mr. Salazar asked me, did you see the wires? And I said no. I saw reference in an e-mail from the closing attorneys that the wires could be sent since the closing was done. That's what I said.
Q. What wires?
A. I saw an e-mail. On the e-mail from the

attorneys who closed the loan. There was reference that the wire can be sent. And Mr. Salazar said, did you see the wire? I said, no, there was a reference in the closing e-mail.

Q. Right. But we're talking about an e-mail that you're speaking about that I haven't seen where the attorneys are saying the wires can be sent. And you've been very clear earlier context is important. So let's get context here.

A. Yes.

Q. What wires?

A. From the closing of the loan in August of I believe 2020. So I don't -- whether it was Corizon -- I don't have a copy of the YesCare -- or I don't have a copy of the Corizon --

Q. So this -- this e-mail that you're referring to is from August of 2020?

A. Yes.

Q. Have you seen any wires from and after August of 2020?

A. I did not see wires after August 2020. '20. I do see a reference to a $2 million additional advance. I see reference to an additional $2 million advance in a first amendment from M2 LoanCo. I believe the date was either 2021 or 2022. I do not see it referenced here as

we're looking for it.
Q. Yeah. Okay.
A. And I --
Q. So --
A. But I'm just saying I did see --
Q. Got it.
A. -- advance additional $2 million.
Q. Got it. So from May 2022, scrolling down, I see there's PIK interest, but I'm not seeing -- and then there's -- I'm assuming these -- well, let me not assume. What do the red lines represent?
A. I think -- I think those are cash payments.
Q. It says, additional PIK interest. What makes you think those are cash payments?
A. Just because the -- the balance goes down.
Q. Okay. What does the REV stand for, you think?
A. Or it could be reverse. I'm not sure.
Q. Do you know what PIK means?
A. Yes. It's interest that you take as -- as you can.
Q. If I say payment in kind, would you agree with me that in general, PIK means payment in kind?
A. Yes.
Q. And so that's sort of what you and I would view as compounding interest? It's interest on interest? It

just gets added to the loan balance?
A. Something that -- yes. Where you cannot make payments, it accrues, that's correct.
Q. So we see additional PIK interest entries here. And every single time the loan balance goes up. And I'm looking from May 1, 2022, through June 30, 2024. Would you agree with me that the PIK interest here increases the loan balance each time?
A. Yes.
Q. Okay. And so when we get down to the red lines and it says REV additional PIK interest --
A. That would be reverse.
Q. Okay. And that's probably -- and do you think that's why it reflects a positive balance rather than a negative balance?
A. That would make sense, yes.
Q. Okay. Let's scroll down past July 31, 2024. Okay. So here we -- here I think is where we get to some things I have questions for you about. And that is let's start December 31, 2024, related party balance. Explain to me what that is.
A. I -- I do not know.
Q. That's a $39.9 million reduction on the debt.
A. Uh-huh.
Q. Did you ask any questions about that?

MR. MARTIN: Objection as to form.
THE WITNESS: I did not get into -- as I said to Mr. Salazar earlier, I did not get into the balance being exactly where it is with the M2 loan due to trying to make sure and believing that the lien was valid. Trying to make sure to operate in order to be able to pay the employees.
BY MR. ZLUTICKY
Q. Got it. Okay.
A. I did say that I would be going through the details as we're going through for the Sigma financial affairs, et cetera, and for clarity when we do this. Right now we're doing the one-year prior. And then, you know, we'll get into any other investigations we need to get into for specificity with anything related to the bankruptcy. But --
Q. Okay.
A. But that's why I have not gotten into every detail of this as of yet.
Q. Got it. Okay. So related party balance, you don't know what that entry is?
A. I don't.
Q. Okay. What about 2024 Geneva MGT fees, what is that?
A. It says -- I -- I'm reading what you're

reading. Again I --

Q. So you don't know what that is?

A. I didn't go line by line on this as of yet. As -- as I said, my -- my goal right now is to try to stabilize and get whatever I can. My request from Mr. Sprouse was to get the current balance as he's the CFO of the company.

He sent me what the current balance was as per his accounting. And all of these related items to go with, we'll call it, insider payments and/or other payments or anything to do with these things we're going through now with the Sigma financial affairs. And then that's where I'm going to start to ask -- or we are asking those questions and getting to the bottom of those things.

Q. Okay.

A. I'm not trying -- I'm not trying to stop your question. I'm just -- I'm just --

Q. No, I understand. So I don't want to go through this line by line and waste your time. So all of these entries from December 31, 2024, you don't know what those are? You haven't looked into them?

A. Not yet. That's --

Q. Okay.

A. -- next phase -- that's next phase past the

next week. But this week is schedules and this. And then next week will -- you know, after all that, getting ready for hearings, we'll move on to, you know, whatever look-backs we have to do.
Q. Okay. When -- when did your retention begin?
A. Officially? A week --
Q. I mean, you started working for YesCare when?
A. Oh. In 2025. Not for the bankruptcy purpose, but, you know, for the purpose of working on the settlement is when I became familiar with the company.
Q. Okay. Well, now, you had said the early stuff past the year out is next week's problem. So let's get to the last year. June 30, 2025, related party Sigma, do you know what those are?
A. I do not know what those party -- I'm sorry. Again, Sigma seems to be the same name that I gave you that paid the retainer fees for this case.
Q. So you don't know why there's a $13.9 million reduction that's titled related party Sigma on June 30, 2025?
A. The answer is I do not know because that's not in the records that I was given as far as -- that I remember as far as related payments 'cause I wasn't reconciling M2 books. I was looking through the disbursements.

Q. Okay. So then I get to -- there's PIK interest. And then I see something I've not seen before. There is a debit -- there's a debit --

A. For related --

Q. -- for related party Geneva of $200,000, October 1, 2025. What's that for?

A. That's a -- that's a really good question. Looks like Geneva paid them $200,000.

Q. Wouldn't -- well, the loan balance went up by $200,000.

A. Oh, I'm sorry. It goes -- not the red, so --

Q. So what do you think that is?

MR. MARTIN: Objection, form.

THE WITNESS: What that is, is a very good question.

BY MR. ZLUTICKY

Q. So you don't know?

A. Nope, but I will -- these are all the things I'm going to be -- you know, documents I didn't see -- this I -- this I know -- I'm saying between the e-mails and all this information I have, as Mr. Salazar said before, a lot more investigation to do and for the M2 from the side of YesCare.

Q. So I'll have -- I'll have my answer in five days, I guess is what you're saying?

A. You will have -- yes, on the 22nd.
Q. Yep. All right. So related party Sigma, related party total, and related party Geneva, we have three more entries including two of them at the end of the year last year. Do you see those three entries?
A. Yes, I do.
Q. Do you know what those are?
A. No.
Q. Okay. Then we have -- and this is from just maybe, what, nine days before the bankruptcy case is filed. Have you been engaged by them nine days before you filed the case?
A. I've -- I've been around, yes.
Q. All right. So this says March 26 related party applied to $16,865,634. Did I read that right?
A. You read that right.
Q. Okay. What is that?
A. That is definitely insider transfer. And it's March 26, not -- the entry was made April 30th.
Q. Yep.
A. But yes, there were definitely some payments made towards this loan in those dates. And it's definitely reflected in the -- in our -- in our 12-month reconciliation.
Q. So do you know what it means when it says

related party?
A. I do not know specifically. There's going to be names associated with it. And definitely is going to be disclosed.
Q. The debtor had no money on day one, right?
A. Debtor had no money on day one. That's correct.
Q. Okay. So what's going to happen if you find out that $16.8 million went out the door nine days before you filed?
A. We are going to go after it. And it wasn't nine days before file date. It's some time in March, but I still think it's within the 90 days.
Q. You're going to go after it from whom, Isaac?
A. Whoever it went to.
Q. Is Isaac going to let you do that?
A. He has no --
MR. MARTIN: Objection as to form.
THE WITNESS: He has no say to stop me.
BY MR. ZLUTICKY
Q. Who are you going to ask what it's for, Isaac?
MR. MARTIN: Objection as to form.
THE WITNESS: I am going to ask the company.
And then if I have to ask Isaac, I will ask Isaac.
BY MR. ZLUTICKY

Q. Anybody other than Isaac?
A. Nope. I mean, again, Jeff, Jimmy, Scott, my main contacts. And then if -- if it leads to Isaac, then it will be Isaac I ask. And we have to press wherever it went, then we'll press wherever it went. I -- I don't need his permission to do that.
Q. I mean, Jeff and Scott are on those on e-mails that we talked about earlier, right?
A. They are.
MR. ZLUTICKY: Okay. So I think we can move off of this exhibit. Thank you very much. I think we need to go to Exhibit No. 7 now, if you wouldn't mind, please.
BY MR. ZLUTICKY
Q. Okay. Exhibit 7 is a list of the YesCare or the -- the debtor contracts, right?
A. Correct.
Q. Okay. And it lists here that the transition dates for all but three were prior to June 1st. Do you agree with that statement?
A. Four. The Dona Ana doesn't transition.
(Reporter clarification.)
BY MR. ZLUTICKY
Q. And today's June 17th. Has the St. Clair County, Michigan contract been transitioned?

A. Yes.
Q. Has the Brevard County, Florida contract been transitioned?
A. Yes.
Q. Has the Philadelphia contract been transitioned?
A. It has been transitioned.
Q. Has the Dona Ana County contract been transitioned?
A. Not as of yet.
Q. So there's only one contract as of today and it's in New Mexico; is that -- is that right?
A. That is correct.
Q. Does the debtor have any contracts today in Florida that it operates under?
MR. MARTIN: Objection, this is beyond the scope of the topics.
MR. ZLUTICKY: No, it's not. I gave topics on the motion to transfer venue. Talk to Jeremy. Talk to Trinitee. Get the (crosstalk) yes, it is. I was told -- hold on.
MR. MARTIN: Nick, you got to let me -- you have to let me --
MR. ZLUTICKY: Okay. Say your stuff (crosstalk) go for it. Say your words.

MR. MARTIN: This is not -- this is not his deposition for the venue motion. This is --

MR. ZLUTICKY: All right. You want -- were we doing that Friday?

MR. MARTIN: -- for the wages. I'm sorry?

MR. ZLUTICKY: We're doing that Friday? Are we do that Friday?

MR. MARTIN: I have no idea. I'm here for the wages motion and the cash collateral motion. What are you here for?

MR. ZLUTICKY: It's pretty relevant what their contracts are for wage and cash collateral. Would you like me to go through step by step how I believe that it is relevant? I'm happy to do so on this call.

MR. MARTIN: Sure.

MR. ZLUTICKY: Okay. So the reason why it's relevant is because we need to know every single employee that's receiving pre-petition and post-petition wages.

We divide that up by contract. The only way to figure out which contracts we believe employees should be paid on a pre-petition and post-petition basis is to figure out which contracts the debtor is still operating under, which states they're in,

which laws apply, and which benefits have to be paid, including wages. Wage and hour laws are important in this case. Do I need to continue?

MR. MARTIN: Yes, because you're wrong and because this is not a deposition on venue. This is a deposition --

MR. ZLUTICKY: It's on wages.

MR. MARTIN: -- on wages and cash collateral.

MR. ZLUTICKY: I just talked about wages. I didn't say a word about --

MR. MARTIN: That's not what --

MR. ZLUTICKY: -- about venue. That was your word.

MR. MARTIN: Question was not about wages.

MR. ZLUTICKY: It is.

MR. MARTIN: Your question is about venue in Florida.

MR. ZLUTICKY: You're speculating as to (crosstalk) what my question is about. Okay. Fine. Instruct him not to answer, don't, or move on.

MR. MARTIN: I'm not instructing him not to answer. I'm saying --

MR. ZLUTICKY: Okay (crosstalk) then answer the question.

MR. MARTIN: This is not -- I'm going to

restate my objection because --

MR. ZLUTICKY: Go for it.

MR. MARTIN: -- full -- full colloquy, right?

MR. ZLUTICKY: Go for it.

MR. MARTIN: So my objection is -- are you done? Are you going to talk over me again? My objection is that you are now beyond the scope of the topics for the venue and the cash collateral that we are producing him for today.

You are asking for questions and trying to piggyback onto a venue deposition that has not been scheduled. That's my objection. And so any question (crosstalk) for this topic is not on behalf of the debtor.

His own personal opinion regarding those questions. So I don't know why you're going down this or trying to piggyback onto a venue motion or a venue opposition deposition.

BY MR. ZLUTICKY

Q. Mr. Goldwasser, please answer the question.

A. I don't even remember.

MR. ZLUTICKY: Let's have the court reporter read it back, if you wouldn't mind, please and thank you.

(The court reporter read back as requested.)

MR. MARTIN: Same objection.
THE WITNESS: The debtor does not operate any contracts in Florida to date.
MR. ZLUTICKY: Okay. Can we pull up Exhibit 16?
BY MR. ZLUTICKY
Q. While we're pulling up Exhibit 16, Mr. Goldwasser, I am a bit of a Florida neophyte. What city in Florida do you live in or what general area?
A. I live in South Florida, Boca Raton, Florida.
Q. Okay. So -- and forgive me here because this is going to show my ignorance, but what is the approximate distance between Boca and Naples?
A. Two hours.
MR. ZLUTICKY: Okay. So let's -- can we scroll down on this annual report? Okay. Keep going, please. Where is -- I think it was maybe Exhibit 17 that I was speaking about. There we go. I apologize. Okay. Would you mind scrolling to the top to see which debtor this is for?
BY MR. ZLUTICKY
Q. So this is CHS Florida, LLC; is that right?
A. That's correct.
Q. This is their voluntary petition?
MR. MARTIN: Object to this line of

questioning. This is, again, a venue issue, not related to any of the topics that were noticed for today's deposition. So anything he's responding to here is not on behalf of the debtors.

BY MR. ZLUTICKY

Q. Is this the voluntary petition?

A. That's what it says.

MR. ZLUTICKY: Okay. Can you scroll down, please, to debtors' address.

BY MR. ZLUTICKY

Q. Mailing address is 205 Powell Place, Suite 104, Brentwood, Tennessee 37027. Do you see that?

A. I do.

MR. MARTIN: Same objection.

BY MR. ZLUTICKY

Q. And is that YesCare's corporate headquarters?

MR. MARTIN: Same objection.

THE WITNESS: That is YesCare's mailing address.

BY MR. ZLUTICKY

Q. Have you ever been to YesCare's corporate headquarters?

A. I testified earlier that I have not.

Q. Okay. Do you know where it's located?

MR. MARTIN: Same objection.

MS. GREEN: Mr. Zluticky, this is Ms. Green. Can I ask a question?

MR. ZLUTICKY: Yes, of course.

MS. GREEN: Thank you. These questions are obviously related to your motion to transfer venue. And you asked earlier if we were going to offer him on Friday. I think you know that he's not available.

But my question is: Given that you're asking questions that you presumably wanted to ask on Friday, will you be withdrawing the notice of deposition for the Friday deposition?

MR. ZLUTICKY: I'm not -- we can talk about that after the deposition's over, Ms. Green. I'm trying to take a deposition of a witness right now. If you have an objection, you're welcome to make it.

MS. GREEN: All the objections have been made.

MR. ZLUTICKY: But I believe --

MS. GREEN: But you asked a question --

MR. ZLUTICKY: -- Mr. Martin is actually --

MS. GREEN: -- earlier. You actually --

MR. ZLUTICKY: -- defending the witness.

MS. GREEN: -- asked the question earlier regarding the deposition on Friday. So I thought I would respond to it.

MR. ZLUTICKY: We can discuss it on a break. I'm happy to do that, Ms. Green.
MS. GREEN: Thank you.
MR. ZLUTICKY: Okay. So the --
MR. MARTIN: Nick, my -- I get to state an objection, too --
MR. ZLUTICKY: Of course.
MR. MARTIN: -- deposition. I think the objection is that if you're deposing him now on venue, you don't get to redepose him.
MR. ZLUTICKY: That's not an objection. Can you make an objection to the question?
MR. MARTIN: It is an objection. I'm objecting because you're asking him questions. And if you do that now, you're not going to be able to ask him those questions later. So that's my objection.
MR. ZLUTICKY: Okay. You don't get to rule on that issue, but you can -- you can say whatever objection you --
MR. MARTIN: I'm not ruling on it, Nick.
MR. ZLUTICKY: Are you --
MR. MARTIN: Nick, Nick --
MR. ZLUTICKY: Would you like to instruct him not to answer?
MR. MARTIN: -- I'm not ruling on anything. I

said I was objecting.
MR. ZLUTICKY: Have you completed stating your objection on the record?
MR. MARTIN: Yes.
BY MR. ZLUTICKY
Q. Mr. Goldwasser, can you please answer the question.
A. I'm lost.
Q. Okay. The question was: Do you know where YesCare's corporate headquarters is located?
MR. MARTIN: Same objection.
THE WITNESS: The mailing address is 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.
BY MR. ZLUTICKY
Q. Is that where their corporate headquarters is located?
MR. MARTIN: Same objection.
THE WITNESS: Nobody shows up to any office. The entire --
(Brief interruption.)
BY MR. ZLUTICKY
Q. Mr. Goldwasser, would you please repeat your answer.
A. I forgot the question. I'm sorry.
Q. Where -- where is YesCare's corporate

headquarters located?

MR. MARTIN: Objection.

THE WITNESS: I, David Goldwasser, am answering the 205 Powell Place, Suite 104, Brentwood, Tennessee 37027 is the mailing address. And as you asked before, is that the corporate headquarters.

The company -- pretty much the office that has a mailing address for proper service, notice, et cetera, et cetera, everybody works remotely all over the place.

And the centers of actual operation were at the locations where the people actually worked physically, one of them being 3347 Tamiami Trail East in Naples, Florida 34112, which was the largest contract, which we were in the process of potentially losing, and where the largest operation's concentrated in Florida after we lost Alabama and Philadelphia.

So that is why that address is on the petition and where physical people work as opposed to nobody working in physical 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

BY MR. ZLUTICKY

Q. And you're aware that that's the address of the Naples jail?

A. I -- yeah. That's where people work.
Q. Is there some sort of co-working arrangement with the Collier County Sheriff's Office?
MR. MARTIN: Same objection.
THE WITNESS: That's where all the employees physically work and have an office.
BY MR. ZLUTICKY
Q. Okay. Do they still work there?
MR. MARTIN: Same objection.
THE WITNESS: They do not work there anymore, not for -- not for YesCare.
BY MR. ZLUTICKY
Q. Does YesCare have any business there anymore?
MR. MARTIN: Same objection.
THE WITNESS: No, they do not have business there anymore.
MR. ZLUTICKY: Okay. Do we have a copy of docket 84? If --
Lou, if you don't have it, I can have my colleague, Morgan, pull it up if we want to give her the right -- the ability to share her screen.
MR. SALAZAR: We can -- if we don't have it, we can get it in a minute.
Ali, you okay getting it?
MS. LEE-SIN: Just one moment.

MR. SALAZAR: Yeah.
BY MR. ZLUTICKY
Q. Okay. Mr. Goldwasser, this your declaration in support of the debtors' motion to approve use of cash collateral. Do you remember reviewing this document before you signed it?
A. I believe so.
Q. Okay. Did you draft this document, create it?
A. I did not.
Q. Okay. Do you believe that all the statements made in there are true and correct to the best of your knowledge?
A. To the best of my knowledge, yes.
Q. Okay. Let's focus on --
MR. ZLUTICKY: Can we please go to paragraph 8?
BY MR. ZLUTICKY
Q. Okay. So I'm going to read the last sentence. And this is, by the way, dated May 20, 2026.
Additionally, since the first day declaration was filed, I have determined that, as of the petition date, certain of the debtors were indebted to M2 in the amount of approximately $16 million inclusive of principle and interest, pursuant to that certain third amended and restated credit agreement, as amended from time to time, the pre-petition loan agreement.

Did I read that correctly?
A. Excellent. You're almost as good as Mr. Salazar. He's a little smoother though.
Q. And -- and when says I have the "I have determined," the "I" in that sentence is you, Mr. Goldwasser; is that correct?
A. Correct.
Q. So you determined as of May 20th that the debtors were indebted to M2 in the amount of approximately $16 million; is that right?
A. Yes.
Q. And you've given us all of the documents that you relied on to make that determination?
MR. MARTIN: Objection as to form.
THE WITNESS: I believe so.
BY MR. ZLUTICKY
Q. What causes you to say you believe so rather than yes?
MR. MARTIN: Objection as to form.
THE WITNESS: I am not sure if you were provided the e-mail that I provided to counsel with the reconciliation from Mr. Sprouse. So as far as the loan documents and the other agreements, the e-mails I referenced earlier, I know that I produced those.

I know I produced the e-mail that Mr. Sprouse sent. I'm just not sure if you have that, which is what I relied upon for the accounting part of my confirmation.

BY MR. ZLUTICKY

Q. So something other than Exhibit 5?

A. Yes --

MR. MARTIN: Objection as to form.

THE WITNESS: Yeah, that's not what I -- that's not --

BY MR. ZLUTICKY

Q. Okay.

THE COURT REPORTER: Would you repeat your answer?

THE WITNESS: I'm sorry. Yes, that is -- I did not rely on Exhibit 5.

BY MR. ZLUTICKY

Q. Sitting here today do you still believe that the debtors are indebted to M2 in the amount of approximately $16 million?

A. I cannot give you the same certainty as I had when I signed this based upon what I have seen today. I have not in general had reason to question the -- the department of companies that I work with.

When I get the reconciliation of -- from them,

which is why I relied upon it. But after seeing all the documents that were provided, seeing -- having to look through the general ledger, I am going to take under advisement and do further deep dive and research to get to, number one, the validity as was questioned.

I'm not saying it's invalid, but I will go through, again, the validity and the balances to make sure that these statements are true and/or have to be amended.

Q. And in doing so are you going to talk to anyone other than Isaac Lefkowitz to do that?

A. Absolutely.

MR. MARTIN: Objection as to form.

THE WITNESS: He's the one person I'm not going to be speaking to about this question.

BY MR. ZLUTICKY

Q. Well, but he is the one you spoke to pre-petition to determine that it was a valid debt, right?

MR. MARTIN: Objection as to form.

THE WITNESS: Mr. Zluticky, you like to say things that I didn't say.

BY MR. ZLUTICKY

Q. Did you speak to anyone other than Isaac Lefkowitz pre-petition about the M2 debt's validity?

A. Pre-petition about the M2 debt's validity? I definitely spoke to the people at the company about M2 having debt, getting through -- down to the little details of the amounts exactly. And what I did post-petition is different. But I did not only speak to Mr. Lefkowitz.

Q. And on the Sigma issues, on the line items on Exhibit 5, who are you going to speak to about that?

MR. MARTIN: Objection as to form.

THE WITNESS: I'm going to speak to people at the company to get further delineation of what those -- why those entries are made, what they refer to, how they came to me, what the transactions were in relation to them.

BY MR. ZLUTICKY

Q. And Sigma's the company that sent the $400,000 to your firm pre-petition?

A. That is --

MR. MARTIN: Objection as to form.

THE WITNESS: Yeah. I see the word "Sigma" in the reconciliation we looked at together, Mr. Zluticky. I do know that a company named Sigma did send -- caused to be sent the $400,000. They might be one in the same. They might not.

I'm assuming they are, but I can't tell you

right now 'cause that's not an official name. That's a -- one name out of, you know -- it's a reference in a -- in a list. But I'm assuming it's the same.

BY MR. ZLUTICKY

Q. So as it currently sits today -- I know the cash collateral motion is filed. The debtors are asking for the court to enter an order where the debtors stipulate and are bound forever that the M2 debt is valid, perfected, secured, and the amount of the debt. Are you prepared to do that today?

MR. MARTIN: Objection as to form.

THE WITNESS: So from my recollection of the court hearings and the stuff that you and your other cohort brought up and representations made by Mr. Nash on the record, we were not asking for that to be entered as an order until the investigations were done and until all objections and -- was made, investigations by yourself, by -- by the committee, et cetera.

It was a proposed -- and there was an interim order. We nor M2 was asking for it to be a final order until the challenge period and whatnot were explored.

So no, I'm not asking for it to be entered as

an order as we speak. And I have what to investigate regardless of this for amounts both for schedule and -- and for the same reasons that you're asking.

BY MR. ZLUTICKY

Q. You said you've confirmed over 170 cases, right, or approximately 170 cases?

A. Yes, approximately.

Q. Are you familiar with what a challenge period is?

A. In a generality, yes.

Q. Okay. What -- can you tell me what your understanding of a challenge period is?

MR. MARTIN: Objection. This is, again, beyond the scope of the topics.

MR. ZLUTICKY: It's directly related to cash collateral. Has absolutely nothing to do with venue. Your objection is noted.

BY MR. ZLUTICKY

Q. Mr. Goldwasser, please tell me what your understanding of a challenge period is.

MR. MARTIN: Objection as to form.

THE WITNESS: Challenge period of the -- period to challenge the validity of the claim in totality.

BY MR. ZLUTICKY

Q. For who to challenge it?
MR. MARTIN: Objection as to form.
THE WITNESS: Other parties, such as yourself.
BY MR. ZLUTICKY
Q. Yeah.
A. And my statement stands that we didn't ask for an order to be entered until this could be adjudicated by yourself if you wanted to or somebody else or any person wanted to challenge the validity of the claim.
Q. But that's other people, right?
A. In addition. In addition. As-is been presented. Documents I have not seen before. Some of them from the Corizon days, not YesCare. Okay? I will myself, as a fiduciary to the estate, investigate the validity.
And if I feel, along with counsel, that there's something that is invalidated, we'll bring it to the attention of all the parties that be. It might change the position of the cash collateral motion, if there is needed to be one if there is no (interference).
So it's -- I am not leaving this valid. I'm not letting it just sit on its laurels as whatever it is and waiting for you to challenge. Although I'm sure you will and -- and should if you feel it's not valid.
But I am taking my responsibility very

seriously. And, again, shown e-mails that I might be able to access, but were not shown to me prior. And I will drill down to the people who wrote the e-mails and to the reasons those e-mails were written.

And to find out what they reference. And again, there were different dates, different items, different things. Go through the ledger. And through its own -- take this on its own course of investigation.

Q. And all that before July 1st when you're asking the court to enter it on a final basis?

MR. MARTIN: Objection as to form.

THE WITNESS: In the event that I'm not able to do everything, I will not ask for the court to enter it on a final basis at that point in time.

BY MR. ZLUTICKY

Q. But that's what the motion currently says, right?

MR. MARTIN: Objection as to form.

THE WITNESS: That is what the motion currently says. And I think you as well as I have had many times that either motions get kicked out and/or changed. So --

BY MR. ZLUTICKY

Q. But that's what it currently says, right?

A. That is what it currently says.

Q. Thank you. All right. So also if -- if it turns out this debt's not real, isn't that a good thing for the estate?

MR. MARTIN: Objection as to form.

THE WITNESS: So that could be a good thing for the estate. Could be a bad thing for the estate. It could be a nothing for the estate. Again (crosstalk) Mr. Zluticky, you're asking me if it turns out -- I'm saying -- very simple statement. The less on the company, the better things are.

BY MR. ZLUTICKY

Q. Yeah. So to me, it just seems like this is -- I guess I'm not understanding why we're not -- is there -- so net, net, that would be less money the estate owes its creditors, right?

MR. MARTIN: Objection as to form.

THE WITNESS: I think that's what I just said.

BY MR. ZLUTICKY

Q. And this is something you are going to investigate?

A. I might have said that 25 times.

MR. MARTIN: Object to form (crosstalk).

MR. ZLUTICKY: So what I'd like to do, Mr. Martin, is take maybe a ten-minute break. I think I'm almost finished with my questions, but I

want to circle up with my colleagues here.

So if you would give us the opportunity to do that, maybe a ten-minute break. And then hopefully I'll come back and we'll be able to wrap up here shortly thereafter.

THE WITNESS: Yeah, I --

MR. MARTIN: Sounds good.

THE WITNESS: Perfect. Thank you very much.

THE VIDEOGRAPHER: We're going off the record. The time is a 5:12 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: We're going back on the record. The time is 5:22 p.m.

MR. ZLUTICKY: So brief bit of housekeeping before we get started again. Docket 84, which is the declaration we just spoke about, we're going to mark that as Exhibit 18. Just want to make sure we have that on the record so it's clear.

(Matthew Dundon as Wind-Down Officer's Exhibit No. 18 was marked for identification.)

BY MR. ZLUTICKY

Q. So thank you for the break. I really only do have a couple few questions left and then I think I'm finished. So the cash collateral hearing is currently set for July 1st. When does the debtor anticipate

transitioning the New Mexico contract?
A. 6/22.
Q. As of July 1st what will the debtors' business operations be?
MR. MARTIN: Objection as to form.
THE WITNESS: The debtors will be -- the business operations will be collections of the -- of the accounts receivable and going after any other assets of the estate in order to make sure we pay as many creditors as we can.
BY MR. ZLUTICKY
Q. Okay. So just so I understand that, they're not going to be actively operating a business, right?
A. As of this minute that's what it seems, yes.
Q. And their job will be essentially to collect everything that they have and then distribute to creditors?
A. Yes.
Q. Okay. What will the debtors need to use cash collateral for from July 1st forward?
A. The payroll of, again, I believe the 25 individuals that will be needed for approximately a month in our estimation. Might be six weeks. You know, I'm just -- you know, we believe we're able to do what we need to within a month to six weeks unless, again, one of

the groups that's been talking to us wants to take over, buy, do something else. That's pretty much cash collateral will be needed for.

Q. So to fund the employees that the debtors will still need to wind up the collection distribution process?

A. And tie up loose -- you know, any -- any other records that might be needed, you know, for the estate. Making sure that we get everything properly dealt with. There -- there are a lot of little technical items that --

I don't mean technical data. You know, just things that the attorneys need or, you know, litigation matters that are out there that have to be attended to, addressed, those -- those types of things.

Q. What is the benefit to the debtor and its estate to pay the pre-petition wages of the employees on or after July 1st?

A. There might not be any.

Q. Okay. So then I think I want to move to the rest of cash collateral here. The -- does the debtors' budget that's attached to the current motion, will that need to be modified in some way to reflect these transitions of contracts?

A. So I'm not looking at it. Just -- I'm being

pragmatic. I'm not trying to be argumentive.
Q. Yeah.
A. I'm not looking -- I'm not -- just saying I'm not looking at the current budget. We do update it as -- as things change. But we have amended it and further amended it.
And now that we have what we call the wind-down or -- or the team that could remake the company, you know, we might be amending a little bit further as -- as far as the go-forward budget.
As far as, you know, reference to pre-petition amounts, that will be our classification of, you know, claims and -- and -- but not for -- not -- not for use of cash collateral while using -- not for use of cash, you know, while for the operations. That might be on distribution, but not on operations. Does that address your question before?
Q. Yeah, I think so. So it sounds to me -- and I don't -- I apologize for paraphrasing here, but it sounds to me like what you're saying is you're -- you're not constantly, but periodically you're updating the budget to reflect current realities?
A. Yeah, on a weekly basis.
Q. And you anticipate that there will be an updated budget provided to everyone --

A. Yes.
Q. -- before July 1st?
A. Most probably, yes. I don't see -- yes. I'm just -- I don't want to guarantee this second, but yes.
Q. No, that's what you anticipate?
A. That is what I anticipate, yes.
Q. Okay. One other thing I wanted to ask about. And it relates to CHS Employee Group.
A. Uh-huh.
Q. I want to make sure that I heard this correctly. Is the debtor planning on taking specific action against CHS Employee Group under its agreement with CHS Employee Group?
MR. MARTIN: Objection as to form.
THE WITNESS: So from the discussions I've been having with counsel and I think they've been having -- my counsel and they've been having with Mr. Salazar and the U.S. trustee, I believe that the motion -- or preparing a motion to have CHS Employee Group -- just names -- pay the health insurance or the other insurance benefits for the employees as they are contracted to do. And then they could seek reimbursement from us.
Again, I'm not saying that's in the motion, but I'm saying, you know, the theory is that they're

supposed to pay the employers and we're supposed to fund them for -- for the payments since they didn't pay their contract.

Pay the health insurance as opposed to draining the estate right now and paying a large portion. That would not benefit the ongoing business. That would be not the best use of the estate's cash that it does have available.

And for CHS Employee Group to pay that for the benefit of clearing the deck, we'll call it, not legal words, but -- and, you know, potentially helping keep the continuity.

That -- that's the motion that was contemplated being -- being filed and that I -- I asked to be prepared, you know, under my direction, gathering information.

And again, I probably have 700 unanswered e-mails today from being in the deposition, but that's the price of doing business in -- in this place. So I'll be up till 3 in the morning.

But nonetheless, that's -- that's the intention, is to ask them to pay that or make a motion to have them -- compel them to pay that on behalf of the employees, for their benefit, the employees' benefit, as they are employed to CHS

Employee Group and not actual employees of YesCare.
Does that answer your question?
BY MR. ZLUTICKY
Q. It does. Yes. Thank you.
Are you aware that Isaac Lefkowitz and CHS Employee Group have sued a lender in New York state court for violation of usury laws and other things related to a loan that was used to fund payroll?
MR. MARTIN: Objection as to form.
THE WITNESS: I did see a copy of the litigation. It was attached to one of the motions, I think to try to prove Mr. Lefkowitz's ownership of CHS Employee Group or something to that effect.
BY MR. ZLUTICKY
Q. And it's your understanding that Mr. Lefkowitz is the owner of CHS Employee Group?
A. That's what the document says.
Q. Maybe --
A. I'm saying that's what the -- the --
Q. Have you -- have you asked him?
A. I've asked if he controls -- directly owns it, but the document says that he owns it. Again, I don't know if people have investors and/or -- I'm not saying him, just anybody, so --
But the document that you provided says he's

the sole owner. So I would rely on that as -- you know, as you have or whoever provided that. But he definitely is the related party, the signatory on the agreement. So he definitely controls from what I understand.

Q. Have you asked him to pay the money?

A. I -- I have asked him to pay the money.

Q. What did he say?

A. He has said he doesn't have it. But that's why we file a motion and push the buttons as far as we can.

Q. Are you aware that in the Kohchise Jackson litigation when Isaac Lefkowitz was asked about his money he pled the Fifth?

MR. MARTIN: Objection as to form.

THE WITNESS: I don't -- I was not at that testimony.

BY MR. ZLUTICKY

Q. So you're not aware of that?

A. I'm just saying I wasn't there. The transcript -- I wasn't there. So I don't know.

Q. I'm asking if you're aware of it.

A. I've seen --

MR. MARTIN: Objection as to form.

THE WITNESS: I've seen it written in some documents that were filed I think in this case. But I'm just saying I have not gone and -- and looked at

transcripts or I was not at that hearing.
BY MR. ZLUTICKY
Q. And -- but he is the -- as far as you know, one -- a controlling person at least of CHS Employee Group, if not the only owner?
A. Correct.
Q. And who owns M2 LoanCo?
A. Again, I don't know. I know that he's the one that I speak to. I would assume he's the owner. Not -- I'm just --
Q. And who --
A. I'm not -- I'm not -- not trying -- again, I'm not trying to be obtuse. I just don't have -- I don't have documents. I don't have --
Q. No, I hear you. And I guess where I'm going is we -- Isaac is the controlling person of M2 LoanCo and he's the controlling person of CHS Employee Group and he's the controlling person of Sigma. And it hasn't -- you haven't decided to pull the transcripts of testimony where he's testifying about, among other things, his assets?
MR. MARTIN: Objection as to form.
THE WITNESS: Testimony about his assets?
BY MR. ZLUTICKY
Q. Yeah. He's saying he doesn't have the money.

MR. MARTIN: Objection as to form.
THE WITNESS: You know, you lost me in the -- you got -- you had me until pulling transcripts of him testifying about his assets (crosstalk) just I'm -- I'm not being -- I'm going to clar- -- I'm going to cont- -- just you're asking me about him testifying about his assets.
BY MR. ZLUTICKY
Q. Uh-huh.
A. And you made reference to a trial transcript in the middle a trial that wasn't a judgment collection transcript and why I wouldn't -- why I wouldn't have those records in relation to his money.
That's -- I don't -- that line of reasoning doesn't work for me. So that's why -- I'm not trying to be obtuse and say -- I'm just giving you the context of why your question doesn't make sense to me.
Q. I -- I understand. If you don't understand the question, I'm happy to rephrase it. Isaac Lefkowitz is the controlling person of CHS Employee Group; am I right?
A. My knowledge, yes.
Q. CHS Employee Group is not honoring its obligations under its contract with the debtors, correct?
A. Correct.
Q. And so the debtors are looking to enforce that

agreement against CHS Employee Group in whatever form that takes, right?
A. Correct. Yes, yes. So --
Q. You've asked -- you've asked Isaac for the money, right?
A. Yes.
Q. Isaac has said he doesn't have the money.
A. He says CHS Employee Group doesn't have the money, correct.
Q. So wait a minute. He doesn't -- he's not saying he doesn't have the money, he's saying CHS Employee Group doesn't have the money?
A. Mr. Zluticky, you asked me if I spoke to Isaac. I said yes. When I said he, it was a proverbial he. I didn't ask him if he has money in his bank account to fund CHS Employee Group and he said I don't have money.
So my -- and I'll be more direct in my -- my words, not because your -- not because of anything, but I'm speaking proverbial and I will speak more clarified as I answer you. And I apologize for not doing that before.
Q. No need to apologize. I appreciate the clarification. And Mr. Lefkowitz is the controlling person at M2 LoanCo as far as you know?
A. As far as I know.

Q. Okay. So if -- if he doesn't have money for CHS Employee Group to honor their obligations, how is M2 LoanCo going to be your DIP lender?

MR. MARTIN: Objection as to form.

THE WITNESS: I don't understand your question. If you could maybe (crosstalk).

BY MR. ZLUTICKY

Q. Of course. As I'm seeing it, from CHS Employee Group you're saying Isaac Lefkowitz is the controlling person, right?

A. Yep.

Q. M2 LoanCo, Isaac Lefkowitz is the controlling person, right?

A. Yep.

Q. Sigma Risk Management, Isaac's the controlling person, right?

A. I don't know.

MR. MARTIN: Objection as to form.

BY MR. ZLUTICKY

Q. He's the only person you've talked to about Sigma.

A. He's only person I've talked --

MR. MARTIN: Objection as to form.

BY MR. ZLUTICKY

Q. Seems to me all roads lead to Mr. Lefkowitz.

MR. MARTIN: Objection as to form.

BY MR. ZLUTICKY

Q. So -- I haven't asked the question yet. So it seems to me that all roads lead to Mr. Lefkowitz. So if Mr. Lefkowitz doesn't have money in pot A, CHS Employee Group, what makes you think he has money in pot B for M2 LoanCo?

MR. MARTIN: Objection as to form.

THE WITNESS: So I will tell you from my experiences in general, nothing to do with Mr. Lefkowitz, that when people do have a vehicle that has a security interest and a potential of being paid back because of a security interest and the DIP loan, sometimes if somebody doesn't specifically have money or they do have money, they borrow money. They bring in investors.

There are ways that money comes into different vehicles that's not always somebody's personal. Again, I don't know what he personally has. That's not, you know --

But if -- in the past, from what I understand, Mr. Lefkowitz has -- and I'm going to use Mr. Lefkowitz as a proverbial statement. Okay? Has caused monies to come into the company for payroll and/or other items. Okay?

As has been told to me by people at the company, not Mr. Lefkowitz -- he has also told me, but, you know, I have asked people at the company. He has caused money to come in to fund things like payroll.

I know that he has -- I'm sorry -- the money that went to pay the payments you referenced earlier in January or caused to be made by him. Whether it was his money, somebody else's money, I don't know, but they were caused by him.

They did not come from the company or the ledger that shows there's a credit there. Nonetheless, they were not made by the company. They were made by I think it was Alan Rubenstein who was referenced earlier.

So there have been advances made caused by Mr. Lefkowitz, as you're referencing the one and/or be all. And it's not as black and white as to where it comes from and all that. So I -- as resourceful as he seemingly -- he has been over the past few years, I had no reason to doubt that he'd be resourceful now.

BY MR. ZLUTICKY

Q. You said it's not black and white where it comes from. Isn't that by design?

A. I didn't --
MR. MARTIN: Objection to form.
THE WITNESS: I didn't design it.
BY MR. ZLUTICKY
Q. Yeah. But now you get to go unravel it.
A. I get to go play puzzle man.
MR. ZLUTICKY: So Mr. Martin, those are all the questions that I have.
I don't know if, Lou, if you have any additional questions based on my questions.
MR. SALAZAR: No, I do not have any further questions. Just, again, reserving based on the issues that I raised, doc issue and the topic issues from earlier.
MR. ZLUTICKY: Yeah, I need to make the same reservation. I've actually not received a single document. Not one.
MR. MARTIN: Okay. I think that's -- that's it for today then.
THE COURT REPORTER: Okay. Should we get orders on the record?
MR. SALAZAR: Melissa, did you say orders on the record?
THE COURT REPORTER: Yes.
MR. SALAZAR: Yes. I'm going to -- I'm going

to order.

THE COURT REPORTER: Okay. Would anyone like a copy?

MR. ZLUTICKY: This is Nick Zluticky. I would, please and thank you.

MR. SALAZAR: Kevin Nash (crosstalk) sorry, Mr. Martin.

MR. NASH: What?

MR. SALAZAR: Do you want a copy of the depo transcript?

MR. NASH: I do. And I want the exhibits on the same timeline as you two guys.

MR. SALAZAR: We'll get them out to you.

MR. NASH: Okay.

MR. SALAZAR: Yes, sir.

MR. NASH: If not, I'm calling Leo.

THE COURT REPORTER: Mr. Martin --

MR. NASH: (Crosstalk) how to get to -- from the East Coast to it's called -- what is it called, Alligator Alley?

MR. SALAZAR: Alligator Alley.

THE VIDEOGRAPHER: Sir, we're still on the record. Do you want any video orders?

MR. NASH: No, no.

MR. SALAZAR: No, not at this time. Thank you,

Mr. Weaver.

MR. MARTIN: This is Jim Martin and I would like to order a transcript.

And Luis, could you give us the -- could you get us the exhibits by e-mail?

MR. SALAZAR: Of course. Yeah, we'll organize it.

MR. NASH: Yeah, how you do it -- okay. Good.

MR. SALAZAR: Yes.

THE COURT REPORTER: I just put my e-mail in the chat, Mr. Salazar, if you wouldn't mind sending me the exhibits when you get a chance.

MR. ZLUTICKY: You're absolutely getting --

MR. SALAZAR: Just one more clean-up thing. Mr. Martin, I'm assuming read and sign?

MR. MARTIN: Yes.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 5:42 p.m. This concludes today's testimony by David Gold- -- Goldwasser. The total number of media units is six and will be retained by Veritext Legal Solutions.

(The taking of this deposition was concluded at 5:42 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MANATEE

I, MELISSA ENGLAND, the undersigned authority, certify that DAVID GOLDWASSER personally appeared before me on June 16, 2026, at 10:04 a.m. and was duly sworn.

WITNESS my hand and official seal this 25th day of June, 2026.

Melissa England, CSR
Notary Public State of Florida
Commission # HH 731061
Expiration: November 9, 2029

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MANATEE

I, Melissa England, do hereby certify that I was authorized to and did stenographically report the deposition of DAVID GOLDWASSER; that a review of the transcript was requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 25th day of June, 2026 at Manatee County, Florida.

Melissa England

James Martin, Esq.
jmartin@polsinelli.com

June 29, 2026

RE: In Re: CHS FL, LLC, Et Al.

6/17/2026, David Goldwasser (#8277256)

The above-referenced transcript is available for review.

The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at cs-southeast@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

In Re: CHS FL, LLC, Et Al.
6/17/2026, David Goldwasser (#8277256)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

______________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________

REASON____________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________________ _______________

DAVID GOLDWASSER DATE

**&**

**&** 3:13

**0**

**00785** 4:22
**01087** 1:5 6:17

**1**

**1** 4:13,22 13:5,9 14:11,20 15:3 54:22 56:1 95:22 105:9 135:19 200:15 209:5 228:19 235:12 238:6 242:6
**1.310** 286:25
**1.8** 183:15
**10** 4:24 15:20 78:24 79:13,13 79:14 82:23 83:14 132:17 162:13 164:2,4 187:24
**100** 3:14 37:21 55:17 96:5 112:14 114:8,9 186:20 207:1 215:25,25
**100,000** 37:20 38:11,13,21 225:3
**10017** 3:9
**10036** 2:10
**104** 164:23 208:21 251:11 254:13 255:4,21
**105** 4:20
**108e4** 200:8
**10:04** 1:18 6:2 284:8
**11** 1:4 2:10 4:17 4:20 5:3 29:16 29:20 52:17 53:25 74:10,10 78:22 83:10 96:12,15 105:20 106:7,22 179:5 179:5 180:1 181:7 182:25 186:20,21 187:25 188:1,4 188:7 195:13,14 200:15,16 201:3 206:15 217:9,16 234:7
**119** 4:21
**119,104,391** 200:14
**11:20** 66:9
**11:30** 66:5
**11:34** 66:12
**11th** 164:16
**12** 5:4 15:5 96:25 97:9 103:16,17 104:16 189:4,6 189:10 195:13 223:3 224:16 227:11 243:23
**12/31/24** 97:10
**1201** 3:3
**125** 3:9
**125,000** 35:4 221:25
**13** 4:13 5:3,5 15:5 189:24 195:13
**13.9** 241:18
**136** 4:22
**13th** 39:3
**14** 5:6 64:11 192:17,19 194:5 195:14
**15** 5:7 135:3 199:7,9 208:6 234:7
**150** 55:14 175:24 176:1,9
**16** 5:8 83:17 84:12 85:8,14 98:15 99:21 101:3 107:11 108:9,9 117:24 179:9,12 207:15 207:19 209:1,2 213:10 228:23 250:5,7 257:22 258:10 259:20 284:8
**16,204,259.00** 80:21
**16,204,259.00.** 118:20
**16,865,634** 243:15
**16,865,634.00.** 98:16
**16.2** 99:21
**16.8** 99:20 244:9
**1600** 3:14
**162** 4:23
**164** 4:24
**166** 105:2,18
**17** 1:17 5:9 6:3 98:15 209:4,6,8 250:17
**170** 62:12 225:8 227:17 263:6,7
**17th** 245:24
**18** 5:11 15:7 100:23 179:12 267:17,20
**180,104,391** 200:18
**188** 5:3
**189** 5:4,5
**19** 82:23 151:4
**192** 5:6
**199** 5:7
**19th** 232:19 233:2
**1:04** 135:14

**1:30** 134:6
**1:45** 135:10
**1:57** 135:17
**1st** 219:21 245:19 265:9 267:25 268:3,20 269:18 271:2

**2**

**2** 4:14 21:1,3 23:19 25:9 90:18 135:20 159:7 170:24 171:6,12,22,24 177:23 209:10 236:22,23 237:7
**2.1** 159:7
**2.162** 157:7 158:21
**20** 61:14 151:4 236:21 257:18
**200** 2:4 45:21 55:15 176:23 177:15
**200,000** 242:5,8 242:10
**2003** 61:8 136:4
**2006** 148:24
**2020** 199:16 200:14 201:19 202:13,17 206:18,20,20 236:13,17,20,21
**2021** 5:3,5,6 25:3 86:10 193:9 195:15,17 202:18 217:17 236:25
**2022** 5:4 95:21 95:22 96:16 189:12 194:21 195:16 202:18 207:3,4 213:12 213:18 215:2 216:1 235:12 236:25 237:8 238:6
**2024** 96:25 238:6,17,20 239:23 240:21
**2025** 26:16,18 29:7 31:5 52:16 95:12 148:23 164:16 221:17 222:3 241:8,13 241:20 242:6
**2026** 1:17 4:21 5:8 6:3 30:25 119:13 207:16 208:7,8 211:11 228:19,23 257:18 284:8,10 285:17 286:3
**2029** 284:19
**205** 45:21 164:18,23 208:21 251:11 254:12 255:4,21
**207** 5:8
**209** 5:10
**20th** 258:8
**21** 4:14 15:7 84:5,11 86:6 194:21
**212** 2:11 3:10
**2121** 2:4
**218** 4:5
**221-5700** 3:10
**22nd** 243:1
**24** 176:2
**25** 83:5 176:2,19 266:21 268:21
**25th** 161:8,9 284:9 285:17
**26** 5:5 16:6 98:14 200:14 243:14,19
**267** 5:11
**27** 16:2,8 63:3,6
**284** 4:6
**285** 4:7
**286** 4:8 285:25
**287** 4:9
**29** 286:3
**2900** 3:3
**2:26** 1:5 6:17
**2:52** 178:11

**3**

**3** 4:15 79:1,3 90:18 106:17 135:21 165:23 166:21,23 183:19 272:20
**30** 13:6 64:25 98:1 105:8,9 109:11 133:24 238:6 241:13,20 286:16,24
**305** 2:5
**30th** 98:10 243:19
**31** 5:4 16:12 238:17,20 240:21
**314** 2:18
**31st** 189:11
**32** 15:8 108:9
**33129** 2:4
**3347** 209:24 210:15 212:17 255:13
**33602** 3:14
**33781** 284:17 285:22
**34** 15:13,15 97:15 107:18 108:9
**34112** 255:14
**35** 62:20
**37** 16:12
**37027** 208:22 251:12 254:13 255:5,22

**374-4848** 2:5
**382** 127:6,7
**39** 15:14,22 97:13,15
**39.9** 238:23
**3:00** 178:7
**3:06** 178:14
**3:49** 213:1
**3rd** 2:4

**4**

**4** 4:16,21 83:4,7 83:23 118:14 119:13 135:23 167:16 168:14 169:13 209:20 209:21
**4.3** 159:13 160:23 161:13
**4.9** 92:24
**400,000** 222:4,9 223:17 261:16 261:23
**401** 172:6
**41** 15:24 16:4
**42** 16:5 175:21
**43** 16:4,7
**45** 16:9 134:22 135:1,1,5,8
**48** 16:9
**4:00** 212:20
**4:02** 213:4

**5**

**5** 4:18 78:23 93:24 94:3 101:3 106:3 135:24 161:12 161:12 234:25 259:6,16 261:8
**5.1** 92:24
**5/19** 79:23
**5/25** 121:9
**50** 63:18
**50,000** 35:25 38:2
**500,000** 161:1 161:11,14
**506** 109:9
**52** 175:21
**5:12** 267:10
**5:22** 267:13
**5:42** 283:18,23

**6**

**6** 4:19 13:6 64:25 69:7 73:1 105:13,16 106:3 106:3,4,4 135:25 160:17 160:20
**6/17/2026** 286:5 287:2
**6/20** 120:12
**6/22** 120:14 268:2
**6/30** 121:4,6,20
**6/30/26** 121:10 121:16
**60** 23:8,14 96:8 121:23,23
**60,000** 121:23
**63105** 2:17
**64106** 3:4

**7**

**7** 4:21 119:8,8 119:11 136:1 245:12,15
**700** 272:17
**731061** 284:18
**75** 38:11 190:15 191:8 195:7
**75,000** 37:19,21
**7676** 2:17
**79** 4:15
**7th** 22:13,15

**8**

**8** 4:4,22 38:24 102:14 103:6 106:20 116:22 136:5,7 162:24 163:2,3 257:15
**800** 2:17
**81** 78:21 79:5
**813** 3:15
**816** 3:4
**8277256** 286:5 287:2
**83** 4:17
**84** 256:18 267:15
**842-8600** 3:4
**868-7889** 3:15
**87** 225:6
**88** 225:6
**889-8000** 2:18
**8b** 106:20,22
**8th** 22:16 38:25

**9**

**9** 4:23 5:6 14:11 14:21 15:3 23:17 162:13,17 162:19 187:23 193:9 208:8 211:11 284:19
**9/20/21** 194:5
**90** 244:13
**91** 199:19
**92** 95:23 96:11 96:19
**92.5** 95:23
**94** 4:18
**969-3000** 2:11

**a**

**a.m.** 1:18 6:2 66:9,12 284:8
**ability** 27:13 58:2 76:15 106:14 125:1 126:3 150:18 151:8 256:21

**able** 13:24,24 14:1 15:16 24:21 25:24 26:2 32:13 33:7 33:15 40:2,7,13 41:2,3,14 45:16 54:4,5,7 55:16 55:20 56:15 57:20,24 58:16 69:24 71:22,22 77:15 85:12 89:20 100:3 110:25 111:8,22 113:19,22 124:23 125:25 126:14,14 131:4 133:9 145:6,22 145:23 146:7,17 146:18 147:3,6 148:13 151:24 152:6 154:15 157:6 161:19 176:18 182:4 185:8 213:10,17 215:22 223:19 234:17 239:7 253:15 265:2,12 267:4 268:24
**above** 101:21,25 102:6 147:8 286:6
**absent** 173:2
**absolutely** 55:5 55:7 96:9 99:16 140:25 142:9,24 193:7 220:2 225:19 230:20 234:4 260:12 263:17 283:13
**abundance** 185:4
**abundantly** 111:23 113:14 113:16
**acceptable** 183:20
**access** 190:22 265:2
**accommodati...** 125:20
**accomplished** 62:15 148:5
**account** 25:13 47:8,11 84:6,17 89:23 90:2,8,11 90:16,22 91:5 91:12,16,17,21 93:11,16 133:24 157:6 160:6 228:11,15 277:15
**accountant** 188:11
**accounting** 81:5 81:12 85:12 100:12,21 102:5 104:16 129:6 212:2 240:9 259:3
**accounts** 42:20 88:25 89:4 90:13 103:10 124:16 166:13 268:8
**accrued** 32:9 42:20
**accrues** 238:3
**accuracy** 286:9
**accurate** 96:3,5 99:19 106:12 107:2 131:15 170:25 205:16
**accurately** 24:7 25:18 64:17,18 79:20 107:2,3 163:6 166:1,14 167:5,25 170:1 200:19 209:25
**acknowledge** 58:12,13,14 120:18
**acknowledged** 58:10 87:4,10 123:15 169:22
**acquaintance** 31:4
**acquainted** 27:5
**acquired** 190:14 215:2
**acquisition** 9:24 200:7 201:20
**act** 36:14 138:16
**action** 6:23 74:15,15,21 152:19 207:13 271:12 285:14 285:15
**actions** 227:12
**active** 119:25 171:13
**actively** 268:13
**activities** 19:4
**activity** 94:12
**actual** 30:10 45:24 54:25 73:4,9 74:21 85:9 87:24 96:11 100:12 112:17 192:5 196:6 211:23,25 212:15 255:11 273:1
**actuality** 44:11 102:23 117:22
**actually** 11:25 18:24 27:19 32:7 39:12 42:5 46:2,24 52:23 53:19 59:1 63:13 73:13 81:1,20 82:3 99:10 103:25 104:7 116:20 122:5 125:1 149:1 151:20

180:11 186:7,14 187:2 203:11,13 218:16 227:10 252:20,21 255:12 281:16
**actuarily** 102:20
**adar** 48:10,11 48:18
**add** 181:22 184:18 212:21
**added** 238:1
**addition** 103:5 109:7,12 122:21 264:11,11
**additional** 15:11 18:17 38:14 41:11 98:13 122:20 128:19 133:20 156:11,12,17 172:19 202:15 202:15 215:23 235:17 236:22 236:23 237:7,13 238:4,11 281:10
**additionally** 68:25 257:19
**additions** 99:18
**address** 35:16 45:16,22,25 134:25 208:16 208:19 211:13 211:18 251:9,11 251:19 254:12 255:5,8,19,24 270:16
**addressed** 269:15
**addressing** 185:17
**adduced** 8:3
**adequate** 108:18,19 109:3 109:14,18,19 114:13
**adjudicated** 264:7
**adjust** 162:4
**adjusted** 200:10 200:13
**admin** 117:5,8
**administer** 6:22 166:11
**administered** 1:6 172:12
**administration** 45:13 166:25
**administrative** 116:19 122:11 130:10 168:13 168:17,20 169:7
**administratively** 101:16 102:3
**administrator** 174:20 216:11 216:12,19
**admissibility** 61:17
**admission** 192:5 192:7
**admit** 24:7 84:8 165:25 197:16
**admits** 80:1
**admitted** 62:5,8
**admittedly** 165:1
**admitting** 100:11 102:2 117:23 134:3 202:25
**advance** 236:22 236:23 237:7
**advanced** 38:16 126:9 216:7
**advances** 235:11 280:16
**advantageous** 77:22
**advent** 73:12
**advice** 176:15
**advise** 193:8
**advised** 14:9
**advisement** 19:21 260:4
**advisor** 19:9,24 20:2 75:16 226:22
**advisory** 9:12
**affairs** 176:18 239:12 240:12
**affect** 196:10,11
**affected** 96:8
**affil** 49:11
**affiliate** 49:7,7 49:12,16 51:4 52:9 163:5 165:2
**affiliates** 43:23 44:2,6 48:7,7 222:3
**affiliation** 7:4
**affirm** 8:5
**afforded** 34:12
**afraid** 53:3 143:7
**age** 86:7
**agencies** 89:9 126:9 156:23 157:20,21
**agency** 144:10 144:10 159:20
**agent** 104:15 217:21
**ago** 22:13 24:17 25:2,5 31:3 43:16 83:14 116:5 143:10,10 215:1
**agree** 6:10 16:16 32:22 60:14 86:6 94:20 96:6 108:13,17 149:19 167:5

168:25 169:3,21 170:12 191:3,5 191:16 192:2 198:17,17 214:11 237:21 238:7 245:20
**agreed** 32:13,19 32:20 108:13 125:9 160:11,12 169:22
**agreeing** 112:11 117:25 186:10
**agreement** 4:24 23:24 24:22 28:1,9,20,22,24 29:1,6,12 30:10 33:8 34:18 35:23,24 36:4,9 45:4,7 53:23 54:5,8 78:13,15 121:17 156:8 163:22 164:7,13 165:23 167:24 169:23,24 170:4 173:4 179:25 181:7 219:11,15 219:21 228:5,18 257:24,25 271:12 274:3 277:1
**agreements** 24:4 25:14 58:6 86:13 203:24 258:23
**ahead** 82:25 100:18 103:9 110:13 123:21 148:1 149:6,13 166:20 184:17 190:12
**aig** 175:11
**aig's** 102:11
**airpod** 137:9,9
**airpods** 137:16
**al** 1:9 6:14 286:4 287:1
**ala** 178:18,25
**alaba** 178:25
**alabama** 32:25 33:5 41:6 54:17 55:12 121:2,3 140:24 150:9 178:18,22 179:1 179:6,24 181:11 181:21 182:10 182:13 255:18
**alan** 47:4,5,9 227:21 228:10 280:14
**alerted** 207:12
**alf** 136:14,14
**ali** 3:20 7:9 22:9 256:24
**alive** 43:1 172:24
**allegation** 204:23
**alley** 282:20,21
**alligator** 282:20 282:21
**allocated** 225:4
**allow** 111:11 113:6
**allowed** 130:22 150:18 169:11 184:21 186:1 217:7
**allude** 43:10
**als** 11:6 136:12 136:14
**alternative** 27:14
**alternatives** 178:1
**ambushed** 198:15
**amended** 4:19 5:7 105:2,19 106:7,21 135:25 199:12 257:24 257:24 260:9 270:5,6
**amending** 270:9
**amendment** 88:7 201:20 202:1 236:24
**amendments** 24:1 88:6 202:13,18 203:16 207:8 233:9,10,10,10
**amount** 9:18 32:9,11,23 37:18 38:1 42:14 73:20 81:1,8,24 82:3 85:3 87:23 90:25 92:18,23 95:22 96:11 99:20 101:19 109:4 118:1,24 119:1 127:2,12 127:15 157:1,23 170:24 179:7,21 186:7,20 187:1 195:7 198:21 200:11,14 201:13 203:13 205:23 206:24 213:9 217:2 257:22 258:9 259:19 262:10
**amounts** 34:12 104:2 106:23 131:8 167:21 179:22 215:17 233:19,19,25 235:11 261:4 263:2 270:12
**ana** 103:23 120:3 127:1,13 148:4 175:18,20 245:21 246:8
**analysis** 24:2,3 39:19 82:2 96:1

96:4 109:23 118:25 129:24 161:18 186:11
**anew** 34:7
**anita** 50:25 188:10,11,24 189:11 217:10
**annexed** 86:25
**annexes** 24:5
**annual** 5:8 207:16 208:7 210:10 211:10 212:1,12 250:16
**answer** 29:3 33:17 39:11 50:1 59:22,25 61:13,18 77:2 85:3 89:14 90:17 97:17 98:21 106:20 107:6 108:3 110:11,14,15 142:20 145:14 146:2 149:14 158:1,2,4 163:15 171:16 179:7 190:19 191:25 194:23 201:17 203:8 214:22,23 224:11 226:4 231:2 241:21 242:24 248:20 248:22,23 249:20 253:24 254:6,23 259:14 273:2 277:20
**answered** 27:18
**answering** 50:2 255:3
**answers** 195:3 198:1 230:13
**anthem** 172:14 174:19,22 177:6
**anthony** 3:13
**anthonyandpa...** 3:15
**anticipate** 267:25 270:24 271:5,6
**anticipated** 57:2 78:8 155:24
**anybody** 18:17 46:2 102:5 112:3 118:5 128:22 134:4,8 141:22 155:10 155:12,16,24 182:7 213:17 223:11 231:5 245:1 273:24
**anybody's** 184:14
**anymore** 172:24 256:10,13,16
**anyway** 42:6 184:10
**apartments** 225:25 226:5,19
**apologize** 30:20 48:17 90:25 98:6 149:16 150:7 250:19 270:19 277:20 277:22
**apparent** 41:17 42:22 57:3
**apparently** 180:13
**appeal** 55:23 73:7,23
**appearance** 7:1 7:3
**appearances** 2:1 2:14 3:1,7,12
**appeared** 1:19 284:7
**appears** 95:22 98:7
**appleseed** 178:22
**applicable** 100:1 166:25
**application** 36:12 98:20,22 226:7,20
**applications** 99:18 222:7
**applied** 98:14 98:23 243:15
**apply** 248:1
**applying** 99:2
**appointed** 35:18 227:2
**appointment** 36:25 70:2
**appreciate** 59:14 198:15 209:3 277:22
**approached** 115:14 156:2
**appropriate** 21:12 39:22 111:21
**approval** 36:22 157:24 183:18
**approve** 257:4
**approved** 78:12 111:20 159:13 159:19 160:24
**approximate** 38:1 250:13
**approximately** 35:3 69:7 84:5 85:5 92:24 95:24 102:13,13 104:16 107:10 107:18 157:7 161:11,12 225:9 257:22 258:10 259:20 263:7,8 268:22
**april** 72:19 73:1 98:10 180:19,24

208:8 211:11 243:19
**ar** 93:5 104:7
**arbitration** 102:19
**area** 10:7 59:16 250:9
**areas** 64:24
**arguably** 58:6,7
**arguing** 60:4 115:23
**argument** 112:24
**argument's** 144:4
**argumentive** 270:1
**arraigned** 62:18
**arrangement** 32:3 45:6 256:2
**article** 165:23 167:16 178:21 178:22,23
**articles** 10:14
**ascertain** 89:21
**ashley** 3:14
**aside** 75:1 122:12 157:18
**asked** 18:2,24 19:5 52:23 53:1 60:2 72:7 78:16 81:18 84:17 85:6 100:13,21 110:18 140:20 141:2,2 142:8 142:10,12 143:7 143:20,22,25 144:4 153:1 156:14 181:17 185:6,18 188:9 195:25 197:25 202:9 203:9 205:9 220:22 223:2,12,17 224:6 228:15 230:11,14 232:9 235:14,20 252:6 252:19,23 255:6 272:14 273:20 273:21 274:5,6 274:11 277:4,4 277:13 279:3 280:3
**asking** 47:21 63:21,21,22 72:6 109:21 110:15 129:10 139:11 145:5 171:21 186:18 191:3 192:2,7 205:16 240:14 249:10 252:9 253:14 262:7,16 262:22,25 263:4 265:9 266:8 274:20 276:6
**asks** 106:22 218:6
**aspersions** 143:6
**assert** 203:4
**asserted** 205:4,9 205:11
**asserting** 187:20 190:14
**assertion** 53:10 93:21
**assertions** 52:2 142:21
**assess** 35:11
**assessment** 233:23
**asset** 101:22 102:25
**assets** 25:16 35:12,20 73:3 73:13 74:15 79:18 155:9 268:9 275:21,23 276:4,7
**assign** 123:19
**assignment** 11:11,13
**assist** 27:15 156:10
**assistant** 234:17
**assisted** 11:3 137:23
**assisting** 27:19
**associated** 244:3
**assume** 95:7 123:19,20 177:2 237:10 275:9
**assumes** 110:8,9 210:19
**assuming** 105:10 115:11 144:8 196:5 237:10 261:25 262:3 283:15
**assumption** 145:4
**assure** 203:4
**atkinson** 19:10
**attached** 194:10 269:22 273:11 286:11
**attachment** 25:15 197:10
**attain** 33:20
**attainable** 32:12 101:23
**attained** 33:7
**attempted** 19:12
**attend** 20:8 134:23
**attended** 269:14
**attention** 23:21 25:8 100:25 106:21 200:3 208:11 229:20 264:18
**attorney** 7:5 27:8 47:6 70:10

110:16,16 111:17,18 228:14 230:2,3 285:12,14 286:13
**attorneys** 37:5 192:12 223:4 224:16,18 235:22 236:1,7 269:13
**audio** 6:8
**audited** 95:10 95:15,19
**audits** 95:10
**august** 5:6 26:19 193:9 236:12,17,19,21
**authority** 4:15 36:14 59:23 76:7,19 79:6 138:7,16 231:9 231:12 284:6
**authorization** 129:20 171:25
**authorize** 105:23
**authorized** 6:22 79:9 285:6
**auxiliary** 124:9
**available** 19:15 41:12 195:20 215:11 252:8 272:8 286:6
**avenue** 2:4 3:9
**aversion** 52:20
**awarded** 73:23
**aware** 79:7 186:19,22 195:5 195:8 204:22,23 204:25 205:9 227:14 255:24 273:5 274:10,17 274:20
**awe** 73:5

**b**

**b** 13:6 64:25 107:4,5 131:21 131:21 166:5,6 168:13 279:6
**baby** 141:20
**back** 16:19 21:14 32:1 34:13 35:15,18 61:2 66:11 68:25 71:20 78:6 79:23 82:10 102:18,19 102:23 106:16 111:15 113:6,8 113:23 114:19 118:12 127:19 134:6 135:9,16 136:9 149:2,9 155:18 157:9 162:7,8 175:15 178:7,13 183:23 189:17 190:6 191:8 195:12 197:12 213:3 217:17 218:20 220:2 227:24 234:6 249:23,25 267:4,12 279:13
**backed** 27:10,10 113:1
**background** 8:19 9:17,23 41:23 59:9,12
**backing** 82:23
**backs** 241:4
**backstop** 185:17
**backup** 96:19 96:21
**bad** 155:23 204:20 227:8 266:6
**baker** 130:1
**balance** 97:14 97:16 98:24 99:4,20 133:23 174:4 201:3 237:15 238:1,5 238:8,14,15,20 239:4,20 240:6 240:8 242:9
**balances** 99:2 260:7
**bank** 61:8,12,20 62:2,9 90:2,8,11 90:13 92:8 93:11,16 157:6 277:15
**banker** 153:19 154:4
**bankrupt** 53:4 150:5
**bankruptcy** 1:2 5:10 6:14,15 9:2 35:11 39:12 46:4 51:24 52:21 53:2,9,15 56:15 57:16 62:13 65:19 66:16,17 73:7,9 73:14 78:13 87:1,10,14 88:1 105:19 108:14 115:16 116:14 140:12 145:18 148:24 149:20 150:11,15 156:14 169:12 172:20 173:22 179:4 193:24 201:25,25 202:19 203:17 203:23 204:16 204:19 207:7,8 207:8 221:19 224:13 225:8 230:18 231:9 239:16 241:8 243:10

**banks** 61:12 62:6
**bar** 63:12
**barak** 2:8
**barred** 63:9,23 64:3 65:7 227:10
**based** 28:24 60:18 73:20 78:7 118:22 145:4 150:2 153:13 194:12 198:4 201:18 234:2 259:22 281:10,12
**basically** 41:21 121:12 152:17
**basics** 178:25
**basis** 35:11 37:6 109:20 111:7 116:9 138:15,16 155:19 167:3 205:19 213:25 230:21 247:24 265:10,14 270:23
**batch** 39:6,7 97:1,23,23
**baton** 231:20
**bear** 23:23
**becoming** 34:21
**beginning** 7:4 72:19 77:24 84:3 111:15 136:17 148:21 153:5 163:2 166:23 205:11
**behalf** 1:14 8:12 76:23 85:20 90:6 123:14 153:24 167:22 173:5 184:2,24 222:5 230:12 249:13 251:4 272:24
**behoove** 63:14
**belief** 80:20,23 81:4,9 118:19 118:23 213:19 230:18,21
**believe** 13:21 21:8 22:8 23:11 23:15 24:20 25:4,19 26:4 27:6,9 28:18 32:7 35:4 36:15 36:15 37:19,19 37:20 39:4,15 41:1 43:22,22 44:24,25 45:23 45:23 46:2,19 47:5,13 48:24 48:25 49:8,9,13 49:14 50:10 56:13 57:25 62:20 66:24 69:16 70:9 73:1 74:17 76:8,15 79:16 80:13,16 81:21,22,24 82:9 83:13,17 86:4,11,16 87:9 88:10 90:12,18 94:9,18,18,23 95:18 102:19 103:16 108:20 110:20 118:14 127:2 140:10 142:6 144:16 151:19 161:18 173:23 176:1,19 183:24 186:10 186:21 192:1 198:13 214:9,10 215:6 216:7,21 218:11,13 222:17 226:23 227:7 228:13,25 233:1,3,14 236:13,24 247:13,22 252:18 257:7,10 258:15,17 259:18 268:21 268:24 271:18
**believed** 33:2,18 70:6 146:16 230:16
**believes** 77:19 79:25 140:25 141:6
**believing** 239:5
**bell** 48:3
**belong** 91:4 93:6
**beneficiaries** 170:5
**beneficiary** 169:22
**benefit** 45:9 83:19 105:4 166:25 167:2,4 167:9 177:16 269:16 272:6,10 272:24,25
**benefited** 148:25 149:19 156:12,13
**benefits** 130:17 131:1 172:8,9 248:1 271:21
**berenblaut** 131:21
**berenblut** 75:14
**best** 100:9 106:14 112:22 115:11 123:7 176:14 257:11 257:13 272:7
**better** 71:13 137:20,20 146:10 150:16 159:23 184:17 208:17 266:10

**beyond** 71:6 88:15 99:25 101:21,25 102:6 114:13 147:8,16 160:15 226:2 246:16 249:7 263:14
**bid** 34:4 150:9 150:10
**bidding** 150:8
**big** 115:20 125:13 126:16 182:23
**bigger** 96:24
**biggest** 182:7
**bill** 50:22 104:10 130:2 160:6 183:15,15
**billed** 103:19,20 104:11,13
**billing** 129:10
**billion** 33:10 56:1
**bills** 103:18,25 128:4 158:8,10
**binders** 24:2
**bit** 11:15 23:2 26:23 28:14 33:5 43:12 51:3 64:11 66:1 82:23 85:23 96:24 97:21 133:2,8 138:6 150:4 158:2 181:14 186:16 190:6 199:20,21 220:3 225:24 250:8 267:14 270:9
**bk** 1:5 6:17
**black** 280:18,24
**bland** 3:19
**block** 134:17
**blurry** 189:15
**board** 24:3 29:19,25
**boards** 132:11
**boca** 250:10,13
**boiled** 176:18
**bond** 74:2,11
**bonus** 127:25
**book** 203:1
**books** 81:6 85:14 203:25 204:1 206:23 241:24
**bore** 204:17
**born** 87:3,8
**borrow** 28:7 279:16
**borrower** 200:16,21 201:5
**boss** 139:12 159:21,24
**bottom** 165:21 169:19 240:14
**bought** 216:13
**boulevard** 2:17
**bound** 262:9
**box** 8:16
**brain** 141:14
**break** 54:7 61:2 66:4 90:24 105:9 131:10 132:14 134:5 156:20 159:3,5 161:24 212:20 253:1 266:24 267:3,22
**breakdown** 52:19 71:25 103:8
**breaks** 217:6
**brentwood** 45:21 164:19,24 208:21 211:12 251:12 254:13 255:4,22
**brevard** 246:2
**bridge** 184:1
**brief** 254:20 267:14
**bring** 20:13 62:22 63:25 98:24 100:24 217:4,9 264:17 279:16
**bringing** 32:15 217:3
**broad** 153:13,18 153:21
**broader** 152:21
**broker** 156:5
**brokerage** 62:10
**brought** 35:15 41:7 99:4 136:19 202:21 206:25 262:15
**budget** 172:22 172:23 269:22 270:4,10,21,25
**budgeted** 174:4
**budgets** 69:14 162:7
**build** 33:14 56:11
**building** 19:8 65:11 118:10
**bulk** 105:6
**bunch** 44:17 153:1 172:8
**bundle** 214:3
**burdens** 32:8,9
**business** 12:6 43:8 56:16 89:24 112:19 137:2 150:16 153:24 154:7 161:15 174:11 174:14 205:20 208:12,16 209:23 210:15 211:1,12,19,22 211:23 212:1,13

256:13,15 268:3 268:7,13 272:6 272:19
**buttons** 274:9
**buy** 115:15 176:3 186:3 269:2
**buzzes** 89:18

**c**

**c** 7:23 109:9
**calculated** 37:22
**calculation** 38:10,22 81:19 129:15 206:23
**calculations** 129:6,10
**call** 12:14 17:10 17:22 20:7 24:12 27:7 34:2 35:19 74:6 87:5 111:1 113:5,10 113:12,15,16 118:7 127:25 132:7,21 156:4 158:14 161:25 174:12 182:9,16 183:1,11,23 207:24 208:1 240:10 247:15 270:7 272:10
**called** 30:5,10 35:18 45:3 103:23 113:10 124:6 147:20 172:13,14 174:20 183:13 216:11 282:19 282:19
**calling** 7:10 163:24 282:16
**calls** 19:14 163:13
**camera** 6:6 30:19 89:16 137:20
**camera's** 189:14
**cancel** 58:8 232:13,16
**canceled** 232:12
**cancellation** 75:24 200:17 201:4
**capacity** 7:20 37:11 38:4 65:7 111:11 149:14 149:18 150:14 211:24
**capital** 8:20
**capitalization** 55:19
**cards** 147:1
**care** 7:21 56:21 58:15 100:9 117:6 125:25 126:4 128:7 130:6 146:15,20 146:23 148:10 172:19 219:6 221:18 227:25
**cared** 147:9
**caregivers** 146:23
**carry** 178:2
**cascade** 58:24
**cascading** 132:21 154:9
**case** 1:5 4:20,22 6:16 27:3,12,12 52:8 53:5,6 62:16 63:13 64:9 65:18 71:14 72:2 75:12 84:4 87:7 87:8,8,14 89:12 105:2,19,20 106:8,21,22 111:13 112:5 114:6 124:21 127:12 135:25 136:3 152:11 153:5 154:23 209:5 219:9 221:19 225:21 225:25 226:8,25 227:3,4 230:17 230:18 233:17 233:18 241:17 243:10,12 248:3 274:24
**cases** 62:13,20 75:7 223:22,23 225:8,12 227:18 231:10 263:6,7
**cash** 4:15 30:15 40:21,22,24 41:2,24 42:3 66:15 78:20 79:6 84:18 85:9 85:9 88:22,23 91:13 99:22 102:14,14 103:1 103:4 105:7 110:3 111:8 112:12,13 125:6 128:3 135:21 148:9 151:2,5,7 151:16,20,21 152:12,13,20 153:6,12 154:13 154:15 155:5 162:9 181:4,15 181:17 184:16 184:21 185:8 186:8 188:24 200:15 205:14 213:11,22 214:1 214:2,2,3,6 215:1,11 229:23 237:12,14 247:9 247:12 248:8 249:8 257:4 262:7 263:16 264:19 267:24

268:19 269:2,21 270:14,14 272:7
**catch** 155:25
**cause** 9:17 10:8 27:19 28:12 45:16 60:15 86:19 102:7 114:10 178:20 182:18 194:20 203:11 217:3 233:22 241:23 262:1
**caused** 40:18 74:16 200:8 261:23 279:24 280:4,8,10,16
**causes** 258:17
**causing** 152:20
**caution** 185:5
**caveat** 134:15
**ce** 141:11
**cease** 146:11
**cell** 118:7
**centers** 255:11
**ceo** 141:9,11
**ceremony** 196:24
**certain** 32:15 42:20 55:12 58:8 80:9,25 81:15 98:23 106:12 144:4,15 178:23,23 186:13 204:25 232:20 257:21 257:23
**certainly** 10:13 44:22 49:7 79:7 177:14 186:24 193:23
**certainty** 259:21
**certificate** 4:6,7 284:1 285:1
**certify** 284:7 285:5,11
**cetera** 73:7 79:6 107:14 116:20 142:24,24 218:3 239:12 255:9,9 262:20
**cf** 139:24 145:5 182:12,12
**cfg** 51:4,8,11,13 51:20,22 52:2 52:10,12 139:24 140:2,4,12,16 140:19 141:5,16 141:22 142:5,14 142:18,25 143:6 143:11,18,20,25 144:5,6,15,18 144:19,20 145:2 145:5
**cfo** 85:7 141:10 240:7
**ch** 122:18 174:7
**chain** 5:3,5,6 88:9
**chair** 117:21
**chairman** 77:12
**challenge** 100:2 109:10,11 110:22,25 111:7 117:13 163:23 262:23 263:9,13 263:21,23,24 264:1,9,23
**challenged** 113:7 117:12
**challenges** 117:16
**challenging** 117:18
**chance** 119:18 150:12 283:12
**change** 56:23 100:14 101:13 101:15 115:12 211:1 212:11,13 264:18 270:5 287:4,7,10,13 287:16
**changed** 32:6 54:19 211:20 212:5 265:22
**changes** 286:9
**chapter** 1:4 4:17 4:19 29:16,20 52:17 53:25 74:10,10 83:10 105:20 106:7,22
**character** 194:8
**characterized** 71:10
**charge** 92:3 137:13
**chart** 48:25 49:9 119:5,17,19,21
**chase** 154:23,25
**chat** 283:11
**check** 8:16 22:7 90:24 127:7,13 127:16,25
**checklist** 22:4
**checks** 127:13 166:12
**chief** 35:6 192:25
**children** 12:9
**chime** 14:11
**chosen** 223:23
**chronological** 197:12
**chs** 1:9 6:14 44:22 45:3 49:10 79:18 87:3 129:2 130:18,25 143:15 144:22 144:25 145:1 157:18 158:15 163:5,9,17 164:16,17,21 165:2,9,12,16

165:24 166:7,16 166:25 167:2,4 167:8,21,22 168:4,25 170:12 173:2,8 174:8 174:10,14 177:20 208:13 209:5 212:16 250:22 271:8,12 271:13,19 272:9 272:25 273:5,13 273:16 275:4,17 276:20,22 277:1 277:8,11,16 278:2,8 279:5 286:4 287:1
**circle** 267:1
**circled** 154:6
**circulated** 22:2 142:22
**circumstance** 61:3 115:12
**circumstances** 76:17 145:20 154:1
**city** 3:4 144:10 250:9
**civil** 286:24,24
**claim** 25:22 57:25 102:21,22 107:10 117:25 173:6 177:5,7,8 263:24 264:9
**claimant** 3:12
**claimed** 58:9
**claimholders** 1:14 2:1 7:8 13:8 21:2 79:2 83:6 94:2 105:15 119:10 136:6 162:18 164:3 188:3 189:5,23 192:18 199:8 207:18 209:7
**claiming** 102:20
**claims** 25:12 48:14 79:17 102:16 106:23 107:1 122:11,12 172:14,15,18 175:4,5 205:1 270:13
**clair** 245:24
**clar** 95:8 276:5
**clarification** 95:9 123:1 192:20 221:3 245:22 277:23
**clarified** 277:19
**clarify** 15:10 77:2,3 84:20 106:7 118:22 145:25 181:14
**clarity** 9:11 54:2 81:3 112:21 113:15 122:15
223:5 239:12
**classification** 270:12
**classifying** 120:17
**clb** 4:22
**clean** 283:14
**cleaner** 118:13
**cleaning** 115:10 115:10
**clear** 19:6,23 29:2 35:9 36:3 36:20 50:1 57:9 60:20 71:21 76:21,22 84:15 108:6 110:20 111:23 113:14 113:17 117:13 131:8 137:23 163:1 173:10,14 186:12,13 205:18 234:5 236:8 267:18
**clearer** 44:1 86:24
**clearing** 272:10
**client** 182:3,3
**clients** 104:21 148:8
**clo** 170:17
**close** 33:9 42:5
**closed** 86:9 87:14,18,25 197:23 233:5,9
236:1
**closer** 73:4
**closing** 24:1,20 86:4 87:16,24 191:10 201:19 202:16 235:19 235:21,22 236:4 236:12
**clue** 51:10
**coast** 282:19
**code** 57:16
**codi** 200:17 205:25 206:3
**coffin** 148:17
**cohort** 262:15
**cole** 2:3 7:7
**coleschotz.com** 2:5,6
**collateral** 4:15 41:24 42:4 66:15 78:20 79:6 84:19 85:9 88:22,23 91:13 99:22 105:7 106:25 107:18 107:20 108:18 110:3 112:12,14 125:6 128:3 135:21 151:3,7 151:17,20 152:13,20 153:6 153:12 154:13 162:9 181:16,17 184:16,21 185:9

186:9 205:14 229:23 247:9,12 248:8 249:8 257:5 262:7 263:17 264:19 267:24 268:20 269:3,21 270:14
**colleague** 7:19 256:20
**colleagues** 267:1
**collect** 92:13 101:20,25 104:18 111:12 268:15
**collected** 90:22
**collectible** 103:17
**collecting** 88:24 104:12 126:5
**collection** 26:6 89:12 269:5 276:11
**collections** 92:1 100:9 158:8 268:7
**collector** 89:4
**collects** 90:6
**collier** 256:3
**colloquy** 249:3
**combative** 53:13 195:3
**combination** 11:8,8 22:21 123:23 151:11 151:22 172:6 201:10
**combined** 152:24
**come** 26:25 33:24 34:1 35:11 64:7 70:19 71:20 102:21,23 114:19 116:23 132:24 134:6 155:18 156:10 159:14 162:8 172:11 173:14 175:6 178:7 182:25 203:6 218:20 267:4 279:24 280:4,11
**comes** 116:22 151:7 279:17 280:19,25
**coming** 41:13 56:16 68:25 93:5 101:4 103:9 105:11 145:9 227:12 228:16
**commenced** 72:20
**commencing** 1:18
**comment** 111:25 142:17 189:18 194:18
**comments** 194:11
**commingled** 93:7,8,18,20
**commission** 284:18
**commissioner** 160:24
**committee** 1:15 2:1 6:13 7:8 8:12 110:23 117:16 131:2 143:4 151:18 235:8 262:19
**committee's** 13:8 21:2 79:2 83:6 94:2 105:15 119:10 136:6 162:18 164:3 188:3 189:5,23 192:18 199:8 207:18 209:7
**common** 165:7 165:12,17
**communicate** 86:1
**communicated** 81:21,23 146:16 147:19
**communicating** 158:11
**communication** 232:5,7
**comp** 102:12 175:11
**companies** 9:25 44:15 48:17 259:24
**company** 5:8 8:23 9:10 10:25 17:5 18:2 19:14 24:17,19 25:7 28:2,3,3 30:15 33:4,9,14,16 34:18,25 35:13 35:16 40:20 41:4,11,15 44:14 45:3 47:7 50:11,16,17 54:23 55:17,17 56:21 67:23 70:18 77:16,22 81:6 86:2 92:14 101:24 102:10 102:17 113:7 126:22 131:23 132:10 133:6,9 133:14 140:23 141:20 150:2,8 153:20,21 156:6 156:8,11,18 172:13,14,15 180:20,25 183:9 187:7,8 191:13 191:15 195:8

196:6,8 207:16 216:15,20 223:3 224:2,7,15 231:16 232:17 240:7 241:10 244:23 255:7 261:2,11,16,22 266:10 270:8 279:24 280:2,3 280:11,13
**company's** 192:8 227:10
**compare** 203:7
**compel** 130:25 272:23
**compensation** 29:10,12 167:21 178:2
**compilation** 99:14
**compile** 166:11
**complaining** 130:9
**complete** 11:24 24:23
**completed** 161:18 254:2 286:16
**completely** 125:21 163:24 188:1 194:12
**compliance** 30:9
**complicated** 127:20 130:20 133:3
**complication** 128:11
**complications** 19:3,3
**component** 11:7 171:7 175:13
**components** 124:10
**compounding** 237:25
**computer** 124:11 185:25
**con** 92:11 227:4
**concentrated** 255:17
**concept** 193:24
**concern** 78:1 114:21,22 182:7 189:8 215:13
**concerning** 24:5 25:11
**concerns** 132:18
**concerted** 176:14
**concessions** 113:4
**conclude** 134:18
**concluded** 283:22
**concludes** 283:18
**conclusion** 163:13 198:9
**conclusions** 64:1,7
**concurrent** 78:1
**conduct** 41:22 96:2
**conducted** 6:4
**conference** 35:21
**conferences** 104:20
**confidence** 216:16
**confirm** 14:17 24:11 25:17 81:23 87:14 88:12 234:20
**confirmation** 86:4,9 88:13 92:11 129:16,18 259:4
**confirmed** 62:12,20 225:7 225:12 227:18 263:6
**confirming** 87:17
**conflate** 201:22
**confuse** 196:16
**connected** 29:13 45:15 88:9 285:14
**connection** 6:6 31:15 87:7 141:17
**connotation** 93:22
**considered** 286:17
**considering** 109:25 148:24
**consistent** 107:13 167:3
**consolidated** 4:19 105:19
**constantly** 270:21
**constraints** 111:9 146:8 148:9 149:20
**construction** 10:3 27:8
**consult** 138:10 138:15
**cont** 5:1 276:6
**contact** 70:11 75:21 144:20
**contacted** 35:10 75:20
**contacts** 140:14 182:3 183:14 245:3
**contemplated** 56:14 72:4 272:13
**contemplation** 53:14,24 54:4 73:8

**contends** 179:25
**contention** 182:18
**context** 146:1 183:7,10 197:10 197:11 198:5,11 198:16 202:20 203:23 216:6 231:24 236:8,9 276:17
**contextual** 138:18
**continue** 6:9 33:2 58:2 59:1 60:11 64:23 123:20 125:25 146:19 148:14 162:10 169:3 248:3
**continued** 145:17 146:4,14 146:25 217:21
**continues** 166:10
**continuing** 84:24 85:18 118:25 213:6 226:12
**continuity** 126:3 148:10 272:12
**continuous** 133:16
**continuously** 147:19 202:11
**contract** 33:3,5 34:9 40:7,8 46:14 48:12,13 54:18 56:3,19 58:1 89:8 91:7 91:14 92:6 101:13 103:23 104:2 120:3 123:3,12 125:17 126:21 138:22 144:11 145:13 148:6,7,7 150:7 150:11 159:12 160:8,13 161:21 161:21 167:8 168:3,7 173:4 174:10,12,16 179:1,8,14,15 182:23 245:25 246:2,5,8,11 247:21 255:15 268:1 272:3 276:23
**contracted** 46:13 174:14 223:10 271:22
**contractors** 40:3
**contracts** 32:24 33:20,21,24 34:1,3,7,8 39:14 40:10,14 44:4 51:21 52:12 54:15,22 55:15 56:8,11 57:6 69:4,19 75:24 103:25 119:5,24 120:20 123:20 123:20 124:1 136:2 139:25 143:11 145:15 145:16,23 146:4 146:5,19 147:18 150:13 152:14 152:16 153:9 154:9,24 155:9 155:19 179:16 232:3,6,11 245:16 246:14 247:12,22,24 250:3 269:24
**contradicts** 194:13
**contrary** 187:14
**control** 25:14 67:6,7 90:1 165:12,17 180:22
**controlled** 52:9
**controlling** 275:4,16,17,18 276:20 277:23 278:9,12,15
**controls** 273:21 274:4
**convention** 56:13
**conversation** 141:15 220:24
**conversations** 133:16 184:6
**conversely** 141:13
**converted** 227:5
**convoluted** 177:12,12,13
**cook** 147:25
**coordinate** 9:8
**copies** 23:24 86:8,13 88:4 286:14
**copy** 91:9 118:15 236:14 236:15 256:17 273:10 282:3,9
**cor** 190:23
**core** 176:19
**corizon** 27:12 27:12 87:1 188:11,13,16 190:8,23 192:25 200:22 201:11 202:8 203:17 204:1,4,16 236:13,15 264:13
**corp** 79:18 164:22

**corporate** 175:18,23 212:2 251:16,21 254:10,15,25 255:6
**corporation** 5:7 199:12
**correct** 8:21,22 9:2,3,5,19,21,25 10:5,11,22 11:7 11:9 12:3,4 14:12,21,22 15:6,23 16:5,23 19:25 20:8 24:24,25 26:16 29:7,8 30:2,25 31:1 32:4 36:24 39:2 43:17,18 48:21,23 49:12 49:21 54:16 57:18 61:9,10 61:12,19,20 62:2,6,10 63:3,6 63:10,24 64:4 65:5,7,13,20,24 66:19,22 68:10 68:12,16 76:6 78:14,15 79:7 80:17,18,21,22 82:16 84:1 85:16 86:12 88:24 89:3 90:2 90:8,9 93:7,25 99:12,13 100:10 106:9,13 107:8 107:11,15,18,21 107:22 109:3,6 109:7,20 119:1 119:2,9 125:3 136:15 142:16 145:4 163:9,10 164:7,24 165:3 165:10,17 166:18 167:10 167:18 168:4,6 169:15 170:3,7 175:7 177:4,9 177:18,19 180:2 181:13 184:15 186:14,15,22,23 187:2 188:14,17 191:22 192:14 194:2 198:21,22 203:13 204:6,8 205:10 209:14 210:16,17 212:6 217:18,22 226:21 227:16 227:22 228:8 230:5,9 231:7 233:16,19,24 238:3 244:7 245:17 246:13 250:23 257:11 258:6,7 275:6 276:23,24 277:3 277:9
**correction** 95:9
**correctional** 11:11,12 43:3 75:25 86:15 157:21
**corrections** 144:10 179:1,6 179:24 181:9,11 181:22 182:10 182:16 183:2,12 184:3
**correctly** 84:8,9 258:1 271:11
**correlate** 100:24
**corroborated** 87:6 88:3
**corroborating** 87:15
**cortland** 216:12 217:18,20
**cost** 121:19
**costs** 167:22
**counsel** 6:12 7:2 7:14 8:7 13:23 19:22 23:13 24:15,21,23 36:15,17 39:10 50:10,12,16,16 81:23,25 112:17 112:22 113:12 113:17 119:14 119:15 131:2,2 152:2,9 154:14 170:18 181:23 184:20 185:15 192:24 211:5 225:1 226:24 230:7 258:21 264:16 271:16 271:17 285:12 285:14
**counsel's** 88:10
**counselor** 185:16
**counsels** 113:14
**counterparties** 92:6,7 148:8
**counties** 147:2
**counting** 130:12
**country** 56:12
**county** 125:18 127:25 130:1 147:25 245:25 246:2,8 256:3 284:3 285:3,17
**couple** 72:21 75:4,20 123:8 123:23 152:16 213:7 218:15 267:23
**course** 132:19 187:15 196:14 252:3 253:7 265:8 278:8 283:6
**court** 1:2 6:15 6:20 7:24 20:4,9 71:23 106:13

152:1 183:16,18 183:21 204:14 249:22,25 259:13 262:8,14 265:10,13 273:6 281:20,24 282:2 282:17 283:10
**court's** 36:13
**courthouse** 62:19 225:15
**cousins** 21:22
**cover** 43:12,24 65:10,11 69:7 69:25
**coverage** 107:20 108:18 130:17
**covering** 116:10
**covers** 26:10
**covid** 46:18 86:7 136:17
**cr** 4:22
**cracks** 41:8,9,16 41:17 42:10 43:5,9
**create** 257:8
**created** 21:14 22:2 43:25 44:3 44:9
**creates** 169:23
**credit** 6:13 23:24 24:22 41:11 86:14 147:1 257:24 280:12
**creditor** 107:7
**creditors** 65:19 106:23,24 112:8 266:15 268:10 268:17
**criminal** 4:22 64:9
**crisis** 9:21 35:16
**cro** 34:16,18,22 34:24 35:18,23 36:9,13,14,25 43:17,20 65:19 74:25 77:7,7,10 79:9 85:24 112:6 114:10 138:7 223:23 226:8,20 227:2 231:9
**crosstalk** 38:5 43:19 45:1 53:13 57:13 59:3 60:8 76:4 81:11 82:17 85:11 86:18 87:18,20 94:22 95:1,3 97:6 100:17 115:8 121:1,8 133:23 144:2 158:21 161:23 175:5 194:22 195:22 197:6,25 206:2 206:17 208:2 214:2 216:4
246:20,25 248:19,23 249:13 266:8,22 276:4 278:6 282:6,18
**cs** 286:14
**csr** 1:24 284:17
**cure** 33:18 53:22,23
**current** 32:19 35:16 50:9 90:5 120:3 173:7 177:21 201:21 208:12,15 211:11 216:13 240:6,8 269:22 270:4,22
**currently** 8:20 10:21 50:12 102:18 158:14 174:25 193:2 216:25 262:6 265:16,19,24,25 267:24
**cushion** 108:15 108:18 109:2,8 109:13,15 112:14 114:8,9 114:13 116:11
**customary** 110:17

**d**

**daily** 23:5 91:6 155:19
**damaged** 156:16
**daniel** 2:8
**darin** 3:18 6:19
**darkness** 184:15
**data** 4:18 94:11 99:11 235:5 269:12
**date** 1:17 35:14 35:15 38:25 39:5 54:21 80:20 84:4 86:11 118:19 120:19 121:5,6 121:7 122:13 151:25 152:5 155:4 167:2 179:20 206:22 207:2 212:11 228:24 233:2 236:24 244:12 250:3 257:21 286:12 287:23
**dated** 82:23 189:11 211:11 257:18 285:17
**dates** 26:18 72:25 74:19 152:3 154:16 179:22 194:17

194:19 195:1,4 195:14,25 196:17,18,19 197:11,14 198:11 212:6 219:18 243:22 245:19 265:6
**david** 1:13 4:16 5:11 6:12 8:2 30:18 48:3 83:9 140:10 221:8,10 255:3 283:19 284:7 285:7 286:5 287:2,23
**day** 4:17 23:8 39:16 74:20,20 83:11 116:2 134:17 139:2 148:3,21 151:3 151:4 164:16 169:8 179:18 188:9 196:21 208:18 218:3,20 230:17 244:5,6 257:19 284:9 285:17
**days** 22:13 39:18 69:2 72:21 84:10 109:12 151:4 182:8 242:25 243:10,11 244:9 244:12,13 264:13 286:17
**ddesatnik** 2:11
**de** 46:17
**de25** 83:2
**deal** 10:14 40:11 53:16 55:22 118:6 128:2 135:6,7 176:18 180:5 221:22,22
**dealing** 19:2 56:17 182:5
**deals** 31:19 136:23 183:25
**dealt** 269:9
**death** 126:5
**debit** 242:3,3
**debt** 84:6 90:13 93:2 94:12 95:22,23 96:12 96:15 107:20 109:4 135:24 187:20 189:1,15 189:19 190:15 190:25 191:1,9 191:17,23,23 192:9 194:1,2,5 194:6,7,22 195:5,6,6,7,10 196:9 198:4,14 200:7,13,15,17 201:4,14 204:23 204:24,24 205:10,10,17,19 205:20,22,23 206:8,8,15 213:7 214:14 215:14 230:11 235:15,15 238:23 260:18 261:3 262:9,10
**debt's** 260:25 261:1 266:2
**debtor** 22:19 33:18 44:7,8 46:5,7,10 48:7 48:15,17 51:13 54:14,15 66:18 79:24 81:18 89:5 90:7,10,11 91:4 95:11 106:25 109:7 117:15,19 121:24 123:18 135:21 143:25 145:23 146:4,7 146:11 147:17 148:25 149:19 153:16,23 157:24 163:1,5 163:8 168:3,6 168:19 171:11 171:18,19,25 177:22 178:25 179:5 190:22,23 192:9 195:20 201:11,11 207:13 210:4,25 222:18,19 244:5 244:6 245:16 246:14 247:24 249:14 250:2,20 267:25 269:16 271:11
**debtor's** 186:14 187:1
**debtors** 1:10 2:14 4:14,15,17 4:23 7:14 13:7 18:21 21:6,9 24:11 25:16 26:15 30:1,13 32:7 35:1 37:24 38:23 39:2 40:17,18 43:17 43:21 44:9 48:15 49:12 50:13 51:5,23 54:25 57:15 60:22 68:10 76:6,23 79:16 79:18 80:9,21 81:2 83:10 84:5 84:23 85:12,13 85:20 88:25 90:7,7,11 93:6 94:6 110:1 118:19,25 119:13 120:2 121:25 122:13 123:15 128:14 138:11 140:5 145:17 148:23 151:2 153:13

163:3,4 164:22 180:1 186:13,25 186:25 196:11 201:14 206:23 209:16 213:11 222:3,21 230:3 235:7,12 251:4 251:9 257:4,21 258:9 259:19 262:7,8 268:3,6 268:19 269:4,21 276:23,25
**debts** 191:20
**december** 5:3 54:3 195:14 238:20 240:21
**decent** 101:19
**decided** 54:19 152:8 275:19
**deciding** 36:22
**decision** 39:8 76:5 114:10 138:13 177:19 196:11 231:12 231:13
**decisions** 138:10 231:21 231:23
**deck** 272:10
**declaration** 4:16 5:11 26:20 49:16 83:9,12 84:1,21 85:18 135:23,24,24 257:3,19 267:16
**declarations** 226:10
**declare** 287:20
**dedicated** 146:21
**deduct** 125:14 127:12,15
**deducted** 129:7
**deducting** 131:8
**deductions** 128:5
**deem** 103:17
**deep** 217:5 260:4
**default** 30:4,5,9 30:10 32:2 52:20 150:1 228:22 229:1
**defaulted** 30:1,3
**defaults** 30:23 32:4
**defending** 252:22
**defined** 167:2
**definite** 54:8
**definitely** 23:4 25:6 42:23,23 54:4 101:24 105:24 132:8 143:13 150:17 156:12,17 175:2 175:2 202:9 243:18,21,23 244:3 261:2 274:2,4
**definitions** 109:16
**defraud** 62:2
**defrauding** 61:19
**degree** 11:21,23 11:25 12:7,9 27:15 77:2 191:25
**delado** 37:24
**delay** 163:25
**delayed** 154:19
**delays** 153:5
**delineation** 261:11
**demand** 162:2 173:1 177:20
**demanded** 232:15
**denied** 142:15
**department** 179:1,6,24 181:9,11,21 182:9,16 183:2 183:12 184:3 259:24
**dependent** 17:6
**depending** 71:14 76:17 99:17 110:23
**depends** 6:5
**depleted** 159:7 159:10
**depo** 136:11 282:9
**deponent** 8:3 64:25
**deposed** 8:13 12:19
**deposing** 253:9 286:13
**deposit** 25:13 175:8
**deposition** 1:12 4:13 6:3,12,18 7:11 12:17 13:5 13:6,18 18:22 23:20 77:25 103:16 123:9 135:20 141:14 158:5 219:8 220:3,18,20,21 247:2 248:5,6 249:11,18 251:3 252:12,12,15,24 253:8 272:18 283:22 285:7
**deposition's** 252:14
**depositions** 12:20 61:5
**deposits** 102:15
**derivative** 103:3
**desatnik** 2:8

**describe** 15:16 190:25
**described** 145:20 146:9 223:5
**describes** 188:24
**describing** 190:13
**description** 4:12 5:2 60:25 106:24
**deserve** 208:19
**design** 280:25 281:3
**designated** 15:1 37:13 59:11 64:25 77:6 89:3
**designation** 78:3
**desk** 137:19 159:22
**despite** 139:3
**destroyed** 140:23
**destroying** 142:5
**detail** 69:3 86:23 88:8 141:4 239:19
**details** 216:3 239:11 261:4
**determination** 39:15 109:19 258:13
**determine** 85:13 85:24 91:3 96:2 119:1 161:18,19 176:16 192:8 203:12 205:15 213:10,17 215:22 218:7 260:18
**determined** 28:24 39:19 118:2 257:20 258:5,8
**determining** 39:11 79:25 80:1
**detriment** 139:13
**develop** 116:12
**developed** 72:22 93:13
**dft** 64:13
**diamonds** 214:7
**dictated** 113:13
**difference** 141:3 200:10 215:23
**differences** 109:17
**different** 11:2,2 17:22 24:17 26:8,8 27:7 33:4 44:2 47:1,1,2 48:14 56:8,11 56:12,19 58:18 73:11,18 80:13 82:15 86:13,15 86:16 88:5 89:8 93:5,6 110:7 114:12 115:21 124:2,2 125:19 125:23,24 127:23 136:22 136:23 138:20 143:20 152:24 154:1 175:10,10 176:11 179:16 187:4 196:17,19 196:19 197:9,11 197:14 198:10 198:11,11 202:18 203:19 203:21,21,22 204:17 205:5 223:4 224:16 261:5 265:6,6,7 279:17
**differently** 55:10 202:16
**difficult** 50:4 67:13 82:6 95:2
**difficulties** 149:21
**digress** 102:7
**dime** 108:22
**dip** 58:25 60:19 67:16 68:4,5,12 68:13,15,16,20 68:23 70:4,25 71:8,9,12 72:5,7 72:20 75:1,7 76:24 77:5,18 77:21 78:3,14 87:5 91:5,11,16 91:17,20 111:15 124:25 125:5 126:2 131:12 132:17 133:10 133:13,23 139:4 145:22 147:12 147:17,20 148:16 150:23 150:24,24 151:12 152:11 152:21 153:6,13 153:25 157:6 229:23 230:16 230:18,22 278:3 279:14
**direct** 4:4,5 8:9 92:10,10,10,21 110:15 122:22 124:8 163:16 165:8 169:10 218:25 277:17
**directed** 162:3 169:9 232:14
**direction** 22:11 158:6 169:10 272:15
**directly** 31:15 51:8 91:16,17 104:1 125:4,15

126:9 140:18,22 143:25 144:19 156:23 157:17 161:20 163:3 214:24 223:25 263:16 273:21
**director** 9:24 170:14 231:19
**directors** 231:18
**disagree** 42:3 110:6 219:22
**disagrees** 134:5
**disbursements** 241:25
**discharge** 200:9
**discharged** 205:25
**disclosed** 222:6 244:4
**discounting** 101:9
**discovery** 94:24
**discretion** 76:16
**discuss** 17:2 27:9 75:22 138:12 164:10 182:3,10 187:20 190:25 193:18 231:21,23,25 253:1
**discussed** 13:19 13:21,23 17:1 69:8 71:3,9 72:6 131:1 145:5 149:24 181:2 183:3 186:17 193:23 215:1 232:10
**discussing** 28:3 69:23 77:4 190:9 193:9,11
**discussion** 36:6 53:19 69:6,14 77:4 91:15 95:5 95:13,14 143:3 172:10 235:15
**discussions** 32:16 52:19 54:12 56:19 68:18,21 69:12 71:1 73:8 104:12 132:15 142:5 150:25 180:25 219:13 271:15
**dismissed** 227:4 227:6
**dismissive** 115:5
**distance** 250:13
**distinct** 120:23
**distinctly** 46:9
**distribute** 166:12 223:22 268:16
**distributed** 38:7
**distribution** 269:5 270:16
**district** 1:2 6:15 219:15 225:13 225:21
**dive** 8:13 60:15 260:4
**divide** 247:21
**division** 1:3 6:16
**doc** 281:13
**dock** 105:1
**docket** 4:22 36:13 64:9,11 65:4 78:21,21 79:5 83:5 87:10 105:1,18 136:3 162:13 209:4 256:18 267:15
**doctors** 124:6
**document** 4:14 13:19,20 16:1,6 16:7,12 17:1 18:20 19:6 20:14 21:6,7 94:5,7,21 99:8 105:22 106:4 112:17 143:12 164:7 199:1,2 201:18 204:9,14 210:8,10,12 218:4,12 232:21 233:1,20 235:7 257:5,8 273:17 273:22,25 281:17 287:20
**documentary** 216:25
**documentation** 75:9 80:13 128:22,24 192:11
**documents** 12:24 17:7 18:7 18:8,18,19 21:10 22:3,14 22:20,22 23:8 23:14,25 24:13 24:15,16,23 25:2,11,14,21 25:24 26:2,6 44:12 47:21 49:25 62:5,7,9 64:6 66:25 86:3 86:4,19,22,24 86:25 87:6,15 88:4,9 94:16 114:1 117:19 187:7,13,19 190:21,23,23,24 191:10 192:2,6 194:9 195:20 196:3,18 197:19 198:16 202:13 202:14 204:15 204:17 207:6 218:7,16 233:4 233:6 234:14 242:19 258:12 258:23 260:2

264:12 274:24 275:14
**dog** 86:8
**doing** 22:22 71:5 93:4 104:18 105:5 127:1 130:11 131:6 174:11,14 176:14 189:17 208:18 239:13 247:4,6 260:10 272:19 277:20
**dollar** 81:13 117:2 121:19,19 121:21 127:16 127:17 131:5,5
**dollars** 33:10 56:4 90:21 128:1 130:21 132:24 159:6 160:2,3 215:24
**dona** 103:23 120:3 127:1,13 148:4 175:18,20 245:21 246:8
**doom** 69:21
**door** 154:25 244:9
**dorris** 50:25 187:22 188:10 188:11,24 189:4 189:9,11
**double** 139:21
**doubling** 33:13
**doubt** 280:21
**downward** 57:2
**dr** 70:3
**draft** 24:4 95:4 257:8
**drain** 42:18 62:13,17,19 225:13
**draining** 272:4
**draw** 23:21 106:20 200:3 208:11
**drill** 265:3
**drilled** 148:16
**drive** 3:14
**driven** 124:25
**duality** 146:14 174:12
**due** 28:11 32:18 34:12 38:11 56:24 58:8 75:24 82:3 89:7 118:4 150:1 170:23 173:3,19 186:7 187:2 213:9 215:17 239:5
**duly** 8:3 284:8
**dundon** 3:1 7:20 219:5 267:19
**duplicative** 19:21 22:6
**duties** 65:13,18
**duty** 112:7

**e**

**e** 4:21 5:3,4,5,6 7:9,9,21 15:3 17:9 18:12 24:19 58:13 86:1,8 87:16,19 118:7 119:5,13 131:21,21 136:1 144:3 185:25 187:22 188:10 189:4,22 192:14 192:15 193:9,12 193:16,18,21 194:14,17,17,19 195:17 196:6 197:10 198:25 201:10 202:18 215:14 217:4,10 233:20,24 234:9 234:10 235:18 235:21,25,25 236:4,5,16 242:20 245:7 258:21,24 259:1 265:1,3,4 272:18 283:5,10 286:24,25 287:3 287:3,3
**ear** 181:14
**earlier** 12:2 26:4 29:15 52:14,24 57:19 77:25 85:15 86:5,11 112:7 118:14 137:9 139:23 146:9 149:24 150:23 168:15 173:1 181:2,15 186:6 186:17,18 188:9 198:18 211:10 217:17 218:3 219:25 225:7 227:20 230:15 231:8,25 232:2 232:24 235:14 236:8 239:3 245:8 251:23 252:6,21,23 258:24 280:7,15 281:14
**early** 219:14 241:11
**earth** 221:3
**ease** 46:17
**easier** 148:8
**easily** 33:12 82:13 101:23 112:10
**east** 209:25 255:14 282:19
**easy** 101:25 120:6,6,6,7,7 202:3

**ebarak** 2:12
**edge** 172:13 174:19,20 177:6
**edged** 139:21
**educate** 17:14 229:6,10
**education** 11:19
**effect** 74:4 93:15 273:13
**effective** 164:15 167:2
**efficient** 42:1 59:10
**effort** 176:14
**efforts** 33:13 147:16 148:1 153:7 185:18
**ehud** 2:8
**either** 22:15,15 27:7,10,14,25 28:7 39:14 57:10 121:2 123:19 125:8 133:14 140:13 144:5 152:14 159:18 177:3,6 179:12 223:25 236:25 265:21
**electronically** 209:18
**eligible** 177:2
**eliminate** 157:22
**else's** 185:2 280:9
**email** 286:13
**emailed** 286:15
**embedded** 87:4 88:7
**emergency** 4:23 70:1 74:16 162:21 180:10 181:16
**emergent** 35:10
**emphasized** 225:12
**empl** 161:19
**employ** 163:3
**employed** 45:12 46:10 63:9 64:14 272:25
**employee** 44:22 45:3,6,19 46:6,8 46:10,12 49:11 122:18 130:18 130:25 143:15 145:1 157:18 163:5,9,17 164:17 165:9 166:16 167:8 168:4,25 170:12 174:8,10,14 177:8 190:8 247:19 271:8,12 271:13,19 272:9 273:1,6,13,16 275:4,17 276:20 276:22 277:1,8 277:12,16 278:2 278:8 279:5 285:12,13
**employees** 45:10 46:5,9,13 46:14 116:11 122:10 123:5 124:3,4,8,14 126:10,12 140:3 143:18 145:2 146:13,13 161:4 161:20 163:4,4 163:9,9,17,17 166:8,9,12,17 167:1,23 170:23 173:5 175:16,19 177:2,18 178:1 187:8 239:7 247:22 256:5 269:4,17 271:21 272:24,25 273:1
**employers** 184:2 272:1
**employment** 129:2 143:21
**employs** 144:22
**endeavor** 158:4
**ended** 139:24 140:4,4 149:1 190:14 209:12
**ends** 92:12
**enforce** 191:18 191:24 276:25
**enforceability** 193:6
**enforceable** 192:10
**enforced** 73:17
**engage** 76:25
**engaged** 35:6 221:16 243:11
**engagement** 15:17,18 27:23 28:17,18,25 29:6 31:5 34:17 36:4,9
**england** 1:24 6:21 284:6,17 285:5,22
**enlarged** 97:7
**ensued** 56:24
**ensure** 32:3
**enter** 34:17 35:22,24 262:8 265:10,13
**entered** 35:21 36:8 53:23 233:12 262:17 262:25 264:7
**entering** 56:2
**entertain** 34:4
**entire** 24:12 126:6 254:19
**entirely** 163:25 203:9
**entirety** 17:11 155:17

**entities** 31:14 39:12,20,22 40:9,13 43:24 44:2,7,8,9 139:24 161:21 165:16 216:9
**entity** 4:24 31:16 40:2 86:16 163:21 164:6 169:7 215:2
**entries** 238:4 240:21 243:4,5 261:12
**entry** 4:15 35:19 73:5 78:21 79:5 83:5 105:2,18 162:13 239:21 243:19
**equal** 167:21 200:10
**equity** 108:15 108:18 109:2,8 109:13,15 112:14 114:8,9 114:13 116:11 191:20 192:1 194:1
**era** 46:18
**errata** 4:8 286:11,13,16
**especially** 154:1 200:4
**esq** 2:2,3,8,8,9 2:15,15,16 3:2,2 3:8,13 286:1
**essentially** 190:24 268:15
**estate** 9:4,6,7,8 9:8,9,18,20,24 10:7,10,15,20 11:6 27:3 31:10 31:22 65:19 112:8 115:10 116:1,1 126:6 177:17,20 184:9 264:14 266:3,6 266:6,7,14 268:9 269:8,17 272:5
**estate's** 101:16 272:7
**estimated** 106:24 107:10
**estimation** 268:23
**estimations** 161:11
**et** 1:9 6:14 73:7 79:6 107:14 116:20 142:24 142:24 218:3 239:12 255:8,9 262:20 286:4 287:1
**evade** 36:18
**evaluate** 140:17
**eve** 98:10
**event** 78:2 265:12
**eventually** 28:9 32:2
**everybody** 21:21 63:14 66:5 71:7 72:3 115:6 116:12 127:20 135:9,11 148:5 151:14 155:23 158:6 162:3 169:10 173:15 178:6,8 182:7 185:2 231:17 255:9
**everybody's** 63:19
**everyone's** 105:4
**evidence** 110:9 117:20 210:20
**evidencing** 25:11 233:11
**evolving** 159:4
**exact** 26:18 50:3 75:14 77:13 80:3 88:9 89:14 92:2,23 118:24 119:1 154:16,18 159:9 161:11 174:1 179:7,22 190:9 197:11 219:18
**exacting** 50:3
**exactly** 10:17 18:7 22:15 57:18 64:19 65:17 80:4,24 81:16,20 89:13 89:20 90:17 99:3 104:21 109:19 140:8 143:12 144:2 157:11 171:11 176:1 190:16 191:23 216:4,8 217:2 228:24 239:4 261:4
**examination** 1:23 4:4,5 8:9 218:25
**example** 95:12 130:1 205:16
**excellent** 258:2
**except** 46:20 103:12 175:18
**exception** 91:12
**exchanging** 87:16
**excited** 185:16 225:17
**excluded** 218:19
**executing** 83:12
**executive** 86:2
**executives** 51:12 51:19,23 52:8

52:11 140:3 141:5
**exhibit** 13:5,9 21:1,3 23:19 25:9 79:1,3 83:4 83:7,23 93:24 94:3 105:13,16 118:14 119:8,11 136:4,7 162:17 162:19 164:2,4 187:23 188:4,7 189:6,10,24 192:19 194:5 199:5,9 207:19 208:6 209:5,8 217:9,16 234:25 245:11,12,15 250:4,7,17 259:6,16 261:8 267:17,19
**exhibits** 4:11 5:1 12:15 24:1,4 135:19 234:7,18 282:11 283:5,12
**exist** 95:11
**existence** 120:1
**existing** 167:1
**exit** 55:18
**expectation** 55:3
**expectations** 134:13
**expected** 158:25
**expedited** 4:15
**expenditure** 122:21
**expense** 122:11 181:3
**expenses** 69:25 101:21 116:19 116:19 126:10
**experience** 9:18 9:20 10:24 24:9 29:16 115:1
**experienced** 133:15
**experiences** 65:12 279:10
**expertise** 53:7
**expiration** 284:19
**expire** 121:3
**expired** 121:3
**expires** 120:15
**explain** 26:24 28:21 30:12 78:17 103:7 120:25 123:18 171:3 215:23 238:20
**explained** 223:13
**explaining** 118:24 132:11
**explored** 262:24
**exposure** 55:24
**express** 184:24
**extended** 70:18
**extends** 112:7
**extension** 27:25
**extensive** 29:16 132:15
**extent** 47:9 85:25 138:9 140:17 147:21 157:15,22 184:21 218:8
**extra** 42:16,25

**f**

**face** 63:18 69:21
**facilities** 45:14 121:15 137:24 146:15
**facility** 86:14,15 132:17 176:23
**fact** 19:24 27:9 28:5,23 49:22 52:8 58:11 77:14 87:16 89:7 91:3 96:15 133:3,5 143:19 147:14,25 154:10,19 197:19 198:7,15 214:11,25 215:13 226:24
**factions** 78:9
**factor** 214:13,18 214:19
**factored** 128:20
**factors** 198:4
**facts** 73:21 110:8,9 210:19 210:19,19 211:3 227:15 287:20
**failed** 18:21
**failing** 155:19
**fails** 286:20
**fair** 9:12 10:23 11:10,12,19,20 47:3 49:16 51:7 51:11 60:23,24 68:6,7 77:1 88:25 93:11 101:17 119:1 123:16 129:24 145:18 171:22 208:3
**fairness** 24:2
**faith** 227:8
**fake** 197:24 204:24
**fall** 222:3
**falling** 57:11
**false** 62:5,8,9,9 62:10
**familiar** 50:24 105:21 108:15 164:7 193:23 194:2 225:25 226:4 228:11 241:10 263:9

**family** 9:25 115:15
**far** 10:25 14:13 23:11 67:4 68:11 101:1 103:18 112:19 114:25 123:10 125:25 135:18 158:20 181:1 187:15 241:22 241:23 258:22 270:10,11 274:9 275:3 277:24,25
**fast** 101:20
**faster** 155:23
**fatal** 42:24
**fault** 163:25
**faux** 189:1,19 191:5 197:24 198:8,13 204:23 215:14 233:21 235:15
**favor** 169:23 234:16
**favored** 153:25
**february** 53:23 148:24 219:14 219:21 227:24 228:19,23
**federal** 286:18 286:24
**fee** 168:4,5,13 168:17,20
**feel** 26:1 64:25 109:24,24,24 110:4,14 113:25 114:1,2,3 148:25 160:14 264:16,24
**feeling** 71:12 232:15
**fees** 38:12,14,18 38:19,21 167:17 167:20 169:7 225:2,6 239:23 241:17
**felt** 32:14 69:20 154:11 155:23
**fia** 8:20,25 17:18,19,20 37:8,11,13 38:2 38:3,6,12,16 221:24 222:2,8 222:16 224:24 226:22
**fia's** 225:4
**fictitious** 127:7
**fiduciary** 63:10 64:4,15 65:7,13 65:18 112:7 264:14
**field** 9:7 45:13
**fifth** 274:12
**fight** 112:12,13 138:24 139:3
**fighting** 117:4
**figure** 98:16 127:11 187:18 199:7 213:10 247:22,24
**figuring** 127:18 128:11
**file** 21:14,15 24:12 39:8 54:25 71:22 73:7,9 76:5,5,16 94:25 116:15 131:4 166:11 231:9 244:12 274:9
**filed** 6:14 36:16 36:23 37:3 38:23 39:2,16 39:20,21,22 40:3 57:15,15 70:3 79:10,24 80:9 84:22 85:17 105:22,23 105:24 143:2,5 143:13 152:11 154:16,16,19 160:9 172:18 184:22,23 208:8 219:15,21 226:7 226:20 230:16 230:18 232:21 243:11,12 244:10 257:20 262:7 272:14 274:24
**files** 13:22 17:9 18:7,14
**filing** 4:19 5:9 35:11,17 38:12 38:15,18,20 40:1,13 41:3,10 46:15 53:19 54:9,14,17 57:1 68:18 69:11,11 69:24 70:4 71:2 71:5,5,12 72:5 72:13,15,21,23 73:4,12,14 74:18,21 75:1,3 75:9,21 76:24 77:1 78:2,9 79:22 80:12 98:11 101:13 103:19 105:19 106:4,12 121:3 121:5 132:16 143:2,10 145:17 149:1,1,19,25 150:11,15 151:1 152:20 154:23 168:20 172:17 172:17 173:22 179:4,20 212:12 222:5 224:12 225:2,6 227:10 227:13,14
**filings** 25:13 52:2 210:25

**fill** 71:19
**final** 4:15 98:16 100:20 103:22 103:25 111:5 160:1 262:22 265:10,14
**finality** 113:2
**finalize** 70:5 76:25
**finalized** 70:4
**finally** 32:17
**finance** 125:5
**finances** 153:21
**financial** 19:9 19:24 20:2 28:4 41:15 62:5 75:15 95:15,20 116:9 146:8 149:20,21 226:22 239:11 240:12
**financially** 6:24 285:15
**financials** 41:9 56:24
**financing** 27:15 55:19 60:20,21 66:18 67:16 68:5 70:2,4 75:1 75:5,7,11,19,22 76:24 124:25 126:3 131:12 139:4 145:22 147:12,17 148:16 150:24 152:12,21 153:7 153:14 154:8 155:5 156:11,13 156:17 229:23
**find** 21:10 27:14 52:4 104:21 156:9 158:12 244:8 265:5
**finding** 172:25 227:9
**fine** 42:7 208:2 226:15 248:19
**fingers** 130:12
**finish** 12:8,8,10 42:4 58:21 105:5 134:7 193:20
**finished** 266:25 267:24
**finkel** 3:8
**firm** 7:9,18 86:9 87:13 197:23 221:24 233:5 261:17
**first** 4:17 8:3 11:10,13 19:16 23:17,21 38:25 39:6,8,9,16,23 40:2 43:16 52:15 59:8 61:12,20 62:2 70:25 71:1 73:19 79:13 83:10 87:12 89:2 91:13 94:7 95:21 97:9,10 97:10 116:14 117:7,14 124:20 132:25 135:24 136:11 156:25 158:17 164:12 164:13 165:14 169:10 180:23 182:2,7,8 187:22,22 193:14 194:16 194:24 217:10 219:7,9 221:16 235:11 236:24 257:19
**five** 39:16 130:13 242:24
**fixed** 30:21
**fl** 1:9 6:14 286:4 287:1
**flacks** 191:12,14 191:17,19,23,25 192:1 195:6
**flesh** 116:6
**flip** 198:16,16
**float** 41:12
**floated** 184:12
**flop** 198:16
**florida** 1:2 2:4 3:14 5:8 6:16 10:3 26:22 56:7 56:7,9,10 63:12 207:16 208:9,13 209:5 211:20 212:16,17 246:2 246:15 248:17 250:3,8,9,10,10 250:22 255:14 255:17 284:2,18 285:2,18 286:18 286:24
**flow** 30:15 154:9 181:4
**flowed** 88:5 89:22
**flowing** 147:5
**fluctuate** 175:24
**flushed** 198:5
**fmr** 1:5 6:17
**focus** 56:10 79:12 100:7 101:6 102:3,4 115:20 117:9 118:9 139:15 151:15 257:14
**focused** 53:19 101:11
**folder** 21:14,15
**folders** 94:25
**folks** 43:15 75:20 119:14 178:23 183:11
**follow** 91:1 149:4 156:19 173:11,17 213:7

**following** 118:11 136:10
**follows** 8:4
**footnote** 83:19 84:13,22
**force** 173:8
**forcing** 73:11
**forecast** 159:8
**forecasted** 158:20
**foregoing** 285:8 287:20
**foremost** 117:14 158:17
**forever** 262:9
**forgave** 206:14
**forget** 134:1 150:7 157:5
**forgive** 250:11
**forgiven** 186:21
**forgot** 134:2 254:24
**form** 35:5 70:18 71:18 100:15 112:15 114:15 125:5 132:6 148:19 149:2,23 151:10 152:22 153:15 163:11 163:12 180:15 184:2 187:10 191:2 196:13 201:6,16 203:15 204:11 205:3 206:4,6,19 207:5 210:2,6 210:18 211:2,4 211:6,16,21 212:1,7,14 214:16,20 215:5 229:8,14 231:1 232:8,25 239:1 242:13 244:18 244:22 258:14 258:19 259:8 260:13,20 261:9 261:19 262:12 263:22 264:2 265:11,18 266:4 266:16,22 268:5 271:14 273:9 274:13,22 275:22 276:1 277:1 278:4,18 278:23 279:1,8 281:2
**formal** 28:25 34:17 35:23 36:9 78:13,15
**formalize** 34:15
**formalized** 36:5
**formally** 35:6,8 35:9
**formed** 151:18
**former** 68:13
**formerly** 9:24
**forsyth** 2:17
**fort** 1:3 6:16
**forth** 197:12 234:6
**forthcoming** 127:21
**forward** 30:7 69:5,15,25 113:8 125:10 139:16 155:19 176:21 178:2 268:20 270:10
**forwarded** 88:11
**found** 86:20
**foundation** 62:21 110:10
**four** 39:15 147:11 153:7 197:9 245:21
**fowler** 50:22
**frame** 221:22
**fraud** 61:8,11 204:19
**free** 64:25
**freeze** 73:3,12 74:14
**freezing** 151:14
**friday** 74:17 158:4,13 159:1 159:18,18 161:17,17,19 162:5 247:4,6,7 252:7,11,12,24
**friends** 126:22
**front** 20:20 23:12 25:4 26:18 35:14 48:25 62:20 72:25 74:19 76:13 103:12 141:21 154:17 174:1 179:20 221:2 225:13,22
**fuel** 217:14
**full** 40:21 56:1,1 69:3 127:24 151:10 249:3,3
**fully** 69:5 72:8 89:20 116:12 198:5
**fun** 219:11
**function** 74:11 85:12 111:22
**fund** 77:17,19 147:17 173:20 174:7,25 177:22 177:22 224:1,12 224:25 230:22 230:24 269:4 272:2 273:8 277:16 280:4
**funded** 70:6 172:12 230:16 230:17,19
**funding** 57:20 59:1 70:8 77:5 78:1 132:9

**funds** 38:7 41:12 42:18 47:12 91:4 92:13,16 177:24
**funny** 21:23,24 21:25 90:19
**further** 20:6 33:14 69:8,14 69:23 77:22 97:19 196:22,22 216:23 217:14 233:10,22 260:4 261:11 270:5,9 281:11 285:11

**g**

**g** 7:23
**game** 205:22
**gap** 38:22 184:2
**garner** 56:16
**gather** 15:11
**gathered** 17:9
**gathering** 22:14 22:19,21 272:15
**gatherings** 46:20
**gauge** 141:3
**gc** 170:17
**gears** 43:12
**gefner** 48:4 221:8,10
**general** 4:18 18:3 28:4 50:10 50:12,15,24 91:8 94:10 98:25 99:11,12 107:14 150:17 170:18 192:24 235:4 237:22 250:9 259:23 260:3 279:10
**generality** 17:16 27:24 42:12 45:8 75:23 77:5 111:2 124:4 179:23 263:11
**generalization** 89:10
**generally** 15:16 179:8
**geneva** 239:23 242:5,8 243:3
**getting** 18:12 21:13 23:2 54:24 70:8 73:9 73:10,13 78:6 102:19 104:4 111:5 114:25 115:11,19 117:2 117:4 128:25 129:19 132:4,5 146:22 151:16 157:4 159:4 160:22 173:2,9 189:14 191:8 222:5 240:14 241:2 256:24 261:3 283:13
**give** 17:12,16 20:6 56:5 62:14 76:18 81:19 83:2 109:22,22 111:10 118:2 139:9,17,17 152:3 154:18 160:3 179:9 183:25 192:4 193:14 194:24 195:2 198:9 216:16 224:2,2 256:20 259:21 267:2 283:4
**given** 27:1 38:3 41:23 55:4 59:9 72:12 87:7 100:22 101:12 111:21 149:20 149:21 154:1 185:4 202:22 241:22 252:9 258:12
**gives** 65:10
**giving** 78:16 118:5 125:24 194:11,11 196:19 201:18 202:18 216:6,6 216:17,22 276:16
**gl** 94:12
**glasses** 97:6,7 134:1
**go** 6:10 11:16 18:7 34:4 39:12 43:14 53:4 61:2 61:2,15 62:21 64:11 78:21,22 79:23 82:25 86:23 93:10 96:24 97:18 99:14 100:18 106:16 110:13 113:17 116:1 123:21,24 127:10 141:22 149:6,13,13 154:5 165:13,20 166:21 167:14 169:17,19 173:4 184:17 190:6,12 195:12 197:12 199:18 203:22 203:24 212:20 216:3 220:2 240:3,9,19 244:11,14 245:12 246:25 247:13 249:2,4 250:18 257:15 260:6 265:7 270:10 281:5,6
**goal** 32:10 33:15 111:8 240:4
**god** 113:20
**god's** 158:12

**goes** 43:2 65:19 93:7,9,10 116:24 129:14 130:12 223:24 237:15 238:5 242:11
**going** 6:1 8:12 8:15,19 12:12 12:13,15,24,25 13:3,4 14:3,17 15:1,2 19:13 21:17 23:20,21 24:14 25:9,10 27:10 28:13,13 28:16 32:25 33:1 35:13 40:7 40:20 41:8,19 41:20 43:14 44:7,17 45:10 47:7,17,17 49:23 52:13,20 57:3,5 61:1,1,15 61:17 62:25 63:2 66:3,8,11 66:14,17,21 70:6 71:6,24 73:6,19,23 75:10 77:14 78:25 79:1 82:24 83:3,4,22 84:21 93:15,23 97:14 101:16 104:22 105:5,8 105:12,13 109:18 110:6 111:2,4,15 112:13 116:5,12 117:12 119:7 120:12,22 121:6 122:17 123:9,23 125:14 127:15 131:9,25 133:21 134:5,16,18,20 135:13,16 136:4 139:18 145:25 152:8 154:24 156:7 158:12 159:25 161:16 162:8,16 164:1 164:1,12 169:14 170:23 171:23 175:15 176:21 178:10,13 180:21 182:5,11 182:14,15,17 183:24,25 184:9 187:19 188:6,7 189:9,10 192:6 194:18,20,23 195:1,2,2 196:11,24 197:16 198:9 199:4 200:6 201:23 202:14 202:15 203:8 208:5 209:4 212:19,20,25 213:3 216:3,9 216:23 218:14 218:21 226:1 230:22 232:17 233:22 234:2 239:10,11 240:11,13 242:19 244:2,3 244:8,11,14,16 244:21,23 248:25 249:6,16 250:12,16 252:6 253:15 257:17 260:3,10,14 261:8,10 266:19 267:9,12,16 268:8,13 275:15 276:5,6 278:3 279:22 281:25 281:25 283:17
**gold** 283:19
**goldberg** 3:8
**goldstein** 3:8
**goldwasser** 1:13 4:16 5:11 6:12 8:2,11 12:19 14:17 16:13,19 16:21 20:16,25 23:19 30:19 42:9 59:3 60:19 61:2 62:4 64:17 70:3 78:25 83:3 83:9,22 97:4 106:21 110:13 112:6 126:7 136:10 149:7 162:16 163:15 167:16 178:17 197:3 200:1 205:25 206:11 207:10,21 209:13 210:14 210:24 213:6 214:22 219:2 249:20 250:8 254:6,22 255:3 257:3 258:6 263:20 283:19 284:7 285:7 286:5 287:2,23
**goldwasser's** 135:23
**good** 7:17 8:11 24:8,8 74:1 97:8 100:25 101:12 126:23 135:5 151:10 157:14 161:14,14 178:9 196:15 202:24 219:3 242:7,14 258:2 266:2,5 267:7 283:8
**goodwill** 115:15 184:10
**gosh** 38:24 189:15
**gotten** 18:25 19:5 34:10 69:18 130:19

134:16 151:25 159:19 239:18
**government** 126:8 157:20,21 159:20 178:24
**governmental** 89:9 176:11
**governments** 155:20
**graduate** 11:21
**graduated** 12:7
**grant** 113:20
**granting** 185:21
**great** 56:21 83:18 115:22 135:2 137:18 166:4 167:6 189:8 198:14 203:2
**green** 2:16 7:16 70:11 119:14 136:1 252:1,1,4 252:14,17,19,21 252:23 253:2,3
**green's** 119:5
**gross** 168:14
**group** 17:11 38:23 39:8,23 44:23 45:3,19 46:6,8,10,12 49:11 122:18 129:3 130:18,25 133:20 143:15 145:1,3 157:18 163:5,10,18 164:17 165:9 166:17 167:8 168:4,25 170:12 174:8,10,14 176:19 271:8,12 271:13,20 272:9 273:1,6,13,16 275:5,17 276:20 276:22 277:1,8 277:12,16 278:2 278:9 279:6
**groups** 269:1
**guarantee** 100:14 271:4
**guarantors** 24:3
**guc** 7:22,22,23 219:7
**guess** 12:2 27:16 28:4 57:12 85:18 110:2 121:22 130:18 134:7 150:23 167:17 174:17 174:22 177:6 192:17 242:25 266:13 275:15
**guilty** 61:8,22 62:1
**gurevitch** 48:1
**guys** 203:5 282:12
**gwfglaw.com** 3:10

**h**

**h** 7:21 287:3
**hagny** 47:23
**half** 82:14 136:11 151:19
**hamstrung** 110:15 111:17
**hand** 130:11 158:22 284:9
**handles** 9:1 129:10
**handy** 234:17
**hang** 146:18
**happen** 21:20 21:21 29:23 55:10 70:15 73:16 76:1 90:14 115:13 132:20,24 137:16 159:21 244:8
**happened** 20:7 47:14 57:1 83:15 84:10 125:24 127:4 149:22 201:20 225:17 230:24
**happening** 55:6 70:14,16 72:21 147:11 176:7 188:25
**happens** 59:15
**happy** 247:14 253:2 276:19
**hard** 53:25
**harder** 158:2
**he'll** 15:15
**head** 137:8
**headed** 151:13
**headquarters** 251:16,22 254:10,15 255:1 255:6
**health** 11:13 43:3 48:21 51:4 51:8,11,13 88:24 90:2 190:9 200:22 271:20 272:4
**healthcare** 10:24,25 11:1 11:11,13 58:4 59:2 60:22 75:4 75:6,25 121:14 153:24 154:11
**hear** 12:14 196:1 275:15
**heard** 6:7 48:5 51:15 72:20 96:12 102:11 210:6 229:21 271:10
**hearing** 19:16 91:13 110:18,20 111:23 112:25 125:6 148:1,2

151:20 152:5,9 152:10 160:12 267:24 275:1
**hearings** 241:3 262:14
**held** 25:12 34:7 34:9
**help** 12:15 27:14 158:12 182:4,5,11 221:17
**helped** 156:18
**helping** 272:12
**hh** 284:18
**hi** 219:2
**hideous** 127:18
**high** 140:3
**higher** 11:18 64:11
**highlighted** 10:11 190:10,12 193:10
**hire** 154:4
**hired** 53:7 140:16
**historical** 138:19
**history** 71:25 215:19 231:25
**hit** 53:21
**hold** 41:19 44:13 59:17 106:2 112:3 152:20 153:11
199:5,5 246:21
**holdco** 199:13
**holder** 144:11
**holders** 56:19 89:8 91:7 104:2 125:17 126:22
**holding** 63:23 102:11 104:21 106:23 111:24 152:19
**home** 11:2 136:12 137:2,23
**honest** 142:20
**honor** 278:2
**honoring** 276:22
**hook** 14:16
**hope** 207:12
**hoped** 33:19
**hopefully** 267:3
**hour** 59:7,12 66:1 178:7 248:2
**hourlies** 36:1
**hours** 129:10,13 129:14 144:5 161:11 250:14
**housekeeping** 267:14
**huh** 14:8 15:24 19:11 45:18,20 72:18 79:15 83:24 88:2 97:25 98:9,12
107:9,9,12 114:11 118:16 118:21 123:13 137:25 142:13 143:16 157:19 158:23 159:16 161:23 164:14 164:20 175:12 175:12 176:13 179:13 185:19 193:4 208:14 209:15,17,17 210:1 215:18,21 222:10 225:23 234:11 238:24 271:9 276:9
**hundred** 160:2
**hyman** 50:19,20 190:1,4,8 195:17
**hyman's** 189:22

**i**

**i.e.** 200:15
**ice** 114:24
**idea** 19:22 98:2 134:12 184:11 247:8
**identification** 13:9 21:1,3 23:20 79:1,3 83:5,7,23 93:25 94:3 105:14,16 119:9,11 136:7
162:17,19 164:2 164:4 188:4 189:6,10,24 192:19 199:9 207:19 208:6 209:8 267:20
**identified** 209:24 210:15
**identify** 12:25
**ignorance** 250:12
**imagine** 65:16
**immediate** 39:17,24,24 40:1 69:6,8 152:5,18
**immediately** 35:20 52:3 57:1 69:22,25 74:19 75:21 128:2 152:13 153:6,8 153:12 156:20 176:7 179:17 210:12
**impact** 42:24,24 178:4 186:25 187:5,8
**impacts** 128:17 128:18
**impending** 69:21
**impetus** 149:25
**important** 100:6 236:8 248:3

**impossible** 57:4
**improperly** 227:13
**inadmissible** 61:14
**incarcerated** 63:3,6
**incessantly** 118:8
**include** 71:16 130:17 166:8 176:22
**included** 62:9
**including** 7:2 23:25 25:12 104:12 119:14 225:10 243:4 248:2
**inclusive** 257:22
**income** 5:7 40:20 42:16 160:4 199:12 200:9,17 201:4 206:1
**incoming** 91:18 92:4,4 181:3
**inconceivable** 73:20
**inconsistency** 30:7
**incorrect** 73:15 96:7
**incorrectly** 210:7,9 229:4
**increased** 34:12
**increases** 238:7
**incumbent** 34:3 139:18
**incurred** 167:22
**indebted** 257:21 258:9 259:19
**indebtedness** 84:24 85:3,19 200:9,11
**independently** 141:2
**index** 4:2
**indicate** 198:21 214:14 215:3
**indicated** 120:12 211:11
**indie** 225:25 226:5,19
**indirect** 165:8
**indirectly** 51:9 140:18
**individual** 131:19 132:13 149:14,18 170:13
**individually** 226:12
**individuals** 5:9 122:17 131:11 133:20 268:22
**industry** 11:4 43:4 153:22 154:6 155:8
**infamous** 10:16
**influence** 52:12
**informal** 28:20 28:21,23 29:10 179:25
**information** 15:12 18:20 19:2,13 21:13 26:6 80:20,23 81:4,9 85:10 100:8 118:18,23 144:6 145:6 156:6 157:4 166:11 207:24 233:23 242:21 272:16
**informed** 57:5
**inherited** 216:13
**inhibitor** 124:19 124:22,23
**initial** 109:8
**initiated** 235:19
**inmates** 45:14
**inquire** 67:21 145:10,11
**ins** 103:6
**insider** 71:9 78:3 165:2 169:11,13 240:10 243:18
**insolvent** 101:16 102:3
**instance** 19:16 71:8 223:25
**institutions** 122:3,4
**instruct** 59:25 248:20 253:23
**instructing** 248:21
**instruction** 232:3
**instructions** 232:2,4
**insurance** 101:23 102:10 102:15 103:6 130:17,19,20,22 167:10 170:22 170:22,23 171:7 172:6,10,12,23 174:15 175:4,5 176:20 177:15 178:3 271:20,21 272:4
**insured** 172:13 174:7
**insurer** 174:22 174:23
**intend** 36:14
**intending** 68:19
**intent** 68:21
**intention** 36:21 56:2 77:25 105:5 168:22,24 169:1 272:22

**intentional** 19:17 37:4,5
**intentionally** 36:21
**intentions** 68:23
**interact** 154:14
**interactions** 67:4
**interest** 25:16 77:21 140:18 142:14 188:24 237:9,13,19,25 237:25,25 238:4 238:7,11 242:2 257:23 279:12 279:13
**interested** 6:24 132:4,5,8 155:8 285:15
**interference** 17:23 41:20 46:19 77:10 100:3 104:7 105:24 114:19 115:24 153:25 165:1 172:21 202:19 213:12 216:24 264:20
**interim** 4:15 88:22 111:6 262:21
**internal** 92:1 129:9
**internally** 196:8
**internet** 6:6
**interrupt** 58:20
**interruption** 254:20
**interviewed** 10:10
**interviews** 9:23
**introduced** 28:2 153:20
**invalid** 260:6
**invalidated** 264:17
**invest** 31:23
**invested** 31:21 31:24
**investigate** 84:24 85:19 86:21 140:17 187:15 203:11 216:23,24 217:14 233:24 234:2 263:2 264:14 266:20
**investigation** 88:12,16 96:1 118:25 203:5 205:13,15 217:15 218:3 242:22 265:8
**investigations** 239:14 262:17 262:19
**investments** 137:3
**investors** 68:3 273:23 279:16
**invoice** 103:23
**invoices** 103:21 147:21
**involve** 11:6
**involved** 11:1 21:17 26:25 27:1,3 31:19 51:13 52:15 61:11,19 70:9 75:6,16 132:5,5 137:24 148:22 180:7 227:16
**involvement** 48:6 138:2 142:25
**ipad** 137:19
**irrelevant** 205:24
**isaac** 17:18 27:4 170:14 220:10 220:11 224:14 229:24,25 230:8 230:11 231:6,8 244:14,16,21,24 244:24 245:1,3 245:4 260:11,24 273:5 274:11 275:16 276:19 277:4,7,13 278:9,12
**isaac's** 230:13 278:15
**issue** 14:3 40:1 40:11 43:10 57:19 61:17 130:20 146:17 189:8 200:10,13 200:16 203:12 207:12 213:6 251:1 253:18 281:13
**issued** 150:1
**issues** 39:17,24 39:25 58:8 75:23,25 176:11 218:15,17 261:7 281:13,13
**item** 42:13
**items** 42:21 55:23 240:9 261:7 265:6 269:10 279:25
**iteration** 24:17
**iterations** 119:20

**j**

**jackson** 30:25 35:10 53:20,25 72:17 229:1,17 229:19 274:10
**jail** 255:25
**james** 2:15 7:13 42:2 50:19,20

59:20 190:1 220:6 286:1
**january** 5:4 54:3 189:11 195:16 219:14 227:24 228:19 280:8
**jargon** 159:17
**jeb** 3:19
**jeff** 17:21,22,23 141:9 220:4 245:2,7
**jeremy** 2:15 7:15 75:5 131:17 153:18 246:19
**jeremy.johnson** 2:19
**jerry's** 216:19
**jim** 283:2
**jimmy** 17:24 245:2
**jmartin** 2:18 286:2
**job** 115:5 166:4 167:6 268:15
**joel** 221:11,12
**john** 129:13 216:19
**johnson** 2:15 7:15 70:11 77:8 230:1,2
**joint** 182:16
**jointly** 1:6
**jordan** 2:9
**joseph** 155:14
**journal** 10:10
**joy** 65:10
**jsazant** 2:12
**judge** 62:13,13 62:13,17,19 225:13,22
**judges** 62:14,22
**judgment** 30:24 35:10,19 53:20 54:1 55:23 72:17 73:2,5,11 73:11,20,24 184:17 276:11
**judgments** 73:16
**july** 54:22 238:17 265:9 267:25 268:3,20 269:18 271:2
**jump** 136:9,9 166:20
**june** 1:17 4:21 5:5 6:3 22:13 98:1 119:13 123:6 160:17 195:17 200:14 206:20 238:6 241:13,20 245:19,24 284:8 284:10 285:17 286:3

**k**

**k** 172:6
**kansas** 3:4
**karen** 17:19
**keep** 32:15 35:12 41:24 81:16 86:18 121:25 138:24 138:24 139:4 172:23 232:3,17 250:16 272:12
**keeping** 121:12 232:6
**kentucky** 57:5,6
**kept** 147:4 151:15
**kevin** 3:8 282:6
**key** 176:3 187:8
**keybank** 61:12 61:19 62:2
**kick** 152:1
**kicked** 151:17 265:21
**kind** 10:14 31:9 36:12 37:7 43:14 57:17 78:13 81:19 82:2 90:1 91:2 121:25 237:21 237:22
**king** 17:25 28:2 50:6 52:4 170:17 192:22
194:4 197:18 220:8 224:18
**knash** 3:10
**knell** 126:5
**knew** 31:11 55:11,12 80:15
**knife** 57:11
**know** 12:23 13:2,20,21,21 13:22 14:14 17:8 18:10,11 18:12 19:3 22:4 22:5,6,15,16 23:5 25:5 26:7 27:1,13 28:6 29:22,23 32:14 32:20 33:9,10 33:14,16 34:3 34:11 35:15 37:20 40:18,21 41:6 42:15,17 42:18,24,25 43:3,5,8 44:18 44:20,22 45:1,8 46:12,19,20 47:5,6,9,10,14 47:18,21,25 48:2,5,6,10,18 48:18 49:3,5,8 49:10,13,22,22 49:24 50:2,10 50:15,19,20,21 50:23 51:1,16 51:17,20 52:6

52:11,19 53:18
53:19,21 54:6
54:10,11,11,19
55:9,10,18,21
55:22,23,24
56:3,10,11,14
56:15,16,16,18
56:23 57:9,12
57:24,25 58:5,7
58:11,12,17
60:3,3,3 63:11
67:12,14 68:2,2
68:3,25 69:1,3
69:15,20 70:10
70:13,18 71:7
71:13,16,19,23
72:6,13 73:8,10
73:10,16,16,17
73:19,22 74:4,4
74:13,14,15
75:4,8,12,15,17
75:22,22,25
76:1 77:4,6,7,9
77:11,14,24
78:5,7 80:4
81:13 82:7,14
83:15 84:13
85:23 86:7 89:3
89:4,25 90:3,14
90:14,19,22
91:2 92:2,15,23
93:14 97:17
98:22 99:15,17
99:24 100:2,3,3
100:4,20,21
101:3,15,18,22
101:24 102:20
102:24 103:18
105:6,10 106:11
109:9,11,17,20
109:22,25
110:24 111:3,4
111:16 112:4,6
112:19,21,25
113:22 114:1,5
114:6,17 115:2
115:6,9,10,14
115:16,17,18,19
115:21,22,23
116:11,15,15,18
116:20,23,24
117:6,7,7,8,11
118:1,2,22
120:1 123:19
124:11,11
125:16,17,20
126:2,6,23
127:1,6,11,16
127:17,18 128:1
128:4,5,8,10,24
129:12 130:2,2
130:4,5,8,11,24
131:2,15 132:10
132:11,17,19,21
132:23 133:4,7
133:10,11,13,15
134:1,6 136:20
136:21 138:19
139:12,12,14,19
139:19 140:6,6
140:7,14 141:1
141:16,19,23
142:2,3,4,6,8,22
142:22 143:6,8
143:9,19,20,21
143:22 146:13
146:24 147:8,14
147:23,25 148:2
148:6 150:14
151:4,13 152:4
152:14,18 153:4
153:11 155:8
156:10 157:2,23
158:6,7,8,9,10
158:11,17,24
159:23 160:3,6
160:8,11,14,16
160:18,21
161:10,12,13
162:2,7 165:11
168:14 172:19
173:13,23 174:9
174:12,23,25
175:14 176:1,2
176:3,20 177:14
178:3 179:7,15
179:22 180:3,8
180:22,24,25
181:3,6 182:4,5
182:6,10,11,21
182:23 183:6,8
183:9,14,16,17
183:19,21 184:1
184:5,6,8,11,13
184:14,16 185:4
185:13,17,20,23
186:1,2,4 187:7
187:8,17 188:20
188:22,23
192:22 206:9,24
209:18 210:7
212:8 214:6,7
215:19 216:11
216:15,17,20,21
217:4 218:4
219:11,25
220:14 221:15
223:1 224:10,19
224:20 225:10
225:15 227:21
227:23 228:17
229:9 231:4,5
233:21 234:6,8
237:18 238:22
239:14,21 240:2
240:21 241:2,3
241:9,14,15,18
241:21 242:17
242:19,20 243:7
243:25 244:2
247:18 249:16
251:24 252:7
254:9 258:24
259:1 261:22
262:2,6 268:23
268:24 269:7,8

269:12,13 270:9 270:11,12,15 271:25 272:11 272:15 273:23 274:1,19 275:3 275:8,8 276:2 277:24,25 278:17 279:19 279:20 280:3,6 280:9 281:9
**knowledge** 46:14 47:20 51:6 69:3 77:17 92:14 106:14 123:7 140:1 144:25,25 153:21 168:19 169:1 181:6 222:22 257:12 257:13 276:21
**knows** 60:2,2 141:25
**kohchise** 30:24 35:9 53:20,25 72:17,24 181:2 229:1,17,19 274:10

**l**

**l** 7:9 131:21
**lack** 110:9 124:25 148:16
**ladida** 155:23
**lafalce** 3:13
**lag** 175:8
**landau** 221:11 221:12
**lane** 225:22
**lang** 80:3
**language** 108:12 167:8
**large** 32:24 57:5 57:6 63:12 75:6 75:15 179:8,14 272:5
**larger** 33:6 83:18
**largest** 10:21 54:18,22 130:3 255:14,16
**late** 151:4
**laurels** 264:22
**law** 7:18 63:13 86:9 87:13 197:23 233:5
**lawrence** 3:2 7:19
**laws** 248:1,2 273:7
**lawyer** 64:1,5,6 142:19,19
**lay** 62:21
**laying** 175:25
**layman** 109:22
**lead** 54:9 66:16 68:17 69:10 87:9 278:25 279:4
**leading** 172:13 174:17,20 177:6
**leads** 147:12 245:3
**leap** 194:25
**lease** 163:4
**leased** 146:13 163:17
**leasing** 45:4,5,6 143:17 145:2 174:13
**leave** 36:17 116:25
**leaves** 160:16,19
**leaving** 264:21
**ledger** 4:18 94:11 98:25 99:11,12 107:14 235:5 260:3 265:7 280:12
**lee** 3:20 7:9 12:13,16 13:14 20:12,22 22:10 23:16 26:12 64:8,9,13 66:2 78:20,22 82:19 83:1,16 88:19 93:1 96:23 97:20 99:6 104:25 106:1,16 108:24 119:4,8 122:7 162:12,14 162:15,23 163:20,24 165:21 166:20 167:13 168:10 169:17 170:8 187:21,24,25 189:3,21 190:5 192:16 195:12 195:15,16 198:25 199:6,18 199:21 207:14 207:15 208:24 209:1,3,9,20 217:9,24 234:20 234:22 235:1 256:25
**lef** 44:14 113:15
**lefkowitz** 27:4,4 31:4 44:15 48:9 49:21 51:8 66:23 67:17,18 67:19,20,23 68:8 69:12 70:25 76:10 77:11,12 110:1 110:1 112:20 113:16 138:1,5 138:10 140:18 141:17 142:4,12 165:8 169:6 170:14 220:10 220:12 223:5 224:6,15 229:24 229:25 230:8,22 231:6,8,19,21

232:6,10 260:11 260:25 261:6 273:5,15 274:11 276:19 277:23 278:9,12,25 279:4,5,11,22 279:23 280:2,17
**lefkowitz's** 76:6 273:12
**left** 43:16 55:14 99:25 117:16 133:1 156:20 175:25 225:3,4 267:23
**legal** 6:19,21 17:22 63:16,25 78:6 109:16,21 109:23 110:16 111:1,9 159:17 163:13 176:15 188:21 192:25 203:3 272:11 283:21 286:23
**legality** 123:25
**legitimate** 87:10
**lender** 68:12,15 68:16 77:17,18 77:21 80:10,21 82:3,13 90:1 107:7 110:2,6 111:15 116:2 118:20 139:19 153:19 156:2,4 186:7 192:3
224:1 273:6 278:3
**lenders** 79:17 133:13 147:20 153:17,17,23,25
**lending** 215:23
**length** 197:18
**leo** 282:16
**letter** 4:9 28:17 28:18 36:4 184:20 185:22 186:1 189:11 190:10,11
**letters** 58:9 190:17
**letting** 121:13 264:22
**level** 33:4 73:18 112:20 115:1 140:3 148:13
**levi** 48:1
**liability** 5:8 158:13,16,19 207:16
**lien** 80:2,10 85:25 86:22 109:10 113:24 114:1,2,6 117:19 218:8 232:20 233:8 239:6
**lift** 154:11
**likewise** 12:7
**limitation** 23:25
**limitations** 16:18 25:13
**limited** 5:8 39:8 109:11 136:18 136:25 137:2 166:8 207:16 218:16
**line** 42:4 61:6,6 61:15 95:21 97:10 98:8 152:13 226:14 240:3,3,20,20 250:25 261:7 276:14 287:4,7 287:10,13,16
**lines** 237:11 238:10
**liquidate** 136:20
**list** 14:25 43:14 44:2 62:14 120:8 157:3 245:15 262:3
**listed** 44:9 64:23 111:2 120:21 211:19,23 212:1
**listen** 61:16 229:5
**lists** 164:18 245:18
**literally** 127:4 130:11 159:23
**litigation** 43:2 223:7 269:13
273:11 274:11
**little** 11:15 13:1 23:2,3 26:23 28:14 33:5 42:1 43:12 44:1 51:3 64:11 66:1 82:23 83:18 85:23 96:24 97:18,20 118:13 131:15 133:2,8 138:6 150:4 158:2 181:14 186:16 190:6 199:20 220:3 225:24 258:3 261:3 269:10 270:9
**live** 26:22 250:9 250:10
**lives** 58:4 125:20
**living** 11:3 137:23
**llc** 1:9 3:19 6:14 48:22 49:11 107:8 163:5 170:13 199:13 200:12 208:13 209:5 250:22 286:4 287:1
**llp** 2:9 3:3,8 7:18
**loan** 24:12,13 24:13,15 25:2

68:14,20,24 69:13 71:8 80:14,15 86:5 86:19,22,24,25 87:2,5,7 145:22 185:11,11 188:24 189:14 190:9,13 191:5 191:5,7,9 192:6 193:6,9 194:9 196:12,12,18 197:21 200:24 200:25 201:3,19 201:25 202:14 202:16 203:12 203:13 204:15 207:6 213:12,13 213:18,19,22,24 215:2,3,4,8 216:12,13,16,20 216:22 217:1,21 230:16,19,23 233:3,8,11,15 233:19,21 236:1 236:12 238:1,5 238:8 239:4 242:9 243:22 257:25 258:23 273:8 279:14

**loanco** 3:7 24:13 66:19,22 67:1,8 107:8 200:12 229:22 230:4,8 235:11 236:24 275:7,16 277:24 278:3,12 279:7

**loanco's** 230:11

**loans** 190:18 215:10,12 216:19

**local** 45:14 147:3 224:25

**locate** 45:16

**located** 251:24 254:10,16 255:1

**location** 45:24

**locations** 255:12

**locums** 124:6,14 124:22

**long** 83:14 134:12 197:16 220:23 221:12

**longer** 177:2 205:21

**longevity** 70:17

**look** 59:23 63:13 71:8 76:9 109:24 156:8 192:7 196:21,24 196:25 197:5,16 198:7,12 206:3 217:15 233:22 241:4 260:2

**looked** 13:22 16:2 28:3 147:23 156:7 218:4,8,9 224:9 240:22 261:21 274:25

**looking** 8:25 20:17,18 29:22 36:25 37:1 103:11,13 106:19,19 111:20 112:3,4 118:2,12,14 144:3 177:25 197:6 235:10 237:1 238:6 241:24 269:25 270:3,4 276:25

**looks** 155:3 165:5 193:22 242:8

**loose** 45:5,10 269:7

**loosely** 35:8

**lose** 40:7,8 57:6

**losing** 255:16

**loss** 41:7

**lost** 30:18 40:10 57:4 141:6 254:8 255:17 276:2

**lot** 9:8,16,20 10:14 17:8 19:4 23:9 42:14 43:4 47:20,20 59:9 83:15 94:16 108:14 139:24 142:5,21 143:13 143:13,20 156:6 202:9 234:6 242:22 269:10

**lou** 234:17 256:19 281:9

**loud** 177:11

**louis** 2:17

**love** 164:9

**lower** 167:14

**lsalazar** 2:5

**luis** 2:2 7:6 8:11 59:4,19,19 64:21 283:4

**lunch** 105:9

**m**

**m** 6:17 7:21

**m2** 3:7 24:13,15 25:12,23 47:8 47:12 66:18,21 66:22,23 67:1,5 67:8,19,20,20 67:24 68:13 69:12 70:10,25 75:2,10 76:24 77:5,11,17 78:14 80:10 81:1,5,7,19 84:5 84:25 85:19 86:14,17 90:1 93:2 94:12 95:23 96:15,18 101:4 102:4 107:8 111:10 114:21 115:11

115:19 116:5 117:10 118:9 135:24 147:14 151:1,13 153:8 153:8 187:20 190:13,13,16,20 190:20 191:4,18 191:23 192:3,9 193:6 194:6 195:6 199:13 200:11,25 201:21 204:5 205:10,16 206:14,17 216:13 228:14 229:22 230:3,8 230:10,12 231:6 232:20 233:3 235:5,11,14,17 236:24 239:4 241:24 242:22 257:21 258:9 259:19 260:25 261:1,2 262:9 262:22 275:7,16 277:24 278:2,12 279:6
**m2's** 25:15 85:25 185:7 196:12 201:2 204:2,2,9
**machinations** 188:18,21
**made** 29:12 32:6,10,20 40:23,25 42:21 47:8,11 53:10 74:21 75:10 99:18 102:16,22 104:23 110:20 113:3,14,16 121:17 122:16 129:1,2,8,23 147:25 148:3 156:22 157:21 164:15,15 168:19 173:2 177:19 179:17 179:19 180:7,23 183:4 185:5 189:19 213:11 213:18,19,21 214:10 215:7,8 221:20 228:6 233:2 243:19,22 252:17 257:11 261:12 262:15 262:18 276:10 280:8,13,14,16
**mail** 4:21 5:3,4 5:5,6 15:3 86:1 87:19 118:7 119:5,13 136:1 185:25 187:22 188:10 189:4,22 193:9,12,16,18 193:21 195:17 215:14 217:10 233:20 235:18 235:21,25,25 236:4,5,16 258:21 259:1 283:5,10
**mailed** 198:25
**mailing** 251:11 251:18 254:12 255:5,8
**mails** 17:9 18:12 24:19 58:13 86:8 87:16 144:3 192:14,15 194:14,17,17,19 196:6 197:10 201:10 202:18 217:4 233:24 234:9,10 242:20 245:7 258:24 265:1,3,4 272:18
**main** 124:10,13 124:13 245:3
**maintain** 56:10 57:4 122:5 147:6,7
**maintained** 122:2
**maintaining** 177:17 216:14
**maintains** 174:8
**make** 8:17 16:18,18 19:14 19:15,17 22:5 28:7,8 29:2 30:14,16 33:8 33:12,15,18,22 39:21 40:2,17 40:19,22,24 41:3,14 42:25 43:15 68:20,23 69:13,24 71:17 77:15 78:22 83:17 86:23 91:12,15 96:24 100:3 104:6,10 104:19,22 109:19 110:5 111:10,22 112:4 128:6,18,19 130:7 132:18 133:9 134:24 147:9,17 148:9 151:24 154:14 154:20 155:4 158:18 160:25 162:3,5 173:2,8 178:18 180:5 181:17 182:12 182:14,15,17,18 183:21,25 184:19,23 213:13 215:8 222:8 223:14 224:19,23 229:13 231:22 231:23 233:23

234:1 238:2,16 239:5,6 252:16 253:12 258:13 260:7 267:17 268:9 271:10 272:22 276:17 281:15
**maker** 114:10
**makes** 179:23 232:10 237:13 279:6
**making** 28:5 90:20,23 100:8 101:6 114:6 125:19 129:5 175:14 177:7 181:16 194:9 231:12 269:9
**man** 221:9 281:6
**manage** 23:6 48:13 134:13 200:19
**management** 4:20 9:10,21 24:4 48:10,11 48:12 86:2 105:2,20 106:8 115:16 133:17 133:17 135:25 222:17,18,19,20 222:24 223:1,6 223:8 224:10,15 278:15
**manager** 10:2 136:19
**managing** 136:19
**manatee** 284:3 285:3,17
**mandatory** 113:23
**marcelle** 3:20 7:9
**march** 98:14 164:16 243:14 243:19 244:12
**mark** 13:4 17:18 75:14 79:1 83:4 131:21 164:2 188:7 189:10 208:5,6 267:17
**marked** 13:9 21:1,3 79:3 83:7 94:3 105:13,16 119:11 136:7 162:19 164:4 188:4 189:6,24 192:19 199:4,9 207:19 209:8 267:20
**marking** 93:24 162:17
**markowitz** 75:6 131:17 153:18 155:12 156:1
**martin** 2:15 7:13,13 14:11 14:18,22,24 15:4,6,9,15,23 15:25 16:5,10 41:19 42:7 58:20 59:4,7,24 60:4,7,12 64:21 66:1 110:8 112:15 114:15 119:16,20 148:19 149:2,8 149:13,23 152:22 153:15 163:11,13 165:4 180:15 187:10 191:2 196:13 201:6,16 203:15 204:11 205:3 206:4,19 207:5 210:2,7,8,12,18 211:2,6,16,21 212:7,14 214:16 214:20 215:5 226:1,11,16 229:8,14 231:1 232:8,25 239:1 242:13 244:18 244:22 246:16 246:22 247:1,5 247:8,16 248:4 248:8,11,14,16 248:21,25 249:3 249:5 250:1,25 251:14,17,25 252:20 253:5,8 253:13,20,22,25 254:4,11,17 255:2 256:4,9 256:14 258:14 258:19 259:8 260:13,20 261:9 261:19 262:12 263:14,22 264:2 265:11,18 266:4 266:16,22,24 267:7 268:5 271:14 273:9 274:13,22 275:22 276:1 278:4,18,23 279:1,8 281:2,7 281:18 282:7,17 283:2,2,15,16 286:1
**master** 89:12
**matt** 219:5
**matter** 6:13 23:1 42:13 74:12 81:9,15 101:7,9,19 102:24 155:21 159:15
**matters** 9:2 145:5 181:2 269:14
**matthew** 3:1 7:20 267:19

**max** 176:25
**mayor** 159:24
**mayor's** 159:22
**mean** 18:25 23:9 26:7 28:21 36:24 41:14 42:12 43:10 45:1 49:20 53:5 54:2 55:7 57:22 57:23 59:21 67:15 68:14 76:4,18 90:14 107:25 121:7,11 139:19 144:19 151:9 180:5,20 214:1 241:7 245:2,7 269:12
**meaning** 26:5 46:8 57:22 216:4 220:21
**means** 120:25 189:16 212:9 233:21 237:18 237:22 243:25
**meant** 43:9,24 108:4 116:9 144:9 209:20
**media** 6:11 283:20
**medical** 146:20 172:19
**medication** 124:18
**medications** 147:2
**medicine** 147:4
**meet** 19:12,24 20:1 32:7 77:9 203:7
**meeting** 77:9
**meetings** 23:5 46:20 133:16
**melissa** 1:24 6:21 281:22 284:6,17 285:5 285:22
**member** 63:12 63:12
**menendez** 17:19 21:18
**mention** 10:6
**mentioned** 8:12 14:6 18:6 29:25 31:2 32:2 40:17 43:3 48:9 50:6 77:25 92:20 107:25 122:10 123:11 131:11 133:19 140:8,9 145:24 147:11 148:4 173:1 174:17 175:10 193:22 217:20
**mess** 125:13
**message** 188:23
**messages** 158:9
**met** 46:25 77:9
**mexico** 120:9 176:23 177:16 246:12 268:1
**mgt** 239:23
**miami** 2:4
**michael** 2:3 7:11 19:9 47:23
**michelle** 140:11
**michigan** 245:25
**microphone** 137:15,16,17
**middle** 1:2 6:15 64:13 90:19 107:5 168:11 187:16 276:11
**mill** 159:6
**million** 55:15,17 56:4,4 69:7 84:5 84:11,12 85:8 85:14 90:18,21 92:24 95:23,23 96:8,11,12,15 96:19 97:13,15 98:15 99:20,21 99:21 100:23 101:3 102:14 103:6,17 104:16 107:11,18 116:22 117:24 132:17 157:7 158:21 159:6,7 159:7,13 160:3 160:17,20 161:13 170:24 171:6,12,22,24 177:23 179:5,9 179:12 180:2,11 181:7 182:25 183:15,19 186:20,20,21 190:15 191:8 195:7 200:15,15 200:16 201:3 206:15 207:1 213:10 215:24 215:25,25 236:22,23 237:7 238:23 241:18 244:9 257:22 258:10 259:20
**mind** 40:5 70:13 116:7 181:25 201:13 208:20 221:21 245:13 249:23 250:19 283:11
**minimize** 178:3
**minimizing** 176:12
**minute** 14:24 66:4 102:7 145:13 162:10 173:20 193:14 212:20 256:23 266:24 267:3 268:14 277:10

**minutes** 24:3 105:8,9 131:10 133:24 134:23 135:1,1,3,5,8 178:6
**mischaracterize** 202:4 232:7
**misread** 210:5
**missed** 34:13 42:17 126:4 146:12 172:16 229:7,9
**missouri** 2:17 3:4
**misstates** 210:19 211:2
**mistaken** 171:24
**misty** 44:20
**mitigate** 157:22
**mix** 125:12
**model** 147:4
**modification** 28:1 29:14 53:16
**modifications** 24:1
**modified** 269:23
**moment** 14:18 26:13 31:2,3,25 37:7 43:16 51:2 52:14 58:22 78:23 82:24 85:22 88:18,24 92:25 93:2 98:5 98:6 99:7 100:11 106:2 108:21 111:24 116:4 118:10,12 118:13 125:14 128:17 150:6 161:17 162:14 163:19,22 166:6 169:16 177:25 190:4 196:5 198:23 199:2,3 199:5,20,23 215:1 218:21 225:21 235:1 256:25
**monday** 132:16 151:19 161:8 184:23
**money** 28:7 37:22 38:3 40:23 68:24 69:1 71:4 77:16 78:6 101:23 102:10,19 103:24 117:4 122:17 125:4,5 126:5 128:13 132:7,18 139:7 139:9,18 147:20 151:8,25 152:8 154:5,20,24 155:1 171:25 173:9 174:25 175:9 179:21 180:9 183:8,17 184:22 185:3,7 186:2,4 189:17 191:8 214:3,3,4 216:7,8 222:2 222:11,15,16 223:12,18,19,21 223:23,24 224:2 224:2,6,7,8,12 224:24 228:14 229:15 244:5,6 266:14 274:5,6 274:11 275:25 276:13 277:5,7 277:9,11,12,15 277:16 278:1 279:5,6,15,15 279:16,17 280:4 280:6,9,9
**monies** 57:23,25 89:22 91:11,20 92:4 98:23 116:17 125:15 197:19 202:1 279:24
**month** 35:25 56:5 96:25 104:13 160:7,17 179:9 209:24 210:24 211:18 243:23 268:22 268:25
**monthly** 32:11 213:25
**months** 63:3,6 103:9 172:16 173:21 174:5 227:11
**morgan** 3:2 7:19 256:20
**morgan.lawre...** 3:5
**morning** 7:17 8:11 14:23 91:9 91:22 123:9 272:20
**motion** 4:15,23 41:25 70:2 71:22 73:3 74:14 78:21 79:5,7 80:4,9 82:22 84:19 85:9 99:22 118:15,18 130:25 131:4 135:22 151:12 151:17,20,21 152:5 160:9 162:21 184:19 185:1,5 246:19 247:2,9,9 249:17 252:5 257:4 262:7 264:19 265:16 265:19 269:22 271:19,19,24

272:13,23 274:9
**motions** 57:24 151:24 152:3 154:14 181:16 265:21 273:11
**mouth** 225:11
**move** 20:6 33:10 62:25 66:14 69:25 83:16 113:8 153:5,12 161:16 162:9 203:8 207:10 241:3 245:10 248:20 269:20
**moved** 20:5
**moving** 41:24 69:14,15 125:10 139:16 142:23 155:18
**msolimani** 2:6
**municipalities** 89:9,10 102:1 116:16 125:13 126:8 156:23 157:20 158:3 160:9
**myers** 1:3 6:16

**n**

**n** 7:10 131:21
**nail** 148:16,17
**nailing** 101:1
**naked** 133:1
**name** 6:19 7:10 17:17,22 21:5 37:12 48:5 50:21,23,24 106:23 131:17 131:20,24 132:14 136:16 136:18,24 140:10,11 165:11 192:3,3 192:4 219:2 241:16 262:1,2
**named** 75:5 221:10 261:22
**names** 17:12 44:17 47:18 51:17 86:15 131:14 140:8 141:13 190:18 223:4 244:3 271:20
**naphcare** 182:12,13,16,17
**naples** 209:25 210:16 211:19 212:17 250:13 255:14,25
**narrowly** 28:23
**nash** 3:8 35:21 70:9 81:23 110:21 112:23 113:3,12 184:20 226:24 227:1 230:1,3 262:16 282:6,8,11,14 282:16,18,24 283:8
**nature** 31:10 75:24 84:24 85:19 185:3 195:10 197:9
**nearing** 215:25
**necessary** 33:21 53:9 117:8 139:5
**necessity** 101:10
**need** 14:1 59:23 60:1 69:6,24 71:4 74:2 97:7 113:8 115:21 134:14 138:10 138:12 142:20 155:2 176:16,20 178:21 239:14 245:6,12 247:18 248:3 268:19,25 269:5,13,23 277:22 281:15
**needed** 13:22 18:15,17,18,21 32:15 36:1 39:12,20 40:10 69:1,4,9 71:21 113:17 121:15 124:3,12 144:6 144:14 146:20 154:15 176:16 177:16 178:3 184:23 185:9 187:18 224:5 264:20 268:22 269:3,8
**needing** 181:1
**needs** 100:4 117:12 144:5
**negative** 93:22 238:15
**negotiate** 27:14 28:10 76:24 112:17,18 221:17
**negotiated** 78:11 227:24
**negotiating** 66:17 67:16,22 68:4,5 70:24 110:2
**negotiation** 110:23
**negotiations** 24:5 32:13 53:8 72:20 156:7
**neophyte** 250:8
**net** 127:2 266:14,14
**netted** 129:7
**never** 31:23,23 31:23 47:10 58:10 78:6 89:14 114:19 191:7

**new** 2:10,10 3:9 3:9 10:9 34:9 94:24 120:9 127:24 136:4,21 161:4 176:23 177:16 200:15 201:25 202:1,14 225:13,21 246:12 268:1 273:6
**newco** 202:9
**nicholas** 3:2,13 7:17 59:24,24 60:8
**nicholas.zluti...** 3:5
**nick** 59:20 219:2 226:11 246:22 253:5,20 253:22,22 282:4
**nicon** 10:2
**night** 161:1
**nine** 243:10,11 244:9,12
**nlafalce** 3:15
**non** 5:9 43:21 44:7,9 163:5 230:7
**nonanswer** 195:3
**nonlawyer** 230:6
**nonoperative** 44:8,8,11
**nonpayment** 172:17
**nope** 242:18 245:2
**normal** 154:22 159:17
**normally** 129:12 179:11 223:20
**notary** 284:18
**notation** 95:6
**note** 6:3 286:10
**noted** 66:1 263:18
**notepad** 207:23
**notes** 14:14 164:22 203:7 221:2 285:9
**nothing's** 169:10
**notice** 4:13,19 12:17 13:5,11 13:18 20:20,23 23:20 57:10 69:18 103:16 105:19 120:14 135:19 252:11 255:8
**noticed** 251:2
**notices** 132:22 212:2
**noticing** 7:5
**notification** 92:5,11
**notified** 92:17
**notions** 72:8
**november** 284:19
**number** 6:16 15:20 16:2,8 17:13 25:8,9,21 25:22 40:22 51:12 54:15 82:15 84:18,18 85:4,8,13,14,14 87:11 96:7,7 99:4 100:11,12 100:20,23 101:1 103:11 106:20 109:12,20 119:14 140:3,6 140:7 158:18 159:4,5 166:8 183:3 186:11 196:14 197:21 209:5,10 218:6 218:16 260:5 283:20
**numbers** 14:14 73:23 107:13 127:8 158:20 175:24 203:22
**nurses** 118:6 146:23 152:17
**nursing** 11:2 136:12 137:2,23

**o**

**oath** 4:6 6:22 8:4 84:1 284:1
**object** 41:20 59:21 72:3 110:8 111:16,16 114:17 148:19 149:8 205:3 207:5 226:1,11 250:25 266:22
**objected** 15:25 16:7 60:9 71:11
**objecting** 253:13 254:1
**objection** 15:18 15:19 16:1 64:22 71:13 72:2,4 78:4 112:1,15,24 114:15 115:25 149:2,23 152:22 153:15 163:11 165:4 180:15 185:2 187:10 191:2 196:13 201:6,16 203:15 204:11 206:4,6 206:19 210:2,6 210:18,22 211:2 211:4,6,16,21 212:7,14 214:16 214:20 215:5 226:14 229:8,14

231:1 232:8,25 239:1 242:13 244:18,22 246:16 249:1,5 249:7,12 250:1 251:14,17,25 252:16 253:6,9 253:11,12,13,16 253:19 254:3,11 254:17 255:2 256:4,9,14 258:14,19 259:8 260:13,20 261:9 261:19 262:12 263:14,18,22 264:2 265:11,18 266:4,16 268:5 271:14 273:9 274:13,22 275:22 276:1 278:4,18,23 279:1,8 281:2

**objectionable** 71:17

**objections** 6:25 16:11 78:8 143:5 252:17 262:18

**objectors** 183:21

**obligated** 167:18

**obligation** 130:7 157:18 166:16 167:9 168:2,6

**obligations** 165:24 168:5 276:23 278:2

**obstructive** 18:11 197:8

**obtain** 22:3 92:17 147:17 185:7

**obtained** 30:24

**obtuse** 275:13 276:16

**obviously** 17:16 18:12 23:12,15 32:16 41:6 52:22 64:24 77:22 99:24 100:14,24 102:5 111:7 113:20,25 127:7 183:18 184:4,11 187:4 216:16 252:5

**occur** 44:5

**october** 242:6

**odd** 85:8

**offer** 10:6 178:2 183:22 252:6

**offered** 109:9 166:25 184:1

**offering** 27:20

**offers** 115:15

**offhand** 51:17

**office** 45:25 46:1,3,6,16,19 46:22,23,24 125:19 159:22 164:18,23 254:18 255:7 256:3,6

**officed** 46:17

**officer** 3:1 7:20 35:7 37:12,14 192:25 219:6

**officer's** 267:19

**offices** 9:25 144:14

**official** 30:5 36:25 39:13 81:7 111:11 262:1 284:9

**officially** 35:17 155:24 241:6

**oh** 51:2 59:5 92:9,13 117:13 120:5 135:4 137:12,18 141:12 144:13 146:10 171:6,6 184:19 189:15 207:4 213:16 219:24 226:13 241:8 242:11

**okay** 8:15,25 9:14,22 10:23 11:18,24 12:2,7 13:13 14:16 15:21 17:12 19:23 22:1 25:1 27:22 29:15 30:21 31:11,21 31:25 32:6 33:24 34:20,23 35:3,5 36:8,12 36:20 38:9,23 39:6 40:16 44:17,22 45:15 47:14,16 48:3,6 48:21 50:12,15 50:19,22,25 51:2,7,11,16 52:14 53:11 54:14 60:1,6 61:1,11,24 62:4 62:8 63:5,8 65:9 65:15 66:21 67:4,9,11,15,21 67:25 68:8 69:10,17 72:10 76:5,20 79:12 79:22 80:6,19 80:23 82:8,11 83:3,14 84:10 85:10,22 87:22 88:18 89:2 90:14 92:9 94:1 95:17 96:1,6,10 96:18 97:4,6 98:5,19 100:16 101:5 105:10 108:21 119:3,23 120:20 121:21 122:2 129:5,13

131:18,22 132:3 134:7,22 135:12 136:9 137:5,12 137:14,18,18 138:4,8 139:3 139:10 140:21 142:17 144:13 144:21 145:13 145:20 146:10 146:11 157:5,9 162:15 163:15 165:7 172:2,2 173:25 174:24 175:19,19,22 177:10,21 178:5 179:4 180:4 181:20 182:20 184:1 188:1,2,8 188:19 189:3,20 191:16 192:16 193:8,21 194:4 194:12,16 195:12,18 196:17,20 197:15,21 198:3 198:23 199:18 200:2,5,23 201:8 204:6 205:21 207:4,11 207:25 208:10 210:14 211:15 212:19 213:21 214:5,11 215:17 216:2 217:8,24 218:14 220:6,10 220:25 221:8 222:16 224:21 225:7,10,20 226:7 227:1,2 227:17,20 228:5 228:9,18 229:3 229:6,12 230:10 230:13,15 231:4 231:15 232:5,19 233:17 234:5,16 235:10 237:2,16 238:10,13,17,18 239:9,17,20,23 240:16,24 241:5 241:11 242:1 243:9,17 244:8 245:10,15,18 246:24 247:17 248:19,23 250:4 250:11,15,16,19 251:8,24 253:4 253:17 254:9 256:8,17,24 257:3,8,10,14 257:17 259:12 263:12 264:13 268:12,19 269:20 271:7 278:1 279:23,25 281:18,20 282:2 282:14 283:8,17

**omni** 225:1

**once** 13:17 78:13 92:16,16 167:6

**ones** 10:9 39:16 57:7 104:3 130:1 131:6 187:16

**ongoing** 22:18 95:4 121:8 272:6

**online** 9:17 234:21

**op** 180:22

**open** 158:10 160:5,6,16,19 161:2,6,7 183:15 185:25 199:1

**opened** 90:10,11

**openly** 159:15 160:18

**operate** 37:10 59:1 124:14 239:6 250:2

**operates** 246:15

**operating** 36:19 73:24 211:24 247:25 268:13

**operation** 43:25 255:11

**operation's** 255:17

**operational** 180:22

**operations** 39:14 59:2,2 60:22 146:12 180:10 211:25 212:16 268:4,7 270:15,16

**operator** 136:16 136:24

**operators** 11:2 11:3 136:12

**opinion** 63:16 109:22 249:15

**opinions** 24:2

**opportunity** 267:2

**oppose** 16:17

**opposed** 77:12 79:25 255:20 272:4

**opposition** 249:18

**order** 14:2 27:9 28:8 35:11,16 43:1 48:13 51:20 52:11 70:11 71:20,21 86:2 90:5 99:14 111:5 124:1 130:6 136:5 144:6,15 146:15 146:17,18 147:8 147:18 148:5,9 152:6 154:7 163:23,24

172:23 176:17 196:16 197:13 198:11 202:21 202:22 224:12 232:17 239:7 262:8,17,22,23 263:1 264:7 268:9 282:1 283:3
**ordered** 95:7
**ordering** 286:15
**orders** 4:15 281:21,22 282:23
**org** 48:24 49:9
**organizational** 49:25 66:25
**organize** 283:6
**original** 12:16 13:5 33:11,15 86:5,14 110:18 186:19
**originally** 86:16 87:2,5 89:6,7,19 89:22 144:21
**originated** 87:2
**oust** 136:19
**outcome** 6:24
**outreach** 155:11
**outside** 46:8,9 111:11 122:14 126:18 140:23 230:7
**outstanding** 81:20,24 100:4 104:3 200:11
**overall** 100:7 139:13
**overcomplicat...** 23:2
**overkill** 110:18 111:3
**overture** 75:10
**overturned** 111:19
**owe** 81:5,17 117:24 118:19 160:8 189:16
**owed** 57:22 58:1 80:21 81:1 84:5 103:24 106:24 147:20 186:14
**owes** 266:14
**own** 17:9,17 120:16 143:23 144:8,17 145:6 158:6 166:12 173:9 177:23 178:3 192:8 203:5 222:20 249:15 265:8,8
**owned** 49:20,20 51:8 52:9 66:23 110:1 192:1,1 223:3 224:15
**owner** 8:23 67:5 67:11,23 68:9 136:21 191:19 273:16 274:1 275:5,9
**ownership** 142:14,18,25 165:8,9 201:21 216:13 273:12
**owns** 44:15 110:2 273:21,22 275:7

**p**

**p.c.** 2:3,16 7:7 7:14
**p.m.** 135:14,17 178:11,14 213:1 213:4 267:10,13 283:18,23
**package** 24:23 202:16
**packages** 24:20
**packet** 191:10
**page** 4:3,12 5:2 13:15 23:17 78:23 106:3,3,5 106:17 107:5 165:21 167:14 168:11,11 169:18,19 170:9 199:19,19 287:4 287:7,10,13,16
**paid** 32:9 34:25 35:3 57:21 101:7 104:4 122:13,25 124:20 125:9,15 127:2,6 128:3,4 128:21,25 129:17,17,19 130:2,2,8,21,23 131:7,7 146:22 155:17 158:19 159:18 161:20 167:22 168:19 169:2,11,12,14 169:15 171:15 172:6,7,14,15 173:3,4 175:3 180:19 183:5 184:8 200:11,14 205:17,19 206:7 215:10 221:24 222:6 241:17 242:8 247:23 248:2 279:13
**painstaking** 130:9,10
**papers** 49:15,23 63:7 142:21 143:2
**paperwork** 155:3
**paragraph** 78:22,23 79:13 80:19 81:4 83:17 162:24 163:2,2 164:13 165:14,14 200:4

202:17 257:15
**paragraphs** 26:8
**paralegal** 3:20 12:14
**paraphrasing** 270:19
**pardon** 6:17
**parent** 48:24,25
**park** 3:9
**part** 10:21 38:20 40:12 51:25 53:6 55:16 60:16 62:4 63:8 86:25 87:6 88:1 94:6 100:2 104:17 126:18,19 129:25 131:5 145:14 146:15 167:17,17 168:22 171:23 177:21,22,23 181:3 191:1 205:13 259:3
**partial** 30:4,4 42:24 90:20
**partially** 153:19 153:19
**participant** 156:5
**participants** 6:6
**particular** 143:3 221:5
**parties** 1:19 6:10 21:12 71:25 75:14,18 110:24 123:12 161:21 169:22 170:4 264:3,18 285:12,13 286:15
**partner** 136:20 155:11,13 156:9
**partners** 3:13 7:15 8:20 68:3 136:18,25 137:3
**party** 6:23 97:13 98:2,14 114:21 169:21 169:24,24 170:5 170:13 200:8 202:22 224:1 238:20 239:20 241:13,15,19 242:5 243:2,3,3 243:14 244:1 274:3
**passed** 125:23
**passthrough** 121:18
**past** 11:3 27:5 28:11 32:18 61:3 117:4 121:18 138:20 156:6 238:17 240:25 241:12 279:21 280:20
**path** 173:7
**patient** 121:25
**pause** 20:24 165:25 218:15
**pay** 32:23,23 38:3,14,19,20 58:16 111:12 112:4,4 113:22 114:18 116:13 118:8 125:1,10 128:3,4,9,12,18 128:23 129:14 130:8 131:1 147:21 148:1,2 148:3 151:21 154:4 155:2,18 157:24 158:10 158:25,25 159:8 160:1,10,24 161:14 162:21 166:9,17 167:21 168:4,22 169:6 171:25 172:10 172:23 175:3,4 175:5 177:22 180:2 181:7 183:15,17,19,20 184:10 223:19 225:2 239:7 268:9 269:17 271:20 272:1,3 272:4,9,22,23 274:5,6 280:7
**payable** 42:20 124:16 160:17 170:24
**payback** 32:18
**paychecks** 127:3,5
**paying** 34:12 38:11,12 42:14 99:25 122:10,13 125:14,18 126:5 131:4 153:10 166:17 171:12 171:18,19 188:23 229:20 272:5
**paymaster** 89:12
**payment** 30:1,6 32:11 117:23 126:15 157:15 159:10 169:14 170:22,22 173:2 173:8 179:5,8 179:17,19 180:7 180:8,23 182:24 183:5,24 184:24 215:15 229:13 237:21,22
**payments** 27:11 28:6,8,11 30:7 30:14,16 32:7 32:10,19,21 33:8,12,15,19 33:22 34:11,13

42:15,17,21,22 43:1 47:7,11 55:22 90:24 91:19 104:23 111:10 117:23 122:16 128:19 128:19 129:1,2 129:23 151:15 151:24 156:22 157:1,22 169:11 173:19,21 174:3 175:14 179:11 186:12 189:14 189:15,18 213:11,14,18,19 213:22,23,24 214:1,7,10,12 214:13 215:1,1 215:7,7,11,12 215:20 228:6,16 237:12,14 238:3 240:10,11 241:23 243:21 272:2 280:7

**payroll** 19:2 40:2,11,18,19 40:22,24,25 41:4,14 45:4,9 69:7,25 77:15 90:20,24 99:25 100:4,9 101:21 122:14,14,16,21 122:22 123:5 125:9,9,10,23 127:24 128:3,5 128:19 129:1,7 129:18,19 130:3 130:6,16,21 131:5,5 143:23 143:24 144:7,8 144:15,17 145:2 145:7 146:12,17 147:18 148:2 152:17,18 153:11 154:20 154:21 155:18 156:22 157:17 157:23 158:17 158:25 160:1,19 160:25 161:2,6 161:7,8,10,12 162:5 166:11,12 168:23 169:8,9 171:24 180:2 181:8 182:6,12 182:15,18 183:5 183:17 185:3 186:2,4 268:21 273:8 279:24 280:5

**payrolls** 40:8

**pays** 205:22

**penalties** 287:20

**pending** 59:6,18 149:6 150:7 151:17,25 152:1 155:4 159:12

**penny** 115:11

**people** 17:14 18:3 20:1 45:11 45:11 46:16,18 46:25 53:2 57:9 57:20 58:16 75:4 101:6,11 102:4 111:12 112:4 113:22 114:1,18 116:14 117:7 118:7 124:20 125:15 125:18 126:18 126:22 127:2,3 127:4 128:1,6 128:23,24 129:18 130:11 134:14 136:23 138:20 139:20 140:7,9,12 143:23 144:7 146:12,21,23 147:9,20 153:7 154:6 155:2,14 155:15 158:10 158:11,16,18 161:1 172:18 175:25,25 176:2 176:4,9,19,23 183:2,20 184:8 184:10 212:16 255:12,20 256:1 261:2,10 264:10 265:3 273:23 279:11 280:1,3

**people's** 68:1 125:20

**percent** 56:1 96:5 112:14 114:8,9 168:14 169:13

**perfect** 267:8

**perfected** 79:17 80:10 232:20 262:10

**perfection** 25:15

**perform** 145:17 146:4

**performing** 150:2

**period** 23:9 41:14 55:12 64:4 65:6 74:20 109:11 126:1,17 128:23 130:8 133:18 137:4 171:2 219:17 262:23 263:9,13 263:21,23,23

**periodic** 213:22 214:25 215:11

**periodically** 216:8 270:21

**periods** 42:16

**perjury** 287:20

**permission** 113:20 130:14 138:21 143:22

151:6 183:16 184:5,20,24 185:8,21 186:8 232:1 245:6
**person** 37:10 51:1 66:25 67:1 67:3 92:2,3 131:20 133:21 169:24,25 230:7 231:8 260:14 264:8 275:4,16 275:17,18 276:20 277:24 278:10,13,16,20 278:22
**personal** 150:14 170:22 249:15 279:18
**personally** 125:17 156:15 228:17 279:19 284:7
**persons** 146:20
**perspective** 139:13 150:16 186:13,14
**pertinent** 17:4 17:10 39:17 190:12
**petition** 5:9 36:24 37:8,8 41:22 78:12,12 80:20 84:4,6 90:23 118:19 122:13 130:7 160:1 168:20 171:1,2,4,5 172:5 174:3 183:17 208:25 209:13,14 211:23 212:12 212:18 247:19 247:20,23,23 250:24 251:6 255:19 257:20 257:25 260:18 260:25 261:1,5 261:17 269:17 270:11
**petitioning** 54:10
**petitions** 4:17 83:10
**pharmacies** 124:5,15,17,17 147:3
**phase** 240:25,25
**philadelphia** 33:1 54:18 55:13 91:14 92:21 121:2,4 144:12 148:3 150:10 159:11 159:11,12 161:4 246:5 255:18
**philly** 123:3,4 140:14,15 141:6 144:3,9 160:2
**phone** 118:7 152:2 182:2 230:1
**phonetic** 37:24 47:24 48:4 160:24
**physical** 45:24 46:3 49:13 73:8 74:21 130:11 131:4 255:20,21
**physically** 58:3 117:2 124:13 131:3 152:4 219:23 255:13 256:6
**picked** 72:22
**pieces** 124:13
**piggyback** 249:11,17
**pik** 217:18 237:9,13,18,22 238:4,7,11 242:1
**pirates** 133:11
**pitching** 147:8
**place** 1:19 6:9 6:18 45:21 93:18 111:12 139:15 142:23 164:18,23 169:25 208:12 208:15,21 209:19,23 210:15 211:1,12 211:19,22,25 212:13 251:11 254:13 255:4,10 255:21 272:20
**places** 56:12
**plain** 167:7
**plan** 116:25 172:12 177:21
**planning** 74:13 271:11
**plans** 45:9 166:25 167:3,4 167:9
**plant** 142:20,21
**play** 142:24 205:21 281:6
**players** 43:15
**plaza** 225:25 226:5,19
**plea** 62:4
**please** 6:3,25 7:25 12:17 20:14,23 22:10 23:17 58:13,22 62:21 64:9 69:16 78:21,23 83:2,20 93:2 104:25 106:17 118:10 119:6 146:18 162:13 162:23,24 170:10 187:22 189:4 194:18 199:19,21

208:25 217:13 229:3,6 234:25 245:13 249:20 249:23 250:17 251:9 254:6,22 257:15 263:20 282:5 286:12
**pleasure** 219:19
**pled** 61:8,22 62:1 274:12
**plethora** 19:1
**plus** 103:17 109:15 195:7 200:15
**poach** 52:11
**poached** 51:19 51:22 141:5
**pockets** 125:18
**point** 12:10 13:25 30:5 32:17 33:13 34:11,14,14,16 35:17,22 41:5 41:14 46:2,15 46:16 51:19 52:18 53:14,15 55:2 56:7 74:1 74:12 79:22,24 80:14,17,18,25 87:11,12 95:19 96:3,20,22 97:3 99:19,24 101:12 101:15 102:24 103:3 109:14 116:21 117:5 118:5 119:23 125:7 150:15 156:16 175:16 180:23 182:15 186:12,17 191:20 196:1,1 202:2 204:1 216:1 217:15 265:14
**policy** 102:15,16 171:12
**polsinelli** 2:16 7:14 224:25
**polsinelli.com** 2:18,19,19 286:2
**pool** 78:5
**populating** 21:15
**portion** 190:13 193:10 272:5
**position** 44:14 58:17 60:13 61:16,21 63:9 64:14 71:7 77:13,23 114:20 118:3 150:6 184:4 187:1 264:19
**positions** 63:23
**positive** 27:19 238:14
**possession** 66:18 90:8,11 90:13 153:17,23 154:7
**possibility** 52:17 115:17
**possible** 12:25 50:2 57:21 58:3 112:5 126:1 132:10 134:23 155:2
**possibly** 14:1 156:10
**post** 11:16,21 41:3 46:18 69:11 71:5,12 72:5 78:9,12 90:22,23 101:13 130:7 160:1 171:1,2,5,7,11 172:5 247:20,23 261:5
**postdate** 204:18
**postdates** 203:18
**posthaste** 76:2
**pot** 279:5,6
**potential** 31:7 40:9 52:19 53:2 53:9,14 54:4,9 66:18 68:5,6,15 68:16 69:12,21 75:7,23 95:8 99:23 131:12 147:12,19 150:19 158:19 160:17 169:13 221:17 279:12
**potentially** 29:19,21 39:9 40:6 55:21 69:1 103:9 149:25 156:16 159:25 176:20 178:1 181:1 255:16 272:11
**pounded** 159:22
**powell** 45:21 164:18,23 208:21 251:11 254:12 255:4,21
**practice** 10:22 37:15 48:12,13
**pragmatic** 128:10 172:9 270:1
**pragmatically** 123:24 144:24 159:15
**pre** 36:24 37:8,8 41:22 71:5 78:12 84:6 171:1,4,4,6,11 174:3 183:17 247:19,23 257:25 260:18 260:25 261:1,17 269:17 270:11

**prec** 227:12
**preceded** 227:12
**precipitated** 73:13
**preconceived** 72:8
**predecessor** 24:16 188:14
**prelaw** 11:23
**preliminary** 4:18 94:10 99:11 235:4
**premiums** 130:17
**prepaid** 147:1
**preparation** 29:19 218:18 220:16,17,19
**prepare** 13:18 18:22 53:8 166:10 220:3,21
**prepared** 14:10 15:16 16:13,22 75:13 262:11 272:15
**preparing** 18:16 57:24 271:19
**present** 3:17 7:2
**presentations** 24:4
**presented** 14:10 264:12
**presenting** 14:20
**preserve** 40:14
**press** 245:4,5
**presumably** 252:10
**pretty** 24:8,8 42:5 60:24,24 60:24 247:11 255:7 269:2
**prevail** 187:16
**previous** 32:21 141:20
**previously** 18:19 32:19 34:7 50:6
**price** 200:10,13 200:16 272:19
**principal** 8:20 164:18,23 208:12,15 209:18,23 210:15 211:1,12 211:19,22,25 212:13
**principle** 257:23
**prior** 31:5,8 34:13,17,24 41:9 42:19 46:4 46:15 51:23 53:17 54:14,17 72:11 76:7,24 86:25 95:12 96:16 105:22 121:3,5 130:3 140:12 148:24 151:18 153:20 172:16 179:4,17 179:18 203:24 210:8,10,12 219:12 227:13 227:14 239:13 245:19 265:2
**priority** 25:15 85:25 101:10 218:7
**prison** 153:24
**probably** 63:14 141:24 238:13 271:3 272:17
**problem** 30:23 69:8 135:8 159:4 163:12 241:12
**problems** 28:5 56:17
**procedure** 36:19 73:24 286:24,24
**proceed** 8:7
**proceeding** 6:25 20:4,9 204:16
**process** 22:17 22:18 27:15 52:5 56:20 87:4 111:11 129:21 130:10,24 131:3 131:6 148:11 159:18 202:19 255:15 269:6
**processed** 129:19 130:5
**processes** 23:6 159:20
**processing** 129:17
**produce** 18:17 62:14 177:18
**produced** 23:7 23:10 24:12 94:5,21 149:10 185:10 187:3 235:8 258:24 259:1
**producing** 15:18 19:19,20 249:9
**production** 15:20 19:21 23:2 24:24 94:6 135:21 185:11
**professional** 37:11,24
**professionals** 37:23 38:4,20 51:23 122:12 222:6,12 223:20 223:22,24 224:3
**profitable** 41:5
**project** 10:2

**promptly** 66:4
**proof** 49:14 117:25 197:22 197:23
**proper** 55:19 78:7 104:15 110:24 123:1 146:19 185:5 197:10 198:10 217:6 255:8
**properly** 33:9 74:13 78:10 79:17 80:16 99:18 112:5 122:25 144:7 146:2 229:5 233:8,9,11,15 269:9
**property** 136:20 136:22
**proposed** 88:23 262:21
**proskauer** 2:9
**proskauer.com** 2:11,12,12
**protect** 139:22
**protection** 78:7 108:19 109:3,14 109:18,20 114:13
**prove** 202:21,23 273:12
**proven** 198:14
**proverbial** 148:17 231:20 277:14,19 279:23
**proves** 62:18
**provide** 9:4 10:15 16:13 18:21 33:21 36:9 75:10 123:5 124:7,23 133:10 139:4,14 144:1 146:15,19 147:3 166:24 167:9 218:9 222:11 223:6
**provided** 24:14 26:5 37:7,8 85:4 128:22 144:18 147:3 149:10 165:24 166:7 185:15 192:11 192:12 233:20 233:23 258:21 258:21 260:2 270:25 273:25 274:2
**provider** 54:20 54:21 56:22
**providers** 34:5 121:14 124:2 125:7,8,22 148:7 174:17
**provides** 130:18 168:13 223:8
**providing** 36:4 48:19 72:5,7 75:18 121:10,19 123:4 124:18 132:17 145:2 146:25 167:23 177:15 184:20
**province** 3:19 19:10
**provisions** 57:16 148:3
**pub** 65:4
**public** 65:4 284:18
**pull** 12:16 64:8 78:20 82:24 83:1 93:1 105:1 119:4 162:12 163:21 189:3,21 192:16 207:15 208:4,25 234:18 234:25 250:4 256:20 275:19
**pulling** 158:2 250:7 276:3
**pulls** 20:16
**punched** 63:18
**purchased** 203:1
**purported** 25:11,16
**purportedly** 30:9
**purpose** 18:25 91:14 197:15 241:8,9
**purposes** 30:11 77:3 95:5 141:23 174:15 185:6
**pursuant** 167:7 170:4 257:23
**pursuing** 173:8
**push** 274:9
**pushing** 93:14
**put** 21:11 22:17 22:23 33:4 49:23 57:2 70:10,10 71:22 76:19 82:25 84:18 100:12 101:24 103:25 104:11 110:4 114:17 117:24 127:19 132:6 145:6 162:2 163:23 190:16 224:5 225:11 283:10
**puts** 129:11
**putting** 130:25 146:13 157:17
**puzzle** 281:6

**q**

**qualify** 195:6

**quality** 6:5,5
**question** 17:10 18:2 25:20 32:22 36:18 52:24 58:21 59:6,16,18 60:2 60:15,18 65:1,5 70:14,23 78:16 82:12 91:1 97:9 98:1 108:2 110:16 132:23 144:21 145:25 146:1 149:4,6 149:16 150:21 151:10,11 152:25 153:4 156:18 171:10 171:16 172:3 181:10 196:2,22 197:25 198:9 201:13 202:10 204:12 205:8 208:3 211:8 213:14 214:23 217:3 218:10 220:22 222:22 223:2 233:18 240:18 242:7,15 248:14,16,19,24 249:13,20 252:2 252:9,19,23 253:12 254:7,9 254:24 259:23 260:15 270:17 273:2 276:17,19 278:5 279:3
**questioned** 8:4 78:3 202:10 260:5
**questioning** 42:5 61:6 73:15 117:20 195:21 195:24 196:8 226:15 251:1
**questions** 17:7 18:10 47:22 61:18 66:15 68:24 74:5 101:9 105:6 111:16 134:20 136:10 138:18 138:19 173:12 213:7 217:5 220:14,15,17,20 220:25 230:10 238:19,25 240:14 249:10 249:16 252:4,10 253:14,16 266:25 267:23 281:8,10,10,12
**quick** 59:19
**quickly** 69:20
**quit** 175:25
**quote** 94:11
**quoted** 94:11 178:23 180:9,12

**r**

**r** 131:21 287:3,3
**raise** 64:21 101:12 201:12
**raised** 15:19 16:1 117:16 281:13
**ramble** 76:4
**ran** 89:23
**range** 161:13
**rate** 129:14
**rather** 63:14 86:20 133:14 135:6 163:4 238:14 258:17
**raton** 250:10
**reach** 155:10,12 155:21 228:5
**reached** 26:25 27:4 32:3 131:12 228:19
**reaching** 155:7
**read** 4:9 9:1,16 9:22 15:2 23:23 24:7 25:10,10 25:17 43:23 44:17 62:11,12 62:12 64:6,17 64:18 79:20 84:8,9,21 85:1 85:14 87:18 107:2 118:17 163:6 164:9 165:25,25 166:14,19 167:5 167:25 170:1 190:11 191:6 193:10,14,17,19 193:21 199:23 200:6,19,20 208:16 209:25 210:7,8 211:13 243:15,16 249:23,25 257:17 258:1 283:15 286:8 287:20
**reader** 208:17
**reading** 47:21 173:3 194:12 201:8 202:17 206:12,14,17 207:21 239:25 240:1
**reads** 167:11 174:12
**ready** 73:9 152:7 192:9 241:3
**real** 9:4,6,7,7,8 9:9,18,20,24 10:7,10,14,14 10:20 11:6 27:2 31:10,22 32:10 53:18,18 59:19 69:2 102:25 115:8 190:15

191:7,9 204:24 214:14 215:4,12 216:18 266:2
**realities** 270:22
**realization** 200:9
**realize** 23:7 30:21
**realized** 151:15
**really** 10:17 56:10 70:7,16 72:20 77:15 97:17 98:1 117:19 177:1 195:2 196:15 200:20 202:24 204:20 230:25 233:21 242:7 267:22
**realm** 133:15
**reason** 19:15 40:13 53:6 62:17 70:17 72:12 80:12,16 94:9,13,18 133:10 154:18 219:22 228:25 233:14 247:17 259:23 280:21 286:10 287:6,9 287:12,15,18
**reasonable** 286:17
**reasoning** 276:15
**reasons** 32:14 41:22 57:15 158:7 263:3 265:4
**rebuild** 55:18
**recall** 37:18 83:12,25 186:18 221:5,6 228:3
**recap** 135:19
**receipt** 22:16 224:9 286:17
**receiv** 14:24
**receivable** 88:25 89:5 268:8
**receivables** 41:1 41:2,13 101:19 103:7,10
**receive** 47:12 179:5 222:16
**received** 13:18 14:25 17:1 38:1 38:6,19 82:1,1,2 88:13 126:15 129:21 218:17 222:2,9 223:17 228:10,14 233:5 281:16
**receives** 92:5
**receiving** 247:19
**recent** 11:18 90:15 94:6
185:11
**recently** 129:20 220:15
**recess** 66:10 135:15 178:12 213:2 267:11
**recharacteriza...** 193:13,24 194:6 196:10
**recharacterizing** 194:1
**reclassified** 198:4
**recognition** 37:1 71:13
**recognize** 94:7
**recognized** 10:8 71:10 200:17
**recollection** 104:17 180:11 262:13
**reconcile** 175:6
**reconciled** 161:10
**reconciliation** 84:17 85:6,7 100:22 243:24 258:22 259:25 261:21
**reconciling** 241:24
**reconfirmed** 88:3
**reconstituted** 132:9
**record** 6:1,10 7:4 15:2 16:16 16:22 23:24 52:24 61:23,24 61:24 64:22 66:8,12 85:13 88:1 99:15 110:21 114:5 117:25 118:17 121:12,15 135:13,17 163:22 178:10 178:14 193:19 200:7 209:1 212:25 213:4 228:12 232:22 254:3 262:16 267:9,13,18 281:21,23 282:23 283:18 285:9
**recorded** 6:8,11 203:17,23 204:15
**recording** 6:5,9
**records** 47:7 81:12,16,16 82:16,17 84:17 100:13,21 103:12 104:19 121:25 122:6 129:11 143:21

161:10 192:8 205:16 206:23 212:2 216:14 241:22 269:8 276:13
**recover** 137:3
**recovery** 101:4
**recredited** 133:14
**recurring** 133:4
**recycle** 132:25
**red** 96:25 97:10 97:23 237:11 238:10 242:11
**redepose** 253:10
**reduce** 32:11 55:24 157:23 158:13,16,19
**reduction** 98:15 238:23 241:19
**refer** 66:21 261:12
**reference** 27:7 67:1 191:9 192:3,5 194:9 220:1 221:20 235:21 236:1,3 236:22,23 262:3 265:5 270:11 276:10
**referenced** 86:5 86:11 236:25 258:24 280:7,15 286:6
**references** 190:18 197:11
**referencing** 232:21,22 280:17
**referred** 200:24
**referring** 41:18 43:6,9 66:22 84:22 165:13 236:16
**refers** 98:3
**reflect** 52:24 269:23 270:22
**reflected** 243:23
**reflecting** 24:5
**reflects** 52:25 238:14
**refresh** 18:18
**refuse** 58:15
**refused** 58:11 58:14
**refusing** 36:21 61:13
**refute** 49:24
**regard** 84:25 286:19
**regarding** 149:10 249:15 252:24
**regardless** 158:14 263:2
**regards** 154:13 219:10
**regional** 10:2
**register** 89:13 144:7
**registered** 207:7
**regular** 68:14 138:15 215:15
**reimbursement** 175:7 271:23
**reincarnation** 52:3
**reinstatement** 53:16
**reinvestigate** 202:11
**reject** 114:18
**rejected** 114:12
**related** 4:24 6:23 21:19 23:25 24:13,22 25:14 42:3 75:4 97:13,16 98:2 98:14 114:21 131:10 150:21 163:21 164:6 165:16 169:7 190:20 200:8 215:2 218:18 238:20 239:15 239:20 240:9 241:13,19,23 242:4,5 243:2,3 243:3,14 244:1 251:2 252:5 263:16 273:7
274:3
**relates** 271:8
**relating** 25:22
**relation** 18:4 21:22 24:15 28:20 67:19 223:7 261:14 276:13
**relationship** 142:18
**relationships** 126:24
**relative** 285:11 285:13
**relatively** 127:12 130:4
**release** 63:17
**releases** 71:16
**relevant** 247:11 247:14,18
**reliance** 169:25
**relied** 112:16 230:13 258:13 259:3 260:1
**relief** 4:17 83:11
**rely** 259:16 274:1
**remaining** 16:23 103:21 136:1 155:9,9,9 178:1
**remake** 270:8
**remem** 185:24

**remember** 40:6 69:17 75:14 92:22 94:19 95:14,16 113:3 131:24 136:16 136:17,18,24,24 140:8 143:12 185:25 216:3,5 219:17,18,18 220:23 228:16 241:23 249:21 257:5
**remembered** 157:11,12
**remind** 170:16
**remotely** 7:3 255:9
**removed** 169:9
**ren** 131:25
**renco** 132:1,2 133:7,20
**rendered** 34:25 103:24
**renegotiate** 28:9
**renewal** 34:2
**renewals** 34:2
**reorganization** 55:4
**repaid** 132:25
**repayment** 132:19
**repeat** 149:15 211:8 254:22 259:13
**repeated** 58:12
**rephrase** 276:19
**report** 5:8 91:6 91:9,22,25 92:17 162:7 207:17 208:7 210:11 211:10 212:1,12 231:15 231:18 250:16 285:6
**reporter** 4:7 6:20 7:24 192:20 245:22 249:22,25 259:13 281:20 281:24 282:2,17 283:10 285:1
**reporting** 91:3
**reports** 231:17
**repository** 122:5
**represent** 6:19 7:7,19 13:3 68:19 219:5,20 228:9 237:11
**representations** 262:15
**representative** 160:21
**representatives** 46:5
**represented** 110:21 222:4 224:14
**request** 15:19 16:2,6,6,7,12 20:14 21:6,10 21:11,17 25:9 91:11 92:18 110:16 135:20 172:10,23 218:4 218:12,17 240:5
**requested** 21:13 26:9 82:7,9,12 87:13 111:25 171:14 172:7 218:5 223:19 249:25 285:8
**requesting** 102:17,18 111:5 128:18
**requests** 4:14 23:17,22 107:6 114:13
**require** 15:11 123:4 213:24
**required** 30:14 30:16 152:19 166:24 211:5
**requiring** 63:10 64:14
**res** 160:24
**research** 24:18 43:4 260:4
**reservation** 281:16
**reserve** 84:25 102:12 218:15 218:19
**reserving** 281:12
**resolution** 43:23 76:9,12,15
**resolutions** 77:6
**resolve** 54:7
**resourceful** 280:19,22
**resources** 175:1
**respect** 25:20 38:14 63:11 106:22 115:6 187:1 191:17
**respective** 86:3
**respectively** 16:12
**respond** 139:8 252:25
**responding** 251:3
**response** 23:8 141:4 188:23 189:13 218:9,17
**responsibilities** 63:10 64:15
**responsibility** 127:24 196:23 197:5 198:13 216:14 234:4 264:25
**responsive** 21:10 25:22

**rest** 41:12 177:1 177:2 269:21
**restate** 249:1
**restated** 257:24
**restatements** 24:6 88:6
**restating** 110:19
**restricted** 124:17
**restructure** 29:14 55:20,21
**restructuring** 9:2,9 10:15 11:11 27:2 28:10,25 29:13 29:16 35:7 37:12,14 38:5 53:3,7 55:18 132:9
**restructurings** 11:1,6 29:23
**result** 65:12 200:6,7
**retain** 33:3
**retained** 31:14 36:13 37:13 55:16 283:21
**retainer** 37:8,9 37:17,18 38:1,7 224:25 225:5 241:17
**retainers** 222:12 223:20 224:6
**retention** 222:7 241:5
**retentions** 37:4
**retract** 81:22
**return** 5:7 133:24 199:12 201:3,19,19 202:13 204:13 234:12
**returned** 216:8 286:16
**returns** 62:9 67:2 205:17
**reunion** 225:24
**rev** 237:16 238:11
**revealed** 42:10
**revenue** 33:10 41:7 55:17 133:4
**reverse** 237:17 238:12
**review** 4:18 18:8 42:10 94:10 95:5 99:11,14 215:17 228:12 235:4 285:7 286:7
**reviewed** 13:19 13:20 18:6,13 41:17 213:9
**reviewing** 257:5
**rfp** 32:25 33:2 55:15 135:20 150:8,19
**rfps** 150:19
**right** 8:13,15,19 10:4,8,15,17,23 11:16 12:11,11 12:12,23 16:4,9 16:15,25 17:7 18:6 20:3,21,23 21:9 22:1,1,3,8 22:25 23:22 25:20 26:1,11 26:11,20,22,23 26:24 27:16,20 28:17 29:9,17 29:24 30:12 31:2 33:17 36:20 37:20 38:24 39:1,4,6 43:11,11,19 44:23,25 47:3 47:19,23 48:1,9 49:6,12 50:5 52:17 53:22 55:9,16,20 57:12 60:4,10 61:1,22,23 62:1 62:23 64:12,12 64:19,19 65:9 65:17,25 66:5,7 66:14 67:15,21 68:17 70:1,20 72:3 73:3 74:8 76:20 78:19 79:12 81:18 82:13,18,22 84:3,13,20,22 85:2,22 86:18 90:10 91:1 92:16,20,25 93:10,23 95:21 95:23 96:8,14 96:23,25 97:10 97:18 101:3 103:5 105:12,20 106:3,5 107:1,6 108:11,13,14 109:4,13 110:19 112:10 116:24 117:1 119:23 120:8,8 121:24 122:7,23 123:8 123:18 125:4 129:3 132:2 134:4,17 135:9 136:17 137:11 137:22 139:25 140:5 141:24 144:18 145:8 146:24 151:7,8 153:6 157:7,11 157:13 158:11 158:13,18 159:1 159:9 161:14,16 162:8 165:19 168:2,7 169:4 170:4,14 171:8 171:10 175:17 176:7,9,17,24

177:5 178:5,8 178:18,20 179:2 179:25 181:5 182:22 186:16 186:24 187:12 188:22 191:1 192:22,25 193:3 193:24 194:6,21 196:3 198:20 199:13,16 200:22 203:14 204:5,5 205:5 205:13 207:1,10 210:4 211:13 212:5 218:14 219:16 221:19 222:14,20 223:18 225:1,8 225:13,18 226:8 226:20,25 227:11,20,21 228:1,20 231:10 231:13 232:20 233:15 234:23 235:5,8 236:5 239:13 240:4 243:2,14,15,16 244:5 245:8,16 246:12 247:3 249:3 250:22 252:15 256:21 258:10 260:19 262:1 263:7 264:10 265:17 265:24 266:1,15 268:13 272:5 276:20 277:2,5 278:10,13,16

**rightfully** 118:4

**rights** 58:7 84:25 111:1 116:1 169:23

**ring** 48:3

**risk** 132:7 222:17,18,19,20 222:23 223:1,6 223:8 224:10,15 278:15

**road** 53:21 62:21

**roads** 278:25 279:4

**role** 50:9,9 191:13,14,17 193:2

**roll** 168:2

**room** 35:21

**rose** 2:9

**roughly** 25:2 99:20 134:6

**round** 168:23

**rubenstein** 47:4 47:5,9 227:21 228:13 280:14

**rubenstein's** 228:10

**rude** 134:11

**rule** 253:17 286:24,25

**rules** 286:18

**ruling** 253:20 253:25

**run** 52:8 111:13 112:5 114:7 133:9 141:18,18 187:19

**running** 10:25 38:4 69:5

**runs** 45:4,9

**runway** 133:8

**s**

**s** 7:10 287:3

**sad** 56:23

**sake** 16:16 46:11

**sakes** 144:4

**salazar** 2:2 4:4 7:6,7 8:8,10,11 12:12,18 13:4 13:10,13,16 14:20,23 15:5,7 15:13,21,24 16:4,9,15,20 20:12,15,22 21:4 22:9,12 23:16,18 26:12 26:14 42:2,8 58:21,23 59:5 59:14,18 60:10 60:13,17 62:3 62:11 63:11 64:5,8,16 65:2,3 65:25 66:7,13 78:19 79:4 82:19,21 83:1,8 83:16,21 88:19 88:21 93:1,3,23 94:4 96:23 97:2 97:20,22 99:6,9 104:25 105:17 106:1,6,16,18 108:24 109:1 110:12 113:9 116:3 119:4,12 119:18,22 122:7 122:9 134:3,9 134:10,15 135:1 135:5,8,12,18 136:8 148:20 149:4,5,12,15 149:17,24 150:20 153:3 155:6 162:12,15 162:20,23,25 163:12,14,20 164:5 165:6,20 165:22 166:20 166:22 167:13 167:15 168:10 168:12 169:17 169:20 170:8,11 178:5,15,16 180:16 187:11 187:21 188:1,5

189:3,7,21,25 190:5,7 191:11 192:16,21 195:12,19 197:1 198:25 199:10 199:18,22 201:9 202:5 203:20 204:21 205:7 206:10,21 207:9 207:14,20 208:24 209:2,9 209:11,20,22 210:3,5,10,13 210:21,23 211:4 211:7,9,17 212:4,8,10,19 212:24 213:5 214:17,21 215:16 217:8,11 217:24 218:1,14 218:24 228:15 234:19,23 235:20 236:2 239:3 242:21 256:22 257:1 258:3 271:18 281:11,22,25 282:6,9,13,15 282:21,25 283:6 283:9,11,14
**sarachek** 155:15
**sarah** 129:13
**sat** 62:19
**satisfaction** 88:10,11
**satisfactory** 39:10
**satisfied** 88:12 88:13,14 233:4
**saturday** 69:15
**save** 56:9 147:18
**saving** 101:23
**saw** 10:9 82:22 215:24 216:1,7 234:7 235:18,21 235:25
**saying** 9:10 18:11 23:14 31:21 70:7 80:24 85:11 93:12 94:14 99:13 100:6 101:14 102:25 104:9,17 108:1 112:21 115:8 116:9 117:1 120:24 124:13 125:2 126:7 133:11 141:2,7 143:10 144:9,16 156:2 160:16,22 171:14 174:16 176:12 180:9 185:6,15 190:14 194:5,25 196:9 196:15 197:7,9 202:12 206:7,11 206:16 213:13 215:14 219:23 229:18 236:7 237:5 242:20,25 248:22 260:6 266:9 270:3,20 271:24,25 273:19,23 274:18,25 275:25 277:11 277:11 278:9
**says** 15:15 26:20 45:8 62:7,7 64:13 65:8 79:21,25 80:19 84:23 85:5 94:12 95:4,4 97:13,19,23 98:1,13,16 99:10 107:17,19 107:22 108:1,9 118:18,20 164:15,17,25 165:12,18 166:7 166:15,23,24 167:16,19,20 170:6 188:25 191:5,7,8 199:11 208:12 208:15 235:6 237:13 238:11 239:25 243:14 243:25 251:7 258:4 265:16,20 265:24,25 273:17,22,25 277:8
**sazant** 2:9
**scale** 152:21
**schedule** 24:3 93:2 135:25 214:10,13 263:3
**scheduled** 20:5 214:12 249:12
**schedules** 19:1 19:19 22:22 23:1 24:1 47:17 100:8 220:16 241:1
**scheme** 61:11 61:19 62:2
**scholastic** 115:3
**school** 11:16
**schotz** 2:3 7:7
**scope** 25:15 27:22 100:7 138:7 226:2 246:17 249:7 263:15
**scott** 17:24 50:6 170:16,16 192:22 220:8 224:18,22 245:2 245:7
**screen** 6:8 256:21

**scroll** 20:22 22:9,10 64:10 97:20 99:6 119:16 190:5 199:20,20 209:9 238:17 250:15 251:8
**scrolling** 237:8 250:19
**scrutinized** 78:2
**se** 9:11 35:15 177:8
**seal** 284:9
**search** 150:24 153:13
**second** 32:1 39:7 40:16 41:19 54:18 76:3 83:2 87:13 92:25 96:25 124:22 175:15 197:25 200:3 271:4
**secrecy** 177:12
**secretary** 208:8
**section** 42:6 66:15 94:11 105:6 166:5,7 166:21,23 168:13,15 190:10 200:8
**secure** 68:25 77:23 87:11
**secured** 25:11 25:22 77:16 79:17 80:16 106:23 107:7 116:2 195:10 198:3 233:15 262:10
**securing** 106:25
**security** 279:12 279:13
**see** 13:2,11 20:16 27:24 28:6 36:12 67:20 83:19 88:9 92:13 95:25 97:3,5 98:16,18 99:7 103:8 111:3 114:1 115:19 116:20 117:1 118:13 119:16 126:15 141:3 144:13 156:9 157:6 170:9 171:6,16,16 187:15 189:1 190:20 194:16 194:17,18 195:4 198:20 199:14 199:14,15,16,17 200:21 201:2,7 203:6 208:8 212:21 235:11 235:13,20 236:2 236:21,22,23,25 237:5,9 238:4 242:2,19 243:5 250:20 251:12 261:20 271:3 273:10
**seeing** 41:3 94:19 237:9 260:1,2 278:8
**seek** 36:14,22 70:1,1 151:2,2 182:19 271:22
**seeking** 69:19 75:1 152:21 157:24 171:25 191:18
**seem** 109:5 152:18 174:5
**seemed** 110:18 143:11 150:24
**seemingly** 57:11 73:20 148:18 202:2 280:20
**seems** 97:14 98:14 241:16 266:12 268:14 278:25 279:4
**seen** 6:7 18:19 21:7 49:9,24 80:13 84:15 111:9 114:4 117:19 119:19 119:19,20 164:8 173:6 178:20 192:13,13,15 193:15,16 195:22,23 196:2 198:19 205:6 216:21 234:14 235:17 236:6,19 242:2 259:22 264:12 274:21 274:23
**seize** 35:20
**seizure** 35:12
**selected** 54:20 54:21
**self** 172:12 174:7
**selling** 58:17
**send** 24:21 63:16 87:15 90:7 91:10 104:19 261:23
**sending** 91:5 158:7 283:11
**senior** 63:12 188:11
**sense** 8:17 28:7 121:21 179:23 224:19,23 232:11 238:16 276:17
**sent** 21:12,14 23:13,13 24:20 24:23 26:9 71:18 75:8,8,12 75:15 87:16,17

87:19,25 91:11 91:25 92:18 93:6 94:25 103:18,21 104:1 198:19,20 212:3 224:7,8 235:22 236:2,7 240:8 259:2 261:16,23
**sentence** 79:13 84:23 257:17 258:5
**sentenced** 63:5
**sentences** 59:8
**sentencing** 63:8 64:3,10 65:6
**separated** 22:5
**separately** 141:3 183:13
**september** 26:17,19 221:21
**series** 30:6
**seriously** 65:13 265:1
**served** 21:6 22:13 74:10,11
**serves** 50:15
**service** 58:2 123:4,5 124:1 126:23 145:7,22 145:23 146:19 167:17 168:5 211:24 255:8
**serviced** 120:4
**services** 4:24 7:21 9:4,8,12 10:7,15 27:20 34:25 35:23,25 36:10 45:12,13 48:14,19,22,23 88:24 90:2 103:24 121:9,10 121:11,18,20 124:2,7,12,24 125:1 145:2 146:25 160:13 163:21 164:6 165:24 166:7,17 166:24 167:23 168:8 219:6 221:18 223:6,8 227:25
**serving** 64:4 65:7 139:12 193:2
**set** 89:6,7,15,19 89:21 267:25
**sets** 136:23
**settle** 160:5
**settled** 160:7
**settlement** 27:11 28:1,10 30:17 33:8 42:15 53:17 54:6,8 72:1 150:1 156:8 160:23 202:22 219:11,15 221:18 227:25 228:6 241:10
**several** 159:6 173:21,23 190:25
**shade** 184:15
**shape** 100:15 132:6 184:2
**shapiro** 221:14
**share** 133:21 143:22 256:21
**shattered** 125:21
**shattering** 221:3
**she'll** 119:9
**sheet** 4:8 70:12 71:18,21 286:11 286:13
**sheets** 71:16
**sheriff's** 56:13 125:19 256:3
**ship** 77:10
**shock** 73:5
**sholey** 17:21,22 17:24 28:2 51:18 52:4 140:7,24 141:4 141:7,9 220:4
**short** 14:2 66:10 71:19 135:15 146:17 178:12 213:2 267:11
**shorten** 21:5 146:7 164:17
**shortly** 267:5
**shout** 187:23
**show** 12:24 13:1 13:3 20:25 69:21 78:25 83:3,22 93:23 104:8 105:12 106:2 119:7 146:14 162:16 164:1 178:21 187:13 188:6 189:9 194:20 195:1,3,13,13 195:13 197:9 199:4 202:12,16 208:5 209:4 216:25 217:12 250:12
**showed** 127:5 127:13 187:3,6 194:13 196:17 211:10 215:14 217:4,16 218:6
**showing** 80:14 124:22 194:24 196:18 203:18 204:6
**shown** 87:7 174:3,3 198:10 233:1 234:2 265:1,2

**shows** 100:23 254:18 280:12
**shrink** 55:17
**sic** 102:18 114:25 165:2 191:19 208:6
**side** 22:24 70:19 81:10 103:10 115:25 117:9 242:23
**sidebar** 216:20
**sides** 68:8
**sideways** 20:17
**siding** 117:9
**sigma** 97:24 98:2 222:17,18 222:19,20,23 223:1,8 224:10 224:15 239:11 240:12 241:13 241:16,19 243:2 261:7,20,22 275:18 278:15 278:21
**sigma's** 261:16
**sign** 4:9 138:13 283:15 286:12
**signatory** 274:3
**signature** 106:5 106:9 284:17 285:22
**signatures** 87:17 88:7 170:10 233:6
**signed** 76:9 87:6 108:8 196:18 197:19 207:7 209:13,14 257:6 259:22 286:21
**significantly** 157:23
**signing** 170:13 170:13 209:12
**similar** 15:19 16:6,7,11 175:3
**similarly** 167:1
**simple** 127:13 202:2 266:9
**simplicity** 202:8
**sin** 3:20 7:9 12:13,16 13:14 20:12,22 22:10 23:16 26:12 64:8,9,13 66:2 78:20,22 82:19 83:1,16 88:19 93:1 96:23 97:20 99:6 104:25 106:1,16 108:24 119:4,8 122:7 162:12,14 162:15,23 163:20,24 165:21 166:20 167:13 168:10 169:17 170:8 187:21,24,25 189:3,21 190:5 192:16 195:12 195:15,16 198:25 199:6,18 199:21 207:14 207:15 208:24 209:1,3,9,20 217:9,24 234:20 234:22 235:1 256:25
**single** 94:17 99:1 238:5 247:18 281:16
**sir** 8:14,22,24 9:3 13:12 33:23 38:8 61:21 84:2 97:12 163:7 179:3 191:3 208:5 231:11,14 234:13 282:15 282:22
**sit** 90:18 92:2 98:21 115:1 117:24 181:5 216:10 264:22
**sits** 262:6
**sitting** 40:23 115:2 144:3 151:23 179:21 259:18
**situated** 137:19 167:1
**situation** 27:16 28:4,7 101:13 110:5 111:21 127:20 221:23
**situations** 55:10 125:24
**six** 91:18 268:23 268:25 283:20
**sizable** 125:5 179:21
**size** 30:16 33:4
**skip** 8:15
**skipped** 136:3 173:21 174:3
**skittish** 133:5
**slaughtered** 141:21
**slight** 131:14
**sliver** 13:2
**slotted** 32:18
**slowly** 131:15
**smack** 64:13 107:5
**smaller** 130:4
**smart** 19:22
**smoother** 258:3
**social** 27:6
**software** 124:11
**sole** 8:23 274:1
**solely** 171:7
**solidify** 33:9
**solidly** 66:14
**solimani** 2:3 7:11
**solutions** 6:20 6:21 283:21 286:23

**solve** 146:17
**solvency** 24:2
**somebody** 17:5 17:5 18:1 27:8 32:22 114:20 126:1 128:12 129:16 154:5 156:10 176:3 205:19,22 264:8 279:14 280:9
**somebody's** 279:18
**somewhat** 110:17
**soon** 39:21 154:15 155:2
**sooner** 134:6 149:1,20
**soonest** 134:7
**sorry** 19:7 20:19 20:20 22:10 30:20 43:19 48:16 54:20 59:3,5 70:2 72:13,24,25 76:12 80:11 81:1,21 85:2 89:16,17,18 98:6 100:18 103:16,23 104:6 106:20 107:4 120:5,24 121:13 122:15 141:12 144:19,23 157:2 162:14 166:2,5 181:25 182:13 185:9 189:14 190:6 193:19 207:21 208:7 209:20 210:21 211:7 214:6 241:15 242:11 247:5 254:24 259:15 280:6 282:6
**sort** 77:5 184:24 237:24 256:2
**sorts** 235:16
**sought** 34:7 123:11,12
**sound** 137:18,21
**sounds** 37:20 39:4 50:23 90:19 101:14 143:1 147:10 148:15 159:23 176:22 196:15 204:22 232:3 267:7 270:18,19
**source** 91:23
**south** 3:14 250:10
**southeast** 286:14
**southern** 219:15 225:12,21
**southwest** 2:4
**space** 155:14
**speak** 17:13,14 17:21 19:12 45:7 46:7,7 61:14 75:3 99:3 104:1 123:23 138:22 153:16 153:17 155:13 155:22 157:7 180:6 193:5 216:10 219:3 220:10,11,19 221:8,11,14 260:24 261:5,8 261:10 263:1 275:9 277:19
**speaking** 18:4 95:10 144:23 159:14 175:23 219:19 236:6 250:18 260:15 277:19
**speaks** 61:24,25
**specific** 10:24 18:2,9 39:9,18 42:13 43:10 44:3,4 59:23 99:1 109:21 111:4 112:18 121:12 122:17 130:6 140:7 143:24 145:6 154:2,4 181:6 183:1,3 186:4 191:5 194:10 220:20,21 221:7 271:11
**specifically** 9:7 13:25 17:14 18:16 27:22 36:2 43:7 46:15 94:8,19 111:14 112:18 113:3,13 130:21 133:9 136:24 140:13 140:15 144:16 144:24 150:2 182:6 185:16 217:2 220:17,23 244:2 279:15
**specificity** 17:11 39:10 198:5 216:2 239:15
**speculating** 248:18
**spelling** 131:16
**spend** 155:1
**spiral** 57:2
**split** 130:8
**spoke** 17:13 52:3 67:1 131:20 153:23 181:10 219:10 219:23 220:4,6 260:17 261:2 267:16 277:13
**spoken** 47:10 62:3 67:3

125:16 197:18 219:9 220:15 221:9,12 222:23 223:11 229:22 229:24 230:7
**spot** 10:18 109:25
**spreadsheet** 21:12 22:2
**sprouse** 17:24 85:7 100:13 220:6 240:6 258:22 259:1
**square** 2:10
**st** 2:17 245:24
**stabilize** 240:5
**stable** 33:16
**staff** 17:5 21:18 23:4 36:1 129:9 133:17 147:7 155:17 188:11
**stage** 115:17
**stance** 115:22
**stand** 114:7 237:16
**standard** 36:4 36:19 37:14 73:24
**standing** 162:6 196:23 226:14
**standpoint** 216:25
**stands** 264:6
**start** 8:17,19 34:15 66:4,16 70:24 73:6 75:1 77:11 89:18 96:19 145:15 150:25 164:12 166:6 178:24,24 187:21 210:5 238:20 240:13
**started** 14:24 21:15 22:17 26:15 27:19 28:17 29:6 58:24 59:10 69:21 84:11 89:13 91:19 134:7 150:25 241:7 267:15
**starting** 96:2,7 96:20,22 99:19 186:12,17 206:22,22,24 216:1
**state** 6:25 7:3 10:3 56:8,9 163:2 178:4 208:9,9 253:5 273:6 284:2,18 285:2
**stated** 57:19 112:25 187:13 204:15 212:15 232:22 287:21
**statement** 11:20 42:12 81:7,19 82:2 101:2 105:2 118:17 233:2 245:20 264:6 266:9 279:23
**statements** 62:10,10 87:24 95:11 190:17 257:10 260:8
**states** 1:2 6:15 44:3,4 79:16 163:3 165:14 169:21 170:3 208:16 210:18 247:25
**stating** 81:8 100:19 254:2
**status** 25:12 120:11
**statute** 286:18
**statutory** 1:14 2:1 7:8 13:8 21:2 79:2 83:6 94:2 105:15 119:10 136:6 162:18 164:3 188:3 189:5,23 192:18 199:8 207:18 209:7
**stay** 32:25 43:1 123:5 176:16,17 176:17 181:19
**stayed** 132:11 146:22
**stein** 62:13
**stenographic** 285:9
**stenographica...** 285:6
**step** 113:5,8 122:20,20 247:13,13
**steps** 13:17 21:9 85:23 88:15,15 88:16,17 90:4 91:2
**stinson** 3:3 7:18
**stinson.com** 3:5 3:5
**stipulate** 192:10 196:12 205:14 262:9
**stipulated** 201:14
**stipulation** 88:23 90:5,5 109:8
**stipulations** 110:7
**stop** 28:12 35:12 40:12,21 56:6 57:11,16,21 64:12 154:24 186:5 218:21 240:17 244:19

**story** 21:22 194:24
**straight** 142:8 143:7
**strain** 41:15 42:19
**strange** 58:17
**strategic** 155:11 155:13 156:9
**streams** 117:23 215:15
**street** 3:3
**strength** 27:2
**strict** 30:9
**strike** 62:25 203:8
**strongest** 56:8
**strongly** 134:4
**structure** 155:10
**struggling** 150:3
**stub** 127:5
**stuck** 42:13
**studies** 11:24
**study** 12:5
**stuff** 17:8 18:13 22:7 103:19 104:13 112:11 162:9 194:24 216:22 241:11 246:24 262:14
**stupid** 197:15
**stylistic** 108:3
**subcontractors** 124:7
**subject** 16:10 95:4,8 100:14 110:11,22,22 111:7 112:23 118:24 167:3 193:13 194:6,8 217:16,18
**subjective** 26:23
**subjectively** 109:18
**submitted** 62:5 106:8 108:8 226:10
**subordinating** 194:2
**subpoena** 103:15
**subsection** 169:18
**subsequent** 39:20 86:14
**subsequently** 228:15
**subsidiaries** 39:13 199:13
**successful** 29:13
**suddenly** 40:19
**sued** 273:6
**sufficient** 30:15
**suggested** 286:16
**suit** 116:16
**suite** 2:4,17 3:3 3:14 45:21 164:23 208:21 251:11 254:13 255:4,21
**suited** 71:13
**suits** 9:17
**summary** 4:20 105:3,20 106:8 106:22 135:25
**summer** 26:16 26:16,17,20 29:7 52:15 221:17,20
**summer's** 26:23
**sunday** 69:24 132:16 184:22
**sunny** 10:3
**supervised** 63:17
**supervisory** 64:4 65:6
**supplement** 24:6
**support** 4:16 33:21 36:10 83:10 226:10 257:4
**suppose** 60:21
**supposed** 36:16 38:13 114:23 229:10 272:1,1
**sure** 14:5,19 19:18 22:5 23:13 28:15 29:2,4 39:21 43:13,15 44:19 45:1 61:4,7 73:25 76:4 78:23 80:3,4,24 82:5,9 90:17 100:8,24 101:6 101:18 102:9 104:6,10,19,22 108:16 110:14 111:22 112:5 113:14 114:6 128:6 130:7 131:17 134:10 134:24 137:7 141:16 143:9 144:2 147:9 148:9 150:22 156:21,24 157:16 158:18 162:3,11 172:21 173:13,18 175:14 178:18 185:12,15 188:25 190:12 190:16 213:8 219:24 222:8 223:14,16 226:13 228:13 233:23 234:1 237:17 239:5,6

247:16 258:20 259:2 260:8 264:23 267:17 268:9 269:9 271:10
**surmountable** 154:12
**surplus** 101:21
**survive** 150:18
**suspicion** 201:12
**suspicious** 143:11
**sustain** 41:4 59:1 60:22
**swear** 7:25
**sweep** 90:6
**sweeping** 91:4
**sweet** 10:18
**switch** 43:11 131:9
**switching** 145:13
**sword** 139:21
**sworn** 8:4 284:8
**system** 41:8,9 41:16 42:10 43:5,10 62:18 74:4 89:21 93:12 127:19 130:13 177:13
**systems** 30:21 51:4,8,12,14 121:13

**t**

**t** 7:21 131:21 287:3,3
**table** 73:14
**tack** 135:3
**tackle** 14:3
**tail** 60:15 144:5 215:24
**take** 6:9 20:12 26:12 44:4 56:5 65:12 66:3 77:20,21 82:19 85:24 88:15,19 104:22 105:1,8 108:24 111:11 115:21 117:6 122:8 130:6 134:5,21 136:5 161:24 163:20 178:6 179:9 198:24 199:1,23 207:14 208:24 212:19,20 217:24 237:19 252:15 260:3 265:8 266:24 269:1
**taken** 1:14,17 1:23 6:12 66:10 127:23 128:6 135:15 178:12 183:9 198:5 213:2 267:11
**takes** 207:13 277:2
**talk** 85:23 126:18 138:6 148:21 181:25 186:16 220:13 225:20 246:19 246:19 249:6 252:13 260:10
**talked** 15:3 16:22 29:15 49:10 106:11 112:6 139:23 140:2 148:23 177:15 186:6,18 198:18 231:5 245:8 248:9 278:20,22
**talking** 58:3 77:11,20 107:8 107:14 108:12 141:7 152:2 153:7 159:6 160:18 173:13 175:13 176:23 177:11 181:15 185:13 198:3 225:18 236:5 269:1
**tamiami** 209:24 210:15 212:17 255:13
**tampa** 3:14
**tandem** 148:6
**target** 181:19
**targeting** 120:12
**task** 127:18
**taub** 17:18,18 17:18
**tax** 5:7 53:25 62:9 67:2 199:12 201:2,18 201:19 202:13 204:13 205:17 234:12
**taxes** 122:14,21 131:5
**taxing** 23:3
**team** 19:10 20:1 74:25 85:24 94:16 96:2 115:16 270:8
**technical** 19:3 121:10,11 269:10,12
**technicality** 30:11 71:4 123:24
**technically** 121:19
**teed** 152:4 155:3
**teeing** 151:11
**teetering** 56:3
**teeth** 158:2
**tehum** 7:21,22 27:12 30:2

219:6,7 221:18 227:25
**teleconference** 1:19 17:23
**tell** 12:25 13:17 18:7 21:9,21 27:22 47:4 67:2 68:18 70:15 82:5 86:20,20 110:6 114:3,4 131:14 134:16 136:12 142:2 152:12 154:18 158:3,11 169:4 169:5 181:21 195:2,4 197:24 198:1 204:18 229:3 261:25 263:12,20 279:9
**telling** 64:2 139:3 194:7 196:24 198:17 204:9 206:16
**ten** 22:13 23:8 66:3,4 74:20,20 84:10 129:13 178:6 182:8 212:20 266:24 267:3
**tennessee** 45:22 164:24 208:22 211:13 251:12 254:13 255:5,22
**tense** 54:3
**term** 45:5,5 70:12 71:16,18 71:21 78:6 108:15 120:23 121:1 188:21
**terminate** 69:19 123:12 160:13 172:21
**terminated** 40:4 54:15,17 120:13 120:21 145:21 152:14
**termination** 58:11,13 69:4 120:15,18,19 121:5,6 123:15 132:22
**terminations** 56:25 57:17 58:14,19,24 60:19 138:23 154:10
**terminology** 57:12
**terms** 15:17 29:9 36:7 68:6 109:21 112:19 113:13 120:16 167:4 230:6
**territory** 133:3
**testified** 8:4 52:14 53:6 146:3 148:22 230:15 231:25 233:4 251:23
**testify** 13:24,25 15:1 16:22 52:22 62:22 142:3
**testifying** 69:16 275:20 276:4,7
**testimony** 16:13 38:6 51:24 123:10 150:23 232:24 274:15 275:19,23 283:19 286:8,17
**texas** 79:18 219:16
**text** 118:7
**tggreen** 2:19
**thank** 7:6,12 8:6 8:8 12:11,17 13:15 20:11 24:22 64:12,19 65:2,24 66:6,7 78:24 82:20 97:1 104:24 108:25 119:3 134:3 135:11 162:15 165:19 165:21 166:5 167:7,12 171:2 172:4 178:15 188:22 195:15 199:7 200:21 208:23 209:2,2 210:21 211:5 212:23,24 218:23,24 234:24 235:2 245:11 249:23 252:4 253:3 266:1 267:8,22 273:4 282:5,25
**thanks** 66:2 119:6 122:7 226:16
**them's** 75:5
**theoretical** 103:3
**theory** 44:10 52:7 55:9,11 114:16 126:2 202:21 271:25
**thereof** 24:6
**thereon** 169:25
**thereto** 24:6
**thing** 40:16 63:2 65:10 89:17 146:24 164:12 204:20 266:2,5 266:6 271:7 283:14
**thing's** 63:15
**things** 8:16 13:22 26:9 55:10 56:21 62:15 71:9,16 73:11 76:2 93:14 101:15

109:12,15 111:2 113:2,6 124:9 134:2,24 136:10 138:19 144:15 147:4 152:24 153:1 159:21 160:6 163:23 172:7,8,20 176:14 183:9 194:9 197:11 198:8,10 203:2 205:5 218:5 224:25 225:17 235:16 238:19 240:11,15 242:18 260:22 265:7 266:10 269:13,15 270:5 273:7 275:20 280:4
**think** 7:11 8:18 10:9,9 17:21,23 18:16 22:21 30:3,3 31:7 37:3 40:4,5 41:20,23 42:3,19 46:17 49:15 50:6 56:4 59:9,11 61:3 64:10 68:14 69:15 71:2,8 72:19 73:1 74:20 76:3 77:7 84:11 88:22 91:18 94:13 102:16 105:7 111:23 113:1 114:24 115:2 116:4,5 119:8 131:1 134:12 140:10,13,14,15 141:19 149:9 150:25 156:15 158:25 161:1 173:16 179:11 184:22 186:2,21 189:22 190:19 192:12 199:19 203:10 208:18 209:12,12 214:18 216:12 218:3,6 219:25 221:9 227:4,9 228:24 237:12 237:12,14,16 238:13,18 242:12 244:13 245:10,11 250:17 252:7 253:8 265:20 266:17,25 267:23 269:20 270:18 271:16 273:12 274:24 279:6 280:14 281:18
**thinking** 44:3 73:6 159:8 160:22 173:14 187:9
**thinks** 141:25
**third** 34:6 124:23 150:19 169:21,24 170:4 170:5 257:23
**thought** 52:5 53:5 70:8,13,16 70:21 72:8 78:9 89:16,17 102:11 151:12 155:13 156:2 158:18 185:13 198:2 232:10,11 252:24
**thoughts** 52:16 232:16
**thousand** 160:2
**thousands** 177:18
**threatened** 40:4
**three** 33:19,20 33:24 34:1,10 69:2 102:16,21 121:13 124:10 124:21 126:4 129:13 150:13 173:24 174:5 243:4,5 245:19
**threw** 153:8
**thrown** 78:5
**thursday** 71:2 74:17
**tide** 128:1
**tie** 269:7
**tied** 181:24,24
**till** 151:3 272:20
**time** 1:18 6:2 7:1 14:1 15:11 19:20 20:5,10 22:23 23:3,6 27:10,23 28:17 28:19,24 30:7,8 30:13 33:13 34:14,15,16,21 34:23,24 35:22 36:5,8 42:20 46:3 53:21 54:3 54:24 55:12 58:25 63:15,17 63:17,20,22,22 65:6,22 66:9,12 70:3,4 72:12 73:4,18 79:22 79:23 80:8,12 80:25 84:3 85:11,17,17 96:18 101:15 119:23 125:3,6 132:15 134:14 135:14,17 147:10,23,25 149:25 153:2 154:22 172:6,7 175:16,24 178:11,14 180:6 181:3 183:7

191:20 194:25 197:16,24 198:24 204:1 213:1,4,12 217:6 219:7,9 219:18 221:13 221:22 226:12 233:12 238:5,8 240:20 244:12 257:25,25 265:14 267:10 267:13 282:25 283:18
**timeline** 54:25 57:8 282:12
**timelines** 32:15
**timely** 16:17
**times** 2:10 8:15 27:6 54:11 63:19 108:9,10 108:17 109:3 122:10 123:8 164:8 193:22,23 219:11 265:21 266:21
**timing** 18:23,25 63:21 143:8
**title** 92:2 166:3 199:11
**titled** 94:10 164:6 165:24 241:19
**tn** 48:21,23 49:3 88:24 89:3 90:1 91:3 92:13,18 93:7,9
**tn's** 90:6
**today** 6:2 15:1 58:12 103:22 104:1 115:1 131:3 150:17 158:8 181:5 218:18,19 220:4 232:23,24 234:3 234:14 246:11 246:14 249:9 259:18,22 262:6 262:11 272:18 281:19
**today's** 13:18 245:24 251:3 283:19
**together** 14:1 18:13 19:18 21:11,13 23:3 70:10 93:14 104:11 126:20 129:11 130:25 181:24 219:8 261:21
**told** 52:6 67:13 67:24 123:3 138:24 148:11 169:2,4,6 223:10 246:21 280:1,2
**tomorrow** 116:22 161:1 162:4
**took** 13:17 21:9 125:8,22 126:1 169:8,8 183:7 183:24
**top** 99:7,7 120:4 127:10 178:7 200:22 250:20
**topic** 15:3,7,7 15:13,14,15,21 41:21 59:8,12 59:21,22 131:9 149:3,9,10 221:5 249:13 281:13
**topics** 13:14 14:10,11 15:5 15:10 16:4,14 16:23 17:2,3,15 41:25,25 43:12 59:11 64:23 134:19 218:18 226:2 246:17,18 249:8 251:2 263:15
**tort** 3:12
**total** 23:8 35:4 91:18 167:21 186:7 213:9 243:3 283:20
**totality** 150:3 176:1 178:4 224:5 263:24
**totally** 82:14 226:15
**tough** 43:8 109:25 155:16
**touro** 12:3
**towards** 26:17 41:24 98:23 130:22 169:18 222:4 243:22
**towsends** 21:18
**track** 86:18 105:10 126:14
**tracking** 128:14
**trail** 209:24 210:16 212:17 255:13
**transaction** 68:9 86:10 87:14,18,25 91:15 99:2 233:6
**transactions** 31:8,9,12,15,18 75:17 91:19 99:15 191:21 261:13
**transcript** 274:19 276:10 276:12 282:10 283:3 285:8,9 286:6,20
**transcripts** 61:14 62:15 275:1,19 276:3

**transfer** 243:18 246:19 252:5
**transition** 32:1 55:13 57:21 58:8,15 120:11 120:19 121:4 123:12 125:22 136:21 143:23 144:15 160:12 176:3 245:18,21
**transitionary** 144:4
**transitioned** 57:10 120:22 121:9 125:8 152:15 153:10 161:4,5,6,7 175:17 245:25 246:3,6,7,9
**transitioning** 57:10 120:25 141:23 148:12 268:1
**transitions** 56:25 132:21 154:10 269:24
**transmits** 121:14 129:12
**transmittals** 91:6
**transmitted** 91:10,20
**traveled** 46:22
**tremendous** 9:18 41:7
**trial** 276:10,11
**trick** 197:2
**tried** 52:23 63:18 76:23 78:16 123:19
**triggered** 212:13
**trinitee** 2:16 7:16 119:14 246:20
**true** 10:5 127:10 142:1 197:25 257:11 260:8 285:9 287:21
**trust** 7:22 27:25 30:2 32:3,14 47:12 55:22 204:25 205:2,4 205:9 219:7 228:10,15
**trustee** 7:22 110:24 204:25 219:6 271:18
**trusts** 27:11 42:15,23 202:22 221:18 228:6
**trusty** 234:17
**try** 22:3 27:24 28:8 35:12 50:1 51:20 52:12 55:24 67:13 111:12 115:15 118:8 147:9 154:23 160:9 173:8 184:1 194:25 196:16 202:3,22,24 203:6 240:4 273:12
**trying** 9:11 18:10 19:17 36:18 40:5 50:3 67:12 82:6,6 93:21 95:1 104:10 115:4 117:9 118:6 122:24 126:25 130:12 131:23 153:1 159:3,13 160:25 162:4 184:7 190:19 191:24 197:2,8 197:8 198:6 201:22 202:12 203:4 204:18 221:6 227:24 239:5,6 240:17 240:17 249:10 249:17 252:15 270:1 275:12,13 276:16
**tuesday** 71:3 132:16
**turn** 12:12 13:14 16:19 23:16 25:8,21 106:1 137:8 162:23 168:10 170:9 208:19 218:21
**turned** 20:17 25:25 84:11 89:16,17
**turnover** 54:21
**turns** 266:2,9
**twice** 20:5 128:12
**twizzlers** 186:3
**two** 16:14 21:18 23:17,21 25:8,9 25:21,22 26:5,8 26:10 32:8,8,10 32:24 33:3 34:2 34:2,3 54:22 57:5,6,9 59:8 61:11 69:19 73:11 75:13 90:12 100:24 102:16,21 107:21 108:9,10 108:17 109:3,13 113:13 116:24 124:20,21 126:4 128:8 131:11 133:19 136:22 136:23 140:7,9 140:12 143:10 150:18 161:7 173:23 174:5 190:17 210:25

210:25 212:6 218:6 220:14,25 228:6 243:4 250:14 282:12
**type** 33:5 73:22 122:11 132:9 213:23
**types** 11:2 75:16 75:18 143:5 205:5 215:11 269:15
**typical** 77:21 213:24
**typically** 11:5

**u**

**u** 7:21,23 131:21
**u.s.** 5:7 110:23 199:12 271:18
**ucc** 25:13
**uh** 14:8 15:24 19:11 45:18,20 72:18 79:15 83:24 88:2 97:25 98:9,12 107:9,9,12 114:11 118:16 118:21 123:13 137:25 142:13 143:16 157:19 158:23 159:16 161:23 164:14 164:20 175:12 175:12 176:13 179:13 185:19 193:4 208:14 209:15,17,17 210:1 215:18,21 222:10 225:23 234:11 238:24 271:9 276:9
**ultimately** 76:6 149:21 188:16 190:21 228:5
**umbrella** 43:7 44:10 174:13
**unable** 26:3 30:13 40:17,19
**unanswered** 272:17
**unaware** 145:1
**uncertainty** 148:13
**uncommon** 224:5
**under** 19:21 30:16 33:8 44:10 84:1 89:25 106:8 145:16,20 146:4 146:8 148:7 158:6 165:17,23 166:5,6 167:18 167:20,23 168:3 168:7 184:14 186:11 217:21 246:15 247:25 260:3 271:12 272:15 276:23 286:18 287:20
**undersigned** 284:6
**understand** 8:25 23:9 29:3 33:17 42:2 43:4 43:15 49:3,6 50:5 60:13 61:16 65:9,18 68:11 72:1,16 74:7 78:18 101:8 102:8 108:6 114:20 116:7 135:4 137:22 146:1,10 151:10 152:23 157:1 170:21 172:11,18 173:16 188:13 192:24 200:25 222:8 223:14 231:24 234:1 240:19 268:12 274:4 276:18,18 278:5 279:21
**understanding** 19:9 30:13 45:2 47:6,18 48:11 48:23 49:2 50:8 52:1,7 67:5,7,10 71:24 80:8 89:3 90:4,15 95:6 96:10,14,17 97:15 98:19,22 104:4 105:21 151:14 165:7 174:24 186:25 190:1 191:12,14 191:17,19,22 213:21 223:3 263:13,21 266:13 273:15
**understands** 75:17
**understood** 11:5 13:20 15:13,21 16:15 20:3 26:11 29:24 37:16 44:13 106:15 145:14 149:12 171:23 174:6 183:4 188:10 235:9
**undertake** 205:15
**undertaken** 154:3
**undertaking** 126:17 129:24
**undo** 130:12 203:6
**unhappy** 61:3 65:10
**union** 61:12,20 62:2 159:21,24

**unique** 128:7
**unit** 6:11
**united** 1:2 6:15
**units** 283:20
**university** 11:16 11:22 12:3
**unpack** 152:25 172:3
**unprecedented** 73:22
**unravel** 281:5
**unrelated** 34:18
**unresponsive** 63:1 203:9
**unsecured** 1:14 2:1 7:8 13:8 21:2 79:2 83:6 94:2 105:15 119:10 136:6 162:18 164:3 188:3 189:5,23 192:18 199:8 207:18 209:7
**update** 104:19 270:4
**updated** 162:7 270:25
**updating** 270:21
**upfront** 38:4 173:9
**upset** 52:10
**urgent** 74:24
**use** 4:15 40:7 44:7 45:10 48:11 52:12 53:3 56:25 57:16 58:7 71:25 79:6 89:11 91:8 93:8 111:8 112:12,13 118:22 121:13 121:15,18 122:24 124:3,6 125:4 137:19 139:18 141:13 151:2,6,8 152:13 154:15 172:9 180:21,22 184:21,25 185:7 185:8 186:2,8 202:14,15,20 216:18 217:6 257:4 268:19 270:13,14 272:7 279:22
**used** 51:12 57:14 140:4 147:2 152:23 180:2,10,11,17 181:7 183:8 222:11 224:24 273:8 286:20
**using** 45:5,8 46:9 78:6 86:10 89:10 91:8 93:22 120:23 127:7 130:1 137:14,15,17 153:12 185:16 188:20 202:20 233:20 270:14
**usually** 8:16 73:18 223:25
**usury** 273:7

**v**

**valid** 80:2,10 86:21 192:10 196:9 197:20 203:13 205:10 215:8,9 232:20 233:15 239:6 260:18 262:10 264:21,24
**validity** 85:25 117:18 192:9 193:5 195:25 196:9,12 201:14 203:3 213:7 218:7 233:3 260:5,7,25 261:1 263:24 264:9,15
**valuation** 24:2
**value** 106:25 107:17 177:18 203:1
**various** 49:15
**vehemently** 140:22 141:25
**vehicle** 279:11
**vehicles** 279:18
**vendor** 127:24
**vendors** 58:1
**venue** 246:19 247:2 248:5,12 248:16 249:8,11 249:17,18 251:1 252:5 253:10 263:18
**verbal** 77:7
**verdict** 229:1,18 229:19
**verified** 130:5
**verify** 67:2 96:5 131:7 187:14 286:9
**veritext** 6:19,21 283:21 286:14 286:23
**veritext.com** 286:14
**versions** 68:1
**versus** 25:5 42:21 116:19 133:10 203:1 213:23 214:1
**vested** 76:18
**viable** 172:24,25
**video** 1:19 6:8 6:11 17:23 282:23
**videographer** 3:18 6:1,20 7:24

8:6 66:8,11 135:13,16 178:10,13 212:25 213:3 267:9,12 282:22 283:17
**videotaped** 1:12
**view** 113:21 115:9 142:4,7,7 193:8 237:24
**viewed** 71:11
**village** 147:4
**violation** 273:7
**virtual** 12:20 35:21
**virtually** 6:4 208:6
**visible** 69:5
**vision** 33:11
**vivid** 141:4
**voluntary** 5:9 250:24 251:6
**voted** 204:9

**w**

**wage** 41:25 247:12 248:2
**wages** 151:21,24 162:10,21 166:9 166:18 168:14 247:5,9,20 248:2,7,8,9,14 269:17
**wait** 58:5,5,5 208:4 277:10
**waiting** 54:12 151:3 152:17 264:23
**waiver** 109:9
**waiving** 15:17 16:11
**walk** 164:11 176:15
**walked** 109:9
**walking** 74:13 113:18,21
**walnut** 3:3
**want** 13:2 20:6 20:25 43:12 62:11,12,14,21 63:13,19,25 64:6 65:10 66:16 76:25 79:12 82:5 83:19 99:7 102:7 104:9 106:20 114:16 117:6 120:2 128:12 132:6,14 133:5 134:13 138:6 143:8 146:2,24 148:12 156:19 158:1,1 158:10,14,16 162:22 164:10 170:9 178:17 184:18 186:16 194:23 195:1 200:3 202:20 208:11 217:12 217:15,17 220:2 223:14 225:11 225:20 226:11 228:12 231:24 232:7 234:5 240:19 247:3 256:20 267:1,17 269:20 271:4,10 282:9,11,23
**wanted** 27:13 40:7 56:5,9 71:19 77:15 128:6 137:3,5 172:20 176:17 224:10 252:10 264:8,9 271:7
**wants** 176:3 269:1
**waste** 63:19 128:13 240:20
**wasting** 63:14
**watch** 10:9
**watching** 115:7 181:4
**way** 8:17 21:19 22:6 27:16,24 34:24 37:21 43:20,22 57:11 76:19 80:7 81:14 89:6,13 89:14,19 100:15 108:5 113:18,21 114:7 118:5 130:13 131:8 132:6 146:10 148:8 167:11 174:4,11 177:13 179:16 181:13 184:2 185:4 194:4 197:12 247:21 257:18 269:23
**ways** 279:17
**we've** 19:4 23:10 69:18 91:18 99:23 107:7,13 126:25 128:10 130:21 130:22 219:9
**wear** 134:1
**weaver** 3:18 6:19 178:15 283:1
**website** 9:1
**wednesday** 1:17 6:2 71:3 76:8
**week** 57:3 60:20 71:3 74:20 76:8 90:20 102:25 116:2 127:6 143:9 151:19 161:6,7 180:23 182:2,8 241:1,1 241:2,6

**week's** 241:12
**weekly** 270:23
**weeks** 57:9 103:9 124:21 126:4 143:10 179:19 268:23 268:25
**welch** 44:20
**welcome** 252:16
**went** 11:15 12:2 12:9 21:11,16 24:18 35:20 38:20 42:23 78:13 81:25 84:16 85:11 88:8 91:17 129:21 139:20 140:12 141:4 156:3 159:21 172:18,18 181:12 242:9 244:9,15 245:5 245:5 280:7
**weprin** 3:8
**whatnot** 38:12 48:14 55:19 72:1 77:6 116:25 129:11 181:16 202:10 262:23
**whatsoever** 37:2 150:12
**whichever** 118:15
**white** 280:18,24
**widgets** 58:18
**wind** 3:1 7:20 154:22 176:2 219:5 267:19 269:5 270:7
**window** 147:10
**winter** 114:24
**wire** 91:15,15 91:15 92:21,22 159:25 160:25 224:9 235:19 236:2,3
**wired** 96:11 197:20 202:1,6 202:6
**wires** 87:17,19 87:20,23,25 198:18,19,21 202:15,16 215:22 228:10 235:17,20,22,24 236:7,11,19,21
**wise** 19:6
**withdrawing** 252:11
**withhold** 37:1
**withholdings** 127:11
**witness** 1:23 6:7 7:25 8:5 13:7 59:22 66:6 94:1 112:16 114:16 134:9,11,22 135:4,6,11 149:15 152:23 153:16 165:5 178:9 191:3 195:18 196:14 201:7,17 203:16 204:13 205:4 206:5,7,20 207:6 211:7,22 212:15,23 215:6 229:9,15 231:2 232:9 233:1 239:2 242:14 244:19,23 250:2 251:18 252:15 252:22 254:12 254:18 255:3 256:5,10,15 258:15,20 259:9 259:15 260:14 260:21 261:10 261:20 262:13 263:23 264:3 265:12,19 266:5 266:17 267:6,8 268:6 271:15 273:10 274:14 274:23 275:23 276:2 278:5 279:9 281:3 284:9 286:8,10 286:12,20
**word** 35:8 40:5 44:7 45:10,10 48:12 56:25 58:7 89:11 91:8 122:24 124:3 125:4 139:18 159:11 172:9 180:21,22 198:12 202:14 202:15 233:21 248:10,13 261:20
**words** 31:17 46:9 184:7 225:11 246:25 272:11 277:18
**work** 9:6,7,9 12:9 27:2,25 46:17 55:24 75:7 108:14 136:11 140:4 148:8 155:22 174:8 212:16 221:25 227:25 255:20 256:1,6 256:8,10 259:24 276:15
**worked** 31:4,7 62:18 73:18 120:1 128:2 129:13,13 148:4 148:6 177:13 255:12
**workers** 102:12
**working** 23:5 26:15 31:17

45:13 46:6 51:13 55:9,11 123:20 126:19 130:13 241:7,9 255:21 256:2
**workman's** 175:11
**works** 17:18,19 17:19 46:2,12 255:9
**world** 27:8 47:2 47:2 93:8 115:9
**wrap** 267:4
**wrapping** 42:6
**write** 80:4 133:25 134:1,2 215:25
**writes** 189:15
**writing** 185:8 207:23
**written** 29:5 36:3,9 81:14,14 186:20 201:4 233:24 235:16 265:4 274:23
**wrong** 119:9 134:16 188:2 198:14 205:6 248:4
**wrongful** 56:25
**wrote** 96:15 127:6,14,25 157:10 265:3

**x**

**x** 128:1

**y**

**yeah** 9:9 12:23 14:13,16 15:15 19:8 20:20 22:4 24:9,10 25:5 26:22 30:20 31:17 36:5 37:16 41:16 46:11 49:18,18 49:20 53:5,13 53:13,14 54:2 55:1 68:12 72:14 74:23 76:14 79:9 81:11,12 85:2 93:12,12,15,20 94:15 95:1,1 99:13 103:2,14 107:23,24 108:2 108:7 117:18 122:4 125:11 126:7 127:22 131:13 132:2,2 133:12,19,25 134:15 135:9 137:8 141:13,13 142:11 143:8,8 144:23 146:3,6 147:13,15 148:17 149:18 166:16 168:16 170:18 171:20 174:10,21 176:6 176:8,8,8 177:1 178:9 180:20 185:10,14,21 191:12 193:25 197:2 200:21 208:2 209:13 211:10 212:22 213:15 214:2,5 214:5,8,9,9,25 219:14,17,20 220:2 221:20 225:2 226:9,16 227:1,6,17 237:2 256:1 257:1 259:9 261:20 264:5 266:12 267:6 270:2,18,23 275:25 281:5,15 283:6,8
**year** 25:6 42:19 56:5 86:7 95:11 95:16 219:10,21 239:13 241:12 241:13 243:5,5
**years** 24:17 25:1 25:5 31:8,8 61:14 86:6,8 95:12 102:16,21 116:24 126:23 130:13 196:19 280:21
**yep** 64:18 170:15 199:25 226:17 243:2,20 278:11,14
**yescare** 43:7,23 44:1,6,10 45:11 45:12 46:13,14 48:7,13 49:1,12 51:21 52:3 56:21 77:13 79:18 87:3 92:1 92:1 114:22,23 117:14 141:11 141:18,19 154:2 158:15 161:15 163:16 164:22 165:3,9,12,16 167:16,18,20 168:3 170:19 173:3,9 174:11 174:13,15 188:14,17 193:3 202:8,8 203:25 204:5,17 213:13 223:7,9 228:1 236:14 241:7 242:23 245:15 256:11,13 264:13 273:1
**yescare's** 45:22 251:16,18,21 254:10,25
**yesterday** 14:9 37:4 95:13

120:14 159:22
**yitz** 17:17
**york** 2:10,10 3:9 3:9 10:9 136:4 225:13,21 273:6

**z**

**zalman** 221:14
**zero** 142:25 205:19
**zluticky** 3:2 4:5 7:17,18 59:17 59:19,20 60:1,6 134:19 206:6 218:22,23 219:1 219:3 226:3,13 226:17,18 229:11,16 231:3 232:18 233:13 234:16,24 235:2 235:3 239:8 242:16 244:20 244:25 245:10 245:14,23 246:18,24 247:3 247:6,11,17 248:7,9,12,15 248:18,23 249:2 249:4,19,22 250:4,6,15,21 251:5,8,10,15 251:20 252:1,3 252:13,18,20,22 253:1,4,7,11,17 253:21,23 254:2 254:5,14,21 255:23 256:7,12 256:17 257:2,15 257:16 258:16 259:5,11,17 260:16,21,23 261:15,22 262:5 263:5,16,19,25 264:4 265:15,23 266:8,11,18,23 267:14,21 268:11 273:3,14 274:16 275:2,24 276:8 277:13 278:7,19,24 279:2 280:23 281:4,7,15 282:4,4 283:13
**zoom** 6:18 46:25 86:1
**zooms** 137:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.